Mark C. Holscher (SBN 139582)
mark.holscher@kirkland.com
Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

*Attorneys for Defendants*
*Aerojet Rocketdyne Holdings, Inc. and*
*Aerojet Rocketdyne, Inc.*

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. BRIAN MARKUS, individually,<br><br>                    Relator,<br><br>         vs.<br><br>AEROJET ROCKETDYNE HOLDINGS, INC., a corporation and AEROJET ROCKETDYNE, INC., a corporation,<br><br>                    Defendants. | Case No. 2:15-cv-02245-WBS-AC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEMORANDUM IN SUPPORT**<br><br>SAC Filed:        Jan. 4, 2019<br><br>Judge:            Hon. William B. Shubb<br>Hearing Date:     May 6, 2019<br>Time:             1:30 p.m.<br>Courtroom:        5 |

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 1:30 p.m. on May 6, 2019, or as soon thereafter as the matter may be heard, before the Honorable William B. Shubb, United States District Judge for the Eastern District of California, Defendants Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc. (together, "Aerojet Rocketdyne"), will and hereby do move to stay proceedings and compel arbitration of counts four, five, and six of Relator's Second Amended Complaint and to dismiss counts one, two, and three of Relator's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Ashley Neglia, Defendants' Request for Judicial Notice, the papers on file in this matter, the arguments of counsel, and any other matter this Court wishes to consider.

DATED:  February 22, 2019                Respectfully submitted,

KIRKLAND & ELLIS, LLP

/s/ *Mark Holscher*
Mark C. Holscher (SBN 139582)
mark.holscher@kirkland.com
Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

*Attorneys for Defendants*
*Aerojet Rocketdyne Holdings, Inc. and*
*Aerojet Rocketdyne, Inc.*

# <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................3

    A.    Aerojet Rocketdyne Provides the Government with Vital Propulsion Systems for the Aerospace and Defense Sectors. ....................................................3

    B.    The Government Implements a Whipsawed Approach to Regulating Cybersecurity with Government Contractors. ........................................................4

    C.    Aerojet Rocketdyne Assesses Its Compliance and Discloses Its Status to the Government; the Government Tells Aerojet Rocketdyne That it Is Likely Compliant...................................................................................................8

    D.    Relator's Tenure with Aerojet Rocketdyne. .........................................................10

    E.    Relator Files a Lawsuit Devoid of Specific Allegations; the Government Investigates and Declines to Intervene. ...............................................................12

III.  LEGAL STANDARD............................................................................................14

    A.    The Motion to Compel Arbitration. ......................................................................14

    B.    The Motion to Dismiss...........................................................................................14

IV.   ARGUMENT .......................................................................................................15

    A.    Relator's Employment-Based Claims Must Be Arbitrated....................................15

    B.    Relator Fails to State a Cognizable Legal Theory for His Claims Under the Federal False Claims Act Because He Cannot Meet the Stringent Materiality Standard Set Forth in the Supreme Court's *Escobar* Decision.............................17

    C.    Relator's Conspiracy Claim Fails as a Matter of Law Under the Intracorporate Conspiracy Doctrine. ..........................................................................................21

V.    CONCLUSION.....................................................................................................22

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................14

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
  475 U.S. 643 (1986) ..................................................................................................16

*Balistreri v. Pacifica Police Dep't,*
  901 F.2d 696 (9th Cir. 1990) ....................................................................................15

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................................14

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,*
  637 F.3d 1047 (9th Cir. 2011) ..................................................................................15

*U.S. ex rel. Campie v. Gilead Scis., Inc.,*
  No. C-11-0941 EMC, 2015 WL 106255 (N.D. Cal. Jan. 7, 2015) ............................22

*Cox v. Ocean View Hotel Corp.,*
  533 F.3d 1114 (9th Cir. 2008) ..................................................................................15

*Dean Witter Reynolds, Inc. v. Byrd,*
  470 U.S. 213 (1985) ..................................................................................................15

*U.S. ex rel. Fisher v. IASIS Healthcare LLC,*
  No. CV-15-00872-PHX-JJT, 2016 WL 6610675
  (D. Ariz. Nov. 9, 2016) .............................................................................................22

*Gilmer v. Interstate/Johnson Lane Corp.,*
  500 U.S. 20 (1991) ....................................................................................................17

*U.S. ex rel. Hendow v. Univ. of Phoenix,*
  461 F.3d 1166 (9th Cir. 2006) ..................................................................................17

*Herndon v. Sci. Applications Int'l Corp.,*
  No. 05CV2269-BEN (RBB), 2007 WL 2019653
  (S.D. Cal. July 10, 2007) ..........................................................................................15

*Hoefer v. Fluor Daniel, Inc.,*
  92 F. Supp. 2d 1055 (C.D. Cal. 2000) ......................................................................22

*Hooper v. Lockheed Martin Corp.,*
  688 F.3d 1037 (9th Cir. 2012) ..................................................................................21

ii

*U.S. ex rel. Hopper v. Anton*,
  91 F.3d 1261 (9th Cir. 1996) ...........................................................................18

*Junius Constr. Corp. v. Cohen*,
  257 N.Y. 393 (1931) ........................................................................................21

*U.S. ex rel. Kelly v. Serco, Inc.*,
  846 F.3d 325 (9th Cir. 2017) .............................................................18, 19, 20

*Knudsen v. Sprint Commc'ns Co.*,
  No. C13-04476 CRB, 2016 WL 4548924 (N.D. Cal. Sept. 1, 2016) ...............19, 20

*U.S. ex rel. Lupo v. Quality Assurance Servs., Inc.*,
  242 F. Supp. 3d 1020 (S.D. Cal. 2017) ...........................................................22

*U.S. ex rel. Mateski v. Raytheon Co.*,
  No. 2:06-CV-03614-ODW(KSx), 2017 WL 3326452
  (C.D. Cal. Aug. 3, 2017) ............................................................................18, 19

*Mikes v. Strauss*,
  889 F. Supp. 746 (S.D.N.Y. 1995) ..................................................................16

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ......................................................................................14, 16

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967) ........................................................................................14

*Reddy v. Litton Indus., Inc.*,
  912 F.2d 291 (9th Cir. 1990) ...........................................................................21

*United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*,
  46 F. App'x 412 (9th Cir. 2002) .........................................................................1

*United States v. Scan Health Plan*,
  No. CV09-5013-JFW, 2017 WL 4564722 (C.D. Cal. Oct. 5, 2017) ...........................19

*United States v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) .........................................................................14

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
  136 S. Ct. 1989 (2016) ............................................................................. *passim*

*U.S. ex rel. Welch v. My Left Foot Children's Therapy, LLC*,
  871 F.3d 791 (9th Cir. 2017) ...........................................................................16

*Williams v. Wash. Mut. Bank*, Civil Action
  No. 07-5559 (JAG), 2008 WL 5427805
  (D.N.J. Dec. 30, 2008) .....................................................................................14

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

**Statutes**

9 U.S.C. § 2 ..................................................................................................................14

9 U.S.C. § 3 ...........................................................................................................14, 17

9 U.S.C. § 4 ...........................................................................................................14, 15

