Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:     (310) 552-4200
Facsimile:     (310) 552-5900

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:     (214) 972-1770
Facsimile:     (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne
Holdings, Inc. and Aerojet Rocketdyne, Inc.*

## UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA ex rel. BRIAN MARKUS, individually,<br><br>        Relator,<br><br>    vs.<br><br>AEROJET ROCKETDYNE HOLDINGS, INC., a corporation and AEROJET ROCKETDYNE, INC., a corporation,<br><br>       Defendants. | Case No. 2:15-cv-02245-WBS-AC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[PUBLIC REDACTED VERSION]**<br><br>Judge:       Hon. William B. Shubb<br>Hearing Date:   November 1, 2021<br>Time:       1:30 p.m.<br>Courtroom:   5 |

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 1:30 p.m. on November 1, 2021, or as soon thereafter as the matter may be heard, before the Honorable William B. Shubb, United States District Judge for the Eastern District of California, pursuant to Federal Rule of Civil Procedure 56, Defendants Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc. (together, "Aerojet"), will and hereby do move for summary judgment on all claims in this case, or alternatively, for summary adjudication. As set forth in the accompanying memorandum in support and demonstrated by Aerojet's separate statement of undisputed facts, Relator cannot succeed under any theory of liability under the False Claims Act (the "FCA"). Thus, there is no genuine dispute as to any material fact and Aerojet is entitled to judgment as a matter of law.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Statement of Undisputed Facts, Request for Judicial Notice, the Declaration of Tammy Tsoumas and exhibits thereto, the papers on file in this matter, the arguments of counsel, and any other matter this Court wishes to consider.

DATED: September 20, 2021

Respectfully submitted,

KIRKLAND & ELLIS, LLP

/s/ *Tammy A. Tsoumas*
Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:     (310) 552-4200
Facsimile:     (310) 552-5900

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:     (214) 972-1770
Facsimile:      (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne*
*Holdings, Inc. and Aerojet Rocketdyne, Inc.*

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................1

II.     BACKGROUND ............................................................................................4

    A.    The Scope of This Case Is Limited to Eight Contracts, At Most. .........................4

    B.    The Cybersecurity Clauses at Issue: The DoD Revoked the 2013 Clause, Finding It Unworkable for Private Contractor Systems. .........................................6

    C.    The Cybersecurity Clauses at Issue: The NFS Clause.............................................9

    D.    Aerojet Disclosed Its Noncompliance to the Government and the Government Understood Aerojet Was Not Compliant. .................................................................9

        1.    Aerojet Disclosed to the DoD That It Was Not Compliant with the DFARS Clause, Belying Any Fraud. .........................................................9

        2.    The DoD Understood that Aerojet Was Not Compliant with the NIST Controls...............................................................................................13

        3.    Aerojet Detailed Its Cybersecurity Status to NASA, and NASA Approved of Aerojet's Efforts. ....................................................................14

    E.    Despite Recognizing Aerojet's Non-Compliance, the Government Continued to Pay Aerojet and to Award Aerojet Contracts. .................................................16

    F.    The Government Knew the Defense Industry Was Not Compliant with Cybersecurity Controls, but Continued Doing Business with Industry.................17

    G.    Aerojet Delivered the Goods and Services It Promised.........................................18

    H.    Relator Failed to Uncover Any Evidence to Support His Claims. .........................19

III.    LEGAL STANDARD....................................................................................20

    A.    The False Claims Act............................................................................................20

    B.    Summary Judgment ..............................................................................................21

IV.     ARGUMENT ..................................................................................................22

    A.    The Scope of Relator's Claims Must Be Limited at the Outset to the Eight Contracts Pleaded in the SAC That Contain the Cybersecurity Clauses, at Most. ......................................................................................................................22

    B.    Relator Cannot Prove His Implied False Certification Claim (Count 2) Because Aerojet Made No Specific Representation in Connection with a Claim for Payment. ...............................................................................................24

i

C.  There Is No Evidence That Any Alleged Misrepresentation by Aerojet Caused the Government to Enter into the At-Issue Contracts. ............................................25

D.  Aerojet's Cybersecurity Compliance Was Not Material to the Government for Purposes of FCA Liability. ......................................................................................29

  1.  Non-Compliance with the Cybersecurity Clauses Did Not Affect Government Contracting or Payment Decisions........................................30

    a.  The Government Continued to Pay and Contract with Aerojet Despite Knowledge of Its Non-Compliance. ................................30

    b.  The Government Knew Industry Was Not Compliant with the Cybersecurity Clauses.................................................................37

  2.  The Government's Abandonment of the 2013 DFARS Clause Requirements Belie Materiality. ................................................38

  3.  A Review of the Cybersecurity Clauses and the Contracts Demonstrate that Neither Award Nor Payment Was Conditioned on Compliance. .......39

E.  Relator Should Be Foreclosed From Seeking Actual Damages Because the Government Received the High-Quality Goods It Hired Aerojet to Deliver. .......42

V.  CONCLUSION.........................................................................................................45

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ab-Tech Const., Inc. v. United States*,
   31 Fed. Cl. 429 (1994), *aff'd sub nom.*, 57 F.3d 1084 (Fed. Cir. 1995), *abrogated
   on other grounds* ................................................................................................43

*In re Agent Orange Prod. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd sub nom. In re Agent Orange Prod. Liab.
   Litig. MDL No. 381*, 818 F.2d 145 (2d Cir. 1987)..............................................34

*United States ex rel. Berg v. Honeywell Int'l, Inc.*,
   740 Fed. App'x 535 (9th Cir. 2018) ...................................................................37

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047, 1057 (9th Cir. 2011) ..................................................................40

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)............................................................................................21

*United States ex rel. Cimino v. Int'l Bus. Machines Corp.*,
   3 F.4th 412 (D.C. Cir. 2021) ...............................................................................26

*Coyne v. Amgen, Inc.*,
   717 F. App'x 26 (2d Cir. 2017) ...........................................................................36

*D'Agostino v. ev3, Inc.*,
   845 F.3d 1 (1st Cir. 2016).................................................................3, 26, 27, 29

*United States ex rel. Foreman v. AECOM*,
   454 F. Supp. 3d 254 (S.D.N.Y. 2020)..................................................................36

*United States ex rel. Harman v. Trinity Indus. Inc.*,
   872 F.3d 645 (5th Cir. 2017) ..............................................................................36

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) ..............................................................................43

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
   2019 WL 3291582 (C.D. Cal. June 14, 2019) .....................................................36

*United States ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ................................................................. *passim*

*United States ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996) .................................................................. *passim*

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

*United States ex rel. Howard v. Caddell Constr. Co., Inc.*,
  2021 WL 1206584 (E.D.N.C. Mar. 30, 2021) ........................................................37, 41

*Joe Hand Promotions, Inc. v. Albright*,
  2013 WL 2449500 (E.D. Cal. June 5, 2013) (Shubb, J.) ........................................2, 43

*United States ex rel. Kelly v. Serco, Inc.*,
  846 F.3d 325 (9th Cir. 2017) ............................................................................ *passim*

*Knudsen v. Sprint Commc'n. Co.*,
  2016 WL 4548924 (N.D. Cal. Sep. 1, 2016) ................................................................40

*United States ex rel. Lamers v. City of Green Bay*,
  998 F. Supp. 971 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999) ..............21, 40

*United States ex rel. Lewis v. California Institute of Technology*,
  2021 WL 1600488 (C.D. Cal. Apr. 19, 2021) ..............................................31, 36, 37

*United States ex rel. Lewis v. Honolulu Cmty. Action Program, Inc.*,
  2019 WL 4739283 (D. Haw. Sept. 27, 2019) ..............................................................42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).....................................................................................................21

*United States ex rel. McBride v. Halliburton Co.*,
  848 F.3d 1027 (D.C. Cir. 2017) ..............................................................................36, 37

*United States ex rel. McGrath v. Microsemi Corp.*,
  140 F. Supp. 3d 885 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017).................23, 41, 42

*United States ex rel. Mei Ling v. City of Los Angeles*,
  2018 WL 3814498 (C.D. Cal. July 25, 2018) ..............................................................30

*United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*,
  787 F. Supp. 2d 1329 (M.D. Ga. 2011) ......................................................................21

*United States ex rel. Petratos v. Genentech Inc.*,
  855 F.3d 481 (3d Cir. 2017)........................................................................................36

*United States ex rel. Poehling v. Unitedhealth Grp.*,
  2018 WL 1363487 (C.D. Cal. Feb. 12, 2018)...............................................................40

*United States ex rel. Rose v. Stephens Inst.*,
  909 F.3d 1012 (9th Cir. 2018) ...............................................................................30, 37

*Soremekun v. Thrifty Payless, Inc.*,
  509 F.3d 978 (9th Cir. 2007) ......................................................................................21

*United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*,
  820 F.3d 1162 (10th Cir. 2016) ..................................................................................42

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

*United States ex rel. Thomas v. Siemens AG,*
  708 F. Supp. 2d 505 (E.D. Pa. 2010) ................................................................22

*United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021),
  *cert. denied sub nom. Mortg. Invs. Corp. v. U.S. ex rel. Bibby*, 2021 WL 1951877
  (May 17, 2021)................................................................................................41

*United States v. Catholic Health Sys. of Long Island Inc.*,
  2017 WL 1239589, at *23 (E.D.N.Y. Mar. 31, 2017) ...................................36

*United States v. Comstor Corp.*,
  308 F. Supp. 3d 56 (D.D.C. 2018) ...................................................................40

*United States v. J-M Mfg. Co., Inc.*,
  2020 WL 4196880 (C.D. Cal. June 5, 2020) .................................................43, 44, 45

*United States v. Monaco Enterprises, Inc.*,
  2016 WL 3647872 (E.D. Wash. July 1, 2016)..............................................21

*United States v. Woodbury*,
  359 F.2d 370, 379 (9th Cir. 1966) ................................................................44

*Universal Health Svcs. v. United States ex rel. Escobar,*
  136 S.Ct 1989 (2016).......................................................................... *passim*

*United States ex rel. Westrick v. Second Chance Body Armor Inc.*,
  128 F. Supp. 3d 1, 18 (D.D.C. 2015), *on reconsideration in part*, 2017 WL
  8809510 (D.D.C. Mar. 31, 2017), *on reconsideration in part*, 266 F. Supp. 3d 110
  (D.D.C. 2017) ...............................................................................................26, 27

**Statutes**

31 U.S.C. §§ 3729 - 3733 ........................................................................ *passim*

31 U.S.C. § 3730.................................................................................................28

**Rules**

Fed. R. Civ. P. 56.......................................................................................21, 43

**Other Authorities**

48 C.F.R. § 252.204-7012 ........................................................................ *passim*

48 C.F.R. § 1852.204-76 .......................................................................... *passim*

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION**

Relator Brian Markus brings broad claims against Aerojet Rocketdyne for purportedly defrauding the government based on its representations about its regulatory cybersecurity compliance status. After three years of leveraging the government's resources to investigate his claims and over two more years of civil discovery, the record is clear that Relator cannot succeed in proving that Aerojet intentionally and materially misled the government causing it to award Aerojet contracts or pay claims for the missile and rocket goods and services Aerojet provided.

Indeed, the reality is that Aerojet did not defraud the government. Instead, Aerojet time and time again ***disclosed*** to the government that ***it was not compliant*** with technical and shifting cybersecurity regulations, but was making diligent efforts to interpret and implement them. It outlined how its systems fared with those requirements and described its plan to comply with the regulations and when it would do so. In response to Aerojet's repeated disclosures, Aerojet's government customers, including the only contracting officer to be deposed in this case, indicated that they understood that Aerojet's systems did not fully conform to the outlined regulations. And instead of taking adverse action against Aerojet, the government:

- frequently voiced support for Aerojet's efforts to become compliant;
- lauded Aerojet's openness about its deficiencies;
- awarded Aerojet contracts;
- paid Aerojet's invoices in full;
- accepted the contracted-for goods and services; and
- sent more work for similar projects Aerojet's way.

Under these circumstances, there simply can be no fraud.

Nevertheless, Relator's entire case hinges on the belief that any regulatory non-compliance should result in damages and penalties under the False Claims Act (the "FCA"). Not so. Instead, Relator bears a heavy burden to show that Aerojet made some false or misleading representation to the government and that that representation was material to the government's payment decisions. Under his fraudulent inducement theory of liability, Relator must even go further and show that any

1

misrepresentations ***actually caused*** the government to contract with Aerojet. With discovery now closed, Relator failed to adduce sufficient evidence to support his claims. For a myriad of independent reasons outlined below, Relator's claims should not survive summary judgment, or at a minimum, Relator's claims should be drastically narrowed.

