THYBERGLAW
GREGORY A. THYBERG SBN102132
3104 O STREET. #190
SACRAMENTO, CALIFORNIA 95816
TEL: (916) 204-9173
greg@thyberglaw.com

ATTORNEYS FOR PLAINTIFF, BRIAN MARKUS

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA: *ex rel.* BRIAN MARKUS | ) Civil Action No. 2:15-cv-2245 WBS-AC ) ) |
| Plaintiffs, | ) MEMORANDUM OF POINTS AND ) AUTHORITIES IN SUPPORT OF ) RELATOR'S MOTION FOR SUMMARY |
| vs. | ) JUDGMENT OF IN THE ) ALTERNATIVE SUMMARY |
| AEROJET ROCKETDYNE HOLDINGS, INC., a corporation and AEROJET ROCKETDYNE, INC. a corporation. | ) ADJUDICATION ) ) ) |
| Defendants | ) Date: November 1, 2021 ) Time: 1:30 p.m. ) Courtroom: 5 ) Judge: Hon. William B. Shubb ) |

_____

1
2

# <u>TABLE OF CONTENTS</u>

3

**I.      INTRODUCTION**…………………………………………………**1**

**II.      STATEMENT OF RELEVANT UNDISPUTED MATERIAL FACTS**….**2**

    **1. AR Failed To Comply With Mandatory NASA FARS and
     DFARS Cybersecurity Requirements**…………………………………**2**

    **2. AR Failed To Provide Adequate Security To Protect Sensitive
     Government Data Related To Military and Space Technology**……………**2**

    **3. AR Knew It Was Non-Compliant And Failing To Provide
     Adequate Cybersecurity**……………………………………………**3**

    **4. AR Knew Its Cybersecurity Compliance Status Could Influence
     The Government's Decision To Award Contracts**……………………**4**

    **5. AR's Compliance Status And Ability To Protect Sensitive Data Was
     Material To NASA Contract Award Decisions**………………………**4**

    **6. AR Made False Statements And Material Omissions To Secure
     NASA Contracts And Subcontracts**…………………………………**5**

    **7. AR's Compliance Status And Ability To Protect Sensitive Data Was
     Material To The DOD's Contract Award Decisions**…………………**6**

    **8. AR Made False Statements And Material Omissions To Secure DOD
     Contracts And Subcontracts**…………………………………………**7**

    **9. AR Made False Statements And Material Omissions To Secure DOD
     Contracts And Subcontracts.** ………………………………………**8**

    **10. AR Has Been Paid Money On DOD Contracts Obtained By Fraud While It
     Was Not Compliant With The DFARS Clause**………………………...**9**

**III.      LEGAL ARGUMENT**………………………………………………**9**

    **A. The Summary Judgment Standard**………………………………**9**

**B. Relator's Undisputed Material Fact's Establish That AR Has Violated The False Claims Act As A Matter Of Law**.........................**10**

**1. Regulatory Background Of The NASA FARS and DFARS Cybersecurity Regulations**.........................................**10**

**2. AR Made False Statements And Concealed Its Cybersecurity Status So AR Could Continue To Receive Government  Contracts**..................**15**

**3. AR Is Obligated To Repay Three Times The Amount Th Government Has Paid On Fraudulently Obtained Contracts**...............................**16**

**4. AR Is Obligated To Repay Three Times The Amount The Government Has Paid On Fraudulently Obtained Contracts**..............................**19**

**IV.     CONCLUSION**.......................................................................**20**

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*California v. Campbell*, 138 F.3d 772  (9th Cir. 1998)…………………………………9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)………………………………………9.10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574……………………10

*Universal Health Servs., Inc. v. United States (Escobar),* 136 S. Ct. 1989 (2016)…17.18

*United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240

(E.D. Cal. 2019)………………………………………………………………………..1,17

*U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)………………19

*United States v. Union Pacific R.R. Co*., 565 F. Supp. 2d 1136 (E.D. Cal. 2008)………9.

**Statutes**

31 U.S.C. §3729(a)(1)(A)……………………………………………………………..1,18

**Rules**

Fed. R. Civ. P. 56………………………………………………………………………..9

**Federal Regulations**

48 C.F.R. § 252.204-7012……………………………………………………………….11

48 C.F.R. § 1852.204-76………………………………………………………………...14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.  INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 260, Relator Brian Markus (" Markus or Relator") seeks summary judgment against defendants, Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc. (hereafter collectively "AR") on count one of relator's second amended complaint ("SAC") for promissory fraud in violation of  31 U.S.C. §3729(a)(1)(A).

