Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:    (214) 972-1770
Facsimile:    (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne
Holdings, Inc. and Aerojet Rocketdyne, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. BRIAN MARKUS, individually,<br><br>       Relator,<br><br>   vs.<br><br>AEROJET ROCKETDYNE HOLDINGS, INC., a corporation and AEROJET ROCKETDYNE, INC., a corporation,<br><br>      Defendants. | Case No. 2:15-cv-02245-WBS-AC<br><br>**DEFENDANTS' OPPOSITION TO RELATOR'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>Judge:      Hon. William B. Shubb<br>Hearing Date:  November 1, 2021<br>Time:      1:30 p.m.<br>Courtroom:   5 |

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION.................................................................................................1

II.   BACKGROUND .................................................................................................3

    A.   Relator's SAC Only Alleges Fraud in Connection with Eighteen Contracts, Half of Which Do Not Even Contain the Relevant Contract Clause. ......................3

    B.   The Cybersecurity Clauses. ........................................................................4

    C.   Aerojet Disclosed its Noncompliance, the Government Understood Aerojet Was Not Compliant, and Nevertheless Continued to Contract with and Pay Aerojet............................................................................................................6

III.  LEGAL STANDARD ........................................................................................8

IV.   ARGUMENT.......................................................................................................9

    A.   As a Threshold Matter, Relator's Lack of Evidence Limits This Case to Eight Contracts, at Most. ......................................................................................9

    B.   For the Eight Contracts in the SAC with Cybersecurity Clauses, Relator Cannot Prove a FCA Violation. ................................................................11

        1.   Notwithstanding That No Such Evidence Exists, Relator's Failure to Even Attempt to Obtain Evidence of Materiality or Causation is Telling. .........................................................................................11

        2.   The Undisputed Evidence Shows that Aerojet's Compliance with the Cybersecurity Clauses Did Not Affect the Government's Contracting Decisions........................................................................13

        3.   Relator's Attempts to Distract from His Lack of Evidence of Causation and Materiality are Unavailing. ...................................19

    C.   Even if Relator Can Establish the Elements of His FCA Claim, Relator Is Not Entitled to the Actual Damages He Claims Because the Government Received the Contracted-For Products and Services............................................22

V.    CONCLUSION .................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Berg v. Honeywell Int'l, Inc.*,
226 F. Supp. 3d 962 (D. Alaska 2016), *aff'd*, 740 F. App'x 535 (9th Cir. 2018)............................8

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
637 F.3d 1047 (9th Cir. 2011) ......................................................................................................13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................................................8

*United States ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) ...................................................................................................8, 9

*United States ex rel. Hopper v. Anton*,
91 F.3d 1261 (9th Cir. 1996) .........................................................................................2, 8, 11, 13

*United States ex rel. Kelly v. Serco, Inc.*,
846 F.3d 325 (9th Cir. 2017) .............................................................................................2, 8, 18

*Knudsen v. Sprint Commc'n. Co.*,
2016 WL 4548924 (N.D. Cal. Sep. 1, 2016) ...............................................................................13

*United States ex rel. Lamers v. City of Green Bay*,
998 F. Supp. 971 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999) ...............................9, 13

*United States ex rel. Lewis v. Honolulu Cmty. Action Program*,
2019 WL 4739283 (D. Haw. Sept. 27, 2019) ...............................................................................14

*United States ex rel. McGrath v. Microsemi Corp.*,
140 F. Supp. 3d 885 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017).....................10, 14

*United States ex rel. McLean v. Cnty. of Santa Clara*,
2011 WL 5223076 (N.D. Cal. Oct. 31, 2011), *aff'd*, 542 F. App'x 579 (9th Cir.
2013) ..............................................................................................................................................9

*McSherry v. City of Long Beach*,
584 F.3d 1129 (9th Cir. 2009) .......................................................................................................1

*Nelson v. Pima Cmty. Coll.*,
83 F.3d 1075 (9th Cir. 1996) .........................................................................................................1

*United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*,
787 F. Supp. 2d 1329 (M.D. Ga. 2011) .........................................................................................9

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM.
ADJUDICATION**

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
  457 F.3d 963 (9th Cir. 2006) ...................................................................................9

*United States ex rel. Poehling v. Unitedhealth Grp.*,
  2018 WL 1363487 (C.D. Cal. Feb. 12, 2018).........................................................13

*U.S. ex rel. Thomas v. Siemens AG*,
  991 F. Supp. 2d 540 (E.D. Pa.), *aff'd*, 593 F. App'x 139 (3d Cir. 2014) .....................20

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
  715 F.2d 1327 (9th Cir. 1983) ...................................................................................8

*Uchytil v. Avanade*,
  2018 WL 11236950 (W.D. Wash. Aug. 16, 2018)..................................................19

*United States v. J-M Mfg. Co., Inc.*,
  2020 WL 4196880 (C.D. Cal. June 5, 2020) ......................................................22, 24

*United States v. Monaco Enters., Inc.*,
  2016 WL 3647872 (E.D. Wash. July 1, 2016)...........................................................9

*United States v. Woodbury*,
  359 F.2d 370 (9th Cir. 1966) ..................................................................................24

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S.Ct. 1989 (2016) .............................................................................................13

*United States ex rel. Westrick v. Second Chance Body Armor Inc.*,
  128 F. Supp. 3d 1 (D.D.C. 2015), *on reconsideration in part*, 2017 WL 8809510
  (D.D.C. Mar. 31, 2017), *on reconsideration in part*, 266 F. Supp. 3d 110 (D.D.C.
  2017) ....................................................................................................................12

**Statutes**

31 U.S.C. §§ 3729 - 3733 ........................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................8

**Other Authorities**

48 C.F.R. § 252.204-7012........................................................................... *passim*

48 C.F.R. § 1852.204-76............................................................................. *passim*

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM.
ADJUDICATION**

## I.      INTRODUCTION

Far from basing his summary judgment motion on an explanation of how the undisputed material facts support each element of False Claims Act ("FCA") liability, Relator's motion instead relies only on the repetition of the allegations in his Second Amended Complaint, as well as supposition and conjecture.  After years of litigation, these slender reeds are insufficient to support his motion for summary judgment on such serious charges directed at a government contractor like Aerojet Rocketdyne.

Even worse, Relator now inexplicably asks this Court to effectively bankrupt Aerojet, and find liability in connection with every single government contract it was awarded between June 2013 (oddly, a few months *before* one of the cybersecurity clauses at issue was even implemented) and May 2016, for a total of over $19 billion in purported damages.  He does so even though Aerojet disclosed its noncompliance to the government at multiple times and in multiple ways.  There has been no evidence uncovered in almost six years to show that the government was misled about Aerojet's compliance, or that it suffered any damages as a result of Aerojet's noncompliance with the cybersecurity clauses at issue.  In fact, quite to the contrary, the government knew Aerojet was not compliant, and despite this knowledge, the government decided to consistently award Aerojet contracts (even after Relator filed the complaint in this matter).

Relator's motion falls far short of the high showing a plaintiff must make to bypass a jury's scrutiny of his unsupported allegations.  Relator's motion for summary judgment should therefore be denied for numerous, independent reasons.

