Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:    (214) 972-1770
Facsimile:    (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne
Holdings, Inc. and Aerojet Rocketdyne, Inc.*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA ex rel.
BRIAN MARKUS, individually,

                              Plaintiff,

        v.

AEROJET ROCKETDYNE HOLDINGS,
INC., a corporation and AEROJET
ROCKETDYNE, INC., a corporation,

                              Defendants.

Case No. 2:15-cv-02245-WBS-AC

**DEFENDANTS' RESPONSE TO
RELATOR BRIAN MARKUS'
STATEMENT OF FACTS**

Judge:          Hon. William B. Shubb
Hearing Date:   November 1, 2021
Time:           1:30 pm
Courtroom:      5

---

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

Pursuant to Local Rule 260 and Federal Rule of Civil Procedure 56, Defendants Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc., (together, "Aerojet") respectfully submit their Response to Relator Brian Markus' Statement of Facts ("RSOF") as well as Aerojet's Additional Statement of Facts ("ASOF").

To assist with the Court's and the parties' review of the facts, Aerojet has reproduced and included herein the facts set forth in Aerojet's Statement of Facts that was submitted in support of its affirmative Motion for Summary Judgment or, Alternatively, Motion for Summary Adjudication, instead of cross-referencing to Aerojet's statement of facts in support of its motion. In doing so, Aerojet has maintained the same numbering convention for each fact. For example, the first fact in Aerojet's Statement of Facts in support of its motion is the same first fact set forth below in Aerojet's ASOF. Aerojet has also included a number of additional facts in its ASOF below (starting at ASOF number 239) in response to Relator's motion and statement of facts.

As further explained in Aerojet's concurrently filed Opposition, the substantial majority of Relator's asserted facts are not material to the Court's analysis of Relator's motion for summary judgment, but Aerojet does not make relevance objections at this juncture.[1]  Aerojet reserves its right to make such objections should Relator's claims reach trial.[2]

### AEROJET'S RESPONSE TO RELATOR'S STATEMENT OF FACTS[3]

1.     Aerojet Rocketdyne's ("AR") NASA Gap Analysis completed at the beginning September 2015 ("NGA") found that AR was only 23.9 % compliant with the required NASA FARS

---

[1]   *Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (Shubb, J.) (explaining that for summary judgment, a court "cannot rely on irrelevant facts, and thus relevance objections are redundant. Instead of objecting, parties should simply argue that the facts are not material.").

[2]   *Harper v. Charter Commc'ns*, LLC, 2021 WL 603724, at *2 n.1 (E.D. Cal. Feb. 16, 2021) (Shubb, J.) (noting the parties may "raise these evidentiary objections . . . at trial").

[3]   Relator's Statement contains multiple argumentative headings. Aerojet does not agree with Relator's characterizations but, because Relator's does not proffer the headings themselves as statements of fact, Aerojet does not address them in this Response. To the extent that objections were present in quoted deposition testimony, those objections also have been omitted for ease of review. Aerojet notes that Relator has added highlights and marks to most of the evidence cited.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   NIST 800-53 controls. (Ex. A 292; Ex. L Defendants' Response to Relator's First Set of Requests for

2   Admissions Response No. 168)

3   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 1:**

4   **Disputed that the NASA Gap Analysis found that Aerojet was 23.9% compliant with the**

5   **NIST 800-53 controls. The document reflecting 23.9% compliance and cited by the Relator is a**

6   **draft of the NASA Gap Analysis Executive Summary, and not the final version of the Executive**

7   **Summary. Indeed, in the cover email attaching the draft of the Executive Summary of the NASA**

8   **Gap Analysis cited by Relator, the Relator wrote: "The wording is very harsh and the**

9   **statements are very bold and without the details behind them, many do not make sense." Ex.**

10  **231[4] (attaching and describing Ex. A at 292–94 (AR00004762–64));** *see also* **Ex. 252 (Markus**

11  **Dep. Tr.) at 151:10-12 ("I didn't think [Emagined] did a good job, and I expected more of them**

12  **on that."). A later version of the NASA Gap Analysis reflected that Aerojet was 23.8% compliant**

13  **with the NIST 800-53 controls.** *See* **Ex. L at Response No. 168; Ex. A at 007.[5]**

14

15      2.      The NGA found that AR was only 21.8% compliant with the DFARS NIST 800-171

16  required controls and was only 27.5% compliant with the Pre-August 2015 required DFARS controls.

17  (Ex. A, 292; Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response

18  No.169)

19  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 2:**

20  **Undisputed that the NASA Gap Analysis found that Aerojet was 21.8% compliant with**

21  **the NIST 800-171 controls, but disputed that the NASA Gap Analysis found that Aerojet was**

22  **27.5% compliant with Pre-26 August 2015 DFARS. The version of the analysis reflecting 27.5%**

23  **compliance and cited by the Relator is a draft of the NASA Gap Analysis, and not the final**

24  _____

25  [4]  References to Exhibits A–Q refer to the exhibits to the Declaration of Gregory Thyberg (ECF No.
26  125).  References to Exhibits 1 through 213 refer to exhibits to the Declaration of Tammy Tsoumas
    submitted in support of Aerojet's Motion for Summary Judgment (ECF No. 117).  References to
27  Exhibits 214 through 260 refer to exhibits to the Second Declaration of Tammy Tsoumas
    submitted in connection with this opposition.

28  [5]  There is a later version of the NASA Gap Analysis that Relator did not include in the record.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1    **version. Indeed, in the cover email attaching the draft of the NASA Gap Analysis cited by**

2    **Relator, the Relator wrote: "The wording is very harsh and the statements are very bold and**

3    **without the details behind them, many do not make sense." Ex. 231 (attaching and describing**

4    **Ex. A at 292–94 (AR00004762–64));** *see also* **Ex. 252 (Markus Dep. Tr.) at 151:10-12 ("I didn't**

5    **think [Emagined] did a good job, and I expected more of them on that."). Rather, a later version**

6    **of the NASA Gap Analysis reflected that Aerojet was 27.4% compliant with the Pre-26 August**

7    **2015 DFARS.** *See* **Ex. L at Response No. 170.**

8

9        3.      The NGA Executive Summary stated: "AR does not have the organizational structure

10   or resources to meet the majority of the security requirements." (Ex. A, 292)

11       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 3:**

12       **Disputed. The version of the analysis cited by the Relator is a draft of the NASA Gap**

13   **Analysis Executive Summary, and not the final version. Indeed, in the cover email attaching the**

14   **draft of the Executive Summary of the NASA Gap Analysis cited by Relator, the Relator**

15   **wrote: "The wording is very harsh and the statements are very bold and without the details**

16   **behind them, many do not make sense." Ex. 231 (attaching and describing Ex. A at 292–94**

17   **(AR00004762–64));** *see also* **Ex. 252 (Markus Dep. Tr.) at 151:10-12 ("I didn't think [Emagined]**

18   **did a good job, and I expected more of them on that."). Rather, the final version of the Executive**

19   **Summary of the NASA Gap Analysis states "AR's organizational structure and resource**

20   **allocation is not optimized to meet the NASA regulatory requirements." Ex. A at 007.**

21

22       4.      The NGA Executive Summary stated: "AR does not have the necessary technical

23   solutions or resources to satisfy the majority of the security requirements." (Ex. A, 293)

24       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 4:**

25       **Disputed. The version of the analysis cited by the Relator is a draft of the Executive**

26   **Summary of the NASA Gap Analysis, and not the final version. Indeed, in the cover email**

27   **attaching the draft of the Executive Summary of the NASA Gap Analysis cited by Relator, the**

28   **Relator wrote: "The wording is very harsh and the statements are very bold and without the**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1  **details behind them, many do not make sense.” Ex. 231 (attaching and describing Ex. A at 292–**

2  **94 (AR00004762–64));** *see also* **Ex. 252 (Markus Dep. Tr.) at 151:10-12 (“I didn’t think**

3  **[Emagined] did a good job, and I expected more of them on that.”). Rather, a later version of**

4  **the NASA Gap Analysis states “AR’s technical resource allocations need improvements to**

5  **satisfy the majority of NASA regulatory requirements.” Ex. A at 008.**

6

7      5.      The NGA Executive Summary stated: “Given the large number of controls found not

8  in place and the need to address these controls in an expedited manner to preclude fines and other

9  negative consequences, a significant change in strategic direction is required and a significant

10  investment in technical solutions needs to be made.” (Ex. A, 293)

11      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 5:**

12      **Disputed. The version of the analysis cited by the Relator is a draft of the NASA Gap**

13  **Analysis, and not the final version. Indeed, in the cover email attaching the draft of the NASA**

14  **Gap Analysis cited by Relator, the Relator wrote:  “The wording is very harsh and the**

15  **statements are very bold and without the details behind them, many do not make sense.” Ex.**

16  **231 (attaching and describing Ex. A at 292–94 (AR00004762–64));** *see also* **Ex. 252 (Markus Dep.**

17  **Tr.) at 151:10-12 (“I didn’t think [Emagined] did a good job, and I expected more of them on**

18  **that.”). A later version of the NASA Gap Analysis Executive Summary does not contain this**

19  **statement or a similarly worded statement. Ex. A at 007-009.**

20

21      6.      The NGA Executive Summary stated: “AR must hold leadership and employees

22  accountable for their actions and inactions especially with respect to safeguarding AR assets and

23  intellectual property. This will require a shift in how the business addresses contractual and regulatory

24  responsibilities in order to avoid devaluation of the business.” (Ex. A, 294)

25      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 6:**

26      **Disputed. The version of the analysis reflecting that statement and cited by the Relator is**

27  **a draft of the Executive Summary of the NASA Gap Analysis, and not the final version. Indeed,**

28  **in the cover email attaching the draft of the NASA Gap Analysis cited by Relator, the Relator**

**DEFS.’ RESPONSE TO RELATOR BRIAN MARKUS’ STATEMENT OF FACTS**

wrote: **"The wording is very harsh and the statements are very bold and without the details behind them, many do not make sense." Ex. 231 (attaching and describing Ex. A at 292–94 (AR00004762–64));** *see also* **Ex. 252 (Markus Dep. Tr.) at 151:10-12 ("I didn't think [Emagined] did a good job, and I expected more of them on that."). A later version of the NASA Gap Analysis does not contain this statement or a similarly worded statement. Ex. A at 007-009.**

7.      During the period May 2013 to May 31, 2016 was AR not fully compliant with the required NASA FARS cyber security requirements. (Ex. C, Declaration of Jens Laundrup ("Laundrup Dec.") ¶¶18,19,28,29,35,37; Ex. A 349; Ex. F, Figler Dep. 79:12-80:8,105:14-108:19,190:6-191:13; Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response Nos. 91,92,97,106, 107,111, 112,116, 117,121,122,163,165-169)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 7:**

**Undisputed. Aerojet notes that it disclosed its compliance status with those controls to NASA.** *E.g.***, ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49.**

8.      During the period November 2013 to May 31, 2016, AR was not fully compliant with the DFARS cybersecurity requirements. (Ex. C, Laundrup Dec.¶¶ 18,19,28,29,35,37; Ex. F Figler Dep. 190:6-191:13; Ex. A 295; Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response Nos. 1,2,21,22,26,27,31,32,41,42, 66,67,160,162,165,168,170,179)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 8:**

**Undisputed. Aerojet notes that it disclosed its compliance status with the applicable controls to DoD agencies.** *E.g.***, ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121.**

9.      AR was not encrypting sensitive government information when storing it at rest or in transit, which was a NASA FAR Clause and DFARS Clause requirement. (Ex. C, Laundrup Dec. ¶36, Ex. F, Figler Dep. 64:3-18; Ex. K, Ruiz Dep. 63:4-64:16)

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 9:**

2    **Disputed. Aerojet disputes that Aerojet has never encrypted any NASA or DoD data, as**

3    **this fact suggests. For example, as early as January 2014, Aerojet had processes in place for**

4    **encrypting sensitive information transmitted via e-mail. *See* Ex. 256. Aerojet also encrypted**

5    **remote laptops. *See* Ex. 241. Undisputed insofar as Ruiz testified that "data in storage" is**

6    **supposed to be encrypted under the NIST standards and "some of the aged equipment . . . did**

7    **not have the capability," (Ex. 250 (Ruiz Dep. Tr.) at 63:4-64:16), and Curt Figler testified that**

8    **in April 2017 the information stored on Aerojet's network at rest was not encrypted, Ex. 251**

9    **(Figler Dep. Tr.) at 64:3–18. Aerojet notes that encryption proved to be one of the most difficult**

10   **controls to implement. For instance, Sera Brynn found that adopting CUI-at-rest was one of the**

11   **"controls that were the most problematic to implement," with 78% of surveyed contracts unable**

12   **to implement encryption at rest. Ex. 213 at p. 11. Aerospace Industries Association explained**

13   **that 47% of surveyed contractors were able to encrypt CUI on mobile devices. Ex. 207 at 15.**

14

15   10.    In a September 2, 2014 email to AR President Warren Boley, AR Vice President and

16   Chief Information Officer ("CIO") Jose Ruiz ("RUIZ") acknowledged that AR was not NASA FARS

17   or DFARS compliant when he stated: "From my personal experience, this has taken multiple years to

18   get to DFARS and NASA FARS (NFS) compliance… were not even close to the NFS level of

19   compliance." (Ex. A, 098)

20   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 10:**

21   **Undisputed. Aerojet notes that it disclosed its compliance status to the government. *E.g.*,**

22   **ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49.**

23

24   11.    Starting May 2013, AR's experienced multiple data breaches that resulted in huge

25   amounts of data leaving the Rocketdyne Network. (Ex. C, Laundrup Dec.¶¶ 7, 13-15)

26   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 11:**

27   **Disputed. Relator cites to no admissible evidence to establish that the data breaches**

28   **"resulted in a huge amounts of data leaving." The only support for that fact is the declarant's**

1  recollection of what was "stated by the FBI," Ex. C, Laundrup Dec.¶ 15, which is inadmissible

2  hearsay evidence. Aerojet further notes that Relator's reference to "Rocketdyne" refers to Pratt-

3  Whitney Rocketdyne, not Aerojet Rocketdyne. On June 14, 2013, Aerojet Rocketdyne's parent

4  company, GenCorp Inc., completed the acquisition of Pratt & Whitney Rocketdyne from United

5  Technologies Corporation. Ex. 235 at ¶ 6. Pratt & Whitney Rocketdyne was then merged with

6  Aerojet-General Corporation to form the defendant entity in this case, Aerojet Rocketdyne, Inc.

7  *Id.* Though the integration of the companies' business functions occurred in June 2013, the

8  integration of the entities' information technology systems took much longer to complete. Ex. A.

9  at 077 (noting in November 2013 that the "network integration" between Rocketdyne and

10  Aerojet was not yet complete). Because of the firewall in place between the two systems, the

11  attackers were not able to get into the Aerojet network.  *See* Ex. 248 (Halterman Dep. Tr.) at

12  30:6-31:8.

13

14      12.     In the summer of 2013, AR brought in Emagined Security, Inc. ("ESI") to investigate

15  the cause to the data breaches from the Rocketdyne Network. (Ex. C, Laundrup Dec.¶¶ 6,7)

16      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 12:**

17      Undisputed. Aerojet notes that the documents Relator submits in support of his

18  allegations also reveal that Rocketdyne and/or Aerojet took steps to remedy the identified

19  weaknesses in its systems, including: "clean[ing]" the affected systems (Ex. A at 061);

20  "identif[ying] and remov[ing]" the malware (Ex. A at 061, 079); the impacted system "was

21  removed from the network (Ex. A at 062); "Rocketdyne deleted all administrator accounts and

22  created new ones with significantly increased complexity requirements" (Ex. A at 062); "the

23  [infected] computer was removed from the network, the logs were analyzed, and the computer

24  was wiped clean and rebuilt" (Ex. A at 062); "deployed" "a FireEye Malware Prevention

25  System," reconfigured "a Palo Alto Networks Firewall"; and upgraded the "Anti-Malware

26  systems" (Ex. A. at 077).

27

28

13.     ESI's investigation revealed AR had serious cybersecurity deficiencies that allowed a foreign nation state to enter its system on multiple occasions and exfiltrate huge amounts of data. (Ex. C, Laundrup Dec.¶13)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 13:**

**Disputed. ESI investigated attacks on the Rocketdyne network, which was not fully integrated with the Aerojet network at the time of the attacks or ESI's investigation. On June 14, 2013, Aerojet Rocketdyne's parent company, GenCorp Inc., completed the acquisition of Pratt & Whitney Rocketdyne from United Technologies Corporation. Ex. 235 at ¶ 6. Pratt & Whitney Rocketdyne was then merged with Aerojet-General Corporation to form the defendant entity in this case, Aerojet Rocketdyne, Inc.** *Id.* **Though the integration of the companies' business functions occurred in June 2013, the integration of the entities' information technology systems took much longer to complete. Ex. A. at 077 (noting in November 2013 that the "network integration" between Rocketdyne and Aerojet was not yet complete). Because of the firewall in place between the two systems, the attackers were not able to get into the Aerojet network.** *See* **Ex. 248 (Halterman Dep. Tr.) at 30:6-31:8.**

**Relator does not present evidence to establish that a foreign nation state infiltrated the systems and exfiltrated data and the evidence reflects that there was no such conclusion.** *See* **Ex. 248 (Halterman Dep. Tr.) at 32:6-32:8 ("There's -- there's no evidence of who breached United Technologies' network. There's only an incident of somebody breaching."); Ex. 244 (Evans Dep. Tr.) at 52:11-18 (testifying he was not aware of any incidents in which a foreign nation accessed Aerojet's network). Indeed, in the paragraph Relator cites in support of this purported fact, the declarant stated that he "do[es] not recall how it was determined to be a foreign nation state." Ex. C (Laundrup Decl.) ¶ 13.**

14.     Sensitive data belonging to the government that was stored on AR's computer network at the time of these cyberattacks included designs for advanced weapons systems including documents related to the Terminal High Altitude Area Defense ("THAAD") Missile System. (Ex. L, Defendants'

Response to Relator's First Set of Requests for Admissions Response No. 148; Ex. C, Laundrup Dec.¶¶14-15)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 14:**

**Undisputed that "UCTI was present on its computer system at some point in time while performing its work for the THAAD program." (Ex. L at Response No. 148). The only support cited by Relator for the fact that the data concerned rocket fuels is the declarant's recollection of what was "stated by the FBI," which is inadmissible hearsay evidence.**

15.     AR VP of Advanced Space Programs, Julie Van Kleeck ("VAN KLEECK") confirmed that AR worked on rocket engines and had rocket designs that could assist a foreign country in developing an intercontinental ballistic missile. (Ex. H, Van Kleeck Dep. 10:9-11:6, 25:12-26:1)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 15:**

**Undisputed.**

16.     ESI's investigation found that huge amounts of data related to the testing of rocket fuels were exfiltrated during one of the cyber intrusions. (Ex. C, Laundrup Dec.¶¶ 13-15)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 16:**

**Disputed. ESI's investigation was unable to conclude what data was exfiltrated. Ex. A at 82 ("it remains unclear what data was leaked."). The only support cited by Relator for the fact that "huge amounts of data related to the testing of rocket fuels were exfiltrated" is a declarant's recollection of what was "stated by the FBI," which is inadmissible hearsay evidence.**

17.     Ernst & Young ("EY") was able to penetrate AR's computer environment undetected by noon on November 16, 2015 for a second time in a matter of months and obtain Domain Administrator access across the AJRD domain. (Ex. A 312; Ex. F, Figler Dep. 94:12-95:9)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 17:**

**Undisputed that an internal e-mail between Aerojet employees describes a call with Ernst & Young ("E&Y") and states that E&Y's "audit team was able to gain full access to the AJRD**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**environment by noon on Monday, 11/16, by exploiting a NetBIOS vulnerability. Once in the environment they discovered local admin account passwords that were shared across numerous hosts. Using those accesses they were able to obtain Domain Adm in access across the AJRD domain." Ex. A at 312. Disputed insofar as Relator seeks to establish the truth of the matter asserted as the statements as part of internal Aerojet characterizes of statements purportedly made by E&Y, which are statements made by third parties and are thus inadmissible hearsay evidence. Further disputed insofar as Relator seeks to establish that Figler testified to that fact; Figler merely testified that he believed that E&Y conducted a penetration test on November 16, 2015. Ex. 251 (Figler Dep. Tr.) at 94:12-95:9. Aerojet further notes that Figler testified that "E&Y had accesses and knowledge of the infrastructure that individuals external to AR wouldn't have and that they leveraged that knowledge and those accesses in order to gain this level of access to the systems." *Id*. at 90:20–24. Figler also testified that "it was our -- our contention that this particular aspect of the audit report was misrepresented because of the fact that they had leveraged these additional access capabilities and knowledge of the infrastructure and -- however, even though we took exception to this statement and this finding, we took it seriously and worked very hard to address the specific issues in the -- all of the audit findings." *Id*. at 90:25–91:8.**

18.     The AR "Aerojet Rocketdyne Internal Audit FY2016 Cyber Security Assessment Findings & Recommendations Report December 2016" indicated AR still had five high risk findings and one medium risk finding. (Ex. A, 365-366)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 18:**

**Disputed. The document Relator cites to, "Aerojet Rocketdyne Internal Audit FY 2016 Cyber Security Assessment Findings & Recommendations Report December 2016," pages 363 through 396 of Exhibit A, is a draft of the Internal Audit report, and not the final version. *See generally* Ex. 243 (reflecting a subsequent draft of the report). Rather, the Internal Audit reflected five, not six, findings: 3 high risk, 1 medium risk, and 1 low risk. Ex. 243 at 3.**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

19.     ESI provided a memorandum dated September 4, 2013 to AR's Vice President and CIO, Craig Halterman ("HALTERMAN"), and a draft second memorandum for HALTERMAN to provide to AR's CEO Scott Seymour and President Warren Boley. (Ex. C, Laundrup Dec.¶¶ 8,9,10)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 19:**

**Undisputed.**

20.     The memo to HALTERMAN stated: "In the past four months, multiple incidents have been detected resulting in huge quantities of data leaving the Rocketdyne Network." (Ex A, 058)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 20:**

**Undisputed.**

21.     ESI advised AR they investigated incidents that occurred on August 18 and 26 and September 2, 2013 and confirmed the August 18 attack gave the attackers full administrative access. (Ex. A, 058)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 21:**

**Disputed.   The draft memorandum dated September 4, 2013, states that Emagined "investigated an incident that occurred on 18 Aug 2013 and confirmed the attacker(s) gained administrator access." Ex. A at 058. Relator cites no evidence supporting his assertion that an attacker gained "full administrative access" on that date, or on August 26, 2013 or September 2, 2013.**

22.     ESI advised AR that their attempts to protect the network had not been fully effective. (Ex. A, 058, 061)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 22:**

**Undisputed insofar the draft memorandum dated September 4, 2013, states that "[a]dditional actions have been taken to attempt to protect the network, but they have not been completely effective." Ex. A at 058. Aerojet notes that according to the government, even if a contractor was fully compliant with the NIST Standards, that would not be "fully effective" to**

11

combat cyber incidents. Ex. 21 at 38:3-12 (DoD official explaining that contractors who are "implementing [the NIST controls] 100 percent all the time will still have cyber incidents occur," but that "does not mean there is any fault by the contractor" and the fact of an incident should be "something that is going to go against a contractor contractually").

23.     ESI advised AR :" It is probable an advanced, well-hidden malware infection remains in the network. The existing IT security systems and implementations are not able to stop the flow of unauthorized data and are not sophisticated enough to detect and stop cyber intrusions." (Ex. A 059, 063;Ex. C, Laundrup Dec.¶ 16)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 23:**

**Undisputed.**

24.     ESI warned AR that these attacks were targeting design data worth possibly hundreds of millions of dollars. (Ex. A, 061, Ex. C, Laundrup Dec.¶17)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 24:**

**Disputed. The draft memorandum dated September 4, 2013, stated that "[t]he attacks have targeted *systems containing* design data possibly worth hundreds of millions of dollars." Ex. A at 061 (emphasis added).  There is no evidence supporting Relator's claim that the attacks were targeting the design data specifically.**

25.     ESI provided AR a remediation plan with recommended investments in staffing and infrastructure that were needed to correct the security deficiencies in AR's computer network. (Ex. A, 059; Ex. C, Laundrup Dec.¶ 17)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 25:**

**Undisputed that Emagined provided a remediation plan as part of its draft memorandum dated September 4, 2013 that made recommendations relating to staffing and infrastructure following an investigation of security incidents on United Technologies' Network. *See* Ex. A at 058–59. Aerojet notes that Rocketdyne and/or Aerojet had already taken steps to remedy the**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1  identified weaknesses in its systems, including: "clean[ing]" the affected systems (Ex. A at 061);

2  "identif[ying] and remov[ing]" the malware (Ex. A at 061, 079); the impacted system "was

3  removed from the network (Ex. A at 062); "Rocketdyne deleted all administrator accounts and

4  created new ones with significantly increased complexity requirements" (Ex. A at 062); "the

5  [infected] computer was removed from the network, the logs were analyzed, and the computer

6  was wiped clean and rebuilt" (Ex. A at 062); "deployed" "a FireEye Malware Prevention

7  System," reconfigured "a Palo Alto Networks Firewall"; and upgraded the "Anti-Malware

8  systems" (Ex. A. at 077).

9

10  26.     ESI warned AR that: "Aerojet Rocketdyne must change the corporate culture and

11  embrace cybersecurity the same way as physical security. Without this change, Aerojet Rocketdyne

12  can lose countless millions in intellectual property and risk government intervention." (Ex. A, 059)

13  <u>RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 26:</u>

14  Undisputed that the draft memorandum dated September 4, 2013, is accurately quoted.

15

16  27.     ESI provided AR an "Investigative Analysis and Forensics Review" report dated

17  November 14, 2013 describing ESI's investigation between August 5 and 30, 2013. (Ex. A, 068-083;

18  Ex. C, Laundrup Dec.¶¶12,13)

19  <u>RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 27:</u>

20  Disputed insofar the final "Investigative Analysis and Forensics Review" report is dated

21  November 21, 2013. Aerojet notes that the documents Relator submits in support of his

22  allegations also reveal that Rocketdyne and/or Aerojet took steps to remedy the identified

23  weaknesses in its systems, including: "clean[ing]" the affected systems (Ex. A at 061);

24  "identif[ying] and remov[ing]" the malware (Ex. A at 061, 079); the impacted system "was

25  removed from the network (Ex. A at 062); "Rocketdyne deleted all administrator accounts and

26  created new ones with significantly increased complexity requirements" (Ex. A at 062); "the

27  [infected] computer was removed from the network, the logs were analyzed, and the computer

28  was wiped clean and rebuilt" (Ex. A at 062); "deployed" "a FireEye Malware Prevention

13

1    **System," reconfigured "a Palo Alto Networks Firewall"; and upgraded the "Anti-Malware**
2    **systems" (Ex. A. at 077).**

3

4        28.    The report concluded that AR's current infrastructure will allow malware to enter the
5    system and cause data leakage. (Ex. A, 079)

6        **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 28:**

7        **Disputed. Relator selectively quotes and characterizes the conclusion of the**
8    **"Investigative Analysis and Forensics Review" report, which states in its entirety: "All malware**
9    **identified to date has been removed. Increased monitoring is occurring and an Application**
10   **Firewall along with FireEye Malware Protection System is being used to prevent future malware**
11   **infections. It is strongly recommended that actions identified in the recommendations be**
12   **considered as the current infrastructure will still allow malware to enter and cause further**
13   **problems such as data leakage." Ex. A at 79.**

14

15       29.    ESI performed an audit in 2014 that found AR was not compliant with the DFARS
16   Clause, finding AR was only fully compliant with 5 of 59 required controls. (Ex. L, Defendants'
17   Response to Relator's First Set of Requests for Admissions Response Nos. 160-162)

18       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 29:**

19       **Undisputed, Aerojet notes that it disclosed its compliance status to the DoD agencies. *E.g.*,**
20   **ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121.**

21

22       30.    ESI performed an audit in 2015 that found AR was not compliant with the DFARS
23   Clause finding AR was only fully compliant with only 41 of the required 188 NIST SP 800-171
24   required controls. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions
25   Response No. 165)

26       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 30:**

27       **Undisputed.**

28

---

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

31.     ESI performed an audit in 2014 that found AR was not compliant with the NIST SP 800-53 controls required by NASA FARS Clause, finding AR was only fully compliant with 16 of 264 required controls. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 163)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 31:**

**Undisputed that ESI performed an audit in 2014 that found that of the NIST 800-53 controls applicable to the NFS Clause, Aerojet was "fully compliant" with 16 NIST 800-53 controls, "partially compliant" with 107 NIST 800-53 controls and "not compliant" with 19 NIST 800-53 controls. Aerojet notes that it disclosed its compliance status to NASA, including presenting the results of ESI's Audit. *E.g.*, ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49, Ex. 162.**

32.     EY advised AR of cybersecurity deficiencies when it provided the AR Board (known as GenCorp at the time) the results of an Information Security System internal audit dated July 12, 2013 that indicated AR had 8 high risk and two moderate risk findings. (Ex. A, 039-57) "High Risk" was defined as involving a significant deviation from regulatory requirements and fraud or management misconduct. (Ex. A 057, Ex. D, Halterman Dep. 44:13-45:16)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 32:**

**Disputed. E&Y drafted an "Information Security Program Assessment Findings and Recommendations Report," which is dated July 12, 2013 and the report states that there are 8 high risk and 2 moderate risk findings. However, Relator selectively quotes the definition of "High Risk" on page 57 of Exhibit A and does not include all potential categorizations of "high risk" findings. Aerojet also objects to Exhibit A at pages 39-57 as inadmissible hearsay evidence. Aerojet further notes that it retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a learning and improvement document."). The E&Y audit did not concern the technical controls at issue in this case. Ex. A at 040 ("Findings, as used in this report . . . are not meant to be defined as a non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or**

1    written company policies and procedures unless specifically stated otherwise."). Finally,

2    GenCorp is Aerojet's parent company; Aerojet was not "known" as GenCorp.

3

4        33.    EY gave AR's Security Monitoring the lowest score of 1.00 out of 5.00. (Ex. A, 043)

5    A score if "1.00" indicated: "There is a critical need for enhancements." (Ex. A, 055)

6        **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 33:**

7        **Disputed to the extent Relator seeks to establish the truth of the matter asserted in this**

8    **statement because it is based on statements made by a third party (E&Y) and is inadmissible**

9    **hearsay evidence. Undisputed that Relator accurately characterizes the cited evidence. Aerojet**

10   **further notes that it retained E&Y to conduct annual audits so that Aerojet could locate**

11   **vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We**

12   **engaged EY to understand where we were. This is a learning and improvement document.").**

13   **The E&Y audit did not concern the technical controls at issue in this case. Ex. A at 040**

14   **("Findings, as used in this report . . . are not meant to be defined as a non-compliance with**

15   **applicable U.S. Government or other governmental organizations' rules and regulations or**

16   **written company policies and procedures unless specifically stated otherwise.").**

17

18       34.    In July 2015, EY provided AR the results of an audit report that indicated AR's network

19   could be penetrated in four hours undetected. Aerojet Rocketdyne Internal Audit, Cyber Security

20   Assessment, Summary Findings & Recommendations Report, July 2015. (Ex. A, 220-276)

21       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 34:**

22       **Disputed. Relator seeks to establish the truth of the matter asserted in an E&Y statement**

23   **on the grounds that this statement was made by a third party and is inadmissible hearsay**

24   **evidence. The E&Y report states that the IA team gained unauthorized access within four hours**

25   **of beginning the assessment. Ex. A at 225. Aerojet further notes that it retained E&Y to conduct**

26   **annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex.**

27   **248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a**

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   learning and improvement document."). The E&Y audit did not concern the technical controls

2   at issue in this case. *See generally* Ex. A 220–76 (not evaluating technical controls).

3

4          35.     The EY audit found multiple security risk issues categorized by risk level. There were

5   23 high risk findings, 5 moderate risk findings and 11 low risk findings. (Ex. A 224) A "High Risk

6   Finding" was defined as: "Finding creates a large exposure that could result in a loss if system control,

7   access, application control, and/or exposure of customer data via the compromise of administrative

8   accounts and/or other system functions. It could also create an exposure of confidentiality or integrity,

9   resulting in many user accounts being compromised or restricted system functions being accessed."

10  (Ex. A, 276, Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response

11  Nos. 171-174,177)

12          **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 35:**

13          **Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y**

14  **statement on the grounds that this statement was made by a third party and is inadmissible**

15  **hearsay evidence. Aerojet also disputes that this purported fact is supported by Aerojet's**

16  **Responses to Requests for Admission cited by Relator. *See* Ex. L at Response Nos. 171-174, 177.**

17  **Undisputed that Relator accurately quotes the E&Y report.  Aerojet notes that it retained E&Y**

18  **to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate**

19  **them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were.**

20  **This is a learning and improvement document."). The E&Y audit did not concern the technical**

21  **controls at issue in this case. Ex. A   *See generally* Ex. A 220–76 (not evaluating technical**

22  **controls).**

23

24          36.     The EY audit indicated within four hours EY was able to utilize identified

25  vulnerabilities to fully compromise the windows network and retrieve all AJRD user accounts and

26  encrypted passwords, while remaining undetected for six days. The attack remained undetected for

27  another six days. (Ex. A, 225; Ex. L, Defendants' Response to Relator's First Set of Requests for

28  Admissions Response Nos. 171-174,177)

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 36:**

**Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y statement on the grounds that this statement was made by a third party and is inadmissible hearsay evidence. Aerojet also disputes Relator's characterization of E&Y's report, which states "[w]ithin four hours of beginning the assessment, the IA team was able to utilize identified vulnerabilities to fully compromise the Windows network and retrieve all AJRD user accounts and encrypted passwords. This activity was not detected by AJRD. After de-briefing the company's Cyber Security team and removing evasive tactics, we continued our attack and penetration activities with the cooperation of Cyber Security and remained undetected by IT Operations for another six days." Ex. A at 225. Aerojet disputes that Aerojet's Responses to Requests for Admission cited by Relator support this purported fact. *See* Ex. L at Response Nos. 171-174. Aerojet notes that it retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a learning and improvement document."). The E&Y audit did not concern the technical controls at issue in this case. Ex. A  *See generally* Ex. A 220–76 (not evaluating technical controls).**

37.     EY identified numerous vulnerabilities and was able to identify at least five unique pathways to compromise the network. (Ex. A, 225)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 37:**

**Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y statement on the grounds that this statement was made by a third party and is inadmissible hearsay evidence. Undisputed that the E&Y 2015 Audit is accurately quoted. Aerojet notes that it retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a learning and improvement document."). The E&Y audit did not concern the technical controls at issue in this case. Ex. A  *See generally* Ex. A 220–76 (not evaluating technical controls).**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

2   38.   EY was able to retrieve every item of "Trophy Data" identified before the test

3   including: CEO's and CFO's email and network files; Employee Personally Identifiable Information;

4   Legal documents and files; Engineering management email and files containing rocket design

5   documents; and Access to Security's visitor system, physical security files and folders, and ability to

6   control security cameras and view/listen to footage." (Ex. A, 225; Ex. F, Figler Dep. 100:4-101:3,

7   101:24-102:18; Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions

8   Response Nos. 171,174,177)

9   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 38:**

10   **Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y**

11   **statement on the grounds that this statement was made by a third party and is inadmissible**

12   **hearsay evidence. Undisputed that Relator accurately quotes the E&Y 2015 Audit. Aerojet notes**

13   **that when asked about the statement, Figler testified that "[i]t was indicated in the report that**

14   **[E&Y] were able to find" this data but explained that the report doesn't indicate exactly how**

15   **they did that. [E&Y] may have used their internal accesses to be able do that." Ex. 251 (Figler**

16   **Dep. Tr.) at 100:21-101:3. Aerojet disputes that some of the evidence cited by Relator supports**

17   **this purported fact. *See* Ex. L at Response Nos. 171 and 177. Aerojet further notes that it**

18   **retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems**

19   **and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand**

20   **where we were. This is a learning and improvement document."). The E&Y audit did not**

21   **concern the technical controls at issue in this case. Ex. A  *See generally* Ex. A 220–76 (not**

22   **evaluating technical controls).**

23

24   39.   EY advised AR they needed to take immediate action to address the findings of their

25   report. (Ex. A, 227)

26   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 39:**

27   **Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y**

28   **statement on the grounds that this statement was made by a third party and is inadmissible**

1   hearsay evidence. **Undisputed that Relator accurately characterzies the E&Y 2015 Audit.**

2   **Aerojet further notes that it retained E&Y to conduct annual audits so that Aerojet could locate**

3   **vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We**

4   **engaged EY to understand where we were. This is a learning and improvement document.").**

5   **The E&Y audit did not concern the technical controls at issue in this case. Ex. A  *See generally***

6   **Ex. A 220–76 (not evaluating technical controls).**

7

8       40.     AR's VP and CIO, RUIZ, agreed that in March of 2015 AR's system was not able to

9   detect cyber intrusions. (Ex. K, Ruiz Dep. 31:23-32:5)

10      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 40:**

11      **Disputed.  Ruiz, when asked this question, testified "We knew that we were still not to**

12  **the level that we needed to be in the infrastructure, that is true." Ex. 250 (Ruiz Dep. Tr.) at**

13  **31:23-32:5.**

14

15      41.     RUIZ did not dispute that in March 2015 EY was able to penetrate AR's computer

16  system undetected in about four hours and remain undetected for seven days. (Ex. K, Ruiz Dep. 32:6-

17  16)

18      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 41:**

19      **Undisputed.**

20

21      42.     RUIZ indicated that EY was able to gain administrator access to AR'S system which

22  gave them access to all of AR's information. (Ex. K, Ruiz Dep. 32:17-33:1)

23      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 42:**

24      **Undisputed that in response to whether E&Y gained administrator access to Aerojet's**

25  **system and whether doing so afforded E&Y control and access to all of Aerojet's system, Ruiz**

26  **testified yes, they were abe to have access. Aerojet notes, however, that Ruiz's response was**

27  **based on Relator's characterization of the results of an Ernst & Young audit. Aerojet also**

28  **disputes this purported fact to the extent Relator seeks to establish the truth of the matter**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   asserted in an E&Y statement on the grounds that this statement was made by a third party and

2   is inadmissible hearsay evidence. Aerojet further notes that it retained E&Y to conduct annual

3   audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248

4   (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a

5   learning and improvement document."). The E&Y audit did not concern the technical controls

6   at issue in this case. Ex. A at 040 ("Findings, as used in this report . . . are not meant to be defined

7   as a non-compliance with applicable U.S. Government or other governmental organizations'

8   rules and regulations or written company policies and procedures unless specifically stated

9   otherwise.").

