1  THYBERGLAW
   GREGORY A. THYBERG SBN102132
2  3104 O STREET. #190
   SACRAMENTO, CALIFORNIA 95816
3  TEL: (916) 204-9173
   greg@thyberglaw.com
4

5  ATTORNEYS FOR PLAINTIFF, BRIAN MARKUS

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA:         )   Civil Action No. 2:15-cv-2245 WBS-AC
   *ex rel.*                         )
12 BRIAN MARKUS                      )
13                                   )
             Plaintiffs,             )   **RELATOR BRIAN MARKUS'**
14                                   )   **MEMORANDUM OF POINTS AND**
        vs.                          )   **AUTHORITIES IN OPPOSITION TO**
15                                   )   **DEFENDANTS' MOTION FOR**
   AEROJET ROCKETDYNE HOLDINGS,      )   **SUMMARY JUDGMENT OR IN**
16 INC., a corporation and AEROJET   )   **THE ALTERNATIVE SUMMARY**
   ROCKETDYNE, INC. a corporation.   )   **ADJUDICATION**
17                                   )
18          Defendants              )
                                     )   Date: November 1, 2020
19                                   )   Time: 1:30 p.m.
                                     )   Courtroom: 5
20                                   )   Judge: Hon. William B. Shubb
21 _____
22

23

24

25

26

27

28
      **RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MSJ**   1

                    **CASE NO. 2:15-cv-2245 WBS-AC**

1

**<u>TABLE OF CONTENTS</u>**

2

Page

3

I.     INTRODUCTION..............................................................................5

4

II.    STATEMENT OF FACTS..............................................................5

5
6

III.   LEGAL STANDARD....................................................................10

7

IV.    LEGAL ARGUMENT...................................................................11

8

   A. Relator's False Claim's Action Is Not Limited To Eight Contracts...........11

9
10

   B. Relator Has A Viable Implied False Certification Claim Because
      Defendants Made False Statements To NASA To Secure the
      Payment of Invoices.............................................................................13

11

12

   C. Relator Has Established That AR's Fraudulent Representations And
      Omissions Caused The Government To Enter Contracts.......................15

13

14

   D. AR Has Failed To Establish Its Cybersecurity Compliance Status
      Was Not Material To The Government..................................................16

15

16

   1. The DOJ Has Stated That Contractors Who Conceal Cyber Breaches
      Or Fail To comply With Cybersecurity Requirements May Be Subject
      To False Claims Liability.......................................................................16

17

18

   2. AR Did Not Fully Disclose Its Cybersecurity Compliance Status
      To The Government...............................................................................17

19

20

   3. Government Knowledge Of A False Claims Action Or Investigation
      Is Not Dispositive On The Issue of Materiality...................................18

21

22

   4. AR Has Presented No Evidence That The Government Paid A
      Invoice Or Entered A Contract With Actual Knowledge Of The Extent
      Of AR's Non-Compliance......................................................................19

23

24

   5. Industry Compliance With Cybersecurity Clauses Is Not Relevant
      To This False Claims Action Against AR..............................................19

25

26

   6. The Government Did Not Abandon The 2013 DFARS Clause............20

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

7.  **Contract Awards Were Conditioned On Compliance With Cybersecurity Requirements.** …………………………………………………..21

E. **AR Should Pay Damages In The Amount of Three Times The Invoices Paid Which Is Less Than The Actual Damages The Government Sustained**………………………………………………………………………21

V.       CONCLUSION………………………………………………………...…22

1

2

**TABLE OF AUTHORITIES**

3

                                                                                                    **Page**

4

**Cases**

5

*Anderson v. Liberty Lobby, Inc.,* U.S. 242 (1986)………………………………………11

6

*Ricci v. DeStefano,* 557 U.S. 557 (2009)……………………………………………..11

7

8

<u>*United States ex rel. Escobar v. Universal Health Servs., Inc.*</u>, 842 F.3d 10
(1st Cir. 2016)…………………………………………………………………...…18

9

10

*U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)……………22

11

*United States ex rel. Kelly v. Serco, Inc.,* 846 F.3d 325, 333 (9th Cir. 2017)…………14

12

13

*United States v. Pub. Warehousing Co. K.S.C.,* No. 1:05-CV-2968-TWT, 2017
WL 1021745,(N.D. Ga. Mar. 16, 2017) ……………………………………...18,19

