1  THYBERGLAW
   GREGORY A. THYBERG SBN102132
2  3104 O STREET. #190
3  SACRAMENTO, CALIFORNIA 95816
   TEL: (916) 204-9173
4  greg@thyberglaw.com

5
   ATTORNEYS FOR PLAINTIFF, BRIAN MARKUS
6

7

8                     UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA:           )   Civil Action No. 2:15-cv-2245 WBS-AC
12  *ex rel.*                           )
    BRIAN MARKUS                        )   RELATOR'S RESPONSE TO
13                                      )   DEFENDANT'S STATEMENT OF
                                        )   UNDISPUTED FACTS IN SUPPORT OF
14          Plaintiffs,                 )   MOTION FOR SUMMARY
         vs.                            )   JUDGMENT/ADJUDICATION AND
15                                      )   STATEMENT OF RELATOR'S
    AEROJET ROCKETDYNE HOLDINGS,        )   ADDITIONAL UNDISPUTED FACTS IN
16  INC., a corporation and AEROJET     )   OPPOSITION TO MOTION.
17  ROCKETDYNE, INC. a corporation.     )
                                        )
18          Defendants                  )   Date: November 1, 2021
19                                      )   Time: 1:30
                                        )   Courtroom: 5
20                                      )   Judge: Hon. William B. Shubb
21  _____

22          Pursuant to Local Rule 260(a) and Federal Rule of Civil Procedure 56, Relator

23  respectfully submit his response to defendants' Statement of Undisputed Facts in support of its

24  Motion for Summary Judgment, or, in the Alternative, Summary Adjudication and additional

25  undisputed facts in support of relator's opposition to defendants' motion.

26

27

28

**Relator's Response to Defendants' Statement of Undisputed Facts**                    1
**CASE NO. 2:15-cv-2245 WBS-AC**

**I.      The DOD RECOGNIZED THE FLAWS WITH the CYBERSECURITY CLAUSE AT ISSUE (THE 2013 DFARS Clause) and AS A RESULT, ABANDONED IT.**

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 1 | *On November 18, 2013, section 252.204-7012 was published in Chapter 2 of Title 48 of the Code of Federal Regulations (the "2013 DFARS Clause").[1]*<br><br>48 C.F.R. § 252.204-7012 (Nov. 18, 2013) | Not Disputed |
| 2 | *The 2013 DFARS Clause required contractor systems that transmitted or stored unclassified, controlled technical information ("UCTI") to either (a) implement fifty-one selected National Institute of Standards and Technology ("NIST") Special Publication 800-53 ("NIST SP 800-53") security controls or (b) submit a written explanation to the contracting officer stating why a control was not applicable or that an alternate control or protective measure was used by the contractor to achieve adequate protection.*<br><br>48 C.F.R. § 252.204-7012 (Nov. 18, 2013)<br><br>Ex. 13 (NIST Special Publication (SP) 800-53 r.4) (NIST standards in effect at time of November 2013 Clause implementation)<br><br>ECF No. 42 ("SAC") ¶¶ 12, 18-19 (admitting that DFARS and NFS Clauses only apply if UCTI is involved)<br><br>Ex. 70 (Office of the Chief Information Officer ("OCIO") concurring with Air Force assessment that DFARS Clause "does not apply" in the event contract did not include UCTI)<br><br>Ex. 200 (OCIO memorandum to Navy indicating that DFARS Clause was not applicable to contractor because it was not | Not Disputed |

---

[1]      Where Aerojet references the "DFARS Clause" without referencing a specific version of the clause, Aerojet intends to refer to all versions of 48 C.F.R. § 252.204-7012.

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | required to store UCTI) | |
| | Ex. 205 (1/6/2016 e-mail from OCIO stating that contracts could be awarded to non-compliant contractors) | |
| | Ex. 92 (5/20/2015 e-mail from OCIO stating that contract could be awarded to non-compliant contractors) | |
| 3 | *Representatives from the Department of Defense (the "DoD") acknowledged that the controls in NIST SP 800-53 were intended for use on federal government information systems, which differ from private contractor systems*<br><br>Ex. 21 at 8:20-24 (4/6/2017 DoD SBTW Presentation: "[I]f anybody is familiar with [NIST SP 800-53], that's actually a document that is focused on protecting government systems, it's very federalistic and it gives lots of how to."); *see also* "Ex. 20 (video recording of same)<br><br>SAC ¶ 20 ("The NIST SP 800-53 standards were originally implemented to apply to contractors operating computer systems on behalf of the federal government.")<br><br>Ex. 23 at 19:9-10 (6/23/2017 DoD Industry Day Presentation: "[800-53] was for federal agencies and federal information."); *see also* Ex. 22 (video recording of same)<br><br>Ex. 9 (Guissanie Dep.) at 63:10-64:17 ("there are elements in [NIST 800-53] that are federally focused that do not apply to nonfederal entities.")<br><br>Ex. 10 (Thomas Dep.) at 84:17-21 ("So prior to May 2016 my understanding is that [NIST 800-]171 was written specifically for industry. Where as [NIST 800-]53 was not, so it was written with the properties of a contractor system in mind.") | Not Disputed |
| 4 | *The DoD admitted that applying the NIST 800-53 standard to private contractor systems was not practicable.* | Disputed<br><br>The DOD stated the NIST 800-53 was focused on protecting |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 25 at 25:4-6 (6/23/2017 DoD Industry Day Presentation: "To apply [NIST 800-53] to a contractor system to protect CDI for confidentiality really isn't very -- isn't possible."); *see also* Ex. 24 (video recording of same)

Ex. 23 at 19:17-23 (6/23/2017 DoD Industry Day Presentation: "Also, since 800-53 was focused on the federal government, there's a lot of things in there that are federal-centric. They're the ways federal government decided to do business for itself based on policy or other reasons that aren't necessarily the way it has to be done in order to achieve the security objective."); *see also* Ex. 22 (video recording of same)

Ex. 25 at 26:12-20 (6/23/2017 DoD Industry Day Presentation: explaining that NIST 800-53 was "overly specific because the federal government wanted to do it in a particular way . . . and that was going to be problematic if we applied that to the contracting community, so we wanted to take that out of the situation"); *see also* Ex. 24 (video recording of same)

Ex. 23 at 19:9-13 (6/23/2017 DoD Industry Day Presentation: "So that's 800-53. That was for federal agencies and federal information. In order to apply [NIST 800-53] to the contracting community, NIST 800-171 was developed."); *see also* Ex. 22 (video recording of same)

Ex. 18 at AFDODCIO000589 ("[NIST] 800-53 controls developed for Federal systems . . . [and is] overly granular and difficult to apply to an 'as-built' contractor's system[, contains m]any baseline controls [that are] unnecessary . . . [contains m]any controls/elements [that] should not apply outside the US Government (Federal-centric).") | government systems, it was very prescriptive does not always make sense for industry with existing information systems which hold way more than just weapon system information. (Thyberg Dec. Opp. Ex. 1, 8:18-9:9 AR00232956-7) |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 5 | *Contractors and contracting officers were confused by the requirements of the DFARS Clause and the NIST standards, leading the Government to clarify requirements in later versions of the DFARS Clause and NIST revisions.*<br><br>Ex. 7 (Markus Dep.) at 163:16-164:4 ("[I]n areas where a control or something was intended . . . [the Government] intended one thing, and [contractors] implemented it a Ex. 7 (Markus Dep.) at 163:16-164:4 ("[I]n areas where a control or something was intended . . . [the Government] intended one thing, and [contractors] implemented it a different way, and so [the Government] wanted to clarify, and they did end up clarifying that quite a bit or clarifying quite a few [requirements].")<br><br>Ex. 9 (Guissanie Dep.) at 45:8-20 ("There were less questions from contractors about 171 than we had with [800-]53 because . . . the language is much plainer and . . . it was a holistic document, it packaged everything up and explained everything it was much easier for most contractors to understand then the table of selected 800-53 controls in a DFARS clause.")<br><br>Ex. 10 (Thomas Dep.) at 117:23-118:2 ("I am aware that many questions came in to the DoD CIO with regards to the NIST standards and requirements[.]")<br><br>Ex. 206 at AFDODCIO000215 & AFDODCIO000224 (12/15/2015 contractor disclosure reflecting disagreement between contractor and Air Force regarding NIST control requirements and wish to "remove some of the ambiguity" of the requirements)<br><br>Ex. 35 at ii (2019 Inspector General Report: "DoD Component contracting offices and requiring activities did not always know which contracts required contractors to maintain CUI" and "DoD does not know the | Not Disputed |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
|  | amount of DoD information managed by contractors and cannot determine whether contractors are protecting unclassified DoD information from unauthorized disclosure") |  |
| 6 | *On August 26, 2015, a new version of the DFARS Clause was published (the "August 2015 DFARS Clause") that adopted the security requirements set forth in NIST Special Publication 800-171 ("NIST SP 800-171"). The August 2015 Clause permitted a contractor to implement "alternative but equally effective security measures" in lieu of implementing the technical requirements in NIST 800-171.*<br><br>48 C.F.R. § 252.204-7012 (Aug. 26, 2015) | Contractors were not permitted to implement "alternative but equally security measures" in lieu of implementing the technical requirements in NIST 800-171. The August 26, 2015 clause provided that "alternative but equally security measures" had to be approved in writing by an authorized representative of the DOD CIO prior to contract award.<br><br>48 C.F.R. § 252.204-7012 (Aug. 26, 2015) |
| 7 | *NIST SP 800-171 required contractors to comply with 109 cybersecurity controls, which built upon the table of controls set forth in NIST 800-53 and expanded them, adding additional requirements.*<br><br>Ex. 14 (NIST 800-171)<br><br>Ex. 17 at 15 (reflecting defense industry group understanding that under NIST 800-171, even if a contractor was fully compliant with 800-53 they would have 70 "new" or "partially new" requirements) | Not Disputed |
| 8 | *NIST SP 800-171 expected contractors to have "plans of action designed to correct deficiencies and reduce or eliminate vulnerabilities."*<br><br>Ex. 14 (NIST SP 800-171) at Control 3.12.2 | Not Disputed |
| 9 | *Under the August 2015 DFARS Clause, contractors were expected to have implemented the NIST 800-171 controls* | Not Disputed |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *immediately upon receiving covered information.*<br><br>48 C.F.R. § 252.204-7012 (Aug. 26, 2015) | |
| 10 | *On October 8, 2015, the DoD issued a classwide deviation allowing contractors additional time to implement multifactor authentication.*<br><br>Ex. 16 | Not Disputed |
| 11 | *On December 30, 2015, the DFARS Clause was amended to give contractors until December 31, 2017 to comply with NIST SP 800-171 (the "December 2015 DFARS Clause").*<br><br>48 C.F.R. § 252.204-7012 (Dec. 30, 2015)<br><br>Ex. 21 at 9:20-25 (4/6/2017 DoD SBTW Presentation: "Other changes that we made as we moved forward with the rule, we gave them extra time to implement the standards. So right now industry has until December 31, 2017, to get these requirements in place on their information systems."); *see also* Ex. 20 (video recording of same)<br><br>Ex. 10 (Thomas Dep.) at 102:10-15 (testifying the December 2015 DFARS Clause "gave contractors until December 2017 to implement the 171 requirements"), 107:14-17 (same) | Not Disputed |
| 12 | *Under the December 2015 DFARS Clause, contractors were compliant with the DFARS Clause even if they had implemented no controls until December 31, 2017.*<br><br>Ex. 9 (Guissanie Dep.) at 46:24-47:1, 108:2-18 (testifying "the December 2015 interim rule basically said you had up to two years to implement the requirements of 800-171 . . . for that period, technically one didn't have to meet any requirement")<br><br>SBTW17 Tr. at 21:7-12 ("Because as a department we basically had about a two year period from 2015 when we put out the | Disputed<br><br>Although contractors were given until December 31, 2017 to comply with the NIST 800-171 technical controls, but compliance the DFARS Clause required more than compliance with the NIST 800-171 controls. If a contractor did not comply with a NIST 800-171 requirement that were required to submit to the contracting office for consideration of the DOD Chief |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | interim rule until it was final, and then having extended the requirements to be compliant until December of 2017, you had almost two years for industry to work on it.") | Information Officer (CIO) a written explanation as to why a particular requirement was not applicable or how an alternative but equally effective, security measure is used to compensate for the inability to satisfy the particular requirement and achieve equivalent protection. The authorized DoD CIO representative was required to adjudicate the offerors request to vary form NIST SP 800-171 and respond in writing prior to the contract award with accepted variance being incorporated in the resulting contract. Apart from the required technical controls and equally effective alternative measures the contractors are always required to provide "adequate security" which means "protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information."<br><br>DFARS Clause 252.204-7012 (December 2015 version) |
| 13 | *The deadline for compliance with NIST 800-171 was extended because the DoD understood that immediate implementation of NIST 800-171 was not feasible for government contractors.*<br><br>Ex. 19 at 2 (letter from industry group stating that industry and the DoD reached a "consensus" regarding the December 31, 2017 implementation deadline) | Disputed<br><br>Defense Undersecretary Ellen Lord's testimony, in defendants' Ex. 32, referred only to the difficulties small defense contractors were having in complying. Ex's 17, and 19 cited by defendants are hearsay documents published by industry groups lobbying the government and should be disregarded. |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 17 at 2 (industry group letter discussing "inability of industry to comply with at least one of the requirements" of the August 2015 DFARS Clause and explaning that contractors needed "time to implement the requirements of the [NIST 800-171]")<br><br>Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics reflecting that December 31, 2017 deadline was adopted because of concern about compliance) | |
| 14 | *On October 21, 2016, the DFARS Clause was amended again (the "2016 DFARS Clause"). The amendment reiterated that compliance with NIST SP 800-171 was not required until December 31, 2017 and provided instructions to contractors on how to request variances from NIST SP 800-171's controls.*<br><br>48 C.F.R. § 252.204-7012 (Oct. 21, 2016)<br><br>81 FR 72986 at 72990 (The phrase "as soon as practical" is added to encourage contractors to begin implementing the security requirements in NIST SP 800-171 prior to the December 31, 2017, deadline, but allows contractors to exercise their own judgement when planning an optimal implementation strategy.) | Not Disputed |
| 15 | *In December 2016, NIST published SP 800-171, Revision 1. Under the Revision, contractors could show compliance through adoption of a system security plan ("SSP") and implementation of plans of action and milestones ("POAMs") when they had not yet implemented a given control.*<br><br>Ex. 15 (NIST 800-171 Revision 1) at Ch. 3 ("Nonfederal organizations should describe in a system security plan, how the specified | Not Disputed |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | security requirements are met or how organizations plan to meet the requirements.") | |
| | Ex. 29 at 4:20-5:70 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."); *see also* Ex. 28 (video recording of same) | |
| | Ex. 29 at 15:13-21 (6/23/2017 DoD Industry Day Presentation: "[Y]our SSP and any associated POAMs document your implementation of [NIST 800-]171. So there could be a case where the requiring activity does not even ask for it. And if not, by signing the contract, you have something that documents how you're implementing [NIST 800-]171, so you're in compliance with that requirement of the clause."); *see also* Ex. 28 (video recording of same) | |
| 16 | *SSPs set forth how an organization's cybersecurity requirements are currently met or how the organization plans to meet those requirements. POAMs are specific to any unimplemented security controls, and describe how the organization plans to address them and how the planned mitigation will be implemented.* | Not Disputed |
| | Ex. 15 (NIST 800-171 Revision 1) at Ch. 3 ("Nonfederal organizations should describe in a system security plan, how the specified | |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | security requirements are met or how organizations plan to meet the requirements.") Ex. 29 at 4:20-5:70 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation."); *see also* Ex. 28 (video recording of same) | |
| 17 | *As of December 2016, a contractor would be considered to have implemented NIST 800-171 if they had an SSP reflecting POAMs in place.* Ex. 15 (NIST 800-171 Revision 1) at Ch. 3 Ex. 29 at 4:20-5:7 (6/23/2017 DoD Industry Day Presentation: "So, again, [NIST 800-]171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."); *see also* Ex. 28 (video recording of same) 48 C.F.R. § 252.204-7012 (Oct. 21, 2016) 48 C.F.R. § 252.204-7012 (Dec. 30, 2015) Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics: "the only requirement for [2017] is to lay out what | Disputed Defendants' Undisputed Fact No. 17 is an inaccurate paraphrase of the exhibits defendants rely on. For example, Ex. 29 states: "… a POAM may be linked with the system security plan to even show planned implementation" of a NIST 800-171. Ex. 29 does not state that simply because you have a POAM you are considered to be implementing a NIST 800-171. To the contrary, Ex. 29 indicates that government has to indicate they are willing to accept the risk of your POAM before you are considered implementing 171. |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | your plan [for compliance with NIST 800-171] is" and that it can "be a very simple plan") | |
| | Ex. 34 at 53:7-11 (4/26/2018 DoD SBTW Presentation: "Compliance means again not having every single security requirement implemented but having a System Security Plan in place."); *see also* Ex. 33 (video recording of same) | |
| | Ex. 34 at 19:24-20:24 (4/26/2018 DoD SBTW Presentation: "The NIST 800-171 is structured such that a contractor can demonstrate that he's implementing the 110 requirements in that pub[lication] by documenting what he's doing in a System Security Plan . . . in that he describes his information system and he also would describe how he is implementing the security requirements that he's implementing, and he would indicate which security requirements he has not yet implemented"); *see also* Ex. 33 (video recording of same) | |
| | Ex. 34 at 21:14-23 (4/26/2018 DoD SBTW Presentation: "But now because they can document in the System Security Plan how they plan to implement, they now can confidently sign the contract knowing that they are implementing NIST 800-]171 in the way that it says you need to implement it."); *see also* Ex. 33 (video recording of same) | |
| | Ex. 29 at 15:13-21 (6/23/2017 DoD Industry Day Presentation: "[Y]our SSP and any associated POAMs document your implementation of [NIST 800-]171. So there could be a case where the requiring activity does not even ask for it. And if not, by signing the contract, you have something that documents how you're implementing [NIST 800-]171, so you're in compliance with that requirement of the clause."); *see also* Ex. 28 (video recording of same) | |
| | Ex. 29 at 22:22-23:4 (6/23/2017 DoD | |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Industry Day Presentation: "if you look at the language in the clause, it says shall implement as a minimum, 800-171. And if you look at revision 1, [NIST] 800-171 says you can meet my requirements by doing a SSP and planned requirements with a plan of action. So it doesn't say implement the -- the clause doesn't say implement the requirements of 171. It says implement 171."); *see also* Ex. 28 (video recording of same) | |
| 18 | *The DoD recognized that contractors would remain non-compliant with the technical controls in NIST 800-171 even after the December 31, 2017 compliance deadline, yet remain compliant with the DFARS Clause.*<br><br>Ex. 21 at 20:18-23 (4/6/2017 DoD Small Business Training Week ("SBTW") Presentation: "And it might take longer than 2017 to get [to full technical compliance]. They would document that in their System Security Plan. What's interesting about the System Security Plan is that the NIST 800-171 says that the System Security Plan documents how the contractor is implementing 171."); *see also* Ex. 20 (video recording of same) | Disputed<br><br>Defendants misquote their source. The DOD presentation stated it "**might**" take longer than 2017 to get full technical compliance. The statement further reiterated that the DFARS required that contractors must implement 171 although they recognized the rule does not say contractors have to be 100% compliant 100% of the time. The defendants undisputed fact does not define "non-complaint." There is no indication in the cited source that the DOD expected contractors to be less than 25% compliant as Aerojet was according to its Nasa Gap Analysis "NGA". |
| 19 | *The DoD instructed contracting officers to modify existing contracts that incorporated the 2013 DFARS Clause or the initial version of NIST SP 800-171 in favor of NIST SP 800-171, Revision 1, which offered more flexibility to contractors.*<br><br>Ex. 30 at 3 (9/21/2017 Memorandum from Office of the Under Secretary of Defense | Not Disputed |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | directing "contracting officer[s] to modify the contract[s] to authorize the use of NIST SP 800-171, Revision 1, dated December 2016," if the contract included an earlier version of the NIST requirements)<br><br>Ex. 31 (12/12/2017 Memorandum from the Office of the Under Secretary of Defense "requesting contracting administration components to act on behalf of all affected components to issue mass modifications to bring DoD contracts in conformity with the latest version of NIST SP 800-171.") | |
| 20 | *In 2020, the "NIST SP 800-171 DoD Assessment Methodology" and the "Cybersecurity Maturity Model Certification" took effect.*<br><br>85 FR 61505 (introducing assessment methodology)<br><br>Ex. 21 at 16:22-17:11 (4/6/2017 DoD SBTW Presentation: discussing in 2017 whether DoD would monitor contractors' system for implementation of NIST 800-171 and stating "that is not going to happen" and explaining DoD "publishing this DFARS rule, realized that there is no conceivable way for us to deal with the volume of contractors and subcontractors that we have to deal with to be able to go out and do a hands-on inspection of their systems. So that is not the intent."); *see also* Ex. 20 (video recording of same).<br><br>Ex. 21 at 17:11-17:13 (stating in 2017 that "[t]he department's position is that they will not recognize third party assessor certifications"); *see also* Ex. 20 (video recording of same). | Not Disputed |
| 21 | *The NIST SP 800-171 DoD Assessment Methodology was the first time the DoD required a compliance assessment with any NIST standards from contractors.*<br><br>85 FR 61505 (introducing assessment | Not Disputed |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | methodology) | |
| | 48 C.F.R. § 252.204-7012 (Nov. 18, 2013) | |
| | 48 C.F.R. § 252.204-7012 (Aug. 26, 2015) | |
| | 48 C.F.R. § 252.204-7012 (Sept. 21, 2015) | |
| | 48 C.F.R. § 252.204-7012 (Dec. 30, 2015) | |
| | 48 C.F.R. § 252.204-7012 (Oct. 21, 2016) | |
| | 48 C.F.R. § 252.204-7012 (Dec. 31, 2019) | |
| | Ex. 21 at 16:22-25 (4/6/2017 DoD SBTW Presentation: telling industry that it "is not going to happen" that someone would "come and monitory [industry] systems to see if we're actually implementing [NIST 800-]171") *see also* Ex. 20 (video recording of same) | |
| | Ex. 21 at 17:1-23:6 (4/6/2017 DoD SBTW Presentation: explaining that "when publishing this DFARS rule, [DoD] realized that there is no conceivable way for us to deal with the volume of contractors and subcontractors that we have to deal with to be able to go out and do a hands-on inspection of their systems. So that is not the intent" and it was the "department's position is that they will not recognize third party assessor certifications") | |
| | Ex. 199 (reflecting that there is no accreditation of DFARS compliance and that contractors have "latitude" in complying with the DFARS Clause) | |
| | Ex. 35 at 28 ("While DoD Component contracting offices oversee contractor performance, they expressed confusion on whether they could conduct oversight activities of contractor networks and systems specific to cybersecurity protections.") | |
| 22 | *The NIST SP 800-171 DoD Assessment Methodology introduced, for the first time, a method to assess contractor implementation of NIST 800-171 controls required by the DFARS Clause. Specifically, the methodology scores contractors based on the* | Not Disputed |

