# EXHIBIT "3"

Case 2:15-cv-02245-WBS-AC Document 134-3 Filed 10/12/21 Page 2 of 18

ROGERS JOSEPH O'DONNELL
Neil H. O'Donnell (State Bar No. 057928)
nodonnell@rjo.com
John G. Heller (State Bar No. 129901)
jheller@rjo.com
Lauren Kramer Sujeeth (State Bar No. 259821)
lsujeeth@rjo.com
Eleanor M. Ross (admitted *pro hac vice*)
eross@rjo.com
311 California Street, 10th Fl.
San Francisco, California 94104
Telephone: 415.956.2828
Facsimile: 415.956.6457
311 California Street
San Francisco, California 94104
Telephone: 415.956.2828
Facsimile: 415.956.6457

Attorneys for Plaintiff
CGI FEDERAL INC.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CGI FEDERAL INC., a Delaware Corporation,

Plaintiff,

vs.

AEROJET ROCKETDYNE, INC., an Ohio Corporation,

Defendants.

Case No. 2:20-cv-01781-JAM-KJN

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES AND DEMAND FOR JURY TRIAL**

1. Breach of Contract
2. Concealment

EXHIBIT 3

Plaintiff CGI FEDERAL INC. hereby alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action under 28 U.S.C. § 1332 and because the amount in controversy exceeds $75,000.00.

2. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because all defendants are subject to personal jurisdiction in this state and judicial district.

**PARTIES**

3. Plaintiff CGI Federal Inc. ("CGI" or "Plaintiff") is a Delaware corporation registered to do business in the State of California. Its principal place of business is 12601 Fair Lakes Circle, Fairfax, Virginia 22033.

4. Upon information and belief, defendant Aerojet Rocketdyne, Inc. ("AR" or "Defendant") is an Ohio corporation registered to do business in the State of California, having its principal place of business at 2001 Aerojet Road, Rancho Cordova, CA 95742.

**FACTUAL ALLEGATIONS**

**The Parties' Contractual Relationship**

5. On May 2, 2016, AR released a Request for Proposal for Information Technology Services Outsourcing (the "RFP"), seeking bids for the provision of a wide range of information technology ("IT") services, including migrating substantial assets to off-site rack servers (also referred to as "the cloud"). AR announced that it would be evaluating offerors on a "lowest price, technically acceptable basis" in three domains: price; technical/management; and acceptance of AR Master Services Agreement. RFP § 3.10, Evaluation Criteria. CGI submitted its initial response on June 27, 2016 and a subsequent response on December 9, 2016. On January 2, 2017, CGI submitted its best and final offer (the "BAFO"), including its final pricing proposal. Based on CGI's BAFO proposal, AR selected CGI and AR and CGI (together, the "Parties") entered into contract negotiations.

6. On or about February 16, 2017, the Parties entered into Master Service Agreement No. 16681, which includes attached Terms and Conditions of Master Service Agreement (the "MSA"), for the provision of various IT services. A true and correct copy of

EXHIBIT 3

the MSA, as amended in July 2018, is attached to this Complaint as part of Exhibit A and is incorporated herein by reference.

7. On March 13, 2017, the Parties entered into a Letter Contract subject to the terms and conditions of the MSA. The Letter Contract authorized CGI to begin work while the Parties negotiated the terms of a Statement of Work ("SOW") and associated Attachments. Under the Letter Contract, CGI would provide AR with six months of Information Technology Outsourcing Services ("ITO Services") and AR would pay CGI based on a mixture of milestone achievements and monthly recurring service fees. A true and correct copy of the Letter Contract, including its four fully-executed Change Orders, is attached to this Complaint as Exhibit B and is incorporated herein by reference.

8. On or about March 13, 2017, CGI began performing ITO Services under the Letter Contract, including Initial Transition services from AR to CGI.

9. On or about September 14, 2017, the Parties completed negotiations and executed Statement of Work #001 for Information Technology Services Outsourcing ("SOW #001"), which includes various Attachments and is subject to the MSA. Upon execution of SOW #001, the Letter Contract terminated and was superseded and replaced by SOW #001.