31 U.S.C. § 3729 .........................................................................................13, 17, 18, 21

31 U.S.C. § 3730(h) ...............................................................................................13, 15

**Rules**

Fed. R. Civ. P. 8 ..........................................................................................................15

Fed. R. Civ. P. 9(b) .....................................................................................................15

Fed. R. Civ. P. 12(b)(6) .....................................................................................10, 15, 22

**Other Authorities**

48 C.F.R. 252.204-7012(b) (effective Nov. 18, 2013) ....................................................4, 5

48 C.F.R. 252.204-7012(b)(1)(ii)(A) (effective Dec. 30, 2015) ............................................6

48 C.F.R. 252.204-7012(b)(1)(ii)(B) (effective August 26, 2015) ....................................5, 6

48 C.F.R. 252.204-7012(b)(2)(ii)(A) (effective October 21, 2016) ......................................6

48 C.F.R. 1852.204-76 (effective Jan. 24, 2011) ...............................................................4

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Aerojet Rocketdyne is an aerospace and defense contractor world-recognized for its propulsion, missile defense, and tactical systems. Relator, Mr. Brian Markus ("Relator") is Aerojet Rocketdyne's former Director of Cybersecurity. On October 29, 2015, Relator filed a complaint under seal in this Court. Relator alleged that Aerojet Rocketdyne misrepresented its compliance with DoD and NASA cybersecurity regulations to its government customers in violation of the Federal False Claims Act ("FCA"), and wrongfully terminated Relator in retaliation for his internal complaints about the truthfulness of Aerojet Rocketdyne's communications to the Government regarding its assessment of its cybersecurity compliance status. On September 13, 2017, Relator filed a First Amended Complaint ("FAC"). Defendants moved to dismiss the FAC and compel arbitration arguing that Relator had ignored a mandatory arbitration provision that requires him to arbitrate his employment claims. Moreover, his FCA claims as pled were subject to dismissal because they completely failed to plausibly state facts with the particularity required to support a cognizable legal theory of fraud.

Instead of opposing Defendants' motion to dismiss, Relator filed a Second Amended Complaint ("SAC") on January 4, 2019 in an attempt to plead around the deficiencies in his FAC. (Dkt. 42.) The SAC, however, is still woefully deficient for several reasons.

***First***, Relator cannot plead around the fact that his employment claims are subject to arbitration. In fact, it is undisputed that Relator signed a broadly-worded arbitration agreement as part of his employment agreement with Aerojet Rocketdyne. Under the agreement, Relator is required to arbitrate *all* disputes between Relator and Aerojet Rocketdyne—including his employment claims in this action. Under binding Ninth Circuit precedent, Relator cannot avoid arbitration of Counts Four through Six of the SAC against Aerjoet under this very broad arbitration provision by also alleging certain non-arbitrable claims under the FCA. *See United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002). It will be for an arbitrator, and not this Court, to adjudicate Relator's employment claims. Regardless, Relator's employment claims will fail. Aerojet Rocketdyne eliminated Relator's position as part of a Company-wide Competitive

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

Improvement Plan ("CIP") initiated six months before Relator's September 2015 complaints, for which he falsely claims he suffered retaliation. This plan involved a reduction in force that included a reduction of the IT Organization, which began **four months before** Relator submitted any complaints to the Company about its cybersecurity posture. The Company opted in 2015 to outsource its entire cybersecurity function to a third party, and this decision pre-dated and was unrelated to Relator's complaints.

*Second*, Relator's FCA allegations still fail as a matter of law. Relator's FCA claims fail because Relator cannot meet his burden on plausibly alleging materiality, as required by *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016). The SAC does nothing to change this reality. In fact, as Relator admits in his SAC, Aerojet Rocketdyne disclosed its compliance status to its Government customers, including to senior-ranking officials within the office of the Department of Defense's Chief Information Officer. After these disclosures, the Government took the position that although it understood Aerojet to be disclosing that it was *not* fully compliant with cybersecurity provisions of the DFARS, Aerojet Rocketdyne's cybersecurity was likely sufficient and continued to execute numerous contracts with Aerojet Rocketdyne. Moreover, here, Aerojet Rocketdyne's work on propulsion and weapons systems is wholly unrelated to cybersecurity.

Additionally, for years the Government has known that the defense industry was overwhelmingly non-compliant with these onerous new cybersecurity regulations, and the Government's response was to amend the regulations *multiple times* to make compliance easier, ultimately substantially relaxing the regulations to the point where full compliance with all of the enumerated controls is not required. For years, the Government was also aware of Aerojet Rocketdyne's inability to comply with the new cybersecurity regulations, as the Company affirmatively disclosed the challenges it, along with the rest of the defense industry, was facing with compliance. The Government's response to Aerojet was to advise the Company that its cybersecurity programs were sufficient and to pay Aerojet Rocketdyne for the numerous contracts it performed after the institution of cybersecurity regulations.      Under these circumstances, Relator cannot possibly meet his burden under Rules 9(b) and 8(a) to plausibly allege with specificity that this

2

cybersecurity regulation, incorporated into contracts unrelated to cybersecurity, was material to Aerojet Rocketdyne's government customers. It is also worth noting that the Department of Justice declined to intervene in this case following a comprehensive, multi-agency investigation spanning eighteen months, further undermining the proposition that compliance was material to the Government.

**Third,** Relator's remaining claim for conspiracy between Aerojet Rocketdyne Holdings, Inc. and its wholly owned subsidiary, Aerojet Rocketdyne, Inc., is barred as a matter of law under the intracorporate conspiracy doctrine. Relator's attempt to save this claim by alleging that Defendants' officers and directors participated in this alleged conspiracy ignores the law, which bars such claims.

## II. BACKGROUND

### A. Aerojet Rocketdyne Provides the Government with Vital Propulsion Systems for the Aerospace and Defense Sectors.

Aerojet Rocketdyne is a world-recognized, technology-based engineering and manufacturing company that develops and produces specialized propulsion and armament systems for space, defense, civil, and commercial applications. (SAC ¶ 7.) Aerojet Rocketdyne's primary aerospace and defense customers include the Department of Defense ("DoD") and its agencies, the National Aeronautics & Space Administration ("NASA"), and the prime contractors such as Boeing and Raytheon that supply products to these customers. (*See id.* ¶¶ 7, 126) For years, these customers have trusted Aerojet Rocketdyne to provide critical products such as the RS-68 booster engine for the Delta launch vehicle, (RJN ¶ 1, Ex. A), and the RS-25 engine, one of the most tested large rocket engines in history. (RJN ¶ 2, Ex. B.) Over thirty-four years, Aerojet Rocketdyne has designed, built, tested, and delivered every main engine used to power NASA's space shuttles into orbit, without a single mission failure due to engine malfunction across 135 missions. (RJN ¶ 3, Ex. C.) Between 2013 and 2016, Aerojet Rocketdyne's sales to these customers totaled between approximately $1.3 and $1.7 billion a year, representing scores of contracts across numerous product lines and programs. (RJN ¶ 4, Ex. D at 22, 23.)