**The Scope of the Case Should Be Limited To Eight Contracts, At Most.** As a threshold matter, before even reaching the merits of Relator's claims, the scope of this case must be limited. Relator alleges that Aerojet entered into eighteen contracts with the government that included cybersecurity clauses requiring Aerojet to comply with certain technical controls. But only ***eight*** of the eighteen contracts actually include the cybersecurity clauses at issue. Without any contract clause or applicable regulation, rule, or statute with which Aerojet did not comply, Relator could not even make out a breach of contract claim, let alone fraud. *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (affirming grant of summary judgment where compliance was not a prerequisite for payment).

**Relator Should Be Precluded From Seeking "Actual" Damages.** Relator believes he is entitled to three times the value of each of the contracts listed in his complaint as "actual" damages in addition to statutory penalties, even though Aerojet delivered, and the government accepted, the goods and services for which the government contracted even knowing of Aerojet's non-compliance. There, however, is no evidentiary support to allow Relator to proceed to trial on the issue of actual damages. There is simply no evidence that the purposes of the contracts with the government were undermined or that any data was lost as the result of some cyber incident because of Aerojet's non-compliance with these technical regulatory requirements. Thus, the undisputed facts establish that the government received the benefit of its bargain resulting in no damages to it and Relator's claim to treble damages cannot endure. *See Joe Hand Promotions, Inc. v. Albright*, 2013 WL 2449500, at *1, 8 (E.D. Cal. June 5, 2013) (Shubb, J.) (granting partial summary judgment finding enhanced damages were not awardable).

**Relator's Claims Also Fail on Their Merits.** For the eight contracts that contain the cybersecurity requirements, Relator has insufficient evidence to establish a claim under any theory of an FCA claim for at least three reasons.

---

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

***First***, Relator cannot prove falsity for his false certification claim (Count 2). The Ninth Circuit requires that a false statement be made ***in*** a claim for payment, and Relator cannot point to any. *See United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332 (9th Cir. 2017). This gap in evidence is dispositive of Relator's Count 2.

***Second***, Relator cannot make the requisite heavy showing for his promissory fraud theory (Count 1) that any misrepresentations were the actual cause of the government contracting with Aerojet. The only evidence in the record reflects that the government would have contracted with Aerojet regardless of its compliance status, ***and in fact did so***. Indeed, even after investigating Aerojet's supposed fraud alleged here after Relator filed his initial complaint under seal, all of the involved agencies continued their contracts with Aerojet ***and*** awarded Aerojet additional contracts. This showing of what the government ***actually did*** despite knowing of Aerojet's non-compliance forecloses a finding that any representations would have caused the government to reject Aerojet as a contractor. *See D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016) (granting summary judgment and finding causation fatally lacking where government learned of alleged fraud and took no adverse action).

***Finally***, Relator simply cannot meet the high bar for materiality set by the Supreme Court in *Escobar*. In the face of Aerojet's good-faith disclosures about its compliance status, the government's inaction in response, the government's abandonment of the at-issue cybersecurity regulations, and the government's continued payment and continued contracting with Aerojet and other contractors who had not implemented all of the technical controls, materiality cannot be shown. *See Kelly,* 846 F.3d at 328 (materiality lacking where the government learned of non-compliance with ancillary requirement, continued to pay, and there were substantial regulatory changes). Rather, the undisputed facts reflect that Aerojet made diligent efforts to decipher and comply with the arduous cybersecurity specifications all the while ***disclosing its status*** and progress to its government customers and continuing to provide the government with the rocket and missile technology it needed.

The sworn testimony of seven government contracting officers and numerous contemporaneous documents establish that Aerojet disclosed to the government its gaps in

cybersecurity compliance and that Aerojet transparently updated the government regarding its

progress toward closing those gaps. Thus, there are no facts to create a triable issue for fraud and this

case should not proceed past summary judgment. For all of these reasons that are developed further

below, both Counts One and Two cannot survive.

## II.   BACKGROUND

Below, Aerojet provides an overview of Relator's claims, reflecting why the scope of this

case is limited to eight contracts at most, and explains the relevant cybersecurity clauses at issue.

Aerojet then details its affirmative, proactive disclosures to the government regarding its non-

compliance with those clauses and the government's response: including its continued payment,

acceptance of the bargained-for products and services, additional awards, and lack of adverse action,

reflecting the immateriality of Aerojet's compliance for the purposes of FCA liability. Finally,

Aerojet describes the history of Relator's failure to develop the record in any meaningful way to

support his claims.

### A.   The Scope of This Case Is Limited to Eight Contracts, At Most.

Relator's two remaining claims against Aerojet for Promissory Fraud (Count 1) and False

Certification (Count 2) allege that Aerojet made false statements regarding its compliance with

DFARS Clause 252.204-7012 and NFS Clause 1852.204-76, and the technical controls incorporated

by them (collectively, the "Cybersecurity Clauses"), in connection with eighteen contracts with the

DoD and NASA. ECF No. 42 (the "SAC") ¶¶ 67-69; 84-119.[1] But as reflected in the table below,

***only half*** of those contracts ***actually contain the Cybersecurity Clauses***:

| SAC ¶ | Award Date | Agency | Contract Number | Contains Cybersecurity Clause | SUF ¶ |
|---|---|---|---|---|---|
| 85 | 2/25/2014 | Army | W31P4Q14C0075 | No | 32 |

---

[1] Notably, Relator claims that two contracts required Aerojet to comply with the August 2015 version of the DFARS Clause. SAC ¶¶ 91-93. However, one incorporated the 2013 DFARS Clause and the other does not contain the DFARS Clause at all. *See* Statement of Undisputed Facts ("SUF") ¶¶ 45, 46.

4

| SAC ¶ | Award Date | Agency | Contract Number | Contains Cybersecurity Clause | SUF ¶ |
|---|---|---|---|---|---|
| 106 | 3/11/2014 | NASA | NNC10BA13B, Award ID # NNC13TA66T | Yes[2] | 33 |
| 86 | 4/22/2014 | Navy | N0001414C0035 | Yes | 34 |
| 87 | 9/29/2014 | Air Force | FA865013D2335, Award ID # 0002[3] | No | 35 |
| 88 | 9/30/2014 | Navy | N6893614C0035 | Yes | 36 |
| 89 | 9/30/2014 | Air Force DARPA | FA865014C7424 | Yes | 37 |
| 107 | 12/11/2014 | NASA | NNC10BA02B, Award ID # NNC15TA07T | No | 38 |
| 109 | 3/31/2015 | NASA | NNC15CA07C | Yes | 39 |
| 90 | 4/8/2015 | Air Force | FA865013D2335, Award ID # 0003 | No | 43 |
| 110 | 7/27/2015 | NASA | NNC15VD08P | No | 44 |
| 92 | 9/15/2015 | DARPA | HR001115C0132 | Yes | 45 |
| 93 | 10/8/2015 | Air Force | FA865013D2335, Award ID # 0004 | No | 46 |
| 112 | 11/17/2015 | NASA | NNM16AB22P | No[4] | 47 |
| 110 | 11/19/2015 | NASA | NNM16AA02C | Yes | 48 |
| 108 | 12/14/2015 | NASA | NNM16AB21P | No | 49 |
| 67-69 | 12/23/2015 | Army | W31P4Q16C0026[5] | Yes | 50 |
| 113 | 1/15/2016 | NASA | NNH16CP17C | No | 51 |
| 114 | 4/1/2016 | NASA | NNM16AA12C | Yes | 52 |

Additionally, for one of the nine contracts above, NNC15CA07C, the undisputed evidence reflects that the NFS Clause was inapplicable and imposed no requirements on Aerojet,[6] leaving only eight contracts that imposed regulatory cybersecurity requirements on Aerojet. SUF ¶¶ 39-42.

---

[2] The specific task order Relator includes in his SAC does not contain the NFS Clause. SUF ¶ 33. However, the parent award, which the task order incorporates, does. *Id.*

[3] Aerojet was awarded parent contract FA8650-13-D-2335 on May 10, 2013, which also did not contain the DFARS Clause. SUF ¶ 35.

[4] There is no evidence that contract NNM16AB22P contained the NFS Clause.

[5] Relator's SAC references contract # W31P4Q-15-C-0016 (SAC ¶¶ 66-68), but the contract actually awarded was W31P4Q-16-C-0026. SUF ¶ 58.

[6] Prior to contracting, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ SUF ¶¶ 40; 42. Further, neither the contract nor its attachments reference or incorporate any applicable documents related to cybersecurity, including NPR 2810.1, which outlines the NIST requirements. SUF ¶ 41.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

Importantly, three of those eight contracts were awarded after Relator "commenced this litigation" and "are not at issue" under this Court's order on Aerojet's motion to dismiss. *See* ECF No. 57 at 11; SUF ¶¶ 48, 50, 52.

As discussed below, this threshold flaw with Relator's claims substantially limits the scope of the issues that this Court must now decide. Put differently, Aerojet cannot be subjected to potential liability related to contracts *that do not even contain the relevant cybersecurity clauses*.

**B.    The Cybersecurity Clauses at Issue: The DoD Revoked the 2013 Clause, Finding It Unworkable for Private Contractor Systems.**

For the remaining DoD contracts at issue (five contracts), Relator claims that Aerojet was not compliant with the DFARS Clause contained in those contracts and that Aerojet made false and misleading statements to the government about its compliance. SAC ¶¶ 67-69, 85-93. Each of the five DoD contracts that actually contain the clause contain a version of it from November 2013 that the government *has admitted was unworkable for private contractors*, like Aerojet, and has since been abandoned. SUF ¶¶ 3; 4; 23. The regulations themselves have been revised multiple times, demonstrating that certain requirements proved to be unworkable, and that contractors needed an extensive amount of time to fully implement. *Id.* The requirements are summarized in the following chart and are discussed in more detail below.

|  | 18 November 2013 *(Final Rule)* | 26 August 2015 *(Interim Rule)* | 30 December 2015 *(Interim Rule)* | 21 October 2016 *(Final Rule)* |
|---|---|---|---|---|
| **Scope – What Information** | Controlled technical information (CTI) | Covered Defense Information (CDI) | Covered Defense Information (CDI) | Covered Defense Information (CDI) |
| **Applicable NIST Standard** | NIST 800-53 (selected controls) | NIST 800-171 | NIST 800-171 | NIST 800-171 |
| **Deadline for Compliance (if CTI or CDI, as applicable)** | Contract Award | Contact Award | As soon as practical, but no later than December 31, 2017 | As soon as practical, but no later than 31 December 2017 |

**November 2013 DFARS Clause** (the clause at issue in the five remaining DoD contracts).

In November 2013, the first version of DFARS Clause 252.204-7012 (the "2013 DFARS Clause")

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

was published.[7] SUF ¶ 1. The clause imposed requirements for contractors to provide "adequate security" when the contract included unclassified controlled technical information ("UCTI"). *See* SUF ¶ 2. Under the clause, contractors were directed to comply with selected security controls from the National Institute of Standards and Technology ("NIST") Special Publication 800-53 ("NIST 800-53"). *Id*. If a contractor could not implement the NIST 800-53 controls, the 2013 DFARS Clause permitted a contractor to comply with the clause by submitting a "written explanation" to the contracting officer explaining its "alternate controls" or why certain NIST 800-53 controls were not applicable. *Id*. The 2013 DFARS clause did not specify a format for the written explanation, nor did it explain what qualified as an alternate control providing equivalent protection. *Id.* The November 2013 DFARS Clause required immediate compliance upon the receipt of covered information. *Id.*

Though the 2013 DFARS Clause sought to apply NIST 800-53 controls to private contractor systems, NIST 800-53 was originally intended only for use on federal systems. SUF ¶ 3. Indeed, the government has recognized that applying the NIST 800-53 framework to contractor systems was "not possible," leading to the government's abandonment of the NIST 800-53 framework and adoption of a standard meant specifically for non-federal systems. SUF ¶ 3-4.

**August 2015 DFARS Clause**. The new standard intended for contractor systems, NIST Special Publication 800-171 ("NIST 800-171"), was incorporated into the clause in August 2015 (the "August 2015 DFARS Clause"). *See* SUF ¶ 6. As before, the clause permitted contractors to be less than fully compliant with the technical controls by submitting "alternative, but equally effective, security measure[s]." *Id*. The incorporated NIST 800-171 standard also contemplated that contractors would have "plans of action designed to correct deficiencies and reduce or eliminate vulnerabilities." *See* SUF ¶ 8. The August 2015 DFARS Clause required immediate compliance upon the receipt of covered information. SUF ¶ 9.

**December 2015 DFARS Clause**. Just four months later, in December 2015, the clause was amended again (the "December 2015 DFARS Clause"), this time to allow contractors over two years—until December 31, 2017—to be compliant with the applicable NIST standard. *See* SUF

---

[7] References to the "DFARS Clause" should be interpreted to refer to all versions of Title 48, section 252.204-7012 of the Code of Federal Regulations unless otherwise stated.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

¶¶ 11-12. Under the December 2015 DFARS Clause, contractors did not need to be compliant with **any** of the NIST controls when contracting and the DoD recognized that it was "virtually impossible" for contractors to be 100% compliant with the NIST requirements at all times. SUF ¶ 12, Ex. 9 at 46:24-47:1, 108:2-18.