As this court has previously ruled, the essential elements for a claim based on promissory fraud are:  "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1245 (E.D. Cal. 2019) As set in relator's statement of undisputed  material facts and the evidence filed in support thereof, there is no genuine  dispute as to the material facts establishing these elements so relator is entitled to summary judgment as a matter of law.

As set forth is this motion, AR secured contracts with the federal government while it was non-compliant with mandatory NASA FARS and DFARS cybersecurity requirements. AR not failed to comply with these regulations but it failed to provide "adequate security" to protect the government's sensitive data related to military and space technology.

After experiencing several cyber intrusions from foreign countries  and being advised that it computer network was leaking data and could not detect intrusions, AR engaged in a fraudulent course of conduct by continuing to enter contracts with the government  and storing the government's sensitive data  while misrepresenting its cyber security status. AR's knew cyber

security status could influence the  government's decision to award contracts so AR responded to government inquiries with misdirection, critical omissions and fraudulent statements. As as aa result AR's fraudulent conduct the government had paid  AR billions of dollars.

## II. STATEMENT OF RELEVANT UNDISPUTED MATERIAL FACTS

**1.  AR Failed To Comply With Mandatory NASA FARS and DFARS Cybersecurity Requirements.**

During the period from May 2013 though at least May 31, 2016, AR was not compliant with the NASA FARS Clause or DFARS Clause cybersecurity requirements. (Undisputed Material Fact, hereafter "UMF" Nos. 7,8). AR was less than 25% compliant with the required NASA FARS, NIST 800-53 and DFARS NIST 800-171 controls.(UMF Nos. 1,2). Sensitive government information was not encrypted at rest or in transit as required by NASA FARS and DFARS Clause. (UMF No. 9) Given its organizational structure, resources and technical solutions AR did not have the ability to meet the majority of the required cybersecurity requirements. (UMF Nos. 3,4)

**2.  AR Failed To Provide Adequate Security To Protect Sensitive Government Data Related To Military and Space Technology.**

Starting  May 2013, AR's experienced multiple data breaches that allowed a foreign nation state to exfiltrate huge amounts of data. (UMF Nos. 11,12) At the time of these breaches, AR stored sensitive government data that included designs for advanced weapons systems and rocket designs that could assist a foreign country in developing an intercontinental ballistic missile.(UMF Nos. 14,15)  Emagined Security, Inc. ("ESI") advised AR it was probable there was advanced well-hidden malware in their system so

that AR could not stop cyber intrusions or prevent the unauthorized flow if data. (UMF No. 23) Two years later ,AR still was unable to detect or stop cyber intrusions as  two internal penetration tests conduct by EY in 2015, revealed that EY could penetrate the AR system in few hours undetected gaining  administrator access across the whole AR domain. (UMF No.17) A cybersecurity conducted at AR at the end of December found AR still had serious security deficiencies as AR had five high risk and one medium risk finding. (UMF No. 18)

### 3.  AR Knew It Was Non-Compliant And Failing To Provide Adequate Cybersecurity.

In July 2013, EY advised the AR Board their cybersecurity audit revealed eight high risk findings, (UMF No. 32) The report defined "High Risk" as involving a significant deviation  from regulatory requirements, fraud or management misconduct. (*Id.*) A second  EY audit in July 2015, revealed AR a decline in AR's security posture as they had 23 "high risk" findings. ESI advised AR in September 2013 it needed to change its corporate culture as its computer network could not detect or stop cyber intrusions and warned that AR was  risking government intervention and the loss of design data worth hundreds of millions of dollars. (UMF Nos. 22-26) ESI performed an audit in 2014 that found AR was only fully compliant with 5 of 59 required DFARS controls and 16 of 264 NASA FARs controls. (UMF Nos. 29,30) A second ESI audit in 2015 revealed that AR was only fully compliant with 41 of 188 required DFARS NIST SP 800-171 controls. (UMF No. 30) AR's VP and CIO Jose Ruiz ("RUIZ") agreed that AR was not providing adequate security to protect  resources on its system and  he did not feel comfortable

having his personal information on AR's computer network nor did he think the

government would be comfortable with AR's cyber security. (UMF Nos. 47-50)

**4. AR Knew Its Cybersecurity Compliance Status Could Influence The Government's Decision To Award Contracts.**

Multiple AR management employees acknowledged that if AR wanted to continue to

sell products NASA or the DOD they would have to comply with NASA FARS and

DFARS cybersecurity requirements. AR VP of Advanced Space Programs, Julie Van

Kleeck ("VAN KLEECK") knew that part of performing a NASA contract required

complying with the NASA FAR 1852.204-76 cybersecurity requirements. (UMF No. 60).