*First*, as a threshold barrier to granting Relator's motion, Relator has failed to present the Court with evidence that all of the contracts for which he seeks damages even contained the cybersecurity clauses at issue.  Alone, this is dispositive because Relator has failed to meet his initial burden of production.  *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009) ("Summary judgment requires facts, not simply unsupported denials or rank speculation.").  Relator's failure to present this threshold evidence is particularly important here where the record shows that of the

1

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

eighteen contracts Relator actually included in his SAC, **only half of them** even contain the relevant clause.  Aerojet simply cannot be liable for fraud for representations made in connection with contracts that do not even have the applicable requirements.  *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (affirming grant of summary judgment where compliance was not a prerequisite for payment).

*Second*, Relator's motion contains dozens of pages of inflammatory (and inaccurate) statements about Aerojet's cybersecurity, which (even if true) at most relate only to two elements of his claim: falsity and scienter.  He apparently hopes that the Court will draw unreasonable inferences to connect the dots for him where he lacks evidence to meet his burden of demonstrating the two remaining elements of his claim: materiality and causation.  Despite filing this case nearly six years ago and litigating this case for over three years after the government declined to intervene, Relator chose not to pursue discovery from any government contracting officer who awarded Aerojet a contract to determine whether Aerojet's cybersecurity status impacted (or could have impacted) their contracting decisions.  This is a remarkable omission.  Indeed, quite to the contrary, the evidence shows that the government would have (and did) award Aerojet contracts regardless of its compliance status.  The undisputed record reflects that Aerojet told the Department of Defense (the "DoD") and the National Aeronautics and Space Administration ("NASA") that its systems did not fully comply with the applicable cybersecurity standards and that the government understood as much.  Nevertheless, the government proceeded to contract with Aerojet, pay its claims, and accept its missile and rocket engine technology.  The government's actions in the face of knowing Aerojet's non-compliance foreclose any finding of fraud, and doom Relator's motion and case.  *See United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329 (9th Cir. 2017).

*Finally*, even if Relator had met his burden of proving fraud (he quite clearly has not), Relator has failed to present sufficient evidence to support his astronomical damages claim.  Relator does not submit invoices or proofs of payment showing that Aerojet was actually paid the sums he claims, which is fatal.  Nor has he explained how Aerojet can be liable for the entire contract amount (even for contracts that did contain the relevant cybersecurity clauses) when the government received and accepted the goods and services contemplated by the contracts.  In fact, at no point in

2

the many years this litigation has been ongoing did Relator ask a single government contracting officer what value they attached, if any, to compliance with the cybersecurity regulations. This additional omission in the record precludes Relator from obtaining damages under a full-contract-price theory. Even if Relator could satisfy the other elements of his fraud claims (he cannot), any damages should be limited to statutory penalties.

These shortcomings preclude Relator's motion from being granted, and for these and the additional reasons set forth in Aerojet's motion for summary judgment, preclude his case from proceeding to trial. Relator's motion should be denied, and this case should be dismissed.

## II.    BACKGROUND

### A.    Relator's SAC Only Alleges Fraud in Connection with Eighteen Contracts, Half of Which Do Not Even Contain the Relevant Contract Clause.

Relator alleges that Aerojet fraudulently induced the DoD and NASA into entering into contracts with it by misrepresenting its compliance with the agencies' respective cybersecurity clauses.[1] ECF No. 42 (the "SAC") ¶¶ 121–131. In his SAC, Relator identifies eighteen contracts purportedly procured by fraud, all of which are directly between Aerojet and the government. *Id.* ¶¶ 67–69; 84–119. In his motion, Relator—for the first time—alleges that Aerojet defrauded the government in connection with an additional thirty-two prime contracts and also in connection with one hundred forty two sub-contracts where Aerojet had no direct relationship with the government. Mot. at 9, Ex. Q[2] (reflecting printout of public information regarding Aerojet's contracts).

Notably, Relator does not submit the contracts for **any** of these awards as evidence, or provide any proof that the Cybersecurity Clauses were contained in the additional contracts. In fact, for the eighteen contracts identified in the SAC, **half** of them do not even contain the clauses

---

[1] Hereinafter, the NFS Clause (48 C.F.R. § 1852.204-76), the DFARS Clause (48 C.F.R. § 252.204-7012), and National Institute of Standards and Technology ("NIST") Special Publication 800-53 ("NIST 800-53") will be referred to collectively as the "Cybersecurity Clauses."

[2] References to Exhibits A–Q refer to the exhibits to the Declaration of Gregory Thyberg (ECF No. 125). References to Exhibits 1 through 213 refer to exhibits to the Declaration of Tammy Tsoumas submitted in support of Aerojet's Motion for Summary Judgment (ECF No. 117). References to Exhibits 214 through 260 refer to the exhibits to the Second Declaration of Tammy Tsoumas submitted in connection with this opposition.

3

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

(Aerojet's Additional Statement of Facts ("ASOF") ¶¶ 32, 35, 38, 43, 44, 46, 47, 49, 51):

| Date of Contract | SAC ¶ | Contract No. | Agency | Contains Cybersecurity Clause | ASOF ¶ |
|---|---|---|---|---|---|
| 2/25/2014 | 85 | W31P4Q-14-C-0075 | Army | **No** | 32 |
| 3/11/2014 | 106 | NNC10BA13B, NNC13TA66T | NASA | Yes[3] | 33 |
| 4/22/2014 | 86 | N00014-14-C-0035 | Navy | Yes | 34 |
| 9/29/2014 | 87 | FA8650-13-D-2335, Award ID 0002 | Air Force | **No** | 35 |
| 9/30/2014 | 89 | FA8650-14-C-7424 | Air Force / DARPA | Yes | 36 |
| 9/30/2014 | 88 | N68936-14-C-0035 | Navy | Yes | 37 |
| 12/15/2014 | 107 | NNC10BA02B, NNC15TA07T | NASA | **No** | 38 |
| 3/31/2015 | 109 | NNC15CA07C | NASA | Yes | 39 |
| 4/8/2015 | 90 | FA8650-13-D-2335, Award ID 0003 | Air Force | **No** | 43 |
| 7/27/2015 | 110 | NNC15VD08P | NASA | **No** | 44 |
| 9/15/2015 | 92 | HR001115C0132 | DARPA | Yes | 45 |
| 10/8/2015 | 93 | FA8650-13-D-2335, Award ID 0004 | Air Force | **No** | 46 |
| 11/17/2015 | 112 | NNM16AB22P | NASA | **No**[4] | 47 |
| 11/19/2015 | 111 | NNM16AA02C | NASA | Yes | 48 |
| 12/14/2015 | 108 | NNM16AB21P | NASA | **No** | 49 |
| 12/23/2015 | 67 | W31P4Q-16-C-0026 | Army | Yes | 50 |
| 1/15/2016 | 113 | NNH16CP17C | NASA | **No** | 51 |
| 4/1/2016 | 114 | NNM16AA12C | NASA | Yes | 52 |

**B.** **The Cybersecurity Clauses.**

Relator's case centers on Aerojet's representations to the DoD and NASA regarding its compliance with the respective agencies' cybersecurity regulations, the DFARS Clause and the NFS Clause, respectively. Though similar, the clauses have differing requirements.

**The DFARS Clause at Issue Has Been Rescinded and Replaced**. Perhaps intentionally, Relator does not state in his motion with which version of the DFARS Clause Aerojet was required to comply. The undisputed record, however, reflects that the five DoD contracts in Relator's SAC that contain any DFARS Clause at all, contain a version of it from November 2013. *See* ASOF ¶¶ 33, 34, 36, 37, 39, 45, 48, 50, 52. As more fully explained in Aerojet's motion for summary judgment (ECF No. 116 ("AMSJ")) and as admitted by Relator (Mot. at 12), as early as 2015, the government abandoned the standard incorporated into the November 2013 version of the clause and

---

[3] The specific task order Relator includes in his SAC does not contain the NFS Clause. SUF ¶ 33. However, the parent award, which the task order incorporates, does. *Id.*

[4] There is no evidence that contract NNM16AB22P contained the NFS Clause.