10

11          43.     RUIZ confirmed EY was able to access engineering management emails and files

12  containing rocket design documents. (Ex. K, Ruiz Dep. 33:2-7 ;35:15-19)

13          **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 43:**

14          **Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y**

15  **statement on the grounds that this statement was made by a third party and is inadmissible**

16  **hearsay evidence. Ruiz testified that the E&Y audit "report identifies some engineering design**

17  **drawings that they were able to access." Ex. 250 (Ruiz Dep. Tr.) at 33:6-7, 35:15-19. Aerojet**

18  **further notes that it retained E&Y to conduct annual audits so that Aerojet could locate**

19  **vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We**

20  **engaged EY to understand where we were. This is a learning and improvement document.").**

21  **The E&Y audit did not concern the technical controls at issue in this case. Ex. A at 040**

22  **("Findings, as used in this report . . . are not meant to be defined as a non-compliance with**

23  **applicable U.S. Government or other governmental organizations' rules and regulations or**

24  **written company policies and procedures unless specifically stated otherwise.").**

25

26          44.     RUIZ confirmed EY was able to access AR CEO and CFO emails and network files.

27  (Ex. K, Ruiz Dep. 34:25-35:3)

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 44:**

**Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y statement on the grounds that this statement was made by a third party and is inadmissible hearsay evidence. Aerojet further notes that it retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a learning and improvement document."). The E&Y audit did not concern the technical controls at issue in this case. Ex. A at 040 ("Findings, as used in this report . . . are not meant to be defined as a non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise.").**

45.    RUIZ confirmed EY was able to access AR employee personally identifiable information. (Ex. K, Ruiz Dep. 35:6-10)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 45:**

**Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y statement on the grounds that this statement was made by a third party and is inadmissible hearsay evidence. Ruiz testified agreed that "according to the report, they were capable of getting employee personally identifiable information." Ex. 250 (Ruiz Dep. Tr.) at 35:6-10. Aerojet further notes that it retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a learning and improvement document."). The E&Y audit did not concern the technical controls at issue in this case. Ex. A at 040 ("Findings, as used in this report . . . are not meant to be defined as a non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise.").**

46.    RUIZ confirmed EY was able to access legal documents, AR CEO and CFO emails and network files. (Ex. K, Ruiz Dep. 34:25-35:3, 35:11-14)

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 46:**

Undisputed that Ruiz testified that "according to the report, [E&Y] w[as] able to get access to legal documents and files." Ex. 250 (Ruiz Dep. Tr.) at 35:11-14. Disputed insofar as Relator seeks to establish the truth of the matter asserted in E&Y's statement that E&Y was able to access legal documents on the grounds that the statements are third party statements and are thus inadmissible hearsay evidence. Aerojet further notes that it retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a learning and improvement document."). The E&Y audit did not concern the technical controls at issue in this case. Ex. A at 040 ("Findings, as used in this report . . . are not meant to be defined as a non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise.").

47.     RUIZ agreed that EY was able to access AR's vistor security system, physical security files and folders and was able to control security cameras allowing them to view and listen to the footage. (Ex. K, Ruiz Dep. 35:20-25)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 47:**

Disputed insofar as Relator seeks to establish the truth of the matter asserted in an E&Y statement on the grounds that this statement was made by a third party and is inadmissible hearsay evidence.  Aerojet notes that it retained E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:1-15 ("We engaged EY to understand where we were. This is a learning and improvement document."). The E&Y audit did not concern the technical controls at issue in this case. Ex. A at 040 ("Findings, as used in this report . . . are not meant to be defined as a non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise.").

DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS

48.     RUIZ did not feel comfortable having his personal information on AR's computer system when it could be penetrated undetected in four hours. (Ex. K, Ruiz Dep. 37:21-25)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 48:**

**Undisputed.**

49.     RUIZ was sure that the United States government did not feel comfortable having their rocket designs and weapons system designs on Aerojet's system when could be penetrated undetected in four hours and remain undetected. (Ex. K, Ruiz Dep. 38:2-10)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 49:**

**Disputed. Relator mischaracterizes the testimony. Ruiz testified as follows:**

**Q      I can restate it. I'm just asking:  With this system that could be penetrated in four hours' notice, do you feel comfortable having your personal information on Aerojet's system?**

**A      Certainly not.**

**[ ]**

**Q      BY MR. THYBERG:  Do you think the United States government should feel comfortable having rocket designs and weapon system designs on Aerojet's system when they could be penetrated in four hours and go undetected?**

**[ ]**

**THE WITNESS:  I'm sure that they don't feel as comfortable either. I'm not sure what the design documents were, so I can't say to what extent.**

**Ex. 250 (Ruiz Dep. Tr.) at 37:21–38:10.**

50.     RUIZ agrees that AR was not providing adequate security to protect the resources on its system. (Ex. K, Ruiz Dep. 57:14-21)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 50:**

**Disputed. Relator mischaracterizes Ruiz's testimony. Ruiz testified in response to Relator's question "Now at this time, July of 2015, do you think that Aerojet Rocketdyne was providing adequate security for their NASA and Department of Defense technical information?" that Aerojet "had some areas that were more secure than others. But, overall, we still lacked**

1  **areas -- to say that we were fully compliant, we were still working through processes, manual**

2  **processes for the most part. To say that we were moving in that direction -- but we did not have**

3  **a lot of the tools or the equipment that we would need that were required for DFARS or NIST**

4  **in some cases." Ex. 250 (Ruiz Dep. Tr.) at 28:17-29:3.   Relator cites a "yes" response to a**

5  **compound question primarily asking whether E&Y was able to penetrate Aerojet's system in**

6  **four hours.  *Id.* at 57:14-21. Aerojet disputes this purported fact to the extent Relator is trying**

7  **to establish that Ruiz testified that Aerojet was not providing adequate security as defined by**

8  **the DFARS Clause.[6]  Relator did not define "adequate security" in any of his questions to Ruiz.**

9

10     51.     RUIZ knew that in addition to the specific NIST requirements there was an overarching

11  requirement that AR provide adequate security to protect the government's unclassified controlled

12  security information and he understood that the government or any customer was requesting that their

13  data be protected. (Ex. K, Ruiz Dep. 56:19-57:1)

14     **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 51:**

15     **Disputed. Relator asked whether Ruiz "underst[ood] that the DFARS cyber security**

16  **clause, in addition to having obviously specific NIST requirements, that there was an**

17  **overarching requirement that Aerojet provide adequate security to protect government's**

18  **unclassified controlled security information?" Ruiz responded: "From an infrastructure**

19  **perspective, my responsibility was to protect all data, including customer data, company data,**

20  **personal data.  That is what a CIO's responsibility is primarily." Ex. 250 (Ruiz Dep. Tr.) at**

21  **56:19-57:5. Relator then asked whether "Aerojet was supposed to be providing adequate**

22  **security," without reference to any customer, contract clause, or regulation. Ruiz responded,**

23  **"Yes. I think that the government is -- or any customer -- any client is requesting that their data**

24  **be protected." Ex. 250 (Ruiz Dep. Tr.) at 57:6-13.**

25

26

27  _____

28  [6]   Where Aerojet references the "DFARS Clause" without referencing a specific version of the clause, Aerojet intends to refer to all versions of 48 C.F.R. § 252.204-7012.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1    52.    RUIZ stated at the time was hired in March 2014, AR was not at the level it needed to

2    be to be compliant with the NASA FARS cyber security requirements. (Ex. K, Ruiz Dep. 20:5-22,

3    30:23-24)

4    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 52:**

5    **Undisputed that Ruiz testified when he began his employment at Aerojet, but Aerojet**

6    **notes that Ruiz explained that this was "primarily because of the Rocketdyne infrastructure that**

7    **was being extracted from Pratt Whitney with different equipment, different levels of tools and**

8    **applications. So to integrate that, that was a complex environment at the time. So at different**

9    **levels of security, I should say as well." Ex. 250 (Ruiz Dep. Tr.) at 20:17-22.**

10

11    53.    Ruiz was briefed on the fact that ESI advised AR in 2013 that AR'S system was out of

12    date so they could no longer see if information was leaking or if there was malware in AR's system.

13    (Ex. K, Ruiz Dep. 29:17-25)

14    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 53:**

15    **Undisputed.**

16

17    54.    ESI advised AR that their computer system was leaking data every day. (Ex. K Ruiz

18    Dep. 85:9-14)

19    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 54:**

20    **Disputed. Relator mischaracterizes the testimony. Ruiz testified as follows:**

21    **Q      BY MR. THYBERG:  Are you aware that Imagine during this timeframe,**
        **that Imagine was indicating that your system was leaking data every day?**
22

23    **[ ]**

24    **THE WITNESS:  As I said before, we knew there was some vulnerabilities.**
        **We didn't know to the extent.**

25    **Ex. 250 (Ruiz Dep. Tr.) at 85:9–14. Further, Danette Smith testified that she was not aware that**

26    **Aerojet's computer system was "leaking information every day." Ex. 249 (Smith Dep. Tr.) at**

27    **46:21-46:25.**

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

55.     As of July 29, 2014, AR had no approved or funded plan to drive DFARS compliance. (Ex. H, Van Kleeck Dep. 78:25-79:17)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 55:**

**Disputed. When Relator asked Van Kleeck about a statement discussing funding for DFARS compliance, she testified: "I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place. I have no knowledge of that, so no." Ex. __ (Van Kleeck Dep. Tr.) at 80:20-81:5.**

56.     RUIZ'S requests to increase his budget to address cybersecurity and AR's need to become compliant with the NASA FARS cybersecurity requirements were denied. (Ex. K, Ruiz Dep. 44:5-20, 95:18-96:12, 115:3-116:15)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 56:**

**Disputed. Relator mischaracterizes Ruiz's testimony. Ruiz testified that he asked for additional funds "in the middle of the -- it was prior to the budgeting processes" and was ask to re-prioritize his budget "and try to figure out how to do it[.]" Ex. 250 (Ruiz Dep. Tr.) at 44:5-20. Aerojet further disputes this purported fact insofar as Relator has failed to identify a specific year for the request. Ruiz testified, "I don't recall that they actually cut the budget for that year, but the plan was to reduce budgets the following year. And I don't know if that actually happened or not." *Id.* at 99:13-16. Undisputed that Ruiz testified that there were instances in which additional funding was not available. Further, Aerojet's IT Program Manager Curt Figler testified that "if [he] needed resources, I tapped on the right shoulders, indicated what I needed, and those resources were allocated." Ex. 251 (Figler Dep. Tr.) at 41:7-42:2.**

57.     When RUIZ requested that AR increase his budget to address cybersecurity and the NASA FARS requirements, AR COO, TUCKER, told him he had to reduce his budget. (Ex. K, Ruiz Dep. 98:16-99:1, Exhibit 15 to Ruiz Dep.)

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 57:**

2      **Disputed. Ruiz testified that "Mark Tucker, before he became COO, was leading an**

3  **effort to consolidate facilities in order to reduce overall costs for the company. And part of that**

4  **was all departments to have a reduction in budgets." Ex. 250 (Ruiz Dep. Tr.) at 98:9-13. Ruiz**

5  **also testified that he didn't "recall that they actually cut the budget for that year, but the plan**

6  **was to reduce budgets the following year. And I don't know if that actually happened or not."**

7  *Id.* **at 99:13-16. Aerojet notes that Relator has not provided Exhibit 15 to Ruiz's deposition, but**

8  **notes that Exhibit 15 does not support the purported fact as it does not relate to the IT**

9  **department's budget.**

10

11      58.    When RUIZ discussed AR's non-compliance with cyber security requirements with

12  TUCKER and AR VP Scott Correll ("CORRELL") they indicated that if the government were to ever

13  audit Aerojet, Aerojet would just apologize and receive a slap on the wrist with a chance to meet

14  requirements at a later date. (Ex. K, Ruiz Dep. 98:16-99:1)

15      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 58:**

16      **Disputed. Tucker testified that he did not make such a statement: "it's certainly not --**

17  **that's not what I stated," and that what he said could have been misinterpreted. Ex. 247 (Tucker**

18  **Dep. Tr.) at 143:11-144:10. Tucker further testified that his "objective was to understand the**

19  **position we were at so we could accurately present to the customer where we stood. And if we**

20  **were not compliant, we would -- we would address that, and we would commit to the customer**

21  **we would be, but I never inferred that we should misrepresent where we were at and that the --**

22  **the ramifications would be insignificant."** *Id.*

23

24      59.    RUIZ stated at the time was hired in March 2014, AR was not at the level it needed to

25  be to be compliant with the NASA FARS cyber security requirements. (Ex. K, Ruiz Dep. 20:5-22,

26  30:23-24)

27      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 59:**

28      **Undisputed.**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

60.     AR VP of Advanced Space Programs, Julie Van Kleeck ("VAN KLEECK"), was aware in 2014 that there were NASA FAR 1852.204-76 cybersecurity requirements that that were required to be complied with at part of performing a NASA contract. (Ex. H, Van Kleeck Dep. 10:9-11:6,18:5-25)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 60:**

**Disputed. Van Kleeck testified that in 2014 she became aware there were certain NASA cybersecurity requirements. Ex. 245 (Van Kleeck Dep. Tr.) at 18:18–25. Not every NASA contract contained the NFS Clause, meaning that complying with it was not required for each contract. ASOF ¶¶ 27–30.**

61.     On June 17, 2015, AR Director of Contracts, Debra Blagg, acknowledged AR would have to comply with the NASA FARS Clause or obtain a waiver if AR wanted to continue to sell to NASA or NASA Prime contractors. (Ex. A, 165)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 61:**

**Undisputed that on June 17, 2015 Debra Blagg wrote "[i]f AR wishes to continue selling our products to NASA (or NASA prime contractors), we are going to have to comply with these requirements or obtain a waiver . . ." Ex. A at 165. Disputed that the NFS Clause was a requirement for NASA contracts given that NASA acknowledged and accepted Aerojet's non-compliant status.  ASOF ¶¶ 128–130, 132–149, 153**

62.     On June 22, 2015, AR VP CORRELL, acknowledged that AR'S compliance status was affecting AR'S business when he stated in an email: " This issue is beginning to affect multiple business areas to include Tactical, RS-25, Missile Defense and our AP organizations- ultimately will impact awards and sales." (Ex. A, 186)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 62:**

**Disputed that cybersecurity was affecting Aerojet's business becuase it disclosed its non-compliance with contracting government agencies, (*e.g.*, ASOF ¶¶ 57; 81; 86; 101; 108–09; 116;**

29

**119; 121; 128–29; 132; 134; 138–41; 144–49), and the government continued to do business with Aerojet, (ASOF ¶¶ 126; 160; 169; 178; 193; 199). Undisputed that Correll wrote the quoted language.**

63.    AR VP CORRELL, emailed AR COO, TUCKER, on June 24, 2015 advising him that the GMLRS program may not be awardable and they may not obtain the RS-25 program contract unless they do a gap analysis for the NASA security requirements. (Ex. A, 205-206)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 63:**

**Disputed. Correll indicated that the Aerojet might "not be[] able to obtain a contract for the [RS-25 Restart Contract] at summer's end." Ex. A at 205–06. The RS-25 Restart contract was awarded to Aerojet. ASOF ¶ 48; Ex. 246 (Correll Dep. Tr.) at 35:9–36:7 ("I believe they awarded us an RS-25 production restart proposal.").**

64.    AR's COO, TUCKER, knew that for AR to get DOD and NASA contracts AR was required to declare AR was compliant with the DFARS and NASA FARS cybersecurity requirements. (Ex. E, Tucker Dep. 23:3-14, 81:21-82:23)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 64:**

**Disputed. Aerojet disclosed its non-compliance to the government without declaring that it was compliant with the DFARS and NFS Clauses and was still awarded contracts, reflecting that a declaration of compliance was not required for Aerojet "to get DOD and NASA contracts." *E.g.*, ASOF ¶¶ 57; 81; 86; 101; 108–109; 116; 119; 121; 128–129; 132; 134; 138–141; 144–149. Further, in the testimony cited by Relator, Tucker does not make this statement or any similar statement. Finally, not all DoD and NASA contracts contained the DFARS or NFS Clauses. ASOF ¶¶ 53–54.**

65.    In an email to Paul Meyer on July 24, 2014, VAN KLEECK stated that the DFARS clause is something that could affect all new defense contracts. (Ex. H, Van Kleeck Dep 71:22-72:3)

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 65:**

2   **Undisputed.**

3

4   66.     VAN KLEECK sent an email on September 5, 2014 stating that that AR trying to keep

5   the customer apprised of their progress in DFARS compliance status so they would stay with AR. (Ex.

6   A, 097-098; Ex. H, Van Kleeck Dep. 85:12-86:23)

7   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 66:**

8   **Undisputed.**

9

10  67.     In July 2013, AR entered a contract modification with NASA for contract

11  NNM06AB13C which included a "Space Launch System Rocket Engine Development Project

12  Statement of Work (SOW)" AR00194353-194423 (Ex. A, 416-495)

13  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 67:**

14  **Undisputed. Aerojet notes that the contract identified in this purported fact is not**

15  **identified in Relator's Second Amended Complaint and is not at issue in this case.**

16

17  68.     The SOW stated that :"The contractor shall provide support for the following NASA

18  Technology Protection Program Processes (TPP) processes, Critical Program Information(CPI)

19  identification, Threat & Vulnerability Analysis, Selection and implementation of security

20  countermeasures. AR 00194358 (Ex. A 421)

21  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 68:**

22  **Undisputed. Aerojet notes that the contract referenced in this purported fact is not**

23  **identified in Relator's Second Amended Complaint and is not at issue in this case. Aerojet**

24  **further notes that the Statement of Work does not contain the NFS Clause.**

25

26  69.     The SOW stated AR: " … shall ensure that NASA'S Sensitive But Unclassified (SBU)

27  information,… is encrypted in storage and transmission." AR00194358-194359 (Ex. A, 421-22)

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 69:**

**Undisputed. Aerojet notes that the contract referenced in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

70.     Prior to awarding the RS-25 Contract, NASA advised AR that wanted to better understand AR'S IT Security and when AR was projecting to be compliant. (Ex. A, 173)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 70:**

**Disputed to the extent that Relator seeks to establish the truth of the matter on the grounds that the purported statement, recited by an Aerojet employee, was made by a third party and constitutes inadmissible hearsay evidence. Undisputed that the June 18, 2015 e-mail states that "NASA would like to understand this topic better when we (AR) are projecting to be compliant, etc." Ex. A at 173. Aerojet notes that it disclosed that it "*is not fully compliant* per the Security Requirements for Unclassified Information Technology Resources at this time" in the proposal for Contract No. NNM16AA02C (the RS-25 contract) in June 2015. Ex. 153 (emphasis added). After the contract was awarded on November 19, 2015, (ASOF ¶ 48) but before performance began, Aerojet made a detailed presentation to NASA further revealing that it was only 37% compliant with NIST 800-53. ASOF ¶ 134; Ex. 162.**

71.     Prior to awarding the RS-25 contract, NASA asked AR for more information regarding AR'S compliance go forward plan for NASA FARS compliance and questioned the status of AR'S cybersecurity compliance on AR's current RS-25 Liquid Eng & Adaptation contract. (Ex. A 174-175,177; Ex. K, Ruiz Dep. 99:17-101:13)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 71:**

**Disputed to the extent that Relator seeks to establish the truth of the matter on the grounds that the purported statement, recited by an Aerojet employee, was made by a third party and constitutes inadmissible hearsay evidence. Undisputed that before November 19, 2015, when NASA awarded Aerojet the RS-25 contract, Danette Smith stated in a June 22, 2015 e-mail that "NASA as part of the normal proposal process asked Marty's team for more**

information regarding our compliance go-forward plan and specifically also questioned the status of the current RS-25 Liquid Eng & Adaptation Contract." Ex. A at 174. Disputed insofar as Ruiz did not testify to this fact. Rather, Ruiz testified that the RS-25 program "had NASA NIST requirements" and was one of the reasons Aerojet conducted the gap analysis. Ex. 250 (Ruiz Dep. Tr.) at 99:17-101:13. Aerojet notes that it disclosed that it "*is not fully compliant* per the Security Requirements for Unclassified Information Technology Resources at this time" in the proposal for the RS-25 contract in June 2015. Ex. 153 (emphasis added). After the contract was awarded on November 19, 2015, (ASOF ¶ 48) but before performance began, Aerojet made a detailed presentation to NASA further revealing that it was only 37% compliant with NIST 800-53. ASOF ¶ 134; Ex. 162.

72.     On June 15, 2015, as part of the normal proposal process re the NASA RS-25 Restart contract NASA asked for more information regarding AR'S compliance go forward plan and specifically questioned status of the current RS-25 Liquid Engine and Adaptation Contract. (Ex. H, Van Kleeck Dep. 97:9-99:14)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 72:**

Undisputed that Ex. A at 174 (which Relator does not cite here) reflects an internal Aerojet discussion summarizing hearsay statements purportedly made by NASA, which is inadmissible. Aerojet notes that the testimony from Van Kleeck cited by Relator does not support this fact. Van Kleeck testified that Aerojet was "providing [NASA] statuses regularly. . . . You know, we were communicating enough, you know, appropriately with them; so they were confident in our plan. Ex. __ (Van Kleeck Dep. Tr.) at 99:10–14. Aerojet notes that it disclosed that it "*is not fully compliant* per the Security Requirements for Unclassified Information Technology Resources at this time" in the proposal for the RS-25 contract in June 2015. Ex. 153 (emphasis added). After the contract was awarded on November 19, 2015, (ASOF ¶ 48; Ex. 245 (Van Kleeck Dep. Tr.) at 99:9-14) but before performance began, Aerojet made a detailed presentation to NASA further revealing that it was only 37% compliant with NIST 800-53. ASOF ¶ 134; Ex. 162.

73.     On August 31, 2015, Bernadette Kan from NASA sent an email to AR contracting officer, Joseph Capizzi, regarding the RTAPS contract advising him that NASA will need information on how AR will be working with the NASA environment on the contract and will require that AR answer questions and provide an IT Security Management Plan. (Ex. A, 290-291)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 73:**

**Disputed. Relator mischaracterizes the document. The August 31, 2015 e-mail states:**

**As far as documents required after the award of the contract, please see the attached template that I'll need your company to complete to start the process on submission of your IT Security management plan and/or IT Security Plan." Answers to the questions help us determine which route to take in the submission requirements.**

**I have also included a 2nd attachment. This document lists security controls that may be needed to be implemented on the system(s) Aerojet Rocketdyne is using while working on the NASA project. As the CO, I must emphasize that until NASA has more information that documents how you will be working in with the NASA environment, we will not know what controls need to be implemented. The attachment indicates the types of questions NASA will be asking depending on how Aerojet Rocketdyne will be working on the contract. Please do not get wigged out (Technical term), since we know we have an IT Security Staff that is here to support and contribute to your success in accomplishing your goals as well as making sure the systems are protected with minimum security baselines in place.**

**Ex. A at 290. Aerojet further disputes this purported fact to the extent Relator seeks to establish that this e-mail relates to the RTAPS contract. Rather, this email relates to the RTAPS 2 contract, (Ex. A at 290 (stating in the subject line "[EXTERNAL] RTAPS 2 signed SF33"), which is Contract No. NNC15BA09B, (Ex. 229 at AR00087887; Ex. 121 at cells 18B and 18K).[7] Contract No. NNC15BA09B is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

74.     NASA wanted reassurance about AR's cybersecurity compliance in connection with its review of AR's RS-25 Restart contract proposal. (Ex. H, Van Kleeck Dep.88:21-91:3 92:4-93:16, 94:3-97:8; Ex. J, Smith Dep. 71:16-72:15)

---

[7] Exhibit 121, cell 18:K references "RTAPS 2" in the fourth line of the paragraph.

1

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 74:**

2       **Disputed. Neither Julie Van Kleeck nor Danette Smith testified that NASA sought**

3   **reassurances about Aerojet's cybersecurity status. In response to a question from Relator's**

4   **counsel asking "[i]sn't it true on that proposal that NASA wanted reassurance about Aerojet's**

5   **cybersecurity compliance before awarding the contract?" Van Kleeck testified that "[t]here**

6   **were many requirements. This is a -- as with most NASA contracts, there are a lot of**

7   **requirements associated with it, of which cybersecurity was one." Ex. 245 (Van Kleeck Dep. Tr.**

8   **90:20-91:3). Ms. Smith confirmed that she wrote in an email that NASA had requested detailed**

9   **information regarding Aerojet's compliance and go-forward plan, and testified that "that's**

10  **normal process. Some customers ask for information, and we take actions to get the**

11  **information." Ex. 249 (Smith Dep. Tr. at 72:5-15).**

12      **Indeed, at the time of Ms. Smith's email in June 2015, Aerojet had disclosed to NASA**

13  **that it "*is not fully compliant* per the Security Requirements for Unclassified**

14  **Information Technology Resources at this time" in the proposal for Contract No.**

15  **NNM16AA02C (the RS-25 contract). Ex. 153 (emphasis added). And after the contract was**

16  **awarded on November 19, 2015, (ASOF ¶ 48) but before performance began, Aerojet made a**

17  **detailed presentation to NASA further revealing that it was only 37% compliant with NIST 800-**

18  **53. ASOF ¶ 134; Ex. 162.**

19

20      75.     In December 2015, NASA requested a briefing from AR in connection with the NASA

21  RS25 contract regarding the results of AR'S NASA Gap Analysis and asked for AR'S assessment of

22  what risk there was to NASA data and whether NASA should be worried. NASA also wanted to know

23  what steps were being taken to mitigate NASA's risk and what AR's strategy was to achieve

24  compliance. (Ex. A, 320)

25      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 75:**

26      **Disputed. The cited document summarizes items Aerojet was gathering in preparation**

27  **for a presentation. Ex. A at 320. The document does not reflect any requests from NASA.**

28

---

35

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

76.     AR'S reply strategy to respond to NASA's concerns was " …to articulate why 23.9 % compliant to the NASA-NIST SP 800-53 requirements is ok." (Ex. A, 320)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 76:**

**Disputed. The cited document summarizes items Aerojet was gathering in preparation for a presentation. Ex. A at 320. The document does not reflect any requests or concerns from NASA.  However, undisputed that Aerojet planned to and did tell NASA that it was 23.9% compliant with the NIST SP 800-53 controls in 2015. ASOF ¶ 134; Ex. 162.**

77.     On February 16, 2016, following a meeting with AR regarding AR'S NASA FARS compliance status on the RS-25 contract, NASA told AR they wanted to see the details of AR'S gap analysis through all 264 controls so they could come to independent assessment about NASA's risk posture. (Ex. A, 359)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 77:**

**Disputed. Exhibit A at 359 contains inadmissible hearsay of statements purportedly made by NASA and cannot be used to establish the truth of the matter asserted. Further, the February 16, 2016 e-mail states, "NASA wants to see the details of our gap analysis (through all 264 controls) as they need to come to their own independent assessment as to their risk posture *due to our non-compliance with the requirements." Id*. (emphasis added). During a February 16, 2016 presentation, Aerojet informed NASA that it was not compliant with 167 of the NIST SP 800-53 controls. ASOF ¶ 134. In fact, based on Aerojet's February 2016 presentation, NASA understood that Aerojet had a "burn down plan" for its non-compliant controls. ASOF ¶ 135.**

78.     On January 5, 2017, NASA told AR that material omissions of required information in a Technology System Security Plan could lead to a stop work order. (Ex. A, 406)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 78:**

**Undisputed, but Aerojet notes that the AEPS contract, Contract No. NNC16CA21C, (Ex. 121 at cells B26 & K26), that is the subject of the cited email, is not identified in Relator's Second Amended Complaint and is not at issue in this case. Aerojet has consistently disclosed its**

36

1   compliance status to NASA. *E.g.*, ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Further, NASA

2   Contracting Officer Joseph McCollister stated that during his time as a contracting officer for

3   NASA, he "had not terminated or refused to award a contract for non-compliance with NASA

4   FARS Supplement 1852.204-76." Ex. 185 ¶ 5. Aerojet further notes that this contract is ongoing

5   and is expected to be completed on July 31, 2024. *Id.*

6

7        79.    In December 2015, AR gave a presentation to the NASA regarding AR's NASA FARS

8   Clause compliance status in regard to the RS-25 Restart Contract where AR claimed to have

9   "Protective security controls to safeguard unclassified IT resources are in place." (Ex. J, Smith Dep.

10  122:9-25, 125:4-13, 175:7-24, Exhibits 1,2 and 4 to Smith Dep.)

11       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 79:**

12       **Undisputed. Aerojet notes Emagined concluded that Aerojet "protect[ed] the**

13  **confidentiality, integrity, and availability of NASA Electronic Information and IT resources and**

14  **protect[ed] NASA Electronic Information from unauthorized disclosure.'" Ex. 222. Aerojet**

15  **notes that some of the evidence cited by Relator does not support or even relate to this purported**

16  **fact.** *See* **Ex. J-1 (presentation to MDA, not NASA).**

17

18       80.    In December 2015, AR told NASA in a presentation they had two factor authentication

19  in place to protect NASA data when in fact AR only had two factor authentication in place in some

20  instances. (Ex. F, Figler Dep. 236:9-237:20)

21       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 80:**

22       **Undisputed that Aerojet gave a presentation to NASA on the status of its cybersecurity**

23  **and compliance efforts and informed NASA that it was not compliant with 167 of the NIST 800-**

24  **53 controls. In the cited testimony, Curt Figler is testifying about a presentation to MDA, not**

25  **NASA.** *See* **Ex. 251 (Figler Dep. Tr.) at 230:4–237:20. Aerojet notes that it arrived at the**

26  **statement that "[p]rotective security controls to safeguard unclassified IT resources are in**

27  **place," through its cybersecurity consultants Emagined. Specifically, David Chamberlain had**

28  **informed that "NFS 1852.204-76 . . . says 'The contractor shall protect the confidentiality,**

1    **integrity, and availability of NASA Electronic Information and IT resources and protect NASA**

2    **Electronic Information from unauthorized disclosure.' This we do." Ex. 222.**

3

4    81.    The presentations to NASA and the MDA in December 2015 stated the AR was

5    transitioning to a managed service provider model for IT Infrastructure, applications and cybersecurity

6    when AR had not yet hired a managed service provider and did not hire one until April 2017. (Ex. F,

7    Figler Dep. 54:4-11; Ex. J, Smith Dep. Exhibits 1,2 and 4 to Smith Dep.)

8    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 81:**

9    **Undisputed that Aerojet told NASA and MDA that it was moving to a managed services**

10   **provider in 2017 and kept them apprised of the status, including that it issued a request for**

11   **proposal in April 2016, that negotiations were completed in December 2016, that Aerojet**

12   **expected to have the outsourcing agreements in place by February 2017, and that gaps were**

13   **planned to be closed by December 2017. Ex. 178. Aerojet notes that contracts between Aerojet**

14   **and the MDA are not identified in Relator's Second Amended Complaint and are not at issue in**

15   **this case.**

16

17   82.    AR published an explanatory statement on its website to communicate to customers

18   regarding it compliance with the DFARS and NASA FARS cybersecurity controls. (Ex. A, 277-280,

19   321-330,361)

20   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 82:**

21   **Undisputed that Aerojet provided its customers with copies of the explanatory controls**

22   **statement, which was "updated on a regular basis" and made available to Aerojet's employees**

23   **through a non-public "SharePoint site."** *See* **Ex. 251 (Figler Dep. Tr.) at 197:8-198:19.**

24

25   83.    AR added a statement to supplement these explanatory statements to its website in

26   December 2015. (Ex. A, 496-497; Ex. F, Figler Dep. 197:8-198:19)

27

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 83:**

**Disputed. Pages 496 through 497 of Exhibit A is the same document as pages 361 through 362, referenced in purported Fact No. 82—both are Bates stamped as AR00031106–07. Relator cites no evidence in support of the proposition that Aerojet added a statement to supplement its statement of non-compliance in December 2015.**

84.     The new statement characterized the compliance deficiencies found in the NGA analysis as areas for improvement while stating that: "…security controls to safeguard unclassified IT resources are in place as described in the Explanatory Control Statement." (Ex. A, 496)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 84:**

**Disputed. Page 496 of Exhibit A is not a "new statement," as it is identical to page 361. Page 496 of Exhibit A states that "[w]hile the analysis has identified compliance gaps and areas of improvement, security controls to safeguard unclassified IT resources are in place as described in AR's Explanatory Control Statement" in addition to stating "AR completed a gap analysis of our enterprise infrastructure to assess our posture from a documentation and technical perspective. AR does not intend to deviate from any of the security requirements under DoD FARS clause 252.204-7012 (Dec 2015), or propose alternative security measures, but has prepared a strategy and plan to address the gaps going forward." The explanatory controls statement disclosed that Aerojet had "compliance gaps and areas for improvement," and went on to describe the "security controls to safeguard unclassified IT resources" in detail.**

85.     The new statement also represented that where AR was not compliant they had: "…alternative controls or protective measures in place to achieve equivalent protection" to the DFARS and NASA FARS security requirements. (Ex. A, 496)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 85:**

**Disputed. Page 496 of Exhibit A is not a "new statement," as it is identical to page 361. Page 496 also does not relate to the NFS Clause. Ex. A. at 496. Aerojet also disputes this purported fact to the extent Relator selectively quotes; the entire sentence reads "AR was fully**

**compliant in meeting 24 security controls and identified 36 alternative controls or protective measures in place to achieve equivalent protection."** *Id.* **Aerojet notes that it disclosed its compliance status with the applicable controls to DoD agencies.** *E.g.***, ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121.**

86.     In a October 27, 2015 email, AR Senior Director Program manager Daniel Adamski expressed his concern that AR was misleading NASA in discussing the RS-25 contract when he stated: "Am I the only one that is struggling with the fact that we are going forward to one of our largest customers (NASA) and not telling them we are non-compliant with the requirements ? "Areas of Improvement" is not a synonym for "non-compliance.., we seem to be torturing verbiage and not giving them the real story… We are walking a very fine line on this one and appear to be "overly cute" in communicating with NASA…" (Ex. A, 308)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 86:**

**Undisputed that Relator accurately quotes the October 27, 2015 e-mail, but Aerojet disputes these statement's characterizations of Aerojet's disclosures of non-compliance to NASA. Rather, Aerojet disclosed its compliance status to NASA.** *E.g.***, ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49.**

87.     Other AR employees working on a NASA contracts were concerned that AR should be notifying the government about NASA FARS non-compliance issues related to current contracts. (Ex. A, 408-410)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 87:**

**Undisputed but Aerojet notes it disclosed its compliance status to NASA.** *E.g.***, ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49.**

88.     AR submitted a Contractor Information Security Management Plan- Space Launch System (SLS) Rocket Engine Development Project. Contract: NNM06AB13C dated May 22, 2015

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   ("MAY 2015 PLAN") that contained numerous false and misleading statements that were inconsistent

2   with the findings of the NGA. (Ex. A, 146-155)

3   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 88:**

4   **Undisputed that Aerojet submitted a "Space Launch System (SLS) Rocket Engine**

5   **Development Project" plan, dated May 22, 2015, for Contract No. NNM06AB13C. Aerojet**

6   **disputes this purported fact to the extent that Relator seeks to imply that Aerojet intentionally**

7   **made false and misleading statements. Ex. 246 (Correll Dep. Tr.) at 62:4–8 ("[A]ny requirement**

8   **in our contract we tried to understand that requirement and make sure that we could meet that**

9   **requirement. And if we couldn't meet that requirement we told our customers where we could**

10  **not meet that requirement."). The May Plan is dated May 22, 2015, months before the NASA**

11  **Gap Analysis was completed on September 9, 2015. And the May Plan was prepared by**

12  **Emagined's David Chamberlain. Ex. A at 146. Emagined was Aerojet's consultant on**

13  **cybersecurity and Aerojet relied on its consultants' determinations. Relator also concluded that**

14  **the document "look[ed] reasonable." *See* Ex. 221. Aerojet also notes that it disclosed its**

15  **compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41;**

16  **144–49. Finally, Aerojet notes that the contract identified in this purported fact is not identified**

17  **in Relator's Second Amended Complaint and is not at issue in this case.**

18

19  89.    The MAY 2015 PLAN claimed AR developed policies and procedures addressing

20  minimum security requirements for "Risk Assessment" while the NGA found AR was only 57.7%

21  compliant with these NASA FAR Requirements. (Ex. A, 031,151)

22  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 89:**

23  **Disputed to the extent Relator suggests that the categories in the May 2015 Plan are**

24  **expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The**

25  **May 2015 Plan describes the policies that Aerojet had in place at the time and cited each**

26  **applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP**

27  **submission required only an explanation of "what we do" rather than whether Aerojet's systems**

28  **were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that**

41

1  **the NASA Gap Analysis found that Aerojet was 57.1% compliant with the Risk Assessment**
2  **Control Family. Aerojet also notes that it disclosed its compliance status with the applicable**
3  **controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the**
4  **contract identified in this purported fact is not identified in Relator's Second Amended**
5  **Complaint and is not at issue in this case.**

7      90.     The MAY 2015 PLAN claimed AR developed policies and procedures addressing
8  minimum security requirements for "Planning" while the NGA found AR was 0% compliant with
9  these NASA FAR Requirements. (Ex. A, 019,152)

10      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 90:**

11      **Disputed. The May 2015 Plan are not tethered to the NIST 800-53 controls evaluated by**
12  **the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place**
13  **at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining**
14  **that the IT SMP submission required only an explanation of "what we do" rather than whether**
15  **Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).**
16  **The May 2015 Plan states "AR Cyber Security includes requirements for ensuring users are**
17  **aware of the rules of behavior for accessing the information systems." Ex. A at 151. This section**
18  **also states that "AR Cyber Security will prepare system security plans on defined systems**
19  **supporting SLS per guidelines specified in NFS 1852.204-76 and provide the requested**
20  **information per the guidelines specified in DRD 1118CD-003." *Id*. Undisputed that the NASA**
21  **Gap Analysis found that Aerojet was 0% compliant with the Planning Control Family. Aerojet**
22  **also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶**
23  **128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this**
24  **purported fact is not identified in Relator's Second Amended Complaint and is not at issue in**
25  **this case.**

27      91.     The MAY 2015 PLAN described claimed AR had developed policies and procedures
28  to address the minimum security requirements "Systems and Services Acquisitions" requirements

while the NGA found AR was only 7.1 % compliant with these NASA FAR requirements. (Ex. A, 032,151)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 91:**

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 7.1% compliant with the Systems and Services Control Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

92.     The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Awareness and Training" while the NGA found AR was only 20% compliant with these NASA FAR Requirements. (Ex. A, 019,152)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 92:**

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 20% compliant with the Awareness and Training Control Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes**

that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.