14

15

*Universal Health Servs., Inc. v. United States (Escobar),*
136 S. Ct. 1989, (2016)……………………….………………   ….13,14,16,17,18,19

16

**Statutes**

17

31 U.S.C. §§ 3729 *et seq*…………………………………………………………..16

18

19

**Rules**

20

Fed. R. Civ. P. 56…………………………………………………………………10,11

21

**Federal Regulations**

22

DFARS Clause 252.204-7012………………………………………………………13,20

23

NASA FARS Clause 1852.237-73…………………………………………...……12

24

25

26

27

28

## I.   INTRODUCTION

Aerojet Rocketdyne's ("AR") MSJ motion and entire defense in this case has been based on the premise that complying with cyber security requirements is not material to its government contracts so it cannot be the basis for a false claims action. AR's drumbeat has been that the government does not care about cyber security because they continued to award them contracts after the filing of this case and elected not to intervene. Two weeks after Relator filed his MSJ motion in this case, which is being monitored by DOJ Main Justice, outlining AR's blatant violation of cyber security standards that has resulted in handing our most advanced missile technology to our adversaries, the government has finally said enough is enough.

On October 6, 2021, the DOJ announced the launch of the Civil Cyber Fraud Initiative and its intention to utilize the False Claims Act to pursue government contractors and grant recipients who have engaged in cybersecurity fraud. (Declaration of Gregory A. Thyberg In Support Of Opposition to Defendants MSJ, "Thyberg Dec. Opp." Ex. 12) In announcing the Civil Cyber Fraud Initiative, Deputy Attorney General, Lisa Monaco, stated: "For too long, companies have chosen silence under the mistaken belief that it less risky to hide a breach than to bring it forward and report it…Well that changes today. We are announcing today that we will use our civil enforcement tools to pursue companies, those who are government contractors who receive federal funds, when they fail to follow required cybersecurity standards-because we know it puts all of us at risk." *Id.*

AR's motion should be denied because there is overwhelming evidence that AR in its effort to secure government contracts has endangered American lives by concealing cyber breaches and willfully failing to comply with cyber security regulations.

## II.   STATEMENT OF FACTS

There are three basic things the government requires every defense contractor storing sensitive data on their computer network to do to protect the data. First, implement cybersecurity controls to prevent cyber intrusions.  Second, implement cybersecurity controls so the contractor can detect and report cyber intrusions when they occur; and third, encrypt data so if it is compromised, the party stealing the data cannot read it. AR secured government contracts promising to protect the sensitive data when it knew it was unable to effectively do any of these things.

Since at least May 2013, AR has failed to address serious weaknesses in its computer network that has allowed huge amounts of data to leave the network. (Relator's Undisputed Material Fact in Support of Relators' MSJ, "UMF" No. 11) On June 13, 2013 EY disclosed to AR that a cyberattack on the Rocketdyne network on May 25, 2013 had resulted in the exfiltration of 100.5 gigabytes of data in 61,640 files located in 5,643 directories, accessing approximately nine years of data and a broad range of content including information regarding hypersonic weapons systems, DARPA white papers and NASA Briefings. (Relator's Additional Undisputed Fact In Opposition to Defendants MSJ "AUF" No. 26)

Emagined Security Inc. ("ESI") investigated several cyber breaches at AR in the summer of 2013, and found that foreign nation states had entered the AR system on multiple occasions and exfiltrated huge amounts of data, including data related to rocket fuel testing. (UMF Nos. 11-16) Included on AR's system at the time were rocket designs that could assist a foreign country in developing an intercontinental ballistic missile. (UMF No. 15) Not only was AR's system vulnerable to cyberattack but AR had failed to encrypt its data as required by the NASA FARS and DFARS Clause. (UMF No. 9) ESI advised AR management in September 2013, that their network was not sophisticated enough to detect or stop cyber intrusions that AR or prevent the unauthorized flow of

data out of its network exposing design data worth possibly hundreds of millions of dollars. (UMF Nos. 22-24) ESI warned AR that it must change its culture to embrace cyber security and recommended a remediation plan needed to correct the deficiencies. (UMF No. 25)