| No. | Moving Party's Undisputed Fact and Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *"net effect of NIST SP 800-171 security requirements not yet implemented[.]"* | |
| | 85 FR 61505 (introducing assessment methodology) | |
| | Ex. 21 at 16:22-23:6 (4/6/2017 DoD SBTW Presentation: stating in 2017 that "[t]he department's position is that they will not recognize third party assessor certifications"); *see also* Ex. 20 (video recording of same) | |
| | Ex. 199 (reflecting that there is no accreditation of DFARS compliance) | |
| | Ex. 92 (OCIO recognizing that in 2015, the DFARS Clause did not have enforcement mechanism) | |
| 23 | *No version of the DFARS Clause after November 2013 required contractors to comply with controls from NIST 800-53.* | It is not disputed that versions of the DFARS Clause after November 2013 referred to NIST 800-171 rather than NIST 800-53 |
| | 48 C.F.R. § 252.204-7012 (Aug. 26, 2015) | |
| | 48 C.F.R. § 252.204-7012 (Sept. 21, 2015) | |
| | 48 C.F.R. § 252.204-7012 (Dec. 30, 2015) | |
| | 48 C.F.R. § 252.204-7012 (Oct. 21, 2016) | |
| | 48 C.F.R. § 252.204-7012 (Dec. 31, 2019) | |
| 24 | *The government expected that contractor systems, even if fully compliant with NIST 800-53 or NIST 800-171 could be breached and information could be exfiltrated.* | Disputed<br><br>The quoted presentation makes no mention of exfiltrated information. The full context of the quotation indicates the purpose of the DFARS compliance is not that it prevents a breach but when a breach occurs the contractor knows it is happening so that can take action to mitigate the loss of data and report to the DOD. |
| | Ex. 34 at 45:15-17 (4/26/2018 DoD SBTW Presentation: "And they could implement everything about the clause perfectly and still have a cyber incident."); *see also* Ex. 33 (video recording of same) | |

## II.    The NFS Clause AT ISSUE

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| 25 | *On January 24, 2011, Section 1852.204-76 was published in Title 48 of the Code of Federal Regulations (the "NFS Clause").*<br><br>48 C.F.R. 1852.204-76 (Jan. 24, 2011) | Not Disputed |
| 26 | *The NFS Clause requires contractors to "protect the confidentiality, integrity, and availability of NASA Electronic Information and IT resources and protect NASA Electronic Information from unauthorized disclosure."*<br><br>48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (a) | Not Disputed |
| 27 | *By its terms, the NFS Clause is only "applicable to [] NASA contractors . . . that process, manage, access, or store unclassified electronic information, to include Sensitive But Unclassified (SBU) information."*<br><br>48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (b) | Not Disputed |
| 28 | *The NFS Clause does not require the contractor's information technology system to meet any specific security standard on its face, and allows "Parts of the clause and referenced ADL may be waived by the contracting officer."*<br><br>48 C.F.R. 1852.204-76 (Jan. 24, 2011) | Disputed<br><br>Defendants have quoted 48 C.F.R 1852.204-76 out of context. "Parts of the clause and ADL may be waived by the contracting officer "if the contractor's ongoing IT security program meets or exceeds the requirements of NASA Procedural Requirements (NPR) 2810.1 in effect at the time of the award." |
| 29 | *The NFS Clause instructs NASA contracting officers to outline the requisite cybersecurity standards in an "Applicable Documents List (ADL) provided as an attachment to the* | Dispute<br><br>The clause does not instruct the contracting officer to "outline" |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | *contract."*<br>48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (b) | anything. The clause states: Applicable requirements, regulations, policies, and guidelines are identified in the Applicable Documents List (ADL) provided as an attachment to the contract. The documents listed in the ADL can be found at: ***http://www.nasa.gov/offices/ocio/itsecurity/index.html.*** For policy information considered sensitive, the documents will be identified as such in the ADL and made available through the Contracting Officer. |
| 30 | *One document that is optional for NASA contracting officers to include in a contract's ADL is NASA Procedural Requirement ("NPR") 2810.1, which sets forth NASA cybersecurity policies which contemplate a system compliant with NIST 800-53.*<br>Ex. 36 (NPR 2810.1A)<br>Ex. 212 (NASA webpage reflecting cybersecurity policies)<br>RJN Fact No. 21 | Disputed<br><br>NPR 2810.1 is not an optional applicable document. Ex. 212 referenced by defendants indicates that NPR 2810.1 is a document on the list of documents contractors interested in doing business with NASA should refer to for information security requirements. |

**III.   LESS THAN HALF OF THE CONTRACTS IN RELATOR'S COMPLAINT INCLUDE THE DFARS OR  NFS CLAUSES.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| 31 | *Relator alleges that Aerojet defrauded the government in connection with eighteen contracts enumerated in his Second Amended Complaint.*<br>Ex. 7 (Markus Dep.) at 295:3–8. | Dispute<br><br>Relator's Second Amended Compliant ("SAC") is not limited to eighteen contracts but alleges defendants engaged in a fraudulent |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | SAC ¶¶ 67-68, 84-119<br><br>RJN Fact No. 71 | course of conduct to obtain multiple contracts. SAC ¶ 29. The SAC alleges that defendants signed **at least** six DOD contracts. (Emphasis added) SAC ¶ 84. The SAC alleged two contracts where Aerojet was required to comply with the interim August 2015 DFARS Clause. SAC ¶ 91 The SAC alleges that defendants signed **at least** nine NASA contracts. (Emphasis added) SAC ¶ 105 Count One of SAC refers to defendants engaging in a course of conduct where they entered multiple contracts. SAC ¶ 121. The SAC alleges that defendants violated the false claims act by entering subcontracts with prime contracts that were subject to the NASA FARS and DFARS clause including contracts with Boeing, Lockheed Martin and Raytheon. SAC ¶ 126 The SAC also refers to defendants violating the False Claims Act on the GBSD contract. SAC ¶ 76 The SAC refers to defendants violating the False Claims Act on Air Force contract FA8650-14-C-7424. |
| 32 | *On February 25, 2014, the Department of the Army (the "Army") awarded Aerojet contract # W31P4Q-14-C-0075, to manufacture HAWK rocket motors. The contract did not contain the DFARS Clause.*<br><br>Ex. 71<br><br>Ex. 37 at Row 2 | Disputed<br><br>The contract included a DD Form 254 which required that Aerojet comply with all laws and regulations governing access to "Unclassified Controlled Technical Information" which would include the DFARS Clause. The DD Form 254 stated: "The contractor is responsible for compliance with all applicable laws |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | | and regulations governing access to Classified or Controlled Unclassified Information. Ex. 71 to Defendant's motion. The contract actually required Aerojet to comply with more stringent requirements including ITAR, the NISPOM and DOD 5220.22 because it required that Aerojet handle classified information. *Id.* The SAC referred that not only violated the DFARS Clause but earlier contracts that did not have the DFARS Clause but had cybersecurity requirements in a DD-254. SAC ¶ 12 |
| 33 | *On March 11, 2014, the National Aeronautics and Space Administration ("NASA") awarded Aerojet Award ID # NNC13TA66T under parent contract # NNC10BA13B, to study the potential application of additive manufacturing for the RL10 rocket propulsion engine. The award did not contain the NFS Clause.*<br><br>Ex. 122<br><br>Ex. 121 at row 10 | Disputed<br><br>The only evidence offered by defendants is the task order, not the parent contract. |
| 34 | *On April 22, 2014, the Department of the Navy (the "Navy") awarded Aerojet contract # N00014-14-C-0035, to develop injector/manifold, and inlet designs for a continuous detonation engine. The contract contained the 2013 DFARS Clause.*<br><br>Ex. 104<br><br>Ex. 37 at Row 3 | Not Disputed |
| 35 | *On September 29, 2014, the Department of the Air Force (the "Air Force") awarded* | Disputed<br><br>Defendants have only provided a |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | *Aerojet contract # FA8650-13-D-2335, Award ID # 0002,[2] to fabricate powerhead hardware for a scramjet technology program. The contract did not contain the DFARS Clause.*<br><br>Ex. 39<br><br>Ex. 37 at Row 5 | task order not the complete contract. The document by it terms is does not list all clauses that apply to the contract. Section I of Ex 39 cited by defendants, states that the document is not to be construed as a complete listing of all of the contract clauses. |
| 36 | *On September 30, 2014, the Navy awarded Aerojet contract # N68936-14-C-0035, to perform system optimization studies for defense weapons systems. The contract contained the 2013 DFARS Clause.*<br><br>Ex. 105<br><br>Ex. 37 at Row 8 | Not Disputed |
| 37 | *On September 30, 2014, the Air Force awarded Aerojet contract # FA8650-14-C-7424, to design the thrust chamber assembly for a bantam rocket engine. The contract was funded by the Defense Advanced Research Projects Agency ("DARPA"). The contract contained the 2013 DFARS Clause.*<br><br>Ex. 42<br><br>Ex. 37 at Row 7 | Not Disputed |
| 38 | *On December 11, 2014, NASA awarded Aerojet contract # NNC10BA02B, Award ID # NNC15TA07T, to conduct testing to advance key enabling technology for hypersonic propulsion systems. The contract itself did not contain the NFS Clause but stated that "all of the applicable clauses under [the parent award] are still applicable" and referenced particular regulations "for their specific importance to this Task Order." The parent award included* | Not Disputed |

---

[2]    Aerojet was awarded parent contract FA8650-13-D-2335 on May 10, 2013, with subsequent awards #0002, 0003, and 0004, named in Relator's SAC. The original parent award did not contain the DFARS Clause. *See* Ex 38.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | *the NFS Clause.*<br><br>Ex. 124<br><br>Ex. 121 at Row 14 | |
| 39 | *On March 31, 2015, NASA awarded Aerojet contract # NNC15CA07C, to produce the NASA ion propulsion system for future space exploration and commercial use. The contract contained the NFS Clause.*<br><br>Ex. 125 | Not Disputed |
| 40 | *Prior to contracting with Aerojet, NASA determined that Contract No. NNC15CA07C would not require access to or storage of NASA Electronic Information or Information Technology ("IT") resources, meaning that Aerojet did not have access to information requiring protection under the NFS Clause.*<br><br>Ex. 123 at NASA_TOUHY00001128 (6/23/14 NASA form indicating that contract would not require selected contractor to have access to NASA's systems or generate data with NASA or on behalf of NASA)<br><br>Ex. 166 (interpreting Ex. 123 to mean that NFS Clause was not applicable) | Disputed.<br><br>Defendants' Ex. 123 is a requisition request and makes no reference to contract NNC15CA07C. Defendants admit in Undisputed Fact No. 39 this contract contained the NFS Clause. Ex. 166 contains conflicting information about whether the NFS Clause applies and at best is a contracting officer's interpretation of the contract. A contracting officer does not have authority to change a mandatory contract term or by bind the government by interpreting that a term in the contract did not apply. |
| 41 | *Contract # NNC15CA07C does not reference any applicable documents related to, or that contain cybersecurity standards, such as NPR 2810.1, which outlines certain NIST 800-53 compliant technical requirements.*<br><br>Ex. 125<br><br>Ex. 36 (NPR 2810.1A)<br><br>Ex. 212 (NASA webpage reflecting cybersecurity policies)<br><br>RJN Fact No. 21 | Disputed.<br><br>Defendants admit in their Undisputed Fact No. 39 that NNC15CA07C included the NFS Clause which references NIST 800-53. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| 42 | *The NFS Clause was not applicable to Contract No. NNC15CA07C and Aerojet was not required to implement a NIST 800-53 compliant system for that contract.*<br><br>Ex. 123 at NASA_TOUHY00001128<br><br>Ex. 125 | Disputed.<br><br>Defendants admit in their Undisputed Fact No. 39 that NNC15CA07C included the NFS Clause which references NIST 800-53. |
| 43 | *On April 8, 2015, the Air Force awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0003, to test engine operability and performance for scramjet technology. The contract did not contain the DFARS Clause.*<br><br>Ex. 40<br><br>Ex. 37 at Row 9 | Disputed<br><br>Defendants have provided no evidence as to the contract terms of the parent award. Defendant have provided a copy of an order for supplies not the contract itself. |
| 44 | *On July 27, 2015, NASA awarded Aerojet contract # NNC15VD08P, to perform an industry hypersonic propulsion capability assessment. The contract did not contain the NFS Clause.*<br><br>Ex. 126<br><br>Ex. 121 at Row 17 | Not Disputed |
| 45 | *On September 15, 2015, the Defense Advanced Research Projects Agency ("DARPA") awarded Aerojet contract # HR001115C0132, to perform research and development for the High Altitude Velocity (HAVOC) program for the Air Force. The contract incorporated by reference the 2013 DFARS Clause.*<br><br>Ex. 41<br><br>Ex. 37 at Row 15 | Not Disputed |
| 46 | *On October 8, 2015, the Air Force awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0004, to conduct a performance analysis of flight four of X-51A. The contract did not contain DFARS Clause 252.204-7012.* | Disputed<br><br>Defendants have provided no evidence as to the contract terms of the parent award. Defendant have provided a copy of an order for |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | Ex.43 <br><br> Ex. 37 at Row 17 | supplies not the contract itself. |
| 47 | *On November 17, 2015, NASA issued Award No. NNM16AB22P to accommodate final payment to Aerojet on contract # NAS8-36801, though there is no writted record for this award. The government's records reflect that the contract was completed on July 11, 2017.* <br><br> Ex. 121 at Row 20 <br><br> RJN Fact No. 60 | Not Disputed |
| 48 | *On November 19, 2015, NASA awarded Aerojet contract # NNM16AA02C, to provide RS-25 rocket engines for the Space Launch System. The contract incorporated the NFS Clause by reference.* <br><br> Ex. 127 <br><br> Ex. 128 <br><br> Ex. 121 at Row 21 | Not Disputed |
| 49 | *On December 14, 2015, NASA awarded Aerojet contract # NNM16AB21P, to test a research engine for the purpose of demonstrating a RAMS injector. The contract did not contain the NFS Clause.* <br><br> Ex. 129 <br><br> Ex. 121 at Row 22 | Disputed <br><br> The contract did not include the NFS Clause but included NASA FARS Clause 1852.237-73 which required Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure. |
| 50 | *On December 23, 2015, the Army awarded Aerojet undefinitized contract # W31P4Q-16-C-0026,[3] to manufacture Igniter rocket motors. The contract incorporated by reference the 2013 DFARS Clause. The* | Not Disputed |