10. On April 1, 2018, July 1, 2018, January 17, 2020, April 30, 2020, and July 31, 2020, the Parties agreed to Change Orders modifying SOW #001 and its various Attachments. A true and correct copy of SOW #001 as amended, including its various Attachments, is attached to this Complaint as part of Exhibit A and is incorporated herein by reference. The Exhibit A MSA and SOW #001, as amended and together with their respective Attachments, represent the operative contract that governs the Parties' rights and responsibilities and collectively are referred to herein as the "Contract."

11. SOW #001 Section 3.A, *Service Description*, lists the various "Services" to be provided by CGI to AR under the Contract, including: (a) cross functional services; (b) IT infrastructure services; (c) end-user support services; (d) applications services; (e) security services; (f) compliance, audit, and risk services; and (g) business

EXHIBIT 3

continuity and disaster recovery services. SOW #001 also describes the various methodologies under which AR pays CGI for its various services.

12. SOW #001 Attachment G, *Governance*, sets out a governance structure and issue resolution process, including a disputes and issues escalation procedure that: (a) requires the Parties to attempt to resolve issues and disputes at the operational level and (b) provides a process for the escalation of issues to a Management Steering Committee and then an Executive Steering Committee ("ESC"). Additionally, under MSA Section 29, *Disputes*, "any dispute not settled between the [P]arties will be referred to a court of competent jurisdiction in the state of California."

13. The Parties attempted to resolve the issues and disputes raised in this proceeding via SOW #001's ESC escalation process without success.

**Transformation Delay**

14. SOW #001 sets forth various Milestones for Transformation whereby AR's IT infrastructure would, among other things, be migrated to the cloud at a data center contracted by CGI within the first 11 months of Contract performance. Specifically, SOW #001 Attachment O at Section 2 and Attachment C at Section 2.3.2 provide that CGI shall transform the AR IT enterprise in accordance with a Transformation Project Management Plan that defines specific measurable actions for CGI to complete in order to transform AR's "as-is" enterprise into an enterprise compliant with the requirements of the Department of Defense's Supplement to the Federal Acquisition Regulation ("DFARS"). SOW #001 Attachment O at Section 2 sets forth certain "Transformation Milestones" for delivery and payment, which are listed in SOW #001 Attachment C at Exhibit C.4.2. It also outlines at Table O-2 the Parties' respective responsibilities regarding certain Transformation Requirements.

15. The Parties understood at the time that they entered into SOW #001 that many of the Transformation Milestones were dependent on this data center migration and could not reasonably occur until the migration to the CGI data center had occurred.

EXHIBIT 3

16. Shortly after CGI started its Initial Transition in March 2017, CGI began discovering what later proved to be millions of critical vulnerabilities on AR servers, workstations, and network devices. Although AR disclosed some information to CGI about its IT enterprise in the RFP and when CGI visited AR's Sacramento facility in February 2017, AR never disclosed these hidden vulnerabilities to CGI. In fact, AR made representations to CGI that reasonably led CGI to understand that: AR's IT ecosystem had been maintained properly; AR was compliant with guidelines and best practices applicable to federal government contractors; and AR IT ecosystem was not plagued by such critical vulnerabilities. For example, AR represented in its RFP that it had certain security systems in place that CGI later determined were not actually in place. Additionally, when CGI visited AR's Sacramento facility, AR representatives, Kurt Figler and Mark McBride, gave CGI copies of security policies and procedures touted as AR's standard practices. CGI later learned that AR never fully or widely implemented these proffered security policies and procedures. CGI could not have reasonably discovered AR's hidden vulnerabilities or AR's failure to implement the proffered security policies and procedures before CGI took over administration of AR's IT ecosystem during Transition because: (a) AR did not disclose these vulnerabilities in the RFP process; (b) AR did not grant CGI the degree of system access that might have permitted CGI to discover these hidden vulnerabilities prior to committing to the terms of the Contract and beginning work; and (c) the configuration of AR's security tools and sensors masked and filtered all or a substantial number of its critical security alerts.