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

**B.**     **The Government Implements a Whipsawed Approach to Regulating Cybersecurity with Government Contractors.**

In November of 2013, the DoD issued final rule DFARS 252.204-7012 (the "DFARS Clause"), aimed at securing government information housed on defense contractors' information technology systems from cyber threats. C.F.R. 252.204-7012(b) (effective Nov. 18, 2013). This rule, and the amendments that followed, are at the heart of Relator's FCA allegations.[1] As described below, the rule resulted in a regulatory scheme that has proven difficult (and in some cases impossible) for contractors and subcontractors, including Aerojet Rocketdyne, to implement. In fact, in direct response to open dialogue with the defense contracting industry, the DoD has revised the DFARS Clause (and the cybersecurity standards the Clause incorporates) multiple times, eventually allowing for less than full compliance with its technical requirements.

**1.**     In November 2013, the DoD Issues New Rules on Cybersecurity.

On November 18, 2013, the DoD issued a final rule, DFARS 252.204-7012, which imposed requirements on defense contractors to safeguard Unclassified Controlled Technical Information ("UCTI") from cybersecurity threats.[2] (SAC ¶ 13); C.F.R. 252.204-7012(b) (effective Nov. 18, 2013). Specifically, the rule incorporated a number of controls from National Institute of Standards and Technology Special Publication 800-53 ("NIS TSP 800-53"), "Security and Privacy Controls for Federal Information Systems and Organizations." C.F.R. 252.204-7012(b) (effective Nov. 18, 2013). The rule required defense contractors to implement fifty-one controls covering fourteen areas of cybersecurity. *Id.* at Table 1. Under the rule, contractors could submit a written explanation to Contracting Officers explaining how the company had alternative methods for achieving protection

---

[1] Relator also alleges that Aerojet Rocketdyne "fraudulently entered subcontracts with prime contractors" that required compliance with the cybersecurity requirements of the "NASA FARS." (SAC ¶ 31.) The NASA FARS, or NFARS, required compliance with NIST 800-53. *See*, *e.g.*, 48 C.F.R. 1852.204-76 (effective Jan. 24, 2011).

[2] UCTI includes "technical information with military or space application that is subject to controls on the access, use, reproduction, modification, performance, display, release, disclosure, or dissemination." Examples of this information include, "research and engineering data, engineering drawings, and associated lists, specifications, standards, process sheets, manuals, technical reports, technical orders, catalog-item identifications, data sets, studies and analyses and related information." (*See* RJN ¶ 5, Ex. E. (National Archives explanation of CUI, available at https://www.archives.gov/cui/registry/category-detail/controlled-technical-info.html).)

4

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

equivalent to the NIST standards, or otherwise explain why the standards were inapplicable. *See id.* at 252.204-7012(b).[3] After November 2013, this Clause began appearing in new agreements that the government had with its contractors. (SAC ¶ 16.) As its title suggests, NIST 800-53 was drafted specifically for the *federal government's* information technology systems. (*See* SAC ¶ 20; RJN ¶ 6, Ex. F at ii.) As a result, the Government has since agreed that the NIST 800-53 guidance regarding implementation of the identified control standards is too specific to be generally applicable to the defense industry as a whole, and is essentially impossible for private defense contractors to comply. (*See* RJN ¶ 24, Ex. X at 19.) Acknowledging that contractors and subcontractors would be unable to comply with the strict application requirements contained in NIST 800-53, in June of 2015, the DoD and NIST published a new set of standards specifically tailored to non-federal systems, NIST Special Publication 800-171 ("NIST 800-171"), "Protecting Controlled Unclassified Information in Nonfederal Information Systems and Organizations." (*See* RJN ¶ 8, Ex. H.)

> 2.   The Government Issues an Interim Rule in August 2015 Rendering Immediate Compliance with DFARS 252.204-7012 Effectively Impossible.

In August 2015, the DoD issued an interim rule—absent any preceding proposed rule and without soliciting comments from the defense industry—which modified and significantly expanded the Government's cybersecurity requirements for contractor and subcontractor information systems. *See* 48 C.F.R. 252.204-7012(b)(1)(ii)(B) (effective August 26, 2015). The interim rule established a new set of baseline security controls for contractors' covered information systems and broadened the scope of protected material to include Covered Defense Information ("CDI"). *Id.* Specifically, the interim rule abandoned reliance on the fifty-one NIST 800-53 cybersecurity controls, and instead incorporated the 109 cybersecurity controls contained in the new NIST 800-171. *Id.* Although the interim rule still allowed contractors to propose alternative methods for achieving equivalent protection, it required that such alternative measures be "approved in writing by an authorized representative of the DoD CIO prior to contract award." *Id.* The interim rule also significantly expanded the scope of information that must be safeguarded under the rule, thereby further widening

---

[3] Beginning with the August 2015 revision to the rule, these explanations had to be "approved in writing by an authorized representative of the DoD CIO [Chief Information Officer]." 48 C.F.R. 252.204-7012(b)(1)(ii)(B) (effective August 26, 2015).

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

the application of the expanded set of requirements across contractors' and subcontractors' systems. Without warning, the Government required immediate compliance for all contracts that included the Clause subsequent to August 2015. *Id*.

        3.      The Government Issues an Extension for Compliance and Then Abandons the Requirement of Full Technical Compliance.

     The negative response to the August 2015 revision of the DFARS Clause from the defense industry was overwhelming. The industry as a whole strongly objected to the immediate implementation of these onerous cybersecurity requirements being imposed upon it. (*See, e.g.*, RJN ¶¶ 9–10, Exs. I & J.)  In response to the wave of comments received from the defense industry, in December 2015, the DoD amended the DFARS Clause yet again, this time to allow contractors until January 1, 2018 to have compliant or equally effective alternative controls in place. *See* 48 C.F.R. 252.204-7012(b)(1)(ii)(A) (effective Dec. 30, 2015)[4]; (RJN ¶ 11, Ex. K.)

     Amidst continuing concerns that contractors would not be able to comply with even this extended deadline, in December 2016, NIST, in collaboration with senior officials supporting the DoD's CIO, published a revised version of NIST 800-171. NIST 800-171 Revision 1 ("Revision 1") in essence entirely rolled back any requirement for defense contractors and subcontractors to be fully technically compliant with all of the 109 NIST 800-171 standards. Instead, Revision 1 allows contractors to achieve compliance with its cybersecurity requirements through the use of documented System Security Plans ("SSPs") and Plans of Action and Milestones ("POAMs"). (RJN ¶ 12, Ex. L at Rev. 1, Ch. 3, Security Reqs. 3.12.4, 3.12.2.)[5] As a practical matter, Revision 1 allows contractors to be "compliant" with the rule as long as they have a written plan of action setting forth how they will achieve technical compliance at some point in the future. Additionally, nothing in the

---

[4] The imposition of this deadline was confirmed when DoD finalized the rule in October 2016. *See* 48 C.F.R. 252.204-7012(b)(2)(ii)(A) (effective October 21, 2016).