**October 2016 DFARS Clause**. In October 2016, the clause was amended again to not only continue to provide contractors until December 31, 2017 to comply with the NIST standards, but also to allow the government to authorize the contractor to "vary" from the requirements of NIST 800-171. *See* SUF ¶ 14. In enacting the October 2016 rule, the DoD made clear that contractors were "encourage[ed] [] to begin implementing the security requirements in NIST 800-171 prior to the December 31, 2017 deadline, but [were] allow[ed] [] to exercise their own judgment when planning an optimal implementation strategy." *Id.*; 81 FR 72986 at 72990.

**December 2016 NIST Revision**. In December 2016, although the DFARS Clause remained intact, NIST 800-171 was revised to allow contractors to achieve compliance through System Security Plans ("SSPs") and Plans of Actions and Milestones ("POAMs"). SUF ¶ 15. These features allowed contractors to be compliant with the NIST standard **by merely having a plan in place** to implement the technical security controls. *Id.* at 21; *see also* SUF ¶¶ 15-17 (reflecting statements from DoD officials making clear that having an SSP and POAMs in place constitutes compliance).

Reflecting the DoD's desire for contractors to have more flexibility in implementing the cybersecurity requirements, the DoD issued guidance to contracting officers to modify existing contracts to incorporate the new, more lenient standards. SUF ¶ 19.

**November 2020 Rule Change**. In November 2020, the government again substantially rewrote the cybersecurity regulation scheme. *See* SUF ¶ 20. This revision, for the first time, introduced a method for the DoD to check whether a contractor was actually compliant with the NIST controls. *See* SUF ¶¶ 21-22. The new scheme also made clear that complete compliance with the NIST security controls is not required by implementing a scoring system for contractors based on their compliance status. *See* SUF ¶ 22.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

C.     **The Cybersecurity Clauses at Issue: The NFS Clause.**

NASA has its own regulatory scheme for cybersecurity as well.  Section 1852.204-76 of title 48 of the Code of Federal Regulations (the "NFS Clause") requires NASA contractors to "protect the confidentiality, integrity, and availability of NASA Electronic Information and IT resources and protect NASA Electronic Information from unauthorized disclosure" if the clause is in its contracts that involve Sensitive But Unclassified ("SBU") information. SUF ¶¶ 25–29. The NFS Clause does not require that a contractor's information technology system meet any specific security standard on its face, but instead, instructs NASA contracting officers to identify cybersecurity requirements in an "Applicable Documents List (ADL) provided as an attachment to the contract." *Id*. One document that is optional to include in a contract's ADL is NASA Procedural Requirement ("NPR") 2810.1, which directs contractors to comply with technical requirements that are compliant with NIST 800-53. *See* SUF ¶ 30. Unlike the 2013 DFARS Clause which required compliance with only 60 of the NIST 800-53 controls, NPR 2810.1 contemplates a system in compliance with all 264 controls. *Id.*

D.     **Aerojet Disclosed Its Noncompliance to the Government and the Government Understood Aerojet Was Not Compliant.**

Contrary to Relator's claims that Aerojet somehow defrauded the government, the facts reflect that Aerojet ***voluntarily and repeatedly made disclosures*** to the government detailing its lack of compliance with the applicable cybersecurity standards, and the only evidence in the record shows that the government understood that Aerojet was disclosing its noncompliance.

1.     **Aerojet Disclosed to the DoD That It Was Not Compliant with the DFARS Clause, Belying Any Fraud.**

Once Aerojet began receiving solicitations containing the 2013 DFARS Clause, Aerojet assessed its compliance status and began informing customers that it was not compliant with the NIST 800-53 controls in the 2013 DFARS Clause. *See, e.g.,* SUF ¶¶ 57, 81, 86, 101, Exs. 60, 61, 111, 87. Though Aerojet disclosed its non-compliance through e-mails, teleconferences, and presentations (discussed further below), it also sent many of its customers disclosure statements plainly stating that Aerojet was not compliant with all of the enumerated NIST controls. SUF ¶ 61, Ex. 78 (Army); ¶ 67, Ex. 83 (Army); ¶ 77, Ex. 89 (Army); ¶ 82, Ex. 110 (Navy); ¶ 94, Ex. 59-61

(Air Force and DARPA), ¶ 97, Ex. 65 (Air Force). These letters included a plain table breaking

down the number of controls Aerojet had implemented:

SUF ¶ 94, Ex. 60. The letter continued to explain what each category meant and further provided a

matrix identifying each control's implementation status and the priority ranking for implementation.

*See id.* at 3-6. Aerojet sent a substantially similar disclosure letter to the Army on September 29,

2014 and October 27, 2014, to the Navy on September 30, 2014, the Air Force on September 18,

2014 and June 17, 2015, and DARPA on September 18, 2014. SUF ¶ 61, Ex. 78 (Army); ¶ 67, Ex.

83 (Army); ¶ 82, Ex. 110 (Navy); ¶ 94, Ex. 60 (Air Force), ¶ 97, Ex. 65 (Air Force).

In addition, Aerojet had numerous teleconferences, meetings, and e-mail exchanges with

DoD agencies in which Aerojet disclosed its non-compliance with the DFARS Clause and NIST

800-53 controls. SUF ¶¶ 57-126.  For example:

- On July 24, 2014, Aerojet conveyed in a teleconference with the Air Force that they

  were ███████████████████████████████████████

  but that Aerojet was ███████████████  SUF ¶ 88, Ex. 56 (emphasis added).

- On August 28, 2014, Aerojet submitted a conditional acceptance to the Army for a

  contract, but took specific exception to the inclusion of the DFARS Clause. *See*

  SUF ¶ 58, Ex 58. During discussions with the government, Aerojet reiterated that

  Aerojet ████████████████████████████████████████

  ██████  SUF ¶ 59, Ex 77 (emphasis added).

- On September 8, 2014, in a teleconference with the Defense Contract Management Agency discussing an Air Force contract, Aerojet disclosed its plan ███████ ██████████████████████████████████████████████ SUF ¶ 93, Ex. 55 (emphasis added).

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

- On September 16, 2014, Aerojet participated in a teleconference with DARPA and the Air Force in which Aerojet discussed its compliance status with the NIST controls. SUF ¶ 104, Ex. 61.

- On June 15, 2015, Aerojet again told the Army that there were ███████████ ████████████████████████████████████████. SUF ¶ 74, Ex. 93 (emphasis added).

- On June 17, 2015, Aerojet again told the Air Force that Aerojet was ███████ ██████████████████████████ SUF ¶ 97, Exs. 65-66 (emphasis added).

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

- On June 30, 2015, Aerojet participated in a teleconference with the Army and representatives from the Office of the Chief Information Officer, in which Aerojet openly discussed its non-compliance with the controls in the 2013 DFARS Clause. SUF ¶¶ 74, 75, 113, 114.

- On December 16, 2015, Aerojet met with representatives of the Missile Defense Agency (the "MDA") and provided a 20-slide presentation on its compliance gap analysis. SUF ¶ 119, Ex. 118. The presentation included a control-by-control breakdown of Aerojet's compliance gaps, the plan to address those gaps, and the timeline for gap closure. *Id.* ███████████████████████████████████████

███████████████████████████████████████████████████████████████

[large redacted block]

After the presentation, the MDA said Aerojet had the ████████████

██████████████████████████████████ *Id.*

- On December 23, 2015, Aerojet again disclosed to the Army that it was still not compliant with the NIST 800-53 controls, but would address ████████████

████████████████████████ SUF ¶ 78, Ex. 101.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

Through these communications and others, Aerojet repeatedly informed the government of its non-compliance. SUF ¶¶ 57-125.

>    2.    **The DoD Understood that Aerojet Was Not Compliant with the NIST Controls.**

Not only did Aerojet plainly disclose its non-compliance to the DoD and its agencies, but the government also indicated that it understood that Aerojet was disclosing that it was not compliant. For example, the Army summarized an October 2, 2014 teleconference with Aerojet as involving Aerojet █████████████████████████████████████████████████████████████████████████ SUF ¶ 66, Ex. 82 (emphasis added). The Army also stated in correspondence to the DoD Office of the Chief Information Officer that it understood that Aerojet was ███████████████████████ ████████████████████████ SUF ¶¶ 69, 108, Ex. 86 (emphasis added). The Army responded to Aerojet's disclosure asking for a ████████████████████████████████████████████ ███████████████████████ reflecting its understanding that Aerojet was not compliant at that time. SUF ¶ 71, Ex. 91. Another Army representative recognized that Aerojet was ███████████████ ██████████████████████████████████████ SUF ¶ 80, Ex. 94.

Ms. Laurie Hewitt, ***the only contracting officer to offer deposition testimony in this case***, understood based on Aerojet's disclosure that Aerojet "did not comply with the DFARS Clause" and information in Aerojet's disclosure statement informed her "how noncompliant Aerojet was." SUF ¶ 80, Ex. 8 at 25:14-26:4, Ex. 79.

Likewise, officials from DCMA understood from Aerojet's disclosures that Aerojet ███████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████ SUF ¶ 123, Ex. 115.[8]  The Air Force also acknowledged that Aerojet was ██████████████████████████████████████████████████████████████████ ████████████████████████████████████ *Id*. Air Force and DARPA indicated that they planned to ██████████████████████████████████████████████████████████████

---

[8] In January 2020, the Defense Contract Management Agency (the "DCMA") ████████████████ ████████████████████████████████████████████████████████████████ SUF ¶ 125, Ex. 120.

---

13

1    ██████████████████████████████████████████████████ SUF ¶ 106, Ex. 54

2   (emphasis added). The Air Force wrote Aerojet a letter on September 26, 2014 indicating that it

3   understood that Aerojet has a ████████████████████████████████████████

4   █████████████████████████ SUF ¶ 96, Ex. 64 (emphasis added).

5           And perhaps most importantly, the DoD OCIO understood that Aerojet was ███████

6   ██████████████████ *See* SUF ¶¶ 107, 108, 115, Exs. 82, 88, 89, 94, 97.

7           **3.    Aerojet Detailed Its Cybersecurity Status to NASA, and NASA Approved
                    of Aerojet's Efforts.**

8           Aerojet also had extensive and continuous dialogue with NASA about its non-compliance

9   with the NIST standards from 2012 forward. Even before Aerojet merged its business and

10  information technology systems with Pratt & Whitney Rocketdyne, Aerojet had an open dialogue

11  with NASA about its non-compliance with NIST 800-53. SUF ¶ 127. Those conversations continued

12  in the years to follow, including through submissions of detailed security management plans

13  reflecting Aerojet's progress toward implementation of the NIST standards and cybersecurity

14  policies it had in place to protect NASA information consistent with the text of the NFS Clause

15  while it worked toward full compliance. *See, e.g.,* SUF ¶¶ 128-152, Exs. 150, 152, 154, 157, 158,

16  159, 176, 177, 179. Consistent with its approach to provide the government with information,

17  Aerojet also agreed to provide NASA with ████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████

19  ████  SUF ¶ 131, Ex. 151.

20          Aerojet also had regular meetings and calls with NASA to update the agency on its progress

21  towards achieving compliance with NIST 800-53. SUF ¶¶ 128-152. For example, in February 2016,

22  Aerojet made a presentation to NASA, briefing its representatives on the status of Aerojet's

23  cybersecurity and continued efforts to comply with NIST 800-53. SUF ¶ 134, Ex. 162. During its

24  presentation Aerojet informed NASA that it completed its gap analysis ████████████████

25  ████████████████████████████████████████ *Id.* As of the date of the

26  presentation, Aerojet had worked to close some of those gaps and was able to inform NASA that it

27  had reduced the non-compliant number of controls ██████████. *Id.*

28

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

1

2

3

4

5    Following the February 2016 presentation, Aerojet continued to update NASA on its

6    compliance status, including by providing another compliance matrix to NASA detailing its progress

7    on October 14, 2016. SUF ¶ 146, Exs. 171. Aerojet informed NASA that ████████████

8    ███████████████████████████████████████████████████████

9    ██████ *Id.* On January 20, 2017, Aerojet met with NASA yet again and provided an update on its

10   compliance status, disclosing that █████████████████████████████████

11   SUF ¶ 149, Ex. 178.

12

13

14

15   Beyond these specific meetings and presentations, Aerojet further maintained an ongoing

16   dialogue with NASA representatives apprising them of its compliance gap burn-down, and move

17   toward a managed service provider for compliance. *See* SUF ¶¶ 150-152, Ex. 180.