Moreover, VAN KLEECK sent an email where she acknowledged they had to keep the

customer apprised of AR's progress on DFARS compliance so they would stay with AR.

(UMF No. 61) AR VP, Scott Correll ("CORRELL") acknowledged AR compliance

status affected multiple business areas and would impact AR's awards and sales. (UMF

No. 62) Mark Tucker ("TUCKER"), AR's COO knew that for AR to get DOD and

NASA contracts AR was required to declare it was compliant with the DFARS and

NASA FARS cybersecurity requirements.(UMF No. 64)

**5. AR's Compliance Status And Ability To Protect Sensitive Data Was Material To NASA Contract Award Decisions.**

NASA confirmed the importance of complying  NASA FARS cybersecurity by

including these requirements as part of its statement of work (SOW) for NASA contracts.

AR entered a contract modification for contract NNM06A13C where the SOW required

technology protection which included Critical Program Information (CIP) identification,

Threat & Vulnerability Analysis, Selection and implementation of security countermeasures. (UMF No. 68) The SOW stated AR: " … shall ensure that NASA'S Sensitive But Unclassified (SBU) information,… is encrypted in storage and transmission." (UMF No. 69) Before awarding the RS-25 Restart Contract NASA wanted more information about AR's NASA FARS compliance and questioned AR about the status of compliance on its current RS-25 Liquid Engine and Adaptation Contract. (UMF Nos. 70-72) NASA requested a briefing by AR regarding the results of AR's NASA Gap Analysis ("NGA") so that AR could address their risk posture, advise them of steps AR was taking to mitigate NASA's risk and let NASA know whether they should be worried. (UMF No. 75)

### 6. AR Made False Statements And Material Omissions To Secure NASA Contracts And Subcontracts.

AR gave a presentation to NASA in December 2015 regarding its compliance status in regard to the NASA RS-25 Restart Contract and advised NASA, "Protective security controls to safeguard unclassified IT resources are in place to protect NASA's data when EY had just penetrated the AR network on November 16, 2015 undetected gaining domain administrator access, and ESI had advised AR they were leaking data every day. (UMF 17, 54, 79) The presentation advised NASA, AR had two factor authentication  in place when it was only in place at some locations. AR told NASA they were transitioning to a managed service provider for cyber security when hiring that provider was sixteen months away. (UMF Nos.80,81)

AR provided NASA Information Security Management Plans that claimed AR was following  NASA FARS  policies and procedures for which the NGA concluded AR was far from compliant. (UMF Nos. 88-105)  Information Technology  Security Inventories were submitted to NASA on contracts that falsely asserted AR has appropriate access controls to implement NASA Security requirements when they were only 22.8% compliant. (UMF Nos. 106,107,112,118) AR submitted inventories claiming that had "contingency planning" when the NGA indicated there did not appear to be a plan. (UMF Nos.106,109,113,118) These inventories indicated AR would comply with NASA incident response requirements, when AR could not detect cyber intrusions. (UMF Nos. 106,110,115,120) The inventories claimed AR had policies related to "access controls" to limit the authorized persons and devices allowed to access the AR system, when the NGA found there was no control over what external devices can be used on any of the systems. (UMF No. 106,108,119) When AR requested the  ESI consultant LAUNDRUP sign one of these inventories, he refused because he was uncomfortable with the documents assertions. (UMF No. 121)

### 7. AR's Compliance Status And Ability To Protect Sensitive Data Was Material To The DOD's Contract Award Decisions.

Even before enactment of the DFARS Clause, the Missile Defense Agency ("MDA") required that  government  contracts mandate the  protection of  Ballistic Missile Defense ("BMD") information  from network intrusions and data exfiltration. (UMF No. 124) After the enactment of the DFARS Clause, AR received communications from multiple DOD agencies compliance that the DFARS Clause was mandatory and if AR

wanted to participate in defense contracts they were expected to comply. This included communications from the Army, Navy, and Air Force. (UMF Nos.126,128,129)