4

admitted that it was unworkable for private contractors, like Aerojet.  ASOF ¶¶ 3, 4, 23; AMSJ at 6–8.

While in effect, the 2013 DFARS Clause applied only to contracts for which a contracting officer made a determination that unclassified controlled technical information would be involved.  ASOF ¶ 2; Mot. at 11 (admitting that the DFARS clause was only to be inserted into contracts determined by contracting officers to require "access to UCTI OR SBU").  If the clause was incorporated into a covered contract, it required that a contractor provide "adequate security."  *See* 48 C.F.R. § 252.204-7012 (b)(1)(i) (Nov. 18, 2013).  According to the 2013 DFARS Clause, "adequate security" included "at a minimum" implementing the selected NIST 800-53 controls set forth in the clause.  *Id.*  If a contractor had not implemented the minimum controls, the contractor was required to submit a "written explanation" to the contracting officer regarding its systems.  *Id.*

As discussed further below, Aerojet disclosed to the government that it had not yet implemented all of the required controls, and the DoD nevertheless proceeded to do business with Aerojet (both before and after Relator filed his complaint) and continues to contract with Aerojet to this day.

**The NFS Clause**.  Where incorporated into contracts, the NFS Clause requires NASA contractors to "protect the confidentiality, integrity, and availability of NASA Electronic Information and IT resources and protect NASA Electronic Information from unauthorized disclosure."  ASOF ¶¶ 25–29.  As Relator acknowledges, the NFS Clause is only applicable to contracts that involve sensitive but unclassified information ("SBU").  *See* Mot. at 11 (admitting that the NFS Clause was only to be inserted into contracts determined by contracting officers to include SBU).  By its terms, the NFS Clause does not require that a contractor's information technology system meet any specific security standard on its face, but instead, instructs NASA contracting officers to identify cybersecurity requirements in an "Applicable Documents List (ADL) provided as an attachment to the contract."  *Id.*  As with the DoD, Aerojet disclosed to NASA the state of its systems and that it was not compliant with the NIST 800-53 standard, and like the DoD, NASA proceeded to do business with Aerojet and continues to contract with Aerojet to this day.

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

### C.     Aerojet Disclosed its Noncompliance, the Government Understood Aerojet Was Not Compliant, and Nevertheless Continued to Contract with and Pay Aerojet.

Relator's motion focuses heavily on Aerojet's non-compliance (a fact that Aerojet does not dispute and in fact repeatedly disclosed to the government long before the initiation of this lawsuit), but mentions only in passing that Aerojet sent disclosure letters stating that it was not compliant with the Cybersecurity Clauses to the government agencies that he claims Aerojet defrauded.  *See* Mot. at 8.  In fact, Aerojet sent at least one disclosure letter to each of the implicated DoD agencies, which plainly stated it was not fully compliant with the cybersecurity standards in the DFARS Clause.  *See* AMSJ at 9–14; ASOF ¶ 61, Ex. 78 (Army); ¶ 67, Ex. 83 (Army); ¶ 77, Ex. 89 (Army); ¶ 82, Ex. 110 (Navy); ¶ 94, Ex. 59–61 (Air Force and DARPA), ¶ 97, Ex. 65 (Air Force).

Relator claims that Aerojet's letters somehow "softened" the message of its non-compliance to its customers (Mot. at 16), but nowhere states, or provides evidence, that the government understood Aerojet's disclosures as something other than stating its non-compliance.  To be sure, Relator did not ask a single contracting officer who awarded Aerojet a contract whether they understood Aerojet's letters to state anything but non-compliance.  Instead, the only evidence in the record reflects that the government plainly understood Aerojet's letters as a statement that Aerojet was not fully compliant with the baseline cybersecurity requirements set forth in the DFARS Clause. *See, e.g.*, ASOF ¶¶ 69, 71, 80, 107, 108, 115, Exs. 79, 82, 88, 86, 89, 91, 94, 97.  In fact, Ms. Laurie Hewitt, ***the <u>only</u> contracting officer to offer deposition testimony in this case***, understood based on Aerojet's disclosure that Aerojet "did not comply with the DFARS Clause" and information in Aerojet's disclosure statement informed her exactly "how noncompliant Aerojet was."  ASOF ¶ 80, Ex. 8 at 25:14–26:4.

Relator similarly fails to cite the litany of communications Aerojet had with the government at the time about its non-compliance, including numerous teleconferences with the Army, the Defense Contract Management Agency, the Defense Advanced Research Projects Agency, the Office of the Chief Information Officer, and the Air Force throughout the relevant time period. ASOF ¶¶ 57–125.  Nor does he mention that the evidence reflects that the government's takeaway

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

from all of these discussions was that Aerojet was not compliant.  ASOF ¶ 66, Ex. 82; ¶ 80, Ex. 94; ¶ 123, Ex. 115; ¶ 106, Ex. 54; ¶ 96, Ex. 64. For example:

- **Army**:  Aerojet sent a letter disclosing that it was not compliant with the DFARS Clause to the Army on September 29, 2014 (Ex. 78) and the record reflects that the Army understood that Aerojet's letter was "identif[ying] [Aerojet's] noncompliance."  Ex. 8 at 92:3–6.

- **Air Force**:  On September 18, 2014, Aerojet sent a letter to the Air Force disclosing its non-compliance (Exs. 59–61), from which the Air Force understood that Aerojet "ha[d] developed a phased approach which will assist in efforts to become fully compliant [with the NIST 800-53] controls in the future."  (Exs. 65–66).

- **DARPA**:  After reading Aerojet's disclosure letter and discussing Aerojet's status with Aerojet, DARPA concluded that Aerojet "had a reasonable plan to comply" with the NIST requirements, and concluded that the "new Gov't [DFARS] clause was not well thought thru."  Exs. 59–62.

- **DoD OCIO**:  Representatives from the DoD Chief Information Officer's Office (the "OCIO") read Aerojet's disclosure letter to the Army and understood from it that Aerojet was "not compliant."  Exs. 86, 89.

Relator acknowledges that Aerojet also had a dialogue with NASA about its non-compliance with the NIST standards (Mot. at 5–6), but omits that Aerojet expressly told NASA ***in no uncertain terms*** that it was only compliant with 37% of the NIST controls in February 2016.  ASOF ¶ 134, Ex. 162.

| NASA FARS Gap Analysis and Current Status Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Gap Analysis Report | | | February 2016 | |
| **Requirements Source** | **Total** | **Compliant** | **Non-Compliant** | **Percent Compliant** | **Compliant** | **Non-Compliant** | **Percent Compliant** |
| NASA (NIST SP 800-53 Moderate Controls) | 264 | 63 | 201 | 24% | 97 | 167 | 37% |

Relator further ignores the evidence showing that NASA understood the extent of Aerojet's non-compliance and responded by offering Aerojet support, guidance, and encouragement.  ASOF ¶ 152, Ex. 180; ¶ 141, Ex. 168; ¶ 145, Ex. 169; ¶ 152, Ex. 180.