93.    The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Configuration Management" while the NGA found AR was only 13.6% compliant with these NASA FAR Requirements. (Ex. A, 022, 152)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 93:**

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 13.6% compliant with the Configuration Management Control Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

94.    The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Contingency Planning" while the NGA found AR was only 22.7% compliant with these NASA FAR Requirements. (Ex. A 023, 152)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 94:**

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems**

were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 13.6% compliant with the Configuration Management Control Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.

95.     The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Incident Response" while the NGA found AR was 0% compliant with these NASA FAR Requirements. (Ex. A, 025, 152)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 95:**

Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 0% compliant with the Incident Response Control Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.

96.     The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Maintenance" while the NGA found AR was only 44.4% compliant with these NASA FAR Requirements. (Ex. A, 026, 153)

1

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 96:**

2

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are**

3

**expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The**

4

**May 2015 Plan describes the policies that Aerojet had in place at the time and cited each**

5

**applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP**

6

**submission required only an explanation of "what we do" rather than whether Aerojet's systems**

7

**were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that**

8

**the NASA Gap Analysis found that Aerojet was 44.4% compliant with the Maintenance Control**

9

**Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to**

10

**NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract**

11

**identified in this purported fact is not identified in Relator's Second Amended Complaint and**

12

**is not at issue in this case.**

13

14

97.     The MAY 2015 PLAN claimed AR developed policies and procedures addressing

15

minimum security requirements for "Media Protection" while the NGA found AR was only 11.1%

16

compliant with these NASA FAR Requirements. (Ex. A, 027,153)

17

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 97:**

18

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are**

19

**expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The**

20

**May 2015 Plan describes the policies that Aerojet had in place at the time and cited each**

21

**applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP**

22

**submission required only an explanation of "what we do" rather than whether Aerojet's systems**

23

**were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Aerojet also notes**

24

**that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29;**

25

**132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this purported**

26

**fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

27

28

46

98.     The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Physical and Environmental Protection " while the NGA found AR was only 72.2 % compliant with these NASA FAR Requirements. (Ex. A, 028, 153)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 98:**

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.   *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 72.2% compliant with the Physical and Environmental Protection Control Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49.  Finally, Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

99.     The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Personal Security" while the NGA found AR was only 50% compliant with these NASA FAR Requirements. (Ex. A, 030,153-54)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 99:**

**Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.   *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 50% compliant with the Personal Security Control Family. Aerojet also notes that it disclosed its compliance status with the applicable**

controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.

100.   The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "System Information Integrity" while the NGA found AR was only 33.3% compliant with these NASA FAR Requirements. (Ex. A, 034,154)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 100:**

Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP submission required only an explanation of "what we do" rather than whether Aerojet's systems were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that the NASA Gap Analysis found that Aerojet was 33.3% compliant with the System Information Integrity Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.

101.   The MAY 2015 PLAN claimed AR developed policies and procedures addressing minimum security requirements for "Access Control" while the NGA found AR was only 22.8% compliant with these NASA FAR Requirements. (Ex. A, 018,154)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 101:**

Disputed to the extent Relator suggests that the categories in the May 2015 Plan are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The May 2015 Plan describes the policies that Aerojet had in place at the time and cited each applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP

1    submission required only an explanation of "what we do" rather than whether Aerojet's systems

2    were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that

3    the NASA Gap Analysis found that Aerojet was 22.8% compliant with the Access Control

4    Family. Aerojet also notes that it disclosed its compliance status with the applicable controls to

5    NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes that the contract

6    identified in this purported fact is not identified in Relator's Second Amended Complaint and

7    is not at issue in this case.

8

9        102.   The MAY 2015 PLAN claimed AR developed policies and procedures addressing

10   minimum security requirements for "Audit and Accountability" while the NGA found AR was only

11   22.2% compliant with these NASA FAR Requirements. (Ex. A, 020,154)

12       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 102:**

13       Disputed to the extent Relator suggests that the categories in the May 2015 Plan are

14   expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The

15   May 2015 Plan describes the policies that Aerojet had in place at the time and cited each

16   applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP

17   submission required only an explanation of "what we do" rather than whether Aerojet's systems

18   were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that

19   the NASA Gap Analysis found that Aerojet was 22.2% compliant with the Audit and

20   Accountability Control Family. Aerojet also notes that it disclosed its compliance status with the

21   applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes

22   that the contract identified in this purported fact is not identified in Relator's Second Amended

23   Complaint and is not at issue in this case.

24

25       103.   The MAY 2015 PLAN claimed AR developed policies and procedures addressing

26   minimum security requirements for "Identification and Authentication" while the NGA found AR was

27   only 4.4% compliant with these NASA FAR Requirements. (Ex. A, 024, 154)

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 103:**

2   **Disputed to the extent Relator suggests that the categories in the May 2015 Plan are**

3   **expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The**

4   **May 2015 Plan describes the policies that Aerojet had in place at the time and cited each**

5   **applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP**

6   **submission required only an explanation of "what we do" rather than whether Aerojet's systems**

7   **were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that**

8   **the NASA Gap Analysis found that Aerojet was 4.4% compliant with the Identification and**

9   **Authentication Control Family. Aerojet also notes that it disclosed its compliance status with the**

10  **applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49. Finally, Aerojet notes**

11  **that the contract identified in this purported fact is not identified in Relator's Second Amended**

12  **Complaint and is not at issue in this case.**

13

14  104.    The MAY 2015 PLAN claimed AR developed policies and procedures addressing

15  minimum security requirements for "System and Communication Protection" while the NGA found

16  AR was only 20.8% compliant with these NASA FAR Requirements. (Ex. A, 033, 154-155)

17  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 104:**

18  **Disputed to the extent Relator suggests that the categories in the May 2015 Plan are**

19  **expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  The**

20  **May 2015 Plan describes the policies that Aerojet had in place at the time and cited each**

21  **applicable Aerojet internal policy.  *See* Ex. 230 (Emagined explaining that the IT SMP**

22  **submission required only an explanation of "what we do" rather than whether Aerojet's systems**

23  **were NIST 800-53 compliant); Ex. 242 (describing requirements of IT SMP).  Undisputed that**

24  **the NASA Gap Analysis found that Aerojet was 20.8% compliant with the System and**

25  **Communication Protection Control Family. Aerojet also notes that it disclosed its compliance**

26  **status with the applicable controls to NASA. ASOF ¶¶ 128–29; 132; 134; 138–41; 144–49.**

27  **Finally, Aerojet notes that the contract identified in this purported fact is not identified in**

28  **Relator's Second Amended Complaint and is not at issue in this case.**

1

2

3          105.    AR sent a Technology Security Management plan dated July 2, 2015 to NASA Stennis

4     Space Center Re: Contract NNS15AA43P which contained the same statements as the MAY 2015

5     PLAN. (Ex. A, 156-164)

6          **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 105:**

7          **Disputed. Aerojet submitted a Contractor Information Technology (IT) Security**

8     **Management Plan dated July 2, 2015 for Contract No. NNS15AA43P, but the July 2, 2015 plan**

9     **does not contain all the same statements as the May 2015 Plan.** ***Compare*** **Ex. A at 146-155** ***with***

10    **Ex. A 156-164. Aerojet notes that the contract identified in this purported fact is not identified**

11    **in Relator's Second Amended Complaint and is not at issue in this case.**

12

13         106.    AR sent NASA an Information Technology Security Inventory for Contract

14    #NNM06AB13C dated November 30, 2015, ( "NOV 2015 INVENTORY") (Ex. A, 314-319)

15         **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 106:**

16         **Disputed. Aerojet did not send the cited document to NASA. The cited document is an**

17    **"initial draft" that was only circulated internally. Ex. 234. Aerojet also notes that the contract**

18    **identified in this purported fact is not identified in Relator's Second Amended Complaint and**

19    **is not at issue in this case.**

20

21         107.    The NOV 2015 INVENTORY stated AR has "Appropriate access controls implement

22    NASA security requirements" while the 9/4/15 NGA found AR was only 22.8% compliant with these

23    required NASA FAR Access Controls. NGA p. 15 (Ex. A, 019, 318)

24         **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 107:**

25         **Disputed insofar as this document is an "initial draft" that was circulated internally and**

26    **was not sent to NASA. Ex. 234. Disputed to the extent Relator suggests that the categories in the**

27    **November 2015 Inventory are expressly tethered to the NIST 800-53 controls evaluated by the**

28    **NASA Gap Assessment.  Information Technology System Security Inventories are only required**

**to provide information, none of which require certification or assessment of compliance with NIST 800-53. Ex. 242 (describing requirements of IT System Security Inventory).  Undisputed that Relator accurately quotes the internal "initial draft" document, (Ex. A at 318), and that the NASA Gap Analysis found that Aerojet was 22.8% compliant with the Access Control Family. Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

108.    While AR claimed in the NOV 2015 INVENTORY to limit the users and devices access to the AR systems. The inventory stated: "Access Controls: Security Program develops and documents policies addressing the minimum security requirements to limit information system access to authorized users, processes acting on behalf of authorized users, or devices…and to the types of transactions and unctions authorized users are permitted to exercise the NGA stated: "There is no control over what external devices can be used on any systems." (Ex. A, 018, 319)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 108:**

**Disputed insofar as this document is an "initial draft" that was circulated internally and was not sent to NASA. Ex. 234. Disputed to the extent Relator suggests that the categories in the November 2015 Inventory are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.  Information Technology System Security Inventories are only required to provide information, none of which require certification or assessment of compliance with NIST 800-53. Ex. 242 (describing requirements of IT System Security Inventory).  Undisputed that Relator accurately quotes the internal "initial draft" document and the NASA Gap Analysis. Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

109.    In the NOV 2015 INVENTORY, AR represented that they had a Contingency Plan which includes a Disaster Recovery Plan ("DRP") updated June in 2015 and claimed to regularly perform a DRP checklist test. (Ex. A, 319) The NGA stated there did not appear to be "a plan to refer

to in the case of a business continuity concern" and "testing of the contingency plan does not occur on an annual basis." NGA p. 20 (Ex. A, 023)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 109:**

**Disputed insofar as this document is an "initial draft" that was circulated internally and was not sent to NASA. Ex. 234. Disputed to the extent Relator suggests that the categories in the November 2015 Inventory are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment. Information Technology System Security Inventories are only required to provide information, none of which require certification or assessment of compliance with NIST 800-53. Ex. 242 (describing requirements of IT System Security Inventory). Aerojet notes that the contract identified in this purported fact is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

110. Although AR network had just been penetrated by EY for the second time undetected in seven months on November 16. 2015 (Ex. A, 312) and AR had been advised by ESI that their network was not able to detect or stop cyber intrusions (Ex. A, 059), the NOV 2015 INVENTORY stated that AR's incident response team would report cyber intrusions to NASA ensuring the incidents are reported consistent with NIST SP 800-61. (Ex. A 319) AR further stated: " Per NASA Far Supplement 1852.204-76, any incidents involving NASA information NASA Security Operations to be notified in order to take appropriate action." Id.

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 110:**

**Disputed. First, Aerojet notes that the November Inventory is an "initial draft" that was circulated internally and was not sent to NASA. Ex. 234. Additionally, Aerojet disputes this purported fact to the extent Relator seeks to establish the truth of the matter asserted in a recitation of a statement made by Aerojet employees regarding a purported E&Y statement on the grounds that this statement was made by a third party and is inadmissible hearsay evidence. Further, Information Technology System Security Inventories are only required to provide information, none of which require certification or assessment of compliance with NIST 800-53. Ex. 242 (describing requirements of IT System Security Inventory). Aerojet further notes that**

53

this November 20, 2015 e-mail does not reference prior purported penetrations and Relator does not cite any evidence in support of that contention. Aerojet notes that it engaged E&Y to locate vulnerabilities in its systems and remediate them. Ex. 248 (Halterman Dep. Tr.) at 54:11-13 ("We engaged EY to understand where we were. This is a learning and improvement document."). In doing so, "E&Y had accesses and knowledge of the infrastructure that individuals external to AR wouldn't have and that they leveraged that knowledge and those accesses in order to gain this level of access to the systems." Ex. 251 (Figler Dep. Tr.) at 90:20–24. Figler also testified that "it was our -- our contention that this particular aspect of the audit report was misrepresented because of the fact that they had leveraged these additional access capabilities and knowledge of the infrastructure and -- however, even though we took exception to this statement and this finding, we took it seriously and worked very hard to address the specific issues in the -- all of the audit findings." *Id.* at 90:25–91:8. Thus, Aerojet disputes this purported fact to the extent Relator seeks to conflate E&Y's audit activities as "any incidents involving NASA information." Finally, Aerojet notes that Emagined memorandum referenced by Relator is dated September 4, 2013, whereas Relator otherwise references events in November 2015.

111. According to records provided by NASA pursuant a Touhy request, AR sent at least 19 Information Technology Security Inventories for Contract #NNM06AB13C to NASA with the same statements as the NOV 2015 INVENTORY between 4/10/15 and 12/9/16. (Ex. B, 001-111)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 111:**

Disputed. Relator has not provided at least nineteen inventories dated between April 10, 2015 and December 9, 2016 for Contract No. NNM06AB13C in Exhibit B. Aerojet also disputes that each inventory dated between April 10, 2015 and December 9, 2016 for Contract No. NNM06AB13C contains the same statements as the November 2015 Inventory. Aerojet notes that the November Inventory is an "initial draft" that was circulated internally and was not sent to NASA. Ex. 234 (cover email stamped AR00028749 for Exhibit A at 314–19 (AR00028752–57)). Disputed to the extent Relator suggests that the categories in the November 2015 Inventory

1  are expressly tethered to the NIST 800-53 controls evaluated by the NASA Gap Assessment.

2  Information Technology System Security Inventories are only required to provide information,

3  none of which require certification or assessment of compliance with NIST 800-53. Ex. 242

4  (describing requirements of IT System Security Inventory).  Aerojet further notes that the

5  contract identified in this purported fact is not identified in Relator's Second Amended

6  Complaint and is not at issue in this case.

7

8      112.    In these inventories, AR stated they had :"Appropriate access controls implement

9  NASA    security    requirements."    (Ex.    B,    5,9,13,17,21,25,29,33,35,38,43,48,53,58,63,

10  66,73,78,84,90,97,103.109)

11      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 112:**

12      **Disputed to the extent Relator suggests that the categories in the cited inventories are**

13  **tethered to the NIST 800-53 controls.  Information Technology System Security Inventories are**

14  **only required to provide information, none of which require certification or assessment of**

15  **compliance with NIST 800-53. Ex. 242 (describing requirements of IT System Security**

16  **Inventory).  Finally, Aerojet notes that the contract under which these inventories were**

17  **submitted is not identified in Relator's Second Amended Complaint and is not at issue in this**

18  **case.**

19

20      113.    In these inventories, AR made the same claims as the NOV 2015 INVENTORY

21  regarding    "contingency    planning".    (Ex.    B,    6,10,14,22,26,30,34,39,44,49,50,54,

22  59,64,67,74,79,85,92,98,104,109)

23      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 113:**

24      **Disputed. Aerojet notes that the "initial draft" of the November 2015 Inventory, which**

25  **was circulated internally and was not sent to NASA, does not contain the same statement**

26  **regarding "contingency planning" in all other documents Relator cites to. For example, page**

27  **109 of Exhibit B makes no mention of "contingency plan" and on page 111 of Exhibit B, the**

28  **document states "Contingency Plan; (NIST SP 800-34) (Reference NFS 1852.204-76 (b.2)): AR-**

1 **POLICY-I .03.07, Enterprise Business Continuity Plan (EBCP), and lT-M-7.06.01.05, Aerojet**

2 **Rocketdyne Disaster Recovery Plan (DRP). Completion Date of annual 'Classroom Exercises':**

3 **EBCP published June 2016 and DRP updated on October 2016 at AR. Completion Date of most**

4 **recent 'Functional Exercises': Tests of EBCP communication plans in support of the Business**

5 **Continuity Plan were conducted in June and July 2016. AR also regularly performs a DRP**

6 **checklist. *The last test was on June 2015 at AR.*" In contrast, the "initial draft" of the November**

7 **2015 Inventory states "Contingency Plan Title: Aerojet Rocketdyne Disaster Recovery Plan**

8 **(DRP). Completion Date of annual 'Classroom Exercises': DRP updated on: December 2013 at**

9 **AR. Completion Date of most recent 'Functional Exercises': AR regularly performs a DRP**

10 **checklist test *with the most recent test scheduled for March 2014 at AR.*" Ex. A at 319. Finally,**

11 **Aerojet notes that the contract referenced in this purported fact is not identified in Relator's**

12 **Second Amended Complaint and is not at issue in this case.**

13

14      114.    In these inventories, AR made the same claims as the NOV 2015 INVENTORY

15 regarding     "access     controls".     (Ex.     B,     6,10,14,22,26,30,34,39,44,49,50,54,59,

16 64,67,74,79,85,92,98,104,109)

17     **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 114:**

18     **Undisputed. Aerojet notes that the contract referenced in this purported fact is not**

19 **identified in Relator's Second Amended Complaint and is not at issue in this case.**

20

21      115.    In these inventories, AR made the same claims as the NOV 2015 INVENTORY

22 regarding its compliance with "NASA FARS incident response requirements".(Ex. B,

23 6,10,14,22,26,30,34,39,44,49,50,54,59,64,67,74,79,85,92,98,104,109)

24     **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 115:**

25     **Undisputed, though Aerojet notes that the language is not identical in each inventory, but**

26 **the differences are substantively irrelevant. Aerojet notes that the contract referenced in this**

27 **purported fact is not identified in Relator's Second Amended Complaint and is not at issue in**

28 **this case.**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

2

3     116.   According to records provided by NASA pursuant a Touhy request, AR sent at least 16

4  Information Technology Security Inventories for Contract #NNM16AA02C RS-25 RESTART

5  contract to NASA with the same statements as the NOV 2015 INVENTORY between 1/2016 and

11/20/2019. (Ex. B, 179-246)

6

7     **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 116:**

8     **Disputed. The inventories dated between January 2016 and November 20, 2019 for**

9  **Contract No. NNM16AA02C do not contain the same statements as the November 2015**

10 **Inventory draft. Aerojet further notes that it disclosed that it "*is not fully compliant* per the**

11 **Security Requirements for Unclassified Information Technology Resources at this time" in the**

12 **proposal for Contract No. NNM16AA02C in June 2015. Ex. 153 (emphasis added). After the**

13 **contract was awarded on November 19, 2015, (ASOF ¶ 214) but before performance began,**

14 **Aerojet made a detailed presentation to NASA further revealing that it was only 37% compliant**

15 **with NIST 800-53. ASOF ¶ 134; Ex. 162.**

16

17    117.   In these inventories, AR stated they had :"Appropriate access controls implement

18 NASA security requirements." (Ex. B 181,185,189,193,197,201,205,209,214,219,224,234,239,244,

239)

19

20    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 117:**

21    **Undisputed. Aerojet notes that it disclosed that it "*is not fully compliant* per the Security**

22 **Requirements for Unclassified Information Technology Resources at this time" in the proposal**

23 **for Contract No. NNM16AA02C in June 2015. Ex. 153 (emphasis added). After the contract was**

24 **awarded on November 19, 2015, (ASOF ¶ 214) but before performance began, Aerojet made a**

25 **detailed presentation to NASA further revealing that it was only 37% compliant with NIST 800-**

26 **53. ASOF ¶ 134; Ex. 162.**

27

28

118.    In these inventories, AR made the same claims as the NOV 2015 INVENTORY regarding "contingency planning".  (Ex. B,

182,186,190,194,198,202,206,210,215,220,225,235,239,245,250)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 118:**

**Disputed. Aerojet notes that the "initial draft" of the November 2015 Inventory, which was circulated internally and was not sent to NASA, does not contain the same statement regarding "contingency planning" in all other documents Relator cites to. For example, page 250 of Exhibit B document states:**

> **Contingency Plan; (NIST SP 800-34) (Reference NFS 1852.204-76 section (b)): AR-POLICY- 1.03.07, Enterprise Business Continuity Plan (EBCP); IT-R-J.03.07.0I, Business Continuity Plan; and IT-M-7.06.01.05, Aerojet Rocketdyne Disaster Recovery Plan (DRP). EBCP published March 2019, JT-R-1.03 .07.01 updated on October 2019, and DRP updated on October 2019 at AR. Completion Date of most recent "Table Top Exercises": Test of Aerojet Rocketdyne's Business Response Team (BRT) Table Top Exercise in s uppo1t of AR ·s Business Continuity Plan was conducted on September 18, 2018. Completion Date of most recent "DR Exercises": Test of Aerojet Rocketdyne's Incident Response Team Exercise in support of A R' s Incident Response Plan was conducted on November I, 2019.**

**In contrast, the "initial draft" of the November 2015 Inventory states "Contingency Plan Title: Aerojet Rocketdyne Disaster Recovery Plan (DRP). Completion Date of annual 'Classroom Exercises': DRP updated on: December 2013 at AR. Completion Date of most recent 'Functional Exercises': AR regularly performs a DRP checklist test with the most recent test scheduled for March 2015 at AR." Ex. A at 319. Aerojet notes that it disclosed that it "*is not fully compliant* per the Security Requirements for Unclassified Information Technology Resources at this time" in the proposal for Contract No. NNM16AA02C in June 2015. Ex. 153 (emphasis added). After the contract was awarded on November 19, 2015, (ASOF ¶ 214) but before performance began, Aerojet made a detailed presentation to NASA further revealing that it was only 37% compliant with NIST 800-53. ASOF ¶ 134; Ex. 162.**

119.    In these inventories, AR made the same claims as the NOV 2015 INVENTORY regarding access controls. (Ex. B, 182,186,190,194,198,202,206,210, 215,220,225,235,239,245,250)

1

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 119:**

2

**Undisputed. Aerojet notes that it disclosed that it "*is not fully compliant* per the Security**

3

**Requirements for Unclassified Information Technology Resources at this time" in the proposal**

4

**for Contract No. NNM16AA02C in June 2015. Ex. 153 (emphasis added). After the contract was**

5

**awarded on November 19, 2015, (ASOF ¶ 214) but before performance began, Aerojet made a**

6

**detailed presentation to NASA further revealing that it was only 37% compliant with NIST 800-**

7

**53. ASOF ¶ 134; Ex. 162.**

8

9

120.    In these inventories, AR made the same claims as the NOV 2015 INVENTORY

10

regarding its compliance with NASA FARS incident response requirements. (Ex.

11

B,182,186,190,194,198,202,206,210,215,220,225,235,239,245,250)

12

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 120:**

13

**Disputed. Aerojet notes that the "initial draft" of the November 2015 Inventory, which**

14

**was circulated internally and was not sent to NASA, does not contain the same statement**

15

**regarding incident reporting in the inventories dated between January 2016 and November 20,**

16

**2019 for Contract No. NNM16AA02C. For example, page 250 of Exhibit B states "Aerojet**

17

**Rocketdyne shall ensure its incident response team contacts the NASA Security Operations**

18

**Center (SOC) Hotline at 877-627-2732, as well as the NASA COR, within 24 hours once the**

19

**incident has been determined to involve NASA data and shall ensure incidents are reported**

20

**consistent with NIST SP 800-61." Ex. B at 250. In contract, the "initial draft" of the November**

21

**2015 Inventory states "Aerojet Rocketdyne shall ensure its incident response team contacts the**

22

**NASA Security Operations Center (SOC) at Hotline at 877-627-2732 as well as NASA COR,**

23

**ensuring that incidents are reported consistent with NIST SP 800-61." Ex. A at 319. Further,**

24

**Aerojet notes that it disclosed that it "*is not fully compliant* per the Security Requirements for**

25

**Unclassified Information Technology Resources at this time" in the proposal for Contract No.**

26

**NNM16AA02C in June 2015. Ex. 153 (emphasis added). After the contract was awarded on**

27

**November 19, 2015, (ASOF ¶ 214) but before performance began, Aerojet made a detailed**

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1    presentation to NASA further revealing that it was only 37% compliant with NIST 800-53.

2    **ASOF ¶ 134; Ex. 162.**

3

4         121.    Jens Laundrup ("LAUNDRUP") from ESI refused to sign an AR Information

5    Technology Security Inventory because he was uncomfortable with the assertions being made in the

6    document as the document required AR to have security controls that were not fully in place and

7    required AR to report cyber incidents to NASA. (Ex. C, Laundrup Dec. ¶¶ 20-22)

8         **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 121:**

9         **Undisputed that Laundrup claims that he refused to sign an Information Technology**

10   **Security Inventory.**

11

12        122.    After LAUNDRUP declined to sign the NASA security inventory, AR's VP and

13   General Counsel, Brian Sweeney tried to get LAUNDRUP to sign the document telling him that

14   signing the document was very important to AR. (Ex. C, Laundrup Dec.¶ 23)

15        **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 122:**

16        **Disputed. Sweeney did not approach Laundrup regarding signing a NASA security**

17   **inventory, try to get Laundrup to sign the document, or tell him that signing the document was**

18   **"very important" to Aerojet.  Ex. 235 ¶ 4–5.**

19

20        123.    When approached by AR lawyers, Joel Landau and Amanda Weiner, about AR's

21   DFARS compliance LAUNDRUP advised them AR was out of compliance with the clause. (Ex. C,

22   Laundrup Dec. ¶ 25)

23        **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 123:**

24        **Undisputed that Relator accurately characterizes the cited declaration. Aerojet notes**

25   **that it disclosed its non-compliance status to the government. *E.g.*, ASOF ¶¶ 57; 81; 86; 101;**

26   **108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49.**

27

28

124.    The DOD issued Policy Memorandum No. 68 dated April 10, 2013 that required contracting officials to ensure that contracts that required classified or unclassified information relating to Ballistic Missile Defense ("BMD") be created, processed or stored on non-government networks include terms that mandate safeguards to protect BMD information including safeguards to protect against network intrusions and data exfiltration. (Ex. A, 037-038)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 124:**

**Undisputed that the DoD's Missile Defense Agency issued Policy Memorandum No. 68 on April 10, 2013. Ex. A at 037–38. Disputed insofar as Relator seeks to establish that the memorandum applied to all contracting officers within the DoD, rather it applied to "MDA program executives, program managers, and contracting officials." *Id*. at 037. Aerojet further disputes that the memorandum required classified or unclassified information relating to Ballistic Missile Defense ("BMD") be created, processed or stored on non-government networks and include terms that mandate safeguards to protect BMD information including safeguards to protect against network intrusions and data exfiltration. Rather, the memorandum states that it applies in instances with "non-Government sponsored unclassified and classified contractor owned or operated networks and systems that create, process, or store ballistic missile defense (BMD) information, classified or unclassified, critical program information [citation], or other unclassified MDA information not cleared for public release [citation]." *Id*. Relator's reference to item (a)(1)—that MDA contracting officials mandate the "[i]mplementation of information safeguards to protect against computer network intrusions and data exfiltration"—applies only to the "*affected* contracts," as opposed to all contracts as indicated by Relator. *Id*. (emphasis added). Aerojet notes that Memorandum No. 68 was promulgated before the November 2013 DFARS Clause at issue in this case, which went into effect on November 18, 2013. ASOF ¶ 1. Finally, Aerojet notes that contracts between Aerojet and the MDA are not identified in Relator's Second Amended Complaint and are not at issue in this case.**

125.    In a letter dated March 24, 2013, prime contractor Lockheed Martin ("LM") advised AR that the Navy was putting DFARS Clause 252.204-7012 in contract for FY 2015 as a flow down

1   requirement and that LMSSC anticipates that AR will be fully compliant with the subject clause. (Ex.
2   A, 090)

3   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 125:**

4   **Disputed. The letter is dated March 24, 2014. Ex. A at 090. This purported fact also relies**
5   **only on statements made by a third party, which is inadmissible hearsay evidence, and thus**
6   **Aerojet disputes the fact to the extent Relator seeks to establish the truth of the matter asserted.**

7

8   126.    In an email on July 1, 2014, the Navy advised AR DFARS Clause 252.204-7012 was
9   mandatory and could not be removed from a contract. (Ex. A, 088)

10   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 126:**

11   **Undisputed that the e-mail is accurately characterized. Aerojet notes that July 1, 2014 e-**
12   **mail is in response to Aerojet's informing the Navy that it took exception to including the DFARS**
13   **Clause in the Navy's proposed Basic Order Agreement ("BOA") and that "[w]hile we intend to**
14   **comply with this [DFARS] clause[,] we are currently investigating how much time and money it**
15   **will take for us to be 100% compliant." Ex. A at 088–89.**

16

17   127.    On July 23, 2014, AR was not able to proceed with negotiations with the Defense
18   Advanced Research Projects Agency ("DARPA") for the X-1 contract because they did not have a
19   position explaining their compliance or lack thereof with the DFARS Clause. (Ex. A, 092; Ex. H, Van
20   Kleeck Dep. 71:4-21)

21   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 127:**

22   **Undisputed that Relator accurately characterizes the cited July 23, 2014 e-mail, but**
23   **disputed that Aerojet was not able to proceed with negotiations with DARPA for the XS-1**
24   **contract. Aerojet's Van Kleeck testified that Aerojet "did negotiate an XS-1 contract very**
25   **shortly after" July 24, 2014. Ex. 245 (Van Kleeck Dep. Tr.) at 71:12-72:4. Indeed, on July 21,**
26   **2014, Vijay Ram of DARPA wrote "I followed up with Ms. Melinda Voiles [of the Air**
27   **Force] . . . [and b]ased on the conversation with Melinda, it is clear that AFRL contracting is**
28   **willing to work with the Contractor, Aerojet Rocketdyne (AR) to find a way to move forward**

while making sure AR makes good-faith progress toward full compliance." Ex. 54. Aerojet proceeded with negotiations on the XS-1 contract, (ASOF ¶ 87, Ex. H at 71:12-13); disclosed its non-compliance with the DFARS Clause, including in July, August, and September of 2014, (ASOF ¶¶ 88, 90, 92–94); the government understood the Aerojet was not compliant with the DFARS Clause before and after awarding Aerojet the XS-1 contract (ASOF ¶¶ 89, 95, 96); Aerojet was awarded the XS-1 contract on September 30, 2014, (ASOF ¶¶ 37, 87); Aerojet delivered the goods and services for which the government paid, (ASOF ¶ 56); the government paid all invoices submitted on the XS-1 contract, (ASOF ¶¶ 182–83); and the XS-1 contract was successfully completed on March 31, 2016, (ASOF ¶ 184).

128.    On September 9, 2014, the ARMY advised AR in negotiating contract W31P4Q-14-C-0157 that DFARS Clause 252.204-7012 was included in the contract by Executive Order, and that the ARMY could not issue the contract without including the clause. (Ex. A, 094)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 128:**

Undisputed that Relator accurately characterizes the September 9, 2014 e-mail. Aerojet notes that this e-mail states that "AR [took] exception to the [DFARS Clause]" when represented with the contract. *Id*. Indeed on August 28, 2014, Aerojet sent the Army a letter stating that it took exception to the DFARS Clause in connection with Contract No. W31P4Q-14-C-0157, which was eventually awarded to Aerojet as Contract No. W31P4Q16C0026.[8] ASOF ¶ 58. Aerojet further notes during the negotiations related to Contract No. W31P4Q16C0026, Aerojet repeatedly disclosed its non-compliance with the DFARS Clause to the Army, including in September and October 2014 and February, April, and June, and December 2015 (ASOF ¶¶ 57–61, 63–64, 66–67, 74–78). The government understood the Aerojet was not compliant with the DFARS Clause (ASOF ¶¶ 57, 62, 65, 68–73, 80); the only contracting officer who testified in this case, Laurie Hewitt, testified repeatedly that she understood Aerojet' disclosures to communicate that Aerojet was not compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.)

---

[8]   For ease of reference, Aerojet hereinafter refers to this contract as the awarded contract number, unless otherwise indicated.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

at 25:14-26:4 (discussing a 9/29/2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause"), 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); 67:21-23 ("It was my understanding that on February 10, 2015, Aerojet was still not in compliance with the DFARS Clause."); 71:24-72:4 ("[i]t is my understanding that [Aerojet] are still not in compliance, based on the information attached to this e-mail"). The government awarded Aerojet Contract No. W31P4Q16C0026 on December 23, 2015, (ASOF ¶ 50); Aerojet delivered the goods and services for which the government paid, (ASOF ¶ 56); the government paid all invoices submitted on the Contract No. W31P4Q16C0026, (ASOF ¶¶ 164–65); and the contract was successfully completed on August 1, 2017, (ASOF ¶ 166).

129.    The Air Force sent AR an email on September 9, 2014 re: Contract FA 8650-14-7424 reminding AR that the DFARS Clause would remain in the contract and stated: If AR choses to submit a written explanation (of an alternate control): "…the government team will review it and take it into consideration". (Ex. A, 095)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 129:**

Undisputed that Relator accurately characterizes the September 9, 2014 e-mail.  Aerojet notes that on July 21, 2014, Vijay Ram of DARPA wrote "I followed up with Ms. Melinda Voiles [of the Air Force] . . . [and b]ased on the conversation with Melinda, it is clear that AFRL contracting is willing to work with the Contractor, Aerojet Rocketdyne (AR) to find a way to move forward while making sure AR makes good-faith progress toward full compliance." Ex. 54. On September 19, 2014, Voiles concluded that Aerojet "submitted sufficient information required by the clause to determine that an 'alternative controls' is in place" and suggested

sending a letter reflecting that conclusion. ASOF ¶ 95. Aerojet further notes that it proceeded with negotiations on the XS-1 contract, (ASOF ¶ 87); disclosed its non-compliance with the DFARS Clause, including in July, August, and September of 2014, (ASOF ¶¶ 88, 90, 92–94); the government understood the Aerojet was not compliant with the DFARS Clause before and after awarding Aerojet the XS-1 contract (ASOF ¶¶ 89, 95, 96); Aerojet was awarded the XS-1 contract on September 30, 2014, (ASOF ¶¶ 37, 87); Aerojet delivered the goods and services for which the government paid, (ASOF ¶ 56); the government paid all invoices submitted on the XS-1 contract, (ASOF ¶¶ 182–183); and the XS-1 contract was successfully completed on March 31, 2016, (ASOF ¶ 184).