Ernst & Young ("EY") also warned AR's board in July 2013 that they had eight high risk findings, with a "high risk" finding defined as involving a significant deviation from regulatory requirements, fraud or management misconduct. (UMF No. 32) In July 2015, two years after AR was warned that a remediation plan was needed, EY's audit findings were far worse as AR now had twenty-three "high risk" findings. (UMF No. 34-35)

AR's failure to take the steps needed to protect the government's sensitive information was evident from the results of NASA Gap Analysis ("NGA") which was designed to assess AR's compliance with the required NASA FARS and DFARS Controls. The NGA revealed that AR was only 23.9% compliant with the required NASA FARS NIST 800-53 controls and only 21.8% compliant with the required DFARS NIST 800-171 controls. (UMF No. 2) The NGA concluded that AR did not have the necessary organizational structure, resources, or technical solutions to satisfy the majority of these clauses' security requirements. (UMF Nos. 2-3)

AR's own internal penetration test conducted by EY revealed that its computer network could not be trusted to protect sensitive information. In April 2015, EY was able to penetrate AR's network undetected and remain undetected for seven days. (UMF No.36) EY gained administrator access to the system and was able to access all agreed upon "trophy data" including rocket design documents. (UMF No. 38) The EY findings were so bad that AR's VP and CIO Jose Ruiz indicated he did not feel comfortable having his personal information on the network and he was sure the government would

not feel comfortable either. (UMF Nos. 48-49) EY advised AR they needed to take immediate action to address their findings.  EY was able to penetrate the network again undetected a few months later in November 2015. (UMF Nos. 17) In the face of the results of the EY report, RUIZ requested an increase in budget to address cyber security. (UMF No. 56) AR's COO, Mark Tucker, responded by telling RUIZ he had to reduce his budget. (UMF No. 57) Saving money rather than addressing cyber security was a theme at AR as AR VP and CIO Mark Angelo suggested in 2016, it would not be fiscally responsible for AR to achieve the highest level of cybersecurity of 5.00. (Additional Undisputed Fact in Support or Relator's Opposition to MSJ "AUF" No. 46)

Although the filing of this false claims action should have been a wake-up call for AR to get its house in order, that has not been the case. After failing multiple penetration tests conducted by EY, AR decided to use another company to test its network, Grant Thornton, LLP. Grant Thornton's Loss Prevention Audit dated November 26, 2018 found AR was still not able to detect or stop cyber intrusions or prevent the exfiltration of data. (AUF Nos. 27-31) Grant Thornton recommended certain enhancements as AR was at risk of losing proprietary information but according to Grant Thornton's Cyber Security Loss Prevention Audit dated February 21, 2020 AR had failed to address its findings resulting in a worse audit report in 2019 than 2018. (AUF Nos. 32-34) Grant Thornton's 2019 penetration test revealed that AR still could not detect or prevent cyber intrusions. (AUF No. 36) Grant Thornton found AR was still using an unsupported Windows 2003 operating system that AR had been warned was vulnerable to cyberattack in 2013. (AUF No. 36)

AR advised NASA and MDA in 2015 that they were addressing cybersecurity by transitioning to a managed service provider. (UMF No. 81) When the managed service provider, CGI Federal, Inc. ("CGI") was finally hired in March 2017 they found that AR

had millions of critical vulnerabilities in AR's servers, workstations and network devices. (AUF No. 37) CGI has now sued AR based on the material omissions and fraudulent statements made about its cyber security status when the parties negotiated the contract. (AUF Nos. 37-42)

While AR ignored the warnings from multiple vendors that it could not provide "adequate security" to protect the government's sensitive information, AR entered multiple government contracts where it stored advanced military and space technology on its computer network. When NASA requested information regarding AR's compliance status and whether NASA should be worried about its sensitive information, AR told NASA: "Protective security controls to safeguard NASA's unclassified IT resources are in place." (UMF Nos. 75,84) Serious cybersecurity deficiencies were discounted as areas of improvement. (UMF No. 84) In a presentation in December 2015, AR assured NASA their sensitive information was secure when EY had penetrated their network undetected a month earlier. (UMF. Nos. 17, 75) AR claimed to have alternative controls or protective measures in place to achieve equivalent protection to the NASA FARS Clause, when they did not. (UMF No. 85) AR provided NASA with Contractor Information Security Management Plans that were filled with false and misleading statements regarding AR's cyber security status when compared to the results of the NGA. (UMF Nos. 88-105) AR also sent NASA multiple Information Security Management Plans containing false statements about AR implementing NASA security requirements. (UMF Nos. 106-120)