[3]  Contract # W31P4Q-16-C-0026 is the correct, as-awarded contract number for contract W31P4Q-15-C-0016, which was named in Relator's complaint. SAC ¶¶ 66-68; *see also infra* Fact No. 58.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
|  | *definitized contract was signed on October 31, 2016.*<br><br>Ex. 72 at AR00234332, AR00234336.<br><br>Ex. 73<br><br>Ex. 37 at Row 19 |  |
| 51 | *On January 15, 2016, NASA awarded Aerojet contract # NNH16CP17C, to participate in the NEXTSTEP program to develop capabilities and technologies for advanced propulsion systems, with commercial applications. The contract did not contain the NFS Clause.*<br><br>Ex. 130<br><br>Ex. 121 at Row 23 | Disputed<br><br>The contract did not include the NFS Clause but included NASA FARS Clause 1852.237-73 which required Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure. |
| 52 | *On April 1, 2016, NASA awarded Aerojet contract # NNM16AA12C, to manufacture RL10 rocket flight engines for SLS missions. The contract incorporated the NFS Clause by reference.*<br><br>Ex. 131<br><br>Ex. 121 at Row 25 | Not Disputed |
| 53 | *Of the contracts identified in Relator's SAC, there are five DoD contracts that contain the DFARS Clause*<br><br>SAC ¶¶ 67-69; 85-114<br><br>Ex. 71 (Contract No. W31P4Q-14-C-0075 without the DFARS Clause)<br><br>Ex. 104 (Contract No. N00014-14-C-0035 with 2013 DFARS Clause)<br><br>Exs. 72 & 73 (Contract No. W31P4Q-16-C-0026 with 2013 and 2016 DFARS Clauses)<br><br>Ex. 105 (Contract # N68936-14-C-0035 with 2013 DFARS Clause)<br><br>Ex. 42 (Contract No. FA8650-14-C-7424 | Disputed<br><br>Relator's SAC compliant identified more than the contracts listed. The SAC alleges that defendants violated the false claims act by entering subcontracts with prime contracts that were subject to the NASA FARS and DFARS clause including contracts with Boeing, Lockheed Martin and Raytheon. SAC ¶ 126 The SAC also refers to defendants violating the False Claims Act on the GBSD contract. SAC ¶ 76 The SAC |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | with 2013 DFARS Clause)<br><br>Ex. 39 (Contract No. FA8650-13-D-2335, Award ID # 0002 without DFARS Clause)<br><br>Ex. 40 (Contract No. FA8650-13-D-2335, Award ID # 0003 without DFARS Clause)<br><br>Ex. 43 (Contract No. FA8650-13-D-2335, Award ID # 0004 without DFARS Clause)<br><br>Ex. 41 (Contract No. HR001115C0132 with the 2013 DFARS Clause) | refers to defendants violating the False Claims Act on Air Force contract FA8650-14-C-7424. |
| 54 | *Of the contracts identified in Relator's SAC, there are 4 NASA contracts that contain the NFS Clause.*<br><br>Ex. 122 (Contract No. NNC10BA13B, Award ID # NNC13TA66T incorporating the NFS Clause)<br><br>Ex. 130 (Contract No. NNH16CP17C without NFS Clause)<br><br>Ex. 131 (Contract No. NNM16AA12C with NFS Clause)<br><br>Ex. 129 (Contract No. NNM16AB21P without NFS Clause)<br><br>Ex. 127 (Contract No. NNM16AA02C with NFS Clause)<br><br>Ex. 125 (Contract No. NNC15CA07C with the NFS Clause)<br><br>Ex. 124 (Contract No. NNC10BA02B, Award ID # NNC15TA07T without the NFS Clause)<br><br>Ex. 126 (Contract No. NNC15VD08P without the NFS Clause) | Not Disputed |
| 55 | *As of 2017, only approximately 80% of contracts included the DFARS Clause as a contract term.*<br><br>Ex. 21 at 33:3-11 (4/6/2017 DoD SBTW Presentation: "We're up to I think like, 80 percent of the time [the DFARS Clause] gets | Disputed<br><br>This undisputed fact is not supported by the quoted statement. The statement itself is hearsay and there is a lack of foundation for the |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response Supporting Evidence |
|---|---|---|
| | in [contracts], but not always."); *see also* Ex. 20 (video recording of same) | statement. |

**IV.   AEROJET DELIVERED THE GOODS AND SERVICES IT CONTRACTED TO  PROVIDE THE GOVERNMENT.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 56 | *Aerojet delivered the goods and services for which the government agencies paid on Contract Nos. W31P4Q-14-C-0075; N00014-14-C-0035; FA8650-13-D-2335, Award ID # 0002; N68936-14-C-0035; FA8650-14-C-7424; FA8650-13-D-2335, Award ID # 0003; NNM16AB22P; HR001115C0132; FA8650-13-D-2335, Award ID # 0004; W31P4Q-16-C-0026; NNC10BA13B, Award ID # NNC13TA66T; NNC10BA02B, Award ID # NNC15TA07T; NNC15CA07C; NNC15VD08P; NNM16AA02C; NNM16AB21P; NNH16CP17C; and NNM16AA12C.*<br><br>Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data)<br><br>Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data) | Disputed<br><br>The good and services the government is paying for when a contractor is hired to produce a product related to advanced military or space technology is not simply the product produced but the value of the technology and intellectual property invested in creating that physical product. The government has stated that when its advanced technology is stolen in a cyber incident the finished product is less valuable to the government as the DOD stated: "The adversary is looking to steal information in order to counter, kill or clone our capabilities and when information is compromised in the development of a program, then the program is less valuable to the DOD and the money invested is less valuable. (Thyberg Dec. Opp. Ex. 2,4:22-5:7, AR00233090)<br><br>Part of services Aerojet was required to perform in connection with these contracts was to provide "adequate security" to protect the government's unclassified controlled technical information and sensitive but unclassified information which |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | Aerojet did not do. NASA wanted to understand how AR would be working with their SBU information prior to awarding contracts. (Thyberg declaration in support of relator's MSJ motion "Thyberg Dec. , Ex A 173-177, 290-291, Thyberg Dec.  Ex. K Ruiz Dep. 99:17-101:13.) NASA contract statement of works orders included cybersecurity as AR NASA contract NNM06AB13C "Space Launch System Rocket Engine Development Project Statement of Work (SOW)" (Thyberg Dec. Ex. A, 416-495) which stated that :"The contractor shall provide support for the following NASA Technology Protection Program Processes (TPP) processes, Critical Program Information(CPI) identification, Threat & Vulnerability Analysis, Selection and implementation of security countermeasures. ( Thyberg Dec. Ex. A 421) The SOW stated AR: " … shall ensure that NASA'S Sensitive But Unclassified (SBU) information,… is encrypted in storage and transmission." (Thyberg Dec. Ex. A, 421-22) The DOD also advised AR part of the services performing a DoD contract that included the DFARS clause was providing cybersecurity indicated that when a contractor signs a contract with the DFARS Clause they certifying are compliant with the clause. (Thyberg Dec. Ex A 212.) The MDA demanded that defense contractors adhere to the DFARS Clause requirement to safeguard |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | covered defense information on DOD contracts and cybersecurity reporting will apply to all DOD contracts. (Thyberg Dec., Ex. A 310). The documents cited do not indicate what the good and services in were itemized in these contracts. |

**V.   AEROJET DISCLOSED ITS NONCOMPLIANCE WITH THE CYBERSECURITY CLAUSES TO THE GOVERNMENT AND THE GOVERNMENT UNDERSTOOD THAT AEROJET WAS NOT COMPLIANT.**

    **A.   Aerojet disclosed to the DoD that it was not compliant with the DFARS Clause or NIST 800-53 and the DoD Understood that Aerojet Was Not Compliant.**

        **1.   Aerojet's Contracts with the Army**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Army and the Army understood that Aerojet was not compliant.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 57 | *Aerojet disclosed that it was not compliant with the DFARS Clause to the Army.*<br><br>Ex. 76 (8/28/14 e-mail and attached letter taking exception to the DFARS Clause in Igniter contract)<br><br>Ex. 77 (9/10/2014 e-mail from B. Joe to J. Nabity, noting AR "cannot confirm that we are compliant with this clause at this time.")<br><br>Ex. 78 (9/29/2014 email noting 9/22/14 telecom and attached disclosure statement from B. Joe to J. Nabity)<br><br>Ex. 79 (9/30/2014 email reflecting Army's understanding that Aerojet was "not compliant" with the DFARS Clause)<br><br>Ex. 80 (10/2/2014 e-mail invite for teleconference to discuss AR position on DFARS) | Disputed<br><br>Aerojet claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. Aerojet has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statements accompanied Aerojet's disclosures that it was not technically compliant with the DFAR |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 82 (10/2/2014 Hewitt internal memo detailing teleconference discussion where AR disclosed non-compliance with DFARS) | controls. In a letter to the ARMY in September 2014, Aerojet disclosed its compliance status with controls but  the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Thyberg Dec. Ex. A, 103) This letter advised Aerojet was compliant with the "majority" of the requirements when the NGA concluded Aerojet was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that Aerojet  was making every effort to prevent a data breach when Aerojet knew if was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68-83 , Thyberg Dec. Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) |
| | Ex. 83 (at AR00035399-5405 (10/27/14 email and attached disclosure letter to Army providing compliance update) | |
| | Ex. 84 (10/27/14 disclosure letter to Army providing compliance update) | |
| | Ex. 85 (2/10/2015 email noting that "Aerojet provided a process to become compliant," and that "Contract Specialist is currently working … [to] obtain a waiver for the DFARS Clause.") | |
| | Ex. 91 (4/16/2015 e-mail from B. Joe to C. McElyea responding that AR does "not have an ECD [estimated completion date] at this time[,]" for when it will be fully compliant with DFARS.) | |
| | Ex. 93 (6/15/2015 e-mail to M. Teasley providing additional information for "areas in which AR is not completely compliant[.]") | |
| | Ex. 95 (6/30/2015 e-mail from B. Joe to M. Teasley, L. Hewitt, and V. Michetti, attaching list of 7 items "in which AR says we are not compliant.") | |
| | Ex. 96 (6/30/2015 e-mail telecom invite to discuss DFARS with OSD and Army) | |
| | Ex. 98 (7/31/2015 e-mail with telecom invite to discuss DFAR compliance) | |
| | Ex. 101 (12/23/15 e-mail from J. Greene to M. Teasley updating Army that AR was still not compliant with NIST 800-171 or NIST 800-53 controls but would address "[i]dentified gaps in compliance" with POAMS) | Aerojet advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were leaking data and EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's |
| | Ex. 8 (Hewitt Dep.) at 25:14-26:4 (discussing a September 29, 2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause") | |
| | Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to | |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's noncompliance")<br><br>Ex. 8 (Hewitt Dep.) at 71:24-72:4 ("[i]t is my understanding that [Aerojet] [was] still not in compliance, based on the information attached to this e-mail") | representations to the government that they had "alternate controls" this was code for "alternate controls and no controls." (Thyberg Dec. Ex. A 213-217, 220-276, 302) |
| 58 | *On August 28, 2014, Aerojet sent the Army a letter stating that it took exception to the DFARS Clause in connection with Contract No. W31P4Q-14-C-0157, which was eventually awarded to Aerojet as Contract No. W31P4Q-16-C-0026.[4]*<br><br>Ex. 76 (Aerojet's conditional acceptance taking exception to the DFARS Clause)<br><br>Ex. 8 (Hewitt Dep.) at 54:11-13 (testifyiAerojet never accepted W31P4Q-14-C-0157)<br><br>Ex. 82 (noting the change from W31P4Q-14-C-0157 to W31P4Q-15-C-0016)<br><br>Ex. 8 (Hewitt Dep.) at 66:20–22 ("Aerojet did not sign . . . W31P4Q-15-C-0016 . . . .")<br><br>Ex. 8 (Hewitt Dep.) at 73:10-19 (testifying that the solicitation was reissued as W31P4Q-14-R-0109, Amendment 2 on August 10, 2015)<br><br>Ex. 73 at AR00234357 (signed definitized Contract No. W31P4Q-16-C-0026)<br><br>Ex. 37 at cells 19B & 19L (reflecting that contract W31P4Q-16-C-0026 resulted from solicitation W31P4Q-14-R-0109) | Disputed<br><br>Ex. 73 is a definitized contract which means the parties never came to an agreement on the contract terms. |

---

[4]     For ease of reference, Aerojet hereinafter refers to this contract as the awarded contract number.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 59 | *On September 10, 2014, in connection with Contract No. W31P4Q-16-C-0026, Aerojet indicated that it could "not confirm that [Aerojet] [is] compliant with [the DFARS] clause at this time."*<br>Ex. 77 | Not Disputed |
| 60 | *On September 22, 2014, Aerojet disclosed its non-compliance with the DFARS Clause to the Army during a teleconference in connection with Contract No. W31P4Q-16-C-0026.*<br>Ex. 78 | Disputed<br><br>There not indication in defendants' Ex. 78 as to what was said in the teleconference. Attached as part of Ex.78 is a September 29, 2014 letter. The letter does not disclose that Aerojet's system cannot detect of stop cyber intrusions, prevent the exfiltration of data and is leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13). This letter advised that Aerojet was compliant with the "majority" of the requirements when the NGA concluded Aerojet was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A) 292 The letter claimed that Aerojet was making every effort to prevent a data breach when Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13.) Aerojet claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) |
| 61 | *On September 29, 2014, Aerojet sent the* | Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *Army a letter in connection with Contract No. W31P4Q-16-C-0026 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."* <br><br> Ex. 78 <br><br> Ex. 81 <br><br> Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("With this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's noncompliance") | The letter does not disclose that Aerojet's system cannot detect of stop cyber intrusions, prevent the exfiltration of data and is leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13). This letter advised that Aerojet was compliant with the "majority" of the requirements when the NGA concluded Aerojet was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that Aerojet was making every effort to prevent a data breach when Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) |
| 62 | *The Army read Aerojet's September 29, 2014 letter and understood that it "documented their non-compliance with DFARS Clause 252.204-7012."* <br><br> Ex. 78 <br><br> Ex. 81 <br><br> Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only | Disputed <br><br> The documents indicate that the ARMY was aware that Aerojet was not fully compliant with the DFARS technical controls but there is no indication in these supporting exhibits that ARMY was made aware that Aerojet was not providing "Adequate Security" to protect the DOD's UCTI information, that Aerojet could not detect or stop cyber intrusions, prevent the |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's noncompliance") | exfiltration of data or that Aerojet was leaking sensitive data every day. |
| 63 | *On September 29, 2014, Aerojet and the Army had a teleconference in which Aerojet disclosed that it was not compliant with the DFARS Clause.*<br><br>Ex. 81<br><br>Ex. 8 (Hewitt Dep.) at 25:14-26:4 ("one of the topics concerned as to how much Aerojet did not comply with the DFARS clause") | Disputed<br><br>Although Aerojet had a teleconference to discuss its technical compliance with the DFARS controls these documents to do not indicate that Aerojet actually disclosed the extent of its non-compliance and that the government information on the Aerojet's system was not secure as Aerojet could not detect or stop cyber intrusions, prevent the exfiltration of data or that Aerojet was leaking sensitive data every day. |
| 64 | *On September 29, 2014, Aerojet e-mailed Army contracting officers and explained that Aerojet "is working diligently in bringing all of our [NIST] controls to full compliance with the DFARS Clause."*<br><br>Ex. 79<br><br>Ex. 81 | Not Disputed |
| 65 | *On September 30, 2014, a contracting officer for the Army recognized that Aerojet's communications reflected "the areas that Aerojet Rocketdyne are not compliant."*<br><br>Ex. 79<br><br>Ex. 81<br><br>Ex. 82 | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 66 | *On October 1, 2014, Aerojet requested a teleconference with the Army "to further discuss" the DFARS Clause, which was held on October 2, 2014. Relator, along with Aerojet's cybersecurity experts, participated in the teleconference. The Army summarized the call as Aerojet "mainly re-stat[ing] Aerojet's non-compliance issues with [the DFARS Clause] and how they worked it out with the Air Force and Navy."* <br><br> Ex. 82 <br> Ex. 80 | Disputed <br><br> Although Aerojet had a teleconference to discuss its technical compliance with the DFARS controls these documents to do not indicate that Aerojet actually disclosed the extent of its non-compliance and that the government information on the Aerojet's system was not secure as Aerojet could not detect or stop cyber intrusions, prevent the exfiltration of data or that Aerojet was leaking sensitive data every day. |
| 67 | *On October 27, 2014, Aerojet sent a letter to the Army stating that the attachment which described Aerojet's status with respect to NIST 800-53 control implementation showed "the specific 7 areas in which [Aerojet] is in substantial compliance to the requirements of [the DFARS Clause]."* <br><br> Ex. 83 at AR00035400. | Not Disputed |
| 68 | *On February 10, 2015, a contracting officer from the Army indicated that she understood that "Aerojet provided a process to become compliant" with the DFARS Clause and that the Army wanted to obtain a waiver.* <br><br> Ex. 85 | Not Disputed |
| 69 | *In March 2015, the Army sent Aerojet's October 27, 2014 letter to the DoD Office of the Chief Information Officer (the "DoD OCIO") along with a memorandum stating that the Army concluded that Aerojet's letter stated "compliance issues they may have with the requirements [in the DFARS* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *Clause]."* <br> Ex. 86 | |
| 70 | *On April 2, 2015, the DoD OCIO sent a memorandum to the Army concluding that Aerojet was "not in compliance with the requirements of the subject DFARS Clause."* <br> Ex. 89 | Not Disputed |
| 71 | *On April 14, 2015, the Army requested an estimate date that Aerojet would be compliant with the DFARS Clause. Aerojet stated that it did not currently have an estimated completion date for compliance.* <br> Ex. 91 | Not Disputed |
| 72 | *On May 14, 2015, the Army requested a waiver of the DFARS Clause from the DoD OCIO for Contract No. W31P4Q-16-C-0026.* <br> Ex. 92 | Not Disputed |
| 73 | *On May 21, 2015, the DoD OCIO informed the Army that it concluded that Aerojet was "not compliant with the DFARS Clause" but that there was "nothing to preclude [the Army] from awarding the contract" to Aerojet.* <br> Ex. 94 at AR00218330. | Disputed <br><br> This undisputed fact is misleading. The DOD CIO Stated: "In discussing this with OUSD (AT&L) they noted the DFAR does not require compliance with the controls prior to award-but the controls must be in place by the time the contractor has Controlled Technical Information (CTI) on his information system. Defendants' Ex. 94 <br><br> Michetti from the DOD CIO office indicated that the DFARS Clause controls had to be in place before AR was awarded a contract and that was relayed to AR. (Thyberg Dec. Opp., |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | Ex. 5, Hewitt Dep. 49:5-18) |
| 74 | *On June 15, 2015 and June 30, 2015, Aerojet disclosed to the Army a "list of the 7 areas in which [Aerojet] is not completely compliant" with the DFARS Clause.*<br>• Ex. 93<br>Ex. 95 | Not Disputed |
| 75 | *Aerojet made its cybersecurity experts available to the Army on June 30, 2015, via teleconference, to discuss Aerojet's non-compliance with the DFARS Clause.*<br>• Ex. 97<br>Ex. 96 | Not Disputed |
| 76 | *Aerojet conducted another teleconference with the Army on August 3, 2015 in which Aerojet discussed its non-compliance with the DFARS Clause.*<br>Ex. 98 | Disputed<br><br>The supporting document does not mention non-compliance nor does it prove the teleconference ever happened or provide information as to what was actually discussed. |
| 77 | *On August 13, 2015, Aerojet sent the Army an updated matrix regarding its DFARS Clause compliance status.*<br>Ex. 89 | Not Disputed |
| 78 | *On December 23, 2015, Aerojet sent a signed version of undefinitized Contract No. W31P4Q-16-C-0026 with a cover e-mail disclosing that it was not compliant with the 2013 DFARS Clause as it was only "fully compliant in meeting 24 [of the 60] security controls and identified 36 alternative controls . . . ."*<br>Ex. 101 | Disputed<br><br>The cover email indicated that it was complying with the DFARS by providing 36 alternate controls or protective measures to achieve equivalent protection. Defendant's Ex. 101 |
| 79 | *On March 31, 2016, the project manager for Contract No. W31P4Q-16-C-0026 concluded* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
|  | *that the DFARS Clause was not applicable to the contract because the contract did not involve UCTI.*<br><br>Ex. 102 |  |
| 80 | *The Army understood that Aerojet was not compliant with the 2013 DFARS Clause.*<br><br>Ex. 86 at AFDODCIO000109.<br><br>Ex. 91<br><br>Ex. 94 (5/27/2015 e-mail from M. Teasley to B. Joe relaying OSD interpretation of compliance)<br><br>Ex. 79<br><br>Ex. 81 (10/1/2014 timeline re Igniters contract)<br><br>Ex. 82 (10/2/2014 Hewitt internal memo detailing teleconference discussion where AR disclosed non-compliance with DFARS)<br><br>Ex. 85 (2/10/2015 email noting that "Aerojet provided a process to become compliant," and "Contract Specialist is currently working … [to] obtain a waiver for the DFARS Clause.")<br><br>Ex. 8 (Hewitt Dep.) at 25:14-26:4 (discussing a 9/29/2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause")<br><br>Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 | Disputed<br><br>AR has presented no evidence that the ARMY was ever given the complete story about its DFARS Clause compliance status. Although the ARMY knew AR was not compliant with the technical controls required by the DFARS clause, AR communicated to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's Undisputed Material Fact ("UMF") in support of relator's motion for MSJ No. 166) There is no evidence that the AR ever disclosed or the ARMY understood that AR was not compliant with the DFARS requirement that AR provide "adequate security."  AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the ARMY that EY was able to penetrate their computer network undetected in four hours gaining access to rocket |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | (testifying that September 29 letter "identified [Aerojet's noncompliance")<br><br>Ex. 8 (Hewitt Dep.) at 67:21-23 ("It was my understanding that on February 10, 2015, Aerojet was still not in compliance with the DFARS Clause.")<br><br>Ex. 8 (Hewitt Dep.) at 71:24-72:4 ("[i]t is my understanding that [Aerojet] are still not in compliance, based on the information attached to this e-mail") | designs. (Relator's UMF Nos. 34-39 in support of Relator's MSJ) AR's disclosures of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 2014 letter to the ARMY, AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF 1, 151 in Support of Relator's MSJ). The September 2014 letter stated AR was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF 54, 151 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective measures, AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied their VP and CIO's request to  increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) |