17. CGI is informed and reasonably believes and thereon alleges that AR was aware of the many vulnerabilities of its system before the Parties entered into SOW #001, as evidenced by: (a) breaches of AR's computer systems in 2013 and 2014 by nation-state-sponsored threat actors, which AR reported to the U.S. Government (the "Government"); (b) a January 2015 presentation regarding AR's cybersecurity compliance prepared by Brian Markus, who then worked for AR as its Senior Director of Cyber Security, Compliance & Controls; (c) security audits conducted by Emagined Security Inc. in 2014 and

EXHIBIT 3

2015 that identified numerous security gaps in AR's computer systems; and (d) an April 2015 vulnerability assessment of AR's systems by Ernest & Young ("E&Y") during which the E&Y assessment team was able to compromise the windows network and retrieve user accounts and passwords within four hours.

18. On May 2, 2017, AR experienced a major security incident at one of its facilities (the "CA-11 incident"), which was the result of several critical flaws in AR's security environment. CGI performed an initial assessment of the state of AR's IT enterprise following the CA-11 incident and assisted AR in limiting and remediating the initial impact for a period of 2-3 months in Summer 2017. The Government subsequently performed an audit of AR's systems (the "CA-11 audit"), identifying significant shortfalls that revealed compromises to AR's existing environment and indicating that AR's IT enterprise could not be trusted.

19. Because of the issues identified by the CA-11 audit and by CGI's subsequent analysis of AR's system and procedural implementation following the CA-11 incident, AR's environment was exposed to a very high level of security risk. As a result of these issues, CGI was required to perform remediation on AR's IT ecosystem, which prevented CGI from migrating AR's on-premise infrastructure to the planned CGI data center operated by CGI subcontractor Rackspace/Datapipe (the "Rackspace/Datapipe Data Center").

20. Because CGI was delayed in migrating AR's infrastructure to the Rackspace/Datapipe Data Center as planned, CGI was forced to incur significant additional costs, including, but are not limited to, costs required to: (a) encrypt AR's data on the legacy system rather than in the cloud; (b) retain personnel longer than planned; (c) purchase additional hardware to refresh AR on-site equipment; and (d) purchase additional hardware and software not previously anticipated.

**Payment for Additional Virtual Cloud Servers Based on Demand Units**

21. SOW #001 Attachment C sets forth the Contract's Financial Provisions. Specifically, Attachment C at Section 2.1 states, among other things, that CGI is entitled to recovery of demand-based fees for the provision of cross-functional services, infrastructure

EXHIBIT 3

services, application services, and security services based on AR's actual monthly usage. Per Attachment C at Section 2.2, usage is measured by the number of Demand Units ("DUs"), which are defined as a measurable unit such as an authorized end-user, an authorized end-user's device or applications, a user independent device, or a shared device. In short, CGI is entitled to payment at specified rates per DU each month.

22. DUs for demand-based services are grouped into two categories: Mandatory and Additional. The Mandatory Demand Category includes the baseline suite of applications applied to each end-user or walkup device. The Additional Demand Category includes services that certain end-users could elect to receive and inventory added after the cutover of services to CGI (such as additional printers or terabytes of storage). SOW #001 Attachment C at Section 2.2.2 specifically defines the date for the cutover of services to CGI as June 9, 2017 ("Cutover Date"). For services under the Additional Demand Category, AR agreed to pay supplementary charges for additional DUs that it requested and approved during the Contract period.

23. SOW #001 Attachment C at Section 4 and Exhibit C.5 set forth an estimate of demand baselines based upon the Parties' expectations and SOW #001 Attachment E defines the In-Scope Hardware and Software. As described in SOW #001 Attachment C at Section 2.2.8, during the 60 days following the Effective Date of SOW #001, a hardware and software asset true-up was to be conducted that would include an inventory of AR's actual hardware and software assets and the identification of the relevant hardware and software assets in the Configuration Management Database ("CMDB"). Once the asset inventory true-up was complete, AR would be charged based on actual DU consumption.

24. As of the Cutover Date, AR's inventory tracking system identified 421 virtual cloud server devices. Since that time and to date, AR has requested and approved an additional 475 virtual cloud server devices.

///

///

EXHIBIT 3

Case 2:20-cv-02245-BAM Document 21 Filed 11/18/20 Page 8 of 17

**AT&T Pass-Through Costs**

25. According to SOW #001 Attachment C at Section 2.2.9, CGI is required to administer pass-through costs associated with telecommunications circuits and network equipment services provided to AR by AT&T, including: MPLS; VOIP (PRI/DID); External Internet (MIS); WANX; DSL; ISDN; and Managed Services ("Pass-Through Costs"). Pass-Through Costs are considered part of the services provided by CGI and included in the DU charges.