[5] Moreover, rather than issuing guidance prohibiting government procurement officials from entering into contracts with contractors and subcontractors who are relying on SSPs and POAMs, Revision 1, instead, grants federal agencies the discretion to consider contractors' SSPs and POAMs when deciding whether to store or transmit CDI on a system hosted by a nonfederal organization and whether to contract with that contractor. (*See id*. at 9.)

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

rule requires that these plans be reviewed or approved in advance of contractors accepting contracts with the DFARS clause.

Relying on Revision 1, the DoD has issued multiple policy statements to both the defense industry and government procurement officials confirming that Revision 1 enables nonfederal organizations to demonstrate implementation of NIST 800-171 by simply documenting an SSP and associated POAMs and clarifying that federal agencies may accept this documentation as evidence of compliance with the DFARS Clause. For example, the DoD has made the following statements regarding Revision 1's application to DoD contractors:

- "The system security plan and any associated plans of action for any planned implementations or mitigations demonstrate implementation or planned implementation of the security requirements in NIST SP 800-171." (RJN ¶ 13, Ex. M at 17.)

- "The contractor may then address any residual issues, e.g., security requirement implementations in progress, through 'plans of action' (as described in security requirement 3.12.2 noted above) in the contractor's equivalent of a system security plan. The 'system security plan' is addressed in NIST 800-171 as 'expected to be routinely satisfied by nonfederal organizations without specification' as part of an overall of a risk-based information security program." (RJN ¶ 14, Ex. N at 19.)

        4.     <u>The DoD No Longer Seeks to Hold the Defense Industry Accountable to Earlier Versions of the DFARS Clause.</u>

The DoD has acknowledged that its multiple changes to the DFARS Clause has in some cases left contractors in a position where they are performing under contracts that incorporate the earlier, problematic versions of the DFARS Clause. (RJN ¶ 24, Ex. X at 19 (noting how 800-53 was "[o]verly granular and difficult to apply," and "should not apply outside the US Government").) Indeed, even NIST itself objected to the use of selected 800-53 controls in the DFARS Clause. (*Id*.) To remedy this, the DoD has repeatedly advised, including in a formal policy statement released on September 21, 2017, both contracting officers and contractors to work together to reach an agreement ***modifying all existing contracts so that they implement the latest version of the DFARS Clause and NIST 800-171 Revision 1***. (*See, e.g.*, RJN ¶ 15, Ex. O at 3 ("DoD guidance is for

contracting officers to work with contractors who request assistance in the consistent implementation

of the latest version of DFARS Clause 252.204-7012 and NIST SP 800-171, Revision 1").)

### C. Aerojet Rocketdyne Assesses Its Compliance and Discloses Its Status to the Government; the Government Tells Aerojet Rocketdyne That it Is Likely Compliant.

As the Government began rolling out cybersecurity rules, Aerojet Rocketdyne, in early 2014,

engaged an outside consulting firm, Emagined Security, Inc. ("Emagined") to conduct an assessment

of Aerojet Rocketdyne's compliance with the rule. (SAC ¶ 43.) Based on Emagined's assessment

that Aerojet Rocketdyne was less than fully compliant, Aerojet Rocketdyne created a cybersecurity

task force, including Relator, to address the Company's cybersecurity compliance. The task force

was aimed at achieving compliance with the new rule and providing Aerojet Rocketdyne's

customers with the most up-to-date information on the Company's compliance status. Aerojet

Rocketdyne also began disclosing its compliance status to its customers in the form of disclosure

statements. (*See, e.g.*, SAC ¶ 59; RJN ¶ 25, Ex. Y.) These disclosure statements, created with

information Relator and his department provided to Aerojet Rocketdyne, put the government on

notice that Aerojet Rocketdyne was not fully compliant with the cybersecurity controls required

pursuant to DFARS Clause 252.204-7012, but was working to come into compliance, and that it

would provide the Government with updates on the status of its progress:

> It is important to note that AR is compliant with the majority of the clause's requirements.  Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures.  AR has developed a phased approach to address the necessary controls. AR will provide quarterly status reports to the Government to document our progress.

(RJN ¶ 25, Ex. Y at 2.) Aerojet Rocketdyne went on to provide a detailed control matrix identifying

each of the subset of NIST 800-53 controls required by DFARS Clause 252.204-7012 (*see* C.F.R.

252.204-7012(b) (effective Nov. 18, 2013)), along with the anticipated phase of work during which

the Company would address each control for which it was not fully compliant. (RJN ¶ 25, Ex. Y at

3–7.)

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

1    In response to one of these disclosures, Vicki Michetti, Deputy Director of the

2    Cybersecurity/Information Assurance Program at the DoD CIO, and one of the individuals

3    responsible for reviewing contractors' proposed alternative controls, drafted a detailed response to

4    Aerojet Rocketdyne's disclosure letter. Ms. Michetti made several statements acknowledging that it

5    understood Aerojet Rocketdyne to be representing that it was *not* compliant with the rule. However,

6    the DoD CIO stated that Aerojet Rocketdyne was compliant or likely closer to compliant than it had

7    represented:

8    Thank you for your query.  Based on the documentation provided by the
     contractor, we determined that they are not compliant with the DFARS Clause
9    252.204-7012.  However, it may be a relatively simple matter for the
     contractor to become compliant.  We believe the best way to address this is
10   via teleconference with your office, the contractor's IT/cybersecurity
     person, our office and, if possible, someone from the Requiring Activity
11   (Precision Fires Rocket and Missile Systems).  My memo (dated 2 April)
     identified some of the difficulties we had in interpreting the information
12   the contractor provided (see notes below).  A conversation with the
     contractor may serve to clear any questions we have.  It is possible that
13   they are compliant but they are either not fully describing what they are
     doing, or are misinterpreting the requirements.
14

15   (RJN ¶ 26, Ex. Z.) Ms. Michetti went on to acknowledge that even though she understood Aerojet

16   Rocketdyne was disclosing that it believed it was not compliant with cybersecurity requirements, she

17   could not understand why Aerojet Rocketdyne could not be compliant, given that the controls are not

18   "particularly hard" to implement:

19   complete).  The contractor never states in his letter that he is now
     compliant and based on his description of the status as "partial controls
20   are in place" we have to assume that he is still not in compliance.  That
     said, we do not understand why he can't be in compliance - these are not
21   particularly hard to do and he seems to have done most of what is required.

22   (*Id*. at 2.) Additionally, with respect to specific controls, Ms. Michetti concluded that Aerojet

23   Rocketdyne was compliant in certain areas where it had concluded it was not. For example:

24

25   AC-22, Publicly Accessible Content: as noted in our memo, this control is adequately described in the
     'controls in place' field and appears compliant (though the status column says 'partial controls in place').

26

27

28

9

DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL
ARBITRATION; MEM. IN SUPP.