18   Like the DoD, NASA similarly indicated that it knew that Aerojet was not fully compliant

19   with NIST 800-53, and was supportive of Aerojet's plan to become compliant by December 31,

20   2017 (the deadline set by the December 2015 DFARS Clause). SUF ¶ 152, Ex. 180. NASA's CISO,

21   for example, recognized that Aerojet was making ████████████████████████

22   ███████████████████████████████████████████████

23   █████████████████████████ SUF ¶ 141, Ex. 168; ¶ 145, Ex. 169; ¶ 152, Ex. 180;

24   NASA also indicated that ██████████████████████████████████

25   ████████████████████ SUF ¶ 152, Ex. 180.[9]

26

27   ────────────────
     [9] NASA recognized Aerojet's commitment to cybersecurity, awarding it a NASA Silver

28   Achievement Medal for its continued cybersecurity efforts in 2019. SUF ¶ 154.

15

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

**E.    Despite Recognizing Aerojet's Non-Compliance, the Government Continued to Pay Aerojet and to Award Aerojet Contracts.**

In the face of Aerojet's disclosed non-compliance with the Cybersecurity Clauses, the government continued to award contracts to Aerojet, pay Aerojet's invoices in full, and accept the goods and services for which the government contracted. *See* SUF ¶¶ 155-227. After Aerojet's initial disclosure to the DoD in 2014, the DoD awarded Aerojet at least 60 contracts. SUF ¶¶ 118, 126, 160, 169, 178, 193. Similarly, after Aerojet disclosed its non-compliance to NASA, NASA awarded Aerojet over $2 billion in contracts. *See* SUF ¶ 199. The government also remitted payment to Aerojet for every invoice it submitted on the contracts in the SAC. *See* SUF ¶¶ 162, 171, 174, 180, 183, 186, 189, 195, 201, 204, 207, 210, 213, 216, 219, 222.  Notably, none of those invoices contained any representation about Aerojet's compliance with the 2013 DFARS Clause or the NIST 800-53 requirements incorporated therein. SUF ¶¶ 161, 170, 173, 179, 182, 185, 188, 194, 200, 203, 206, 209, 212, 215, 218, 221.

Despite Aerojet's numerous disclosures of non-compliance with NIST 800-53, as numerous Navy and NASA contracting officers admit in sworn declarations, none of Aerojet's contracts were terminated for non-compliance with the Cybersecurity Clauses. *See* SUF ¶ 155. In fact, four NASA contracting officials admit in those declarations that non-compliance with the NFS Clause ***did not impact their contracting decisions***. Each contracting officer stated under oath that they did "not terminate[] or refuse[] to award a contract for non-compliance with [the NFS Clause]" and similarly have no recollection of other contracting officers terminating or refusing to award a contract to a similarly situated contractor. SUF ¶ 224. Similarly, two Navy contracting officers from separate Navy offices have provided sworn declarations explaining that they do not know of any instance where an invoice was not paid, a contract was terminated, or a contract was refused to be awarded for non-compliance with the DFARS Clause. SUF ¶ 238.

Indeed, even after Relator filed this action and the government thoroughly investigated his claims, the government continued to award Aerojet contracts (over forty) and continued to pay Aerojet on contracts Relator expressly identified in his pleadings as having been allegedly procured by fraud. *See* SUF ¶¶ 160-226.

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.     The Government Knew the Defense Industry Was Not Compliant with Cybersecurity Controls, but Continued Doing Business with Industry.**

Aerojet was not the only company struggling with implementing the burdensome NIST controls. SUF ¶ 229. Though the DFARS Clause was included in approximately 80 percent of contracts as of 2017 (SUF ¶ 55), the defense industry as a whole was widely non-compliant. *See, e.g.*, SUF ¶¶ 229. Communications produced by the DoD OCIO reflect that dozens of contractors had not fully implemented the NIST requirements. *Id.*

The DoD's actions and statements after introducing the DFARS Clause reflect that the DoD was aware of the defense industry's struggles. For example, the DoD explained that it tracked contractors' unimplemented controls (*see id*. at Ex. 9 at 94:7-96:1, 103:7-105:2; Ex. 21 at 22:4-9) and that it was aware of industry surveys reflecting widespread non-compliance. SUF ¶ 230-231. Representatives from the DoD also participated in working groups, where defense contractors "openly discuss[ed]" non-compliance with the DFARS Clause. *See* SUF ¶ 228.

The government's continual revisions of the DFARS Clause to relax the necessary technical compliance discussed above also highlights the government's acknowledgement that contractors were unable to meet the strict standards set by early versions of the clause. Indeed, the DoD expected that many contractors would remain non-compliant with certain NIST controls well after the December 31, 2017 deadline. SUF ¶ 18. A 2019 DoD Inspector General audit report confirmed the accuracy of that expectation. SUF ¶ 233, Ex. 35 (finding that none of the ten contractors audited were 100% compliant with the NIST 800-171 controls). In fact, the DoD recognized that in 2019, only "1% of [Defense Industrial Base] companies [had] implemented all 110 controls from [NIST 800-171]." *See* SUF ¶ 237.

Further, officials from the DoD OCIO who helped draft the NIST cybersecurity controls were aware that full compliance with each of the NIST controls at all times was unrealistic. Gary "Gus" Guissanie, from the DoD OCIO, and an author of NIST 800-171, acknowledged that the NIST 800-53 standard, designed for use on federal information systems, "isn't possible" to apply to a contractor system. *See* SUF ¶ 234, Ex. 25 at 25:1-9. Mary Thomas, from the Defense Procurement and Acquisition Policy similarly remarked that it was not "realistic" for government contractors to

17

comply with the NIST 800-53 controls in the 2013 DFARS Clause and that full compliance at all times with the later 800-171 controls was "virtually impossible." *See* SUF ¶ 234, Ex. 21 at 9:18-20; ¶ 235, Ex. 21:19:14-22.

### G.    Aerojet Delivered the Goods and Services It Promised.

For each of the contracts identified in Relator's SAC, Aerojet delivered the goods and services for which the government agencies contracted and paid. SUF ¶ 56. Of the eighteen contracts mentioned in the SAC, six of them were awarded *after* Relator filed this case (SUF ¶¶ 47-52) and fifteen of them were successfully completed since this case has been pending. SUF ¶¶ 163, 202, 172, 181, 184, 175, 208, 187, 211, 196, 190, 217, 166, 220. Two are still in progress to this day. SUF ¶¶ 214, 223.

| Date of Contract | SAC ¶ | Contract No. | Agency | Completed After Relator's Complaint Filed | SUF ¶ |
|---|---|---|---|---|---|
| 2/25/2014 | 85 | W31P4Q-14-C-0075 | Army | Yes (completed 1/31/2016) | 32, 163 |
| 3/11/2014 | 106 | NNC10BA13B, NNC13TA66T | NASA | Yes (completed 9/24/2016) | 33, 202 |
| 4/22/2014 | 86 | N00014-14-C-0035 | Navy | Yes (completed 6/8/2017) | 34, 172 |
| 9/29/2014 | 87 | FA8650-13-D-2335, Award ID 0002 | Air Force | Yes (completed 6/15/2019) | 35, 181 |
| 9/30/2014 | 89 | FA8650-14-C-7424 | Air Force / DARPA | Yes (completed 3/31/2016) | 36, 184 |
| 9/30/2014 | 88 | N68936-14-C-0035 | Navy | Yes (completed 12/31/2015) | 37, 175 |
| 12/15/2014 | 107 | NNC10BA02B, NNC15TA07T | NASA | No (completed 5/11/2015) | 38, 205 |
| 3/31/2015 | 109 | NNC15CA07C | NASA | Yes (completed 10/9/2020) | 39, 208 |
| 4/8/2015 | 90 | FA8650-13-D-2335, Award ID 0003 | Air Force | Yes (completed 08/30/2016) | 43, 187 |
| 7/27/2015 | 110 | NNC15VD08P | NASA | Yes (completed 3/31/2016) | 44, 211 |
| 9/15/2015 | 92 | HR001115C0132 | DARPA | Yes (completed 9/30/2016) | 45, 196 |
| 10/8/2015 | 93 | FA8650-13-D-2335, Award ID 0004 | Air Force | Yes (completed 09/28/2018) | 46, 190 |
| **10/29/2015** | | **Relator's Complaint Filed** | | | |
| 11/17/2015 | 112 | NNM16AB22P | NASA | Yes (completed 7/11/2017) | 47 |
| 11/19/2015 | 111 | NNM16AA02C | NASA | Ongoing | 48, 214 |
| 12/14/2015 | 108 | NNM16AB21P | NASA | Yes (completed 3/31/2016) | 49, 217 |

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

| 12/23/2015 | 67 | W31P4Q-16-C-0026 | Army | Yes (completed 8/1/2017) | 50, 166 |
| 1/15/2016 | 113 | NNH16CP17C | NASA | Yes (completed 6/30/2019) | 51, 220 |
| 4/1/2016 | 114 | NNM16AA12C | NASA | Ongoing | 52, 223 |

**H.**     **Relator Failed to Uncover Any Evidence to Support His Claims.**

After the government concluded its investigation of Relator's allegations and declined to take any action against Aerojet (SUF ¶ 159), Relator has controlled the litigation of this case for over three additional years. During that time, Relator: (1) served Aerojet with multiple written discovery requests; (2) deposed eight current and former company employees; (3) obtained third-party document productions from Aerojet's cybersecurity consultant, Emagined, as well as its independent cybersecurity auditor, Ernst & Young; (4) took the deposition of a contracting officer from the Army, Laurie Hewitt; (5) participated in the depositions of two former employees from the DoD's Office of the Chief Information Officer; and (6) received thousands of documents from Aerojet in response to 76 document requests. Decl. of Tammy Tsoumas ¶¶ 4-9.

Nonetheless, despite receiving copious information, the body of evidence Relator has marshalled does nothing to support Relator's theories and, in fact, demonstrates the fatal flaws in Relator's claims. For example:

- As noted above, the evidence shows that only eight of the contracts in the SAC contain the regulatory requirements that Relator alleged were breached (SUF ¶¶ 40-42, 53, 54);

- The evidence shows that Aerojet repeatedly disclosed compliance status to its government customers time and time again (SUF ¶¶ 57-153);

- The only government contracting officer Relator deposed confirmed that the government understood Aerojet's disclosure statements to be communicating non-compliance (SUF ¶ 62, Ex. 8 at 33:14-23);

- Relator has uncovered no evidence that DoD agencies or NASA has terminated any contract with Aerojet (or any other contractor) for failure to comply with the DFARS Clause or the NFS Clause, even after Relator filed this case (SUF ¶¶ 155, 224, 228);

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

- The evidence shows that Aerojet was paid for the goods it promised to provide the government under the at-issue contracts, even after Relator filed this case (SUF ¶¶ 161-166, 170-175, 179-190, 194-196, 200-223);

- Relator has uncovered no evidence to refute the reality that the government received the goods and services they hired Aerojet to deliver, nor has he unearthed evidence that government information was "exfiltrated" as he claims;

- The evidence shows that Aerojet continued to receive contract awards from DoD agencies and NASA after disclosures of non-compliance (SUF ¶¶ 118, 126, 160, 169, 178, 193, 199);

- The evidence shows that Aerojet has received awards from NASA and was praised by other customers for its cybersecurity efforts (SUF ¶¶ 119, 227).

Notably, Relator did not obtain evidence from *any* government witness indicating that Aerojet had misled the government with respect to its cyber status, nor did he obtain any evidence that indicates that the government entered into an agreement that it otherwise would not have entered into given Aerojet's status at the time of contracting.

## III.  LEGAL STANDARD

### A.  The False Claims Act

In order to succeed on his FCA claim under either a fraudulent inducement[10] theory (Count 1) or a false certification theory (Count 2), Relator must show: (1) a false or fraudulent statement, (2) made with scienter, (3) that was material, and (4) that caused the government to pay out money. *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006); *see also* 31 U.S.C. § 3729(a). A typical claim under the FCA is a false certification claim, where a defendant makes an affirmative statement that it is providing something that it is not. *See Hopper*, 91 F.3d at 1266. Courts also recognize an implied false certification claim "where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance

---

[10] Relator's Count One is termed as a claim based on promissory fraud which is also referred in the case law and herein as fraudulent inducement.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

with *material* statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Kelly*, 846 F.3d at 332 (quoting *Universal Health Svcs. v. United States ex rel. Escobar*, 136 S.Ct 1989, 2000-01 (2016)).

Another theory of FCA liability is fraudulent inducement, which requires a showing that a contract was awarded because of fraud by the recipient. *See Hendow*, 461 F.3d at 1173. Fraudulent inducement is "actionable in ***rare*** circumstances," and requires a close examination of the temporal relationship between any false or misleading statements and the government's contracting decision. *See Hopper*, 91 F.3d at 1267 (emphasis added). To prove a fraudulent inducement claim, a relator must meet a heavy burden to show that the government would not have entered into the contract but for the alleged fraud. *Hendow*, 461 F.3d at 1173; *see also United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1340 (M.D. Ga. 2011) (explaining fraudulent inducement "is a difficult theory under which to proceed" and granting summary judgment for defendant); *United States v. Monaco Enterprises, Inc.*, 2016 WL 3647872, at *7 (E.D. Wash. July 1, 2016) (explaining fraudulent inducement is a "difficult [theory] to sustain"); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 987 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999) (same and granting summary judgment for defendant).