Vicki Michetti ("MICHETTI") from the DOD CIO in reviewing an AR contract advised that there was no provision for a waiver of the DFARS Clause requirements and if the Army were to award AR an contract, AR was required to have the DFARS controls in place before they stored Controlled Technical Information ("CTI") belonging to the government on their computer network. (UMF No. 131) In a July 1, 2015 telephone conference, MICHETTI advised AR that DFARS Clause compliance was "a black and white issue, there is no middle ground, and when a contractor signs a contract, they are asserting they are compliant, not that there is a plan to compliancy." (UMF No. 139) Although the DFARS Clause allowed contractors to comply by providing alternate controls that provided equivalent protection, in awarding the GBSD Eval Study Contract, related to the redesign the Air Force's Minuteman III Intercontinental Ballistic Missile, AR was advised 100% compliance with the clause was required or the contract would not be awarded. (UMF Nos.135,136) Prime contractors also advised AR that compliance with the DFARS Clause was a mandatory flow down requirement for defense subcontracts. (UMF Nos. 132,134)

## 8. AR Made False Statements And Material Omissions To Secure DOD Contracts And Subcontracts.

AR made false statements to multiple DOD agencies regarding its cybersecurity status and AR's ability to protect the government's sensitive CTI information so it could continue to win defense contracts. Multiple letters were sent to defense agencies and

DOD prime contractors with misleading statements where AR dodged its non-compliance by characterizing non-compliant controls as 'Controls in Place with Enhancements ongoing" as well as "partial" controls and "mitigating" controls. UMF Nos. 151-157) After the DOD pushed back by telling AR compliance was "a black and white issue", AR started to describe their non-complaint controls as "alternate controls" that protected the information." (UMF Nos.139, 158) "Alternate Controls" at AR was code for alternate controls and no controls. (UMF No. 160)

AR was advising the government that its "alternate controls" protected the information at the same time EY had advised AR they had just penetrated the AR network undetected in four hours and gained administrator authority.(UMF Nos. 34-39, 158) Although NGA found AR was less than 25% DFARS compliant, AR told the DOD and prime contractors it was important to note that AR was compliant with the majority of the clause's requirements and assured the government they were making every effort to prevent a data breach. (UMF Nos. 21-28, 151-157,159)

To obtain the GBSD contract AR promised the Air Force they would be 100% compliant by providing stand-alone system and then failed to comply. (UMF Nos. 145-150). In a December 2015 presentation to the MDA, AR claimed to have protective security controls to safeguard unclassified IT resources in place, when EY had just penetrated the AR network on undetected November 16, 2015. (UMF 17, 165)

**9. AR Has Been Paid Money On NASA Contracts Obtained By Fraud While Not Compliant With The NASA FARS Clause.**

According to the official government website that tracks federal spending,

usaspending.gov, NASA has paid or is obligated to AR $4,269,770,516 on NASA contracts with a start date from June 1, 2013 to May 31, 2016, including NASA contract NNM06AB13C that was modified in July 2013. (UMF 193)

**10. AR Has Been Paid Money On DOD Contracts Obtained By Fraud While It Was Not Compliant With The DFARS Clause.**

According to the official government website that tracks federal spending, usaspending.gov, the DOD has paid or is obligated to pay AR, $2,078,242,523, for work done on DOD prime and subcontracts with a start date of June 1, 2013 to May 31, 2016. (UMF 210)

## III.   LEGAL ARGUMENT

### A.  The Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure a court "shall grant" summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Campbell, 138 F.3d at 780. One of the principle purposes of the rule is to dispose of factually unsupported defenses. United States v. Union Pacific R.R. Co., 565 F. Supp. 2d 1136, 1141 (E.D. Cal. 2008).

Once the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  The party opposing summary judgment may not rest on "mere allegations or denials" of his pleadings, but must tender evidence of specific facts in the form of affidavits or other admissible discovery material in support of its contention that the dispute exists. Matsushita, 475 U.S. at 586-87, n.11; Celotex, 477 U.S. at 324-25.  If the non-moving parties fail to make a sufficient showing on an essential element of their case, the moving party is entitled to a judgment as a matter of law.  Celotex, 477 U.S. at 323.