7

Critically, in the face of Aerojet's disclosures that it was not compliant with the Cybersecurity Clauses, the government did not stop doing business with Aerojet; it continued to award Aerojet contracts, pay Aerojet's invoices, and accept Aerojet's missile and rocket engine technology pursuant to the contracts.  *See* ASOF ¶¶ 118, 126, 155–227.  Indeed, even after Relator filed this action in 2015 and the government thoroughly investigated his claims, the government continued to award Aerojet contracts (over forty) and continued to pay Aerojet on contracts Relator expressly identified in his pleadings as having been allegedly procured by fraud.  *See* ASOF ¶¶ 160–226.

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment for a plaintiff can only be granted where the evidence submitted establishes each element of his claim ***and*** reflects that there is no genuine dispute as to any material fact on each of those elements.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *United States ex rel. Berg v. Honeywell Int'l, Inc.*, 226 F. Supp. 3d 962, 967 (D. Alaska 2016), *aff'd*, 740 F. App'x 535 (9th Cir. 2018).  The evidence, and any inferences based on underlying facts, must be viewed in the light most favorable to the non-movant.  *See Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1328–29 (9th Cir. 1983).

In this FCA case, granting summary judgment in Relator's favor requires findings that Relator has presented undisputed evidence that: (1) Aerojet made false or fraudulent statements, (2) with scienter, (3) that were material, and (4) that caused the government to contract with Aerojet.  *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006); *see also* 31 U.S.C. § 3729(a).  Fraudulent inducement is "actionable in ***rare*** circumstances," and requires a close examination of the temporal relationship between any false or misleading statements and the government's contracting decision.  *See Hopper*, 91 F.3d at 1267 (emphasis added).  To prove a fraudulent inducement claim,[5] a relator must meet a heavy burden to show that the government

---

[5] Relator moves only on Count One of his SAC for Promissory Fraud (otherwise known as "fraudulent inducement").  Relator seeks no relief for Count Two of his SAC based on a false certification theory, presumptively because he cannot point to any false statement Aerojet made in a claim for payment, as required by *Kelly*, 846 F.3d at 332; *see also* AMSJ at 24-25.

would not have entered into the contract but for the alleged fraud.  *Hendow*, 461 F.3d at 1173.[6]

## IV.   ARGUMENT

### A.   As a Threshold Matter, Relator's Lack of Evidence Limits This Case to Eight Contracts, at Most.

To begin, Relator's claims must be confined to (at most) the contracts specifically identified in his SAC: the eighteen prime awards between Aerojet and the DoD or NASA (ECF No. 42 ¶¶ 67–69; 84–119).  Relator cannot now, six years after filing his case, seek to exponentially expand the scope of his case beyond what was pleaded through a dispositive motion.  Yet the instant motion tries to do exactly that.  Relying solely on public information about Aerojet's contracts, Relator purports to sweep in an additional seventeen prime DoD contracts, fifteen prime NASA contracts, fourteen NASA subcontracts, and one hundred forty two DoD subcontracts.  Defs.' Resp. to Relator Brian Markus' Statement of Facts ("RSOF") ¶¶ 431, 448, Ex. Q.  Relator's case should—at most—be limited to the contracts identified in his SAC.[7]  "At the summary judgment stage, liberal pleading standards are inapplicable, and new claims cannot properly be raised for the first time on summary judgment." *United States ex rel. McLean v. Cnty. of Santa Clara*, 2011 WL 5223076, at *14 (N.D. Cal. Oct. 31, 2011), *aff'd*, 542 F. App'x 579 (9th Cir. 2013).  Relator's SAC only alleged fraud in connection with eighteen contracts, and his motion must be limited to those contracts alone.  *See also Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir. 2006) (concluding that the district court did not err in finding that plaintiff failed to provide adequate notice of her claims where the specific factual grounds for those claims were presented for the first time on summary judgment).

---

[6] *See also United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1340 (M.D. Ga. 2011) (explaining fraudulent inducement "is a difficult theory under which to proceed" and granting summary judgment for defendant); *United States v. Monaco Enters., Inc.*, 2016 WL 3647872, at *7 (E.D. Wash. July 1, 2016) (explaining fraudulent inducement is a "difficult [theory] to sustain"); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 987 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999) (same and granting summary judgment for defendant).

[7] Importantly, three of even those eight contracts were awarded after Relator "commenced this litigation" and "are not at issue" under this Court's order on Aerojet's motion to dismiss. *See* ECF No. 57 at 11; ASOF ¶¶ 48, 50, 52.

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

Moreover, Relator fails to meet his burden to prove *fraud* in connection with any specific contracts.  In fact, tellingly, *Relator does not submit a single contract to the Court*.  The record on Relator's motion is thus strikingly devoid of any evidence that the contracts *actually contained the Cybersecurity Clauses* he claims Aerojet lied to the government about.  Simply put, Relator cannot begin to prove falsity if there is no evidence establishing what Aerojet was even required to disclose for a specific contract.  In other words, Aerojet cannot be liable for a violation of the FCA for purportedly making a false or misleading statement regarding its compliance status with the Cybersecurity Clauses if those clauses were not even included in the contract.[8]

This omission is important when the undisputed record shows that a substantial portion of contracts in Relator's chosen timeframe *do not even contain the Cybersecurity Clauses*.  *See* ASOF ¶¶ 32, 35, 38, 43, 44, 46, 47, 49, 51, Ex. 21 at 33:6–11.  In fact, Relator himself admits that the Cybersecurity Clauses are not included in every contract when he admits that the clauses are only applicable where a contracting officer has "review[ed] contracts to see if there would be access to UCTI or SBU."  Mot. at 11.  Again, Relator has not submitted any evidence to show that *any* contract actually was determined to include UCTI or SBU.  To be sure, for two contracts: NNC15CA07C (NASA) and W31P4Q16C0026 (Army), there is unrefuted evidence showing that the contracting agencies determined that the clauses would *not* apply despite being included in the contracts because no UCTI or SBU was involved.  ASOF ¶¶ 39–42; Ex. 102.

There undoubtedly cannot be a viable FCA claim (or even a garden variety breach of contract claim for that matter) when there is no evidence that there was a contract clause, or applicable regulation, rule, or statute that was violated.  *See, e.g.*, *United States ex rel. McGrath v. Microsemi Corp.*, 140 F. Supp. 3d 885, 902 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017)

---

[8] For the DoD contracts and subcontracts, even if Relator had presented evidence that the contracts contained some version of the DFARS Clause, Relator's claims cannot proceed because there is no evidence to show what version of the DFARS Clause the contracts contained.  As discussed in Aerojet's Motion for Summary Judgment (ECF No. 116), the technical requirements incorporated into the DFARS Clause changed drastically between August 2015 and the present and any alleged fraud must be evaluated in the context of which requirements applied.

(compliance must be a prerequisite for payment); *Hopper*, 91 F.3d at 1267 (affirming grant of summary judgment where compliance was not a prerequisite for payment).

Because Relator fails to submit the contracts as evidence, Relator's motion should thus be denied on this threshold basis alone.  At a minimum, Relator's case should be limited to the eight contracts in his SAC that actually contained the relevant clause.

**B.   For the Eight Contracts in the SAC with Cybersecurity Clauses, Relator Cannot Prove a FCA Violation.**

Relator's motion fails for the independent reason that even for the eight contracts at issue, Relator cannot prove (1) materiality or (2) causation.  Failure to establish either element defeats summary judgment.[9]  Relator's embellished narrative without factual support for Aerojet's purportedly inadequate cybersecurity is of no moment when the government was on notice of Aerojet's noncompliance with the Cybersecurity Clauses.  The motion's bare assertions about Aerojet's cybersecurity are merely distractions from the material facts that the Court must evaluate.