130.    On April 14, 2015, the Army asked AR when they believed they would be fully compliant with the requirements in the DFARS Clause. (Ex. A, 142)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 130:**

Undisputed. The Army requested an estimate date that Aerojet would be compliant with the DFARS Clause on April 14, 2015, during the negotiation Contract No. Ex. W31P4Q16C0026, (ASOF ¶ 71), after Aerojet had disclosed to the Army its non-compliance with the DFARS Clause (ASOF ¶¶ 57–61, 63–64, 66–67). Aerojet responded to the Army stating that it did not currently have an estimated completion date for compliance. ASOF ¶ 71. The government understood Aerojet was not compliant with the DFARS Clause (ASOF ¶¶ 57, 62, 65, 68–73, 80); the only contracting officer who testified in this case, Laurie Hewitt, testified repeatedly that she understood Aerojet' disclosures to communicate that Aerojet was not compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at 25:14-26:4 (discussing a 9/29/2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause"), 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying

1  **that September 29 letter "identified [Aerojet's] noncompliance"); 67:21-23 ("It was my**
2  **understanding that on February 10, 2015, Aerojet was still not in compliance with the DFARS**
3  **Clause."); 71:24-72:4 ("[i]t is my understanding that [Aerojet] are still not in compliance, based**
4  **on the information attached to this e-mail"). Aerojet further notes that the government awarded**
5  **Aerojet Contract No. W31P4Q16C0026 on December 23, 2015, (ASOF ¶ 50); Aerojet delivered**
6  **the goods and services for which the government paid, (ASOF ¶ 56); the government paid all**
7  **invoices submitted on the Contract No. W31P4Q16C0026, (ASOF ¶¶ 164–65); and the contract**
8  **was successfully completed on August 1, 2017, (ASOF ¶ 166).**

9

10  131.   On May 21, 2015, Vicki Michetti ("MICHETTI") from DOD CIO office advised Army
11  contracting officer Laurie Hewitt to reject AR's request for a waiver of the DFARS Clause stating:
12  "There is no provision for a waiver of the requirements, nor is a waiver something the DoD CIO can
13  provide. In discussing this with OUSD (AT&L) they noted that the DFAR does not require compliance
14  with the controls prior to the award but the controls must be in place by the time the contractor has
15  Controlled Technical Information (CTI) on his information system." AR00026626 (Ex. A, 412; Ex.
16  L, Defendants' Response to Relator's First Set of Requests for Admissions Response Nos. 190,191)

17  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 131:**

18  **Disputed. Relator mischaracterizes the e-mail, which states "There is no provision for a**
19  **waiver of the requirements, nor is a waiver something the DoD CIO can provide. In discussing**
20  **this with OUSD (AT&L) they noted that the DFAR does not require compliance with the**
21  **controls prior to the award - but the controls must be in place by the time the contractor has**
22  **Controlled Technical Information (CTI) on his information system." Ex. A at 412. Aerojet did**
23  **not seek a waiver of the DFARS Clause; rather the Army requested a waiver of the DFARS**
24  **Clause from the DoD OCIO, as reflected in Laurie Hewitt's e-mail to Michetti on May 14, 2015,**
25  **which states that the Army "would like to a bit more clarification regarding the steps that**
26  **Aerojet would have to take to comply with the regulation or have DOD CIO . . . provide a waiver**
27  **to the DFARS [C]lause[.]" Ex. A at 415; ASOF ¶ 72. Aerojet notes that in Hewitt's e-mail to**
28  **Michetti on May 14, 2015, Hewitt informed the DoD OCIO that Aerojet is not in compliance**

with the DFARS Clause. Ex. A at 415. At this point, Aerojet had disclosed to the Army its non-compliance with the DFARS Clause on numerous occasions. ASOF ¶¶ 57–61, 63–64, 66–67). Aerojet further notes that the government understood the Aerojet was not compliant with the DFARS Clause (ASOF ¶¶ 57, 62, 65, 68–73, 80); Hewitt, the only contracting officer who testified in this case, testified repeatedly that she understood Aerojet's disclosures to communicate that Aerojet was not compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at 25:14-26:4 (discussing a 9/29/2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause"), 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); 67:21-23 ("It was my understanding that on February 10, 2015, Aerojet was still not in compliance with the DFARS Clause."); 71:24-72:4 ("[i]t is my understanding that [Aerojet] are still not in compliance, based on the information attached to this e-mail"). The government awarded Aerojet Contract No. W31P4Q16C0026 on December 23, 2015, (ASOF ¶ 50); Aerojet delivered the goods and services for which the government paid, (ASOF ¶ 56); the government paid all invoices submitted on the Contract No. W31P4Q16C0026, (ASOF ¶¶ 164–65); and the contract was successfully completed on August 1, 2017, (ASOF ¶ 166).

132.    On July 9, 2015, LM advised AR that compliance with DFARS 252.204-7012 was a mandatory flow down requirement for all THAAD contracts. (Ex. A, 144-145)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 132:**

Disputed. The July 9, 2015 letter to THAAD contractors states that "In May, Lockheed Martin provided formal notification that DFARS 252.204-7012 Safeguarding of Unclassified Controlled Technical Information will become a mandatory flow down on all THAAD prime

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1  contracts." Ex. A at 144. Aerojet further disputes this fact insofar as Relator seeks to establish

2  the truth of the matter asserted by third parties, which is inadmissible hearsay evidence.

3

4  133.   On April 14, 2015, the Army asked AR when they believed they would be fully

5  compliant with the requirements in the DFARS Clause. (Ex. A, 142)

6  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 133:**

7  **Undisputed. Aerojet notes that the Army requested an estimate date that Aerojet would**

8  **be compliant with the DFARS Clause on April 14, 2015, during the negotiation of Contract No.**

9  **W31P4Q16C0026, (ASOF ¶ 71), after Aerojet had disclosed to the Army its non-compliance**

10  **with the DFARS Clause (ASOF ¶¶ 57–61, 63–64, 66–67). Aerojet responded to the Army stating**

11  **that it did not currently have an estimated completion date for compliance. ASOF ¶ 71. The**

12  **government understood Aerojet was not compliant with the DFARS Clause (ASOF ¶¶ 57, 62,**

13  **65, 68–73, 80); the only contracting officer who testified in this case, Laurie Hewitt, testified**

14  **repeatedly that she understood Aerojet's disclosures to communicate that Aerojet was not**

15  **compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at 25:14-26:4 (discussing a**

16  **9/29/2014 teleconference between the Army and Aerojet and testifying "one of the topics**

17  **concerned as to how much Aerojet did not comply with the DFARS clause"), 33:14-23 ("Q. So**

18  **did you understand this [] letter that Aerojet had provided the [A]rmy to be representing that**

19  **Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that**

20  **was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith**

21  **this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"),**

22  **92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); 67:21-23 ("It**

23  **was my understanding that on February 10, 2015, Aerojet was still not in compliance with the**

24  **DFARS Clause."); 71:24-72:4 ("[i]t is my understanding that [Aerojet] are still not in**

25  **compliance, based on the information attached to this e-mail"). Aerojet further notes that the**

26  **government awarded Aerojet Contract No. W31P4Q16C0026 on December 23, 2015, (ASOF ¶**

27  **50); Aerojet delivered the goods and services for which the government paid, (ASOF ¶ 56); the**

28

**government paid all invoices submitted on the Contract No. W31P4Q16C0026, (ASOF ¶¶ 164–65); and the contract was successfully completed on August 1, 2017, (ASOF ¶ 166).**

134.    On July 9, 2015, LM advised AR that compliance with DFARS 252.204-7012 was a mandatory flow down requirements for all THAAD contracts and indicated that most government contractors including Lockheed had already taken safeguarding steps in accordance with these existing government contractual requirements. (Ex. A, 144- 45, 218-19)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 134:**

**Disputed. The July 9, 2015 letter to THAAD contractors states that "[i]n May, Lockheed Martin provided formal notification that DFARS 252.204-7012 Safeguarding of Unclassified Controlled Technical Information will become a mandatory flow down on all THAAD prime contracts." Ex. A at 144. Aerojet also disputes this purported fact to the extent Relator seeks to establish that most government contractors were compliant with the DFARS Clause; rather, this letter indicates that contractors were in process of trying to become compliant. *See id.* Aerojet further disputes this fact insofar as Relator seeks to establish the truth of the matter asserted by third parties, which is inadmissible hearsay evidence.**

135.    The Air Force advised AR on June 22, 2015, that they would not be considered for the GBSD Study contact unless they were compliant with DFARS Clause 252.204-7012. (Ex. A, 179,181,184)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 135:**

**Disputed to the extent Relator seeks to establish the truth of the matter asserted in a purported statement by the Air Force from an internal Aerojet e-mail that recites a conversation with the Air Force. Ex. A at 179 (recitation of third party's statement), 181–82 (same), 183–84 (same). Aerojet notes that the documents cited by Relator proceed to outline Aerojet's plan to become compliant. *Id.* at 179 ("Plan to meet compliance for this program."), 184 (stating after program was awarded that "[t]he [compliance] plan addressed the following items"). Aerojet notes that it implemented the compliance plan it proposed around June 26, 2015 and created an**

1   **isolated network server for the GBSD program. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air**

2   **Force accepted Aerojet's compliance plan, (Ex. A at 184), and awarded Aerojet the GBSD Study**

3   **A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the**

4   **entirety of the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The GBSD Study**

5   **A contract is not identified in Relator's Second Amended Complaint and is not at issue in this**

6   **case.**

7

8       136.    On June 23, 2015, the Air Force advised AR they had to have a cyber security

9   compliance plan for the GBSD contract by 2:00 pm or they would lose the contract. (Ex. A, 203)

10      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 136:**

11      **Disputed to the extent Relator seeks to establish the truth of the matter asserted in a**

12  **purported statement by the Air Force from an internal Aerojet e-mail that recites a conversation**

13  **with the Air Force. Undisputed that Relator accurately characterizes the cited e-mail. Aerojet**

14  **notes that it implemented a plan to create an isolated network server for the GBSD program.**

15  **Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan, (Ex.**

16  **A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4.**

17  **Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. *Id*.**

18  **¶¶ 4-6, 8-10. The GBSD Study A contract is not identified in Relator's Second Amended**

19  **Complaint and is not at issue in this case.**

20

21      137.    On June 24, 2015, the Air Force told AR they needed a simple statement that AR would

22  be 100% compliant with the DFARS clause for the GBSD contract. (Ex. A, 206)

23      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 137:**

24      **Disputed to the extent Relator seeks to establish the truth of the matter asserted in a**

25  **purported statement by the Air Force from an internal Aerojet e-mail that recites a conversation**

26  **with the Air Force. Aerojet notes that it implemented a plan to create an isolated network server**

27  **for the GBSD program. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's**

28  **compliance plan, (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223**

1
2
3

**(Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the entirety of the GBSD Study A contract.** *Id*. **¶¶ 4-6, 8-10. The GBSD Study A contract is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

4

5
6
7

138.    On June 29, 2015, Angela Terry from the Missile Defense Agency emailed AR with questions regarding AR'S DFARS Clause compliance status for security review and concurrence before she could award AR contract no. HQ0145-15-C-0010. (Ex. A, 208)

8

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 138:**

9
10
11
12
13
14
15
16
17
18
19
20

**Undisputed that Relator accurately characterizes the cited e-mail.  Aerojet notes that it provided MDA with the requested information. Ex. 259 at AR00224532. Upon receiving Aerojet's additional information, Angela Terry[9] stated "Security has reviewed the additional input you submitted yesterday and concurs that Aerojet has met the requirements as stated in the DFARS Clause for cybersecurity. For items that are not compliant, MDA requests that these be tracked by Aerojet via a POA&M with periodic updates provided to the PM." Ex. 226 at AR00032683. Aerojet notes when this contract was ultimately awarded, Relator stated "[o]ur efforts yesterday paid off. We got the $12.5MM award from the MDA,"** *id*. **at AR00032682. Relator was also congratulated, (Ex. 224 at AR00032631), and thanked for his efforts, (Ex. 250 (Ruiz Dep., Ex. 16)) ("Thank you Brian and Clark for all your help!"). Finally, Aerojet notes that Contract No. HQ014715C0010 is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

21

22
23
24
25

139.    In July 1, 2015 telcom the Office of the Secretary of Defense ("OSD") advised AR that DFARS Clause compliance was a "black and white issue". MICHETTI from the DOD CIO stated twice there is no middle ground. When a contractor signs a contract, they are asserting they are compliant, not that there is a plan to compliancy. (Ex. A, 212)

26
27
28

---

[9]    Angela Terry is also referred to as Dawn Terry. Ex. A at 208.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 139:**

2   **Undisputed insofar as Relator accurately quotes an internal Aerojet e-mail summarizing**

3   **a June 30, 2015 teleconference between Aerojet, the Army, and the DoD OCIO, in which Aerojet**

4   **made its cybersecurity experts available to the Army and DoD OCIO to discuss its non-**

5   **compliance with the DFARS Clause. Ex. A at 212; ASOF ¶¶ 75, 114. Aerojet notes that at this**

6   **point, both the Army and the DoD OCIO understood that Aerojet was not compliant with the**

7   **DFARS Clause. *E.g.*, Ex. 77 (stating on September 10, 2014 AR "cannot confirm that we are**

8   **compliant with this clause at this time."); Ex. 253 (Hewitt Dep. Tr.) at, 60:6-61:5 ("With this**

9   **[September 29, 2014] letter it was my understanding that Aerojet was not in compliance with**

10  **the DFARS clause"); Ex. 82 (October 2, 2014 Hewitt internal memo detailing teleconference**

11  **discussion where AR disclosed non-compliance with DFARS); Ex. 83 at AR00035399-405**

12  **(10/27/14 email and attached disclosure letter to Army providing compliance update); Ex. 85**

13  **(government stating on February 10, 2015 that "Aerojet provided a process to become**

14  **compliant," and that "Contract Specialist is currently working … [to] obtain a waiver for the**

15  **DFARS Clause."); Ex. 86 (Army forwarding AR's October 27, 2014 disclosure to DoD OCIO**

16  **and stating it identified "compliance issues [AR] may have with" the DFARS Clause); Ex. 89**

17  **(DoD OCIO stating on April 2, 2015 that "Aerojet Rocketdyne remains non-compliant" with the**

18  **DFARS Clause); Ex. 91 (AR informing Army on April 16, 2015 AR does "not have an ECD**

19  **[estimated completion date] at this time[,]" for when it will be fully compliant with DFARS.);**

20  **Ex. 92 (Army requesting waiver given non-compliance). Finally, Aerojet notes that the**

21  **government revised the DFARS Clause to allow contractors to achieve compliancy by having a**

22  **plan in place to become compliant. ASOF ¶¶ 15–17.**

23

24  140.   After this meeting, AR started to assert simply assert they had "alternate controls" to

25  provide equivalent protection." (Ex. A, 213-217)

26  **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 140:**

27  **Disputed. In December 2015, for example, Aerojet provided MDA with a compliance**

28  **matrix detailing its continued progress towards complaint. Ex. 118. Aerojet notes that contracts**

1    entered into between Aerojet and Lockheed Martin are not identified in Relator's Second

2    Amended Complaint and are not at issue in this case.

3

4    141.    In notes of meeting on October 29, 2015, the Deputy Director of the MDA, Major

5    General Ole Knudson, AR noted the MDA stated that they will demand that defense contractor adhere

6    to the processes and regulations and that "DFARS 252.204-A7012, Safe Guarding Covered Defense

7    Information and Cyber Incident Reporting will apply to all DoD contracts." (Ex. A, 310)

8    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 141:**

9    **Disputed insofar as Relator seeks to establish what MDA stated based on a recitation of**

10   **a conversation contained in an internal Aerojet e-mail, which is inadmissible hearsay evidence.**

11   **Ex. A at 310. Aerojet further disputes this purported fact insofar as Relator seeks to establish**

12   **that the DFARS Clause would apply to all DoD contracts; rather, the DFARS Clause only**

13   **applied in instances when UCTI was present on a contracts system. ASOF ¶ 2; *see also* Ex. 21 at**

14   **33:3-11 (4/6/2017 DoD Presentation: "We're up to I think like, 80 percent of the time [the**

15   **DFARS Clause] gets in [contracts], but not always."), Ex. 102 (program manager determining**

16   **the DFARS Clause did not apply based on the program's information), Ex. 119 (contracting**

17   **officer stating that she "removed the [DFARS Clause] from the [contract] mod[ification].").**

18   **Aerojet further notes the MDA said Aerojet had the "Best Plan, Only Detailed Plan they [had]**

19   **seen" to reach compliance after a presentation Aerojet made to MDA in December 2015 during**

20   **which Aerojet disclosed that it was 28% compliant. Ex. 118 at p.7.  Aerojet additionally notes**

21   **that the government revised the DFARS Clause to allow contractors to achieve compliancy by**

22   **having a plan in place to become compliant. ASOF ¶¶ 15–17. Finally, Aerojet notes that**

23   **contracts between Aerojet and the MDA are not identified in Relator's Second Amended**

24   **Complaint and are not at issue in this case.**

25

26   142.    The December 2015, the Missile Defense Agency (" MDA") asked AR how much they

27   were spending on an enterprise level to be NIST 800-53 compliant. (Ex. A 345)

28

73

1

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 142:**

2

**Disputed insofar as Relator seeks to establish what MDA stated based on a recitation of**

3

**a conversation contained in an internal Aerojet e-mail, which is inadmissible hearsay evidence.**

4

**Ex. A at 345. Undisputed insofar as Relator accurately quotes an internal Aerojet e-mail. Aerojet**

5

**notes the MDA said Aerojet had the "Best Plan, Only Detailed Plan they [had] seen" to reach**

6

**compliance. Ex. A at 345. Finally, Aerojet notes that contracts between Aerojet and the MDA**

7

**are not identified in Relator's Second Amended Complaint and are not at issue in this case.**

8

9

143.   The MDA responded to AR'S December 2015, DFARS Clause 252.204-7012

10

presentation re contract HQ0147-13-005 by granting AR only a two month extension to prevent a

11

lapse in the period of performance while the government worked toward a resolution of the 7012

12

clause issue. (Ex. A, 346)

13

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 143:**

14

**Undisputed. Aerojet notes that contracts between Aerojet and the MDA are not identified**

15

**in Relator's Second Amended Complaint and are not at issue in this case.**

16

17

144.   On January 14, 2016, Lindsey Marshall from the MDA sent AR an email stating that

18

given the importance of the MDA mission and the sensitivity of MDA related Covered Defense

19

Information ("CDI") the DFARS Clause was required on all new contracts and that the MDA intended

20

to incorporate the clause in existing contracts as well. (Ex. A, 347-348)

21

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 144:**

22

**Undisputed that the e-mail is accurately quoted. Aerojet notes, however, that the DFARS**

23

**Clause only applied instances when UCTI was present on a contracts system. ASOF ¶ 2,  *see also***

24

**Ex. 21 at 33:3-11 (4/6/2017 DoD SBTW Presentation: "We're up to I think like, 80 percent of**

25

**the time [the DFARS Clause] gets in [contracts], but not always."), Ex. 102 (program manager**

26

**determining the DFARS Clause did not apply based on the program's information). Aerojet also**

27

**notes the MDA continued to do business with Aerojet despite Aerojet's disclosure that it was not**

28

**compliant with the DFARS Clause. ASOF ¶ 126. Finally, Aerojet notes that contracts between**

1    **Aerojet and the MDA are not identified in Relator's Second Amended Complaint and are not at**

2    **issue in this case.**

3

4         145.    To secure the GBSD Study contract AR promised the Air Force on June 23, 2015, they

5    would provide a "Dedicated and separate end user computer devices for team members to ensure

6    inviolability of the data and co-mingling of data cannot occur." (Ex. A, 197; Ex. C, Laundrup Dec.

7    ¶32)

8    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 145:**

9         **Undisputed Relator accurately quotes the cited document. Disputed insofar as Relator**

10   **seeks to characterize that Aerojet's statement was made to secure the GBSD Study contract.**

11   **Aerojet notes that "[t]he purpose of this letter is to provide an updated response that is specific**

12   **to our commitment and compliance plan for the GBSD Trade Study A (Post Boost Propulsion)**

13   **program." Ex. A at 196. Aerojet notes that the documents cited by Relator proceed to outline**

14   **Aerojet's plan to become compliant. *Id*. at 179 ("Plan to meet compliance for this program."),**

15   **184 (stating after program was awarded "[t]he [compliance] plan addressed the following**

16   **items"). Aerojet notes that it implemented the compliance plan it proposed around June 26, 2015**

17   **and created an isolated network server for the GBSD program. Ex. 223 (Gilmartin Decl.) ¶¶ 4-**

18   **6, 8-10. The Air Force accepted Aerojet's compliance plan, (Ex. A at 184), and awarded Aerojet**

19   **the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated**

20   **network during the entirety of the GBSD Study A contract. *Id*. ¶¶ 4-6, 8-10; Ex. 244 (Evans Dep.**

21   **Tr.) at 99:7-12 ("My understanding of the GBSD Study A cybersecurity compliance plan, in**

22   **general terms, was we had an isolated computing network system from the Internet in the -- in**

23   **the program that the customer accepted and we implemented through the period of**

24   **performance."); *see also id*. at 35:16-36:19 (testifying Aerojet "create[d] the [isolated] network**

25   **and stand it up and use it to implement the contract"), 97:8-22 ("The [GBSD Study A program]**

26   **contract was executed and in accordance with the negotiations that we agreed to with the U.S.**

27   **Air Force."), 98:17-22 ("I am aware and was aware of a GBSD Study A cybersecurity**

28   **compliance plan that included, in general terms, an isolated computing network system for that**

**contract, which we instituted and successfully operated in the contract period of performance.").**
**The GBSD Study A contract is not identified in Relator's Second Amended Complaint and is**
**not at issue in this case.**

146.   AR sent the Air Force a letter dated August 16, 2015 regarding the GBSD Study
FA8219-15-C-0003 contract advising the government they were no longer using a stand-alone
computer network to comply with the contract stating: "Subsequent to the start of the GBSD Study A
program, AR completed an updated compliance matrix for DFARS 252.204-7012…and based on this
status, the isolated (stand-alone) computing network system for GBSD Study A is no longer
necessary…This letter provides notification the GBSD Study A program now utilizes the AR
enterprise computing environment." (Ex. A, 498)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 146:**

**Disputed. The letter dated August 16, 2015 (page 498 of Exhibit A) was never sent to the**
**Air Force; it is a draft version of a letter that was ultimately sent to the Air Force on September**
**16, 2015. Ex. 223 (Gilmartin Decl.) ¶¶ 7-9, Exs. 3–5. Aerojet assigns and includes reference**
**numbers on its correspondence. Both letters include reference number "1496: 15: CMV:**
**102007." *Id*. at ¶¶ 7-8, Exs. 3-4. September 16, 2015 Aerojet sent the Air Force a different version**
**of the letter that states "[t]his letter provides notification the GBSD Study A program *is***
***proposing to* utilize the AR enterprise computing environment." *Id*. Aerojet notes that it**
**implemented the compliance plan it proposed around June 26, 2015 and created an isolated**
**network server for the GBSD program. *Id*. ¶¶ 4-6, 8, 10. The Air Force accepted Aerojet's**
**compliance plan, (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. *Id*. ¶ 4.**
**Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. *Id*.**
**¶¶ 4-6, 8-10.; Ex. 244 (Evans Dep. Tr.) at 99:7-12 ("My understanding of the GBSD Study A**
**cybersecurity compliance plan, in general terms, was we had an isolated computing network**
**system from the Internet in the -- in the program that the customer accepted and we**
**implemented through the period of performance."); *see also id*. at 35:16-36:19 (testifying Aerojet**
**"create[d] the [isolated] network and stand it up and use it to implement the contract"), 97:8-22**

1    **("The [GBSD Study A program] contract was executed and in accordance with the negotiations**

2    **that we agreed to with the U.S. Air Force."), 98:17-22 ("I am aware and was aware of a GBSD**

3    **Study A cybersecurity compliance plan that included, in general terms, an isolated computing**

4    **network system for that contract, which we instituted and successfully operated in the contract**

5    **period of performance."). The GBSD Study A contract is not identified in Relator's Second**

6    **Amended Complaint and is not at issue in this case.**

7

8    147.    Captain Robert Shannon from the Air Force responded to AR's August 16, 2015 letter

9    stating: "Thank you for keeping us on top of this. When we signed the contract we were told ARI had

10    complied with the clause without exception which includes no alternate control measures, that can

11    only be done at the DoD CIO level. Are we still in compliance?" (Ex. A, 301)

12    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 147:**

13    **Disputed. Captain Robert Shannon from the Air Force never responded to Aerojet's**

14    **August 16, 2015 letter, rather on September 21, 2015, Captain Shannon responded to Aerojet's**

15    **September 16, 2015 letter, which "provide[d] notification the GBSD Study A program [was]**

16    ***proposing to* utilize the AR enterprise computing environment." Ex. 223 (Gilmartin Decl.) ¶¶ 7-**

17    **8, Exs. 3-5. Undisputed that in Captain Shannon's September 21, 2015 response, Captain**

18    **Shannon stated "Thank you for keeping on top of this. When we signed the contract we were**

19    **told ARI had complied with the clause without exception which includes no alternate control**

20    **measures, that can only be done at the DoD CIO level. Are we still in compliance?" Ex. A at 301.**

21    **Aerojet notes that Gary Gilmartin responded to Captain Shannon and scheduled a**

22    **teleconference on September 22, 2015, where Gilmartin clarified that the GBSD Study A**

23    **program had not been removed from the isolated network and would remain there for the**

24    **duration of the GBSD Study A program. Ex. 223 (Gilmartin Decl.) ¶ 9; Ex. 232. Aerojet notes**

25    **that it implemented the compliance plan it proposed around June 26, 2015 and created an**

26    **isolated network server for the GBSD program. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air**

27    **Force accepted Aerojet's compliance plan, (Ex. A at 184), and awarded Aerojet the GBSD Study**

28    **A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the**

**entirety of the GBSD Study A contract.** *Id*. **¶¶ 4-6, 8-10; Ex. 244 (Evans Dep. Tr.) at 99:7-12 ("My understanding of the GBSD Study A cybersecurity compliance plan, in general terms, was we had an isolated computing network system from the Internet in the -- in the program that the customer accepted and we implemented through the period of performance.");** *see also id*. **at 35:16-36:19 (testifying Aerojet "create[d] the [isolated] network and stand it up and use it to implement the contract"), 97:8-22 ("The [GBSD Study A program] contract was executed and in accordance with the negotiations that we agreed to with the U.S. Air Force."), 98:17-22 ("I am aware and was aware of a GBSD Study A cybersecurity compliance plan that included, in general terms, an isolated computing network system for that contract, which we instituted and successfully operated in the contract period of performance."). The GBSD Study A contract is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

148.    AR then sent a letter to the Air Force dated September 16, 2015 regarding the GBSD contract that advised the Air Force that AR had 24 controls in place and 36 alternate controls in place which adequately protected the Air Force's Unclassified Controlled Technical information. (Ex. A, 300) The letter claimed that AR was proposing to utilize the AR enterprise computing network. (Id.)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 148:**

**Disputed that Aerojet sent multiple letters. Aerojet only sent one letter to the Air Force and that was the September 16, 2015 letter, which Caption Shannon responded to Aerojet on September 21, 2015. Ex. 223 (Gilmartin Decl. ¶¶ 7-9, Exs. 3-5); Ex. A at 300–301. Undisputed that Relator accurately quotes Aerojet's September 16, 2015 letter, which proceeds to state that "[t]his letter provides notification the GBSD Study A program** *is proposing to* **utilize the AR enterprise computing environment." Ex. 223 (Gilmartin Dec.) at Ex. 4. Aerojet notes that it implemented the compliance plan it proposed around June 26, 2015 and created an isolated network server for the GBSD program. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan, (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the entirety of the GBSD Study A contract.** *Id*. **¶¶ 4-6, 8-10; Ex. 244 (Evans Dep. Tr.) at 99:7-12**

**("My understanding of the GBSD Study A cybersecurity compliance plan, in general terms, was we had an isolated computing network system from the Internet in the -- in the program that the customer accepted and we implemented through the period of performance."); *see also id*. at 35:16-36:19 (testifying Aerojet "create[d] the [isolated] network and stand it up and use it to implement the contract"), 97:8-22 ("The [GBSD Study A program] contract was executed and in accordance with the negotiations that we agreed to with the U.S. Air Force."), 98:17-22 ("I am aware and was aware of a GBSD Study A cybersecurity compliance plan that included, in general terms, an isolated computing network system for that contract, which we instituted and successfully operated in the contract period of performance."). The GBSD Study A contract is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

149.    AR did not fulfill their promise to the Air Force to provide a system that was 100% compliant, because they did not consistently use the card reader that was necessary for multifactor authentication which is a DFARS Clause requirement. (Ex. C, Laundrup Dec. ¶¶ 32-34)

**<u>RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 149:</u>**

**Disputed. Aerojet implemented the compliance plan it proposed around June 26, 2015 and created an isolated network server for the GBSD program. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan, (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Thereafter, Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4; Ex. 244 (Evans Dep. Tr.) at 99:7-12 ("My understanding of the GBSD Study A cybersecurity compliance plan, in general terms, was we had an isolated computing network system from the Internet in the -- in the program that the customer accepted and we implemented through the period of performance."); *see also id*. at 35:16-36:19 (testifying Aerojet "create[d] the [isolated] network and stand it up and use it to implement the contract"), 97:8-22 ("The [GBSD Study A program] contract was executed and in accordance with the negotiations that we agreed to with the U.S. Air Force."), 98:17-22 ("I am aware and was aware of a GBSD Study A cybersecurity compliance plan that included, in general terms, an isolated computing network system for that**

contract, which we instituted and successfully operated in the contract period of performance."). The GBSD Study A contract is not identified in Relator's Second Amended Complaint and is not at issue in this case. Aerojet notes that the GBSD Study A contract is not identified in Relator's Second Amended Complaint and is not at issue in this case.

150.   AR ultimately dismantled the stand-alone computer system they promised the Air Force to secure the GBSD Study contract. (Ex. C, Laundrup Dec. ¶¶ 32-34)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 150:**

**Disputed. Aerojet notes that it implemented the compliance plan it proposed and created an isolated network server for the GBSD program. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan, (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10; Ex. 244 (Evans Dep. Tr.) at 99:7-12 ("My understanding of the GBSD Study A cybersecurity compliance plan, in general terms, was we had an isolated computing network system from the Internet in the -- in the program that the customer accepted and we implemented through the period of performance."); *see also id*. at 35:16-36:19 (testifying Aerojet "create[d] the [isolated] network and stand it up and use it to implement the contract"), 97:8-22 ("The [GBSD Study A program] contract was executed and in accordance with the negotiations that we agreed to with the U.S. Air Force."), 98:17-22 ("I am aware and was aware of a GBSD Study A cybersecurity compliance plan that included, in general terms, an isolated computing network system for that contract, which we instituted and successfully operated in the contract period of performance."). The GBSD Study A contract is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

151.   AR sent a letter to the ARMY in September 2014 re: Contract W31PQ14C0157.("SEPT 2014 LTR") (Ex. A 101-102) The letter stated: "AR has conducted an extensive analysis of its compliance" and claimed AR "10 Controls in Place and Compliant. 43

1    Controls in Place with Enhancements on-going. 6 Partial Controls and 1 mitigating control. (Ex. A

2    102) The letter stated: "It is important to note that AR is compliant with the majority of the clauses

3    requirements. Please be assured that AR will make every effort to prevent a data breach while we work

4    aggressively to strengthen the controls and implement additional protection measures." (Ex. A, 103)

5            **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 151:**

6            **Undisputed that Aerojet disclosed to the government that it was not compliant with the**

7    **Cybersecurity Clauses. The September 2014 letter, which Relator refers to, is a disclosure letter**

8    **that Aerojet sent to the Army on September 29, 2014, (ASOF ¶¶ 61 (citing to Exhibit 78, which**

9    **includes the September 29, 2014 cover e-mail and this same letter), 57, 62, 65, 80). The September**

10   **29, 2014 disclosure letter's four categories, referenced by Relator, state in full: 10 "Controls in**

11   **Place and Compliant"; 43 "Controls in Place with Enhancements and Refinement On-going"; 1**

12   **"Mitigating Control[s] in Place Enhancement and Refinements On-going"; and 6 "Partial**

13   **Controls are In-place Strengthening, Enhancements, and Refinements On-going[.]" Ex. A at**

14   **102. Aerojet further notes that the only contracting officer deposed in this case, Laurie Hewitt,**

15   **testified that she understood from this September 29, 2014 disclosure letter that Aerojet was**

16   **communicating that it was not compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at**

17   **33:14-23 ("Q. So did you understand this September 29th letter that Aerojet had provided the**

18   **[A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my**

19   **opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and**

20   **compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in**

21   **compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified**

22   **[Aerojet's] noncompliance"). Finally, Aerojet notes that the September 29, 2014 disclosure letter**

23   **was submitted in connection with Contract No. W31PQ14C0157, which was ultimately awarded**

24   **as Contract No. W31P4Q16C0026[10] on December 23, 2015. ASOF ¶¶ 50, 58. Aerojet**

25   **subsequently delivered the goods and services for which the government paid, (ASOF ¶ 56); the**

26

27   ───────────────

28   [10]   For ease of reference, Aerojet hereinafter refers to this contract as the awarded contract number.

1    **government paid all invoices submitted on the Contract No. W31P4Q16C0026, (ASOF ¶¶ 164–**

2    **65); and the contract was successfully completed on August 1, 2017, (ASOF ¶ 166).**

3

4         152.    AR sent the Air Force a letter dated September 18, 2014 re: Contract FA8650-14-C-

5    7424 restating the same claims made in the SEPT 2014 LTR regarding its DFARS compliance status.

6    (Ex. A, 107-111)

7         **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 152:**

8         **Undisputed that Aerojet disclosed to the government that it was not compliant with the**

9    **Cybersecurity Clauses. Aerojet notes that Contract No. FA865014C7424 is the "XS-1" contract**

10   **that Relator refers to in Relator's Purported Fact No. 127. The September 18, 2014 disclosure**

11   **letter's four categories, referenced by Relator, state in full: 10 "Controls in Place and**

12   **Compliant"; 43 "Controls in Place Enhancements and Refinement On-going"; 1 "Mitigating**

13   **Control[s] in Place Enhancement and Refinements On-going"; and 6 "Partial Controls are In-**

14   **place Strengthening, Enhancements, and Refinements On-going[.]" Ex. A at 107. The only**

15   **contracting officer deposed in this case, Laurie Hewitt, testified that she understood from the**

16   **September 29, 2014 disclosure letter—which Relator describes as stating the same claims as the**

17   **letter referenced here—that Aerojet was communicating that it was not compliant with the**

18   **DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at 33:14-23 ("Q. So did you understand this**

19   **September 29th letter that Aerojet had provided the [A]rmy to be representing that Aerojet was**

20   **compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided**

21   **to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it**

22   **was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6**

23   **(testifying that September 29 letter "identified [Aerojet's] noncompliance"). Aerojet notes that**

24   **the Air Force similarly understood Aerojet's non-compliance upon receiving this September 18,**

25   **2014 letter. ASOF ¶¶ 95, 96 (Ex. 64) (Air Force response to the September 18, 2014 disclosure**

26   **letter stating it "understood that Aerojet "ha[d] developed a phased approach which will assist**

27   **in efforts to become fully compliant [with the NIST 800-53] controls in the future."). This**

28   **September 18, 2014 disclosure letter was one of numerous other disclosures of non-compliance**

that Aerojet made to the government in connection with Contract No. FA865014C7424, (ASOF ¶¶ 88, 90, 92–93), and the government also understood from these disclosures that Aerojet was not compliant with the DFARS Clause before and after awarding Aerojet the FA865014C7424 contract (ASOF ¶¶ 89, 95, 96). Aerojet was awarded the FA865014C7424 contract on September 30, 2014, (ASOF ¶¶ 37, 87); delivered the goods and services for which the government paid, (ASOF ¶ 56); the government paid all invoices submitted on the FA865014C7424 contract, (ASOF ¶¶ 182–83); and the FA865014C7424 contract was successfully completed on March 31, 2016, (ASOF ¶ 184).