AR also made false statements and material omissions to gain DOD contracts. AR promised to be 100% compliant with the DFARS clause to obtain the GBSD Study contract and then failed to maintain a stand-alone compliant network as they promised the government. (UMF Nos. 145-150) In order to assure DOD agencies and prime contractors that their information was secure, AR sent a standard letter wherein it claimed

to be complying with the majority of the DFARS Clause requirements and assured the government AR would make every effort to prevent a data breach while it worked aggressively to strengthen the controls and implement additional protection measures. (UMF Nos. 151-157) They promised to prevent a breach when AR could not detect or stop intrusions and knew they were leaking information every day. (UMF Nos. 23,28, 40,53,) The letter promised that AR was working aggressively to strengthen its controls, when there was no funded or approved plan to drive compliance and requests for funds to address compliance were denied as AR sought to cut its cybersecurity budget.  (UMF Nos. 55-57) When the government told AR that compliance was a "black and white" issue, AR started to claim its alternate controls provided equivalent protection to the DFARS controls, when they did not. (UMF Nos. 139-140)

As a result of AR's conduct the government has entered contracts it would have never given AR had it known the truth and the value to the products received was diminished.  When our adversaries steal information that allows them to counter, kill or clone our capabilities the product provided to the government is less valuable  and the money invested is less valuable. (AUF No. 14) Theft of sensitive data compromises military operations and endangers American lives. (AUF 18) It is critical the contractors like AR be honest with the government about the loss of sensitive information and provide that information in a timely manner, so the government can assess what information our adversaries might have when the DOD goes into a military operation. (AUF Nos. 6-8)

## III.   LEGAL STANDARD

Summary judgment is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely

disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view facts that the parties genuinely dispute in the light most favorable to the nonmovant, *Ricci v. DeStefano,* (2009) 557 U.S. 557,586, and draw all justifiable inferences from the evidence in the non-movant's favor, *Anderson v. Liberty Lobby, Inc.,* (1986) 477 U.S. 242,255.

## IV.   LEGAL ARGUMENT

### A.  Relator's False Claim's Action Is Not Limited To Eight Contracts.

Relator's case is not limited to eight contracts as relator has alleged that defendants have engaged in a fraudulent course of conduct in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* to induce the government to enter contracts while failing to comply with NASA and DOD federal acquisition regulations. (Relator's Second Amended Complaint "SAC" ¶¶ 1,9-10) The SAC refers to AR entering **at least** eight prime DOD contracts and nine NASA contracts. (SAC ¶¶ 84,91,105)   The SAC also alleges that AR violated the FCA by entering subcontracts with prime contractors including Boeing, Lockheed Martin and Raytheon. (SAC ¶¶ 77-80,126)

AR's attempt to limit its liability based on the fact that the NASA FARS and DFARS clause did not make it into certain contracts is without merit. AR's obligation to protect sensitive information did not begin the day the NASA FARS or DFARS clause became effective. These clauses were enacted as tools used to make sure contractor's

honored existing obligations to protect the government's sensitive information.  The SAC complaint does not simply refer to the DFARS and NASA FARS Clause but alleged generally that AR's contracts included federal regulations related to cybersecurity. (SAC ¶ 12)

In the case of DOD contracts the SAC alleges not only that DOD contracts included the DFARS Clause but also that contracts included a form DD-254 that incorporated cybersecurity requirements into the contract. *Id.* These DOD contracts that did not yet incorporate the DFARS Clause would include a DD Form 254 which required that AR comply with all laws and regulations governing access to "Unclassified Controlled Technical Information" which would include the DFARS Clause. The standard DD Form 254 states: "The contractor is responsible for compliance with all applicable laws and regulations governing access to Classified or Controlled Unclassified Information". (Defendants' Ex. 71) So the day the DFARS Clause became effective, AR was contractually required to comply with it regardless of whether the clause itself was listed in the contract.  Even before the DFARS Clause was effective the MDA advised AR that safeguarding unclassified information against network intrusions and data exfiltration was a requirement for MDA contracts related to ballistic missile defense. (UMF No. 124)

For NASA contracts that did not specifically include the NASA FARS Clause, the contract would have included NASA FARS Clause 1852.237-73 which required Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure.