2. **Aerojet's Contracts with the Navy**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Navy and the Navy understood that Aerojet was not compliant.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 81 | *Aerojet disclosed that it was not compliant with the DFARS Clause to the Navy.* Ex. 110 Ex. 111 Ex. 112, ¶ 3 | Disputed AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statement accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the NAVY dated September 30, 2014, AR disclosed its compliance status with controls but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Relator's UMF Nos. 151,153 in Support of Relator's MSJ) This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) AR advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were leaking data and EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's representations to the government that they had "alternate controls" this was code for "alternate controls and no controls." (Thyberg Dec. Ex. A 213-217, 220-276, 302) |
| 82 | *Aerojet sent the Navy a letter in connection with N68936-14-C-0035 on September 30, 2014 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."* Ex. 110 Ex. 111 | Disputed In defendants' Exs. 110 and 111 AR claimed it was compliant with the majority of the DFARS Clause requirements. |
| 83 | *On September 30, 2014, the contracting officer for Contract No. N68936-14-C-0035 acknowledged receipt of Aerojet's September* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *30, 2014 letter and "accepted" Aerojet's conditional acceptance of the contract.*<br><br>Ex. 111<br><br>Ex. 112, ¶ 3 | |
| 84 | *The contracting officer for Contract No. N00014-14-C-0035 found no documents related to the DFARS Clause in a search of his files.*<br><br>Ex. 113, ¶ 5 | Not Disputed |
| 85 | *The Navy understood that Aerojet was not compliant with the 2013 DFARS Clause.*<br><br>Ex. 111<br><br>Ex. 112, ¶ 3, Ex. 1 (reflecting acceptance of Aerojet's disclosure statement). | Disputed<br><br>Defendants supporting exhibits indicated that the NAVY understood that AR was not fully compliant with the technical controls required by the DFARS Clause. There is no indication in these documents that the NAVY understood the extent of AR's non-compliance and that AR was operating a computer network that could be penetrated in a few hours undetected allowing full administrator access, that AR's system was leaking sensitive data every day, could not detect or stop cyber intrusions or prevent the exfiltration of sensitive data. Moreover, AR while telling the NAVY it was non-compliant was claimed to have alternate controls to achiev equivalent protection when that was code for "alternate controls and no controls."  (Thyberg Dec. Ex. A 213-217, 220-276, 302) There is no indication the NAVY understood that AR was not providing "adequate security" to protect is information such that AR's VP and CIO Jose |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | Ruiz did not feel comfortable having his personal information on AR's computer network or believe the government would be comfortable. (Thyberg Dec. Ex. K Ruiz Dep. 37:21-38:10) |

3. **Aerojet's Contracts with the Air Force**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Air Force and the Air Force understood that Aerojet was not compliant.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 86 | *Aerojet disclosed that it was not compliant with the DFARS Clause to the Air Force.*<br><br>Ex. 56 (8/7/2014 internal AF e-mail summarizing telecom with AR, noting that Aerojet is "not fully compliant yet" with the DFARS Clause)<br><br>Ex. 55 at AIRFORCE_TOUHY00000006-007 (9/6/14 - 9/8/14 e-mail chain between AR and the AF, discussing 9/8/14 telecom with DCMA ACO re DFARS non-compliance noting that "Aerojet discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance.")<br><br>Exs. 59-61 (disclosure letter sent to Air Force and DARPA representatives)<br><br>Ex. 61 at AIRFORCE_TOUHY00000002-03 (9/18/2014 email to Air Force and DARPA noting 9/16/2014 teleconference which discussed DFARS Clause, and attaching updated compliance matrix from version presented in meeting)<br><br>Ex. 65 (6/17/2015 e-mail to Air Force, attaching compliance matrix noting that "AR | Disputed<br><br>AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statement accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the Air Force in September 18, 2014 AR disclosed its compliance status with controls, but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | is compliant with the majority of the clause's requirements.") Ex. 66 (6/17/2015 e-mail exchange between J. Nishikawa and Cpt. Shannon, noting that AR is "not fully compliant with the subject DFARS clause.") Ex. 67 (6/22/2015 e-mail invite to telecom with AF and DCMA to discuss AR compliance with DFARS) Ex. 68 (6/23/2015 e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark) | while we work aggressively to strengthen the controls and implement additional protection measures." (Defendants Ex 60,61.) This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68-83, (Thyberg Dec. Ex. C, Laundrup Dec. ¶¶ 7-13). On June 23, 2015, AR promised the Air Force they would be 100% DFARS compliant for the GBSD Study contract and that they were complying with the DFARS clause with a stand-alone computer network when they were not. (Thyberg Dec. Ex. A 197,301,498, Thyberg Dec. Ex. C Laundrup Dec. ¶¶ 32-34 |
| ]87 | *After discussing the DFARS Clause with Aerojet, a representative from DARPA who was assisting with (and funding) the procurement, indicated that a contracting officer from the Air Force for Contract No. FA8650-14-C-7424 was "willing to work with [Aerojet] to find a way to move forward [with the contract] while making sure [Aerojet] makes good-faith progress toward compliance."* Ex. 54 at AR00196693 | Disputed The cited exhibits do not support defendants undisputed fact. The exhibits, which have been heavily redacted by AR, contain only self-serving hearsay statements from AR employees and no direct evidence of any statement from a government representative from DARPA. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 37 at row 6 (reflecting that DARPA was the funding agency for the Air Force award) | |
| 88 | *On July 24, 2014, Aerojet disclosed that it was not compliant with the DFARS Clause to contracting officials from the Air Force on Contract No. FA8650-14-C-7424.*<br><br>Ex. 56 | Not Disputed |
| 89 | *Contracting officials from the Air Force on Contract No. FA8650-14-C-7427 understood from the teleconference with Aerojet on July 24, 2014 that Aerojet was not compliant with the DFARS Clause.*<br><br>Ex. 56 | Disputed<br><br>There is no indication that the Air Force understood the extent of AR's non-compliance and that AR was failing to provide "adequate security" to protect DOD UCTI and that AR could not detect or stop cyber intrusions, could not prevent the exfiltration of data and knew it was leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thybeg Dec. Ex. C, Laundrup Dec. ¶¶ 7-13). Defendants' Ex. 56 indicates that AR told the Air Force that AR was putting a "high" priority on becoming compliant with the DFARS Clause when AR had no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) |
| 90 | *On August 7, 2014, Aerojet disclosed again that it was not compliant with the DFARS Clause to contracting officials from the Air Force on Contract No. FA8650-14-C-7424.*<br><br>Ex. 56 | Disputed.<br><br>AR disclosed that they were not "fully" compliant yet and claimed that AR was putting a "high" priority on becoming compliant with the DFARS Clause. (Defendants' Ex. 56) |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 91 | *Contracting officials from the Air Force on Contract No. FA8650-14-C-7427 understood from the teleconference with Aerojet on August 7, 2014 that Aerojet was not compliant with the DFARS Clause.*<br><br>Ex. 56 | Disputed.<br><br>AR disclosed that they were not "fully" compliant yet and claimed that AR was putting a "high" priority on becoming compliant with the DFARS Clause. (Defendants' Ex. 56) |
| 92 | *On August 28, 2014, Aerojet told an Air Force representative in connection with Contract No. FA8650-14-C-7424 that it was "continu[ing] to work the issues / actions associated with [the DFARS Clause]."*<br><br>Ex. 57 | Not Disputed |
| 93 | *On September 8, 2014, Aerojet, including individuals from its IT department participated in a teleconference with DCMA, regarding Contract No. FA8650-14-C-7424, in which Aerojet disclosed that it had a "company plan to reach compliance" with the DFARS Clause.*<br><br>Ex. 55 at AIRFORCE_TOUHY00000006-007 (9/6/14 - 9/8/14 e-mail chain between AR and the AF, discussing 9/8/14 telecom with DCMA ACO re DFARS non-compliance noting that "Aerojet discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance.") | Not Disputed |
| 94 | *On September 18, 2014, Aerojet sent a disclosure letter to the Air Force in connection with Contract No. FA8650-14-C-7424 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."* | Disputed<br><br>The letter does not disclose that AR's system cannot detect of stop cyber intrusions, prevent the exfiltration of data and is leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68- |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Exs. 59-61 | 83, Thyberg Dec. Ex. C Laundrup Dec. ¶¶ 7-13). This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C, Laundrup Dec. ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) |
| 95 | *On September 19, 2014, an Air Force contracting officer for Contract No. FA8650-14-C-7424 concluded that Aerojet "submitted sufficient information required by the clause to determine that an 'alternative controls' is in place" and suggested sending a letter reflecting that conclusion.*<br><br>Ex. 63 | Not Disputed |
| 96 | *On September 26, 2014, the Air Force provided a letter to Aerojet regarding Contract No. FA8650-14-C-7424 stating that Aerojet had "provided a detailed analysis of its compliance status" for the applicable NIST 800-53 controls and that it understood that Aerojet "ha[d] developed a phased approach which will assist in efforts to become fully compliant [with the NIST 800-* | Disputed<br><br>Defendants have taken the statement in their Ex 64 out of context. The letter only references AR's phased approach to become fully compliant as an additional comment to the main point of the letter confirming that the Air Force has approved AR's alternate controls or protective measures that AR has represented to |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *53] controls in the future."*<br><br>Ex. 64 | the government will achieve equivalent protection to the security controls in DFARS Clause 252.204-7012.  Letter indicates AR has a phased strategy to become fully compliant when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec., Ex. H Van Kleeck Dep. 78:25-79:17) |
| 97 | *On June 17, 2015, Aerojet sent a disclosure letter to the Air Force stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." The Air Force responded that its "only take away after reading it several time[s] was [Aerojet] is not compliant with [the DFARS Clause." Aerojet confirmed that it was "not fully compliant with the subject DFARS Clause[.]"*<br><br>Ex. 65<br><br>Ex. 66 | Disputed<br><br>Defendants mispresent Exhibits 65 and 66. The Air Force's stated AR's letter was confusing.  The Air Force concluded AR was not compliant with the DFARS Clause but was representing it was compliant with the majority of the requirements. |
| 98 | *On June 23, 2015, Aerojet discussed its compliance with the DFARS Clause during a teleconference with the Air Force.*<br><br>Ex. 67<br><br>Ex. 68 | Not Disputed |
| 99 | *On June 23, 2015, Aerojet sent the Air Force a letter "providing an updated response that is specific to [its] commitment and compliance plan for the GBSD Trade Study A (Post Boost Propulsion program)" and indicating that Aerojet would put special controls in place for the GBSD program.*<br><br>Ex. 68 | Not Disputed |
| 100 | *The Air Force understood that Aerojet was not compliant with the 2013 DFARS Clause.*<br>• Ex. 64 | Disputed<br><br>Defendants supporting exhibits indicate that the Air Force |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 62 (noting DARPA's acceptance of AR's "reasonable plan to comply")<br><br>Ex. 54 at AR00196693 (7/21/2014 email from DARPA program manager, noting conversations with Air Force, indicating that they were willing to work with AR "to find a way to move forward while making sure AR makes good-faith progress toward full compliance.")<br><br>Ex. 58 at AR00228740 (9/10/2014 email from DARPA program manager to AR, discussing efforts to come to resolution on DFAR-compliant contract, and noting AF openness to "solutions that do not require AR to sign a contract with which it cannot comply.")<br><br>Ex.63 (9/19/2014 email and subsequent chain from Air Force to Aerojet, noting acceptance of alternate controls and proposed letter to this effect)<br><br>Ex. 64 (Letter from M. Voiles (Air Force) to J. Capizzi (Aerojet Contracting) noting that the Air Force accepted AR's alternate control approach and understands "that AR has developed a phased approach which will assist in its efforts to become fully compliant in the future.") | understood that AR was claiming to comply with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls which is an alternate way to comply with the DFARS Clause. The exhibits indicate the Air Force understood AR was not fully compliant with the technical controls required by the DFARS Clause but there is no indication in these documents that the Air Force understood the extent of AR's non-compliance and that AR was operating a computer network that could be penetrated in a few hours undetected allowing full administrator access. There is no indication that the Air Force understood that AR's system was leaking sensitive data every day, could not detect or stop cyber intrusions or prevent the exfiltration of sensitive data. Moreover, AR while telling the Air Force it was non-compliant claimed to have alternate controls to provide equivalent protection when that was code for "alternate controls and no controls." (Thyberg Dec., Ex. A 213-217, 220-276, 302) There is no indication the Air Force understood that AR was not providing "adequate security" to protect is information such that AR's VP and CIO Jose Ruiz did not feel comfortable having his personal information on AR's computer network or believe the government would be comfortable. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | (Thyberg Dec., Ex. K Ruiz Dep. 37:21-38:10) |

**4. Aerojet's Contracts with DARPA**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Defense Advanced Research Projects Agency, which understood that Aerojet was not compliant.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 101 | *Aerojet disclosed that it was not compliant with the DFARS Clause to the Defense Advanced Research Projects Agency ("DARPA").*<br><br>Ex. 54 at 196693 (7/21/2014 e-mail reflecting DARPA's acknowledgement that Aerojet was working toward compliance with the DFARS Clause)<br><br>Ex. 58<br><br>Ex. 59-61 (9/18/2014 email to Air Force and DARPA noting 9/16/2014 teleconference regarding DFARS Clause, and attaching updated compliance matrix from version presented in meeting) | Disputed<br><br>AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statements accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the Air Force and DARPA dated September 18, 2014 (Defendants' Ex. 60), AR disclosed its compliance status with controls but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Defendants' Ex. 60) This letter advised AR was |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec., Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec., Ex. A 58-59, 61, 68-83, Thyberg Dec., Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec., Ex. H Van Kleeck Dep. 78:25-79:17) AR advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were leaking data and EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's representations to the government that they had "alternate controls" this was code for "alternate controls and no controls." (Thyberg Dec., Ex. A 213-217, 220-276, 302) |
| 102 | *Aerojet disclosed that it was not compliant with the DFARS Clause to DARPA at least by July 21, 2014.*<br><br>Ex. 54 at 196693 | Disputed<br><br>The cited exhibits do not support this UMF. The exhibits which have been heavily redacted by AR contain only self -serving hearsay statements from AR employees and no direct |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | evidence that AR disclosed anything to the government. |
| 103 | *On September 10, 2014, DARPA e-mailed Aerojet indicating that it understood that Aerojet could not comply with the DFARS Clause if it was included in a contract.* <br><br> Ex. 58 at AR00228741. | Not Disputed |
| 104 | *After a September 16, 2014 teleconference discussing its compliance status, on September 18, 2014, Aerojet sent a disclosure letter to DARPA stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."* <br><br> Exs. 59-61 | Disputed <br><br> Exhibit 60 does not explicitly state AR is not compliant with the DFARS Clause rather exhibit 60 indicates AR sent a letter where it proposed complying with the DFARS Clause by using alternate controls or protective measures that provided equivalent protection to the DFARS controls. |
| 105 | *Discussing Aerojet's September 18, 2014 letter, a DARPA program manager indicated that she did not believe the "new Gov't [DFARS] clause was [] well thought through" and that Aerojet "had a reasonable plan to comply" with the DFARS Clause.* <br><br> Ex. 62 | Not Disputed |
| 106 | *DARPA understood that Aerojet was not compliant with the 2013 DFARS Clause.* <br><br> Ex. 54 at 196693Ex. 62 (noting DARPA's acceptance of AR's "reasonable plan to comply") <br><br> . | Disputed <br><br> AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | Material omissions and misleading statement accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the Air Force and DARPA dated September 18, 2014 (Defendants' Ex. 60), AR disclosed its compliance status with controls but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Defendants' Ex. 60) This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec., Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew if was leaking data every day and could not stop or detect cyber intrusions. Thyberg Dec., Ex. A 58-59, 61, 68-83, Thyberg Dec., Ex. C Laundrup Dec. ¶¶ 7-13. They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec., Ex. H Van Kleeck Dep. 78:25-79:17) AR advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|-----|---|---|
|     |   | leaking data and EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's representations to the government that they had "alternate controls" this was code for "alternate controls and no controls." (Thyberg Dec., Ex. A 213-217, 220-276, 302) |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|-----|---|---|