26. SOW #001 Attachment C at Section 2.2.9 further states that CGI: (a) is responsible for ensuring all payments are made within the contracted payment provisions outlined in the pertinent AT&T contracts and (b) shall be responsible for any late fees and disconnect or reconnection fees associated with the late payment of invoices. It also states that any invoices paid by AR directly to AT&T shall be credited against CGI invoicing and no additional AT&T pass-through costs may be added by AR without CGI's written consent.

27. CGI is informed and reasonably believes and thereon alleges that, at the time that the Parties entered into SOW #001, AR's negotiated rates with AT&T were significantly-higher than market rates. CGI was not aware of this fact at the time that it: (a) negotiated the terms of the Contract with AR, including the negotiation of SOW #001's AT&T Pass-Through Cost provision, or (b) started Contract performance. Moreover, AR did not provide CGI with any AT&T records from which CGI could have learned this information. CGI attempted to learn this information from AT&T, but AT&T refused to disclose it. CGI also is informed and reasonably believes that AT&T refused to disclose the requested information because AR would not permit its release to CGI.

28. CGI worked with AR and AT&T to negotiate more favorable rates for services included in SOW #001 as Pass-Through Costs. On or about July 2018, after months of AR delays, AR finally signed a new contract with AT&T, which included significantly-lower rates charged by AT&T for services included in SOW #001 as Pass-Through Costs. AR's dilatory conduct included, but is not limited to, its roughly 4-month delay in signing the new contract with AT&T containing the more favorable, renegotiated rates.

EXHIBIT 3

29. During Contract performance, AR retained some responsibility for administering the AT&T Pass-Through Costs, including directly-paying AT&T invoices. AR then withheld (and continues to withhold) amounts that it paid to AT&T as Pass-Through Costs from CGI's monthly invoices.

30. MSA Section 8.1 states that CGI shall not be charged for any liability because of a failure to perform the Agreement under its terms, if the failure arises from causes beyond the control of and without the fault of CGI, provided that CGI gives AR prompt notice in writing.

31. CGI informed AR that the rates invoiced by AT&T, paid by AR as the AT&T Pass-Through Costs, and withheld from CGI by AR were not reasonable. CGI further informed AR that it: (a) had no knowledge at the time of bidding that AR was paying significantly-higher than market rates for AT&T's services and (b) would have negotiated the DU Charges and/or Pass-Through Costs provision differently had it known this information.

32. In addition, CGI informed AR that AR has added additional AT&T Pass-Through Costs without CGI's written consent and has been withholding inappropriately these additional AT&T costs from CGI's invoices. Specifically, AR added the following AT&T services without CGI's written consent: (a) sites that were either not identified in the telecommunications network information provided by AR or were added by AR since the start of the Contract and (b) supplementary capacity and infrastructure that AR added since the start of the Contract, including, but not limited to, increased bandwidth (*i.e.*, MPLS Access Net, MPLS Port Net and MPLS COS), additional circuits, and SD WAN (*i.e.*, Internet ADI, Network LAN extension, and SD WAN Managed Service).

**Asset Transfer at End of Contract**

33. Under SOW #001 Attachment C at Section 5.8, in the event of Contract expiration or termination by default, AR has the right, but not the obligation, to purchase any hardware and software that CGI purchased, refreshed, or leased in accordance with SOW #001 and used, on a fully-dedicated basis, to provide the Contract services ("Dedicated

EXHIBIT 3

Assets"). Under this circumstance, the Parties shall use net book value at such time as those items are being assigned or transferred in its determination of costs to be paid to CGI by AR.

34. SOW #001 Attachment C at Section 5 (including Subsections 5.1 and 5.3) provides that AR shall receive title to the Dedicated Assets if the Contract is terminated, in whole or in part, for convenience, change in control, change in law, or a force majeure event. In exchange, AR is required to pay a termination fee, which is calculated and paid based on the effective date of the termination as set forth in the Contract's Termination Liability Schedule (the "Termination Schedule") as presented in Exhibit C.6.