(*Id*. at 1.) And:

> selection of other security controls, organizations define each type of cryptographic use and the type of cryptography required (e.g., protection of classified information: NSA-approved cryptography; provision of digital signatures: FIPS-validated cryptography)." ==Assuming they have something in place where cryptography is required, as is at least partially described in SC-8, they are probably compliant if they have described what's to be used when and then do it (as is implied by the partial description for SC-8).==

(*Id*.) In a face-to-face meeting between Aerojet Rocketdyne and the DoD CIO's office on June 30, 2015, the Government reiterated its position that Aerojet Rocketdyne was likely compliant. Despite the Government's representations, Aerojet Rocketdyne did not certify that it had achieved full technical compliance to its customers and continued to disclose its progress with additional updates on its cybersecurity status. As contractors industry-wide had voiced in public comments to the DoD, industry did not perceive full, technical compliance with the DFARS to be as simple as the DoD CIO's office implied it was in its communications to Aerojet Rocketdyne. (*See* RJN ¶ 12, Ex. I.)

### D.   Relator's Tenure with Aerojet Rocketdyne.

Among this ever-shifting cybersecurity landscape, on June 30, 2014, Aerojet Rocketdyne hired Relator to serve as the senior director of Cyber Security, Compliance, and Controls. (SAC ¶ 6.) During his onboarding, Relator signed a Mutual Agreement to Arbitrate Claims as part of the terms of his employment with Aerojet Rocketdyne. (Decl. of Ashley Neglia ("Neglia Decl.") ¶ 2, Ex. 1.)[6] The Arbitration Agreement, which is expressly governed by the Federal Arbitration Act, provides that:

> The Company and I mutually consent to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, ***whether or not arising out of my employment (or its termination),*** that the Company may have against me or that I (and no other party) may have against any of the following (1) the Company, (2) its officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary and affiliated entities, (4) the Company's benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates and agents, and/or (5) all successors and assigns of any of them.

---

[6] The Neglia Declaration and accompanying exhibits support Aerojet Rocketdyne's Motion to Stay Proceedings and Compel Arbitration. Aerojet Rocketdyne's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is based solely on the inadequacy of the pleading and documents associated with Aerojet Rocketdyne's Request For Judicial Notice.

10

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

1    (*Id*. at 1 (emphasis added).) On the last page of the Arbitration Agreement, in bold, capitalized

2    letters, the Arbitration Agreement states:

3

> I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, THAT I
> UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS
> BETWEEN THE COMPANY AND ME RELATING TO THE SUBJECTS COVERED IN THE
> AGREEMENT ARE CONTAINED IN IT, AND THAT I HAVE ENTERED INTO THE
> AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR
> REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS
> AGREEMENT ITSELF.
>
> I UNDERSTAND THAT BY SIGNING THIS AGREEMENT I AM GIVING UP MY RIGHT TO
> A JURY TRIAL.
>
> I FURTHER ACKNOWLEDGE THAT I HAVE BEEN GIVEN THE OPPORTUNITY TO
> DISCUSS THIS AGREEMENT WITH MY PRIVATE LEGAL COUNSEL AND HAVE
> AVAILED MYSELF OF THAT OPPORTUNITY TO THE EXTENT I WISH TO DO SO.

11   (*Id*. at 5.) Relator executed the Arbitration Agreement on May 21, 2014. (*Id*.)

12           After Aerojet Rocketdyne hired Relator, two relevant sets of events occurred. First, in

13   March 2015—nine months after Relator joined the Company—Aerojet Rocketdyne instituted a

14   Competitive Improvement Plan ("CIP") with the goal of achieving significant, critical cost

15   reductions across the Company. (Neglia Decl. ¶ 4, Ex. 2 at 9.) Importantly, as part of the CIP,

16   Aerojet Rocketdyne decided to drastically reduce its IT budget by cutting its costs in half by 2019.

17   (*Id.* ¶ 5, Ex. 3 at 3.) By mid-2015, Aerojet Rocketdyne conclusively made the decision to outsource

18   its IT functions, including cybersecurity.

19           Second, around this same time, Aerojet Rocketdyne was communicating with the DoD CIO's

20   Office about Aerojet Rocketdyne's cybersecurity compliance posture. Of critical importance, the

21   Relator did not participate in these communications and was apparently unaware of the contents of

22   these discussions. However, Relator was working to "improve the cyber security" of Aerojet

23   Rocketdyne's computer systems (SAC ¶ 32) and was a member of the task force Aerojet Rocketdyne

24   instituted to assess its cybersecurity compliance status and communicate that status accurately to its

25   customers.

26            Immediately following the May and June 2015 communications between Aerojet

27   Rocketdyne and the DoD CIO's Office (*see supra* Section II.C.), Aerojet Rocketdyne's Chief

28   Operating Officer, Mark Tucker, had a meeting with then Chief Information Officer, Jose Ruiz, and

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL
ARBITRATION; MEM. IN SUPP.**

Relator. (SAC ¶ 81.) Based on the Government's representations that Aerojet Rocketdyne was likely compliant or close to compliant, Mr. Tucker questioned whether Aerojet Rocketdyne's IT department could certify compliance with the DFARS. (*Id*. ¶ 82.) Relator disagreed that Aerojet Rocketdyne was compliant with DFARS requirements. Shortly thereafter, Relator apparently filed an anonymous complaint with Aerojet Rocketdyne's Ethics Hotline. Relator also contacted Aerojet Rocketdyne's in-house counsel expressing his concerns that Aerojet Rocketdyne could not certify compliance with the DFARS given its current cybersecurity posture. (*Id.* ¶ 49.). Relator's concern was unnecessary, however, because Aerojet Rocketdyne did not certify compliance to its customers.

On September 14, 2015, Relator was laid off as part of the reduction in force plan contemplated under the CIP, which had been set in motion months before Relator had filed any complaints with the Company. (Neglia Decl. ¶ 5, Ex. 4 ("Based on the volume of services maintained in the Cyber Security organization and the reliance on outsourcing to perform the actions required by Cyber Security, it does not support having a Senior Director of Cyber Security"); *Id.* ¶ 6, Ex. 4 (stating that Relator had been "selected for layoff" as a result of accelerated outsourcing initiatives).) Relator claims that his layoff was precipitated by his complaints to the Company. (SAC ¶¶ 146, 160.) In fact, 100 employees in the IT organization ultimately lost their positions as part of the CIP.

### E.   Relator Files a Lawsuit Devoid of Specific Allegations; the Government Investigates and Declines to Intervene.

Relator filed his initial Complaint in this action on October 29, 2015. (Dkt. No. 1.) Thereafter, the Government issued a Civil Investigative Demand ("CID") to Aerojet Rocketdyne requesting a broad swath of information related to Aerojet Rocketdyne's cybersecurity compliance and communications with government agencies and prime contractors. (RJN ¶ 16, Ex. P.) The investigation covered Aerojet Rocketdyne's programs with all of Aerojet Rocketdyne's customers, including NASA, the Air Force, the Army, the Missile Defense Agency, and prime contractors. For example, the CID requested that Aerojet Rocketdyne produce all documents "constituting or relating to communications between Aerojet and any federal agency . . . relating to the status of Aerojet's compliance with DFARS 252.204-7008 and 252.204-7012; NIST SP 800-53; and, NIST SP

12

800-171." (*Id.* at 3.) The Government's investigation went even further, requesting copious information from auditing firm, Ernst & Young, which Aerojet Rocketdyne had engaged to audit Aerojet Rocketdyne's cybersecurity systems in 2014 and 2015 (RJN ¶ 17, Ex. Q), and issuing a CID to Emagined (*Id.* ¶ 18, Ex. R). The Department of Justice, along with all potentially affected agencies, participated in the investigation. After conducting a lengthy and thorough investigation, the Government declined to intervene on June 5, 2018. (Dkt. 25.)