### B.    Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted as to an individual claim, or part of a claim, where the evidence shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

After Aerojet "demonstrate[s] the absence of a genuine issue of material fact," *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323), Relator "must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec.*

21

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted).

## IV.   ARGUMENT

Relator's SAC pleads sweeping claims against Aerojet, but after over four years of actively litigating this case, the undisputed facts show that no reasonable jury could find in his favor. Though Relator has relied until today on his so-called representative example complaint to draw out this case, the time has now come for Relator *to present facts* supporting each element of his FCA claims for each and every contract allegedly obtained by fraud. He cannot do so for *any* contract on any claim, and thus the Court should grant summary judgment in Aerojet's favor and dismiss this case.

### A.   The Scope of Relator's Claims Must Be Limited at the Outset to the Eight Contracts Pleaded in the SAC That Contain the Cybersecurity Clauses, at Most.

Relator alleges that Aerojet committed fraud in connection with seventeen[11] contracts. *See* SAC ¶¶ 84–119; *see also* SUF ¶ 31, Ex. 7 at 295:3–8 ("Q. [Y]ou allege 17 contracts that Aerojet allegedly fraudulently induced the government to enter into. . . . A. Yes."). Though Relator claims that his complaint included only "representative examples" in an attempt to exponentially expand the reach of this case, such a theory is not viable here where the undisputed evidence shows that the Cybersecurity Clauses were not consistently inserted into all government contracts. *See* SUF ¶¶ 53-55.  Instead, Relator now must adduce evidence sufficient to convince a reasonable jury to conclude Aerojet committed fraud *on a contract-by-contract basis*.[12]

Even for the contracts Relator points to in the SAC, the undisputed evidence shows that his claims fail before even reaching the merits. Nine of the contracts identified in the SAC—*half of the*

[11] Relator also mentions an additional contract that was awarded to Aerojet under a different contract number in paragraphs 67 through 69 of the SAC. Though not expressly identified in Relator's SAC, Aerojet discusses why Relator's claims as to this contract fail too.

[12] Even if Relator could somehow continue to rely on a "representative example" theory at summary judgment, even in the instances the Cybersecurity Clauses were inserted, in order for those clauses to impose any requirements on Aerojet, it must be shown on a contract-by-contract basis that the contracts involved either UCTI or SBU (SUF ¶ 2). *See United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 515 (E.D. Pa. 2010) ("Thomas argues that because SMS misrepresented discounts with respect to the four contracts he does specify, it must have made similar misrepresentations in securing each of the contracts listed in the exhibit. This is nothing more than conjecture. It is simply a baseless assumption unsupported by factual allegations.").

*contracts identified*— do not contain either the DFARS Clause or the NFS Clause. SUF ¶¶ 53, 54.

One additional contract, NNC15CA07C, includes the NFS Clause, but documents NASA penned

prior to contracting indicate that the NFS Clause would not apply and the contract does not

incorporate any requirement to maintain a NIST 800-53 compliant system. SUF ¶¶ 39-42.

There undoubtedly cannot be a viable FCA claim (or even a breach of contract claim for that

matter) when there was no contract clause, or applicable regulation, rule, or statute that was violated.

*See, e.g.*, *United States ex rel. McGrath v. Microsemi Corp.*, 140 F. Supp. 3d 885, 902 (D. Ariz.

2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017) (compliance must be a prerequisite for payment);

*Hopper*, 91 F.3d at 1267 (affirming grant of summary judgment where compliance was not a

prerequisite for payment). Thus, as reflected in the table below, there are only eight contracts that

even contemplate a system compliant with the NIST 800-53 controls Relator claims Aerojet lied to

the government about (hereinafter, the "at-issue contracts"):

| SAC ¶ | Date of Contract | Contract No. | Agency | Contemplates NIST 800-53 Compliance | SUF ¶ |
|---|---|---|---|---|---|
| 85 | 2/25/2014 | W31P4Q-14-C-0075 | Army | **No** | 32 |
| 106 | 3/11/2014 | NNC10BA13B, NNC13TA66T | NASA | Yes[13] | 33 |
| 86 | 4/22/2014 | N00014-14-C-0035 | Navy | Yes | 34 |
| 87 | 9/29/2014 | FA8650-13-D-2335, Award ID 0002 | Air Force | **No** | 35 |
| 88 | 9/30/2014 | N68936-14-C-0035 | Navy | Yes | 36 |
| 89 | 9/30/2014 | FA8650-14-C-7424 | Air Force | Yes | 37 |
| 107 | 12/11/2014 | NNC10BA02B, NNC15TA07T | NASA | **No** | 38 |
| 109 | 3/31/2015 | NNC15CA07C | NASA | **No** | 39-42 |
| 90 | 4/8/2015 | FA8650-13-D-2335, Award ID 0003 | Air Force | **No** | 43 |
| 110 | 7/27/2015 | NNC15VD08P | NASA | **No** | 44 |
| 92 | 9/15/2015 | HR001115C0132 | DARPA | Yes | 45 |
| 93 | 10/8/2015 | FA8650-13-D-2335, Award ID 0004 | Air Force | **No** | 46 |
| | 10/29/2015 | Relator's Complaint Filed | | | |
| 112 | 11/17/2015 | NNM16AB22P | NASA | **No**[14] | 47 |
| 111 | 11/19/2015 | NNM16AA02C | NASA | Yes | 48 |
| 108 | 12/14/2015 | NNM16AB21P | NASA | **No** | 49 |

---

[13] The specific task order Relator includes in his SAC does not contain the NFS Clause. SUF ¶ 33.
However, the parent award, which the task order incorporates, does. *Id.*

[14] No record of a formal contract for NNM16AB22P exists and the government's records reflect that
it was a purchase order "for payment purposes to accommodate final payment on contract NAS8-
36801," which is not one of the contracts identified in the SAC. SUF ¶ 47.

23

| SAC ¶ | Date of Contract | Contract No. | Agency | Contemplates NIST 800-53 Compliance | SUF ¶ |
|---|---|---|---|---|---|
| 67[15] | 12/23/2015 | W31P4Q-16-C-0026 | Army | Yes | 50 |
| 113 | 1/15/2016 | NNH16CP17C | NASA | **No** | 51 |
| 114 | 4/1/2016 | NNM16AA12C | NASA | Yes | 52 |

Additionally, three of the contracts with the Cybersecurity Clauses were awarded *after* Relator filed this case, informing the government of Aerojet's supposed fraud in connection with those clauses. SUF ¶¶ 48, 50, 52. As the Court stated in its ruling on Aerojet's Motion to Dismiss, "[t]he contracts government agencies entered with [Aerojet] after relator commenced this litigation are not at issue," and should be excluded as well. *See* ECF No. 57 at 11.

The Court's analysis of whether Relator has sufficient evidence to prove the elements of his FCA claims must thus be limited, at a minimum, to the eight contracts imposing compliance with the Cybersecurity Clauses at the outset. The three additional contracts that post-date this litigation should also be excluded based on the law of the case, leaving only five contracts at issue.

**B.** **Relator Cannot Prove His Implied False Certification Claim (Count 2) Because Aerojet Made No Specific Representation in Connection with a Claim for Payment.**

To show falsity under an implied false certification theory of liability in the Ninth Circuit, there must be a specific, false or misleading representation made *in* a claim for payment. *See Kelly*, 846 F.3d at 332. Relator cannot point to any specific representation that Aerojet made in a claim for payment about its compliance with the Cybersecurity Clauses, and thus cannot succeed on his implied false certification theory as a matter of law (Count 2).

In *Kelly*, the defendant was awarded contracts to provide project management, design, and installation services for the Navy. 846 F.3d at 328. The contracts required the defendant to submit project management and cost reports to the government in a specific format, but the defendant did not do so. *Id.* at 328-29. The relator brought suit, claiming that the defendant had violated the FCA by not complying with the required format and also by falsifying the reports that were submitted to

---

[15] Relator's SAC refers to Contract No. W31P4Q-15-C-0016, which was eventually awarded to Aerojet as Contract No. W31P4Q-16-C-0026. *See* SUF ¶ 58.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

the government. *Id.* at 329. The defendant moved for summary judgment, and the district court granted it. *Id.* On appeal, the Ninth Circuit found that the relator's implied false certification claim "fail[ed] as a matter of law" because there was no evidence that the claims for payment submitted by the defendant "made any specific representations about [its] performance." *Id.* at 332. Because there was no certification of compliance or otherwise false statement in the defendant's claims for payment, the court found that the district court properly granted summary judgment on relator's false certification claims. *Id.* at 333.

Here, like in *Kelly*, none of Aerojet's claims for payment for the at-issue contracts (or any of the 18 contracts for that matter) included any specific representations about its compliance with the Cybersecurity Clauses. *See* SUF ¶¶ 161, 170, 173, 179, 182, 185, 188, 194, 200, 203, 206, 209, 212, 215, 218, 221. In fact, many of Aerojet's claims for payment use the same form that was discussed in *Kelly*, containing only the period of performance and total costs and fees. *See* SUF ¶¶ 170, 179, 182, 185, 188, 194, 200, 206, 212, 221. Aerojet's remaining claims for payment contain the same information in a different format, and no representations about Aerojet's compliance with the DFARS Clause. SUF ¶¶ 161, 173, 203, 209, 215, 218, 221. Relator agrees. In his responses to Aerojet's requests for admission, Relator admitted that he cannot point to any representation about Aerojet's compliance with the Cybersecurity Clauses in a claim for payment. *See* SUF ¶¶ 161, 170, 173, 179, 182, 185, 188, 194, 200, 203, 206, 209, 212, 215, 218, 221 at Ex. 6 at Resp. 11.

Because Relator has no evidence that Aerojet made any specific representations about its compliance status in any claim for payment, and the evidence affirmatively shows that Aerojet made no such representations, Relator's implied false certification claim (Count 2) fails as a matter of law.

### C.     There Is No Evidence That Any Alleged Misrepresentation by Aerojet Caused the Government to Enter into the At-Issue Contracts.

Relator has also failed to come forward with any evidence that Aerojet's alleged misrepresentations about its cybersecurity compliance caused the government to either enter into any of the eight contracts or to make payments under the contracts. Causation is an essential element of a claim for fraudulent inducement under the False Claims Act. Relator's failure to adduce evidence of causation is dispositive of his claim (Count 1). *See Hendow*, 461 F.3d at 1174 ("the False Claims Act

25

DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.

requires 'a causal rather than a temporal connection between fraud and payment'") (citation omitted); *D'Agostino*, 845 F.3d at 8 ("[F]raudulent inducement claims include not just materiality *but also causation*; the defendant's conduct must cause the government to make a payment or to forfeit money owed" (emphasis added)); *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 418 (D.C. Cir. 2021) (requiring actual, but-for causation to succeed on a fraudulent inducement theory under the FCA); *see also United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015), *on reconsideration in part*, 2017 WL 8809510 (D.D.C. Mar. 31, 2017), *on reconsideration in part*, 266 F. Supp. 3d 110 (D.D.C. 2017) ("To prevail under [a] fraudulent inducement theory, [the government] must prove not only that the omitted information was material but also that the government was induced by, or relied on, the fraudulent statement or omission when it awarded the contract . . . . In essence, the essential element of inducement or reliance is one of causation.") (internal citation omitted).

Here, Relator's fraudulent inducement claim fails because—despite years' worth of discovery—Relator has not uncovered evidence that an alleged misrepresentation by Aerojet regarding its compliance with the Cybersecurity Clauses ***actually caused*** a government agency to enter into any of the at-issue contracts (or any others for that matter). Indeed, the government's actions in the face of Relator's allegations demonstrate that there is ***no*** causal connection between Aerojet's statements regarding the extent of its non-compliance with the Cybersecurity Clauses and the government's decision to award Aerojet contracts.

*D'Agostino* and *Westrick* are instructive. In *D'Agostino*, the First Circuit analyzed the causation element of a relator's fraudulent inducement claim in depth. *See D'Agostino*, 845 F.3d at 7-10. There, the relator brought claims under the FCA alleging, among other things, that the defendant made misrepresentations to the Food and Drug Administration ("FDA") in seeking approval of a medical device designed to treat malformed blood vessels in the brain. *Id*. at 3, 7. In considering whether amendment of the relator's complaint would be futile, the court found (1) that alleging that FDA approval was a condition of payment and (2) that allegations that statements "could have" induced the government to approve the device were insufficient to plead the necessary causation. *Id*. The court differentiated the materiality and causation requirements, noting that

allegations that statements "could have" but "did not *actually* cause the FDA to grant approval" were akin to "a kick shot in billiards where the cue ball 'could have' but did not in fact bounce off the rail, much less hit the targeted ball." *Id*. (emphasis added).