### B.  Relator's Undisputed Material Fact's Establish That AR Has Violated The False Claims Act As A Matter Of Law.

#### 1.  Regulatory Background Of The NASA FARS and DFARS Cybersecurity Regulations.

United States government contracts are subject to Federal Acquisition Regulations ("FAR"). There are also agency specific regulations that supplement FAR. Contracts entered with the DOD that are subject to Defense Federal Acquisition Regulations ("DFARS") and contracts entered with NASA are subject to NASA Federal Acquisition Regulations ("NASA FARS")

The federal government requires that all companies that enter contracts to provide good or services to the DOD or NASA meet minimum standards to prevent unauthorized access and disclosure of unclassified controlled technical information ("UCTI") or sensitive but unclassified information ("SBU") belonging to NASA or the DOD that will

be stored on the company's computer system in the course of the company performing the government contract. These minimum standards are set forth in the DFARS and NASA FARS regulations and apply to all federal contracts where the contractor will have access to UCTI or SBU belonging to the federal government.

Prior to November 18, 2013, the federal government ensured compliance with these regulations by incorporating terms in federal contracts setting minimum levels of cyber security to make sure that contractors' information systems were protected from unauthorized access. Contractors were required to meet the minimum standards for cyber security set forth in the DFARS and NASA FARS regulations in order to be awarded a government contract where they would have access to UCTI or SBU belonging to the federal government.

The DFARS and NASA FARS regulations require that contactors meet cyber security standards  specified by the National Institute of Standards and Technology ("NIST"). Contracting officers at NASA and the DOD are required to review contracts to see if there would be access to UCTI or SBU and to insert terms in the contract to make sure the DFARS and NASA FARS regulations relating to cyber security were incorporated as a term of the contract.

On November 18, 2013, the DOD issued a regulation, 78 Fed. 69,273, ("DOD REG") which intensified the safeguards required by government defense contractors to protect their computer systems from cyber- attacks that could result in unauthorized access and disclosure of UCTI belonging to the federal government. 48 C.F.R. § 252.204-7012

UCTI according to the DOD REG, included computer software as defined by DFARS Clause 252.227-7013 with a military or space application that is subject to DOD access controls. Technical information included engineering data, drawings, specifications, standards and technical reports. The DOD REG, which was effective immediately imposed two requirements: (1) that contractors provide adequate security for information systems that contain unclassified controlled technical information; and (2) that they report cyber incidents or any compromise of information systems.

The DOD REG required that all federal contracts with the DOD going forward incorporate DFARS Clause 252.204-7012. This clause was required in any contract with the government where the contractor would have access to UCTI belonging to the federal government.  The DOD REG required that contractors and subcontractors working on these federal DOD contracts meet the minimum cyber security safeguards set forth in DFARS Clause 252.204-7012.  DFARS Clause 252.204-7012 required that contactors meet the standards specified by the NIST Special Publication 800-53. The rule required that contractors implement 51 controls covering 14 areas of cyber security. In the event a contractor was deficient in meeting the NIST 800-53 standards in any respect, they were required to contact the government-contracting officer and advise them of the deficiency and explain to the contracting officer how they would be able to meet the standard through alternative means.

The NIST SP 800-53 standards were originally implemented to apply to contractors operating computer systems on behalf of the federal government. In June of 2015 the DOD and NIST published a new set of rules specifically tailored to defense

contractors storing controlled unclassified technical information on defense contractor computer systems, NIST 800-171. NIST 800-171 incorporated 109 cyber security controls from the NIST 800-53 standard.

In August 2015 the DOD issued an interim rule modifying DFARS Clause 252.204-7012.  Under the modified rule defense contractors were only required to meet the NIST 800-171 cyber security standards, which were less stringent than the requirements of NIST 800-53. When the NIST 800-171 standards were not met the clause required that defense contractors provide: "Alternative but equally effective security measures used to compensate for the inability to satisfy a particular requirement and achieve equivalent protection approved in writing by an authorized representative of the Department of Defense Chief Information Officer ("DoD CIO") prior to contract award."

The DOD amended the interim DFARS Clause 252.204-7012 effective December 31, 2015. The new rule required contractors be fully compliant with the NIST 800-171 standards as soon as practical but not later than December 31, 2017. For all contracts awarded prior to October 1, 2017, the contractor was required to notify the DoD CIO via email within 30 days of  the contract award, of any security requirements specified by NIST SP 800-171 not implemented at the time of contract award.

The contractor was required to submit requests to vary from the NIST SP 800-171 standards in writing to the DoD CIO. The contractor was only excused from a security control if it was "adjudicated by an authorized representative of the DoD CIO to be nonapplicable or to have an alternative, but equally effective, security measure that may be implemented in its place."