**1.   Notwithstanding That No Such Evidence Exists, Relator's Failure to Even Attempt to Obtain Evidence of Materiality or Causation is Telling.**

Despite Relator's bold assertions of "overwhelming evidence" to support materiality and that there is "no question" that causation is established, Relator's motion has gaping holes.  Mot. at 18–19.  Though having nearly three years to conduct discovery, Relator chose not to depose a single contracting officer who awarded Aerojet a contract.[10]  He therefore lacks any testimony to show that Aerojet's non-compliance with the Cybersecurity Clauses had any effect on the government's award decisions, let alone that such representations were the ***reason*** the government entered into contracts with Aerojet.  Indeed, Relator devotes only one sentence to the required and stringent causation requirement, stating that "there is no question AR's fraudulent conduct caused the government [to] enter contracts . . . ."  Mot. at 19.  As noted above, an assertion by Relator's counsel that an element

---

[9] For the avoidance of doubt, Aerojet does not concede that Relator can prove the two remaining elements of his claim (falsity and scienter).  Instead, because Relator cannot prove materiality and causation, Relator's motion fails in any event.

[10] Laurie Hewitt, the only contracting officer to be deposed in this case, retired prior to the time that Contract No. W31P4Q-16-C-0026 was awarded to Aerojet. *See* Ex. 8 at 62:4–17.

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

is met is insufficient to meet any burden on the basis of undisputed facts, let alone one sufficient to prove fraud.

Relator's failure to pursue discovery leaves a glaring blank space about why the government paid Aerojet for its goods and services despite knowing that Aerojet's cybersecurity did not meet all of the baseline technical requirements contained in NIST 800-53.  The common-sense inference filling this void can only be that the government did not consider full compliance with the Cybersecurity Clauses material to its decision-making.  This reasonable inference alone precludes summary judgment in Relator's favor.  Relator also provides no explanation whatsoever for the government's continued payment after Relator filed this case and after investigating Relator's allegations for nearly two years.

Furthermore, the undisputed evidence reflects that there is no causal link between Aerojet's Cybersecurity Clause compliance status and the government's contract awards, which is independently required for Relator to prevail on his claims.  *See* AMSJ at 25–29.  Indeed, after repeatedly learning of Aerojet's non-compliance with the NIST 800-53 controls, including through this litigation, each of the government agencies: (i) continued to award Aerojet contracts; (ii) paid its invoices; and, (iii) accepted its goods and services.  *See supra* Section II.C.  All of these facts conclusively establish that the government would have awarded Aerojet contracts regardless of any misstatement about its cybersecurity compliance and summary judgment should be granted in Aerojet's favor.  *See United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015), *on reconsideration in part*, 2017 WL 8809510 (D.D.C. Mar. 31, 2017), *on reconsideration in part*, 266 F. Supp. 3d 110 (D.D.C. 2017) ("To prevail under [a] fraudulent inducement theory, [the government] must prove not only that the omitted information was material but also that the government was induced by, or relied on, the fraudulent statement or omission when it awarded the contract.") (internal citation omitted).

Relator's evidentiary and legal gaps mean that he cannot meet his burden to prove materiality or causation, and therefore, for this reason alone, he is not entitled to summary judgment.

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

2.     **The Undisputed Evidence Shows that Aerojet's Compliance with the Cybersecurity Clauses Did Not Affect the Government's Contracting Decisions.**

Relator declares that it is "inconceivable that the government would not attach importance" to Aerojet's non-compliance with the Cybersecurity Clauses (Mot. at 19), but commits miniscule space to addressing the government's ***actual*** response when Aerojet disclosed its non-compliance. Instead of addressing the actual evidence that is dispositive of the elements of materiality and causation, Relator points to four "facts" that he argues establish materiality: (1) that compliance with the Cybersecurity Clauses was "mandatory" and "not waivable;" (2) that the government asked Aerojet questions about its compliance; (3) that the OCIO engaged in "efforts" to "make sure the regulations are complied with," and (4) that a contract not named in Relator's SAC required an isolated, DFARS-compliant system.  Mot. at 18–19.  As outlined below, none of these purported facts establish materiality, and in any event, the undisputed record reflecting the government's actual conduct in the face of known non-compliance shows that compliance with the Cybersecurity Clauses was not material for purposes of imposing FCA liability.

### a.     *Pointing to Regulations Is Insufficient to Prove Materiality.*

Relator claims that materiality of compliance with the Cybersecurity Clauses "is established by the regulations themselves" because compliance was "mandatory," "required," and "not waivable."  Mot. at 6, 7, 18.  To begin, "merely point[ing] to [] regulations . . . is not sufficient to meet the rigorous standard for [] materiality."  *Knudsen v. Sprint Commc'ns. Co.*, 2016 WL 4548924, at *13 (N.D. Cal. Sep. 1, 2016); *see also United States ex rel. Poehling v. Unitedhealth Grp., Inc.*, 2018 WL 1363487, at *9–10 (C.D. Cal. Feb. 12, 2018) (allegations "that Defendants were obligated by various regulations and contracts to comply with the Attestation requirements" under Medicare were insufficient to establish materiality); *Hopper*, 91 F.3d at 1267 ("Mere regulatory violations do not give rise to a viable FCA action."); *Lamers*, 168 F.3d at 1020 ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations."); *Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011) (breach of contract does not suffice for FCA claim).  Indeed, the Supreme Court in *Escobar* made clear that designating something as a "requirement" is not sufficient to meet the FCA's materiality standard.

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2003 (2016) ("A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment"); *see also United States ex rel. Lewis v. Honolulu Cmty. Action Program*, 2019 WL 4739283, at *7 (D. Haw. Sept. 27, 2019) (granting defendant's motion for summary judgment even where compliance may have been a condition for payment).

Even if designation of a regulation as a "requirement" were sufficient, the undisputed evidence shows, as a matter of law, that compliance with the Cybersecurity Clauses was ***not*** a requirement for payment or contract award, as nothing in the clauses themselves nor the specific contracts tie compliance to payment. *See* AMSJ at 39–42. Instead, the clauses merely state what a contractor "shall" do, but have no reference to any financial repercussions for not doing so. *See McGrath*, 140 F. Supp. 3d at 902 (no materiality where link to payment was missing, despite technical requirement being required in every contract).

Relator also claims that the DFARS clause was "not waivable," but points to no evidence on this point. Mot. at 19. Nor could he—certain contracting officers ***did*** waive the DFARS Clause. *See, e.g.*, ASOF ¶ 120, Ex. 119 (contracting officer stating that she "removed the [DFARS Clause] from the [contract] mod[ification].") The DoD OCIO also suggested that a waiver was possible for non-compliant contractors at the discretion of the contracting officer:

> "If the contractor is not compliant with the DFARS clause, the contracting officer (you) and the requiring activity need to determine appropriate action. DoD CIO does not have authority to approve non-compliance with the clause."

ASOF ¶ 236, Ex. 189; *see also* Ex. 21 at 20:1–8 ("If they don't have all of the requirements implemented . . . it becomes [] a risk-based decision for our requiring activities and program offices . . ."); *id.* at 34:15–35:9 (reiterating that contracting with a contractor who had not implemented all of the NIST controls is a "risk-based decision for the program managers and the requiring activity.").