153.    AR sent the Navy a letter dated September 30, 2014 re: Contract re: Prime Contract #N68936-14-C-0035 restating the same claims made in the SEPT 2014 LTR regarding its DFARS compliance status (Ex. A 112-117),for which the Navy PCO signed a conditional acknowledgement of acceptance. (Ex. A, 113)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 153:**

Undisputed that Aerojet disclosed to the Navy on September 30, 2014 that it was not compliant with the Cybersecurity Clauses and Navy acknowledged receipt of the disclosure letter and signed and "accepted" Aerojet's conditional acceptance of the contract. Ex. A at 112–17; ASOF ¶¶ 81–83 (declaration from Navy Procuring Contracting Officer stating she received the September 30, 2014 disclosure letter). The September 30, 2014 disclosure letter's four categories, referenced by Relator, state in full: 10 "Controls in Place and Compliant"; 43 "Controls in Place Enhancements and Refinement On-going"; 1 "Mitigating Control[s] in Place Enhancement and Refinements On-going"; and 6 "Partial Controls are In-place Strengthening, Enhancements, and Refinements On-going[.]" Ex. A at 112. The only contracting officer deposed in this case, Laurie Hewitt, testified that she understood from the September 29, 2014 disclosure letter—which Relator describes as stating the same claims as the letter referenced here—that Aerojet was communicating that it was not compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at 33:14-23 ("Q. So did you understand this September 29th letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls?

**A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"). Aerojet notes that the Navy similarly understood that Aerojet was not compliant with the Cybersecurity Clauses non-compliance upon receiving this September 30, 2014 letter. ASOF ¶¶ 85. Aerojet was awarded the N6893614C0035 contract on September 30, 2014, (ASOF ¶ 36); delivered the goods and services for which the government paid, (ASOF ¶ 56); the government paid all invoices submitted on the N6893614C0035 contract, (ASOF ¶¶ 173–74); and the N6893614C0035 contract was successfully completed on December 31, 2015, (ASOF ¶ 175).**

154.    AR sent LM a letter dated January 19, 2015, restating the same claims made in the SEPT 2014 LTR regarding its DFARS compliance status. (Ex. A, 119-120) The email AR sent attaching the January 19, 2015 letter advised LM, AR was "using alternative controls or protective measures to achieve equivalent protection for the DFARS Clause." (Ex. A, 118)

**<u>RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 154:</u>**

**Undisputed that Aerojet disclosed to Lockheed Martin on January 19, 2015 that it was not compliant with the Cybersecurity Clauses. Ex. A at 119–20. The January 19, 2015 disclosure letter's four categories, referenced by Relator, state in full: 10 "Controls in Place and Compliant"; 43 "Controls in Place Enhancements and Refinement On-going"; 1 "Mitigating Control[s] in Place Enhancement and Refinements On-going"; and 6 "Partial Controls are In-place Strengthening, Enhancements, and Refinements On-going[.]" Ex. A at 119. The only contracting officer deposed in this case, Laurie Hewitt, testified that she understood from the September 29, 2014 disclosure letter—which Relator describes as stating the same claims as the letter referenced here—that Aerojet was communicating that it was not compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at 33:14-23 ("Q. So did you understand this September 29th letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"). Disputed insofar as Relator seeks to establish that Aerojet advised Lockheed Martin that it was _using_ alternative controls or protective measures to achieve equivalent protection for the DFARS Clause. Rather, the cover e-mail to Aerojet's January 19, 2015 disclosure letter states "attached is what we have been submitting to our customers with regards to an alternative control or protective measure used to achieve equivalent protection for the subject DFARS clause." Ex. A at 118. Finally, Aerojet notes that contracts between Aerojet and Lockheed Martin were not identified in Relator's Second Amended Complaint and are not at issue in this case.**

155.   AR sent LM a letter dated March 16, 2015, restating the same claims made in the SEPT 2014 LTR regarding its DFARS compliance status. (Ex. A, 125-126)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 155:**

**Undisputed that Aerojet disclosed to Lockheed Martin on March 16, 2015 that it was not compliant with the Cybersecurity Clauses. Ex. A at 125–26. The March 16, 2015 disclosure letter's four categories, referenced by Relator, state in full: 10 "Controls in Place and Compliant"; 43 "Controls in Place Enhancements and Refinement On-going"; 1 "Mitigating Control[s] in Place Enhancement and Refinements On-going"; and 6 "Partial Controls are In-place Strengthening, Enhancements, and Refinements On-going[.]" Ex. A at 125. The only contracting officer deposed in this case, Laurie Hewitt, testified that she understood from the September 29, 2014 disclosure letter—which Relator describes as stating the same claims as the letter referenced here—that Aerojet was communicating that it was not compliant with the DFARS Clause. Ex. 253 (Hewitt Dep. Tr.) at 33:14-23 ("Q. So did you understand this September 29th letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6**

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1  (testifying that September 29 letter "identified [Aerojet's] noncompliance"). Finally, Aerojet

2  notes that contracts between Aerojet and Lockheed Martin were not identified in Relator's

3  Second Amended Complaint and are not at issue in this case.

4

5       156.    AR sent LM a letter dated May 14, 2015, restating the same claims made in the SEPT

6  2014 LTR regarding its DFARS compliance status. (Ex. A, 130-131)

7       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 156:**

8       **Undisputed that Aerojet disclosed to Lockheed Martin on May 14, 2015 that it was not**

9  **compliant with the Cybersecurity Clauses. Ex. A at 130–34. The May 14, 2015 disclosure letter's**

10 **four categories, referenced by Relator, state in full: 10 "Controls in Place and Compliant"; 43**

11 **"Controls in Place Enhancements and Refinement On-going"; 1 "Mitigating Control[s] in Place**

12 **Enhancement and Refinements On-going"; and 6 "Partial Controls are In-place Strengthening,**

13 **Enhancements, and Refinements On-going[.]" Ex. A at 130. The only contracting officer deposed**

14 **in this case, Laurie Hewitt, testified that she understood from the September 29, 2014 disclosure**

15 **letter—which Relator describes as stating the same claims as the letter referenced here—that**

16 **Aerojet was communicating that it was not compliant with the DFARS Clause. Ex. 253 (Hewitt**

17 **Dep. Tr.) at 33:14-23 ("Q. So did you understand this September 29th letter that Aerojet had**

18 **provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls?**

19 **A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in**

20 **place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was**

21 **not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter**

22 **"identified [Aerojet's] noncompliance"). Finally, Aerojet notes that contracts between Aerojet**

23 **and Lockheed Martin were not identified in Relator's Second Amended Complaint and are not**

24 **at issue in this case.**

25

26      157.    AR sent the Air Force a letter dated March June 15, 2015, restating the same claims

27 made in the SEPT 2014 LTR regarding its DFARS compliance status. (Ex. A, 135-40)

28

1    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 157:**

2    **Undisputed that Aerojet disclosed to the Air Force on June 17, 2015 that it was not**

3    **compliant with the Cybersecurity Clauses. Ex. A at 135. The June 17, 2015 disclosure letter's**

4    **four categories, referenced by Relator, state in full: 10 "Controls in Place and Compliant"; 43**

5    **"Controls in Place Enhancements and Refinement On-going"; 1 "Mitigating Control[s] in Place**

6    **Enhancement and Refinements On-going"; and 6 "Partial Controls are In-place Strengthening,**

7    **Enhancements, and Refinements On-going[.]" Ex. A at 135. The only contracting officer deposed**

8    **in this case, Laurie Hewitt, testified that she understood from the September 29, 2014 disclosure**

9    **letter—which Relator describes as stating the same claims as the letter referenced here—that**

10   **Aerojet was communicating that it was not compliant with the DFARS Clause. Ex. 253 (Hewitt**

11   **Dep. Tr.) at 33:14-23 ("Q. So did you understand this September 29th letter that Aerojet had**

12   **provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls?**

13   **A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in**

14   **place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was**

15   **not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter**

16   **"identified [Aerojet's] noncompliance"). Finally, Aerojet notes that contracts between Aerojet**

17   **and Lockheed Martin were not identified in Relator's Second Amended Complaint and are not**

18   **at issue in this case.**

19

20   158.   AR sent a letter to LM dated July 29, 2015 that enclosed a compliance matrix claiming

21   to have 24 controls in place and compliant and 36 alternate controls that protected information covered

22   by the clause. (Ex. A 213-217) The letter stated thirteen additional were "controls in place and

23   compliant" when AR'S NASA Gap Analysis stated those controls were not in place and compliant as

24   of September 4, 2015. Those controls were, AC-6 Least Privilege, AC-11 Session lock, AC-17 Remote

25   Access, AT-2 Security Awareness Training, AU-3 Content of Audit Records, AU-9 Protection and

26   Audit Information, IA-2 Identification and Authentication (Organizational Users), IR-2 Incident

27   Response Training, M-4 Nonlocal Maintenance, MP-6 Medial Sanitization, SC-8 Transmission

28   Confidentiality an Integrity, SC-13 Cryptographic Protection and SI-3 Malicious Code Protection.

(Ex. A, 215-221, controls represented as compliant in the compliance matrix, the same controls represented as not compliant in the Gap Analysis Results by Control Summary, on September 6, 2015. Ex. A, 014)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 158:**

**Undisputed that Relator accurately describes the July 19, 2015 letter. Aerojet submitted this disclosure statement in July 2015—before the NASA Gap Analysis had been completed in September 2015. The July 2015 disclosure statement was drafted by Emagined and sent to Relator before Aerojet provided the disclosure statement. Ex. 228; Ex. 260. One of the authors of the NASA Gap Analysis, Emagined's David Chamberlain stated that an updated matrix could not have waited until for the Gap Analysis to have been complete because "that w[ould not] be for a few weeks." Ex. 228. Finally, Aerojet notes that contracts between Aerojet and Lockheed Martin were not identified in Relator's Second Amended Complaint and are not at issue in this case.**

159.    AR sent a letter to LM dated August 20, 2015 that enclosed a compliance matrix claiming to have 24 controls in place and compliant and 36 alternate controls that protected information covered by the clause, once again representing thirteen more controls were in place and compliant which conflicted with the findings of the NGA published a couple weeks later. (Ex. A, 282-287; Ex. C, Laundrup Dec. ¶ 31)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 159:**

**Undisputed that Relator accurately describes the August 20, 2015 letter. Aerojet submitted this disclosure statement in July 2015—before the NASA Gap Analysis had been completed in September 2015. The July 2015 disclosure statement was drafted by Emagined and sent to Relator before Aerojet provided the disclosure statement. Ex. 228; Ex. 260. One of the authors of the NASA Gap Analysis, Emagined's David Chamberlain stated that an updated matrix could not have waited until for the Gap Analysis to have been complete because "that w[ould not] be for a few weeks." Ex. 228. Finally, Aerojet notes that contracts between Aerojet**

1    and Lockheed Martin were not identified in Relator's Second Amended Complaint and are not

2    at issue in this case.

3

4        160.    AR's representations to the government that they had "alternate controls" in place was

5    misleading because at AR "alternate controls in place was code for alternate controls and no controls."

6    (Ex. A, 302)

7        **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 160:**

8        **Undisputed that Relator accurately quotes the statement, but disputed that Aerojet's**

9    **statements to the government were misleading. Aerojet notes that Relator fails to offer any**

10   **evidence to suggest that a government contracting officer read this statement and understood**

11   **that Aerojet was disclosing that it was fully compliant with the Cybersecurity Clauses. Rather,**

12   **Aerojet disclosed its non-compliance to the government, (*E.g.*, ASOF ¶¶ 57; 81; 86; 101; 108–**

13   **09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49), and the government understood that**

14   **Aerojet was not compliant with the Cybersecurity Clauses, (*e.g.*, ASOF ¶¶ 62; 80; 85; 89; 91;**

15   **96; 100; 103; 106; 115; 135; 153).**

16

17       161.    AR asked ESI contractor LAUNDRUP to prepare a report for Raytheon regarding AR's

18   DFARS Clause Compliance status. ( (Ex. C, Laundrup Dec ¶34; Ex. L, Defendants' Response to

19   Relator's First Set of Requests for Admissions Response Nos.199,200)

20       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 161:**

21       **Disputed. Aerojet did not specifically ask Laundrup to prepare a report for Raytheon;**

22   **Aerojet asked Emagined to prepare a response to questions submitted by Raytheon. Ex. L at**

23   **Response No. 199. Emagined is the same entity that drafted the NASA Gap Analysis. Ex. A at**

24   **004. Aerojet notes that the other evidence Relator offers in support of this purported fact fails**

25   **to support his contention as it relates to a different customer. Finally, Aerojet notes that none of**

26   **the contracts identified in the Second Amended Complaint were contracts between Aerojet and**

27   **Raytheon and are not at issue in this case.**

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1   162.   LAUNDRUP prepared a report stating that AR was not compliant but later found out

2   that when AR sent his report to Raytheon it was changed to indicate AR was DFARS compliant. (Ex.

3   C, Laundrup Dec. ¶30)

4   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 162:**

5   **Aerojet notes that Relator fails to offer any specification about the nature of the Raytheon**

6   **report, and as a result Aerojet lacks information to respond further. Aerojet also notes that none**

7   **of the contracts identified in the Second Amended Complaint were contracts between Aerojet**

8   **and Raytheon and are not at issue in this case.**

9

10   163.   On June 30, 2015, AR contract manager, Courtney Strutz, AR sent a letter to Dawn

11   Terry at MDA re proposal for contract HQ014715C0010 stating: "Aerojet Rocketdyne, Inc. (AR) is

12   keenly aware of the importance of DFARS Clause 252.204-7012 and has been actively working to

13   protect all information related to Department of Defense programs." This effort is ongoing and AR is

14   constantly improving its protection of information." (Ex. A, 210-211)

15   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 163:**

16   **Undisputed that the draft letter is accurately quoted. Ex. 225 (including "DRAFT**

17   **RESPONSE" in the subject line); Ex. 259 (actual letter sent). On July 1, 2015, upon receiving a**

18   **letter from Aerojet on June 30, 2015, Dawn Terry stated "Security has reviewed the additional**

19   **input you submitted yesterday and concurs that Aerojet has met the requirements as stated in**

20   **the DFARS Clause for cybersecurity. For items that are not compliant, MDA requests that these**

21   **be tracked by Aerojet via a POA&M with periodic updates provided to the PM." Ex. 226 at**

22   **AR00032683. Aerojet notes when this contract was ultimately awarded, Relator stated "[o]ur**

23   **efforts yesterday paid off. We got the $12.5MM award from the MDA," *id*. at AR00032682.**

24   **Relator was also congratulated, (Ex. 224 at AR00032631), and thanked for his efforts, (Ex. 250**

25   **(Ruiz Dep., Ex. 16)) ("Thank you Brian and Clark for all your help!"). Finally, Aerojet notes**

26   **that Contract No. HQ014715C0010 is not identified in Relator's Second Amended Complaint**

27   **and is not at issue in this case.**

28

164.     Aerojet made assurances to the Missile Defense Agency about DFARS compliance in order to get a 12.5 million dollar contract HQ0147-15-C-0010 awarded. (Ex. K, Ruiz Dep. 103:16-104:16, Exhibit 16 to Ruiz Dep. AR32628-32630

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 164:**

**Disputed.  Ruiz testified only that Aerojet discussed DFARS requirements and made assurances to MDA to get that contract award. (Ex. 250 (Ruiz Dep. Tr.) at 104:8-16. Undisputed that Aerojet disclosed its non-compliance to the MDA, (Ex. 259), and in response to Aerojet's disclosure of non-compliance, Dawn Terry stated "Security has reviewed the additional input you submitted yesterday and concurs that Aerojet has met the requirements as stated in the DFARS Clause for cybersecurity. For items that are not compliant, MDA requests that these be tracked by Aerojet via a POA&M with periodic updates provided to the PM." Ex. 226 at AR00032683. Aerojet notes when this contract was ultimately awarded, Relator stated "[o]ur efforts yesterday paid off. We got the $12.5MM award from the MDA." Ex. *Id.* at AR00032682. Relator was also congratulated, (Ex. 224 at AR00032631), and thanked for his efforts, (Ex. 250 (Ruiz Dep., Ex. 16)) ("Thank you Brian and Clark for all your help!"). Finally, Aerojet notes that Contract No. HQ014715C0010 is not identified in Relator's Second Amended Complaint and is not at issue in this case.**

165.     In December 2015, AR gave a presentation to the MDA regarding their DFARS Clause compliance status where they told the MDA AR that: "Protective security controls to safeguard unclassified IT resources are in place." (Ex. J, Smith Dep. 97:9-98:7, 120:16-20, Exhibit 1 to Smith Dep.)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 165:**

**Undisputed that Aerojet gave a presentation in December 2015 MDA in which Aerojet provided a detailed presentation on its compliance gap analysis. ASOF ¶ 119. Disputed insofar as the copy of the presentation cited by Relator as Exhibit J-1 is not the final copy of the presentation made to MDA. Ex. 118 (internal AR e-mail recounting presentation to MDA and attaching slide deck presented to MDA detailing DFARS compliance strategy). Aerojet notes**

1      **that the slide desk slide deck presented to MDA states: "Protective Security Controls to**

2      **Safeguard Unclassified IT Resources are in Place as Described in AR's Explanatory Control**

3      **Statement." Aerojet notes that after the presentation, the MDA said Aerojet had the "Best Plan,**

4      **Only Detailed Plan they [had] seen" to reach compliance. Ex. A at 345.**

5

6      166.    On December 16, 2015, AR'S Director of Contracts, Douglas Greer sent AR Director

7      of Contracts, Missile Defense, an email with a statement that AR contracts personnel were to use to

8      responding to customers regarding DFARS Clause 252.204-7012 which represented AR was fully

9      compliant with meeting 24 security controls and identified 36 alternate controls or protective measures

10      in place to achieve equivalent protection. The statement stated:

11            *AR completed a gap analysis of our enterprise infrastructure to assess our posture from*

12            *a documentation and technical perspective.* ***AR does not intend to deviate from any of***

13            ***the security requirements under DoD FARS clause (Dec 2015), or propose***

14            ***alternative security measures*** *but had planned a strategy and plan to address gaps*

15            *going forward…* ***While the analysis has identified compliance gaps and areas of***

16            ***improvement, security controls to safeguard unclassified IT resources are in place***

17            *as described in the "Explanatory Control Statement." ( Emphasis added) (Ex. A, 343-*

18            *344)*

19      <u>**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 166:**</u>

20      **Undisputed that Relator accurately quotes the Douglas Greer's statement in the**

21      **December 16, 2015 e-mail. Disputed insofar as Relator mischaracterizes the statement and fails**

22      **to recognize that this compliance summary at the bottom of the e-mail refers to two versions of**

23      **the DFARS Clause: the November 2013 and the December 2015 version. In regards to the**

24      **November 2013 Clause, the statement states that "AR was fully compliant in meeting 24 security**

25      **controls and identified 36 alternative controls or protective measures in place to achieve**

26      **equivalent protection." Ex. A at 343. Aerojet notes this compliance posture was drafted by**

27      **Emagined and sent to Relator. Ex. 228; Ex. 260. In regards to the December 2015 DFARS**

28      **Clause, which give contractors until December 31, 2017 to comply with NIST SP 800-171 and**

1    **deemed contracts contractors compliant even if they had implemented no controls until**

2    **December 31, 2017, (ASOF ¶ 11), Aerojet stated that it:**

3          **[C]ompleted a gap analysis of our enterprise infrastructure to assess our posture**
         **from a documentation and technical perspective. AR does not intend to deviate**
4        **from any of the security requirements under DoD FARS clause 252.204-7012 (Dec**
         **2015), or propose alternative security measures, but has prepared a strategy and**
5        **plan to address the gaps going forward.**

6    **Aerojet then explained that:**

7          **Identified gaps in compliance with the specific security controls levied under the**
         **clause via [NIST 800-171], and defined in the NIST SP 800-53 . . . have been**
8        **documented in Plans of Action and Milestones (POAMs) and closure will be**
         **addressed under detailed plans documented in each POAM. Compliance gaps**
9        **driven by necessary updates to documentation will be closed in Q2 2016 while**
         **technical gaps will be addressed incrementally through 2017 as technical gaps will**
10       **be addressed incrementally through 2017 as AR transitions to a managed services**
         **model for information technology applications, infrastructure and cyber security**
11       **management.**

12   **Ex. A at 343–44. As Relator notes, the statement repeats again that Aerojet has "identified**

13   **compliance gaps and areas of improvements."** *Id*. **at 344.**

14

15         167.    On or about March 11, 2014, AR was awarded contract Parent Award ID

16   NNC10BA13B, Award ID NNC13TA66T to perform work for the National Aeronautics and Space

17   Administration ("NASA"). (Ex. L, Defendants' Response to Relator's First Set of Requests for

18   Admissions Response No. 91)

19         **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 167:**

20         **Undisputed.**

21

22         168.    At the time AR was awarded contract Parent Award ID NNC10BA13B, Award ID

23   NNC13TA66T, AR was not compliant with the minimum NIST SP 800-53 moderate controls required

24   by NASA FARS Clause 1852.204-76. (Ex. L, Defendants' Response to Relator's First Set of Requests

25   for Admissions Response No. 92 )

26

27

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 168:**

**Undisputed that Aerojet was not compliant with all NIST 800-53 controls on or about March 11, 2014, but Aerojet notes that it disclosed its compliance status to the government.** ***E.g.*****, ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49.**

169.    Prior to the government awarding AR contract Parent Award ID NNC10BA13B, Award ID NNC13TA66T, AR did not disclose to the government every NIST SP 800-53 moderate control required by NASA FARS Clause 1852.204-76 that AR was not compliant with. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 93)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 169:**

**Disputed. Before Aerojet was awarded this contract, it had engaged in discussions with the government about its cybersecurity posture.** ***E.g.*****, ASOF ¶ 127. Aerojet then disclosed its non-compliance to the government for the applicable contracts that contained the Cybersecurity Clauses, (*****e.g.,***** ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49) and the government understood that Aerojet was not compliant with the Cybersecurity Clauses, (*****e.g.*****, ASOF ¶¶ 62; 80 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."); 85; 89; 91; 96; 100; 103; 106; 115; 135; 153). Aerojet notes that it disclosed to the government its compliance status with** *every* **applicable control where relevant.** ***See, e.g.*****, Ex. 60 (identifying Aerojet's compliance status with all applicable NIST 800-53 controls); Ex. 65 (same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same); Ex. 84 (same); Ex. 110 (same); Ex. 111 (same); Ex. 116 (same).**

170.    In the course of performing contract Parent Award ID NNC10BA13B, Award ID NNC13TA66T, AR stored Sensitive But Unclassified ("SBU") information belonging to the federal government on its computer system. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 94)

94

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 170:**

**Undisputed that between March 11, 2014 and September 24, 2016—during the time in which Contract No. NNC10BA13B, Award ID # NNC13TA66T was in effect and under performance—Aerojet stored SBU information on its computer system. Ex. L at Response No. 94; ASOF ¶ 202. Disputed to the extent Relator suggests that Aerojet stored SBU on its system related to the cited contract, which is unsupported by the evidence cited.**

171.    The federal government has paid AR at least $12,226,270 for work AR has performed on contract, Parent Award ID NNC10BA13B, Award ID NNC13TA66T. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 95)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 171:**

**Undisputed. Aerojet notes that this contract was successfully completed on September 24, 2016, (ASOF ¶¶ 56, 155–58, 202) and the government paid all invoices on Contract No. NNC10BA13B, Award ID # NNC13TA66T (ASOF ¶¶ 200–202).**

172.    On or about March 31, 2015 AR was awarded contract Award ID NNC15CA07C to perform work for the National Aeronautics and Space Administration ("NASA"). (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 106)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 172:**

**Undisputed.**

173.    At the time AR was awarded contract Award ID NNC15CA07C, AR was not compliant with the minimum NIST SP 800-53 moderate controls required by NASA FARS Clause 1852.204-76. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 107)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 173:**

**Disputed insofar as Relator seeks to establish that the NFS Clause was applicable to Contract No. NNC15CA07C. Indeed, the NFS Clause was inapplicable and imposed no requirements on Aerojet. *See* ASOF ¶¶ 40, 42 (explaining NASA requiring activity indicated**

95

that the contractor would not be required to house NASA technical information, rendering the NFS Clause inapplicable). Undisputed that Aerojet was not compliant with all NIST 800-53 controls on or about March 31, 2015, but Aerojet notes that it disclosed its compliance status to the government. *E.g.*, ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49.

174.    Prior to the government awarding AR contract Award ID NNC15CA07C, AR did not disclose to the government every NIST SP 800-53 moderate control required by NASA FARS Clause 1852.204-76 that AR was not compliant with. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 108)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 174:**

Disputed insofar as Relator seeks to establish that the NFS Clause was applicable to Contract No. NNC15CA07C. Indeed, the NFS Clause was inapplicable and imposed no requirements on Aerojet. ASOF ¶¶ 40, 42 (explaining NASA requiring activity indicated that the contractor would not be required to house NASA technical information, rendering the NFS Clause inapplicable). Before Aerojet was awarded this contract, it had engaged in discussions with the government about its cybersecurity posture. *E.g.*, ASOF ¶ 127. Aerojet also disclosed its non-compliance to the government both before and after March 31, 2015, (*e.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49) and the government understood that Aerojet was not compliant with the Cybersecurity Clauses, (*e.g.*, ASOF ¶¶ 62; 80 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."); 85; 89; 91; 96; 100; 103; 106; 115; 135; 153). Aerojet notes that it disclosed to the government its compliance status with *every* applicable control where relevant. *See*, *e.g.*, Ex. 60 (identifying Aerojet's compliance status with all applicable NIST 800-53 controls); Ex. 65 (same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same); Ex. 84 (same); Ex. 110 (same); Ex. 111 (same); Ex. 116 (same).

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

2       175.    In the course of performing contract Award ID NNC15CA07C, AR stored Sensitive

3   But Unclassified ("SBU") information belonging to the federal government on its computer system.

4   (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 109)

5       **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 175:**

6       **Undisputed that between March 31, 2015 and October 9, 2020—during the time in which**

7   **Contract No. NNC15CA07C was in effect and under performance—Aerojet stored SBU**

8   **information on its computer system. Ex. L at Response No. 109; ASOF ¶ 208. Disputed to the**

9   **extent Relator suggests that Aerojet stored SBU on its system related to the cited contract, which**

10  **is unsupported by the evidence cited. Disputed insofar as Relator seeks to establish that the NFS**

11  **Clause was applicable to contract NNC15CA07C. Indeed, the NFS Clause was inapplicable and**

12  **imposed no requirements on Aerojet. *See ASOF* ¶¶ 40, 42 (explaining NASA requiring activity**

13  **indicated that the contractor would not be required to house NASA technical information,**

14  **rendering the NFS Clause inapplicable).**

15

16      176.    The federal government has paid AR at least $17,862,764 for work AR has performed

17  on contract, Award ID NNC15CA07C. (Ex. L, Defendants' Response to Relator's First Set of

18  Requests for Admissions Response No. 110)

19      **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 176:**

20      **Undisputed. Aerojet notes that the NFS Clause was not applicable to Contract No.**

21  **NNC15CA07C and imposed no requirements on Aerojet. *See ASOF* ¶¶ 40, 42 (explaining NASA**

22  **requiring activity indicated that the contractor would not be required to house NASA technical**

23  **information, rendering the NFS Clause inapplicable). Aerojet notes that this contract was**

24  **successfully completed on October 9, 2020, (ASOF ¶¶ 56, 155–58, 208) and the government paid**

25  **all invoices on Contract No. NNC15CA07C (ASOF ¶¶ 206–208).**

26

27

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

177.    On or about November 1, 2015, AR was awarded contract Award ID NNM16AA02C to perform work for the National Aeronautics and Space Administration ("NASA"). (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 111)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 177:**

**Undisputed.**

178.    At the time AR was awarded contract Award ID NNM16AA02C, AR was not compliant with the minimum NIST SP 800-53 moderate controls required by NASA FARS Clause 1852.204-76. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 112)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 178:**

**Undisputed that Aerojet was not compliant with all NIST 800-53 controls on or about November 1, 2015, but Aerojet notes that it disclosed its compliance status to the government. *E.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49.**

179.    Prior to the government awarding AR contract Award ID NNM16AA02C, AR did not disclose to the government every NIST SP 800-53 moderate control required by NASA FARS Clause 1852.204-76 that AR was not compliant with. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No.113)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 179:**

**Disputed. Before Aerojet was awarded this contract, it had engaged in discussions with the government about it cybersecurity posture, (*e.g.*, ASOF ¶ 127) and specifically stated on or around June 18, 2015, that it was "not fully compliant per the Security Requirements for Unclassified Information Technology Resources at this time," when submitting its proposal for Contract No. NNM16AA02C. ASOF ¶ 128. Furthermore, Aerojet made numerous other disclosures of its non-compliance to the government both before and after November 19, 2015, (*e.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 129; 132; 134; 138–41; 144–49) and the government understood that Aerojet was not compliant with the Cybersecurity Clauses, (*e.g.,***

ASOF ¶¶ 62; 80 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."); 85; 89; 91; 96; 100; 103; 106; 115; 135; 153). Aerojet notes that it disclosed to the government its compliance status with *every* applicable control where relevant. *See*, *e.g.*, Ex. 60 (identifying Aerojet's compliance status with all applicable NIST 800-53 controls); Ex. 65 (same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same); Ex. 84 (same); Ex. 110 (same); Ex. 111 (same); Ex. 116 (same).

180.    In the course of performing contract Award ID NNM16AA02C, AR stored Sensitive But Unclassified ("SBU") information belonging to the federal government on its computer system. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 114 )

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 180:**

**Undisputed that as of November 19, 2015, since Contract No. NNM16AA02C has been in effect and under performance, (ASOF ¶ 214) Aerojet stored SBU information on its computer system. Ex. L at Response No. 114. Disputed to the extent Relator suggests that Aerojet stored SBU on its system related to the cited contract, which is unsupported by the evidence cited.**

181.    The federal government has paid AR at least $788,077,590 for work AR has performed on contract, Award ID NNM16AA02C. (Ex. M, Defendants' Supplemental Response to Relator's First Set of Requests for Admissions Response No. 115)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 181:**

**Undisputed. Aerojet notes that this contract is still ongoing and has not been terminated, (ASOF ¶¶ 56, 155–58, 214) and the government paid all invoices on Contract No. NNM16AA02C (ASOF ¶¶ 212–14).**

182.    The federal government has paid or obligated to pay at least $1,717,862,988 for work AR has performed on contract, Award ID. NNM16AA02C. (Ex. Q 002)

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 182:**

2

**Undisputed. Aerojet notes that this contract is still ongoing and has not been terminated,**

3

**(ASOF ¶¶ 56, 155–58, 214) and the government paid all invoices on Contract No. NNM16AA02C**

4

**(ASOF ¶¶ 212–14).**

5

6

183.    On or about December 14, 2015, AR was awarded contract Award ID NNM16AB21P

7

to perform work for the National Aeronautics and Space Administration ("NASA"). (Ex. L,

8

Defendants' Response to Relator's First Set of Requests for Admissions Response No. 116)

9

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 183:**

10

**Undisputed.**

11

12

184.    At the time AR was awarded contract Award ID NNM16AB21P, AR was not

13

compliant with the minimum NIST SP 800-53 moderate controls required by NASA FARS Clause

14

1852.204-76. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions

15

Response No. 117)

16

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 184:**

17

**Aerojet disputes this purported fact insofar as Relator seeks to establish that the NFS**

18

**Clause was applicable to Contract No. NNM16AB21P. Indeed, the NFS Clause was not included**

19

**in this contract. *See* ASOF ¶ 49. Undisputed that Aerojet was not compliant with all NIST 800-**

20

**53 controls on or about December 14, 2015, but Aerojet notes that it disclosed its compliance**

21

**status with those controls to the government. *E.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119;**

22

**121; 128–29; 132; 134; 138–41; 144–49.**

23

24

185.    Prior to the government awarding AR contract Award ID NNM16AB21P, AR did not

25

disclose to the government every NIST SP 800-53 moderate control required by NASA FARS Clause

26

1852.204-76 that AR was not compliant with. (Ex. L, Defendants' Response to Relator's First Set of

27

Requests for Admissions Response No. 118)

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 185:**

2

**Disputed insofar as Relator seeks to establish that the NFS Clause was applicable to**

3

**Contract No. NNM16AB21P. Indeed, the NFS Clause was not included in this contract, ASOF**

4

**¶ 49, and did not require Aerojet to disclose its compliance status with the NFS Clause. Before**

5

**Aerojet was awarded this contract, it had engaged in discussions with the government about its**

6

**cybersecurity posture.** ***E.g.*****, ASOF ¶ 127. Aerojet also disclosed its non-compliance to the**

7

**government both before and after December 14, 2015 (*e.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09;**

8

**116; 119; 121; 128–29; 132; 134; 138–41; 144–49) and the government understood that Aerojet**

9

**was not compliant with the Cybersecurity Clauses, (*e.g.*, ASOF ¶¶ 62; 80 ("Q. So did you**

10

**understand this [] letter that Aerojet had provided the army to be representing that Aerojet was**

11

**compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided**

12

**to me, Aerojet only had ten controls in place and compliant."); 85; 89; 91; 96; 100; 103; 106;**

13

**115; 135; 153). Aerojet notes that it disclosed to the government its compliance status with *every***

14

**applicable control where relevant. *See*, *e.g.*, Ex. 60 (identifying Aerojet's compliance status with**

15

**all applicable NIST 800-53 controls); Ex. 65 (same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same);**

16

**Ex. 84 (same); Ex. 110 (same); Ex. 111 (same); Ex. 116 (same).**

17

18

186.    In the course of performing contract Award ID NNM16AB21P, AR stored Sensitive

19

But Unclassified ("SBU") information belonging to the federal government on its computer system.

20

(Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 119)

21

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 186:**

22

**Undisputed that between December 14, 2015 and March 31, 2016—during the time in**

23

**which Contract No. NNM16AB21P was in effect and under performance—Aerojet stored SBU**

24

**information on its computer system. Ex. L at Response No. 119; ASOF ¶ 217. Disputed to the**

25

**extent Relator suggests that Aerojet stored SBU on its system related to the cited contract, which**

26

**is unsupported by the evidence cited. Disputed insofar as Relator seeks to establish that NFS**

27

**Clause was applicable; the contract identified in this purported fact does not contain the NFS**

28

**Clause. ASOF ¶ 49.**

187.    The federal government has paid YOU at least $187,682 for work AR has performed on contract, Award ID NNM16AB21P. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 120)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 187:**

**Undisputed. Aerojet notes that the contract identified in this purported fact does not contain the NFS Clause. ASOF ¶ 49. Aerojet further notes that this contract was successfully completed on March 31, 2016, (ASOF ¶¶ 56, 155–58, 217) and the government paid all invoices on Contract No. NNM16AB21P (ASOF ¶¶ 215–17).**

188.    On or about April 1, 2016 AR was awarded contract Award ID NNM16AA12C to perform work for the National Aeronautics and Space Administration ("NASA"). (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 121)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 188:**

**Undisputed.**

189.    At the time AR was awarded contract Award ID NNM16AA12C, AR was not compliant with the minimum NIST SP 800-53 moderate controls required by NASA FARS Clause 1852.204-76. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 122)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 189:**

**Undisputed that Aerojet was not compliant with all NIST 800-53 controls on or about April 1, 2016, but Aerojet notes that it disclosed its compliance status to the government. *E.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49.**

190.    Prior to the government awarding AR contract Award ID NNM16AA12C, AR did not disclose to the government every NIST SP 800-53 moderate control required by NASA FARS Clause

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1852.204-76 that AR was not compliant with. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 123)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 190:**

**Disputed. Before Aerojet was awarded this contract, it had engaged in discussions with the government about its cybersecurity posture. *E.g.*, ASOF ¶ 127. Aerojet also disclosed its non-compliance to the government both before and after April 1, 2016, (*e.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49) and the government understood that Aerojet was not compliant with the Cybersecurity Clauses, (*e.g.*, ASOF ¶¶ 62; 80 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."); 85; 89; 91; 96; 100; 103; 106; 115; 135; 153). Aerojet notes that it disclosed to the government its compliance status with *every* applicable control where relevant. *See*, *e.g.*, Ex. 60 (identifying Aerojet's compliance status with all applicable NIST 800-53 controls); Ex. 65 (same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same); Ex. 84 (same); Ex. 110 (same); Ex. 111 (same); Ex. 116 (same).**

191.    In the course of performing contract Award ID NNM16AA12C, AR stored Sensitive But Unclassified ("SBU") information belonging to the federal government on its computer system. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 124)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 191:**

**Undisputed that as of April 1, 2016, since Contract No. NNM16AA12C has been in effect and under performance, (ASOF ¶ 223) Aerojet stored SBU information on its computer system. Ex. L at Response No. 124. Disputed to the extent Relator suggests that Aerojet stored SBU on its system related to the cited contract, which is unsupported by the evidence cited.**

192.    The federal government has paid or is obligated to pay at least $175,165,695 for work AR has performed on contract, Award ID NNM16AA12C. (Ex. Q 002)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 192:**

**Undisputed.[11] Aerojet notes that this contract is still ongoing and has not been terminated, (ASOF ¶¶ 56, 155–58, 223) and the government paid all invoices on Contract No. NNM16AA12C (ASOF ¶¶ 221–23).**

193.    According to the official government website that tracks federal spending, usaspending.gov, NASA has paid or is obligated to AR $4,269,770,516 on NASA contracts with a start date from June 1, 2013 to May 31, 2016, including NASA contract NNM06AB13C that was modified in July 2013. (Ex. Q 1-7 , Ex. A 67-69)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 193:**

**Disputed.[12] Aerojet notes that Relator has not offered into evidence any of these contracts nor evidenced whether any of these contracts even contain the NFS Clause. Aerojet also notes that Relator includes contracts in his spreadsheet that are not identified in Relator's Second Amended Complaint and are not at issue in this case, including Contract No. NNM06AB13C.**

194.    On or about February 25, 2014 AR awarded contract Award ID W31P4Q14C0075 to perform work for the Department of the Army. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 1)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 194:**

**Undisputed.**

195.    At the time AR was awarded contract Award ID W31P4Q14C0075, AR was notcompliant with the minimum cybersecurity safeguards required by DFARS Clause 252.204-7012. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 2)

---

[11]  Relator's Exhibit Q and USASpending itself list the amount as $175,165,694.98.