Regardless of whether these specific clauses got into a particular contract, AR cannot seriously argue that they did not know that leaking the government's sensitive military information to our adversaries was not illegal or material to these contracts. If AR wants summary adjudication that these clauses do not apply to certain contracts, the burden is on them to produce for the court copies of these contracts so they can demonstrate the clauses are not there. As for the AR subcontracts, compliance with the DFARS and NASA FARS Clause were mandatory flow down requirements. Lockheed sent AR numerous letters wherein they advised AR that compliance with DFARS Clause 252.204-7012 was a mandatory requirement. (UMF Nos.125,132,134)

**B. Relator Has A Viable Implied False Certification Claim Because Defendants Made False Statements To NASA To Secure the Payment of Invoices.**

Defendants should be denied summary adjudication as to Count 2 of relator's SAC. False claims liability attaches when a contractor: "…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 USC § 3729 (a)(1)(B). The Supreme Court *Universal Health Servs., Inc. v. United States (Escobar),* 136 S. Ct. 1989, (2016) held that false claims liability under an implied certification may be found where a contractor makes false statements about the goods or services provided in connection with a claim for payment. The Court wrote:

> [W]e hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths. *Id.* at

2001.

On March 17, 2017, NASA rejected an AR invoice and stated that all future invoices would be rejected due to AR's performance deficiencies in submitting an acceptable Information Technology System Security Plan. (AUF No. 22) AR contends that were paid on all NASA invoices, so AR had to change this plan by adding false statements. From at least this date forward, AR was on notice that NASA was connecting its statements in these security plans to its payment of invoices. Hence, AR used false statements about the goods or services it was providing so NASA would pay its invoices. AR submitted multiple false Information Security Management Plans and Information Technology Security Inventories to NASA and every plan or inventory sent after March 17, 2017 would support liability based on an implied certification. (UMF Nos. 88-120)

Defendants' reliance on *United States ex rel. Kelly v. Serco, Inc.,* 846 F.3d 325, 333 (9th Cir. 2017) to argue they are entitled to summary adjudication is misplaced. The court in *Kelly* granted summary judgment because the relator had no evidence the vouchers presented by the contractor made any representations about its performance. *Id.* at 332. While AR focuses on what is stated in its invoices, the statute does not refer to invoices but a false record or statement. The Court in, *Escobar,* did not state that the false statement had to be in an invoice but that false statements are made connection with a request for payment. Defendants' interpretation would allow a contractor to escape liability by submitting an invoice and then make false statements after the invoice is submitted to get paid, because the false statement is not in the invoice itself. It is the causal connection between the statement and the payment of the invoice that matters.

## C. Relator Has Established That AR's Fraudulent Representations And Omissions Caused The Government To Enter Contracts.

Defendants' argument that relator has not presented any evidence to establish a causal connection between its false statements and the government's decision to enter contracts or make payments is without merit. AR was told that they could not be awarded the GBSD Study contract unless they were 100% compliant with the DFARS Clause. (UMF No. 135-137) AR was only able to secure the GBSD contract after promising to provide 100% compliance with a stand-alone computer network. (UMF No. 145)

The causal connection and AR securing DOD contacts cannot be reasonably questioned as multiple DOD agencies advised AR that compliance with the DFARS Clause was a mandatory nonwaivable requirement to secure a DOD contract where they would access the DOD's unclassified controlled technical information. (UMF Nos.126-139) DOD prime contractors also advised AR that if they wanted to work on DOD subcontracts, compliance with the DFARS Clause was a mandatory flow down requirement. (UMF. Nos.125,132)

There is also a causal connection between AR's cybersecurity status and NASA contract awards.  NASA indicated compliance with NASA FARS Clause was material to its contracting decisions as NASA sought assurance from AR that NASA's sensitive but unclassified ("SBU") information would be protected. Before awarding the NASA RS-25 Restart contract, NASA wanted to understand AR's IT Security, when AR was projected to be compliant and where they stood on current programs. (UMF No. 70-72) Before awarding the RS-25 contract, NASA asked AR if they should be worried about AR's

cybersecurity and wanted to know what steps were being taken to mitigate NASA's risk. (UMF No. 75) In connection with awarding the RTAPS contract, NASA advised AR that they needed to answer questions and provide a security management plan because NASA needed to know how AR will be working with the NASA environment. (UMF No, 73) Later, at the end of 2016, when NASA was concerned that AR was not securing its data, NASA refused to pay invoices and threatened stop work orders. (AUF Nos.22-25)

### D. AR Has Failed To Establish Its Cybersecurity Compliance Status Was Not Material To The Government.

#### 1. The DOJ Has Stated That Contractors Who Conceal Cyber Breaches Or Fail To comply With Cybersecurity Requirements May Be Subject To False Claims Liability.