**5. Aerojet disclosed that it was not compliant with the DFARS Clause to the DoD OCIO, which understood that Aerojet was not compliant.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|-----|---|---|
| 107 | The "DoD CIO is responsible for all matters relating to the DoD information enterprise, such as cybersecurity, communications, information systems, and more."<br><br>RJN Fact No. 23 | Not Disputed |
| 108 | The DoD OCIO was made aware that Aerojet was not compliant with the DFARS Clause.<br><br>Ex. 86 (3/12/2015 letter from Army to DoD OCIO noting that AR "informed the Government they were not in full compliance with DFARS" and attaching compliance matrix.)<br><br>Ex. 89 (3/17/2015 e-mail from DoD OCIO to Army noting they were reviewing AR's compliance matrix)<br><br>Ex. 89 at AFDODCIO000003 (4/2/2015 letter from OCIO Army concluding that Aerojet "is clearly not in compliance[,]" with | Disputed<br><br>Although defendants present evidence that the DOD CIO was aware AR was not compliant with the technical requirements of the DFARS Clause the exhibits provided by defendants do not indicate that AR ever disclosed the extent of their non-compliance with the DFARS Clause. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | certain DFARS controls.)<br><br>Ex. 94 (5/27/2015 e-mail chain between L. Hewitt and V. Michetti discussing how AR can become compliant with DFARS)<br><br>Ex. 95 (6/30/2015 e-mail from B. Joe to M. Teasley, L. Hewitt, and V. Michetti, attaching list of 7 items "in which AR says we are not compliant.") | data and that it was leaking data every day. Defendants have presented no evidence that they advised the DOD CIO that they could not provide adequate security to protect the government's sensitive information. |
| 109 | *In March 2015, the DoD OCIO received Aerojet's October 27, 2014 letter that was sent to the Army to along with a memorandum stating that the Army concluded that Aerojet's letter stated "compliance issues they may have with the requirements [in the DFARS Clause]."*<br><br>Ex. 86 | Not Disputed |
| 110 | *The DoD concluded after reviewing Aerojet's October 27, 2014 letter that Aerojet was "not compliant [with the DFARS Clause]."*<br><br>Ex. 86<br><br>Ex. 89 | Not Disputed |
| 111 | *On May 20, 2015, the DoD OCIO suggested a teleconference with Aerojet to discuss its non-compliance with the DFARS Clause.*<br><br>Ex. 92 | Not Disputed |
| 112 | *The DoD OCIO stated that "the DFAR[S] does not require compliance with the controls prior to award" and stated that there was "nothing to preclude [the Army] from awarding the contract [to Aerojet]."*<br><br>Ex. 92 | Disputed<br><br>This Undisputed Fact is misleading. The DOD CIO Stated: "In discussing this with OUSD (AT&L) they noted the DFAR does not require compliance with the controls prior to award-but the controls must be in place by the time the contractor has Controlled Technical Information (CTI) on his information system. (Defendants' Ex. 92) Michetti from the DOD CIO office indicated that |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | the DFARS Clause controls had to be in place before AR was awarded a contract and that was related to AR. (Thyberg Dec. Opp. Ex.5, Hewitt Dep. 49:5-18) |
| 113 | *On June 30, 2015, Aerojet disclosed to the OCIO a "list of the 7 items in which [Aerojet] [was] not compliant" with the DFARS Clause.*<br><br>Ex. 93<br><br>Ex. 95 | Not Disputed |
| 114 | *Aerojet made its cybersecurity experts available to the DoD OCIO on June 30, 2015, via teleconference, to discuss Aerojet's non-compliance with the DFARS Clause.*<br><br>Ex. 97 (7/1/2015 E-mail from Doug Smith summarizing call with members of the DoD OCIO)<br><br>Ex. 96 (meeting invite including DoD CIO members for 6/30/2015 meeting) | Not Disputed |
| 115 | *The DoD understood that Aerojet was not compliant with the 2013 DFARS Clause.*<br><br>Ex. 88 at 287-288 (3/23/2015 internal OCIO e-mail from V. Michetti acknowledging "we know that [AR] are not compliant from what was submitted.")<br><br>Ex. 89 (4/2/2015 letter from V. Michetti (OCIO) to C. McElyea (Army), stating AR "is clearly not in compliance[,]" with certain DFARS controls.)<br><br>Ex. 97 (7/1/2015 AR e-mail recounting comments from teleconference with OCIO)<br><br>Ex. 82 (10/2/14 memo re teleconference with | Disputed<br><br>This Undisputed Fact is misleading. The exhibits cited by defendants indicate that the DOD understood at a point in time that AR was not compliant with the DFARS Clause controls but nothing in these documents indicates that the DOD was aware of AR performing contracts or handling the government's unclassified technical information while not complying with the DFARS Clause. To the |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Aerojet)<br><br>Ex. 94 at AR00218330 (5/21/2015 E-Mail from OCIO to Army stating the OCIO determined that AR is not compliant but "it may be a relatively simple matter" to become compliant and "seems to have done most of what is required")<br><br>Ex. 8 (Hewitt Dep.) at 68:2-69:1 (DoD concluded that Aerojet's disclosure indicated that it was not in compliance with the DFARS Clause), 69:20-70:2 ("it was my understanding that [DoD's OCIO's] Ms. Michetti believed [Aerojet] was still noncompliant") | contrary these exhibits state that compliance with the DFARS controls was a black and white issue and that AR could not put the government's information on its computer network unless it was compliant with the DFARS controls or had implemented approved alternate controls or protective measure that achieved security that was equivalent to the DFARS controls. The records indicate the AR advised multiple DOD agencies that they were complying with the clause by providing alternate controls or protective measures to achieve equivalent protection. (Thyberg Dec., Ex. A 343-344) The exhibits indicate the DOD understood AR was not fully compliant with the technical controls required by the DFARS Clause but there is no indication in these documents that the DOD understood the extent of AR's non-compliance and that AR was operating a computer network that could be penetrated in a few hours undetected allowing full administrator access. There is no indication that the DOD understood that AR's system was leaking sensitive data every day, could not detect or stop cyber intrusions or prevent the exfiltration of sensitive data. Moreover, AR while telling the DOD it was non-compliant it claimed to have alternate controls to provide equivalent protection when that was code for "alternate controls and no controls." (Thyberg Dec.,Ex. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | A 213-217, 220-276, 302) There is no indication the DOD understood that AR was not providing "adequate security" to protect is information such that AR's VP and CIO Jose Ruiz did not feel comfortable having his personal information on AR's computer network or believe the government would be comfortable. (Thyberg Dec., Ex. K Ruiz Dep. 37:21-38:10) |

**6.     Aerojet disclosed that it was not compliant with the DFARS Clause to Other DoD Agencies, which understood that Aerojet was not compliant.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 116 | *Aerojet disclosed that it was not compliant with the DFARS Clause to the Missile Defense Agency ("MDA") at least by to June 29, 2015. On June 30, 2015, Aerojet provided additional detail regarding its non-compliance and its plan toward compliance with NIST 800-53.*<br><br>Ex. 116 (response to MDA questions with compliance matrix and updated explanatory controls statement) | Disputed<br><br>In December 2015, AR was communicating with the MDA that it was complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection. On December 16, 2015, AR'S Director of Contracts, Douglas Greer sent AR Director of Contracts, Missile Defense, an email with a statement that AR contracts personnel were to use to responding to customers regarding DFARS Clause 252.204-7012 which represented AR was fully compliant with meeting 24 security controls and identified 36 alternate controls or protective measures in place to achieve |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | equivalent protection. The statement stated:<br><br>AR completed a gap analysis of our enterprise infrastructure to assess our posture from a documentation and technical perspective. **AR does not intend to deviate from any of the security requirements under DoD FARS clause (Dec 2015) , or propose alternative security measures** but had planned a strategy and plan to address gaps going forward… **While the analysis has identified compliance gaps and areas of improvement, security controls to safeguard unclassified IT resources are in place** as described in the "Explanatory Control Statement." (Emphasis added) (Thyberg Dec., Ex. A, 343-344) |
| 117 | *On July 1, 2015, MDA determined that "Aerojet ha[d] met the requirements stated in the DFARS clause" and recognized that Aerojet had "items that [were] not fully compliant" and requested that Aerojet track them "via POA&M with periodic updates" to MDA.*<br><br>Ex. 117 | Disputed<br><br>Defendants Undisputed Fact is misleading as it quotes a statement out of context that mixes compliance with the DFARS Clause and compliance with the technical controls required DFARS clause to give the impression that MDA excused AR's failure to be fully compliant with the clause itself rather than the technical controls. Nothing in this statement indicates that the MDA's request that AR track its progress in technical compliance |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | via POA&M excused AR from providing adequate security by providing "alternate controls or protective measures to achieve equivalent protection which the DFARS Clause required for any technical control that was not met. Indeed defendants' Ex. 117 indicates security had reviewed AR's input and concluded AR had met the DFARS cybersecurity requirements, which was apparently based on information AR gave to the MDA about alternate controls that AR claimed achieved equivalent protection. Just a day before on July 1, 2015, the DOD OSD advised AR that a POAM or plan for compliance did not excuse compliance with the clause telling AR compliance was a "black and white" issue there is no middle ground and that when a contractor signs a contract they are asserting they are compliant not a plan to be compliant. (Thyberg Dec., Ex. A 212) Moreover, AR was at a meeting with the MDA on October 29, 2015, where it was stated that the MDA was demanding that defense contractors adhere to DFARS 252.204-7012. (Thyberg Dec., Ex A 310) |
| 118 | On July 2, 2015, MDA awarded Aerojet Contract No. HQ0147-15-C-0010. Relator congratulated the Aerojet team: "Our efforts yesterday paid off. We got the 12.5MM award from the MDA!"<br><br>Ex. 117 | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 119 | *On December 16, 2015, Aerojet met with representatives from the MDA and provided a detailed presentation on its compliance gap analysis. After the presentation, the MDA said Aerojet had the "best plan, only detailed plan they [had] seen" to reach compliance.*<br><br>Ex. 118 (internal AR e-mail recounting presentation to MDA attaching slide deck presented to MDA detailing DFARS compliance strategy) | Disputed<br><br>Defendants' Ex. 118 is nothing more than defendants own self-serving hearsay statement that does not prove anything. |
| 120 | *In response to Aerojet's presentation to the MDA in December 2015, MDA stated that they "underst[oo]d the path forward" and removed the DFARS Clause from a contract modification.*<br><br>Ex. 119 | Disputed<br><br>Defendants misrepresent Ex. 119. The clause was not removed from the contract, only a two-month cost extension. The extension was only given to prevent a lapse in performance because of the holidays. Ex. 119 indicates that there was going to have to be a resolution of clause 7012 if they were going to continue the contract. |
| 121 | *On June 22, 2015, Aerojet sent a disclosure letter to the Defense Contract Management Agency (the "DCMA") stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."*<br><br>Ex. 67 | Disputed<br><br>Defendants' Ex. 67 does not contain any letter addressed to the DCMA or in any way confirm such a letter was sent. The letter included in Ex. 67 is addressed to the Air Force and for that contract, AR represented to the Air Force that all of the DFARS controls would be in place and compliant for the duration of the contract. (Thyberg Dec., Ex. A 206-207) |
| 122 | *On June 23, 2015, Aerojet discussed its non-compliance with the DFARS Clause during a* | Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *teleconference with the DCMA.*<br><br>Ex. 67 | Nothing in defendants' Ex. 67 indicates AR was discussing its non-compliance. The exhibit indicates that it was discussing its compliance in accordance with the DFARS Clause. These discussions on this GBSD contract concluded with AR stating they would be 100% compliant with the DFARS controls for the duration of the contract. (Thyberg Dec., Ex. A 206-207) |
| 123 | *The DCMA concluded on June 22, 2015, after reviewing Aerojet's June 17, 2015 letter to the Air Force, that Aerojet was "not fully in compliance with the solicitations DFAR requirements to safeguard unclassified controlled technical information as per [the DFARS Clause]."*<br><br>Ex. 115 | Not Disputed |
| 124 | *There is no evidence that Aerojet represented to any DoD component that its enterprise system was fully technically compliant with NIST 800-53.*<br><br>Ex. 7 (Markus Dep.) at 331:3-11; 112:22-113:23 (asked whether Aerojet's disclosure statement states Aerojet is fully compliant with the DFARS Clause and testifying "No, I don't see words that say we are DFARS compliant")<br><br>Ex. 8 (Hewitt Dep.) at 64:17-18 ("At no time did Aerojet say that they were compliant with the DFARS Clause.") | Not Disputed |
| 125 | *The Defense Contract Management Agency determined after an audit that Aerojet was fully technically compliant with the NIST SP 800-171 controls in February 2021.*<br><br>Ex. 120 | Disputed<br><br>Defendants' Ex. 120 indicates the DCMA audited AR's Rancho Cordova Facility. There is no statement about AR's compliance at |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | any of its other facilities. It is unclear what the DCMA was auditing in Rancho Cordova as AR announced in April 2017, it was consolidating its defense related engineering and support positions and moving them to Huntsville Alabama which would reduce its workforce in Sacramento from 1400 to 300 by the end of 2018. (Thyberg Opp. Dec., Ex. 10) |
| 126 | *After Aerojet disclosed to the MDA that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, MDA continued to award Aerojet contracts.*<br><br>RJN Fact No. 41.<br><br>Ex. 37 (reflecting 5 contracts awarded since 7/2/2015) | Disputed<br><br>AR did not disclose the full extent of its non-compliance to the MDA. AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection. (Thyberg Dec., Ex. A 343) AR minimized the significance of its failure to comply with the NIST 800-53 controls telling the MDA although it had identified compliance gaps and areas of improvement security controls to safeguard unclassified IT resources were in place. (Thyberg Dec., Ex. A 344). There is no indication that the MDA understood that AR was not providing "adequate" security to protect the MDA's sensitive information at the time the MDA awarded these contracts. |