35. SOW #001 Attachment C at Section 5.1 states that the Termination Schedule shall, at a minimum, be updated quarterly (or more frequently as needed) to account for events that would have a direct impact on the Termination Schedule in accordance with the Change Control Process at SOW #001 Attachment H, *Changes and Control*. Such events include, but are not limited to, changes in the Refresh Plan and/or any other scope changes that have a substantial financial impact. SOW #001's "Refresh Plan" refers to the Contract requirement that the Parties agree to an Equipment Refresh Plan under which CGI is to refresh hardware and software that is in-scope under the Contract. Per Attachment C at Section 5.3, any asset valuation embedded in the Termination Schedule is to be at CGI's net book value at the time of the termination. Finally, Attachment C at Section 5.2 indicates that the Parties contemplated the initial Termination Schedule would be "modified."

36. Beginning in the final quarter of 2017 and on a quarterly basis to date, CGI sent AR a MS Excel file with a complete listing of Dedicated Assets to AR's project team, including Sandra Lent and, after Fall 2018, John Jackson, which indicates each asset's original purchase cost, deployment date, and 5-year useful life.

37. At the end of 2017, at the request of AR, the Parties entered into negotiations to restructure the ownership and financial responsibility of assets under the Contract (and by extension the Contract's Termination Schedule). These restructuring negotiations stalled in June 2018. By Fall 2018, the Parties abandoned restructuring. CGI subsequently asked AR to update the Termination Schedule in accordance with SOW #001

EXHIBIT 3

Attachment C at Section 5.1. AR, through its representative John Jackson, verbally refused to do so in a meeting in November 2018 and AR continues to ignore or reject CGI's requests to update the Termination Schedule.

38. Despite CGI's repeated quarterly requests, to date, AR has refused to update the Termination Schedule. For example, on or about December 5, 2019, CGI sent AR a Change Request in accordance with SOW #001 Attachment H to update the Termination Schedule as of October 2019. CGI's Change Request reflected the following events impacting the Termination Schedule:

(a) As part of the Contract, AR estimated that CGI would be required to provide services, including equipment refreshes, for 4,812 workstations, but the Contract's Demand Measurement Process identified roughly 5,825 users that require workstations – a difference of over 1,000 workstations – which then were included in the Equipment Refresh Plan;

(b) Since Contract execution, CGI has been required to acquire other assets for the performance of the services that were not included in either CGI's proposal or the initial Termination Schedule as Dedicated Assets, but subsequently have been included in the Equipment Refresh Plan as additional Dedicated Assets (such as monitors; VOIP phones; end user devices; peripherals; server devices; network devices; storage devices; conference room devices; printers; copiers; and plotters; *etc.*);

(c) After Contract execution, AR added facilities where CGI was required to perform services, which increased the number of laptops, desktops, and other assets that are now covered by the Equipment Refresh Plan; and

(d) During the Contract, CGI was forced to reduce the data that was to be transitioned to the Rackspace/Datapipe Data Center for storage in the cloud, resulting in a requirement for CGI to purchase equipment to store that data on-site at AR's premises (*i.e.*, server refresh equipment).

39. CGI continues to send Change Requests to AR with updated Termination Schedules as additional assets are purchased and deployed.

EXHIBIT 3

Case 2:20-cv-01781-JAM-KJN Document 21 Filed 11/18/20 Page 12 of 17

40. To date, AR has refused CGI's requests to update the Termination Schedule, asserting that: (a) "net book value" as that term is used in SOW #001 Attachment C at Section 5.3 means the values listed in the Termination Schedule as originally drafted; (b) any asset not listed in the Termination Schedule has a net book value of $0; and (c) no alterations to the Termination Schedule are appropriate or required.

41. CGI rejects AR's position because, unless the Contract's Termination Schedule is updated to reflect, among other things, any assets that have been purchased during the Contract and are not reflected in the Termination Schedule (which will have a residual value at the end of the Contract term), AR effectively would be entitled to convert CGI's property to its own use without fair value compensation. AR contends without support that the Contract does not require updates to the Termination Schedule and, on this basis, has refused CGI's requests to update the Termination Schedule.