Relator filed the FAC on September 13, 2017. (Dkt. 22.) Defendants filed a motion to dismiss the FAC on December 14, 2018. (Dkt. 39.)  In response to Defendants' motion to dismiss the FAC, Relator then filed the SAC on January 4, 2018, alleging the same six claims as the FAC. (Dkt. 42.) Counts one and two allege violations of the Federal False Claims Act. Count one alleges Promissory Fraud in violation of 31 U.S.C. § 3729(a)(1)(A). Count two alleges False or Fraudulent Statement or Record in violation of 31 U.S.C. § 3729(a)(1)(B). Relator's FCA allegations are easily summarized: Aerojet Rocketdyne entered into "multiple contracts with the federal government . . . which required that defendants meet the cyber security standards set forth in the DFARS Clause 252.704-7012 and NASA FARS Clause 1852.204-76 . . . ." (SAC ¶ 29.) Relator alleges that by signing contracts including these requirements, Aerojet Rocketdyne "falsely represent[ed] that they were compliant" with the provisions. (*Id.* ¶¶ 124, 136.)[7]

Counts four, five, and six allege various employment-based claims against Aerojet Rocketdyne. Count four alleges Retaliation in Violation of 31 U.S.C. § 3730(h). (*Id.* ¶¶ 145–47.) Relator alleges that as a result of his complaints to Aerojet Rocketdyne regarding communications with Company executive, Mark Tucker, about cybersecurity compliance, Relator was terminated in violation of FCA whistleblower protections. (*Id.* ¶ 146.) Count five alleges Misrepresentation in Violation of California Labor Code § 970. (*Id.* ¶¶ 148–157.) Relator alleges that Aerojet Rocketdyne misrepresented the budget and staff that he would be afforded as director of cybersecurity (*Id.* ¶¶ 152–53), and that Aerojet Rocketdyne falsely represented that he would have "full authority to implement changes to the computer system that were needed to make the systems compliant with

---

[7] Count three of the SAC alleges that the Aerojet Rocketdyne entities conspired to submit false claims in violation of 31 U.S.C. § 3729(a)(1)(C). (*Id.* ¶¶ 143-144.)

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

cyber security regulations" (*Id.* ¶ 154.) Finally, count six alleges Wrongful Termination in Violation of Public Policy based on the same operative facts as those alleged in count four. (*Id.* ¶¶ 158–164.)

## III. LEGAL STANDARD

### A. The Motion to Compel Arbitration.

The Federal Arbitration Act (the "FAA") reflects a strong policy favoring arbitration of disputes, requiring liberal enforcement of arbitration provisions governed by the FAA. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (stating that the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements"). When a plaintiff sues "upon any issue referable to arbitration under an agreement in writing for such arbitration," the FAA requires courts to compel arbitration according to the parties' agreement and directs courts to stay or dismiss the action until arbitration is completed in accordance with the terms of the parties' agreement. *See* 9 U.S.C. §§ 2–4; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967).[8]

### B. The Motion to Dismiss.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1179 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). A complaint that provides no more than a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. Instead, Plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level" (*id.* at 545), and courts "are not bound to accept as true a legal conclusion couched as a factual allegation" *Iqbal*, 556 U.S. at 678. Accordingly, a complaint may be dismissed for failure to state a claim upon which relief can be

---

[8] Although Section 3 refers to staying proceedings, dismissal is also appropriate when no claims require resolution and there is no reason to stay the proceedings pending arbitration. *See Williams v. Wash. Mut. Bank*, No. 07-5559 (JAG), 2008 WL 5427805, at *4 (D.N.J. Dec. 30, 2008).

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

1  granted for one of two reasons: (1) lack of a cognizable legal theory, or (2) insufficient facts under a

2  cognizable legal theory. *See Herndon v. Sci. Applications Int'l Corp.*, No. 05CV2269-BEN (RBB),

3  2007 WL 2019653, at *2 (S.D. Cal. July 10, 2007) (citing *Balistreri v. Pacifica Police Dep't*, 901

4  F.2d 696, 699 (9th Cir. 1990)).

5       Because the FCA is grounded in fraud, "False Claims Act plaintiffs must also plead their

6  claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for

7  instance, pleading facts to support allegations of materiality." *Escobar*, 136 S. Ct. at 2004 n.6.

8  Failure to plead with particularity as required by Rule 9(b) subjects a claim to dismissal pursuant to

9  Rule 12(b)(6). *See U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055

10 (9th Cir. 2011).

11 **IV.   ARGUMENT**

12      **A.   Relator's Employment-Based Claims Must Be Arbitrated.**

13      When considering a motion to compel arbitration, the Court is limited to determining (1)

14 whether a valid arbitration agreement exists, and, if so (2) whether the arbitration agreement

15 encompasses the dispute at issue. *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir.

16 2008). If these conditions are satisfied (as they are here), the court must compel arbitration. 9 U.S.C.

17 § 4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves

18 no place for the exercise of discretion by a district court, but instead mandates that district courts

19 shall direct the parties to proceed to arbitration.").

20      As noted above, count four alleges Retaliation in Violation of 31 U.S.C. § 3730(h), count

21 five alleges Misrepresentation in Violation of California Labor Code § 970, and count six alleges

22 Wrongful Termination in Violation of Public Policy (together, the "Employment-Based Claims").

23 These three claims must be arbitrated as agreed to in Relator's Mutual Agreement to Arbitrate

24 Claims.

25           1.   <u>Relator's Employment Terms with Aerojet Rocketdyne Contain a Valid Arbitration Provision.</u>

26      When Relator joined Aerojet Rocketdyne in June 2014, he and Aerojet Rocketdyne executed

27 a mutual agreement to arbitrate "all claims or controversies" between them. (Neglia Decl., Ex. 1 at

28 1). The Arbitration Agreement is governed by the FAA. (*Id.*). Relator acknowledged in signing the

15

Arbitration Agreement that he had read the agreement, understood its terms, and understood that by signing it he was giving up his right to a jury trial. (*Id*. at 5.)