Finding that any proposed amendment by the relator would be futile, the court explained why the causation element could not be satisfied: "In the six years since D'Agostino surfaced the alleged fraud, the FDA has apparently demanded neither recall nor relabeling of [the medical device]—this notwithstanding the agency's option to impose post-approval requirements." *Id*. at 8. This inaction on the FDA's part was significant:

> The FDA's failure actually to withdraw its approval of Onyx in the face of D'Agostino's allegations precludes D'Agostino from resting his claims on a contention that the FDA's approval was fraudulently obtained. To rule otherwise would be to turn the FCA into a tool with which a jury of six people could retroactively eliminate the value of FDA approval and effectively require that a product largely be withdrawn from the market even when the FDA itself sees no reason to do so. The FCA exists to protect the government from paying fraudulent claims, not to second-guess agencies' judgments about whether to rescind regulatory rulings.

*Id.* Ultimately, the absence of action by the FDA left a "fatal gap" for causation rendering the relator's complaint unsalvageable. *Id*. at 9-10.

The district court for the District of Columbia adopted a similar line of reasoning in *Westrick*. There, the government alleged that the defendants manipulated data regarding the rate at which bulletproof vests it supplied to the government would degrade, causing the vests to be less effective than promised. *Westrick*, 128 F. Supp. 3d at 6. The government failed to present "any evidence that suggests that the government relied on the allegedly [false statements]" in contracting with the defendant. *Id*. at 19. Thus, the court found that there was no evidence of causation to support the government's fraudulent inducement claims, and granted partial summary judgment for the defendant. *Id.*

Likewise, Relator here has failed to present any evidence that Aerojet's representations regarding the extent of its non-compliance with the Cybersecurity Clauses *caused* government agencies to contract with Aerojet. Rather, the only evidence in the record shows that Aerojet's compliance status had no effect on the government's contracting decisions, prior to the filing of this case, or in the years since. Thus, Relator's fraudulent inducement claim fails.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

To illustrate, Relator filed his original complaint with the Court on October 29, 2015. *See* ECF No. 1. On that date, Relator also disclosed "substantially all material evidence and information" he possessed regarding the alleged fraud. *See* 31 U.S.C. § 3730(b)(2). As of that date (at the latest), the government was on notice of Relator's allegations of fraud related to Aerojet's cybersecurity status. Yet, of the eighteen contracts Relator identifies in the SAC, the government continued to work with Aerojet on seventeen of those contracts **after** the government was put on notice of Relator's allegations. SUF ¶¶ 47, 163, 202, 172, 181, 184, 175, 208, 187, 211, 196, 190, 217, 166, 220, 214, 223. The remaining contract was successfully completed in May 2015. SUF ¶ 205. Even more tellingly, the government **entered into six of those contracts after Relator filed his complaint**. SUF ¶¶ 47-52. In some cases, performance of the contracts continue to this date—nearly six years later and following the government's substantial, years-long investigation into Relator's allegations. SUF ¶¶ 214, 223.



**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

As in *D'Agostino*, the government's determination to continue to work with Aerojet notwithstanding full knowledge of Relator's allegations necessitates a finding that Relator "cannot establish a causal link between the alleged fraudulent representations made," and "the payment of claims for reimbursement by the government." *D'Agostino*, 845 F.3d at 10. *See also infra* Section IV.D.1.a (detailing Aerojet's disclosures of non-compliance and the government's continued payment and contracting thereafter).

As there is no genuine issue of material dispute as to causation for Relator's fraudulent inducement claim (Count One), the Court should grant summary judgment in favor of Aerojet.

### D. Aerojet's Cybersecurity Compliance Was Not Material to the Government for Purposes of FCA Liability.

Relator has also failed to provide any affirmative proof that Aerojet's representations regarding its cybersecurity status were material to the government contracting offices for the at-issue contracts. Thus, Relator cannot succeed on any theory of FCA liability (Counts One or Two). *See Escobar*, 136 S.Ct at 2001. *Escobar* set out a demanding materiality standard intended to significantly limit the breadth of FCA claims by directing courts to "strict[ly] enforce[] [] the Act's materiality and scienter requirements." *Id.* at 2002. The Supreme Court also made clear that a relator's failure to provide sufficient proof of materiality renders the question ripe for resolution in favor of a defendant on summary judgment. *Id.* at 2004 n.6.

To establish materiality, it is not enough for Relator to state that compliance with the Cybersecurity Clauses was required. *Id.* at 2003. Instead, Relator must present *facts* showing that the government attached so much importance to Aerojet's representations[16] about its non-compliance with the Cybersecurity Clauses that they could have influenced the government's decision to contract with or pay Aerojet. *Id. Escobar* directs courts to look at various factors, including: (1) whether the violated requirement was expressly identified as a condition of payment, which, though "relevant, [is] not automatically dispositive" in Relator's favor; (2) whether the violation went to the

---

[16] As discussed in Section IV.B, Relator has not adduced sufficient evidence to prove falsity for his false certification claim, thus the Court lacks a representation to evaluate for materiality. Nevertheless, Aerojet discusses why *any* representation about its compliance with the Cybersecurity Clauses cannot be shown to be material to the government as a matter of law.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

essence of the bargain; (3) whether the violation was minor or insubstantial; and (4) the actions the government took in response to the violation at issue or similar violations. *See id.* at 2003; *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1020–22 (9th Cir. 2018). *Escobar*'s factors, however, are non-exhaustive and other factors, such as regulatory changes, are relevant to the Court's analysis as well. *See Kelly*, 846 F.3d at 334 (considering removal of requirement in materiality analysis in addition to *Escobar*'s enumerated factors); *see also United States ex rel. Mei Ling v. City of L.A.*, 2018 WL 3814498, at *33 (C.D. Cal. July 25, 2018) ("*Escobar*'s non-exhaustive factors for assessing materiality are instructive to the materiality analysis").

Here, Relator has insufficient evidence to convince a reasonable jury that Aerojet's non-compliance with the Cybersecurity Clauses was material to the government. **First**, the undisputed evidence shows that the government knew that Aerojet and other contractors were not compliant with the Cybersecurity Clauses, yet took no adverse action and continued to pay. **Second**, the significant regulatory changes abandoning the 2013 DFARS Clause as well as public statements indicate that compliance with the 2013 DFARS Clause was not material to the government. **Third**, the facts demonstrate that compliance with the Cybersecurity Clauses was not a condition of payment.

Because materiality is an essential element to Relator's claims (Counts One and Two) that is lacking, Aerojet is entitled to judgment as a matter of law on this ground alone.

### 1. Non-Compliance with the Cybersecurity Clauses Did Not Affect Government Contracting or Payment Decisions.

Under *Escobar* and its progeny, the government's actions after learning about non-compliance with a statute, regulation, rule, or contract provision bear heavily on the Court's materiality analysis. As highlighted by *Escobar*, (1) continued payment of the defendant's claims for payment after learning of its non-compliance and (2) regular payment of claims despite knowing that requirements were violated by other contractors are highly indicative of lack of materiality. *See* 136 S.Ct. at 2003-04. As discussed below, here both points weigh in favor of immateriality.

#### a. The Government Continued to Pay and Contract with Aerojet Despite Knowledge of Its Non-Compliance.

Where "the Government pays a particular claim in full despite its actual knowledge that

certain requirements were violated, that is **very strong evidence** that those requirements are not material." *Id.* at 2003 (emphasis added).

In *Kelly*, for instance, the defendant entered into a contract with the Navy that required it to submit cost and progress tracking reports using a specific format. Instead of submitting its report in the required format, the defendant informed the Navy that it could not deliver the reports in the requested format and submitted them in a different format with less detail. 846 F.3d at 329. The relator informed the government that the defendant's reports were unreliable because they were manually created and that the defendant was falsifying its reports and eventually brought qui tam claims against the defendant. After the relator notified the government, the government removed the requirement for the cost reports for the project, indicated that the requirement was "very hard to manage and very hard to do," accepted the reports, and paid the defendant's claims. *Id.* at 334-35. On those facts, the Ninth Circuit found that the relator "failed to establish a genuine issue of material fact regarding [] materiality," and affirmed the district court's grant of summary judgment for the defendant. *Id.*

By way of another example, in *United States ex rel. Lewis v. California Institute of Technology*, 2021 WL 1600488, at *10 (C.D. Cal. Apr. 19, 2021), the defendant entered into a two-part contract with the Department of Energy, both parts of which required the defendant to comply with conflict of interest rules. During the first part of the contract, the government learned of and disqualified an individual under the conflict of interest rules. *Id.* at *10. After the disqualification, the defendant informed the government that the same individual was going to continue to be involved. This time, the government took no action and "made no resulting changes to its funding decisions." The court thus granted defendant's motion for summary judgment on the grounds that materiality was lacking. *Id.*

Here, just as in *Kelly* and *Lewis*, the government's actions after learning that Aerojet was not compliant with the Cybersecurity Clauses demonstrate that materiality is lacking as a matter of law. As an initial matter, Relator has no evidence that Aerojet ever said that its enterprise system **was** compliant with the Cybersecurity Clauses at issue.[17] Indeed, Relator testified under oath that

---

17 ████████████████████████████████████████████████████████████

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

Aerojet's disclosure statement does not say anywhere that Aerojet is fully technically compliant with the Cybersecurity Clauses. SUF ¶ 124, Ex. 7 at 331:3-11 (Q: "So my question was whether there's any place in [Aerojet's disclosure letter] where Aerojet says that they're fully technically compliant with all the DFARS clause; yes or no?" A: "The words that you specifically said, no.")). Instead, as detailed further below, the only evidence in the record is that Aerojet repeatedly disclosed its non-compliance to the government, kept the government apprised of its progress toward compliance, and made its cybersecurity specialists available to answer any of the government's questions. The record also reflects that the **government understood that Aerojet was not compliant;** and the government not only entered into contracts with Aerojet knowing of Aerojet's non-compliance, but as reflected in the image below, also paid Aerojet for its work and allowed Aerojet to continue to perform the at-issue contracts. SUF ¶¶ 57-227.



This fact too highlights that compliance with the DFARS Clause was not material to the government for each of the contracts covered by Relator's claims. Had compliance been important to the government's payment decisions, it would have ███████████ ████████████████████████████████████████████████ *Id.*

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

1        On these facts reflecting what the government **actually** did, just like in *Kelly* and *Lewis*, no

2   trier of fact could reasonably conclude that the government's payment decision **might** have been

3   affected and Aerojet is entitled to judgment as a matter of law.

4        **Aerojet Disclosed That It Was Not Compliant to the DoD.** After the DFARS Clause was

5   abruptly implemented in November 2013, Aerojet conducted a compliance assessment and began

6   notifying its customers. SUF ¶¶ 57, 81, 86, 101, Exs. 60, 61, 111, 87. As new contracts

7   incorporating the DFARS Clause began appearing in early 2014, Aerojet was tasked with addressing

8   the DFARS Clause in an Army contract solicitation in 2014. Aerojet sent the Army a disclosure

9   letter stating that it was ███████████████████████████████████████████████

10  ████████████   SUF ¶ 61, Ex. 78. The Army, also grappling with the new and not well understood

11  requirements, sought out help from the DoD and forwarded Aerojet's disclosure letter to the OCIO.

12  SUF ¶ 69. ██████████████████████████████████████████████████████

13  ██████████████████████████████████████████████   SUF ¶ 70, Ex. 89. The DoD

14  also indicated that the DFARS Clause ███████████████████████████████████

15  ███████████████████████████████████████████████   to Aerojet.

16  SUF ¶ 73, Ex. 94. Thereafter, Aerojet had conversations with the DoD OCIO regarding its

17  compliance status, each time indicating that it was not compliant with the DFARS Clause.

18  SUF ¶¶ 113, 114, Exs. 93, 95. Though Aerojet already disclosed its non-compliance to the DoD,

19  thereby imputing its knowledge to all other DoD agencies,[18] Aerojet continued to openly disclose its

20  non-compliance to its DoD customers and offered transparency into its progress toward compliance

21  by making its cybersecurity personnel available for questions. SUF ¶¶ 57-126.

22       **Aerojet Disclosed to NASA That It Was Not Compliant.** As for NASA, Aerojet disclosed

23  that it was not compliant with NIST 800-53 as early as 2012 to NASA's information technology

24

25

26  _____

[18] *See In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 796 (E.D.N.Y. 1984), *aff'd sub*

27  *nom. In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145 (2d Cir. 1987) ("the
    knowledge of employees of one agency may be imputed to those of another if there is some

28  relationship between the agencies").