Every operative version of DFARS Clause 252.204-7012 required that contractors provide "Adequate Security" to protect UCTI on their system from unauthorized disclosure. The clause stated "Adequate security means protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information."

Contractors awarded contracts from NASA must comply with NASA FAR regulations. NASA FARS 1852.204-76 requires that 264 of the NIST SP 800-53 moderate control be incorporated in NASA contracts where the contractor would store sensitive but unclassified information (SBU) belonging to the federal government on their computer system while performing a contract for NASA.  48 C.F.R. § 1852.204-76

This regulation makes no provision for the contractor use alternative controls or protective measures. NASA FARS 1804.470-4(a) requires that this clause incorporated in every NASA contract where the contractor has access to or stores SBU belonging to the federal government on its computer system. NASA FARS 1852.204-76 states in pertinent part: " (a) The contractor shall protect the confidentiality, integrity, and availability of NASA Electronic Information and IT resources and protect NASA Electronic Information from unauthorized disclosure. (b) This clause is applicable to all NASA contractors and sub-contractors that process, manage, access, or store unclassified electronic information, to include Sensitive But Unclassified (SBU) information, for NASA in support of NASA's missions, programs, projects and/or institutional requirements."

Government contracting officers have no authority to enter a contract unless the contractor is complying with DFARS and NASA FARS regulations that are legally required to be incorporated in the contract. Federal Acquisition Regulation ("FAR") 1.602-1(b) provides that: "No contract shall be entered into unless the contracting officer ensures that all of the requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met." Compliance with DFARS and NASA FARS regulations that are that are required by law to be incorporated in a federal contracts are non-waivable contract terms. According to FAR 1.602-3 (c) (3), the Government can only ratify a change in a contract obligation if "The resulting contract would otherwise have been proper if made by an appropriate contracting officer."

### 2. AR Made False Statements And Concealed Its Cybersecurity Status So AR Could Continue To Receive Government  Contracts.

As set forth above and in Relator's Statement of Undisputed Material Facts filed in support of this motion AR was not compliant with these mandatory cybersecurity regulations from at least May 2013 through May 2016. AR's conduct was  more than a failure to comply with a list of regulatory controls. AR continued to place the government's sensitive data  on a computer network that was not secure so they could continue to work on government contracts.

AR was required to have "adequate" security to protect government resources. The DFARS Clause 252.204-7012  stated: "Adequate security means protective measures that

are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information." Here AR knew the loss of sensitive data was certain and the consequences were catastrophic as they were exposing intercontinental ballistic missile technology.

AR sent reports to NASA claiming to have access controls in place to meet the minimum NASA FAR requirements when they were only 23.9% compliant. Moreover, AR promised to comply with requirements to report cyber intrusions when they could not detect intrusions. Multiple letters we sent to DOD agencies and prime contractors where AR claimed to be complying the majority of the DFARS requirements while making every effort to prevent a data breach when they were leaking data.

When the MDA and NASA requested briefings in December 2015 to assess the risk to their data AR said "Protective security controls to safeguard unclassified IT resources are in place." AR assured the government their information was protected when EY and  had just penetrated the AR network for a second time and AR's CIO did not feel comfortable having his personal information on the system.

Although AR claimed they  disclosed their non-compliance to the government significance of those disclosure statements were always softened other statements like protective controls are in place to protect the information. AR characterized major deviations from regulatory requiremen as "areas for improvement.

**3.  Relator Has Established AR Violated The False Claims Act By Engaging In Promissory Fraud**

The essential elements of a claim for promissory fraud under the false claims act ("FCA") are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States v. Aerojet Rocketdyne Holdings, Inc., supr*a, at 1245.

Relator has established that AR engaged in a fraudulent course to conduct to secure government contracts making false statements and concealing information about its regulatory compliance.

The *scienter* requirement is established by the statements of multiple AR officers and management employees. The statements of these individuals in AR documents and deposition testimony, demonstrates AR was aware of its serious cybersecurity deficiencies and knew if the government learned the truth they would lose contracts. AR knew they were finessing the message, providing false statements and concealing serious vulnerabilities to mislead the government.

Under the FCA ,liability can arise from express falsehoods and material omissions. The Supreme Court in *Universal Health Servs., Inc. v. United States (Escobar),* 136 S. Ct. 1989 (2016) stated that liability under the FCA could be found by looking at common law fraud principles writing: "Because common-law fraud has long encompassed certain misrepresentations by omission, 'false or fraudulent claims' include more than just claims containing express falsehoods." *Id.* at 1999. Here AR not only made false statements but concealed the most important information the government would want to have that AR's system was vulnerable to cyber intrusions and leaking data.