        **b.**    ***That the Government Awarded Contracts and Continued to Pay After Receiving Information About Aerojet's Non-Compliance Supports a Lack of Materiality.***

Relator claims that the fact that Aerojet "held meetings with the MDA and NASA [to] address government questions about their security risk" suggests materiality of the Cybersecurity

Clauses.  Mot. at 19.  Aerojet agrees with Relator that after Aerojet informed its customers that it had not fully implemented the NIST 800-53 controls, certain government customers did request further information from Aerojet about its cybersecurity compliance.  *See, e.g.*, ASOF ¶¶ 59, 71, 114, 132.  Relator, however, ignores the other half of the story, which shows immateriality as a matter of law.

Aerojet provided detailed information about its progress toward compliance with the cybersecurity requirements to both the MDA and NASA, as well as many other customers.  ASOF ¶¶ 57–153.  In June 2015, in connection with Contract No. HQ0147-15-C-0010 (which is not identified in Relator's SAC), Aerojet provided a detailed disclosure letter to MDA explaining that it was "actively working to protect all information related to Department of Defense programs," but that it was only technically "compliant" with ten of the NIST 800-53 controls.  ASOF ¶ 116, Ex. 116.  Knowing of Aerojet's non-compliance, MDA then awarded Aerojet that contract and Relator congratulated the team.  *See* ASOF ¶ 118, Ex. 117.

Similarly, in December 2015, in connection with Contract No. HQ0147-13-C-0005 (also not in Relator's SAC), Aerojet made a detailed presentation to the MDA with support from its technical experts in which Aerojet plainly stated that it was only 28% compliant with the requirements in the 2015 DFARS Clause:

**DFARS (2015) Gap Analysis and Current Status Summary**

| Requirements Source | Total | October 2015 | | | November 2015 | | |
|---|---|---|---|---|---|---|---|
| | | Compliant | Non-Compliant | Percent Compliant | Compliant | Non-Compliant | Percent Compliant |
| DFARS (2015) (NIST SP 800-171) | 188 | 41 | 147 | 22% | 53 | 135 | 28% |

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

ASOF ¶ 119, Ex. 118.  Aerojet further explained to MDA that it had a plan for compliance, but did not expect to be compliant until mid-year 2017.



*Id.*  In response to Aerojet's clear disclosure of non-compliance, MDA did not stop doing business with Aerojet, cancel a contract, or pull funding.  To the contrary, MDA stated that Aerojet had the "Best Plan, Only Detailed Plan they have seen" for compliance with the DFARS Clause.  *Id.*  They even went so far as to **remove the DFARS Clause from the contract**.  *See* ASOF ¶ 120, Ex. 119.

NASA similarly accepted Aerojet's non-compliance, and moved forward with contracts. Indeed, taking the two example contracts for which Relator specifically requests that the Court award him billions of dollars in damages, NNM16AA02C and NNM16AA12C (Mot. at 20–21), the undisputed record reveals that Aerojet disclosed its non-compliance:

**Contract No. NNM16AA02C**

- In June 2015, Aerojet submitted its proposal for Contract No. NNM16AA02C in which Aerojet disclosed its non-compliance:

  > AR, Inc. **is not fully compliant** per the Security Requirements for Unclassified Information Technology Resources at this time.  Efforts are in process to assess the gaps between the technical requirements and the current AR information technology system.  Further information will be provided as it becomes available.

(ASOF ¶ 128, Ex. 153 (emphasis added)).

- The contract was then awarded to Aerojet in November 2015.  ASOF ¶ 48.

- In connection with the same contract after award but before performance began, in February 2016, Aerojet made a detailed presentation further revealing that it was only 37% compliant with NIST 800-53.  ASOF ¶ 134, Ex. 162.

- Contract No. NNM16AA02C remains in progress and is expected to be completed in 2024. ASOF ¶ 214.


**Contract No. NNM16AA12C**

- Aerojet made a detailed presentation to NASA disclosing that it was only 37% compliant with NIST 800-53.  ASOF ¶ 134, Ex. 162.

- NASA awarded Contract No. NNM16AA12C less than two months later, on April 1, 2016. ASOF ¶ 52.

- In January 2017, Aerojet submitted another document to the contracting officer for Contract No. NNM16AA12C, again disclosing that its systems did not comply with NIST 800-53:

> As a part of our ongoing efforts to enhance IT security controls, AR completed a gap analysis of our enterprise infrastructure to assess our IT security posture from a documentation and technical perspective.  Identified gaps in compliance with [NIST 800-53] have been documented in Plans of Action and Milestones (POAMs) and closure will be addressed under detailed plans documented in each POAM.  Compliance gaps driven by necessary updates to documentation will be closed in Q2 2016 while technical gaps will be addressed incrementally through 2017 as AR transitions to a managed services model for information technology applications, infrastructure and cyber security management.

ASOF ¶ 150, Ex. 179.

- Contract No. NNM16AA12C also remains in progress to this day.  ASOF ¶ 223.

> **c.     *That the OCIO Did Not Enforce the DFARS Clause, and Instead Relaxed the 2013 DFARS Clause's Requirements, Demonstrates a Lack of Materiality.***

Relator argues that compliance with the DFARS Clause was material because the DoD OCIO's office took "efforts" to "make sure that the regulations are complied with an[d] to approve alternate controls."  Mot. at 18.  Again, Relator points to no evidence to support this assertion, and

the undisputed evidence shows that the DoD OCIO had **no** involvement in the at-issue 2013 DFARS Clause. *See* 48 C.F.R. § 252.204-7012 (Nov. 18, 2013). Importantly, the DoD has expressly stated that non-compliance with the DFARS Clause was not to be used as a weapon against contractors:

> "[T]he goal of our clause is really to understand what is happening out there [with defense contractors] and what information is being lost rather than for [the DFARS Clause] to be something that is going to go against a contractor contractually."

Ex. 21 at 38:8–12. Further, the DoD made clear in response to contractor concerns about audits that the DFARS requirements were not something for which the OCIO could do any kind of "hands-on inspection of [contractor] systems." ASOF ¶ 21, Ex. 21 at 16:22–17:6. The DoD also stated it would reject any type of third-party certification of compliance and that such an audit of contractor systems was not contemplated. ASOF ¶ 242, Ex. 21 at 17:7–13; 36:24–37:12; Ex. 34 at 21:24–22:9; Ex. 255 at 52:2–8. Moreover, the DoD indicated that if any oversight of implementation of the DFARS Clauses was required, "those terms need to be added to the solicitation and to the contract because the DFARS clause alone **does not cover additional oversight for that process**." Ex. 34 at 22:19–23:4 (emphasis added).

It was not until August 2015 that the DFARS clause was amended to expressly contemplate the OCIO's involvement. 48 C.F.R. § 252.204-7012 (Aug. 26, 2015). Even then, the OCIO was not utilized as a body to "make sure that the regulations were complied with," as Relator claims. Mot. at 18. Rather, the OCIO's **only** involvement under the August 2015 DFARS Clause was to either approve or disapprove alternate controls. *See id.*; Ex. 94 at AR00218330. In December 2015, the OCIO's role expanded to also receive notifications of "any security requirements specified by NIST SP 800-171 not implemented at the time of contract award." 48 C.F.R. § 252.204-7012 (Dec. 30, 2015). That requirement, the OCIO has stated, was only to track the "evolution and the growth of industry" toward compliance with the NIST requirements. *See* Ex. 21 at 21:13–21. Under no version of the DFARS Clause did the OCIO have an independent enforcement mechanism for non-compliance with the Clause. ASOF ¶ 22. Indeed, the DoD's only reaction to realizing that industry was largely non-compliant with the NIST requirements was to change the requirements to provide additional time for contractors to become compliant, and to make compliance easier. These facts weigh in favor of immateriality for purposes of FCA liability. *See* AMSJ at 38–39; *Kelly*, 846 F.3d

18

at 334 (materiality lacking, in part, because the government "eliminated the [] requirement because it

provided minimal benefit and was not cost-justified.").