[12]  Aerojet has not independently verified whether the list of contracts Relator provides is a complete and accurate list of all NASA Prime and Sub-contracts entered into between June 1, 2013 to May 31, 2016.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1          **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 195:**

2          **Disputed insofar as Relator seeks to establish compliance with the DFARS Clause was**

3 **required under Contract No. W31P4Q14C0075. Indeed, the contract identified in this purported**

4 **fact does not contain the DFARS Clause. ASOF ¶ 32. Undisputed that Aerojet was not compliant**

5 **with all NIST 800-53 controls on or about February 25, 2014, but Aerojet notes that it proceeded**

6 **to disclose its compliance status to the government.** ***E.g.,*** **ASOF ¶¶ 57; 81; 86; 101; 108–09; 116;**

7 **119; 121; 128–29; 132; 134; 138–41; 144–49.**

8

9          196.    Prior to the government awarding AR contract Award ID W31P4Q14C0075, AR did

10 not disclose to the government every cybersecurity safeguard required by DFARS Clause 252.204-

11 7012 AR was not compliant with. (Ex. L, Defendants' Response to Relator's First Set of Requests for

12 Admissions Response No. 3)

13          **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 196:**

14          **Disputed. Compliance with the DFARS Clause was not required under Contract No.**

15 **W31P4Q14C0075. Indeed, the contract identified in this purported fact does not contain the**

16 **DFARS Clause. ASOF ¶ 32. Before Aerojet was awarded this contract, it had engaged in**

17 **discussions with the government about its cybersecurity posture.** ***E.g.*****, ASOF ¶ 127. Aerojet then**

18 **disclosed its non-compliance to the government for the applicable contracts that contained the**

19 **Cybersecurity Clauses, (***e.g.,*** **ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134;**

20 **138–41; 144–49) and the government understood that Aerojet was not compliant with the**

21 **Cybersecurity Clauses, (***e.g.*****, ASOF ¶¶ 62; 80 ("Q. So did you understand this [] letter that**

22 **Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these**

23 **60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten**

24 **controls in place and compliant."); 85; 89; 91; 96; 100; 103; 106; 115; 135; 153). Aerojet notes**

25 **that it disclosed to the government its compliance status with** ***every*** **applicable control where**

26 **relevant.** ***See, e.g.*****, Ex. 60 (identifying Aerojet's compliance status with all applicable NIST 800-**

27 **53 controls); Ex. 65 (same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same); Ex. 84 (same); Ex. 110**

28 **(same); Ex. 111 (same); Ex. 116 (same).**

197.    In the course of performing contract Award ID W31P414C0075 AR stored unclassified controlled technical information ("UCTI") belonging to the federal government on AR's computer system. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 4)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 197:**

**Undisputed that between February 25, 2014 and January 31, 2016—during the time in which Contract No. W31P4Q14C0075 was in effect and under performance, Aerojet stored UCTI on its computer system. Ex. L at Response No. 4; ASOF ¶ 163. Disputed to the extent Relator suggests that Aerojet stored UCTI on its system related to the cited contract, which is unsupported by the evidence cited. Disputed insofar as Relator seeks to establish that DFARS Clause was applicable; the contract identified in this purported fact does not contain the DFARS Clause. ASOF ¶ 32.**

198.    The federal government has paid AR at least $12,566,969 for work AR has performed on contract Award ID W31P4Q14C0075. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 5)

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 198:**

**Undisputed. Aerojet notes that the contract identified in this purported fact does not contain the DFARS Clause. ASOF ¶ 32. Aerojet notes that this contract was successfully completed on January 31, 2016, (ASOF ¶¶ 56, 155–58, 163) and the government paid all invoices on Contract No. W31P4Q14C0075 (ASOF ¶¶ 161–63).**

199.    The federal government has paid AR at least $710,149 for work YOU have performed on contract, Award ID N0001414C0035. (Ex. M, Defendants' Supplemental Response to Relator's First Set of Requests for Admissions Response No. 15 )

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 199:**

2    **Undisputed. Aerojet notes that this contract was successfully completed on June 8, 2017,**

3    **(ASOF ¶¶ 56, 155–58, 172) and the government paid all invoices on Contract No.**

4    **N0001414C0035 (ASOF ¶¶ 170–72).**

5

6    200.    On or about September 30, 2014 AR was awarded contract Award ID N6893614C0035

7    to perform work for the Department of the Navy. (Ex. L, Defendants' Response to Relator's First Set

8    of Requests for Admissions Response No. 31)

9    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 200:**

10   **Undisputed.**

11

12   201.    At the time AR was awarded contract Award ID. N6893614C0035, AR was not

13   compliant with the minimum cybersecurity safeguards required by DFARS Clause 252.204-7012. (Ex.

14   L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 32)

15   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 201:**

16   **Undisputed that Aerojet was not compliant with all NIST 800-53 controls on or about**

17   **September 30, 2014, but Aerojet notes that it disclosed its compliance status to the government.**

18   ***E.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49.**

19

20   202.    Prior to the government awarding AR contract Award ID. N6893614C0035, AR did

21   not disclose to the government every cybersecurity safeguard required by DFARS Clause 252.204-

22   7012 that AR was not compliant with. (Ex. L, Defendants' Response to Relator's First Set of Requests

23   for Admissions Response No. 33)

24   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 202:**

25   **Disputed. Before Aerojet was awarded this contract, it had engaged in discussions with**

26   **the government about its cybersecurity posture. *E.g.,* ASOF ¶ 127. Aerojet sent the Navy a letter**

27   **in connection with this contract on September 30, 2014 stating that it was not compliant with**

28   **the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." ASOF**

1
2
3
4
5
6
7
8
9
10
11
12
13

**¶ 82. The Navy acknowledged receipt of Aerojet's letter and accepted Aerojet's conditional acceptance. ASOF ¶ 83. Furthermore, Aerojet made numerous other disclosures of its non-compliance to the government both before and after September 30, 2014, (***e.g.,*** ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–49) and the government understood that Aerojet was not compliant with the Cybersecurity Clauses, (***e.g.***, ASOF ¶¶ 62; 80 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."); 85; 89; 91; 96; 100; 103; 106; 115; 135; 153). Aerojet notes that it disclosed to the government its compliance status with *every* applicable control where relevant. *See*, *e.g.*, Ex. 60 (identifying Aerojet's compliance status with all applicable NIST 800-53 controls); Ex. 65 (same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same); Ex. 84 (same); Ex. 110 (same); Ex. 111 (same); Ex. 116 (same).**

14

15
16
17
18

203.    In the course of performing contract Award ID. N6893614C0035, AR stored unclassified controlled technical information ("UCTI") belonging to the federal government on its computer system. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 34)

19

**RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 203:**

20
21
22
23
24

**Undisputed that between September 30, 2014 and December 31, 2015—during the time in which Contract No. N6893614C0035 was in effect and under performance—Aerojet stored UCTI on its computer system. Ex. L at Response No. 34; ASOF ¶ 175. Disputed to the extent Relator suggests that Aerojet stored UCTI on its system related to the cited contract, which is unsupported by the evidence cited.**

25

26
27
28

204.    The federal government has paid AR at least $ 843,421 for work AR has performed on contract, Award ID. N6893614C0035. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions Response No. 35)

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1     **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 204:**

2     **Undisputed. Aerojet notes that this contract was successfully completed on December 31,**

3     **2015, (ASOF ¶¶ 56, 155–58, 175) and the government paid all invoices on Contract No.**

4     **N6893614C0035 (ASOF ¶¶ 173–75).**

5

6     205.   On or about October 8, 2015, AR was awarded contract Parent Award ID

7     FA865013D2335, Award 0004 to perform work for the Department of the Air Force. (Ex. L,

8     Defendants' Response to Relator's First Set of Requests for Admissions Response No. 66)

9     **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 205:**

10    **Undisputed.**

11

12    206.   At the time AR was awarded contract Parent Award ID FA865013D2335, Award 0004,

13    AR was not compliant with the minimum cybersecurity safeguards required by DFARS Clause

14    252.204-7012. (Ex. L, Defendants' Response to Relator's First Set of Requests for Admissions

15    Response No. 67)

16    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 206:**

17    **Disputed insofar as Relator seeks to establish compliance with the DFARS Clause was**

18    **required under Contract No. FA865013D2335, Award # 0004. Indeed, the DFARS Clause was**

19    **not included in this contract. *See* ASOF ¶ 46. Undisputed that Aerojet was not compliant with**

20    **all NIST 800-53 controls on or about October 8, 2015, but Aerojet notes that it disclosed its**

21    **compliance status to the government. *E.g.,* ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–**

22    **29; 132; 134; 138–41; 144–49.**

23

24    207.   Prior to the government awarding AR contract Parent Award ID FA865013D2335,

25    Award 0004, AR did not disclose to the government every cybersecurity safeguard required by

26    DFARS Clause 252.204-7012 that AR was not compliant with. (Ex. L, Defendants' Response to

27    Relator's First Set of Requests for Admissions Response No. 68)

28

1    **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 207:**

2    **Disputed. Compliance with the DFARS Clause was not required under Contract No.**

3    **FA865013D2335, Award # 0004. Indeed, the DFARS Clause was not included in this contract.**

4    ***See* ASOF ¶ 46. Before Aerojet was awarded this contract, it had engaged in discussions with**

5    **the government about its cybersecurity posture. *E.g.*, ASOF ¶ 127. Aerojet then disclosed its**

6    **non-compliance to the government for the applicable contracts that contained the Cybersecurity**

7    **Clauses, (*e.g.*, ASOF ¶¶ 57; 81; 86; 101; 108–09; 116; 119; 121; 128–29; 132; 134; 138–41; 144–**

8    **49) and the government understood that Aerojet was not compliant with the Cybersecurity**

9    **Clauses, (*e.g.*, ASOF ¶¶ 62; 80 ("Q. So did you understand this [] letter that Aerojet had provided**

10   **the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my**

11   **opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and**

12   **compliant."); 85; 89; 91; 96; 100; 103; 106; 115; 135; 153). Aerojet notes that it disclosed to the**

13   **government its compliance status with *every* applicable control where relevant. *See*, *e.g.*, Ex. 60**

14   **(identifying Aerojet's compliance status with all applicable NIST 800-53 controls); Ex. 65**

15   **(same); Ex. 68 (same); Ex. 78 (same); Ex. 83 (same); Ex. 84 (same); Ex. 110 (same); Ex. 111**

16   **(same); Ex. 116 (same).**

17

18   208.    In the course of performing contract Parent Award ID FA865013D2335, Award 0004,

19   AR stored unclassified controlled technical information ("UCTI") belonging to the federal government

20   on its computer system. (Ex. L, Defendants' Response to Relator's First Set of Requests for

21   Admissions Response No. 69)

22   **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 208:**

23   **Undisputed that between October 8, 2015 and September 28, 2018—during the time in**

24   **which Contract No. FA865013D2335, Award # 0004 was in effect and under performance—**

25   **Aerojet stored UCTI on its computer system. Ex. L at Response No. 69; ASOF ¶¶ 46, 190.**

26   **Disputed to the extent Relator suggests that Aerojet stored UCTI on its system related to the**

27   **cited contract, which is unsupported by the evidence cited.  Disputed insofar as Relator seeks to**

28

1  establish that DFARS Clause was applicable; the contract identified in this purported fact does

2  not contain the DFARS Clause. ASOF ¶ 46.

4     209.   The federal government has paid AR at least $965,818 for work AR has performed on

5  contract, Parent Award ID FA865013D2335, Award 0004. (Ex. M, Defendants' Supplemental

6  Response to Relator's First Set of Requests for Admissions Response No. 70)

7         **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 209:**

8         **Undisputed. Aerojet notes that the contract identified in this purported fact does**

9  **not contain the DFARS Clause. ASOF ¶ 46. Aerojet notes that this contract was successfully**

10 **completed on September 28, 2018, (ASOF ¶¶ 56, 155–58, 190) and the government paid all**

11 **invoices on Contract No. FA865013D2335, Award # 0004 (ASOF ¶¶ 188–90).**

13    210.   According to the official government website that tracks federal spending,

14 usaspending.gov, the DOD has paid or is obligated to pay AR, $2,078,242,523, for work done on DOD

15 prime and subcontracts with a start date of June 1, 2013 to May 31, 2016. (Ex. Q 1-7)

16        **RESPONSE TO STATEMENT OF UNDISPUTED FACT NO. 210:**

17        **Disputed.[13] Aerojet notes that Relator includes contracts awarded *before* the**

18 **promulgation of the any of the DFARS Clauses as the 2013 DFARS Clause was promulgated on**

19 **November 18, 2013. *See, e.g.,* Ex. Q at 5, Row 2 (including contract with award date of**

20 **September 23, 2013); ASOF ¶ 1 (identifying the data of the November 2013 DFARS Clause as**

21 **November 18, 2013). Aerojet further notes that Relator has not offered into evidence any of these**

22 **contracts nor evidenced whether any of these contracts even contain the DFARS Clause. Aerojet**

23 **also notes that Relator includes contracts in his spreadsheet that are not identified in Relator's**

24 **Second Amended Complaint and is not at issue in this case. *See generally* Ex. Q; ECF No. 42**

25 **("SAC"). Finally, Aerojet notes that the figures Relator provides on page 4 of Exhibit Q, which**

---

27 [13] Aerojet has not independently verified whether the list of contracts Relator provides is a complete
28 and accurate list of all DoD Prime and Sub-contracts entered into between June 1, 2013 to May
   31, 2016.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

purport to represent the amount of money obligated or paid to Aerojet for DoD Prime contracts

awarded between June 1, 2013 to May 31, 2016, does not correspond with the amount identified

on page one of Exhibit Q for the same category of contracts.

**AEROJET'S STATEMENT OF ADDITIONAL FACTS**

**I.      THE DOD RECOGNIZED THE FLAWS WITH THE CYBERSECURITY CLAUSE**

**AT ISSUE (THE 2013 DFARS CLAUSE) AND AS A RESULT, ABANDONED IT.**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 1 | On November 18, 2013, section 252.204-7012 was published in Chapter 2 of Title 48 of the Code of Federal Regulations (the "2013 DFARS Clause"). | • 48 C.F.R. § 252.204-7012 (Nov. 18, 2013) |
| 2 | The 2013 DFARS Clause required contractor systems that transmitted or stored unclassified, controlled technical information ("UCTI") to either (a) implement fifty-one selected National Institute of Standards and Technology ("NIST") Special Publication 800-53 ("NIST SP 800-53") security controls or (b) submit a written explanation to the contracting officer stating why a control was not applicable or that an alternate control or protective measure was used by the contractor to achieve adequate protection. | • 48 C.F.R. § 252.204-7012 (Nov. 18, 2013)<br>• Ex. 13 (NIST Special Publication (SP) 800-53 r.4) (NIST standards in effect at time of November 2013 Clause implementation)<br>• ECF No. 42 ("SAC") ¶¶ 12, 18-19 (admitting that DFARS and NFS Clauses only apply if UCTI is involved)<br>• Ex. 70 (Office of the Chief Information Officer ("OCIO") concurring with Air Force assessment that DFARS Clause "does not apply" in the event contract did not include UCTI)<br>• Ex. 200 (OCIO memorandum to Navy indicating that DFARS Clause was not applicable to contractor because it was not required to store UCTI)<br>• Ex. 205 (1/6/2016 e-mail from OCIO stating that contracts could be awarded to non-compliant contractors)<br>• Ex. 92 (5/20/2015 e-mail from OCIO stating that contract could be |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|  |  | awarded to non-compliant contractors) |
| 3 | **Representatives from the Department of Defense (the "DoD") acknowledged that the controls in NIST SP 800-53 were intended for use on federal government information systems, which differ from private contractor systems.** | • Ex. 21 at 8:20-24 (4/6/2017 DoD SBTW Presentation: "[I]f anybody is familiar with [NIST SP 800-53], that's actually a document that is focused on protecting government systems, it's very federalistic and it gives lots of how to."); *see also* "Ex. 20 (video recording of same)<br><br>• SAC ¶ 20 ("The NIST SP 800-53 standards were originally implemented to apply to contractors operating computer systems on behalf of the federal government.")<br><br>• Ex. 23 at 19:9-10 (6/23/2017 DoD Industry Day Presentation: "[800-53] was for federal agencies and federal information."); *see also* Ex. 22 (video recording of same)<br><br>• Ex. 9 (Guissanie Dep.) at 63:10-64:17 ("there are elements in [NIST 800-53] that are federally focused that do not apply to nonfederal entities.")<br><br>• Ex. 10 (Thomas Dep.) at 84:17-21 ("So prior to May 2016 my understanding is that [NIST 800-]171 was written specifically for industry. Where as [NIST 800-]53 was not, so it was written with the properties of a contractor system in mind.") |
| 4 | **The DoD admitted that applying the NIST 800-53 standard to private contractor systems was not practicable.** | • Ex. 25 at 25:4-6 (6/23/2017 DoD Industry Day Presentation: "To apply [NIST 800-53] to a contractor system to protect CDI for confidentiality really isn't very -- isn't possible."); *see also* Ex. 24 (video recording of same)<br><br>• Ex. 23 at 19:17-23 (6/23/2017 DoD Industry Day Presentation: "Also, since 800-53 was focused on the federal government, there's a lot of things in there that are federal-centric. They're the ways federal government decided to do business |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | for itself based on policy or other reasons that aren't necessarily the way it has to be done in order to achieve the security objective."); *see also* Ex. 22 (video recording of same) |
| | | • Ex. 25 at 26:12-20 (6/23/2017 DoD Industry Day Presentation: explaining that NIST 800-53 was "overly specific because the federal government wanted to do it in a particular way . . . and that was going to be problematic if we applied that to the contracting community, so we wanted to take that out of the situation"); *see also* Ex. 24 (video recording of same) |
| | | • Ex. 23 at 19:9-13 (6/23/2017 DoD Industry Day Presentation: "So that's 800-53. That was for federal agencies and federal information. In order to apply [NIST 800-53] to the contracting community, NIST 800-171 was developed."); *see also* Ex. 22 (video recording of same) |
| | | • Ex. 18 at AFDODCIO000589 ("[NIST] 800-53 controls developed for Federal systems . . . [and is] overly granular and difficult to apply to an 'as-built' contractor's system[, contains m]any baseline controls [that are] unnecessary . . . [contains m]any controls/elements [that] should not apply outside the US Government (Federal-centric).") |
| 5 | **Contractors and contracting officers were confused by the requirements of the DFARS Clause and the NIST standards, leading the Government to clarify requirements in later versions of the DFARS Clause and NIST revisions.** | • Ex. 7 (Markus Dep.) at 163:16-164:4 ("[I]n areas where a control or something was intended . . . [the Government] intended one thing, and [contractors] implemented it a different way, and so [the Government] wanted to clarify, and they did end up clarifying that quite a bit or clarifying quite a few [requirements].") |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | • Ex. 9 (Guissanie Dep.) at 45:8-20 ("There were less questions from contractors about 171 than we had with [800-]53 because . . . the language is much plainer and . . . it was a holistic document, it packaged everything up and explained everything it was much easier for most contractors to understand then the table of selected 800-53 controls in a DFARS clause.") |
| | | • Ex. 10 (Thomas Dep.) at 117:23-118:2 ("I am aware that many questions came in to the DoD CIO with regards to the NIST standards and requirements[.]") |
| | | • Ex. 206 at AFDODCIO000215 & AFDODCIO000224 (12/15/2015 contractor disclosure reflecting disagreement between contractor and Air Force regarding NIST control requirements and wish to "remove some of the ambiguity" of the requirements) |
| | | • Ex. 35 at ii (2019 Inspector General Report: "DoD Component contracting offices and requiring activities did not always know which contracts required contractors to maintain CUI" and "DoD does not know the amount of DoD information managed by contractors and cannot determine whether contractors are protecting unclassified DoD information from unauthorized disclosure") |
| 6 | On August 26, 2015, a new version of the DFARS Clause was published (the "August 2015 DFARS Clause") that adopted the security requirements set forth in NIST Special Publication 800-171 ("NIST SP 800-171"). The August 2015 Clause permitted a contractor to implement "alternative but equally effective security measures" in lieu of | • 48 C.F.R. § 252.204-7012 (Aug. 26, 2015) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | implementing the technical requirements in NIST 800-171. | |
| 7 | **NIST SP 800-171 required contractors to comply with 109 cybersecurity controls, which built upon the table of controls set forth in NIST 800-53 and expanded them, adding additional requirements.** | • Ex. 14 (NIST 800-171)<br>• Ex. 17 at 15 (reflecting defense industry group understanding that under NIST 800-171, even if a contractor was fully compliant with 800-53 they would have 70 "new" or "partially new" requirements) |
| 8 | **NIST SP 800-171 expected contractors to have "plans of action designed to correct deficiencies and reduce or eliminate vulnerabilities."** | • Ex. 14 (NIST SP 800-171) at Control 3.12.2 |
| 9 | **Under the August 2015 DFARS Clause, contractors were expected to have implemented the NIST 800-171 controls immediately upon receiving covered information.** | • 48 C.F.R. § 252.204-7012 (Aug. 26, 2015) |
| 10 | **On October 8, 2015, the DoD issued a classwide deviation allowing contractors additional time to implement multifactor authentication.** | • Ex. 16 |
| 11 | **On December 30, 2015, the DFARS Clause was amended to give contractors until December 31, 2017 to comply with NIST SP 800-171 (the "December 2015 DFARS Clause").** | • 48 C.F.R. § 252.204-7012 (Dec. 30, 2015)<br>• Ex. 21 at 9:20-25 (4/6/2017 DoD SBTW Presentation: "Other changes that we made as we moved forward with the rule, we gave them extra time to implement the standards. So right now industry has until December 31, 2017, to get these requirements in place on their information systems."); *see also* Ex. 20 (video recording of same)<br>• Ex. 10 (Thomas Dep.) at 102:10-15 (testifying the December 2015 DFARS Clause "gave contractors until December 2017 to implement the 171 requirements"), 107:14-17 (same) |
| 12 | **Under the December 2015 DFARS Clause, contractors were compliant with the DFARS** | • Ex. 9 (Guissanie Dep.) at 46:24-47:1, 108:2-18 (testifying "the December 2015 interim rule |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | **Clause even if they had implemented no controls until December 31, 2017.** | basically said you had up to two years to implement the requirements of 800-171 . . . for that period, technically one didn't have to meet any requirement") |
| | | • SBTW17 Tr. at 21:7-12 ("Because as a department we basically had about a two year period from 2015 when we put out the interim rule until it was final, and then having extended the requirements to be compliant until December of 2017, you had almost two years for industry to work on it.") |
| 13 | **The deadline for compliance with NIST 800-171 was extended because the DoD understood that immediate implementation of NIST 800-171 was not feasible for government contractors.** | • Ex. 19 at 2 (letter from industry group stating that industry and the DoD reached a "consensus" regarding the December 31, 2017 implementation deadline) |
| | | • Ex. 17 at 2 (industry group letter discussing "inability of industry to comply with at least one of the requirements" of the August 2015 DFARS Clause and explaining that contractors needed "time to implement the requirements of the [NIST 800-171]") |
| | | • Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics reflecting that December 31, 2017 deadline was adopted because of concern about compliance) |
| 14 | **On October 21, 2016, the DFARS Clause was amended again (the "2016 DFARS Clause"). The amendment reiterated that compliance with NIST SP 800-171 was not required until December 31, 2017 and provided instructions to contractors on how to request variances from NIST SP 800-171's controls.** | • 48 C.F.R. § 252.204-7012 (Oct. 21, 2016) |
| | | • 81 FR 72986 at 72990 (The phrase "as soon as practical" is added to encourage contractors to begin implementing the security requirements in NIST SP 800-171 prior to the December 31, 2017, |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | deadline, but allows contractors to exercise their own judgement when planning an optimal implementation strategy.) |
| 15 | In December 2016, NIST published SP 800-171, Revision 1. Under the Revision, contractors could show compliance through adoption of a system security plan ("SSP") and implementation of plans of action and milestones ("POAMs") when they had not yet implemented a given control. | • Ex. 15 (NIST 800-171 Revision 1) at Ch. 3 ("Nonfederal organizations should describe in a system security plan, how the specified security requirements are met or how organizations plan to meet the requirements.") <br><br> • Ex. 29 at 4:20-5:70 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."); *see also* Ex. 28 (video recording of same) <br><br> • Ex. 29 at 15:13-21 (6/23/2017 DoD Industry Day Presentation: "[Y]our SSP and any associated POAMs document your implementation of [NIST 800-]171. So there could be a case where the requiring activity does not even ask for it. And if not, by signing the contract, you have something that documents how you're implementing [NIST 800-]171, so you're in compliance with that requirement of the |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | clause."); *see also* Ex. 28 (video recording of same) |
| 16 | **SSPs set forth how an organization's cybersecurity requirements are currently met or how the organization plans to meet those requirements. POAMs are specific to any unimplemented security controls, and describe how the organization plans to address them and how the planned mitigation will be implemented.** | • Ex. 15 (NIST 800-171 Revision 1) at Ch. 3 ("Nonfederal organizations should describe in a system security plan, how the specified security requirements are met or how organizations plan to meet the requirements.")<br><br>• Ex. 29 at 4:20-5:70 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation."); *see also* Ex. 28 (video recording of same) |
| 17 | **As of December 2016, a contractor would be considered to have implemented NIST 800-171 if they had an SSP reflecting POAMs in place.** | • Ex. 15 (NIST 800-171 Revision 1) at Ch. 3<br><br>• Ex. 29 at 4:20-5:7 (6/23/2017 DoD Industry Day Presentation: "So, again, [NIST 800-]171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."); *see also* Ex. 28 (video recording of same) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|     |                 | • 48 C.F.R. § 252.204-7012 (Oct. 21, 2016) |
|     |                 | • 48 C.F.R. § 252.204-7012 (Dec. 30, 2015) |
|     |                 | • Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics: "the only requirement for [2017] is to lay out what your plan [for compliance with NIST 800-171] is" and that it can "be a very simple plan") |
|     |                 | • Ex. 34 at 53:7-11 (4/26/2018 DoD SBTW Presentation: "Compliance means again not having every single security requirement implemented but having a System Security Plan in place."); *see also* Ex. 33 (video recording of same) |
|     |                 | • Ex. 34 at 19:24-20:24 (4/26/2018 DoD SBTW Presentation: "The NIST 800-171 is structured such that a contractor can demonstrate that he's implementing the 110 requirements in that pub[lication] by documenting what he's doing in a System Security Plan . . . in that he describes his information system and he also would describe how he is implementing the security requirements that he's implementing, and he would indicate which security requirements he has not yet implemented"); *see also* Ex. 33 (video recording of same) |
|     |                 | • Ex. 34 at 21:14-23 (4/26/2018 DoD SBTW Presentation: "But now because they can document in the System Security Plan how they plan to implement, they now can confidently sign the contract knowing that they are implementing |

1

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | NIST 800-]171 in the way that it says you need to implement it."); *see also* Ex. 33 (video recording of same) |
| | | • Ex. 29 at 15:13-21 (6/23/2017 DoD Industry Day Presentation: "[Y]our SSP and any associated POAMs document your implementation of [NIST 800-]171. So there could be a case where the requiring activity does not even ask for it. And if not, by signing the contract, you have something that documents how you're implementing [NIST 800-]171, so you're in compliance with that requirement of the clause."); *see also* Ex. 28 (video recording of same) |
| | | • Ex. 29 at 22:22-23:4 (6/23/2017 DoD Industry Day Presentation: "if you look at the language in the clause, it says shall implement as a minimum, 800-171. And if you look at revision 1, [NIST] 800-171 says you can meet my requirements by doing a SSP and planned requirements with a plan of action. So it doesn't say implement the -- the clause doesn't say implement the requirements of 171. It says implement 171."); *see also* Ex. 28 (video recording of same) |
| 18 | The DoD recognized that contractors would remain non-compliant with the technical controls in NIST 800-171 even after the December 31, 2017 compliance deadline, yet remain compliant with the DFARS Clause. | • Ex. 21 at 20:18-23 (4/6/2017 DoD Small Business Training Week ("SBTW") Presentation: "And it might take longer than 2017 to get [to full technical compliance]. They would document that in their System Security Plan. What's interesting about the System Security Plan is that the NIST 800-171 says that the System Security Plan documents how the contractor is implementing 171."); *see also* Ex. 20 (video recording of same) |
| 19 | The DoD instructed contracting officers to modify existing contracts that incorporated the 2013 DFARS Clause or the initial version of NIST SP 800-171 in favor of NIST SP 800- | • Ex. 30 at 3 (9/21/2017 Memorandum from Office of the Under Secretary of Defense directing "contracting officer[s] to modify the contract[s] to authorize |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
|  | **171, Revision 1, which offered more flexibility to contractors.** | the use of NIST SP 800-171, Revision 1, dated December 2016," if the contract included an earlier version of the NIST requirements) |
|  |  | • Ex. 31 (12/12/2017 Memorandum from the Office of the Under Secretary of Defense "requesting contracting administration components to act on behalf of all affected components to issue mass modifications to bring DoD contracts in conformity with the latest version of NIST SP 800-171.") |
| 20 | **In 2020, the "NIST SP 800-171 DoD Assessment Methodology" and the "Cybersecurity Maturity Model Certification" took effect.** | • 85 FR 61505 (introducing assessment methodology) |
|  |  | • Ex. 21 at 16:22-17:11 (4/6/2017 DoD SBTW Presentation: discussing in 2017 whether DoD would monitor contractors' system for implementation of NIST 800-171 and stating "that is not going to happen" and explaining DoD "publishing this DFARS rule, realized that there is no conceivable way for us to deal with the volume of contractors and subcontractors that we have to deal with to be able to go out and do a hands-on inspection of their systems. So that is not the intent."); *see also* Ex. 20 (video recording of same). |
|  |  | • Ex. 21 at 17:11-17:13 (stating in 2017 that "[t]he department's position is that they will not recognize third party assessor certifications"); *see also* Ex. 20 (video recording of same). |
| 21 | **The NIST SP 800-171 DoD Assessment Methodology was the first time the DoD required a compliance assessment with any NIST standards from contractors.** | • 85 FR 61505 (introducing assessment methodology) |
|  |  | • 48 C.F.R. § 252.204-7012 (Nov. 18, 2013) |
|  |  | • 48 C.F.R. § 252.204-7012 (Aug. 26, 2015) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | • 48 C.F.R. § 252.204-7012 (Sept. 21, 2015) |
| | | • 48 C.F.R. § 252.204-7012 (Dec. 30, 2015) |
| | | • 48 C.F.R. § 252.204-7012 (Oct. 21, 2016) |
| | | • 48 C.F.R. § 252.204-7012 (Dec. 31, 2019) |
| | | • Ex. 21 at 16:22-25 (4/6/2017 DoD SBTW Presentation: telling industry that it "is not going to happen" that someone would "come and monitory [industry] systems to see if we're actually implementing [NIST 800-]171") *see also* Ex. 20 (video recording of same) |
| | | • Ex. 21 at 17:1-23:6 (4/6/2017 DoD SBTW Presentation: explaining that "when publishing this DFARS rule, [DoD] realized that there is no conceivable way for us to deal with the volume of contractors and subcontractors that we have to deal with to be able to go out and do a hands-on inspection of their systems. So that is not the intent" and it was the "department's position is that they will not recognize third party assessor certifications") |
| | | • Ex. 199 (reflecting that there is no accreditation of DFARS compliance and that contractors have "latitude" in complying with the DFARS Clause) |
| | | • Ex. 35 at 28 ("While DoD Component contracting offices oversee contractor performance, they expressed confusion on whether they could conduct oversight activities of contractor networks and systems specific to cybersecurity protections.") |
| 22 | **The NIST SP 800-171 DoD Assessment Methodology introduced, for the first time, a method to assess contractor implementation** | • 85 FR 61505 (introducing assessment methodology) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

（

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
|  | of NIST 800-171 controls required by the **DFARS Clause. Specifically, the methodology scores contractors based on the "net effect of NIST SP 800-171 security requirements not yet implemented[.]"** | • Ex. 21 at 16:22-23:6 (4/6/2017 DoD SBTW Presentation: stating in 2017 that "[t]he department's position is that they will not recognize third party assessor certifications"); *see also* Ex. 20 (video recording of same)<br><br>• Ex. 199 (reflecting that there is no accreditation of DFARS compliance)<br><br>• Ex. 92 (OCIO recognizing that in 2015, the DFARS Clause did not have enforcement mechanism) |
| 23 | **No version of the DFARS Clause after November 2013 required contractors to comply with controls from NIST 800-53.** | • 48 C.F.R. § 252.204-7012 (Aug. 26, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Sept. 21, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 30, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Oct. 21, 2016)<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 31, 2019) |
| 24 | **The government expected that contractor systems, even if fully compliant with NIST 800-53 or NIST 800-171 could be breached and information could be exfiltrated.** | • Ex. 34 at 45:15-17 (4/26/2018 DoD SBTW Presentation: "And they could implement everything about the clause perfectly and still have a cyber incident."); *see also* Ex. 33 (video recording of same) |

## II. THE NFS CLAUSE AT ISSUE

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 25 | **On January 24, 2011, Section 1852.204-76 was published in Title 48 of the Code of Federal Regulations (the "NFS Clause").** | • 48 C.F.R. 1852.204-76 (Jan. 24, 2011) |
| 26 | **The NFS Clause requires contractors to "protect the confidentiality, integrity, and availability of NASA Electronic Information and IT resources and protect NASA** | • 48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (a) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | **Electronic Information from unauthorized disclosure."** | |
| 27 | **By its terms, the NFS Clause is only "applicable to [] NASA contractors . . . that process, manage, access, or store unclassified electronic information, to include Sensitive But Unclassified (SBU) information."** | • 48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (b) |
| 28 | **The NFS Clause does not require the contractor's information technology system to meet any specific security standard on its face, and allows "Parts of the clause and referenced ADL may be waived by the contracting officer."** | • 48 C.F.R. 1852.204-76 (Jan. 24, 2011) |
| 29 | **The NFS Clause instructs NASA contracting officers to outline the requisite cybersecurity standards in an "Applicable Documents List (ADL) provided as an attachment to the contract."** | • 48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (b) |
| 30 | **One document that is optional for NASA contracting officers to include in a contract's ADL is NASA Procedural Requirement ("NPR") 2810.1, which sets forth NASA cybersecurity policies which contemplate a system compliant with NIST 800-53.** | • Ex. 36 (NPR 2810.1A)<br>• Ex. 212 (NASA webpage reflecting cybersecurity policies)<br>• ECF No 119, Fact No. 21 |