Relator has provided overwhelming evidence that compliance with cyber security standards was material to the government. 31 USC § 3729 (b) (4) defines the term material stating: "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property". The Court in *Escobar* defined materiality under the FCA as follows:

> We need not decide whether § 3729(a)(1)(A)'s materiality requirement is governed by § 3729(b)(4) or derived directly from the common law. **Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation…** In tort law, for instance, a 'matter is material' in only two circumstances: (1) **'[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction'**; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not…. Materiality in contract law is substantially similar… **'[A] misrepresentation is material' only if it would 'likely ... induce a reasonable person to manifest his assent,'** or the defendant 'knows that for some special reason [the representation] is likely to induce the particular

recipient to manifest his assent' to the transaction" (Emphasis added and citations omitted) *Escobar, supra,* at 2002-03

What reasonable person would award AR a contract knowing that AR would put designs for intercontinental ballistic missiles on a computer network that can be accessed by Iran or North Korea? Cybersecurity is important to the DOD because they know that the theft of the DOD's sensitive data can allow our adversaries to clone technology, get leap ahead technologies that allow them to counter us in battle, putting our warfighter's lives at risk. (AUF No. 4) Having contractors comply with cybersecurity and timely report cyber intrusions is critical to military operations and our national defense. (AUF Nos. 6,7,8)

Recognizing the critical importance of cyber security to our national defense, the DOJ had announced the formation of the Civil Cyber Fraud Initiative to utilize the False Claims Act to go after contractors, like AR, who fail to follow required cyber security standards and fail to report cyber breaches because this type of conduct puts us all at risk. (AUF Nos. 1,2)

## 2. AR Did Not Fully Disclose Its Cybersecurity Compliance Status To The Government.

AR has presented no evidence to support its contention that the government continued to award them contracts or pay invoices after the government was aware they were not compliant with cybersecurity requirements. At most AR disclosed that it was not fully compliant with required technical controls but those disclosures were accompanied by false statements and material omissions designed to downplay the risk to government data.  The Court in *Escobar,* indicated false claims liability can be attached

to half-truths that state the truth only so far as it goes, while omitting critical qualifying information. *Escobar, supra,* at 2000. Here, AR made so many false statements and material omissions, it cannot be said that they told even "half" the truth.

### 3. Government Knowledge Of A False Claims Action Or Investigation Is Not Dispositive On The Issue of Materiality.

AR's argument that the fact the government continued to contract with them after the filing of this false claims action is not dispositive on the issue of materiality. The government's mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance. See, <u>United States ex rel. Escobar v. Universal Health Servs., Inc.</u>, 842 F.3d 103, 112 (1st Cir. 2016) The filing of a FCA Complaint does not necessarily put the government on notice of the allegations of the complaint. See, *United States v. Pub. Warehousing Co. K.S.C.,* No. 1:05-CV-2968-TWT, 2017 WL 1021745, at *6 (N.D. Ga. Mar. 16, 2017)

Moreover, whether the government continues to contract with a contractor after it is aware of conduct giving rise to false claims liability is not dispositive on the issue of materiality. Some contracts are critical to the government and cannot just be terminated without damaging other government interests. In this case, AR was manufacturing advanced missile technology in which the government had invested billions of dollars. AR was working with other defense contractors on projects the government wanted to complete on a certain timeline, leaving few viable options to replace AR's services. The government knowledge defense carries less weight when the false claim relates to a

product critical to the government. As the court in *United States v. Pub. Warehousing Co. K.S.C., supra,* stated:

> **The more essential the continued execution of a contract is to an important government interest, the less the government's continued payment weighs in favor of the government knowledge defense**. "To find otherwise could lead to perverse outcomes; the more dependent the government became on a fraudulent contractor, the less likely it would be to terminate the contract (and the less likely the contractor would be held liable). (Emphasis added) *Id.*

### 4. AR Has Presented No Evidence That The Government Paid An Invoice Or Entered A Contract With Actual Knowledge Of The Extent Of AR's Non-Compliance.