**B.    Aerojet Disclosed to NASA That Its System Was Not Compliant With NIST 800-53 and Provided Details Regarding Its Cybersecurity Posture and NASA Indicated That Compliance Was Not Material.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 127 | *Aerojet, prior to merging with Pratt Whitney Rocketdyne, disclosed to NASA that it had* | Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *"gaps" in its compliance with NIST 800-53 and discussed those gaps with NASA.*<br><br>Ex. 149 | Defendants' Exhibit 149 provides no evidence as to what AR discussed with NASA. It indicates there was a gap analysis but gives no indication if gaps were found or what was disclosed to NASA. |
| 128 | *When Aerojet submitted its proposal in connection with Contract No. NNM16AA02C in or around June 18, 2015, Aerojet stated that it was "not fully compliant per the Security Requirements for Unclassified Information Technology Resources at this time."*<br><br>Ex. 153 | Not Disputed |
| 129 | *Aerojet periodically submitted Contractor Information Technology Security Management Plans ("IT SMPs") to NASA discussing how Aerojet protected NASA's information, in some instances, explaining how Aerojet's policies and procedures fit within the NIST 800-53 framework.*<br><br>Ex. 150 (12/16/2013)<br><br>Ex. 158 (12/10/2015)<br><br>Ex. 159 (evidence of submission)<br><br>Ex. 179 (1/23/2017)<br><br>Ex. 176 (5/4/2017)<br><br>Ex. 157 at AR00052685 (10/1/15)<br><br>Ex. 152 | Not Disputed |
| 130 | NASA accepted Aerojet's IT SMPs.<br><br>Ex. 152 at AR00232667<br><br>Ex. 155 | Disputed<br><br>Although NASA accepted AR's IT SMP's, the plans NASA approved were filled with false and misleading statements. (See, Relator's Statement of UMF is support of MSJ Nos, 88-105). |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 131 | *Aerojet agreed to provide access to its facilities, installations, operations, documentation, databases, and personnel at NASA's request to "carry out IT security inspection, investigation, and/or audits" to safeguard NASA information.*<br><br>Ex. 151 | Disputed<br><br>This Undisputed Fact is misleading. AR was required to allow NASA access as that was a NASA requirement as set forth in the boilerplate language of defendants' Ex. 151. |
| 132 | *In July 2015, NASA responded to Aerojet's submission of an IT SMP and requested for Aerojet to include "a program plan to address all aspects required by NPR 2810.1A" including security controls compliant with NIST 800-53, reflecting that NASA did not expect full compliance with the requirements.*<br><br>Ex. 154 at AR00067326. | Disputed<br><br>Defendants' Ex. 154 indicates that NASA expected AR to present a plan that showed they were addressing NIST 800-53 requirements with no indication that AR was excused from compliance or expected to be non-compliant. |
| 133 | *On August 31, 2015, NASA informed Aerojet of certain "security controls that may be needed to be implemented," but that NASA did not know which controls would need to be implemented at that time. NASA told Aerojet not to "get wigged out" because NASA was there "to support and contribute to [Aerojet's success in . . . making sure the systems are protected with minimum security baselines in place."*<br><br>Ex. 156 | Not Disputed |
| 134 | *On February 16, 2016, Aerojet made a presentation to NASA briefing representatives on the status of Aerojet's cybersecurity and efforts to comply with NIST SP 800-53. During its presentation,* | Disputed<br><br>AR's disclosure of its 167 non-compliant controls was accompanied by falsehoods that discounted the |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *Aerojet informed NASA that it was not compliant with 167 of the NIST SP 800-53 controls.*<br><br>Ex. 162 (2/16/16 Presentation and Compliance Gap Analysis)<br><br>Ex. 160 (2/16/16 e-mail discussing NASA presentation, and noting further planned technical information exchange with NASA)<br><br>Ex. 161 (2/16/16 e-mail discussing NASA presentation, noting that AR gave NASA "an entire 45 minutes of discussion" and presented them with the data.) | significance of this finding. Defendants' Ex. 162 at page 16 indicates protective controls to safeguard unclassified IT resources are in place. Ex. 162 indicates that AR's disclosure of its 167 non-compliant controls was accompanied by AR's explanatory control statement which discounted AR's compliance gaps as areas for improvement while asserting AR had alternative controls or protective measures in place to achieve equivalent protection. (See, Relator's UMF Nos. 82-85 is Support of Relator's Motion for MSJ). There is no mention in the presentation to NASA that AR could not detect or stop cyber intrusions and was leaking sensitive data every day. |
| 135 | *Based on Aerojet's February 2016 presentation, NASA understood that Aerojet had a "burn down plan" for its non-compliant controls.*<br><br>Ex. 168 at AR00022461. | Not Disputed |
| 136 | *On February 17, 2016, a NASA contracting officer indicated that for Contract No. NNC15CA07C, nobody "paid much attention to [the NFS Clause][,]" and further noted that the signed GRC-1707 form for the contract indicated that Aerojet "would NOT be subject to the requirements that the clause describes." The contracting officer noted that the Clause may have been "include[d]" just in case" and that he could "easily delete [it] . . . and explain . . . why [he] accidentally added this clause in the first place."* | Disputed<br><br>This is nothing more than a self-serving hearsay statement by a contracting officer who has no power to bind NASA trying to cover for the fact that Office of the Inspector General had requested information about his AR contracts that had the NASA FARS Clause. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 163 | |
| 137 | *On February 18, 2016, a NASA contracting officer suggested that the information Aerojet provided under the NFS clause would likely not "be worthwhile to us or even AR[,]" for Contract No. NNC15CA07C, and stated that he "could always still delete the clause[.]"*<br><br>Ex. 164 | Disputed<br><br>This is nothing more than a self-serving hearsay statement by a contracting officer who has no power to bind NASA trying to cover for the fact that Office of the Inspector General is requested information about his AR contracts that had the NASA FARS Clause. The officer's statement he could delete the clause after the fact to avoid providing documents to the Inspectors General Office is not evidence the clause was not actually required in the contract. |
| 138 | *On February 17, 2016, in response to Aerojet's submission of an IT SMP for Contract No. NNM16AA02C, NASA approved Aerojet's submittal with comments and requested a dialogue with Aerojet regarding its cybersecurity policies and procedures.*<br><br>Ex. 165 at AR00023815. | Not Disputed |
| 139 | *On March 4, 2016, in response to NASA's request for a discussion, Aerojet's cybersecurity experts had a meeting with NASA regarding Aerojet's cybersecurity posture and provided NASA with contact information for everyone on Aerojet's cybersecurity team. After the meeting, Aerojet's cybersecurity expert, David Chamberlain, was provided access to NASA's system "to complete future questions as they [were] required" with respect to Aerojet's cybersecurity.*<br><br>Ex. 167, Ex. 173 | Disputed<br><br>Defendants' Exs 167 and 173 provide no evidence that David Chamberlin was given access to the NASA system than other defendants' own inadmissible self-serving hearsay statements. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 140 | *On March 17, 2016, Aerojet provided an updated IT SMP for Contract No. NNM16AA02C in accordance with NASA's comments and March 4, 2016 meeting, which was approved on June 6, 2016.*<br><br>Ex. 152 | Not Disputed |
| 141 | *On June 22, 2016, Aerojet updated NASA on the status of its non-compliance with NIST 800-53, stating that it had "improved our overall compliance to the applicable NIST 800-53 security controls from 24% to 50%. NASA responded that "this is a very good effort on [Aerojet]'s part" and that it "greatly appreciated [Aerojet] sharing th[e] information with" NASA.*<br><br>Ex. 168 at AR00022459-60. | Not Disputed |
| 142 | *On July 3, 2016, the NASA contracting officer on Contract No. NNC15CA07C indicated the NFS clause was "in his blind spot" when entering into the contract.*<br><br>Ex. 174 | Disputed<br><br>Defendants' Ex. 174 does not state the NFS Clause was in his blind spot when entering the contract. The officer states that AR's obligation to submit NASA FARS required plans was in "our blind spots". |
| 143 | *NASA reviewed Aerojet's explanatory control statement which described Aerojet's cybersecurity posture and indicated on July 20, 2016 that the document was "well written" and was "a very good document."*<br><br>Ex. 175 at AR00020134-35. | Disputed<br><br>The statements defendants misrepresent statements taken out of context from their Ex. 175. Ex. 175 says the document is a very good pre-cursor to AR's SMP. |
| 144 | *On August 11, 2016, Aerojet provided an update to NASA regarding its closure of compliance gaps with respect to NIST 800-53, stating that it had completed closing documentation gaps.*<br><br>Ex. 172 at AR00017843-44. | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 145 | *On August 16, 2016, Aerojet met with NASA, including representatives on Contract Nos. NNM16AA02C and NNM16AA12C to discuss Aerojet's NFS Clause compliance. During that meeting, Aerojet "reviewed [its] compliance metrics and plan/stats for transition . . . to an IT outsource provider." NASA acknowledged that Aerojet "had made great progress toward full compliance with [its] documentation compliance gap closure efforts and indicated that they felt [Aerojet] had a solid plan going forward to nail down our technical compliance through the outsourcing initiative."*<br><br>Ex. 169<br><br>Ex. 170 (reflecting Aerojet's desire to "continue to be transparent and forthcoming with [NASA].") | Not Disputed |
| 146 | *On October 14, 2016, Aerojet provided another compliance matrix to NASA detailing its continued progress toward compliance with NIST SP 800-53, including informing NASA that it was not compliant with 130 of the NIST SP 800-53 Controls.*<br><br>Ex. 171 | Not Disputed |
| 147 | *On October 19, 2016, Aerojet had a teleconference with NASA in which Aerojet gave NASA "an update on [Aerojet's] plan to become completely compliant with NFS."*<br><br>Ex. 172 | Not Disputed |
| 148 | *Aerojet submitted IT SMPs to NASA on Contract No. NNM16AA12C beginning in November 2016, which NASA approved. Aerojet indicated that Aerojet "does not develop or document policies and procedures addressing minimum security requirements following the guidelines of the [NIST] Certification and Accreditation (C&A) for all systems containing" NASA data. However, Aerojet stated that it would* | Disputed<br><br>Defendants Ex. 179 indicates in multiple locations that AR developed policies and procedures to meet the minimum NASA FARS security requirements. According to Ex.179 AR stated they had gaps and areas for improvement but claimed to have |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *"adhere to [Aerojet] Cybersecurity Policies, Procedures and Standards to meet the [NASA] requirements" and went on to detail the policies and procedures Aerojet had in place.*<br><br>Ex. 179, Ex. 177 | security controls in place to protect NASA's information. |
| 149 | *On January 20, 2017, Aerojet met with NASA and presented on its strategy to bring its systems into compliance with NIST 800-53.[5] Aerojet informed NASA that it was not compliant with 107 of the NIST SP 800-53 Controls.*<br><br>Ex. 178 | Not Disputed |
| 150 | *On January 23, 2017, Aerojet submitted an IT SMP to NASA in connection with Contract No. NNM16AA12C stating "[a]s a part of our ongoing efforts to enhance IT security controls, AR completed a gap analysis of our enterprise infrastructure to assess our IT security posture . . . [i]dentified gaps in compliance with the specific security controls . . . as defined in the National Institute of Standards and Technology (NIST) Special Publication (SP) 800-53 . . . have been documented in Plans of Action and Milestones (POA&Ms) and closure will be addressed . . . technical gaps will be addressed incrementally through 2017[.]"*<br><br>Ex. 179 at AR00232652 | Disputed<br><br>AR's disclosure about the gap its analysis was false, misleading and had material omissions. Defendants' Ex.179 indicates that in disclosing the gap analysis results, AR stated: "While the analysis has identified compliance gaps and areas of improvement, security controls to safeguard unclassified IT resources are in place as described in AR's IT SMP and the Explanatory Controls Statement." What AR neglected to tell NASA is that the its internal cyber security audit completed a month earlier indicated AR had five high risk and one medium risk finding. (Relator's UMF No. 18 in Support of Relator's MSJ) "High Risk" was defined in the audit as involving a significant deviation |

---

[5] Aerojet's January 2017 meeting with NASA was conducted, in part, to address NASA's rejection of one invoice based on NASA's disapproval of Aerojet's System Security Plan for Contract No. NNC16CA21C. After discussions with Aerojet, NASA approved Aerojet's IT System Security Plan and paid the invoice.  *See* Ex. 148.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | from regulatory requirements and fraud or management misconduct. (Thyberg Dec., Ex. A 395) Ex.179 also indicates that NASA was referred to AR's Explanatory Control Statement where AR claimed to be providing alternate controls or protective measures to achieve equivalent protection to the NIST 800-53 controls. |
| 151 | *In September 2017, in connection with Contract No. NNC15CA07C Aerojet updated NASA on its plan to outsource its cybersecurity and detailed remediation efforts Aerojet and its provider were taking with respect to certain NIST 800-53 controls. Aerojet provided additional status updates regarding its progress and indicated that, though it was not yet compliant with NIST 800-53, it intended to be compliant by December 31, 2017.*<br><br>Ex. 180 | Not Disputed |
| 152 | *NASA responded to Aerojet's disclosure of its non-compliance acknowledging that Aerojet had made "good progress per [its] remediation plan" and thanked Aerojet for its "diligent efforts" and "open, transparent communications" which "demonstrate[d] a path to success."*<br><br>Ex. 180 at AR00229090 & AR00229095 | Not Disputed |
| 153 | *NASA understood that Aerojet did not have a system in place that was compliant with either NPR 2810.1 or NIST 800-53.*<br><br>Ex. 162<br><br>Ex. 160 | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 161 | |
| | Ex. 168 at AR00022461 | |
| | Ex. 167 | |
| | Ex. 168 at AR00022459-60. | |
| | Ex. 175 at AR00020134-35. | |
| | Ex. 169 | |
| | Ex. 171 | |
| | Ex. 172 | |
| | Ex. 178 | |
| | Ex. 180 at AR00229090 & AR00229095 | |
| 154 | *In 2019, Aerojet received a NASA Silver Achievement Medal for its cybersecurity efforts.* <br> Ex. 181 | Not Disputed |

**VI.  THE GOVERNMENT PAID AEROJET AND  CONTINUED TO CONTRACT WITH AEROJET DESPITE KNOWING OF AEROJET'S NON-COMPLIANCE.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 155 | *None of the contracts alleged in the SAC were terminated based on Aerojet's non-compliance with the DFARS or NFS Clauses.* <br> Ex. 181Ex. 183, ¶¶ 4-5 <br> Ex. 182, ¶¶ 4-5 <br> Ex. 112, ¶ 5 <br> Ex. 114, ¶ 4 | Not Disputed |
| 156 | *Aerojet has provided the contracted-for goods and services for the at-issue contracts.* <br> Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts) <br> Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data | Disputed <br><br> Providing cybersecurity counter measures to protect critical program information and NASA's sensitive but unclassified information was part of the statement of work order on NASA contracts. (See, Relator's |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | reflecting completed and ongoing contracts) | UMF Nos. 67-69 in Support of Relator's MSJ) |
| 157 | *The government has not rejected any of the contracted-for goods or services for the contracts listed in Relator's SAC based on Aerojet's non-compliance with the DFARS or NFS Clauses.*<br><br>Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br><br>Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts)Ex. 113, ¶¶ 2, 4<br><br>Ex. 185, ¶ 3<br><br>Ex. 112, ¶¶ 4-5<br><br>Ex. 184, ¶ 3<br><br>Ex. 183, ¶ 3<br><br>Ex. 182, ¶ 3 | Not Disputed |
| 158 | *The government has not rescinded any payments or sought reimbursement for any of the goods or services Aerojet delivered for the at-issue contracts based on Aerojet's non-compliance with the DFARS or NFS Clauses.*<br><br>Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br><br>Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts)Ex. 113, ¶¶ 2, 4<br><br>Ex. 185, ¶ 3<br><br>Ex. 112, ¶¶ 4-5 | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 184, ¶ 3<br><br>Ex. 183, ¶ 3 | |
| 159 | *The United States Department of Justice conducted an investigation into Relator's claims and declined to intervene.*<br><br>Ex. 1 (1/26/2017 Civil Investigative Demand to Aerojet)<br><br>Ex. 2 (8/5/2016 Civil Investigative Demand to Emagined Security)<br><br>Ex. 3 (8/5/2016 Civil Investigative Demand to Ernst & Young LLP)<br><br>Exs. 3 & 4 (reflecting correspondence regarding interviews of Aerojet employees pursuant to Civil Investigative Demand to Aerojet)<br><br>RJN No. 70<br><br>ECF No. 25 | Not Disputed |

**A.   The Army continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 160 | *After Aerojet disclosed to the Army that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Army continued to award Aerojet contracts.*<br><br>RJN Fact No. 35<br><br>Ex. 37 (reflecting 30 contracts awarded since 9/26/2014) | Disputed<br><br>AR has presented no evidence that the ARMY was ever given the complete story about its non-compliance with NIST 800-53 or the DFARS Clause compliance. Although the ARMY knew AR was not compliant with the technical controls required by the DFARS clause, AR was communicating to DOD agencies that it was complying with the clause by proviing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | 166 in Support of Relator's MSJ) There is no evidence that the AR ever disclosed or the ARMY understood that AR was not compliant with the DFARS requirement that AR provide "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the ARMY that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 2014 letter to the ARMY AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF Nos. 1, 151 in Support of Relator's MSJ). The September 2014 letter stated AR was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54, 151 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151 in Support of Relator's MSJ) When EY advised AR their system could be penetrated |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | undetected in four hours giving them access to trophy data, AR not only denied Their VP and CIO's request to increase his budget to improve security he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) |
| 161 | *Aerojet submitted invoices to the Army on Contract No. W31P4Q-14-C-0075, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 74<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 162 | *The Army paid all invoices on Contract No. W31P4Q-14-C-0075.*<br><br>Ex. 75<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 163 | *Contract No. W31P4Q-14-C-0075 was successfully completed on January 31, 2016.*<br><br>RJN Fact No. 53<br><br>Ex. 37 at cell 2F | Not Disputed |
| 164 | *Aerojet submitted invoices to the Army on Contract No. W31P4Q-16-C-0026, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 165 | *The Army paid all invoices on Contract No. W31P4Q-16-C-0026.*<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Resp. to RFAs) | |
| 166 | *Contract No. W31P4Q-16-C-0026 was successfully completed on August 1, 2017.*<br><br>RJN Fact No. 54<br><br>Ex. 37 at cell 19F | Not Disputed |
| 167 | *The Army continued to award Aerojet contracts after this lawsuit was filed.*<br><br>RJN Fact Nos. 36, 68<br><br>Ex. 37 (reflecting 28 contracts awarded since this case was filed)<br><br>ECF No. 1 | Not Disputed |
| 168 | *The Army participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene.*<br><br>RJN Fact Nos. 37, 70<br><br>Ex. 37 (reflecting 16 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br><br>Exs. 3 & 4 (reflecting participation in investigation)<br><br>ECF No. 25 | Not Disputed |

B.     The Navy continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 169 | *After Aerojet disclosed to the Navy that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Navy continued to award Aerojet contracts.*<br><br>RJN Fact No. 32<br><br>Ex. 37 (reflecting 8 contracts awarded since 9/29/2015) | Disputed<br><br>AR has presented no evidence that the NAVY was ever given the complete story about its DFARS Clause compliance status. Although the NAVY knew AR was not compliant with the technical controls required by the DFARS clause AR was communicating |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. 166 in Support of Relator's MSJ) There is no evidence that the AR ever disclosed or the NAVY understood that AR was not compliant with the DFARS requirement that AR provide "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the NAVY that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 30, 2014 letter to the NAVY AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF Nos. 1, 151,153 in Support of Relator's MSJ). The September 30, 2014 letter stated AR was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54,151,153 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151,153 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) |
| 170 | *Aerojet submitted invoices to the Navy on Contract No. N00014-14-C-0035, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 106<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 171 | *The Navy paid all invoices on Contract No. N00014-14-C-0035.*<br><br>Ex. 107<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 172 | *Contract No. N00014-14-C-0035 was successfully completed on June 8, 2017.*<br><br>RJN Fact No. 51<br><br>Ex. 37 at cell 3F | Not Disputed |
| 173 | *Aerojet submitted invoices to the Navy on Contract No. N68936-14-C-0035, none of which contained any representation about Aerojet's compliance with the DFARS Clause.* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 108 Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | |
| 174 | *The Navy paid all invoices on Contract No. N68936-14-C-0035.* Ex. 109, Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 175 | *Contract No. N68936-14-C-0035 was successfully completed on December 31, 2015.* RJN Fact No. 52 Ex. 37 at cell 7F | Not Disputed |
| 176 | *The Navy continued to award Aerojet contracts after this lawsuit was filed.* RJN Fact Nos. 33, 68 Ex. 37 (reflecting 7 contracts awarded since this case was filed) ECF No. 1 | Not Disputed |
| 177 | *The Navy continued to award Aerojet contracts after the United States declined to intervene.* RJN Fact Nos. 34, 70 Ex. 37 (reflecting 2 contracts awarded since June 25, 2018, when the government declined to intervene in this action) ECF No. 25 | Not Disputed |