42. CGI further asserts that "net book value" should be understood, as that term is ordinarily used in the industry, as the value of an asset, taking into account diminutions, depreciations, and other accounting charges, as recorded in the accounts of its owner. CGI maintains that any asset depreciation should be calculated, as is standard in the industry, on a straight 5-year basis from the date such asset is deployed under the Contract. CGI also contends that, during Contract negotiations, it informed AR about its asset depreciation approach and explained how it would be recording the assets in its accounts. In response, AR contends that "net book value" means the asset value as reflected in the original Termination Schedule.

43. Therefore, there exists an actual, present, and justiciable controversy between Plaintiff and Defendant concerning their respective rights and duties under the Contract. This controversy is ripe for judicial decision as to which of the interpretations is correct and declaratory relief is necessary and appropriate so that the Parties may know the legal obligations that govern their present and future conduct.

///

///

EXHIBIT 3

Case 2:20-cv-01781-JAM-KJN Document 21 Filed 11/18/21 Page 13 of 17

## FIRST CLAIM FOR RELIEF

### Breach of Contract

44. Plaintiff incorporates and realleges each and every allegation contained in the preceding paragraphs as if set forth fully herein.

45. This Contract is a valid and enforceable contract for good and valuable consideration.

46. In addition to the Contract's express terms, the law implies a covenant of good faith and fair dealing into the Contract, whereby AR impliedly agrees to deal with CGI fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure the rights of CGI to receive the benefits of the Contract.

47. CGI has performed fully all material covenants, conditions, and obligations required on its part under the terms of the Contract, except those conditions, covenants, and obligations excused by AR's various breaches.

48. AR has breached the express terms of the Contract, including, but not limited to, the following provisions: SOW #001 Attachment C, *Financial Provisions* (including various provisions of: Section 2 such as 2.2.2, 2.2.8, 2.2.9, and 2.3.2; Section 4; Section 5 such as 5.1 and 5.8; and relevant Exhibits such as C.4.2 and C.5); SOW #001 Attachment H, *Changes and Control*; SOW #001 Attachment O, *Transition and Transformation Services* (including Section 2 and Table O-2); and MSA Section 8.1.

49. Specifically, AR breached the aforementioned express Contract provisions by, among other things: (a) failing to pay CGI amounts due under the Contract; (b) failing to pay CGI for the additional virtual server devices that AR requested and approved; (c) failing to compensate CGI for the additional expenses incurred due to the millions of critical vulnerabilities on AR servers, which AR knew that CGI had no prior knowledge of and yet failed to disclose to CGI before CGI began work under the Contract; (d) withholding amounts from CGI invoices as Pass-Through Costs paid to AT&T that were either not valid Pass-Through Costs or resulted from additions or modifications made after Contract execution without CGI's written consent; and (e) failing to update the Termination

EXHIBIT 3

Case 2:20-cv-01781-JAM-KJN Document 1-3 Filed 10/13/20 Page 14 of 17

Schedule quarterly or more frequently to account for events that would have a direct impact on it, including the provision of new equipment, changes in the Refresh Plan, and/or any other scope changes with a substantial financial impact, and failing to set any asset valuation embedded in the Termination Schedule at CGI's net book value.

50. AR also breached the Contract's implied covenant of good faith and fair dealing by, among other things: (a) withholding (and precluding AT&T from releasing) information relevant to the AT&T Pass-Through Costs that would later be CGI's responsibility for which AR had knowledge about the above-market rates being paid by AR for AT&T services and thereby precluding CGI from including the true AT&T costs in its calculation of appropriate DU Charges and (b) delaying by roughly 4 months the signing of agreements with AT&T that lowered the rates that comprise the Pass-Through Costs withheld from CGI.

51. As a direct and proximate result of AR's breaches of its express and implied obligations under the Contract, CGI has been damaged and continues to suffer damages in an amount to be proven at trial, but not less than $15,418,256.