    2.    <u>Relator's Employment Claims Against Aerojet Rocketdyne Are Covered By The Arbitration Agreement.</u>

Given the strong policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25. The arbitration clause here extends to "*all claims or controversies* ('claims'), past, present or future, *whether or not arising out of [Relator's] employment (or its termination)*, . . . that I (and no other party) may have against . . . the Company . . . [and] the Company's parent, subsidiary and affiliated entities . . . ." (Neglia Decl., Ex. 1 at 1 (emphasis added).) Critically, the provision does *not* limit the subject matter of the disputes to be arbitrated between the parties solely to Relator's employment or termination. When parties use such expansive phrasing, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *Mikes v. Strauss*, 889 F. Supp. 746, 755 (S.D.N.Y. 1995) (compelling retaliatory discharge claim under the FCA to arbitration and stating, "unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' the dispute should be submitted to arbitration.") (internal quotation and citation omitted).[9]

Relator's Employment-Based Claims here are all firmly rooted in claims or controversies that Relator has against Aerojet Rocketdyne, Inc. and its parent company, Aerojet Rocketdyne Holdings, Inc. Immediately following the DoD CIO's communications with Aerojet Rocketdyne in May and June of 2015, about Aerojet Rocketdyne's cybersecurity compliance, Relator claims that executives from the Company asked if Relator could certify that Aerojet Rocketdyne was compliant with cybersecurity provisions of the DFARS Clause based on the DoD CIO's opinion that Aerojet

---

[9] In *U.S. ex rel. Welch v. My Left Foot Children's Therapy, LLC*, the Ninth Circuit found that an arbitration agreement did not cover fraud claims under the False Claims Act. *Welch*, however, is inapplicable here because the claims there did not "relate to" relator's employment and were thus outside of the scope of the arbitration agreement, which allowed for arbitration of disputes that arose out of or related to relator's employment. 871 F.3d 791, 799 (9th Cir. 2017). Here, by contrast, Relator's Employment-Based Claims fall squarely within the scope of the arbitration provision at issue.

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

Rocketdyne was likely compliant. (*See* SAC ¶ 81.) When Relator refused, he contends that Aerojet

Rocketdyne terminated him in retaliation for reporting the Company's activity. (*Id.* ¶¶ 146–147;

160–164.) Relator further contends that Aerojet Rocketdyne misrepresented the position that he was

being hired for in order to induce him to accept a job at Aerojet Rocketdyne. (*Id.* ¶¶ 151–154.)

Although the evidence shows that Relator's termination was the direct result of a reduction in force

program implemented nearly a year after Relator was hired at the Company (Neglia Decl., ¶¶ 5-6,

Exs. 4-5), rendering his claims invalid, all three of Relator's Employment-Based Claims

unquestionably relate to a claim or controversy that Relator has against the Company and its parent.

Thus, it is for an arbitrator and not this Court to determine that Relator's claims lack merit.

### 3.   This Action Should Be Stayed Pending Arbitration.

When, as here, the FAA governs an arbitration provision that covers a plaintiff's claims,

Section 3 of the FAA directs the district court to compel arbitration and stay the lawsuit. *See*

9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration); *see*

*also, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991) (FAA "provides for stays

of proceedings in federal district courts when an issue in the proceeding is referable to arbitration).

Thus, to the extent counts one, two, and three of the SAC are not resolved with this motion, those

claims should be stayed pending the resolution of the Employment-Based Claims in arbitration.

**B.   Relator Fails to State a Cognizable Legal Theory for His Claims Under the Federal False Claims Act Because He Cannot Meet the Stringent Materiality Standard Set Forth in the Supreme Court's *Escobar* Decision.**

Relator brings two claims for fraud under the FCA: count one alleges Promissory Fraud in

violation of 31 U.S.C. § 3729(a)(1)(A); and count two alleges False or Fraudulent Statement or

Record in violation of 31 U.S.C. § 3729(a)(1)(B). (SAC ¶¶ 120-42.) "[U]nder either the false

certification theory or the promissory fraud theory, the essential elements of False Claims Act

liability remain the same: (1) a false statement or fraudulent course of conduct, (2) made with

scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."

*U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

Under the false certification theory, the relator can allege an express false certification

theory, where the claimant expressly certifies that it complied with certain requirements that it in fact

17

breached (*U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)); or an implied false certification theory, where the claimant makes "specific representations about the goods or services provided" that are "misleading half-truths" because of "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements" *See Escobar*, 136 S. Ct. at 2001; *accord U.S. ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332 (9th Cir. 2017). Under a fraudulent inducement theory, the relator must allege that the defendant made a *material* misrepresentation to the Government in order to induce it to enter into a contract. *Hopper*, 91 F.3d at 1266. Relator has not pleaded facts sufficient to support either a false certification or fraudulent inducement claim.

The SAC should be dismissed because the Relator does not, and cannot, allege facts to satisfy the FCA's "rigorous" and "demanding" standard for materiality. *Escobar*, 136 S. Ct. at 2003, 2004 n.6. Materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002; *see also* 31 U.S.C. § 3729(b)(4) ("[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."). "As with all elements of an FCA claim, the relator must plead particular facts under Rule 9(b) in support of their allegations of materiality, and the failure to plead such facts should result in dismissal." *U.S. ex rel. Mateski v. Raytheon Co.*, No. 2:06-CV-03614-ODW(KSx), 2017 WL 3326452, at *7 (C.D. Cal. Aug. 3, 2017) (citing *Escobar*, 136 S. Ct. at 2004 n.6).

Materiality is a multi-factor, factual test that courts may take up at the motion to dismiss phase. *See Escobar*, 136 S. Ct. at 2004 n.6. *Escobar* made clear that designating something as a "requirement" or "condition" of payment is not sufficient to meet the FCA's materiality standard. *Id.* at 2003 ("A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment"). And the Government's conduct is directly relevant to the materiality analysis: "the Government['s] regular[] pay[ment of] a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position . . . is strong evidence that the requirements are not material." *Id.* at 2003–04. Further, if the requirement with which defendants allegedly did not comply does not go to the essence of the purpose of the

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**

contract, that weighs against materiality. *Id.* at 2003 n.5.

Relator's materiality allegations rest on repeated speculation that DFARS compliance was a "condition" or "requirement" of payment (*see, e.g.*, SAC ¶¶ 1, 10–12, 16–18), and Relator's belief that "Defendants' knowingly made, used, or verified a false record or statement that was material to the false or fraudulent claim" (*Id.* ¶ 133.) Despite these allegations, Relator still cannot satisfy the FCA's "rigorous" and "demanding" materiality standard. *Escobar*, 136 S. Ct. at 2003, 2004 n.6. Courts have repeatedly held that these allegations are "completely conclusory and thus insufficient" because they "do[] not show *how* [the Defendant's] misrepresentations were material." *Mateski*, 2017 WL 3326452, at *7 (emphasis in original). Needless to say, adding the word "material" to otherwise conclusory allegations (*see* SAC ¶¶ 1, 128–30, 133) does not suffice. *See also Knudsen v. Sprint Commc'ns Co.*, No. C13-04476 CRB, 2016 WL 4548924, at *12-14 (N.D. Cal. Sept. 1, 2016) (finding materiality inadequately pleaded where the relator's only allegation was conclusory and there was evidence that the government continued to pay claims despite non-compliance); *United States v. Scan Health Plan*, No. CV09-5013-JFW (JEMx), 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017) (granting motion to dismiss where complaint included "only conclusory allegations that the [contractor's] conduct was material").

The dearth of materiality allegations is unsurprising given the government's actual conduct regarding Aerojet Rocketdyne and the defense industry's non-compliance. Indeed, the government's conduct makes it impossible for Relator to plead materiality, even if given yet another opportunity to do so.