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

specialists.[19] SUF ¶ 127. In the intervening years, Aerojet continued to keep NASA apprised of its cybersecurity status through submissions of Security Management Plans, among other correspondence. SUF ¶¶ 128, 129, 134, 139-152. ████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████ SUF ¶ 133. ██████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████ SUF ¶ 274. In connection with the RS-25

Restart program, Aerojet indicated in its ████████████████████████████████

████████████████████████████████████ SUF ¶ 128. After completing a

comprehensive gap analysis in 2015, Aerojet gave a presentation to NASA in which Aerojet ████

██████████████████████████████████████████████████████████████████

████████████████████████████████ SUF ¶ 134. Thereafter, Aerojet

met with NASA's CIO regarding Aerojet's cybersecurity and provided additional details they

requested, including contact information for Aerojet's cybersecurity team, making them available for

questions. SUF ¶ 139, 141, 143, 144-147, 149, 151. Aerojet continued to indicate that it was not

compliant with NIST 800-53, but was diligently working toward closure of all gaps. *Id.*

**Following Aerojet's Disclosures That It Was Not Compliant, the Government**

**Continued to Contract with Aerojet.** In response to Aerojet's disclosures, the government readily

acknowledged that Aerojet was disclosing its non-compliance. A contracting officer from the Army

testified that she understood based on Aerojet's disclosure statement that Aerojet "did not comply

with the DFARS Clause" and information Aerojet provided informed her ████████████████

████████████████████████████ SUF ¶ 63, Ex. 8 at 25:14-26:4, 33:14-23. The DoD OCIO

came to the same conclusion upon reviewing Aerojet's disclosure letter, stating that Aerojet was

██████████████████████████████████████████ SUF ¶ 70. Likewise, an

individual from the Defense Contract Management Agency recognized that Aerojet was ████████

---

[19] Though this disclosure pre-dates Aerojet's merger with Pratt-Whitney Rocketdyne, the disclosure nevertheless put NASA on notice that Aerojet was not likely compliant with the NFS Clause after the merger.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

1 ███████████████████████████████████████████████

2 ██████████████████████████ SUF ¶ 123. NASA's CISO recognized that Aerojet was

3 making ██████████████████████████████████████

4 ███████████████████████████████████████████████

5 ██ SUF ¶¶ 145, 152, 153, Exs. 180, 169, 170, 169. NASA also indicated that ████████

6 ██████████████████████████████████████ *Id.* One customer

7 even indicated that Aerojet had the "best plan" to reach compliance with the DFARS Clause, and

8 that no other contractor had even presented a plan to reach compliance. SUF ¶ 119.

9         Upon learning of Aerojet's non-compliance with the strict technical requirements of the

10 NIST standards, the government:

11      -   entered into contracts with Aerojet (SUF ¶ 160, 179, 178, 193, 199);

12      -   paid all of Aerojet's invoices in full (SUF ¶¶ 162, 171, 174, 180, 183, 186, 189, 195,

13          201, 204, 207, 210, 213, 216, 219, 222);[20]

14      -   did not request return of any payments or reimbursement (SUF ¶ 158);

15      -   accepted the goods and services for which it contracted (SUF ¶ 155-158, 163, 166,

16          172, 175, 181, 184, 187, 190, 196, 202, 208, 211, 214, 217, 220, 223);

17      -   approved Aerojet's information technology plans (SUF ¶¶ 138, 140, 148); and

18      -   awarded Aerojet a cybersecurity achievement award (SUF ¶ 227).

19 All of these actions by the government indicate that Aerojet's non-compliance was not material to its

20 payment decisions. *See, e.g.*, *Lewis*, 2021 WL 1600488, at *10 (continued payment, no request for

21 repayment, declination of intervention, and new awards to defendant indicated lack of materiality);

22 *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 2019 WL 3291582, at *15–16 (C.D. Cal.

23

24

25 ————————————————

26 [20] Relator has claimed that ████████████████████████████████

27 ██████████████ SUF ¶ 149 n.5, Ex. 148. ████████████████████

28 ██████████████████████ SUF ¶ 152, Ex. 180.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

1   June 14, 2019) (granting summary judgment where "government knew of the noncomplian[ce] . . .

2   and paid in full anyway").[21]

3          **After Relator Filed His Complaint, the Government Continued to Do Business with**

4   **Aerojet.** Moreover, Relator notified the government of Aerojet's supposed fraud nearly six years

5   ago. ECF No. 1. In response, the government, including not only the Department of Justice, but also

6   each of the involved agencies, thoroughly investigated Relator's claims and declined to take any

7   action. SUF ¶ 159; ECF No. 25. Instead, the government continued to pay Aerojet on the ongoing

8   contracts involved in this case and entered into additional contracts with Aerojet. SUF ¶¶ 167, 168,

9   176, 177, 191, 192, 197, 198, 225, 226. Indeed, three of the contracts identified in Relator's SAC

10  (two of which contain the Cybersecurity Clauses) were awarded to Aerojet *after* Relator disclosed

11  the basis for Aerojet's supposed fraud to the government. *See* SUF ¶¶ 48, 50, 52. These facts

12  strongly point to a lack of materiality for purposes of FCA liability. *See*, *e.g.*, *United States ex rel.*

13  *Berg v. Honeywell Int'l, Inc.*, 740 Fed. App'x 535, 538 (9th Cir. 2018) (affirming grant of summary

14  judgment for defendant where the government continued to pay its claims despite its awareness of

15  the relator's fraud claims for six years); *McBride*, 848 F.3d at 1034 (affirming summary judgment in

16  favor of defendant where the government continued to pay claims and "did not disallow any charged

17  costs" after learning of and investigating the relator's allegations); *Lewis*, 2021 WL 1600488 at *10

18  (no materiality where the government learned of relator's claims, investigated, declined to intervene,

19

20  [21] *Accord United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017)
    (affirming summary judgment in part because "the government continued payment after learning of

21  non-compliance"); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017)
    (FDA's decision to not only maintain approval of drug, but to increase the number of approved

22  indications, after learning of concerns, precluded a finding that the concerns were material); *Coyne
    v. Amgen, Inc.*, 717 F. App'x 26, 30 (2d Cir. 2017) (government's continued reimbursement showed

23  that "any concealment of the [study's] data from [government agency] was immaterial to its payment
    decisions"); *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 668 (5th Cir. 2017)

24  (finding defendant entitled to judgment where government knew of non-compliance and still
    approved payment); *United States v. Catholic Health Sys. of Long Island Inc.*, 2017 WL 1239589, at

25  *23 (E.D.N.Y. Mar. 31, 2017) (granting motion to dismiss where government's continued payment
    despite knowing through an investigation and an audit of the defendant constituted "strong

26  evidence" that compliance with the regulations was not material); *United States ex rel. Foreman v.
    AECOM*, 454 F. Supp. 3d 254, 265 (S.D.N.Y. 2020) (no materiality when the government was aware

27  of violations and continued to pay and extended the contract).

28

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.**

continued to pay the defendant, and praised the defendant's work); *United States ex rel. Howard v. Caddell Constr. Co., Inc.*, 2021 WL 1206584, at *20 (E.D.N.C. Mar. 30, 2021) (government's full payment and awards of additional contracts after learning of allegations precluded materiality); *see also* ECF No. 57 at 11 ("The contracts government agencies entered with AR after relator commenced this litigation are not at issue and possibly relate to a different set of factual circumstances.").

### b.   The Government Knew Industry Was Not Compliant with the Cybersecurity Clauses.

In addition to the government's response to Aerojet's non-compliance (which on its own is a reason to find that there is no materiality as a matter of law), the government's reaction to *other* contractors' non-compliance is also probative of materiality. *See Escobar*, 136 S.Ct. at 2003. In such instances, continuing to contract with or pay non-compliant contractors weighs heavily in favor of a lack of materiality. *Id.*; *see also Rose*, 909 F.3d at 1020 (when evaluating materiality, courts should "consider how the [government] has treated similar violations").

Here, in the mine run of cases, the government did not take adverse action against contractors upon learning of their non-compliance with the Cybersecurity Clauses. Based on public reports, surveys, news articles, and direct contractor communications, the government was well aware that the vast majority of contractors were not compliant with the Cybersecurity Clauses. SUF ¶¶ 229, 231, 233, 237. The DoD OCIO and other high-level DoD offices also created a working group with the defense industry and was told directly that industry was struggling with the requirements of the DFARS Clause. SUF ¶ 228. Such discussions were even reflected in the Federal Register explaining the reasons for rule changes:

> To address concerns from industry with regard to the implementation of the first interim rule, DoD held a public meeting on Monday December 14, 2015 . . . . Various topics were discussed with industry at the public meeting, such as scope, applicability, training, subcontractor flowdown, and implementation issues. Industry representatives specifically expressed to DoD, both prior to and at the public meeting, the need for additional time to implement the security requirements . . . .

80 FR 81472. ██████████████████████████████████████

████████████████████████████████████████████ SUF ¶

229, Ex. 9 at 103:7-105:2.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

Despite this knowledge, the government did not stop paying contractors or awarding contracts. In fact, to the contrary, four NASA contracting officials admit that non-compliance with the NFS Clause did not affect their contracting decisions, each stating that they did "not terminate[] or refuse[] to award a contract for non-compliance with [the NFS Clause]" and similarly have no recollection of other contracting officers terminating or refusing to award a contract. SUF ¶ 224. Two Navy contracting officers from separate Navy offices likewise stated that they do not know of any instance where an invoice was not paid, a contract was terminated, or a contract was refused to be awarded for non-compliance with the DFARS Clause. SUF ¶ 238.

When confronted with non-compliant contractors, the DoD OCIO ██████████████ ███████████████████████████████████████████████ SUF ¶¶ 2, 73, 112, Ex. 9 at 46:24-47:1, 108:2-18 (██████████████████████████████████ ██████████████████████████████████ ), Exs. 92, 200, 203. And memoranda from the Office of the Secretary of Defense directed contracting officers to make mass modifications of contracts to allow contractors to comply with the Cybersecurity Clauses through mere *plans* to become compliant. SUF ¶ 19.

The dearth of evidence reflecting consistent adverse action against contractors for non-compliance points toward compliance with the Cybersecurity Clauses being immaterial to the government's payment and award decisions.

> **2.      The Government's Abandonment of the 2013 DFARS Clause Requirements Belie Materiality.**

The abandonment of the 2013 DFARS Clause and adoption of more lenient standards also reflects that non-compliance with the 2013 DFARS Clause was not material to the government as a matter of law. After adopting the 2013 DFARS Clause, the DoD reacted in the wake of feedback from its contractors and subcontractors about the difficulty in implementing and complying with the rigid cybersecurity regulations by amending the clause to make compliance easier. *See supra* Section II.B. For example, the later iterations of the DFARS Clause:

- expressly permit defense contractors to be non-compliant with the requirements of the clause for two years. SUF ¶¶ 11-12.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

- allow compliance by merely having a plan in place to *eventually* comply with the NIST technical controls. SUF ¶¶ 15-18.

- allow contractors to submit explanations for non-compliance. SUF ¶ 6.

- provide industry-wide exceptions for onerous controls. SUF ¶ 10.

- allow the government to "vary" from the requirements. SUF ¶ 14.

In addition, the DoD has since admitted that the standard set forth in the 2013 version of the DFARS Clause was not "possible" or "realistic" for the defense industry to implement. SUF ¶ 234, Ex. 25 at 25:1-9, Ex. Ex. 21 at 9:18-20. Importantly, in 2017, the DoD set out its formal policy that any contracts including the 2013 DFARS Clause should be modified to incorporate the later, more lenient standards. SUF ¶ 19.

The government's substantial changes to the requirements of the DFARS Clause weigh against finding that compliance with the rescinded and abandoned 2013 DFARS Clause could be material to the government's contracting actions here. Indeed, the Ninth Circuit found that the government's elimination and revisions to at-issue requirements weighs against materiality under *Escobar* and affirmed the district court's grant of summary judgment in favor of the defendant. *See Kelly*, 846 F.3d at 334 (materiality lacking, in part, because the government "eliminated the [] requirement because it provided minimal benefit and was not cost-justified."). Further, the later modifications of the DFARS Clause "express[ing] willingness to 'work with,' vendors in order to address compliance issues instead of outright rejecting claims" or refusing to contract weighs against a finding that the requirements were material. *See United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 87 (D.D.C. 2018).

All of these actions taken by the DoD to reject the 2013 Clause weigh against a finding that compliance with it was material to the government.