In their motion to dismiss, defendants  conceded AR was not compliant with these regulations but argued that regulatory  compliance was not "material" to the governments' decision to award contracts.  AR's materiality argument is without merit as relator has presented overwhelming evidence that establishes "materiality" as a matter of law.

31 U.S.C. § 3729 defines states: The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. The Supreme Court in, *Escobar,* evaluated FCA "materiality by applying common principles writing:

> We need not decide whether § 3729(a)(1)(A)'s materiality requirement is governed by § 3729(b)(4) or derived directly from the common law. **Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.**'.. In tort law, for instance, a 'matter is material' in only two circumstances: (1) "**[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction'; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter** 'in determining his choice of action,' even though a reasonable person would not. Materiality in contract law is substantially similar. '[A] misrepresentation is material' only if it would 'likely ... induce a reasonable person to manifest his assent,' or the defendant "knows that for some special reason [the representation] is likely to induce the particular recipient to manifest his assent" to the transaction. (Citations omitted and emphasis added)   *Id.* at 2002-03

There is no dispute that the government attached in importance to AR's statements about  cybersecurity. The importance of cybersecurity, is established by the regulations themselves and the efforts of  DOD CIO office make sure the regulations are complied with an to approve alternate controls. Moreover, government communications  put AR on

notice that these regulations were important. AR was told they could not have the GBSD Study contract unless they were 100% compliant. AR  was the requirements were not waivable and that when AR signed a contract they were certifying compliance. AR even held meetings  with the MDA and NASA  address government questions about their security risk.

Applying the reasonable person standard, it is inconceivable that the government would not attach importance to the fact AR's computer network was not secure. No trier fact would  conclude that cybersecurity would not be important to the government in awarding  where they would share sensitive data related to national security.

The final element of promissory fraud is established because there is no question AR's fraudulent  conduct caused the government enter contracts and pay invoices on those contracts.

### 4.  AR Is Obligated To Repay Three Times The Amount The Government Has Paid On Fraudulently Obtained Contracts.

Where defendant is found liable for violating the FCA on a "promissory fraud or fraud in the inducement theory, the measure of damages is  the amount paid on every invoice submitted to the government on the fraudulent contract. As the court stated in *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006):

> Another approach to finding False Claims Act liability in the absence of an explicitly false claim is the "promissory fraud" or "fraud-in-the-inducement" theory. This theory, rather than specifically requiring a false statement of compliance with government regulations, is somewhat

broader. It holds that **liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct.** (Emphasis added) *Id.* at 1173

The measure if damages in this case is the amount of every invoice paid on every contract AR entered during its fraudulent course of conduct. According to the official government website that tracks federal spending, usaspending.gov, NASA has paid or is obligated to **$4,269,770,516** on AR NASA contracts with a start date from June 1, 2013 to May 31, 2016, including NASA contract NNM06AB13C that was modified in July 2013. (UMF No. 193). According to usaspending.gov, the DOD has paid or is obligated to pay AR, **$2,078,242,523**, for work done on AR DOD prime and subcontracts with a start date of June 1, 2013 to May 31, 2016. (UMF No. 210)

The total false claims damages AR is liable for is $6,348,013,039.  According to 31 U.S.C. § 3729 (G) AR is liable to the government for three times the damages the government has sustained. AR's total liability is **$19,044,039,117.**

### IV. CONCLUSION

Relator  requests that the court grant summary judgment as to court one of the SAC and enter judgment in the amount of **$19,044,039,117** against AR**.**

In the alternative Relator requests summary adjudication as to NASA Contract NNM16AA02C where invoices have been paid in the amount  $1,717,862,988 and that the damages be tripled for  a total award of **$5,153,588,964**.

In the alternative Relator  also requests summary adjudication as to NASA Contract NNM16AA12C where invoices have been paid in the amount $$175,165,695 request that those damaged be tripled for total award of **$525,497,085**.

Dated:  September 20, 2021                              Respectfully submitted,

                                                                    THYBERGLAW

                                                                     _/s/ Gregory A. Thyberg_
                                                                    GREGORY A. THYBERG
                                                                    Attorneys for Relator
                                                                     BRIAN MARKUS