### d.   The GBSD Program's Requirement for a 100% Compliant System Further Supports Immateriality for All Other Contracts.

Relator claims that the fact that one Air Force program—which is not even named in

Relator's SAC—required a standalone system that was fully compliant with the NIST requirements

reflects materiality for *all* contracts with not only the DoD, but also with NASA.  Mot. at 19.  Quite

to the contrary.  Instead, the fact that the GBSD program is the *only* program to have required that

Aerojet provide a fully-compliant system as a condition of award reflects that full compliance was

not material with respect to other contracts, and highlights why Relator must prove the elements of

his claims for each specific contract.  The DoD in fact recognized that certain programs might have

"high[er] level[s] of risk" than others, which would lead to different cybersecurity requirements for

contractors.  *See* ASOF ¶¶ 236, 245, Ex. 21 at 19:5–11; 20:2–8.  Had compliance been material to

the government on all contracts, it would have required Aerojet to develop compliant networks for

each program, not just one.[11]

### 3.   Relator's Attempts to Distract from His Lack of Evidence of Causation and Materiality are Unavailing.

Relator spends over a dozen pages discussing the alleged lack of security of Aerojet's

systems and Aerojet's purported bad intent, but such "questions of falsity and knowledge are

irrelevant if Relator cannot establish that 'the government was induced by or relied on the fraudulent

statement or omission when it awarded [a] contract.'"  *Uchytil v. Avanade*, 2018 WL 11236950, at

---

[11] Relator claims that Aerojet removed the GBSD program from the DFARS-compliant system it created, but provides no evidence to support that assertion other than one draft letter that was never sent.  Ex. A at 498; RSOF ¶ 146.  Indeed, Aerojet revised the letter and the letter it actually sent ***requested the Air Force's approval*** to switch from the isolated network.  *See* RSOF ¶ 146, Ex. 223 at Ex. 4 (showing use of track changes to convert August 16, 2015 draft letter into the September 16, 2015 letter); Ex. A. at 300.  Further, the undisputed evidence shows that Aerojet maintained the DFARS-compliant system for the GBSD program long after that letter was sent.  *See* RSOF ¶ 146; Ex. 244 at 99:7-12 ("My understanding of the GBSD Study A cybersecurity compliance plan, in general terms, was we had an isolated computing network system from the Internet in the -- in the program that the customer accepted and we implemented through the period of performance."), 98:17-22 ("I am aware and was aware of a GBSD Study A cybersecurity compliance plan that included, in general terms, an isolated computing network system for that contract, which we instituted and successfully operated in the contract period of performance.").

---

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

*11 (W.D. Wash. Aug. 16, 2018) (quoting *U.S. ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 569 (E.D. Pa.), *aff'd*, 593 F. App'x 139 (3d Cir. 2014)).  Though much of Relator's rhetoric is easily disposed of by the undisputed factual record, it is all irrelevant to the only question before the Court: Whether the undisputed evidence reflects that Aerojet defrauded the government about its compliance with the Cybersecurity Clauses.  The uncontroverted evidence detailed above and in Aerojet's motion for summary judgment reflects that the government was aware of Aerojet's non-compliance with the Cybersecurity Clauses, yet the government still chose to contract with Aerojet and pay its claims.  AMSJ at 30–37.  Given Aerojet's disclosures of its non-compliance with many of the technical requirements at the time, Relator's drum-beating about the purported failures of Aerojet's cybersecurity is entirely irrelevant.  Regardless, to correct the record, Aerojet briefly addresses each of Relator's complaints about the security of Aerojet's systems in turn below.

     ***First***, Relator focuses on malware that was allegedly initially installed through attacks on Pratt & Whitney Rocketdyne's network before Pratt & Whitney Rocketdyne was merged with Aerojet General Corp. to form Aerojet Rocketdyne, Inc.  These attacks occurred on Pratt & Whitney Rocketdyne's systems (or those of its parent company, United Technologies), not Aerojet's legacy systems, rendering them irrelevant to any evaluation of the security of Aerojet's systems.  RSOF ¶¶ 11–13, Ex. A at 071 ("Emagined Security's Investigative team has performed an investigative analysis and forensics review of malware identified in the *Rocketdyne legacy network*.") (emphasis added); *id.* at 063 ("The current tool set is . . . not under Aerojet Rocketdyne control"); *id.* at 064 ("[United Technologies Corporation] and [Pratt & Whitney] still control the border systems and data from their systems is not readily available."); Ex. 248 at 30:6-31:8.  Regardless, the undisputed record reflects that Aerojet investigated the attacks and took steps to mitigate harm from any similar attacks.  RSOF ¶¶ 12–13.

     Further, Relator does not connect the dots between these attacks on non-Aerojet systems and Aerojet's non-compliance with the Cybersecurity Clauses (which it repeatedly disclosed to the government), rendering these facts immaterial.  Relator also presents no evidence that information about such breaches would have swayed any contracting officer's decision with respect to contract awards made several years later.  Indeed, the government has itself acknowledged that

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

"implementing [the NIST controls] 100 percent all the time will still have cyber incidents occur," but that "does not mean there is any fault by the contractor."  The fact of an incident should not be "something that is going to go against a contractor contractually."  Ex. 21 at 38:3–12.  And critically, Relator acknowledges that the government was involved in investigating the breaches, negating any suggestion that Aerojet was hiding the attacks from the government.  *See* Ex. 3 at ¶ 13 ("The FBI . . . w[as] involved" in investigating the alleged breaches.).[12]

      ***Second***, Relator's reliance on results of annual audits by Ernst & Young ("E&Y") is equally unavailing.  E&Y conducted the audits so that Aerojet could locate vulnerabilities in its systems and remediate them.  Mot. at 3; ASOF ¶ 241, Ex. 248 at 54:1–15 ("We engaged EY to understand where we were.  This is a learning and improvement document.").  Indeed, Aerojet "intend[ed] for [E&Y's] penetration test [and] audit . . . [to] find risks . . . . [or] they probably haven't done a very good job."  ASOF ¶ 241, Ex. 248 at 77:6–21.  Aerojet was under no obligation to share the results of its routine audits with the government, especially when it had already disclosed its non-compliance with the Cybersecurity Clauses and the audits were not an assessment of Aerojet's compliance with the Cybersecurity Clauses.  Indeed, Gus Guissanie, who was formerly in charge of cybersecurity for the DoD, plainly stated that ***there was no requirement*** for a contractor to share the results of internal audits under any version of the DFARS Clause.  ASOF ¶ 243, Ex. 255 at 52:2–8 (Q: "Are you aware of any provision in either the 2013 or 2015 versions of the DFARS clause that required contractors to share the results of any internal cybersecurity audits with the government?" A: "No.").[13]  Put simply, the record is devoid of any evidence that a single contracting officer would expect to see the results of the E&Y audits or would have changed their decision to contract with Aerojet based on

---

[12] Relator dramatizes the attacks by claiming that they were conducted by a "foreign nation state," but again Relator provides no proof of this fact other than a declarant's conclusory statement to that effect, paired with an admission that he does not know "how it was determined [that the cyberattacker] was a foreign nation state actor."  *See* RSOF ¶ 13, Ex. C at ¶ 13.  Regardless of who the attacker was, the breaches are irrelevant for the reasons above.