## III.   LESS THAN HALF OF THE CONTRACTS IN RELATOR'S COMPLAINT INCLUDE THE DFARS OR NFS CLAUSES.

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 31 | **Relator alleges that Aerojet defrauded the government in connection with eighteen contracts enumerated in his Second Amended Complaint.** | • Ex. 7 (Markus Dep.) at 295:3–8.<br>• SAC ¶¶ 67-68, 84-119<br>• ECF No 119, Fact No. 71 |
| 32 | **On February 25, 2014, the Department of the Army (the "Army") awarded Aerojet contract # W31P4Q-14-C-0075, to manufacture HAWK rocket motors. The contract did not contain the DFARS Clause.** | • Ex. 71<br>• Ex. 37 at Row 2 |
| 33 | **On March 11, 2014, the National Aeronautics and Space Administration ("NASA") awarded Aerojet Award ID # NNC13TA66T under parent contract # NNC10BA13B, to study the potential application of additive** | • Ex. 122<br>• Ex. 121 at row 10 |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
|  | manufacturing for the RL10 rocket propulsion engine. The award did not contain the NFS Clause. |  |
| 34 | On April 22, 2014, the Department of the Navy (the "Navy") awarded Aerojet contract # N00014-14-C-0035, to develop injector/manifold, and inlet designs for a continuous detonation engine. The contract contained the 2013 DFARS Clause. | • Ex. 104 <br> • Ex. 37 at Row 3 |
| 35 | On September 29, 2014, the Department of the Air Force (the "Air Force") awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0002,[14] to fabricate powerhead hardware for a scramjet technology program. The contract did not contain the DFARS Clause. | • Ex. 39 <br> • Ex. 37 at Row 5 |
| 36 | On September 30, 2014, the Navy awarded Aerojet contract # N68936-14-C-0035, to perform system optimization studies for defense weapons systems. The contract contained the 2013 DFARS Clause. | • Ex. 105 <br> • Ex. 37 at Row 8 |
| 37 | On September 30, 2014, the Air Force awarded Aerojet contract # FA8650-14-C-7424, to design the thrust chamber assembly for a bantam rocket engine. The contract was funded by the Defense Advanced Research Projects Agency ("DARPA"). The contract contained the 2013 DFARS Clause. | • Ex. 42 <br> • Ex. 37 at Row 7 |
| 38 | On December 11, 2014, NASA awarded Aerojet contract # NNC10BA02B, Award ID # NNC15TA07T, to conduct testing to advance key enabling technology for hypersonic propulsion systems. The contract itself did not contain the NFS Clause but stated that "all of the applicable clauses under [the parent award] are still applicable" and referenced particular regulations "for their specific importance to this Task Order." The parent award included the NFS Clause. | • Ex. 124 <br> • Ex. 121 at Row 14 |

---

[14]   Aerojet was awarded parent contract FA8650-13-D-2335 on May 10, 2013, with subsequent awards #0002, 0003, and 0004, named in Relator's SAC. The original parent award did not contain the DFARS Clause. *See* Ex 38.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 39 | On March 31, 2015, NASA awarded Aerojet contract # NNC15CA07C, to produce the NASA ion propulsion system for future space exploration and commercial use. The contract contained the NFS Clause. | • Ex. 125 |
| 40 | Prior to contracting with Aerojet, NASA determined that Contract No. NNC15CA07C would not require access to or storage of NASA Electronic Information or Information Technology ("IT") resources, meaning that Aerojet did not have access to information requiring protection under the NFS Clause. | • Ex. 123 at NASA_TOUHY00001128 (6/23/14 NASA form indicating that contract would require selected contractor to have access to NASA's systems or generate data with NASA or on behalf of NASA)<br>• Ex. 166 (interpreting Ex. 123 to mean that NFS Clause was not applicable) |
| 41 | Contract # NNC15CA07C does not reference any applicable documents related to, or that contain cybersecurity standards, such as NPR 2810.1, which outlines certain NIST 800-53 compliant technical requirements. | • Ex. 125<br>• Ex. 36 (NPR 2810.1A)<br>• Ex. 212 (NASA webpage reflecting cybersecurity policies)<br>• ECF No 119, Fact No. 21 |
| 42 | The NFS Clause was not applicable to Contract No. NNC15CA07C and Aerojet was not required to implement a NIST 800-53 compliant system for that contract. | • Ex. 123 at NASA_TOUHY00001128<br>• Ex. 125 |
| 43 | On April 8, 2015, the Air Force awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0003, to test engine operability and performance for scramjet technology. The contract did not contain the DFARS Clause. | • Ex. 40<br>• Ex. 37 at Row 9 |
| 44 | On July 27, 2015, NASA awarded Aerojet contract # NNC15VD08P, to perform an industry hypersonic propulsion capability assessment. The contract did not contain the NFS Clause. | • Ex. 126<br>• Ex. 121 at Row 17 |
| 45 | On September 15, 2015, the Defense Advanced Research Projects Agency ("DARPA") awarded Aerojet contract # HR001115C0132, to perform research and development for the High Altitude Velocity (HAVOC) program for the Air Force. The | • Ex. 41<br>• Ex. 37 at Row 15 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | contract incorporated by reference the 2013 DFARS Clause. | |
| 46 | On October 8, 2015, the Air Force awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0004, to conduct a performance analysis of flight four of X-51A. The contract did not contain DFARS Clause 252.204-7012. | • Ex.43<br>• Ex. 37 at Row 17 |
| 47 | On November 17, 2015, NASA issued Award No. NNM16AB22P to accommodate final payment to Aerojet on contract # NAS8-36801, though there is no writted record for this award. The government's records reflect that the contract was completed on July 11, 2017. | • Ex. 121 at Row 20<br>• ECF No 119, Fact No. 60 |
| 48 | On November 19, 2015, NASA awarded Aerojet contract # NNM16AA02C, to provide RS-25 rocket engines for the Space Launch System. The contract incorporated the NFS Clause by reference. | • Ex. 127<br>• Ex. 128<br>• Ex. 121 at Row 21 |
| 49 | On December 14, 2015, NASA awarded Aerojet contract # NNM16AB21P, to test a research engine for the purpose of demonstrating a RAMS injector. The contract did not contain the NFS Clause. | • Ex. 129<br>• Ex. 121 at Row 22 |
| 50 | On December 23, 2015, the Army awarded Aerojet undefinitized contract # W31P4Q-16-C-0026,[15] to manufacture Igniter rocket motors. The contract incorporated by reference the 2013 DFARS Clause. The definitized contract was signed on October 31, 2016. | • Ex. 72 at AR00234332, AR00234336.<br>• Ex. 73<br>• Ex. 37 at Row 19 |
| 51 | On January 15, 2016, NASA awarded Aerojet contract # NNH16CP17C, to participate in the NEXTSTEP program to develop capabilities and technologies for advanced propulsion systems, with commercial applications. The contract did not contain the NFS Clause. | • Ex. 130<br>• Ex. 121 at Row 23 |

---

[15]   Contract # W31P4Q-16-C-0026 is the correct, as-awarded contract number for contract W31P4Q-15-C-0016, which was named in Relator's complaint. SAC ¶¶ 66-68; *see also infra* Fact No. 58.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 52 | On April 1, 2016, NASA awarded Aerojet contract # NNM16AA12C, to manufacture RL10 rocket flight engines for SLS missions. The contract incorporated the NFS Clause by reference. | • Ex. 131<br>• Ex. 121 at Row 25 |
| 53 | Of the contracts identified in Relator's SAC, there are five DoD contracts that contain the DFARS Clause | • SAC ¶¶ 67-69; 85-114<br>• Ex. 71 (Contract No. W31P4Q-14-C-0075 without the DFARS Clause)<br>• Ex. 104 (Contract No. N00014-14-C-0035 with 2013 DFARS Clause)<br>• Exs. 72 & 73 (Contract No. W31P4Q-16-C-0026 with 2013 and 2016 DFARS Clauses)<br>• Ex. 105 (Contract # N68936-14-C-0035 with 2013 DFARS Clause)<br>• Ex. 42 (Contract No. FA8650-14-C-7424 with 2013 DFARS Clause)<br>• Ex. 39 (Contract No. FA8650-13-D-2335, Award ID # 0002 without DFARS Clause)<br>• Ex. 40 (Contract No. FA8650-13-D-2335, Award ID # 0003 without DFARS Clause)<br>• Ex. 43 (Contract No. FA8650-13-D-2335, Award ID # 0004 without DFARS Clause)<br>• Ex. 41 (Contract No. HR001115C0132 with the 2013 DFARS Clause) |
| 54 | Of the contracts identified in Relator's SAC, there are 4 NASA contracts that contain the NFS Clause. | • Ex. 122 (Contract No. NNC10BA13B, Award ID # NNC13TA66T incorporating the NFS Clause)<br>• Ex. 130 (Contract No. NNH16CP17C without NFS Clause)<br>• Ex. 131 (Contract No. NNM16AA12C with NFS Clause) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|     |                 | • Ex. 129 (Contract No. NNM16AB21P without NFS Clause)<br><br>• Ex. 127 (Contract No. NNM16AA02C with NFS Clause)<br><br>• Ex. 125 (Contract No. NNC15CA07C with the NFS Clause)<br><br>• Ex. 124 (Contract No. NNC10BA02B, Award ID # NNC15TA07T without the NFS Clause)<br><br>• Ex. 126 (Contract No. NNC15VD08P without the NFS Clause) |
| 55 | **As of 2017, only approximately 80% of contracts included the DFARS Clause as a contract term.** | • Ex. 21 at 33:3-11 (4/6/2017 DoD SBTW Presentation: "We're up to I think like, 80 percent of the time [the DFARS Clause] gets in [contracts], but not always."); *see also* Ex. 20 (video recording of same) |

**IV.   AEROJET DELIVERED THE GOODS AND SERVICES IT CONTRACTED TO PROVIDE THE GOVERNMENT.**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 56 | **Aerojet delivered the goods and services for which the government agencies paid on Contract Nos. W31P4Q-14-C-0075; N00014-14-C-0035; FA8650-13-D-2335, Award ID # 0002; N68936-14-C-0035; FA8650-14-C-7424; FA8650-13-D-2335, Award ID # 0003; NNM16AB22P; HR001115C0132; FA8650-13-D-2335, Award ID # 0004; W31P4Q-16-C-0026; NNC10BA13B, Award ID # NNC13TA66T; NNC10BA02B, Award ID # NNC15TA07T; NNC15CA07C; NNC15VD08P; NNM16AA02C; NNM16AB21P; NNH16CP17C; and NNM16AA12C.** | • Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data)<br><br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

**V.      AEROJET DISCLOSED ITS NONCOMPLIANCE WITH THE CYBERSECURITY**

2

**CLAUSES TO THE GOVERNMENT AND THE GOVERNMENT UNDERSTOOD**

3

**THAT AEROJET WAS NOT COMPLIANT.**

4

5

     **A.      Aerojet disclosed to the DoD that it was not compliant with the DFARS Clause or NIST 800-53 and the DoD Understood that Aerojet Was Not Compliant.**

6

       **1.      Aerojet's Contracts with the Army**: Aerojet disclosed that it was not

7

compliant with the DFARS Clause to the Army and the Army understood that Aerojet was not compliant.

8

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 57 | **Aerojet disclosed that it was not compliant with the DFARS Clause to the Army.** | • Ex. 76 (8/28/14 e-mail and attached letter taking exception to the DFARS Clause in Igniter contract)<br><br>• Ex. 77 (9/10/2014 e-mail from B. Joe to J. Nabity, noting AR "cannot confirm that we are compliant with this clause at this time.")<br><br>• Ex. 78 (9/29/2014 email noting 9/22/14 telecom and attached disclosure statement from B. Joe to J. Nabity)<br><br>• Ex. 79 (9/30/2014 email reflecting Army's understanding that Aerojet was "not compliant" with the DFARS Clause)<br><br>• Ex. 80 (10/2/2014 e-mail invite for teleconference to discuss AR position on DFARS)<br><br>• Ex. 82 (10/2/2014 Hewitt internal memo detailing teleconference discussion where AR disclosed non-compliance with DFARS)<br><br>• Ex. 83 at AR00035399-5405 (10/27/14 email and attached disclosure letter to Army providing compliance update)<br><br>• Ex. 84 (10/27/14 disclosure letter to Army providing compliance update)<br><br>• Ex. 85 (2/10/2015 email noting that "Aerojet provided a process to become compliant," and that "Contract Specialist is currently working … [to] obtain a waiver for the DFARS Clause.") |

28

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|     |                 | • Ex. 91 (4/16/2015 e-mail from B. Joe to C. McElyea responding that AR does "not have an ECD [estimated completion date] at this time[,]" for when it will be fully compliant with DFARS.) |
|     |                 | • Ex. 93 (6/15/2015 e-mail to M. Teasley providing additional information for "areas in which AR is not completely compliant[.]") |
|     |                 | • Ex. 95 (6/30/2015 e-mail from B. Joe to M. Teasley, Hewitt, and V. Michetti, attaching list of 7 items "in which AR says we are not compliant.") |
|     |                 | • Ex. 96 (6/30/2015 e-mail telecom invite to discuss DFARS with OSD and Army) |
|     |                 | • Ex. 98 (7/31/2015 e-mail with telecom invite to discuss DFAR compliance) |
|     |                 | • Ex. 101 (12/23/15 e-mail from J. Greene to M. Teasley updating Army that AR was still not compliant with NIST 800-171 or NIST 800-53 controls but would address "[i]dentified gaps in compliance" with POAMS) |
|     |                 | • Ex. 8 (Hewitt Dep.) at 25:14-26:4 (discussing a September 29, 2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause") |
|     |                 | • Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | September 29 letter "identified [Aerojet's] noncompliance") <br><br> • Ex. 8 (Hewitt Dep.) at 71:24-72:4 ("[i]t is my understanding that [Aerojet] [was] still not in compliance, based on the information attached to this e-mail") |
| 58 | On August 28, 2014, Aerojet sent the Army a letter stating that it took exception to the DFARS Clause in connection with Contract No. W31P4Q-14-C-0157, which was eventually awarded to Aerojet as Contract No. W31P4Q-16-C-0026. | • Ex. 76 (Aerojet's conditional acceptance taking exception to the DFARS Clause) <br><br> • Ex. 8 (Hewitt Dep.) at 54:11-13 (testifying Aerojet never accepted W31P4Q-14-C-0157) <br><br> • Ex. 82 (noting the change from W31P4Q-14-C-0157 to W31P4Q-15-C-0016) <br><br> • Ex. 8 (Hewitt Dep.) at 66:20–22 ("Aerojet did not sign . . . W31P4Q-15-C-0016 . . . .") <br><br> • Ex. 8 (Hewitt Dep.) at 73:10-19 (testifying that the solicitation was reissued as W31P4Q-14-R-0109, Amendment 2 on August 10, 2015) <br><br> • Ex. 73 at AR00234357 (signed definitized Contract No. W31P4Q-16-C-0026) <br><br> • Ex. 37 at cells 19B & 19L (reflecting that contract W31P4Q-16-C-0026 resulted from solicitation W31P4Q-14-R-0109) |
| 59 | On September 10, 2014, in connection with Contract No. W31P4Q-16-C-0026, Aerojet indicated that it could "not confirm that [Aerojet] [is] compliant with [the DFARS] clause at this time." | • Ex. 77 |
| 60 | On September 22, 2014, Aerojet disclosed its non-compliance with the DFARS Clause to the Army during a teleconference in connection with Contract No. W31P4Q-16-C-0026. | • Ex. 78 |
| 61 | On September 29, 2014, Aerojet sent the Army a letter in connection with Contract No. W31P4Q-16-C-0026 stating that it was not compliant with the DFARS Clause and that it | • Ex. 78 <br><br> • Ex. 81 <br><br> • Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | only had 10 NIST 800-53 "controls in place and compliant." | that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("With this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance") |
| 62 | The Army read Aerojet's September 29, 2014 letter and understood that it "documented their non-compliance with DFARS Clause 252.204-7012." | • Ex. 78<br>• Ex. 81<br>• Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance") |
| 63 | On September 29, 2014, Aerojet and the Army had a teleconference in which Aerojet disclosed that it was not compliant with the DFARS Clause. | • Ex. 81<br>• Ex. 8 (Hewitt Dep.) at 25:14-26:4 ("one of the topics concerned as to how much Aerojet did not comply with the DFARS clause") |
| 64 | On September 29, 2014, Aerojet e-mailed Army contracting officers and explained that Aerojet "is working diligently in bringing all of our [NIST] controls to full compliance with the DFARS Clause." | • Ex. 79<br>• Ex. 81 |
| 65 | On September 30, 2014, a contracting officer for the Army recognized that Aerojet's | • Ex. 79<br>• Ex. 81 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | communications reflected "the areas that Aerojet Rocketdyne are not compliant." | • Ex. 82 |
| 66 | On October 1, 2014, Aerojet requested a teleconference with the Army "to further discuss" the DFARS Clause, which was held on October 2, 2014. Relator, along with Aerojet's cybersecurity experts, participated in the teleconference. The Army summarized the call as Aerojet "mainly re-stat[ing] Aerojet's non-compliance issues with [the DFARS Clause] and how they worked it out with the Air Force and Navy." | • Ex. 82 <br> • Ex. 80 |
| 67 | On October 27, 2014, Aerojet sent a letter to the Army stating that the attachment which described Aerojet's status with respect to NIST 800-53 control implementation showed "the specific 7 areas in which [Aerojet] is in substantial compliance to the requirements of [the DFARS Clause]." | • Ex. 83 at AR00035400. |
| 68 | On February 10, 2015, a contracting officer from the Army indicated that she understood that "Aerojet provided a process to become compliant" with the DFARS Clause and that the Army wanted to obtain a waiver. | • Ex. 85 |
| 69 | In March 2015, the Army sent Aerojet's October 27, 2014 letter to the DoD Office of the Chief Information Officer (the "DoD OCIO") along with a memorandum stating that the Army concluded that Aerojet's letter stated "compliance issues they may have with the requirements [in the DFARS Clause]." | • Ex. 86 |
| 70 | On April 2, 2015, the DoD OCIO sent a memorandum to the Army concluding that Aerojet was "not in compliance with the requirements of the subject DFARS Clause." | • Ex. 89 |
| 71 | On April 14, 2015, the Army requested an estimate date that Aerojet would be compliant with the DFARS Clause. Aerojet stated that it did not currently have an estimated completion date for compliance. | • Ex. 91 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 72 | On May 14, 2015, the Army requested a waiver of the DFARS Clause from the DoD OCIO for Contract No. W31P4Q-16-C-0026. | • Ex. 92 |
| 73 | On May 21, 2015, the DoD OCIO informed the Army that it concluded that Aerojet was "not compliant with the DFARS Clause" but that there was "nothing to preclude [the Army] from awarding the contract" to Aerojet. | • Ex. 94 at AR00218330. |
| 74 | On June 15, 2015 and June 30, 2015, Aerojet disclosed to the Army a "list of the 7 areas in which [Aerojet] is not completely compliant" with the DFARS Clause. | • Ex. 93<br>• Ex. 95 |
| 75 | Aerojet made its cybersecurity experts available to the Army on June 30, 2015, via teleconference, to discuss Aerojet's non-compliance with the DFARS Clause. | • Ex. 97<br>• Ex. 96 |
| 76 | Aerojet conducted another teleconference with the Army on August 3, 2015 in which Aerojet discussed its non-compliance with the DFARS Clause. | • Ex. 98 |
| 77 | On August 13, 2015, Aerojet sent the Army an updated matrix regarding its DFARS Clause compliance status. | • Ex. 89 |
| 78 | On December 23, 2015, Aerojet sent a signed version of undefinitized Contract No. W31P4Q-16-C-0026 with a cover e-mail disclosing that it was not compliant with the 2013 DFARS Clause as it was only "fully compliant in meeting 24 [of the 60] security controls and identified 36 alternative controls . . . ." | • Ex. 101 |
| 79 | On March 31, 2016, the project manager for Contract No. W31P4Q-16-C-0026 concluded that the DFARS Clause was not applicable to the contract because the contract did not involve UCTI. | • Ex. 102 |
| 80 | The Army understood that Aerojet was not compliant with the 2013 DFARS Clause. | • Ex. 86 at AFDODCIO000109.<br>• Ex. 91 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | • Ex. 94 (5/27/2015 e-mail from M. Teasley to B. Joe relaying OSD interpretation of compliance) |
| | | • Ex. 79 |
| | | • Ex. 81 (10/1/2014 timeline re Igniters contract) |
| | | • Ex. 82 (10/2/2014 Hewitt internal memo detailing teleconference discussion where AR disclosed non-compliance with DFARS) |
| | | • Ex. 85 (2/10/2015 email noting that "Aerojet provided a process to become compliant," and "Contract Specialist is currently working … [to] obtain a waiver for the DFARS Clause.") |
| | | • Ex. 8 (Hewitt Dep.) at 25:14-26:4 (discussing a 9/29/2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause") |
| | | • Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance") |
| | | • Ex. 8 (Hewitt Dep.) at 67:21-23 ("It was my understanding that on February 10, 2015, Aerojet was still |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | not in compliance with the DFARS Clause.")<br>• Ex. 8 (Hewitt Dep.) at 71:24-72:4 ("[i]t is my understanding that [Aerojet] are still not in compliance, based on the information attached to this e-mail") |

**2. Aerojet's Contracts with the Navy**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Navy and the Navy understood that Aerojet was not compliant.

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 81 | Aerojet disclosed that it was not compliant with the DFARS Clause to the Navy. | • Ex. 110<br>• Ex. 111<br>• Ex. 112, ¶ 3 |
| 82 | Aerojet sent the Navy a letter in connection with N68936-14-C-0035 on September 30, 2014 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." | • Ex. 110<br>• Ex. 111 |
| 83 | On September 30, 2014, the contracting officer for Contract No. N68936-14-C-0035 acknowledged receipt of Aerojet's September 30, 2014 letter and "accepted" Aerojet's conditional acceptance of the contract. | • Ex. 111<br>• Ex. 112, ¶ 3 |
| 84 | The contracting officer for Contract No. N00014-14-C-0035 found no documents related to the DFARS Clause in a search of his files. | • Ex. 113, ¶ 5 |
| 85 | The Navy understood that Aerojet was not compliant with the 2013 DFARS Clause. | • Ex. 111<br>• Ex. 112, ¶ 3, Ex. 1 (reflecting acceptance of Aerojet's disclosure statement). |

**3. Aerojet's Contracts with the Air Force**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Air Force and the Air Force understood that Aerojet was not compliant.

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 86 | Aerojet disclosed that it was not compliant with the DFARS Clause to the Air Force. | • Ex. 56 (8/7/2014 internal AF e-mail summarizing telecom with AR, noting that Aerojet is "not fully |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | compliant yet" with the DFARS Clause) |
| | | • Ex. 55 at AIRFORCE_TOUHY00000006-007 (9/6/14 - 9/8/14 e-mail chain between AR and the AF, discussing 9/8/14 telecom with DCMA ACO re DFARS non-compliance noting that "Aerojet discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance.") |
| | | • Exs. 59-61 (disclosure letter sent to Air Force and DARPA representatives) |
| | | • Ex. 61 at AIRFORCE_TOUHY00000002-03 (9/18/2014 email to Air Force and DARPA noting 9/16/2014 teleconference which discussed DFARS Clause, and attaching updated compliance matrix from version presented in meeting) |
| | | • Ex. 65 (6/17/2015 e-mail to Air Force, attaching compliance matrix noting that "AR is compliant with the majority of the clause's requirements.") |
| | | • Ex. 66 (6/17/2015 e-mail exchange between J. Nishikawa and Cpt. Shannon, noting that AR is "not fully compliant with the subject DFARS clause.") |
| | | • Ex. 67 (6/22/2015 e-mail invite to telecom with AF and DCMA to discuss AR compliance with DFARS) |
| | | • Ex. 68 (6/23/2015 e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark) |
| 87 | After discussing the DFARS Clause with Aerojet, a representative from DARPA who | • Ex. 54 at AR00196693 |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
|  | was assisting with (and funding) the procurement, indicated that a contracting officer from the Air Force for Contract No. FA8650-14-C-7424 was "willing to work with [Aerojet] to find a way to move forward [with the contract] while making sure [Aerojet] makes good-faith progress toward compliance." | • Ex. 37 at row 6 (reflecting that DARPA was the funding agency for the Air Force award) |
| 88 | On July 24, 2014, Aerojet disclosed that it was not compliant with the DFARS Clause to contracting officials from the Air Force on Contract No. FA8650-14-C-7424. | • Ex. 56 |
| 89 | Contracting officials from the Air Force on Contract No. FA8650-14-C-7427 understood from the teleconference with Aerojet on July 24, 2014 that Aerojet was not compliant with the DFARS Clause. | • Ex. 56 |
| 90 | On August 7, 2014, Aerojet disclosed again that it was not compliant with the DFARS Clause to contracting officials from the Air Force on Contract No. FA8650-14-C-7424. | • Ex. 56 |
| 91 | Contracting officials from the Air Force on Contract No. FA8650-14-C-7427 understood from the teleconference with Aerojet on August 7, 2014 that Aerojet was not compliant with the DFARS Clause. | • Ex. 56 |
| 92 | On August 28, 2014, Aerojet told an Air Force representative in connection with Contract No. FA8650-14-C-7424 that it was "continu[ing] to work the issues / actions associated with [the DFARS Clause]." | • Ex. 57 |
| 93 | On September 8, 2014, Aerojet, including individuals from its IT department participated in a teleconference with DCMA, regarding Contract No. FA8650-14-C-7424, in which Aerojet disclosed that it had a "company plan to reach compliance" with the DFARS Clause. | • Ex. 55 at AIRFORCE_TOUHY00000006-007 (9/6/14 - 9/8/14 e-mail chain between AR and the AF, discussing 9/8/14 telecom with DCMA ACO re DFARS non-compliance noting that "Aerojet discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance.") |
| 94 | On September 18, 2014, Aerojet sent a disclosure letter to the Air Force in | • Exs. 59-61 |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
|  | connection with Contract No. FA8650-14-C-7424 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." |  |
| 95 | On September 19, 2014, an Air Force contracting officer for Contract No. FA8650-14-C-7424 concluded that Aerojet "submitted sufficient information required by the clause to determine that an 'alternative controls' is in place" and suggested sending a letter reflecting that conclusion. | • Ex. 63 |
| 96 | On September 26, 2014, the Air Force provided a letter to Aerojet regarding Contract No. FA8650-14-C-7424 stating that Aerojet had "provided a detailed analysis of its compliance status" for the applicable NIST 800-53 controls and that it understood that Aerojet "ha[d] developed a phased approach which will assist in efforts to become fully compliant [with the NIST 800-53] controls in the future." | • Ex. 64 |
| 97 | On June 17, 2015, Aerojet sent a disclosure letter to the Air Force stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." The Air Force responded that its "only take away after reading it several time[s] was [Aerojet] is not compliant with [the DFARS Clause." Aerojet confirmed that it was "not fully compliant with the subject DFARS Clause[.]" | • Ex. 65<br>• Ex. 66 |
| 98 | On June 23, 2015, Aerojet discussed its compliance with the DFARS Clause during a teleconference with the Air Force. | • Ex. 67<br>• Ex. 68 |
| 99 | On June 23, 2015, Aerojet sent the Air Force a letter "providing an updated response that is specific to [its] commitment and compliance plan for the GBSD Trade Study A (Post Boost Propulsion program)" and indicating that Aerojet would put special controls in place for the GBSD program. | • Ex. 68 |
| 100 | The Air Force understood that Aerojet was not compliant with the 2013 DFARS Clause. | • Ex. 64 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|     |                 | • Ex. 62 (noting DARPA's acceptance of AR's "reasonable plan to comply") |
|     |                 | • Ex. 54 at AR00196693 (7/21/2014 email from DARPA program manager, noting conversations with Air Force, indicating that they were willing to work with AR "to find a way to move forward while making sure AR makes good-faith progress toward full compliance.") |
|     |                 | • Ex. 58 at AR00228740 (9/10/2014 email from DARPA program manager to AR, discussing efforts to come to resolution on DFAR-compliant contract, and noting AF openness to "solutions that do not require AR to sign a contract with which it cannot comply.") |
|     |                 | • Ex.63 (9/19/2014 email and subsequent chain from Air Force to Aerojet, noting acceptance of alternate controls and proposed letter to this effect) |
|     |                 | • Ex. 64 (Letter from M. Voiles (Air Force) to J. Capizzi (Aerojet Contracting) noting that the Air Force accepted AR's alternate control approach and understands "that AR has developed a phased approach which will assist in its efforts to become fully compliant in the future.") |

4.  **Aerojet's Contracts with DARPA**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Defense Advanced Research Projects Agency, which understood that Aerojet was not compliant.

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 101 | **Aerojet disclosed that it was not compliant with the DFARS Clause to the Defense Advanced Research Projects Agency ("DARPA").** | • Ex. 54 at 196693 (7/21/2014 e-mail reflecting DARPA's acknowledgement that Aerojet was working toward compliance with the DFARS Clause) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | • Ex. 58 |
| | | • Ex. 59-61 (9/18/2014 email to Air Force and DARPA noting 9/16/2014 teleconference regarding DFARS Clause, and attaching updated compliance matrix from version presented in meeting) |
| 102 | Aerojet disclosed that it was not compliant with the DFARS Clause to DARPA at least by July 21, 2014. | • Ex. 54 at 196693 |
| 103 | On September 10, 2014, DARPA e-mailed Aerojet indicating that it understood that Aerojet could not comply with the DFARS Clause if it was included in a contract. | • Ex. 58 at AR00228741 |
| 104 | After a September 16, 2014 teleconference discussing its compliance status, on September 18, 2014, Aerojet sent a disclosure letter to DARPA stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." | • Exs. 59-61 |
| 105 | Discussing Aerojet's September 18, 2014 letter, a DARPA program manager indicated that she did not believe the "new Gov't [DFARS] clause was [] well thought through" and that Aerojet "had a reasonable plan to comply" with the DFARS Clause. | • Ex. 62 |
| 106 | DARPA understood that Aerojet was not compliant with the 2013 DFARS Clause. | • Ex. 54 at 196693<br>• Ex. 62 (noting DARPA's acceptance of AR's "reasonable plan to comply") |

5.     Aerojet disclosed that it was not compliant with the DFARS Clause to the DoD OCIO, which understood that Aerojet was not compliant.

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 107 | The "DoD CIO is responsible for all matters relating to the DoD information enterprise, such as cybersecurity, communications, information systems, and more." | • ECF No 119, Fact No. 23 |
| 108 | The DoD OCIO was made aware that Aerojet was not compliant with the DFARS Clause. | • Ex. 86 (3/12/2015 letter from Army to DoD OCIO noting that AR |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | "informed the Government they were not in full compliance with DFARS" and attaching compliance matrix.)<br><br>• Ex. 89 (3/17/2015 e-mail from DoD OCIO to Army noting they were reviewing AR's compliance matrix)<br><br>• Ex. 89 at AFDODCIO000003 (4/2/2015 letter from OCIO Army concluding that Aerojet "is clearly not in compliance[,]" with certain DFARS controls.)<br><br>• Ex. 94 (5/27/2015 e-mail chain between Hewitt and V. Michetti discussing how AR can become compliant with DFARS)<br><br>• Ex. 95 (6/30/2015 e-mail from B. Joe to M. Teasley, Hewitt, and V. Michetti, attaching list of 7 items "in which AR says we are not compliant.") |
| 109 | In March 2015, the DoD OCIO received Aerojet's October 27, 2014 letter that was sent to the Army to along with a memorandum stating that the Army concluded that Aerojet's letter stated "compliance issues they may have with the requirements [in the DFARS Clause]." | • Ex. 86 |
| 110 | The DoD concluded after reviewing Aerojet's October 27, 2014 letter that Aerojet was "not compliant [with the DFARS Clause]." | • Ex. 86<br>• Ex. 89 |
| 111 | On May 20, 2015, the DoD OCIO suggested a teleconference with Aerojet to discuss its non-compliance with the DFARS Clause. | • Ex. 92 |
| 112 | The DoD OCIO stated that "the DFAR[S] does not require compliance with the controls prior to award" and stated that there was "nothing to preclude [the Army] from awarding the contract [to Aerojet]." | • Ex. 92 |

DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 113 | On June 30, 2015, Aerojet disclosed to the OCIO a "list of the 7 items in which [Aerojet] [was] not compliant" with the DFARS Clause. | • Ex. 93<br>• Ex. 95 |
| 114 | Aerojet made its cybersecurity experts available to the DoD OCIO on June 30, 2015, via teleconference, to discuss Aerojet's non-compliance with the DFARS Clause. | • Ex. 97 (7/1/2015 E-mail from Doug Smith summarizing call with members of the DoD OCIO)<br>• Ex. 96 (meeting invite including DoD CIO members for 6/30/2015 meeting) |
| 115 | The DoD understood that Aerojet was not compliant with the 2013 DFARS Clause. | • Ex. 88 at 287-288 (3/23/2015 internal OCIO e-mail from V. Michetti acknowledging "we know that [AR] are not compliant from what was submitted.")<br>• Ex. 89 (4/2/2015 letter from V. Michetti (OCIO) to C. McElyea (Army), stating AR "is clearly not in compliance[,]" with certain DFARS controls.)<br>• Ex. 97 (7/1/2015 AR e-mail recounting comments from teleconference with OCIO)<br>• Ex. 82 (10/2/14 memo re teleconference with Aerojet)<br>• Ex. 94 at AR00218330 (5/21/2015 E-Mail from OCIO to Army stating the OCIO determined that AR is not compliant but "it may be a relatively simple matter" to become compliant and "seems to have done most of what is required")<br>• Ex. 8 (Hewitt Dep.) at 68:2-69:1 (DoD concluded that Aerojet's disclosure indicated that it was not in compliance with the DFARS Clause), 69:20-70:2 ("it was my understanding that [DoD's OCIO's] Ms. Michetti believed [Aerojet] was still noncompliant") |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6.   **Aerojet disclosed that it was not compliant with the DFARS Clause to Other DoD Agencies, which understood that Aerojet was not compliant.**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 116 | Aerojet disclosed that it was not compliant with the DFARS Clause to the Missile Defense Agency ("MDA") at least by to June 29, 2015. On June 30, 2015, Aerojet provided additional detail regarding its non-compliance and its plan toward compliance with NIST 800-53. | • Ex. 116 (response to MDA questions with compliance matrix and updated explanatory controls statement) |
| 117 | On July 1, 2015, MDA determined that "Aerojet ha[d] met the requirements stated in the DFARS clause" and recognized that Aerojet had "items that [were] not fully compliant" and requested that Aerojet track them "via POA&M with periodic updates" to MDA. | • Ex. 117 |
| 118 | On July 2, 2015, MDA awarded Aerojet Contract No. HQ0147-15-C-0010. Relator congratulated the Aerojet team: "Our efforts yesterday paid off. We got the 12.5MM award from the MDA!" | • Ex. 117 |
| 119 | On December 16, 2015, Aerojet met with representatives from the MDA and provided a detailed presentation on its compliance gap analysis. After the presentation, the MDA said Aerojet had the "best plan, only detailed plan they [had] seen" to reach compliance. | • Ex. 118 (internal AR e-mail recounting presentation to MDA attaching slide deck presented to MDA detailing DFARS compliance strategy) |
| 120 | In response to Aerojet's presentation to the MDA in December 2015, MDA stated that they "underst[oo]d the path forward" and removed the DFARS Clause from a contract modification. | • Ex. 119 |
| 121 | On June 22, 2015, Aerojet sent a disclosure letter to the Defense Contract Management Agency (the "DCMA") stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." | • Ex. 67 |
| 122 | On June 23, 2015, Aerojet discussed its non-compliance with the DFARS Clause during a teleconference with the DCMA. | • Ex. 67 |
| 123 | The DCMA concluded on June 22, 2015, after reviewing Aerojet's June 17, 2015 letter to the | • Ex. 115 |

146

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | Air Force, that Aerojet was "not fully in compliance with the solicitations DFAR requirements to safeguard unclassified controlled technical information as per [the DFARS Clause]." | |
| 124 | There is no evidence that Aerojet represented to any DoD component that its enterprise system was fully technically compliant with NIST 800-53. | • Ex. 7 (Markus Dep.) at 331:3-11; 112:22-113:23 (asked whether Aerojet's disclosure statement states Aerojet is fully compliant with the DFARS Clause and testifying "No, I don't see words that say we are DFARS compliant")<br>• Ex. 8 (Hewitt Dep.) at 64:17-18 ("At no time did Aerojet say that they were compliant with the DFARS Clause.") |
| 125 | The Defense Contract Management Agency determined after an audit that Aerojet was fully technically compliant with the NIST SP 800-171 controls in February 2021. | • Ex. 120 |
| 126 | After Aerojet disclosed to the MDA that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, MDA continued to award Aerojet contracts. | • ECF No 119, Fact No. 41.<br>• Ex. 37 (reflecting 5 contracts awarded since 7/2/2015) |