AR has presented no evidence that the government entered a contract with full knowledge of AR's noncompliance. For AR to succeed on an "actual knowledge" defense, AR has the burden to show that the government paid an invoice or entered a contract with full actual knowledge of its noncompliance and that AR could not protect the government's sensitive data. Moreover, although the government's payment of an invoice or entering a contract with actual knowledge of the illegal conduct is strong evidence the conduct is not material it is not dispositive on the issue of materiality. See, *Escobar, supra* at 2003. The actual knowledge defense carries less weight in this case because the product involved is critical to the government. See, *United States v. Pub. Warehousing Co. K.S.C., supra,* at *6.

### 5. Industry Compliance With Cybersecurity Clauses Is Not Relevant To This False Claims Action Against AR.

Industry compliance with these cybersecurity clauses has no relevance to AR's false claims liability. AR has presented no evidence that any other contractor lied to the

government while placing advanced military technology on a computer network that was being accessed by our adversaries. The fact that the government is working with some contractors to become compliant does not negate materiality. AR's analysis would force the government to throw the book at every non-compliant contractor as soon as a new regulation is enacted or be found to forever waive its right to use the FCA as a tool to enforce contractor compliance. The grace the DOD initially showed non-compliant contractors was based on the assumption that most contractors were trying to do the right thing. (AUF Nos. 20) The DOD made clear that where contractors were not doing the right thing, they wanted to see them held accountable. (AUF Nos. 11,20)

### 6. The Government Did Not Abandon The 2013 DFARS Clause.

The contention that the government abandoned the 2013 DFARS Clause is simply false. The government amended the DFARS Clause to adopt the NIST 800-171 controls that were better suited to private contractors and to give contractors time to achieve full technical compliance with the NIST 800-171 controls. Every single version of the clause required that the contractor provide adequate security to protect the government's sensitive information. "Adequate Security" in every version of the DFARS clause was defined as follows: "Adequate security means protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information." DFARS Clause 252.204-7012. Every version of the clause also required that where the contractor had not achieved technical compliance, that they submit to the DOD for approval, alternate controls or protective measures that achieve protection equivalent to the required technical controls.

### 7.  Contract Awards Were Conditioned On Compliance With Cybersecurity Requirements.

AR argues that relator has failed to show compliance was required for the government to award a contract or pay an invoice. This is simply not the case. Relator has shown from AR's own documents that NASA and the DOD were insisting on compliance or at a minimum assurance that their sensitive information would be protected before awarding a contract. The DOD told AR multiple times the DFARS Clause was not waivable and that if they wanted a contract they had to comply.

### E.  AR Should Pay Damages In The Amount of Three Times The Invoices Paid Which Is Less Than The Actual Damages The Government Sustained.

The fact that AR would argue that the government suffered no actual damage as a result of their leaking missile technology to our adversaries is precisely why AR needs to be held accountable for the full damage it has caused. AR was not simply hired to manufacture military hardware. They were hired to produce the most advanced military weapons to give our warfighter's a strategic advantage when they go to war to protect our country. As the DOD has stated: "The adversary is looking to steal information in order to counter, kill or clone our capabilities and when information is compromised in the development of a program, then the program is less valuable to the DOD and the money invested is less valuable." (AUF 14).

Unfortunately, AR has allowed our adversaries to access billions of dollars in military technology paid for by the American taxpayer. AR does not have the resources to reimburse this loss much less cover the damage that has been caused by putting all

Americans at risk. The court in, *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), held where a defendant is found liable for violating the FCA on a "promissory fraud or fraud in the inducement theory, the measure of damages is the amount paid on every invoice submitted to the government on the fraudulent contract. *Id.* at 1173.

The measure of damages for AR's conduct should be the value of every invoice paid on these fraudulently induced contracts multiplied times three pursuant to 31 U.S.C. § 3729 (G).

## V.   CONCLUSION

For the foregoing reasons defendants' motion for summary judgment/adjudication should be denied in its entirety.

Dated:  October 12, 2021                                  Respectfully submitted,

                                                          THYBERGLAW


                                                           _/s/ Gregory A. Thyberg__
                                                          GREGORY A. THYBERG
                                                          Attorneys for Relator
                                                          BRIAN MARKUS