**C.    The Air Force continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 178 | *After Aerojet disclosed to the Air Force that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Air Force* | Disputed AR has presented no evidence that the |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *continued to award Aerojet contracts.*<br><br>RJN Fact Nos. 29<br><br>Ex. 37 (reflecting 31 contracts awarded since 9/29/2014) | AIR FORCE was ever given the complete story about its DFARS Clause compliance status. Although the AIR FORCE knew AR was not compliant with the technical controls required by the DFARS clause, AR was communicating to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. 166 in Support of Relator's MSJ) There is no evidence that the AR ever disclosed or the AIR FORCE understood that AR was not compliant with the DFARS requirement that AR provide "adequate security."  AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the AIR FORCE that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 18, 2014 letter to the AIR FORCE, AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF Nos.1, 151,152 in Support of Relator's MSJ). The September 18, 2014 letter stated AR was making every effort to |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54,151,152 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151,152 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied Their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) |
| 179 | *Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0002, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 44<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 180 | *The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0002.*<br><br>Ex. 45<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 181 | *Contract No. FA8650-13-D-2335, Award Id. 0002 was successfully completed on June 15, 2019.*<br><br>RJN Fact No. 48 | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 37 at cell 5F | |
| 182 | *Aerojet submitted invoices to the Air Force on Contract No. FA8650-14-C-7424, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 46 , Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 183 | *All invoices were paid by the government on Contract No. FA8650-14-C-7424.*<br><br>Ex. 47<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 184 | *Contract No. FA8650-14-C-7424 was successfully completed on March 31, 2016.*<br><br>RJN Fact No. 47<br><br>Ex. 37 at cell 6F | Not Disputed |
| 185 | *Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0003, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 48<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 186 | *The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0003.*<br><br>Ex. 49<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 187 | *Contract No. FA8650-13-D-2335, Award Id. 0003 was successfully completed on August 30, 2016.*<br><br>RJN Fact No. 49<br><br>Ex. 37 at cell 9F | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 188 | *Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0004, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 50<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 189 | *The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0004.*<br><br>Ex. 51<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 190 | *Contract No. FA8650-13-D-2335, Award Id. 0004 was successfully completed on September 28, 2018.*<br><br>RJN Fact No. 50<br><br>Ex. 37 at cell 17F | Not Disputed |
| 191 | *The Air Force continued to award Aerojet contracts after this lawsuit was filed.*<br><br>RJN Fact Nos. 30, 68<br><br>Ex. 37 (reflecting 24 contracts awarded since this case was filed)<br><br>ECF No. 1 | Not Disputed |
| 192 | *The Air Force participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene.*<br><br>RJN Fact Nos. 31, 70<br><br>Ex. 37 (reflecting 12 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br><br>Exs. 3 & 4 (reflecting participation in investigation)<br><br>ECF No. 25 | Not Disputed |

**D.  DARPA continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 193 | *After Aerojet disclosed to DARPA that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, DARPA continued to award Aerojet contracts.*<br><br>RJN Fact No. 38, Ex. 37 (reflecting 4 contracts awarded since 9/30/2014) | Disputed<br><br>AR has presented no evidence that the DARPA was ever given the complete story about its DFARS Clause compliance status. Although the DARPA may have known AR was not compliant with the technical controls required by the DFARS clause, AR was communicating to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. 166 in Support of Relator's MSJ) There is no evidence that the AR ever disclosed or the DARPA understood that AR was not compliant with the DFARS requirement that AR provide "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the DARPA that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else.  AR told DOD agencies that it was compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | DFARS controls. (Relator's UMF Nos. 1, 151-153 in Support of Relator's MSJ). AR advised DOD agencies it was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54,151-153 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen controls and implement additional protective measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151-153 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) |
| 194 | *Aerojet submitted invoices to DARPA on Contract No. HR001115C0132, none of which contained any representation about Aerojet's compliance with the DFARS Clause.*<br><br>Ex. 52<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 195 | *DARPA paid all invoices on Contract No. HR001115C0132.*<br><br>Ex. 53<br><br>Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 196 | *Contract No. HR001115C0132 was successfully completed on September 30,* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *2016.*<br>RJN Fact No. 55<br>Ex. 37 at cell 15F | |
| 197 | *DARPA continued to award Aerojet contracts after this lawsuit was filed.*<br>RJN Fact Nos. 39, 68<br>Ex. 37 (reflecting 2 contracts awarded since this case was filed)<br>ECF No. 1 | Not Disputed |
| 198 | *DARPA continued to award Aerojet contracts after the United States' declined to intervene.*<br>RJN Fact Nos. 40, 70<br>Ex. 37 (reflecting 1 contract awarded since June 25, 2018, when the government declined to intervene in this action)<br>ECF No. 25 | Not Disputed |

**E.    NASA continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 199 | *After Aerojet disclosed to NASA that it was not compliant with NASA's Security Requirements for Unclassified Information Technology Resources in June 2015, NASA continued to award Aerojet contracts.*<br>RJN Fact No. 44<br>Ex. 121 (reflecting 22 contracts awarded since 7/27/2015) | Not Disputed |
| 200 | *Aerojet submitted invoices to NASA on Contract No. NNC10BA13B, Award ID # NNC13TA66T, none of which contained any representation about Aerojet's compliance* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *with the NFS Clause.* Ex. 132 Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | |
| 201 | NASA paid all invoices on Contract No. NNC10BA13B, Award ID # NNC13TA66T. Ex. 133 | Not Disputed |
| 202 | *Contract No. NNC10BA13B, Award ID # NNC13TA66T was successfully completed on September 24, 2016.* Ex. 121 at cell 10F ,RJN Fact No. 56 | Not Disputed |
| 203 | *Aerojet submitted invoices to NASA on Contract No. NNC10BA02B, Award ID # NNC15TA07T, none of which contained any representation about Aerojet's compliance with the NFS Clause.* Ex. 134 Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 204 | *NASA paid all invoices on Contract No. NNC10BA02B, Award ID # NNC15TA07T.* Ex. 135 | Not Disputed |
| 205 | *Contract No. NNC10BA02B, Award ID # NNC15TA07T was successfully completed on May 11, 2015.* Ex. 121 at cell 14F RJN Fact No. 57 | Not Disputed |
| 206 | *Aerojet submitted invoices to NASA on Contract No. NNC15CA07C, none of which contained any representation about Aerojet's compliance with the NFS Clause.* Ex. 136 Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 207 | *NASA paid all invoices on Contract No. NNC15CA07C.*<br><br>Ex. 137 | Not Disputed |
| 208 | *Contract No. NNC15CA07C was successfully completed on October 9, 2020.*<br><br>Ex. 121 at cell 15F<br><br>RJN Fact No. 58 | Not Disputed |
| 209 | *Aerojet submitted an invoice to NASA on Contract No. NNC15VD08P, which did not contain any representation about Aerojet's compliance with the NFS Clause.*<br><br>Ex. 138<br><br>Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 210 | *NASA paid all invoices on Contract No. NNC15VD08P.*<br><br>Ex. 139 | Not Disputed |
| 211 | *Contract No. NNC15VD08P was successfully completed on March 31, 2016.*<br><br>Ex. 121 at cell 17F<br><br>RJN Fact No. 59 | Not Disputed |
| 212 | *Aerojet submitted invoices to NASA on Contract No. NNM16AA02C, none of which contained any representation about Aerojet's compliance with the NFS Clause.*<br><br>Ex. 140<br><br>Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 213 | *NASA paid all invoices on Contract No. NNM16AA02C.*<br><br>Ex. 141 | Not Disputed |
| 214 | *Contract No. NNM16AA02C is still ongoing.*<br><br>Ex. 121 at cell 21F (showing NNM16AA02C is still in progress and has | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | not been terminated)<br><br>RJN Fact No. 61 | |
| 215 | *Aerojet submitted an invoice to NASA on Contract No. NNM16AB21P, which did not contain any representation about Aerojet's compliance with the NFS Clause.*<br><br>Ex. 142<br><br>Ex. 6 at Resp. No. 13  (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 216 | *NASA paid all invoices on Contract No. NNM16AB21P.*<br><br>Ex. 143 | Not Disputed |
| 217 | *Contract No. NNM16AB21P was successfully completed on March 31, 2016.*<br><br>Ex. 121 at cell 22F<br><br>RJN Fact No. 62 | Not Disputed |
| 218 | *Aerojet submitted invoices to NASA on Contract No. NNH16CP17C, none of which contained any representation about Aerojet's compliance with the NFS Clause.*<br><br>Ex. 144<br><br>Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |
| 219 | *NASA paid all invoices on Contract No. NNH16CP17C.*<br><br>Ex. 145 | Not Disputed |
| 220 | *Contract No. NNH16CP17C was successfully completed on June 30, 2019.*<br><br>Ex. 121 at cell 23F<br><br>RJN Fact No. 63 | Not Disputed |
| 221 | *Aerojet submitted invoices to NASA on Contract No. NNM16AA12C, none of which contained any representation about Aerojet's* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | *compliance with the NFS Clause.*<br><br>Ex. 146<br><br>Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | |
| 222 | *NASA paid all invoices on Contract No. NNM16AA12C.*<br><br>Ex. 147 | Not Disputed |
| 223 | *Contract No. NNM16AA12C is still ongoing.*<br><br>Ex. 121 at cell 25F (showing NNM16AA12C is still in progress and has not been terminated)<br><br>RJN Fact No. 64 | Not Disputed |
| 224 | *NASA contracting officials have not terminated or refused to reward a contract for non-compliance with the NFS Clause, and have no recollection of other contracting officers terminating or refusing to award a contract for non-compliance.*<br><br>Ex. 182 ¶ 5<br><br>Ex. 183 ¶ 5<br><br>Ex. 184 ¶ 5<br><br>Ex. 185 ¶ 5 | Not Disputed |
| 225 | *NASA continued to award Aerojet contracts after this lawsuit was filed.*<br><br>RJN Fact Nos. 45, 68<br><br>Ex. 121 (reflecting 19 contracts awarded since this case was filed)<br><br>ECF No. 1 | Not Disputed |
| 226 | *NASA participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene.*<br><br>RJN Fact Nos. 46, 70 | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 121 (reflecting 8 contracts awarded since June 25, 2018, when the government declined to intervene in this action) | |
| | Exs. 3 & 4 (reflecting participation in investigation) | |
| | ECF No. 25 | |
| 227 | *In 2019, NASA awarded Aerojet the Silver Achievement Medal for its cybersecurity efforts.* <br> Ex. 181 | Not Disputed |

**VII. THE GOVERNMENT KNEW THE DEFENSE INDUSTRY WAS NOT COMPLAINT WITH CYBERSECURITY CLAUSES, BUT CONTINUED TO CONTRACT WITH AND PAY SUPPLIERS**

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| 228 | *Defense Industrial Base companies, including Aerojet, participated in policy working groups with the Government, where companies "openly discuss[ed]" noncompliance with the DFARS Clause.* <br><br> Ex. 7 (Markus Dep.) at 92:16-93:3 ("There were DFARS compliance meetings and presentations at the DIB and we had conversations about them. There were -- excuse me -- quite a few conversations about how the other defense contractors were becoming DFARS compliant and how some of them were already DFARS compliant and what they did to become DFARS compliant at those meetings.") <br><br> Ex. 7 (Markus Dep.) at 159:13-161:7 (reflecting meeting with OCIO before introduction of NIST 800-171 in which Aerojet was trying to "help guide the government as to what makes sense for organizations to comply with and do and what doesn't, what would cost them too much and put us, for example, a small | Disputed <br><br><br> Defendants misrepresent these exhibits. Defendants Ex. 7 indicates that among the defense contractors many were compliant and some were non-compliant and in discussing best practices but these companies were in much better shape than Aerojet. (Defendants' Ex.7 163:2-164:16) Raytheon was discussing the final pieces it put in place to become fully complaint. (Defendants' Ex. 7 164:17-165:6) |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | business out of business if they had to comply with every single control") | |
| | Ex. 7 (Markus Dep.) at 162:11-20 (explaining that working group meetings with the OCIO would include a discussion of "how to individuals get compliant [with the NIST standards] properly") | |
| | Ex. 7 (Markus Dep.) at 163:2-163:9 (contractors "were openly discussing" that they "were noncompliant" in meeting with the OCIO). | |
| | Ex. 10 (Thomas Dep.) at 145:1-147:18 (explaining that there were working groups with the defense industry and the government between 2013 and 2016 regarding the DFARS Clause) | |
| | Ex. 19 at 1 (reflecting "continued engagement" between OCIO, DPAP, and industry" regarding the DFARS Clause) | |
| | Ex. 206 at AFDODCIO000224 (12/15/2015 contractor disclosure reflecting participation in "DoD-led Defense Industrial Base | |
| 229 | *Dozens of contractors disclosed to the DoD that they were not compliant with the technical controls in NIST 800-53 and NIST 800-171 and the DoD recognized that many contractors were not compliant with NIST 800-53 or NIST 800-171.* | Not Disputed |
| | Ex. 186 (8/20/2015 contractor disclosure to DoD OCIO demonstrating 44% compliance with 50 NIST controls) | |
| | Ex. 188 (8/26/2015 OCIO acknowledgment of non-compliance) | |
| | Ex. 187 at AFDODCIO000486 & 488 (11/9/2015 disclosure noting compliance gaps with NIST 800-171 and NIST 800-53 and estimated completion date of gap | |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | analysis as December 31, 2015) | |
| | Ex. 190 (11/14/2015 contracting officer requesting waiver of DFARS Clause and DoD describing contractor's disclosure as "another 'I am not compliant letter'") | |
| | Ex. 191 (11/18/2015 disclosure from contractor reflecting non-compliance with NIST 800-171 controls) | |
| | Ex. 194 (11/25/2015 contractor notifying DoD OCIO that it would not be able to implement the 800-171 controls immediately and that its subcontractors would not be able to either.) | |
| | Ex. 195 (12/14/2015 DoD interpreting contractor disclosure to be "stating that they aren't compliant." with the NIST 800-171 controls) | |
| | Ex. 206 (12/15/2015 contractor disclosure reflecting non-compliance with NIST 800-171); *see also* Ex. 10 (Thomas Dep.) at 138:24-140:16 (reviewing December 14, 2015 disclosure and agreeing that letter reflects that contractor was "not implementing all of the [NIST 800-]171 requirements" and acknowledging non-compliance before DFARS Clause permitted additional time to implement controls) | |
| | Ex. 196 (12/16/2015 e-mail reflecting that a contractor did "not currently meet all of the NIST 800-171 security measures" and DoD OCIO recognizing that "this is a case of non-compliance" and that "compliance appears to be deficient") | |
| | Ex. 197 (12/22/2015 DoD tracking spreadsheet reflecting contractor non-compliance with the NIST standards) | |
| | Ex. 205 (1/6/2016 e-mail from OCIO stating that "so many contractors are not [compliant], this [December 2015 DFARS | |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Clause] gives them time to take appropriate actions" and recognizing that contractors would decrease non-compliant controls approaching December 2017) | |
| | Ex. 198 (2/24/2016 contractor disclosing non-compliance with "105 requirements of NIST SP 800-171") | |
| | Ex. 201 (4/27/2016 contractor disclosing non-compliance with "44 requirements of NIST SP 800-171") | |
| | Ex. 202 (5/2/2016 OCIO recognizing that a contractor was "working to implement" NIST controls, but that they still had gaps in compliance) | |
| | Ex. 189 (acknowledging that contractor is not at 100% compliance) | |
| | Ex. 9 (Guissanie Dep.) at 84:7-85:6; 27:14-30:21 (testifying that between 2013 and 2016, OCIO received approximately two to three a week requests for waivers from the requirements of the DFARS Clause and about "100 to 150" requests for variances from the clause a year) | |
| | Ex. 9 (Guissanie Dep.) at 90:1-18 (testifying "[p]eriodically, we would get . . . a communication that the contracting officer sent the CIO based on what the contractor sent to the contracting officer saying, 'I'm not really compliant with the clause at the current time'" under NIST 800-53 and NIST 800-171 and explaining contracting officers "often" sent OCIO such communications) | |
| | Ex. 9 (Guissanie Dep.) at 81:6- 82:7 (testifying he would see contractors' statements identifying where contractors were and were not compliant) | |
| | Ex. 9 (Guissanie Dep.) at 96:2-97:14 ("Some companies would simply report based on the clause requirement what they knew they | |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | weren't doing. Other companies would -- and so they would report I met all those except for these five, for example.") | |
| | Ex. 9 (Guissanie Dep.) at 94:7-96:1 (reflecting that contractors would disclose non-compliance with NIST requirements after signing a contract and that the OCIO tracked such non-compliance) | |
| | Ex. 9 (Guissanie Dep.) at 103:7-105:2 (testifying OCIO conducted "trend analyses" of unimplemented NIST controls) | |
| | Ex. 21 at 22:4-9 (4/6/2017 DoD SBTW Presentation: "What I've seen is some small businesses are doing extremely well and are almost all fully compliant because it was easier for them to implement some of the solutions than some of the very large companies."); *see also* Ex. 20 (video recording of same) | |
| | Ex. 10 (Thomas Dep.) at 120:9-25 (testifying that between 2013 and 2016, Ms. Thomas knew that contractors "weren't fully compliant [with the NIST requirements] based on their questions" at presentations to the defense industry) | |
| | Ex. 10 (Thomas Dep.) at 108:15-109:4 (testifying after August 2015 that some contractors were not in full compliance but working towards compliance under the December 31, 2017 deadline) | |
| 230 | *Surveys of industry and public articles from 2016 to 2020 reflect that the defense industry has not successfully implemented all of the technical requirements NIST 800-171 or NIST 800-53.*<br><br>Exs. 207 & 208 (AIA survey results)<br><br>Ex. 203 & 204 (NDIA survey and white paper) | Disputed<br><br>All of the exhibits cited by defendant are self-serving hearsay documents from trade organizations and "news" publications whose purpose is to serve as an advocate for the defense industry so none of the statements in |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 213 at Ex. A (5/2019, Reality Check: Defense industry's implementation of NIST SP 800-171) at 2, 3.<br><br>Ex. 209 (9/4/2018 "Small Contractors Struggle with Cyber Rules")<br><br>Ex. 210 (2/19/2020 "New Cybersecurity Standards Pose Challenges for Industry")<br><br>Ex. 211 (6/17/2019 "Why DoD's decision to make cybersecurity an 'allowable cost' matters") | these publications can be accepted as proof for the matters stated. The defense industry lobbied congress to make the DFARS Clause go away. (Thyberg Opp. Dec., Ex 1, 3:12-24, AR00233088) |
| 231 | *The DoD was aware of industry surveys indicating that contractors were not compliant with the NIST 800-53 or NIST 800-171.*<br><br>Ex. 10 (Thomas Dep.) at 159:12-161:2 (testifying that she learned of industry surveys regarding DFARS compliance between 2013 and 2016 through discussions with individuals at the OCIO)<br><br>Ex. 213 at ¶¶ 4, 7, Exs. B, D<br><br>85 FR 61505 (acknowledging surveys reflecting industry non- compliance with NIST controls) | Disputed<br><br>Contrary to what defendants have represented, Mary Thomas of the DOD CIO had no recollection of any surveys. (Defendants' Ex. 10 159:12-23) |
| 232 | *On January 26, 2017, the Aerospace Industries Association ("AIA") sent a letter to the DoD Chief Information Officer, Terry Halvorsen, regarding "DFARS Network Penetration and Contracting for Cloud Services Request" that stated that the industry struggled to implement the DFARS Clause and urged DoD to revise the applicable regulations.*<br><br>Ex. 19 | Not Disputed |
| 233 | *In 2019, the DoD Inspector General issued an audit report on DoD contractors' compliance with the technical controls in NIST 800-171. Out of ten contractors assessed, none were 100% compliant.* | Not Disputed |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | Ex. 35 | |
| 234 | *The DoD knew that contractors were unable to implement NIST 800-53 based on its specificity to contractor systems.*<br><br>Ex. 25 at 25:1-9 (6/23/2017 DoD Industry Day Presentation: "800-53 [] was the baseline as security and established them low, moderate, and high baselines for federal government. To apply that to a contractor system to protect CDI for confidentiality really isn't very -- isn't possible. The moderate baseline is 263 requirements. Many of them are overly specific based on federal organizations and what they require."); *see also* Ex. 24 (video recording of same)<br><br>Ex. 21 at 9:18-20 (4/6/2017 DoD SBTW Presentation: "So [NIST 800-171 is] much more flexible, and much more realistic for us to ask industry to implement."); *see also* Ex. 20 (video recording of same) | Disputed<br><br>Gary Guissanie from the DOD CIO testified it was not impossible for contractors to comply with the NIST 800-53 controls the issue was that some of the controls only applied to federal systems and not private contractors. (Thyberg Dec. Opp. Ex. 13, Guissanie Dep. 122:4-123:2) |
| 235 | *The DoD acknowledged that it is "virtually impossible" to be in full compliance with even the more flexible NIST 800-171 standard.*<br><br>Ex. 21 at 19:14-22 (4/6/2017 DoD SBTW Presentation: "[I]t's also important to know that at any given moment, it's virtually impossible for a contractor to be in 100 percent compliance with 171 because it is a very liquid type of system. Things change, they might have temporary deficiencies, things that they're working toward, things that they haven't gotten in place yet . . . ."); *see also* Ex. 20 (video recording of same)<br><br>Ex. 21 at 20:24-21:2 (4/6/2017 DoD SBTW Presentation: contractor "must implement [NIST 800-]171. It doesn't say that they need to be in 100% compliance 100% of the time."); *see also* Ex. 20 (video recording of same) | Disputed<br><br>Gary Guissanie from the DOD CIO testified it was not impossible for contractors to comply with the NIST 800-171 controls. ((Thyberg Dec. Opp. Ex. 13, Guissanie Dep. 123:3-124:12)<br><br>It is not impossible to comply with the NIST-800-171, it is only impossible to in 100% compliance at all of the time because the liquid nature of the system might cause temporary deficiencies. (Defendants' Ex. 21 at 19:14-22;Thyberg Dec. Opp. Ex. 1, 19: 14-21 AR00232967) |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|-----|--------------------------------------------------------|---------------------------------------------------|
| 236 | *The DoD indicated that non-compliance with the DFARS Clause at the time of contracting would not disqualify a contractor, but would instead be a "risk-based decision for the program managers and the requiring activity" to make.*<br><br>Ex. 21 at 34:12-35:9 (4/6/2017 DoD SBTW Presentation: "[T]he onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the program managers and the requiring activity. . . . So it's really on the program management offices to understand when they need to make sure a certain level of protections are in place."); *see also* Ex. 20 (video recording of same)<br><br>48 C.F.R. § 9.103<br><br>Ex. 189 (indicating that a "contracting officer [] and the requiring activity need to determine appropriate action" when "the contractor is not compliant with the DFARS clause") | Disputed<br><br>Defendants' quote the speaker, Mary Thomas out of context and mispresent what she said. There no indication non-compliance with the DFARS Clause would not disqualify a contractor. Ms. Thomas indicated that not every defense contract involves critical information that is required to be protected by the DFARS Clause. Ms. Thomas off-hand comment taken out of context does not bind the DOD or change the requirements of the DFARS Clause that was enacted into law by executive order. The DOD advised AR that compliance with the DFARS Clause was mandatory and non-waivable. (Relator's UMF Nos. 126, 128, 131 in Support of Relator's MSJ) The DOD's position was that if a contractor was not compliant, they could not have DOD CTI on their system until they were. (Relator's UMF No.131 in Support of Relator's MSJ) |
| 237 | *In 2019, the government acknowledged that only "1% of [Defense Industrial Base] companies have implemented all 110 controls from [NIST]."*<br><br>Ex. 211 (reflecting comments from Katie Arrington, Special Assistant to Assistant Secretary of Defense in the Office of the Under Secretary of Acquisition & Sustainment") | Disputed<br><br>Defendants' proof is nothing more than an inadmissible hearsay statements of a news reporter. The reporter's statement is not under oath so there is no admissible evidence that any statement was made. Even if the reporter's statement were admissible an off-hand comment by |