52. CGI also is entitled to interest on the foregoing amount to the extent permitted by law.

**SECOND CLAIM FOR RELIEF**

**Concealment**

53. Plaintiff incorporates and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if set forth fully herein

54. AR owed CGI a duty to disclose material facts, including those pertaining to the then-current state of AR's IT infrastructure and its infection with millions of critical vulnerabilities, because AR made representations to CGI regarding the robustness of its IT ecosystem and, therefore, was required to disclose additional facts that materially qualified those representations. Having made such representations, AR's failure to disclose facts that qualified these representations, as well as the known presence of millions of critical vulnerabilities in its IT ecosystem, mislead CGI. For example, AR represented in the RFP, as

EXHIBIT

EXHIBIT 3

Case 2:15-cv-02245-WBS-AC Document 134-3 Filed 10/12/21 Page 16 of 18

well as information in the data room for offerors, that AR's current IT ecosystem was reasonably maintained and managed. AR's description of a variety of security measures also reasonably led offerors, including CGI, to believe that AR was actively-implementing those measures. Additionally, after being selected, but before execution and performance of the Letter Contract, AR representatives, Kurt Figler and Mark McBride, provided CGI with copies of AR's security policies and procedures and falsely represented that these policies were standard AR practice (implementation of such policies and procedures is wholly inconsistent with the reality of AR's IT system, which was plagued by significant vulnerabilities).These policies and procedures were, if implemented, inconsistent with an IT system as plagued by vulnerabilities as AR's system turned out to be.

55. AR also independently owed CGI a duty to disclose material facts, including those pertaining to the then-current state of AR's IT infrastructure and its infection with millions of critical vulnerabilities, because: (a) AR had exclusive knowledge of and access to the relevant facts concerning the true state of AR's IT environment and/or (b) AR actively concealed discovery of the relevant facts from CGI by maintaining a configuration of security tools and sensors that masked and filtered all or a substantial number of critical security alerts.

56. On information and belief, AR intentionally concealed from CGI the millions of critical vulnerabilities on its servers, workstations, and network devices. Based on AR's failure to disclose to the contrary, AR intended for CGI to rely on the implied representation that its IT ecosystem did not suffer from millions of vulnerabilities and security alerts related to these vulnerabilities were not being suppressed.

57. CGI did not know of these facts, did not discover these facts, and could not have discovered these facts before submitting its BAFO and committing to Contract performance because: (a) AR did not grant CGI access to its full IT environment until after CGI began the Transition to take over AR's IT ecosystem and (b) in any case, AR's then-existing security tools and sensors masked and filtered thousands of critical security alerts.

EXHIBIT 3

58. Had the omitted information about the true state of AR's infrastructure been disclosed, CGI would have: (a) behaved differently and included the additional costs and time to remediate the AR infrastructure in its BAFO to the RFP and charged those additional costs to AR as part of the Contract compensation structure and added such time to the Contract Transformation project schedules or (b) declined to enter into the Contract on the terms and conditions agreed to.

59. As a direct and proximate cause of AR's concealment, CGI has suffered damages. Specifically, among other harm, CGI was and continues to be forced to incur additional Transformation expenses to bring AR's IT system to a state where it could be migrated to the cloud. These expenses include the costs required to: (a) encrypt AR's data on the legacy system, rather than in the cloud; (b) retain personnel longer than planned; (c) purchase additional hardware to refresh AR on-site equipment; and (d) purchase additional hardware and software not previously anticipated. The full amount of such damages is in an amount to be proven at trial, but not less than $5,340,016.

60. In committing the acts alleged above, AR acted with malice, oppression, or fraud. CGI, therefore, is entitled to punitive damages.

**PRAYER**

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1. For the principal sum of an amount to be proven at trial, but not less than $15,418,256;
2. For a declaration confirming that "net book value" means the value of an asset, taking into account diminutions, depreciations, and other accounting charges, as recorded in CGI's accounts, including with a straight 5-year depreciation schedule from the date such asset is deployed under the Contract;
3. For a declaration confirming that the Contract should be interpreted to require that the Parties update the Termination Schedule to reflect new and/or additional assets purchased during the life of the Contract and such



Case 2:15-cv-02245-WBS-AC Document 134-3 Filed 10/12/21 Page 18 of 18

assets should be valued as recorded in CGI's accounts with a straight 5-year depreciation schedule;

4. For costs incurred in maintaining this suit;
5. For attorney's fees;
6. For punitive damages;
7. For pre-judgment and post-judgment interest; and
8. For such other and further relief as the Court may deem just and proper.

Dated: November 18, 2020

ROGERS JOSEPH O'DONNELL

By: /s/ *Lauren Kramer Sujeeth*

NEIL H. O'DONNELL
LAUREN KRAMER SUJEETH
Attorneys for Plaintiff
CGI FEDERAL INC.

EXHIBIT 3