***First***, Aerojet Rocketdyne's disclosures to its government customers make it impossible for the Relator to plausibly plead that Aerojet Rocketdyne's non-compliance with the DFARS and NASA FARS was material to the government's decision to pay. *Escobar* makes clear that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." 136 S. Ct. 2003-04; *see also Kelly*, 846 F.3d at 334 (finding materiality lacking where the government accepted the defendant's reports and paid its claims in full despite its non-compliance with regulations required by contract); *Knudsen,* 2016 WL 4548924, at *13 (granting motion to dismiss where

19

relator's complaint failed to address the government's knowledge of defendant's non-compliance).

Here, Aerojet Rocketdyne kept its customers abreast of its compliance status; including that is was a long way off. Aerojet Rocketdyne sent its customers a detailed compliance matrix, indicating that Aerojet Rockeydyne was only compliant with ten of sixty DFARS requirements. (*See* SAC ¶ 59–62; RJN Ex. Y.) Yet after these disclosures, none of Aerojet Rocketdyne's contracts were terminated and no suits for breach of contract were filed. Thus, the government's knowledge of Aerojet Rocketdyne's failure to comply fully with the DFARS and NASA FARS "is very strong evidence that those requirements [were] not material" to the contracts at issue. *Escobar*, 136 S. Ct. 2003–04; *Kelly*, 846 F.3d at 334; *Knudsen*, 2016 WL 4548924, at *13.

**Second**, the Government's response to a nearly year and a half investigation into Aerojet Rocketdyne's actions regarding its representations about its cybersecurity compliance undermines any argument that Aerojet Rocketdyne's DFARS compliance was material to any of the agencies who were involved in the investigation. The government subpoenaed and received all of Aerojet Rocketdyne's communications with the government related to its cybersecurity compliance, including its communications with the DoD CIO's office regarding Aerojet Rocketdyne's compliance status. (*See e.g.*, SAC ¶ 59; RJN ¶ 26, Ex. Z.) The government, like the Relator, also received copies of Aerojet Rocketdyne's disclosure statements in which it disclosed that it was only compliant with ten NIST SP 800-53 Rev. 4 controls. (RJN ¶ 25, Ex. Y.) If absolute, strict compliance with each of the NIST controls was required, as Relator alleges, any non-compliance with even one control should have been fatal to Aerojet Rocketdyne's ability to receive contract awards. Instead of blacklisting Aerojet Rocketdyne and seeking to intervene, however, the Government has continued to contract with Aerojet Rocketdyne on a myriad of programs. (*See* RJN ¶¶ 20–22, Exs. T–V.)

Further, NASA itself has reviewed Aerojet Rocketdyne's systems and certified that Aerojet Rocketdyne can continue to receive and perform NASA contracts. (*See id.* ¶ 19, Ex. S.) This Government action demonstrates the immateriality of Aerojet Rocketdyne's compliance status. *See Escobar*, 136 S. Ct. at 2003 (government's actual conduct is relevant to materiality analysis). In light of the Government's actions over the span of several years, Aerojet Rocketdyne's noncompliance

20

could not have been material to the Government. *Id.*; *see also Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1043, 1050–51 (9th Cir. 2012) (affirming dismissal of FCA claims where contractor disclosed noncompliance to the government and the government permitted the contractor to continue performing).

**Third,** the contracts at issue here pertain to missile defense technology and rocket engine technology, not cybersecurity. (*See* SAC ¶ 7.) Aerojet Rocketdyne's compliance with the cybersecurity provisions of the DFARS thus bears no relation to the contracts' central purposes and weighs against materiality. *See Escobar*, 136 S. Ct. at 2004 n.5 (whether a misrepresentation went to the "essence of the bargain" is important to the materiality analysis) (quoting *Junius Constr. Corp. v. Cohen*, 257 N.Y. 393, 400 (1931)). Indeed, many of Aerojet Rocketdyne's contracts containing the DFARS have been fully performed and accepted by the Government. (*See*, *e.g.*, RJN ¶ 23, Ex. W.) Relator will thus be unable to establish the requisite relationship between Aerojet Rocketdyne's DFARS compliance status and the purpose of its underlying contracts.

**Fourth,** regardless of any statement Aerojet Rocketdyne made, the Government's response to the Defense Industry's non-compliance as a whole weighs against a finding of materiality. *See*, *e.g.*, *Escobar*, 136 S. Ct. at 2003 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."). As described in Section II.B *supra*, there is copious judicially-noticeable evidence demonstrating how the Government's knowledge and response to the defense industry's non-compliance undermines a finding of materiality, and further demonstrates why full technical compliance was not expected by the Government here. Since Relator has not, and cannot, plead materiality, the SAC should be dismissed with prejudice. *See, e.g.*, *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990) (noting that dismissal with prejudice is appropriate where granting "leave to amend . . . would be futile").

### C.    Relator's Conspiracy Claim Fails as a Matter of Law Under the Intracorporate Conspiracy Doctrine.

Finally, count three for conspiracy to submit false claims pursuant to 31 U.S.C. Section 3729(a)(1)(C) also fails as a matter of law because Relator has failed to identify two distinct entities

who conspired. It is well established that a conspiracy "requires an agreement among two or more persons or distinct business entities." *U.S. ex rel. Lupo v. Quality Assurance Servs., Inc.*, 242 F. Supp. 3d 1020 (S.D. Cal. 2017) (internal quotations omitted). The intracorporate conspiracy doctrine provides that, as a matter of law, a corporation cannot conspire with its own employees or agents, including wholly owned subsidiaries. *See U.S. ex rel. Campie v. Gilead Scis., Inc.*, No. C-11-0941 EMC, 2015 WL 106255, at *15 (N.D. Cal. Jan. 7, 2015) (dismissing Relators' FCA conspiracy claim after applying the intracorporate conspiracy doctrine to bar conspiracy claims against parent and its wholly owned subsidiary); *U.S. ex rel. Fisher v. IASIS Healthcare LLC*, No. CV-15-00872-PHX-JJT, 2016 WL 6610675, at *15 (D. Ariz. Nov. 9, 2016) (same).

Relator identifies only a parent company and its wholly owned subsidiary as Defendants (SAC ¶¶ 7-8.) By failing to assert that Defendants conspired with any separate and independent individual or entity, Relator's conspiracy claim must be dismissed. The addition of an allegation that Defendants conspired with their "officers and managing agents" to violate the FCA (SAC ¶ 144), does nothing to cure the deficiency in this claim. *See*, *e.g.*, *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000) ("a corporation cannot conspire with its own employees or agents").

## V.  CONCLUSION

For the foregoing reasons, Aerojet Rocketdyne respectfully requests that the action be stayed pending arbitration of counts four, five, and six of the FAC, and that counts one, two, and three of the SAC be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

DATED:  February 22, 2019

Respectfully submitted,

KIRKLAND & ELLIS, LLP

*/s/ Mark Holscher*
Mark C. Holscher (SBN 139582)
mark.holscher@kirkland.com
Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

*Attorneys for Defendants*
*Aerojet Rocketdyne Holdings, Inc. and*
*Aerojet Rocketdyne, Inc.*

**DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS, STAY PROCEEDINGS, AND COMPEL ARBITRATION; MEM. IN SUPP.**