**3.      A Review of the Cybersecurity Clauses and the Contracts Demonstrate that Neither Award Nor Payment Was Conditioned on Compliance.**

Relator cannot show that compliance with the Cybersecurity Clauses was required for the Government to award Aerojet contracts or to pay Aerojet's invoices. Relator presumes that the Clauses were a prerequisite to award or a condition for payment because the Clauses were required

39

to be included in every solicitation. SAC ¶¶ 12, 115. That assumption oversimplifies the required analysis. Rather, the Court must specifically analyze the language used by the government to determine whether compliance was truly a condition of payment. *See Hendow*, 461 F.3d at 1175; *see also Knudsen v. Sprint Commc'n. Co.*, 2016 WL 4548924, at *13 (N.D. Cal. Sep. 1, 2016) ("only point[ing] to the regulations . . . is not sufficient to meet the rigorous standard for [] materiality"); *United States ex rel. Poehling v. Unitedhealth Grp.*, 2018 WL 1363487, at *9–10 (C.D. Cal. Feb. 12, 2018) (allegations "that Defendants were obligated by various regulations and contracts to comply with the Attestation requirements" under Medicare were insufficient to establish materiality); *Hopper*, 91 F.3d at 1267 ("Mere regulatory violations do not give rise to a viable FCA action."); *Lamers*, 168 F.3d at 1020 ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations."); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011) (breach of contract does not suffice for FCA claim). Analyzing the applicable statutory and contract language here shows that payment or award was not conditioned on compliance with the Cybersecurity Clauses.

In *McGrath*, the court found no materiality where there was no link between compliance with export control regulations and payment, despite those regulations being required in every contract. 140 F. Supp. 3d at 900-01, 907, 911.[22] Conversely, where courts have found compliance a condition of payment, the language is strong and obvious in connecting the requirement to a condition for payment. *See, e.g.*, *Hendow*, 461 F.3d at 1175–77 (compliance with executive compensation ban was a condition of payment where statute stated that agreements "shall condition [eligibility] upon compliance," regulation required institution to "enter into an agreement that 'conditioned' its eligibility on compliance," and contract between the parties stated that compliance with the ban was a "prerequisite" to receiving funding); *United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021), *cert. denied sub nom. Mortg. Invs. Corp. v. United States ex rel. Bibby*, 2021

---

[22] It is worth noting that *McGrath* presents strikingly similar allegations to those pleaded here. There, relator who was the lead of the defendant's information technology department, expressed concerns about the defendant's cybersecurity posture and was later terminated. *Id.* at 892.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

WL 1951877 (May 17, 2021) (finding regulation a condition of payment where it stated that "no

loan shall be guaranteed or insured" absent certification of compliance).

Here, no version of the Cybersecurity Clauses or the government's contracts with Aerojet tie

compliance to payment or eligibility. SUF ¶¶ 1, 2, 6, 11, 14, 33, 34, 36, 37, 39, 45, 48, 50, 52. No

law or regulation has any language that would suggest compliance with the Cybersecurity Clauses

was a pre-condition of payment or contract award. Unlike in *Hendow* and similar to *McGrath*, the

Cybersecurity Clauses here merely state what a contractor "shall" do, without reference to any

payment repercussions for not doing so. Notably, both clauses even include carve outs that allow for

non-compliance. *See* SUF ¶¶ 2, 28.

Unlike the contract in *Hendow* that tied compliance to payment, none of the contract

language involved here ties compliance with the Cybersecurity Clauses to payment. SUF ¶¶ 1, 2, 6,

11, 14, 33, 34, 36, 37, 39, 45, 48, 50, 52. To the contrary, the contracts that contain the

Cybersecurity Clauses merely copy and paste them into the contracts or incorporate them by

reference as one-line citation in a laundry list of other regulations. SUF ¶¶ 45, 48, 50, 52 (clause

incorporated by reference); SUF ¶¶ 34, 36, 37, 39 (clause copied and pasted).[23] And, tellingly, even

in the face of directives to include the Cybersecurity Clauses in every contract, like the relator tried

to point to in *McGrath*, the government here even omitted the Cybersecurity Clauses from nearly

half of the contracts set forth in the SAC (*see supra* Section IV.A). SUF ¶¶ 31, 53, 54. Such

widespread exclusion of the Cybersecurity Clauses suggests that they were not a requirement for

contract award or payment. *See also Howard*, 2021 WL 1206584, at *18-19 (no materiality, in part

because "the government did not expressly identify compliance with the Subcontracting Plan and

FAR 52.219-8 as a condition of payment"); *United States ex rel. Lewis v. Honolulu Cmty. Action

Program, Inc.*, 2019 WL 4739283, at *7 (D. Haw. Sept. 27, 2019) (granting defendant's motion for

---

[23] *See also United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1169-72 (10th Cir. 2016) (finding that mere incorporation by reference of regulation into contract weighed against materiality).

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

1   summary judgment where regulations outlining payment were not linked to subject of purportedly

2   false statements).[24]

3       Because Relator cannot point to any statute, rule, regulation, or contract provision that links

4   payment with compliance with the Cybersecurity Clauses, he cannot establish materiality.[25]

5                                    *       *       *

6       In sum, the undisputed evidence shows that the government took no adverse action against

7   Aerojet or other contractors on learning of their non-compliance with the technical requirements of

8   the Cybersecurity Clauses, that the government abandoned the applicable contract clauses after

9   finding they were "not possible" for contractors to implement, and that the Cybersecurity Clauses

10  were not a condition of payment. Under these facts, Relator cannot establish that any representations

11  by Aerojet were material to the government's contracting or payment decisions.

12      **E.   Relator Should Be Foreclosed From Seeking Actual Damages Because the
             Government Received the High-Quality Goods It Hired Aerojet to Deliver.**

13      If the Court finds that any of Relator's FCA claims survive, he should be limited to statutory

14  penalties, since the undisputed facts show that the government suffered no actual damages. Here,

15  Relator claims that he is entitled to three times the amount of all of the contracts at issue, regardless

16  of the fact that the government received the goods and services for which it paid Aerojet to provide.

17  It is Relator's burden to prove actual "damages which the Government sustains *because of*" the

18  alleged fraud. *See* 31 U.S.C. § 3729(a)(1) (emphasis added); *United States v. J-M Mfg. Co., Inc.*,

19  2020 WL 4196880, at *12 (C.D. Cal. June 5, 2020) ("Plaintiff bears the burden of proving actual

20  damages in an FCA case."); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352

21

22  [24] Moreover, the record reflects that, in some cases, ███████████████████████████

23  ██████████████████████████████ SUF ¶¶ 79, 84, 87, 120, 136, 137, 142.

24  [25] To be sure, even if Relator could make a factual showing that compliance with the Cybersecurity
    Clauses was a condition of payment, *Escobar* made clear that designating something as a
25  "requirement" or "condition" of payment is not sufficient to meet the FCA's materiality standard.
    *Escobar*, 136 S.Ct. at 2003 ("A misrepresentation cannot be deemed material merely because the
26  Government designates compliance with a particular statutory, regulatory, or contractual
    requirement as a condition of payment"); *see also Honolulu Cmty. Action Program*, 2019 WL
27  4739283, at *7 (granting defendant's motion for summary judgment even where compliance may
    have been a condition for payment).
28

                                          42

F.3d 908, 923 (4th Cir. 2003) (A "qui tam relator[ ] stands in the place of the government . . . [and] must assume the government's burden of proof as to damages in an FCA case."). In the absence of evidence of damages, partial summary judgment on the issue of actual damages is appropriate.[26] *See* Fed. R. Civ. P. 56(g); *Joe Hand*, 2013 WL 2449500, at *1, 8 (Shubb, J.) (granting partial summary judgment and finding enhanced statutory damages were not awardable).

To determine whether actual damages were suffered by the government, courts typically apply the familiar benefit-of-the-bargain rubric which asks whether the government got less value than it bargained for. *See J-M Mfg.*, 2020 WL 4196880 at *4 (granting defendants' judgment as a matter of law on the issue of actual damages); *Ab-Tech Const., Inc. v. United States*, 31 Fed. Cl. 429, 434 (1994), *aff'd sub nom.,* 57 F.3d 1084 (Fed. Cir. 1995), *abrogated on other grounds* (explaining actual "[d]amages represent compensation for a loss or injury sustained" and reversing actual damage award where "no proof has been offered to show that the Government suffered any detriment to its contract interest because of [defendant's] falsehoods"). Where the government receives the benefit of its bargain—as it did here—it suffers no actual damages. *Id.*

After years of investigation by the government and discovery provided to the Relator, the undisputed evidence reflects that Aerojet delivered—and the government accepted and paid for—the products and services that it contracted to provide.[27] SUF ¶¶ 47, 162, 163, 166, 171, 172, 174, 175, 180, 181, 183, 184, 186, 187, 189, 190, 195, 196, 201, 202, 204, 207, 208, 210, 211, 213, 216, 217, 219, 220, 222. Absent evidence that Aerojet's products and services were somehow defective, failed to function, or functioned poorly ***because of*** Aerojet's non-compliance with the Cybersecurity

---

[26] For clarity, Aerojet does not argue that Relator's FCA claims must fail because he cannot prove damages, as Aerojet recognizes that actual damages are not an essential element of an FCA claim. *See J-M Mfg.*, 2020 WL 4196880 at *1 n.5 (citation omitted). Rather, Aerojet argues that, if any of his claims survive, he must be limited to statutory penalties.

[27] As reflected in the table above on page 18, each of the contracts identified in Relator's SAC are either completed or are ongoing. The government has also accepted and paid all of Aerojet's invoices on those contracts. *See* SUF ¶¶ 162, 171, 174, 180, 183, 186, 189, 195, 201, 204, 207, 210, 213, 216, 219, 222.

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

Clauses, Relator cannot establish any actual damages.[28] *See United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966) (affirming finding of no actual damages where project completed and government received what it contracted for); *J-M Mfg*, 2020 WL 4196880 at *41 (finding no actual damages where the products properly performed).

Over the last couple of years of discovery, Relator has not asked a single question nor sought discovery regarding whether the government suffered actual damages; this evidentiary gap is dispositive. Relator is sure to claim that Aerojet's systems were "breached" and that data was "exfiltrated," but Relator cannot support his conjecture with evidence, nor can he connect it to Aerojet's allegedly fraudulent conduct in connection with the at-issue contracts. "Actual damages under the FCA must be *established by actual evidence*, not merely by an argument." *J-M Mfg*, 2020 WL 4196880 at *12 (emphasis added). Relator cannot carry his burden by flashing hypothetical risks and theoretical harms of possible government injury. *Id.* Further, even if Relator could produce evidence to suggest that Aerojet did suffer breaches through which it lost data, Relator cannot make any connection to the at-issue contracts or show that such data was lost as a direct result of Aerojet's non-compliance with any of the NIST requirements incorporated into the Cybersecurity Clauses. Indeed, the government itself has recognized that compliance with the Cybersecurity Clauses is not expected to stop all attacks and expects that information will be siphoned even from contractors who are fully compliant with all of the technical controls found in the NIST standards. SUF ¶ 24.

As there is no evidence that the government was damaged based on Aerojet's non-compliance with the Cybersecurity Clauses, the Court should grant Aerojet partial summary judgment on the issue of actual damages.

---

[28] That the government received and accepted the quality missile, space, and rocket engine technology and services that it expected under the contracts further illustrates why strict compliance with the NIST controls was not material, though Aerojet took (and continues to take) its cybersecurity responsibilities seriously. *See, e.g., Escobar*, 136 S.Ct. at 2003 n.5 (noting that whether the misrepresentation went to the "essence of the bargain" is relevant to materiality); *Kelly*, 846 F.3d at 333 ("By enforcing [the materiality] requirement rigorously, courts will ensure that government contractors will not face 'onerous and unforeseen FCA liability' as the result of noncompliance with any of 'potentially hundreds of legal requirements' established by contract."); *Black*, 820 F.3d at 1169-72 (finding lack of materiality where defendant illegally hired workers violating a contract provision where those illegal workers nevertheless completed the bargained-for work).

**DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM. ADJUDICATION; MEM. OF P. & A. IN SUPP.**

## V.    CONCLUSION

For the foregoing reasons, Aerojet respectfully requests that the Court grant summary judgment in its favor on all of Relator's claims and dismiss this case. Alternatively, Aerojet requests that the Court grant summary adjudication for Aerojet and find that (a) there is no genuine issue of material fact as to actual damages and (b) Relator's triable claims are limited to, at the most, the contracts that require compliance with the Cybersecurity Clauses (Contract Nos. N00014-14-C-0035, N68936-14-C-0035, FA8650-14-C-7424, NNC10BA13B, Award ID # NNC13TA66T, HR001115C0132, NNM16AA02C, W31P4Q-16-C-0026, and NNM16AA12C).

DATED: September 20, 2021                    Respectfully submitted,

KIRKLAND & ELLIS, LLP

*/s/ Tammy A. Tsoumas*
Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:     (310) 552-4200
Facsimile:     (310) 552-5900

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:     (214) 972-1770
Facsimile:     (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne*
*Holdings, Inc. and Aerojet Rocketdyne, Inc.*

DEFS.' NOTICE OF MOT. AND MOT. FOR SUMM. J., OR, ALTERNATIVELY, SUMM.
ADJUDICATION; MEM. OF P. & A. IN SUPP.