[13] In other presentations the government has made clear that, in connection with the DFARS Clause, it would "not recognize third party assessor certifications" either.  *See* ASOF ¶ 242, Ex. 21 at 17:7–13.

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

those results.

***Finally***, Relator relies heavily on Emagined's findings that Aerojet was not compliant with the Cybersecurity Clauses (Mot. at 3), but omits the important fact that Aerojet ***shared the results*** of Emagined's analyses with its government customers.  Indeed, it was Emagined who put the results of the analysis into the matrix format sent to Aerojet's external customers and who helped draft the language used in Aerojet's DoD disclosure letters (as did Relator for Aerojet's earlier versions), providing a "clear position" regarding Aerojet's non-compliance.  ASOF ¶ 240, Ex. 214, 215, 216, 217, 219, 220; *compare* Ex. 218 (Emagined DFARS gap analysis spreadsheet) *with* Ex. 60 (disclosure letter to DoD customer).  Likewise, for NASA, Aerojet also disclosed the findings of Emagined's analysis regarding the full set of applicable NIST 800-53 controls.  In February 2016, Aerojet ***plainly stated that Aerojet was only 37% compliant*** and disclosed that Emagined's analysis found that it was only 24% compliant several months earlier:

| NASA FARS Gap Analysis and Current Status Summary | | | | | | | Holdi |
|---|---|---|---|---|---|---|---|
| | | Gap Analysis Report | | | February 2016 | | |
| **Requirements Source** | **Total** | **Compliant** | **Non-Compliant** | **Percent Compliant** | **Compliant** | **Non-Compliant** | **Percent Compliant** |
| NASA (NIST SP 800-53 Moderate Controls) | 264 | 63 | 201 | 24% | 97 | 167 | 37% |

ASOF ¶ 134, Ex. 162.  Relator's contention that Aerojet's Information Technology Security Management Plans ("IT SMPs") submitted to NASA somehow misstated its compliance with respect to NIST 800-53 is false (Mot. at 6), as those "ask[ed] [Aerojet] to describe what we do" "not if [Aerojet] [is] compliant" with the NIST 800-53 controls.  RSOF ¶¶ 89–104, Ex. 229–230, 242.  Indeed, Relator himself agreed with the accuracy of the IT SMPs.  *See* RSOF ¶¶ 88, Ex. 221 (Relator stating that IT SMP drafted by Emagined "look[ed] reasonable").

C.     **Even if Relator Can Establish the Elements of His FCA Claim, Relator Is Not Entitled to the Actual Damages He Claims Because the Government Received the Contracted-For Products and Services.**

Even if the Court finds that Relator's claims survive, his astronomical damages claims should be reduced to zero and any potential recovery should be limited to statutory penalties alone.  In a FCA case, it is Relator's burden to prove actual "damages which the Government sustain*s because of*" the alleged fraud.  *See* 31 U.S.C. § 3729(a)(1) (emphasis added); *United States v. J-M Mfg. Co.,*

*Inc.*, 2020 WL 4196880, at \*12 (C.D. Cal. June 5, 2020) ("Plaintiff bears the burden of proving actual damages in an FCA case."). Relator has not met that burden. Among other deficiencies, Relator:

- ***has not cited a single case*** in which a court found that the proper measure of damages is the full-contract value where the government received billions of dollars' worth of conforming goods and services under the contracts at issue;

- ***did not ask any government official*** whether Aerojet's non-compliance with the Cybersecurity Clauses diminished the value of the goods and services delivered and submits no evidence to show that it did;

- ***provides no precedent*** for awarding full-contract value damages on a relator's motion for summary judgment;

- ***has not submitted copies of the contracts*** to show that they even included the Cybersecurity Clauses, which is crucial since the undisputed evidence shows that many contracts did not. *See supra* Section IV.A.; ASOF ¶¶ 32, 35, 38, 43, 44, 46, 47, 49, 51;

- claims entitlement to damages for contracts ***entered prior to enactment*** of the DFARS Clause, which defies logic for a case premised on non-compliance with that regulation. *See* Ex. Q at 005;

- submits an internet print out showing only "obligated" monies ***rather than monies actually paid*** and ***does not provide invoices or proofs of payment*** for most of the contracts for which he claims damages; and

- ***does not even submit awarding entity information*** to the Court for the contracts for which he claims damages. *See* Ex. Q.

This lack of proof—after discovery has closed—dooms Relator's damages claim.

Moreover, the undisputed evidence shows that Relator ***cannot*** establish actual damages given that Aerojet delivered—and the government accepted and paid for—the products and services that it contracted to provide. ASOF ¶¶ 47, 162, 163, 166, 171, 172, 174, 175, 180, 181, 183, 184, 186, 187, 189, 190, 195, 196, 201, 202, 204, 207, 208, 210, 211, 213, 216, 217, 219, 220, 222. Absent evidence that Aerojet's products and services were somehow defective, failed to function, or

23

functioned poorly ***because of*** Aerojet's non-compliance with the Cybersecurity Clauses, Relator cannot establish any actual damages.  *See United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966) (affirming finding of no actual damages where project completed and government received what it contracted for); *J-M Mfg*, 2020 WL 4196880 at *41 (finding no actual damages where the products properly performed).

As there is no evidence that the government was damaged based on Aerojet's (disclosed) non-compliance with the Cybersecurity Clauses, the Court should grant Aerojet partial summary judgment on the issue of actual damages and, at a minimum, cabin any potential recovery to statutory penalties.

## V.    CONCLUSION

Because Relator has not come close to meeting his burden of proof on all of the elements of his FCA claim, his motion should be denied.  Further, the undisputed evidence forecloses any reasonable factfinder from finding in Relator's favor on materiality or causation, and thus summary judgment should be granted in Aerojet's favor.

DATED: October 13, 2021                          Respectfully submitted,

                                                 KIRKLAND & ELLIS, LLP

                                                 */s/ Tammy A. Tsoumas*
                                                 Mark Holscher (SBN 139582)
                                                 mark.holscher@kirkland.com
                                                 Tammy A. Tsoumas (SBN 250487)
                                                 tammy.tsoumas@kirkland.com
                                                 KIRKLAND & ELLIS LLP
                                                 2049 Century Park East
                                                 Los Angeles, CA 90067
                                                 Telephone:    (310) 552-4200
                                                 Facsimile:    (310) 552-5900

                                                 Ashley Neglia (SBN 298924)
                                                 ashley.neglia@kirkland.com
                                                 KIRKLAND & ELLIS LLP
                                                 555 S. Flower Street, Suite 3700
                                                 Los Angeles, CA 90071
                                                 Telephone:    (213) 680-8400
                                                 Facsimile:    (213) 680-8500

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM. ADJUDICATION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:    (214) 972-1770
Facsimile:    (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne
Holdings, Inc. and Aerojet Rocketdyne, Inc.*

**DEFS.' OPP. TO RELATOR'S MOT. FOR SUMM. J. OR IN THE ALTERNATIVE SUMM.
ADJUDICATION**