**B.      Aerojet Disclosed to NASA That Its System Was Not Compliant with NIST 800-53 and Provided Details Regarding Its Cybersecurity Posture and NASA Indicated That Compliance Was Not Material.**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 127 | Aerojet, prior to merging with Pratt Whitney Rocketdyne, disclosed to NASA that it had "gaps" in its compliance with NIST 800-53 and discussed those gaps with NASA. | • Ex. 149 |
| 128 | When Aerojet submitted its proposal in connection with Contract No. NNM16AA02C in or around June 18, 2015, Aerojet stated that it was "not fully compliant per the Security Requirements for Unclassified Information Technology Resources at this time." | • Ex. 153 |
| 129 | Aerojet periodically submitted Contractor Information Technology Security | • Ex. 150 (12/16/2013) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | Management Plans ("IT SMPs") to NASA discussing how Aerojet protected NASA's information, in some instances, explaining how Aerojet's policies and procedures fit within the NIST 800-53 framework. | • Ex. 158 (12/10/2015)<br>• Ex. 159 (evidence of submission)<br>• Ex. 179 (1/23/2017)<br>• Ex. 176 (5/4/2017)<br>• Ex. 157 at AR00052685 (10/1/15)<br>• Ex. 152 |
| 130 | NASA accepted Aerojet's IT SMPs. | • Ex. 152 at AR00232667<br>• Ex. 155 |
| 131 | Aerojet agreed to provide access to its facilities, installations, operations, documentation, databases, and personnel at NASA's request to "carry out IT security inspection, investigation, and/or audits" to safeguard NASA information. | • Ex. 151 |
| 132 | In July 2015, NASA responded to Aerojet's submission of an IT SMP and requested for Aerojet to include "a program plan to address all aspects required by NPR 2810.1A" including security controls compliant with NIST 800-53, reflecting that NASA did not expect full compliance with the requirements. | • Ex. 154 at AR00067326. |
| 133 | On August 31, 2015, NASA informed Aerojet of certain "security controls that may be needed to be implemented," but that NASA did not know which controls would need to be implemented at that time. NASA told Aerojet not to "get wigged out" because NASA was there "to support and contribute to [Aerojet's success in . . . making sure the systems are protected with minimum security baselines in place." | • Ex. 156 |
| 134 | On February 16, 2016, Aerojet made a presentation to NASA briefing representatives on the status of Aerojet's cybersecurity and efforts to comply with NIST SP 800-53. During its presentation, Aerojet informed NASA that it was not compliant with 167 of the NIST SP 800-53 controls. | • Ex. 162 (2/16/16 Presentation and Compliance Gap Analysis)<br>• Ex. 160 (2/16/16 e-mail discussing NASA presentation, and noting further planned technical information exchange with NASA)<br>• Ex. 161 (2/16/16 e-mail discussing NASA presentation, noting that AR gave NASA "an entire 45 minutes of |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | discussion" and presented them with the data.) |
| 135 | Based on Aerojet's February 2016 presentation, NASA understood that Aerojet had a "burn down plan" for its non-compliant controls. | • Ex. 168 at AR00022461. |
| 136 | On February 17, 2016, a NASA contracting officer indicated that for Contract No. NNC15CA07C, nobody "paid much attention to [the NFS Clause][,]" and further noted that the signed GRC-1707 form for the contract indicated that Aerojet "would NOT be subject to the requirements that the clause describes." The contracting officer noted that the Clause may have been "include[d]" just in case" and that he could "easily delete [it] . . . and explain . . . why [he] accidentally added this clause in the first place." | • Ex. 163 |
| 137 | On February 18, 2016, a NASA contracting officer suggested that the information Aerojet provided under the NFS clause would likely not "be worthwhile to us or even AR[,]" for Contract No. NNC15CA07C, and stated that he "could always still delete the clause[.]" | • Ex. 164 |
| 138 | On February 17, 2016, in response to Aerojet's submission of an IT SMP for Contract No. NNM16AA02C, NASA approved Aerojet's submittal with comments and requested a dialogue with Aerojet regarding its cybersecurity policies and procedures. | • Ex. 165 at AR00023815. |
| 139 | On March 4, 2016, in response to NASA's request for a discussion, Aerojet's cybersecurity experts had a meeting with NASA regarding Aerojet's cybersecurity posture and provided NASA with contact information for everyone on Aerojet's cybersecurity team. After the meeting, Aerojet's cybersecurity expert, David Chamberlain, was provided access to NASA's system "to complete future questions as they [were] required" with respect to Aerojet's cybersecurity. | • Ex. 167<br>• Ex. 173 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 140 | On March 17, 2016, Aerojet provided an updated IT SMP for Contract No. NNM16AA02C in accordance with NASA's comments and March 4, 2016 meeting, which was approved on June 6, 2016. | • Ex. 152 |
| 141 | On June 22, 2016, Aerojet updated NASA on the status of its non-compliance with NIST 800-53, stating that it had "improved our overall compliance to the applicable NIST 800-53 security controls from 24% to 50%. NASA responded that "this is a very good effort on [Aerojet]'s part" and that it "greatly appreciated [Aerojet] sharing th[e] information with" NASA. | • Ex. 168 at AR00022459-60. |
| 142 | On July 3, 2016, the NASA contracting officer on Contract No. NNC15CA07C indicated the NFS clause was "in his blind spot" when entering into the contract. | • Ex. 174 |
| 143 | NASA reviewed Aerojet's explanatory control statement which described Aerojet's cybersecurity posture and indicated on July 20, 2016 that the document was "well written" and was "a very good document." | • Ex. 175 at AR00020134-35. |
| 144 | On August 11, 2016, Aerojet provided an update to NASA regarding its closure of compliance gaps with respect to NIST 800-53, stating that it had completed closing documentation gaps. | • Ex. 172 at AR00017843-44. |
| 145 | On August 16, 2016, Aerojet met with NASA, including representatives on Contract Nos. NNM16AA02C and NNM16AA12C to discuss Aerojet's NFS Clause compliance. During that meeting, Aerojet "reviewed [its] compliance metrics and plan/stats for transition . . . to an IT outsource provider." NASA acknowledged that Aerojet "had made great progress toward full compliance with [its] documentation compliance gap closure efforts and indicated that they felt [Aerojet] had a solid plan going forward to nail down our technical compliance through the outsourcing initiative." | • Ex. 169<br>• Ex. 170 (reflecting Aerojet's desire to "continue to be transparent and forthcoming with [NASA].") |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 146 | On October 14, 2016, Aerojet provided another compliance matrix to NASA detailing its continued progress toward compliance with NIST SP 800-53, including informing NASA that it was not compliant with 130 of the NIST SP 800-53 Controls. | • Ex. 171 |
| 147 | On October 19, 2016, Aerojet had a teleconference with NASA in which Aerojet gave NASA "an update on [Aerojet's] plan to become completely compliant with NFS." | • Ex. 172 |
| 148 | Aerojet submitted IT SMPs to NASA on Contract No. NNM16AA12C beginning in November 2016, which NASA approved. Aerojet indicated that Aerojet "does not develop or document policies and procedures addressing minimum security requirements following the guidelines of the [NIST] Certification and Accreditation (C&A) for all systems containing" NASA data. However, Aerojet stated that it would "adhere to [Aerojet] Cybersecurity Policies, Procedures and Standards to meet the [NASA] requirements" and went on to detail the policies and procedures Aerojet had in place. | • Ex. 179<br>• Ex. 177 |
| 149 | On January 20, 2017, Aerojet met with NASA and presented on its strategy to bring its systems into compliance with NIST 800-53.[16] Aerojet informed NASA that it was not compliant with 107 of the NIST SP 800-53 Controls. | • Ex. 178 |
| 150 | On January 23, 2017, Aerojet submitted an IT SMP to NASA in connection with Contract No. NNM16AA12C stating "[a]s a part of our ongoing efforts to enhance IT security controls, AR completed a gap analysis of our enterprise infrastructure to assess our IT security posture . . . [i]dentified gaps in compliance with the specific security controls . . . as defined in the National Institute of | • Ex. 179 at AR00232652 |

---

[16] Aerojet's January 2017 meeting with NASA was conducted, in part, to address NASA's rejection of one invoice based on NASA's disapproval of Aerojet's System Security Plan for Contract No. NNC16CA21C. After discussions with Aerojet, NASA approved Aerojet's IT System Security Plan and paid the invoice. *See* Ex. 148.

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | Standards and Technology (NIST) Special Publication (SP) 800-53 . . . have been documented in Plans of Action and Milestones (POA&Ms) and closure will be addressed . . . technical gaps will be addressed incrementally through 2017[.]" | |
| 151 | In September 2017, in connection with Contract No. NNC15CA07C Aerojet updated NASA on its plan to outsource its cybersecurity and detailed remediation efforts Aerojet and its provider were taking with respect to certain NIST 800-53 controls. Aerojet provided additional status updates regarding its progress and indicated that, though it was not yet compliant with NIST 800-53, it intended to be compliant by December 31, 2017. | • Ex. 180 |
| 152 | NASA responded to Aerojet's disclosure of its non-compliance acknowledging that Aerojet had made "good progress per [its] remediation plan" and thanked Aerojet for its "diligent efforts" and "open, transparent communications" which "demonstrate[d] a path to success." | • Ex. 180 at AR00229090 & AR00229095 |
| 153 | NASA understood that Aerojet did not have a system in place that was compliant with either NPR 2810.1 or NIST 800-53. | • Ex. 162<br>• Ex. 160<br>• Ex. 161<br>• Ex. 168 at AR00022461<br>• Ex. 167<br>• Ex. 168 at AR00022459-60.<br>• Ex. 175 at AR00020134-35.<br>• Ex. 169<br>• Ex. 171<br>• Ex. 172<br>• Ex. 178<br>• Ex. 180 at AR00229090 & AR00229095 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 154 | **In 2019, Aerojet received a NASA Silver Achievement Medal for its cybersecurity efforts.** | • Ex. 181 |

## VI.   THE GOVERNMENT PAID AEROJET AND CONTINUED TO CONTRACT WITH AEROJET DESPITE KNOWING OF AEROJET'S NON-COMPLIANCE.

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 155 | **None of the contracts alleged in the SAC were terminated based on Aerojet's non-compliance with the DFARS or NFS Clauses.** | • SAC ¶¶ 67-68, 84-119<br>• Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts)<br>• Ex. 113, ¶¶ 3-4<br>• Ex. 185, ¶¶ 4-5<br>• Ex. 184, ¶¶ 4-5<br>• Ex. 183, ¶¶ 4-5<br>• Ex. 182, ¶¶ 4-5<br>• Ex. 112, ¶ 5<br>• Ex. 114, ¶ 4 |
| 156 | **Aerojet has provided the contracted-for goods and services for the at-issue contracts.** | • Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts) |
| 157 | **The government has not rejected any of the contracted-for goods or services for the contracts listed in Relator's SAC based on Aerojet's non-compliance with the DFARS or NFS Clauses.** | • Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | and ongoing contracts)Ex. 113, ¶¶ 2, 4<br><br>• Ex. 185, ¶ 3<br><br>• Ex. 112, ¶¶ 4-5<br><br>• Ex. 184, ¶ 3<br><br>• Ex. 183, ¶ 3<br><br>• Ex. 182, ¶ 3 |
| 158 | The government has not rescinded any payments or sought reimbursement for any of the goods or services Aerojet delivered for the at-issue contracts based on Aerojet's non-compliance with the DFARS or NFS Clauses. | • Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br><br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts)Ex. 113, ¶¶ 2, 4<br><br>• Ex. 185, ¶ 3<br><br>• Ex. 112, ¶¶ 4-5<br><br>• Ex. 184, ¶ 3<br><br>• Ex. 183, ¶ 3<br><br>• Ex. 182, ¶ 3 |
| 159 | The United States Department of Justice conducted an investigation into Relator's claims and declined to intervene. | • Ex. 1 (1/26/2017 Civil Investigative Demand to Aerojet)<br><br>• Ex. 2 (8/5/2016 Civil Investigative Demand to Emagined Security)<br><br>• Ex. 3 (8/5/2016 Civil Investigative Demand to Ernst & Young LLP)<br><br>• Exs. 3 & 4 (reflecting correspondence regarding interviews of Aerojet employees pursuant to Civil Investigative Demand to Aerojet)<br><br>• ECF No 119, No. 70<br><br>• ECF No. 25 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

**A.    The Army continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 160 | After Aerojet disclosed to the Army that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Army continued to award Aerojet contracts. | • ECF No 119, Fact No. 35<br>• Ex. 37 (reflecting 30 contracts awarded since 9/26/2014) |
| 161 | Aerojet submitted invoices to the Army on Contract No. W31P4Q-14-C-0075, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 74<br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 162 | The Army paid all invoices on Contract No. W31P4Q-14-C-0075. | • Ex. 75<br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 163 | Contract No. W31P4Q-14-C-0075 was successfully completed on January 31, 2016. | • ECF No 119, Fact No. 53<br>• Ex. 37 at cell 2F |
| 164 | Aerojet submitted invoices to the Army on Contract No. W31P4Q-16-C-0026, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 165 | The Army paid all invoices on Contract No. W31P4Q-16-C-0026. | • Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 166 | Contract No. W31P4Q-16-C-0026 was successfully completed on August 1, 2017. | • ECF No 119, Fact No. 54<br>• Ex. 37 at cell 19F |
| 167 | The Army continued to award Aerojet contracts after this lawsuit was filed. | • ECF No 119, Fact Nos. 36, 68<br>• Ex. 37 (reflecting 28 contracts awarded since this case was filed)<br>• ECF No. 1 |
| 168 | The Army participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene. | • ECF No 119, Fact Nos. 37, 70<br>• Ex. 37 (reflecting 16 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br>• Exs. 3 & 4 (reflecting participation in investigation)<br>• ECF No. 25 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.** **The Navy continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 169 | After Aerojet disclosed to the Navy that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Navy continued to award Aerojet contracts. | • ECF No. 119, Fact No. 32<br>• Ex. 37 (reflecting 8 contracts awarded since 9/29/2015) |
| 170 | Aerojet submitted invoices to the Navy on Contract No. N00014-14-C-0035, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 106<br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 171 | The Navy paid all invoices on Contract No. N00014-14-C-0035. | • Ex. 107<br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 172 | Contract No. N00014-14-C-0035 was successfully completed on June 8, 2017. | • ECF No. 119, Fact No. 51<br>• Ex. 37 at cell 3F |
| 173 | Aerojet submitted invoices to the Navy on Contract No. N68936-14-C-0035, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 108<br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 174 | The Navy paid all invoices on Contract No. N68936-14-C-0035. | • Ex. 109<br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 175 | Contract No. N68936-14-C-0035 was successfully completed on December 31, 2015. | • ECF No. 119, Fact No. 52<br>• Ex. 37 at cell 7F |
| 176 | The Navy continued to award Aerojet contracts after this lawsuit was filed. | • ECF No. 119, Fact Nos. 33, 68<br>• Ex. 37 (reflecting 7 contracts awarded since this case was filed)<br>• ECF No. 1 |
| 177 | The Navy continued to award Aerojet contracts after the United States declined to intervene. | • ECF No. 119, Fact Nos. 34, 70<br>• Ex. 37 (reflecting 2 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br>• ECF No. 25 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

1

**C.   The Air Force continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

2

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 178 | After Aerojet disclosed to the Air Force that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Air Force continued to award Aerojet contracts. | • ECF No. 119,  Fact Nos. 29 <br> • Ex. 37 (reflecting 31 contracts awarded since 9/29/2014) |
| 179 | Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0002, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 44 <br> • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 180 | The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0002. | • Ex. 45 <br> • Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 181 | Contract No. FA8650-13-D-2335, Award Id. 0002 was successfully completed on June 15, 2019. | • ECF No. 119,  Fact No. 48 <br> • Ex. 37 at cell 5F |
| 182 | Aerojet submitted invoices to the Air Force on Contract No. FA8650-14-C-7424, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 46 <br> • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 183 | All invoices were paid by the government on Contract No. FA8650-14-C-7424. | • Ex. 47 <br> • Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 184 | Contract No. FA8650-14-C-7424 was successfully completed on March 31, 2016. | • ECF No. 119,  Fact No. 47 <br> • Ex. 37 at cell 6F |
| 185 | Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0003, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 48 <br> • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 186 | The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0003. | • Ex. 49 <br> • Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 187 | Contract No. FA8650-13-D-2335, Award Id. 0003 was successfully completed on August 30, 2016. | • ECF No. 119,  Fact No. 49 <br> • Ex. 37 at cell 9F |
| 188 | Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award | • Ex. 50 |

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | Id. 0004, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 189 | The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0004. | • Ex. 51<br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |
| 190 | Contract No. FA8650-13-D-2335, Award Id. 0004 was successfully completed on September 28, 2018. | • ECF No. 119, Fact No. 50<br>• Ex. 37 at cell 17F |
| 191 | The Air Force continued to award Aerojet contracts after this lawsuit was filed. | • ECF No. 119, Fact Nos. 30, 68<br>• Ex. 37 (reflecting 24 contracts awarded since this case was filed)<br>• ECF No. 1 |
| 192 | The Air Force participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene. | • ECF No. 119, Fact Nos. 31, 70<br>• Ex. 37 (reflecting 12 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br>• Exs. 3 & 4 (reflecting participation in investigation)<br>• ECF No. 25 |

**D.    DARPA continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 193 | After Aerojet disclosed to DARPA that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, DARPA continued to award Aerojet contracts. | • ECF No. 119, Fact No. 38<br>• Ex. 37 (reflecting 4 contracts awarded since 9/30/2014) |
| 194 | Aerojet submitted invoices to DARPA on Contract No. HR001115C0132, none of which contained any representation about Aerojet's compliance with the DFARS Clause. | • Ex. 52<br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 195 | DARPA paid all invoices on Contract No. HR001115C0132. | • Ex. 53<br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 196 | **Contract No. HR001115C0132 was successfully completed on September 30, 2016.** | • ECF No. 119, Fact No. 55<br>• Ex. 37 at cell 15F |
| 197 | **DARPA continued to award Aerojet contracts after this lawsuit was filed.** | • ECF No. 119, Fact Nos. 39, 68<br>• Ex. 37 (reflecting 2 contracts awarded since this case was filed)<br>• ECF No. 1 |
| 198 | **DARPA continued to award Aerojet contracts after the United States' declined to intervene.** | • ECF No. 119, Fact Nos. 40, 70<br>• Ex. 37 (reflecting 1 contract awarded since June 25, 2018, when the government declined to intervene in this action)<br>• ECF No. 25 |

**E.     NASA continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 199 | **After Aerojet disclosed to NASA that it was not compliant with NASA's Security Requirements for Unclassified Information Technology Resources in June 2015, NASA continued to award Aerojet contracts.** | • ECF No. 119, Fact No. 44<br>• Ex. 121 (reflecting 22 contracts awarded since 7/27/2015) |
| 200 | **Aerojet submitted invoices to NASA on Contract No. NNC10BA13B, Award ID # NNC13TA66T, none of which contained any representation about Aerojet's compliance with the NFS Clause.** | • Ex. 132<br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) |
| 201 | **NASA paid all invoices on Contract No. NNC10BA13B, Award ID # NNC13TA66T.** | • Ex. 133 |
| 202 | **Contract No. NNC10BA13B, Award ID # NNC13TA66T was successfully completed on September 24, 2016.** | • Ex. 121 at cell 10F<br>• ECF No. 119, Fact No. 56 |
| 203 | **Aerojet submitted invoices to NASA on Contract No. NNC10BA02B, Award ID # NNC15TA07T, none of which contained any representation about Aerojet's compliance with the NFS Clause.** | • Ex. 134<br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) |
| 204 | **NASA paid all invoices on Contract No. NNC10BA02B, Award ID # NNC15TA07T.** | • Ex. 135 |

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 205 | **Contract No. NNC10BA02B, Award ID # NNC15TA07T was successfully completed on May 11, 2015.** | • Ex. 121 at cell 14F<br>• ECF No. 119, Fact No. 57 |
| 206 | **Aerojet submitted invoices to NASA on Contract No. NNC15CA07C, none of which contained any representation about Aerojet's compliance with the NFS Clause.** | • Ex. 136<br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) |
| 207 | **NASA paid all invoices on Contract No. NNC15CA07C.** | • Ex. 137 |
| 208 | **Contract No. NNC15CA07C was successfully completed on October 9, 2020.** | • Ex. 121 at cell 15F<br>• ECF No. 119, Fact No. 58 |
| 209 | **Aerojet submitted an invoice to NASA on Contract No. NNC15VD08P, which did not contain any representation about Aerojet's compliance with the NFS Clause.** | • Ex. 138<br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) |
| 210 | **NASA paid all invoices on Contract No. NNC15VD08P.** | • Ex. 139 |
| 211 | **Contract No. NNC15VD08P was successfully completed on March 31, 2016.** | • Ex. 121 at cell 17F<br>• ECF No. 119, Fact No. 59 |
| 212 | **Aerojet submitted invoices to NASA on Contract No. NNM16AA02C, none of which contained any representation about Aerojet's compliance with the NFS Clause.** | • Ex. 140<br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) |
| 213 | **NASA paid all invoices on Contract No. NNM16AA02C.** | • Ex. 141 |
| 214 | **Contract No. NNM16AA02C is still ongoing.** | • Ex. 121 at cell 21F (showing NNM16AA02C is still in progress and has not been terminated)<br>• ECF No. 119, Fact No. 61 |
| 215 | **Aerojet submitted an invoice to NASA on Contract No. NNM16AB21P, which did not contain any representation about Aerojet's compliance with the NFS Clause.** | • Ex. 142<br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) |
| 216 | **NASA paid all invoices on Contract No. NNM16AB21P.** | • Ex. 143 |
| 217 | **Contract No. NNM16AB21P was successfully completed on March 31, 2016.** | • Ex. 121 at cell 22F<br>• ECF No. 119, Fact No. 62 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 218 | Aerojet submitted invoices to NASA on Contract No. NNH16CP17C, none of which contained any representation about Aerojet's compliance with the NFS Clause. | • Ex. 144<br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) |
| 219 | NASA paid all invoices on Contract No. NNH16CP17C. | • Ex. 145 |
| 220 | Contract No. NNH16CP17C was successfully completed on June 30, 2019. | • Ex. 121 at cell 23F<br>• ECF No. 119, Fact No. 63 |
| 221 | Aerojet submitted invoices to NASA on Contract No. NNM16AA12C, none of which contained any representation about Aerojet's compliance with the NFS Clause. | • Ex. 146<br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) |
| 222 | NASA paid all invoices on Contract No. NNM16AA12C. | • Ex. 147 |
| 223 | Contract No. NNM16AA12C is still ongoing. | • Ex. 121 at cell 25F (showing NNM16AA12C is still in progress and has not been terminated)<br>• ECF No. 119, Fact No. 64 |
| 224 | NASA contracting officials have not terminated or refused to reward a contract for non-compliance with the NFS Clause, and have no recollection of other contracting officers terminating or refusing to award a contract for non-compliance. | • Ex. 182 ¶ 5<br>• Ex. 183 ¶ 5<br>• Ex. 184 ¶ 5<br>• Ex. 185 ¶ 5 |
| 225 | NASA continued to award Aerojet contracts after this lawsuit was filed. | • ECF No. 119, Fact Nos. 45, 68<br>• Ex. 121 (reflecting 19 contracts awarded since this case was filed)<br>• ECF No. 1 |
| 226 | NASA participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene. | • ECF No. 119, Fact Nos. 46, 70<br>• Ex. 121 (reflecting 8 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br>• Exs. 3 & 4 (reflecting participation in investigation)<br>• ECF No. 25 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 227 | **In 2019, NASA awarded Aerojet the Silver Achievement Medal for its cybersecurity efforts.** | • Ex. 181 |

## VII.   THE GOVERNMENT KNEW THE DEFENSE INDUSTRY WAS NOT COMPLIANT WITH CYBERSECURITY CLAUSES, BUT CONTINUED TO CONTRACT WITH AND PAY SUPPLIERS

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 228 | **Defense Industrial Base companies, including Aerojet, participated in policy working groups with the Government, where companies "openly discuss[ed]" noncompliance with the DFARS Clause.** | • Ex. 7 (Markus Dep.) at 92:16-93:3 ("There were DFARS compliance meetings and presentations at the DIB and we had conversations about them. There were -- excuse me -- quite a few conversations about how the other defense contractors were becoming DFARS compliant and how some of them were already DFARS compliant and what they did to become DFARS compliant at those meetings.")<br><br>• Ex. 7 (Markus Dep.) at 159:13-161:7 (reflecting meeting with OCIO before introduction of NIST 800-171 in which Aerojet was trying to "help guide the government as to what makes sense for organizations to comply with and do and what doesn't, what would cost them too much and put us, for example, a small business out of business if they had to comply with every single control")<br><br>• Ex. 7 (Markus Dep.) at 162:11-20 (explaining that working group meetings with the OCIO would include a discussion of "how to individuals get compliant [with the NIST standards] properly")<br><br>• Ex. 7 (Markus Dep.) at 163:2-163:9 (contractors "were openly discussing" that they "were |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | noncompliant" in meeting with the OCIO). |
| | | • Ex. 10 (Thomas Dep.) at 145:1-147:18 (explaining that there were working groups with the defense industry and the government between 2013 and 2016 regarding the DFARS Clause) |
| | | • Ex. 19 at 1 (reflecting "continued engagement" between OCIO, DPAP, and industry" regarding the DFARS Clause) |
| | | • Ex. 206 at AFDODCIO000224 (12/15/2015 contractor disclosure reflecting participation in "DoD-led Defense Industrial Base Cybersecurity Working Group") |
| | | • Ex. 103 (reflecting Aerojet's participation in working group meetings) |
| | | • Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics reflecting that she participated in working groups with industry associations and DoD components regarding cybersecurity compliance) |
| | | • 80 FR 81472 (noting that changes to DFARS Clause to allow for additional time was made after discussing "implementation issues" and the "need for additional time to implement the security requirements" with the defense industry) |
| 229 | **Dozens of contractors disclosed to the DoD that they were not compliant with the technical controls in NIST 800-53 and NIST 800-171 and the DoD recognized that many** | • Ex. 186 (8/20/2015 contractor disclosure to DoD OCIO demonstrating 44% compliance with 50 NIST controls) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|  | **contractors were not compliant with NIST 800-53 or NIST 800-171.** | • Ex. 188 (8/26/2015 OCIO acknowledgment of non-compliance)<br><br>• Ex. 187 at AFDODCIO000486 & 488 (11/9/2015 disclosure noting compliance gaps with NIST 800-171 and NIST 800-53 and estimated completion date of gap analysis as December 31, 2015)<br><br>• Ex. 190 (11/14/2015 contracting officer requesting waiver of DFARS Clause and DoD describing contractor's disclosure as "another 'I am not compliant letter'")<br><br>• Ex. 191 (11/18/2015 disclosure from contractor reflecting non-compliance with NIST 800-171 controls)<br><br>• Ex. 194 (11/25/2015 contractor notifying DoD OCIO that it would not be able to implement the 800-171 controls immediately and that its subcontractors would not be able to either.)<br><br>• Ex. 195 (12/14/2015 DoD interpreting contractor disclosure to be "stating that they aren't compliant." with the NIST 800-171 controls)<br><br>• Ex. 206 (12/15/2015 contractor disclosure reflecting non-compliance with NIST 800-171); *see also* Ex. 10 (Thomas Dep.) at 138:24-140:16 (reviewing December 14, 2015 disclosure and agreeing that letter reflects that contractor was "not implementing all of the [NIST 800-]171 requirements" and acknowledging non-compliance before DFARS Clause permitted additional time to implement controls)<br><br>• Ex. 196 (12/16/2015 e-mail reflecting that a contractor did "not |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|     |                 | currently meet all of the NIST 800-171 security measures" and DoD OCIO recognizing that "this is a case of non-compliance" and that "compliance appears to be deficient")<br><br>• Ex. 197 (12/22/2015 DoD tracking spreadsheet reflecting contractor non-compliance with the NIST standards)<br><br>• Ex. 205 (1/6/2016 e-mail from OCIO stating that "so many contractors are not [compliant], this [December 2015 DFARS Clause] gives them time to take appropriate actions" and recognizing that contractors would decrease non-compliant controls approaching December 2017)<br><br>• Ex. 198 (2/24/2016 contractor disclosing non-compliance with "105 requirements of NIST SP 800-171")<br><br>• Ex. 201 (4/27/2016 contractor disclosing non-compliance with "44 requirements of NIST SP 800-171")<br><br>• Ex. 202 (5/2/2016 OCIO recognizing that a contractor was "working to implement" NIST controls, but that they still had gaps in compliance)<br><br>• Ex. 189 (acknowledging that contractor is not at 100% compliance)<br><br>• Ex. 9 (Guissanie Dep.) at 84:7-85:6; 27:14-30:21 (testifying that between 2013 and 2016, OCIO received approximately two to three a week requests for waivers from the requirements of the DFARS Clause and about "100 to 150" requests for variances from the clause a year) |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | • Ex. 9 (Guissanie Dep.) at 90:1-18 (testifying "[p]eriodically, we would get . . . a communication that the contracting officer sent the CIO based on what the contractor sent to the contracting officer saying, 'I'm not really compliant with the clause at the current time'" under NIST 800-53 and NIST 800-171 and explaining contracting officers "often" sent OCIO such communications) |
| | | • Ex. 9 (Guissanie Dep.) at 81:6-82:7 (testifying he would see contractors' statements identifying where contractors were and were not compliant) |
| | | • Ex. 9 (Guissanie Dep.) at 96:2-97:14 ("Some companies would simply report based on the clause requirement what they knew they weren't doing. Other companies would -- and so they would report I met all those except for these five, for example.") |
| | | • Ex. 9 (Guissanie Dep.) at 94:7-96:1 (reflecting that contractors would disclose non-compliance with NIST requirements after signing a contract and that the OCIO tracked such non-compliance) |
| | | • Ex. 9 (Guissanie Dep.) at 103:7-105:2 (testifying OCIO conducted "trend analyses" of unimplemented NIST controls) |
| | | • Ex. 21 at 22:4-9 (4/6/2017 DoD SBTW Presentation: "What I've seen is some small businesses are doing extremely well and are almost all fully compliant because it was easier for them to implement some of the solutions than some of the |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | very large companies."); *see also* Ex. 20 (video recording of same) |
| | | • Ex. 10 (Thomas Dep.) at 120:9-25 (testifying that between 2013 and 2016, Ms. Thomas knew that contractors "weren't fully compliant [with the NIST requirements] based on their questions" at presentations to the defense industry) |
| | | • Ex. 10 (Thomas Dep.) at 108:15-109:4 (testifying after August 2015 that some contractors were not in full compliance but working towards compliance under the December 31, 2017 deadline) |
| 230 | **Surveys of industry and public articles from 2016 to 2020 reflect that the defense industry has not successfully implemented all of the technical requirements NIST 800-171 or NIST 800-53.** | • Exs. 207 & 208 (AIA survey results) <br><br> • Ex. 203 & 204 (NDIA survey and white paper) <br><br> • Ex. 213 at Ex. A (5/2019, Reality Check: Defense industry's implementation of NIST SP 800-171) at 2, 3. <br><br> • Ex. 209 (9/4/2018 "Small Contractors Struggle with Cyber Rules") <br><br> • Ex. 210 (2/19/2020 "New Cybersecurity Standards Pose Challenges for Industry") <br><br> • Ex. 211 (6/17/2019 "Why DoD's decision to make cybersecurity an 'allowable cost' matters") |
| 231 | **The DoD was aware of industry surveys indicating that contractors were not compliant with the NIST 800-53 or NIST 800-171.** | • Ex. 10 (Thomas Dep.) at 159:12-161:2 (testifying that she learned of industry surveys regarding DFARS compliance between 2013 and 2016 through discussions with individuals at the OCIO) <br><br> • Ex. 213 at ¶¶ 4, 7, Exs. B, D |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| | | • 85 FR 61505 (acknowledging surveys reflecting industry non-compliance with NIST controls) |
| 232 | On January 26, 2017, the Aerospace Industries Association ("AIA") sent a letter to the DoD Chief Information Officer, Terry Halvorsen, regarding "DFARS Network Penetration and Contracting for Cloud Services Request" that stated that the industry struggled to implement the DFARS Clause and urged DoD to revise the applicable regulations. | • Ex. 19 |
| 233 | In 2019, the DoD Inspector General issued an audit report on DoD contractors' compliance with the technical controls in NIST 800-171. Out of ten contractors assessed, none were 100% compliant. | • Ex. 35 |
| 234 | The DoD knew that contractors were unable to implement NIST 800-53 based on its specificity to contractor systems. | • Ex. 25 at 25:1-9 (6/23/2017 DoD Industry Day Presentation: "800-53 [] was the baseline as security and established them low, moderate, and high baselines for federal government. To apply that to a contractor system to protect CDI for confidentiality really isn't very -- isn't possible. The moderate baseline is 263 requirements. Many of them are overly specific based on federal organizations and what they require."); *see also* Ex. 24 (video recording of same) <br><br> • Ex. 21 at 9:18-20 (4/6/2017 DoD SBTW Presentation: "So [NIST 800-171 is] much more flexible, and much more realistic for us to ask industry to implement."); *see also* Ex. 20 (video recording of same) |
| 235 | The DoD acknowledged that it is "virtually impossible" to be in full compliance with even the more flexible NIST 800-171 standard. | • Ex. 21 at 19:14-22 (4/6/2017 DoD SBTW Presentation: "[I]t's also important to know that at any given moment, it's virtually impossible for a contractor to be in 100 percent compliance with 171 because it is a very liquid type of system. Things |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| | | change, they might have temporary deficiencies, things that they're working toward, things that they haven't gotten in place yet . . . ."); *see also* Ex. 20 (video recording of same) <br><br> • Ex. 21 at 20:24-21:2 (4/6/2017 DoD SBTW Presentation: contractor "must implement [NIST 800-]171. It doesn't say that they need to be in 100% compliance 100% of the time."); *see also* Ex. 20 (video recording of same) |
| 236 | The DoD indicated that non-compliance with the DFARS Clause at the time of contracting would not disqualify a contractor, but would instead be a "risk-based decision for the program managers and the requiring activity" to make. | • Ex. 21 at 34:12-35:9 (4/6/2017 DoD SBTW Presentation: "[T]he onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the program managers and the requiring activity. . . . So it's really on the program management offices to understand when they need to make sure a certain level of protections are in place."); *see also* Ex. 20 (video recording of same) <br><br> • 48 C.F.R. § 9.103 <br><br> • Ex. 189 (indicating that a "contracting officer [] and the requiring activity need to determine appropriate action" when "the contractor is not compliant with the DFARS clause") |
| 237 | In 2019, the government acknowledged that only "1% of [Defense Industrial Base] companies have implemented all 110 controls from [NIST]." | • Ex. 211 (reflecting comments from Katie Arrington, Special Assistant to Assistant Secretary of Defense in the Office of the Under Secretary of Acquisition & Sustainment") |
| 238 | Navy contracting officials have no recollection of ever terminating a contract, refusing to award a contract, or refusing to pay an invoice for non-compliance with the DFARS Clause. | • Ex. 113, ¶ 4 <br><br> • Ex. 114, ¶¶ 3-4 <br><br> • Ex. 112, ¶¶ 4-5 |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
|     |                 | • Ex. 6 at Resp No. 17 (7/29/20 Relator's Am. Resp. to RFAs) |

## VIII.   AEROJET'S ADDITIONAL FACTS

| No. | Undisputed Fact | Supporting Evidence |
|-----|-----------------|---------------------|
| 239 | On June 14, 2013, Aerojet Rocketdyne's parent company, GenCorp Inc., completed the acquisition of Pratt & Whitney Rocketdyne from United Technologies Corporation. Pratt & Whitney Rocketdyne was then merged with Aerojet-General Corporation to form the defendant entity in this case, Aerojet Rocketdyne, Inc. Though the integration of the companies' business functions occurred in June 2013, the integration of the entities' information technology systems took much longer to complete. | • Ex. 235 (Sweeney Decl.) ¶ 6<br>• Thyberg Decl., Ex. A at 077 (noting in November 2013 that the "network integration" between Rocketdyne and Aerojet was not yet complete)<br>• Ex. 248 at 30:6-31:8 |
| 240 | Emagined drafted the compliance matrices stating Aerojet's compliance status with the DFARS Clause. | • Ex. 214<br>• Ex. 215<br>• Ex. 216<br>• Ex. 217<br>• Ex. 218<br>• Ex. 220<br>• Ex. 228<br>• Ex. 260 |
| 241 | Aerojet hired E&Y to conduct annual audits so that Aerojet could locate vulnerabilities in its systems and remediate them. | • Ex. 248 at 54:1–15 ("We engaged EY to understand where we were. This is a learning and improvement document.").<br>• Ex. 248 at 77:6–21 (Aerojet "intend[ed] for [E&Y's] penetration test [and] audit . . . [to] find risks . . . . [or] they probably haven't done a very good job.") |

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**

| No. | Undisputed Fact | Supporting Evidence |
|---|---|---|
| 242 | The DoD would not accept third-party certifications of compliance with the 2013 DFARS Clause. | • Ex. 21 at 17:7-13 ("People also ask if they should get a third party assessor to assess their systems. And if the department would then accept the certification from third party assessors. The department's position is that they will not recognize third party assessor certifications.) |
| 243 | The DFARS Clause did not require contractors to submit internal cybersecurity audits. | • Ex. 255 at 52:2–8 (Q: "Are you aware of any provision in either the 2013 or 2015 versions of the DFARS clause that required contractors to share the results of any internal cybersecurity audits with the government?" A: "No.") |

DATED: October 12, 2021

Respectfully submitted,

KIRKLAND & ELLIS, LLP

*/s/ Tammy A. Tsoumas*
Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:     (310) 552-4200
Facsimile:     (310) 552-5900

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:     (214) 972-1770
Facsimile:     (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc.*

**DEFS.' RESPONSE TO RELATOR BRIAN MARKUS' STATEMENT OF FACTS**