| No. | Moving Party's Undisputed Fact And Supporting Evidence | Opposing Party's Response And Supporting Evidence |
|---|---|---|
| | | Katie Arrington's, a government employee, cannot bind the entire federal government and is not an admission of the federal government. |
| 238 | *Navy contracting officials have no recollection of ever terminating a contract, refusing to award a contract, or refusing to pay an invoice for non-compliance with the DFARS Clause.*<br><br>Ex. 113, ¶ 4<br><br>Ex. 114, ¶¶ 3-4<br><br>Ex. 112, ¶¶ 4-5<br><br>Ex. 6 at Resp No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Disputed<br><br>Defendants' Undisputed Fact gives the false impression that "Navy Contracting Officials" as whole have no recollection of terminating a contract, refusing to award a contract or pay an invoice for non-compliance with the DFARS Clause. Defendants' evidence is based on the limited knowledge of three Navy contacting officials who can only speak to the limited number of contracts in their purview. Absent from these declarations is any indication that these contracting officers were aware of contractor non-compliance, paid or entered a contract knowing a contractor was non-compliant, or paid or entered a contract knowing the contractor was as non-compliant as Aerojet and failing to provide "adequate security" to protect the DOD sensitive unclassified information. |

**RELATOR'S STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION**

Relator submits the following undisputed facts in support of his opposition to Defendants' Motion for Summary Judgment/ Summary Adjudication. In addition to the facts set forth below, relator incorporates and refers the court  Relator's Statement of Undisputed Material Facts in support of relator's motion for summary judgment / summary adjudication pursuant to FRCP 56(c)(1)(A).

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|-----|----------------------------------------|---------------------|
| 1 | On October 6, 2021 the DOJ announced the launch of the Civil Cyber Fraud Initiative and its intention to utilize the False Claims Act to pursue government contractors and grant recipients who have engaged in cybersecurity fraud. | Thyberg Dec. Opp. Ex. 12 |
| 2 | In announcing the Civil Cyber Fraud Initiative, Deputy Attorney General, Lisa Monaco stated: "For too long, companies have chosen, silence under the mistaken belief that it less risky to hide breach than to bring it forward and report it…Well that changes today. We are announcing today that we will use our civil enforcement tools to pursue companies, those who are government contractors who receive federal funds, when they fail to follow required cybersecurity standards-because we know it puts all of us at risk." | Thyberg Dec. Opp. Ex. 12 |
| 3 | It is very important to the DOD that its proprietary or developmental information is protected when it is in the hands if its defense industry partners. | Thyberg Dec. Opp. Ex. 1, 3:21-4:4, AR00232952 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| 4 | Cyber security is important to the DOD, because the DOD knows that theft of its sensitive data can allow our adversaries to clone technology, get leap ahead technologies that allows them to counter us in battle putting our warfighter's lives at risk. | Thyberg Dec. Opp. Ex. 1, 4:5-12 AR00232952 |
| 5 | It's virtually impossible for a contractor to be in 100 % compliance with 171 because it's a very liquid type system, Things change they might have temporary deficiencies they are working towards. | Thyberg Dec. Opp. Ex. 1, 19: 14-21 AR00232967 |
| 6 | The DFARS Clause requires defense contractors report to incidents on their network where there is covered defense information so the DOD so they can understand the impact the cyber incident on the DOD military operations as the DOD is depending this information in a war fighting situation. (24:21-25:13 AR00232972-73) | Thyberg Dec. Opp. Ex. 1, 24:21-25:13, AR00232972-73 |
| 7 | The DOD needs information from contractors regarding cyber incidents involving covered defense information so they can do a damage assessment so they know what information regarding the capability of our weapons system was exfiltrated by an adversary. | Thyberg Dec. Opp. Ex. 1, 25:14-20, AR0023273 |
| 8 | The DOD wants contractors to provide malware from cyberattacks so they can do a forensic analysis they want to look at the media, what happened and understand impact on the mission. | Thyberg Dec. Opp. Ex. 1, 26:11-22, AR00232974 |
| 9 | DOD advised prime contractors that if you are dealing with a sub-contractor who you don't believe is able to protect data, then your sensitive data should not be going to | Thyberg Dec. Opp. Ex. 1, 31:15-21, AR00232979 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| | them. | |
| 10 | If the information is critical to the DOD Program office they will make sure they satisfied with the state of the contractor system before they will make an award. | Thyberg Dec. Opp. Ex. 1, 34:21-35:3, AR00232982-83 |
| 11 | When the DOD was asked if a contractor could have their contract terminated if their system were breached due a security fault or failure, the DOD make a distinction between contractors who are implementing the DFARS requirements and those who are not but said they were, and in the second case the contractor would be subject to all contract remedies and penalties. | Thyberg Dec. Opp. Ex. 1, 37:24-38:20, AR00232985-86 |
| 12 | The DOD has stated the DFARS Clause is very important for our national security. | Thyberg Dec. Opp. Ex. 2, 2:24-3:1, AR00233087-88 |
| 13 | The defense industry lobbied congress to make the DFARS Clause go away but the DFARS Clause is not going away it got presidential and congressional support because everyone realizes it is important to secure our defense industrial base for national security. | Thyberg Dec. Opp. Ex. 2, 3:12-24, AR00233088 |
| 14 | The adversary is looking to steal information in order to counter, kill or clone our capabilities and when information is compromised in the development of a program, then the program is less valuable to the DOD and the money invested is less valuable. | Thyberg Dec. Opp. Ex. 2, 4:22-5:7, AR00233090 |
| 15 | When a DOD contractor has cyber incident on their system they are required to report it to the DOD and if they find malware on their system they need to submit it to the DOD as | Thyberg Dec. Opp. Ex. 2, 9:17-10:10, AR00233094-95 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| | well. | |
| 16 | When a DOD contracor has covered defense information they are required to protect it no matter where it is. If they give it to anyone in their supply chain they are still responsible for protecting it. | Thyberg Dec. Opp. Ex. 2, 10:17-11:3, AR00233095-96 |
| 17 | When there is a cyber incident the contractor is required to report to the DOD within 72 hours so the DOD can take appropriate action. | Thyberg Dec. Opp. Ex. 2, 26:23-27:6, AR00233111-12 . |
| 18 | When information is compromised the DOD wants to do a damage assessment, they want to understand what part of a weapon system had been potentially compromised and how that may change how they use the weapon in an actual military operation. | Thyberg Dec. Opp. Ex. 2, 28:20-29:18, AR00233113-14 |
| 19 | When a contractor signs a contract they are stating they have met all of the contract and one of those is NIST 800-171 and when they sign the contract the contractor is saying they have documented system security plan on how they are implementing the their requirements and they have a plan of action for any requirement not yet implemented. | Thyberg Dec. Opp. Ex. 2, 41:11-23, AR00233126 |
| 20 | The DOD understands that most companies are really trying to do the right thing but thing happen but where companied are not doing the right thing the DOD definitely wants to see those companies held accountable. | Thyberg Dec. Opp. Ex. 2, 44:3-24, AR00233129 |
| 21 | The Army determined that the DFARS Clause did not apply to contract W31P4Q-16-C-0026 because the it did not require information that was required to be protected | Thyberg Dec. Opp. Ex. 9, ARMY_TOUHY00000012 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| | by the DFARS Clause. | |
| 22 | On March 17, 2017, NASA rejected payment on an invoice and all future invoices due to AR's performance deficiencies in submitting an acceptable Information Technology System Security Plan. | Thyberg Dec. Opp. Ex. 8, NASA_TOUHY 00000113-15 |
| 23 | Due to security concerns, on December 22, 2016 ,NASA Deputy CISO, David Murnan, recommended that NASA not share any sensitive data on contract NNC15CA21C, until AR had an authorized Information Technology System Security Plan. | Thyberg Dec. Opp. Ex. 8, NASA_TOUHY 00000202-03 |
| 24 | On January 5, 2017, Leahmarie Khoury, lead contracting officer at NASA emailed Ann Bovee, Mark McBride, David Chamberlin at AR stating:<br><br>**"The subject DRD has been rejected by the Government due to material omissions of required information and the quality of information provided**… The AEPS Project is currently operating at risk until the corrections to the plan are made, which includes the assessment described below. Without assurance there are adequate protections in place, the late delivery of the DRD along with the **low fidelity if the documentation provided puts the NASA data in AR possession at risk. As such the Government will require a complete risk mitigation plan and schedule to be provided no later than January 23, 2017 as to avoid actions leading to a stop work order."** (Emphasis added) AR00025727 | Thyberg Dec. Opp. Ex. 7, AR00025727 |
| 25 | On or about January 17, 2017, AR was warned by their NASA Glenn contracts manager that AR's failure to satisfy NASA IT concerns will | Thyberg Dec. Opp. Ex. 7, AR00025719-20 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| | result in stop work order. AR00025719-20 | |
| 26 | On June 13, 2013 EY disclosed to AR (known as Gencorp at that time) that the cyberattack on the Rocketdyne network on May 25, 2013 had resulted in the exfiltration of 100.5 gigabytes of data in 61,640 files located in 5,643 directories accessing approximately nine years of data and a broad range of content including information regarding hypersonic weapons systems, DARPA white papers and NASA Briefings. | Thyberg Dec. Opp. Ex. 6, EY-AEROJET -00030350 |
| 27 | Grant Thornton Data Loss Prevention Audit dated November 26, 2018 rated AR's did not Data Loss Prevention Process ("DLP")  as "high risk" as it was not able to prevented data loss and relied on procedures that notified AR after a potential disclosure of data has occurred rather than employing preventive measure to address DPL before exfiltration or unauthorized disclosure. | Thyberg Dec. Opp. Ex.11, GT00044-45 |
| 28 | Grant Thorton 2018 Cyber Security Report dated December 21, 2018, advised AR they needed to make improvements in cybersecurity due to the severity of the audit findings and associated risks. | Thyberg Dec. Opp. Ex.11, GT 00027 |
| 29 | The 2018 Grant Thornton Audit advised AR they had well known vulnerabilities due to outdated operating systems and missing patches. | Thyberg Dec. Opp. Ex.11, GT 00027 |
| 30 | Grant Thornton found AR's system was not protected against well-known vulnerabilities such as "WannaCry" and warned AR that their unsupported and unpatched servers could lead to critical vulnerabilities that could be exploited and increased the risk of | Thyberg Dec. Opp. Ex.11, GT 00030 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| | exposure of sensitive, proprietary, and restricted information. | |
| 31 | Grant Thornton indicated that during their penetration test AR's managed service provider CGI failed to identify or respond to the suspicious activity indicating that a malicious scan could go undetected and result in the exfiltration of data. | Thyberg Dec. Opp. Ex.11, GT 00033 |
| 32 | Grant Thornton's 2019 Cyber Security Loss Prevention Audit dated February 21, 2020, indicated risk losing proprietary information, significant enhancements of certain key processes in the cybersecurity program were required and that AR had failed to address a number if findings in their previous year's audit. | Thyberg Dec. Opp. Ex.11, GT 00003 |
| 33 | Grant Thornton's 2019 AR audit findings were worse than the 2018 findings as now AR had two "high risk" findings, and three "moderate risk" findings. | Thyberg Dec. Opp. Ex.11, GT 00004 |
| 34 | Although Grant Thornton had advised AR their servers were not adequately patched to protect against well-known critical vulnerabilities, a year later Grant Thornton found this issue had not been adequately addressed. | Thyberg Dec. Opp. Ex.11, GT 00007 |
| 35 | Grant Thornton found that in 2019 AR was still using Windows 2003 servers that were no longer supported by Microsoft when Grant Thornton had warned AR these outdated and unsupported systems were at risk for being compromised by malicious vulnerabilities. | Thyberg Dec. Opp. Ex.11, GT 00009 |
| 36 | In their 2019 penetration test Grant Thornton found that AR's managed service provider | Thyberg Dec. Opp. Ex.11, GT 00009 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| | CGI still failed to correctly identify their malicious scanning activities indicating that a malicious scan could go unprotected. | |
| 37 | Shortly, March 2017, CGI found what later proved to be millions of critical vulnerabilities in AR's servers, work stations and network devices. | Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶¶ 16,54 |
| 38 | AR made representations to CGI leading CGI to believe AR was compliant with guidelines and best practices applicable to federal government contractors and was not plagued with critical vulnerabilities | Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶¶ 16,54 |
| 39 | AR representatives, Kurt Figler and Mark McBride gave CGI copies of security policies and practices touted as AR standard practices but CGI learned these security policies and procedures were never fully or widely implemented. CGI Amended Comp | Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶16 |
| 40 | AR represented to CGI they had security systems in place that were not in place. | Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶16 |
| 41 | AR concealed its critical vulnerabilities by configuring it computer network with security tools and sensors that masked all or a substantial number of its critical security alerts. | Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶¶16,55 |
| 42 | Due to critical flaws in its security environment AR experienced a major security incident on May 2, 2017. | Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶18 |
| 43 | Army contracting officer Laurie Hewitt would not award AR a contract unless AR was compliant with the DFARS Clause. | Thyberg Dec. Opp. Ex. 5, Hewitt Dep. 46:4-18 |

| No. | Relator's Additional Undisputed Facts | Supporting Evidence |
|---|---|---|
| | (Hewitt Dep. 46:4-18) | |
| 44 | Compliance with the DFARS Clause was not a Department of Defense wide problem. (Hewitt Dep. 48:6-10) | Thyberg Dec. Opp. Ex. 5, Hewitt Dep. 48:6-10 |
| 45 | Michetti from the DOD CIO office indicated that the DFARS Clause controls had to be in place before AR was awarded a contract and that was related to AR. | Thyberg Dec. Opp. Ex. 5, Hewitt Dep. 49:5-18 |
| 46 | AR VP and CIO Mark Angelo did not think it was fiscally responsible for AR to try to achieve the highest cyber security standard stating **… I am not convinced that it is fiscally responsible for leadership to attempt to achieve a maturity level of 5.** (Emphasis added) AR00180711 | Thyberg Dec. Opp. Ex. 4, AR00180711 |

Dated:  October 12, 2021

Respectfully submitted,

THYBERGLAW

 _/s/ Gregory A. Thyberg_
GREGORY A. THYBERG
Attorneys for Relator
BRIAN MARKUS