PHILLIP A. TALBERT
Acting United States Attorney
COLLEEN M. KENNEDY
RACHEL J. MUOIO
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

JAMIE A. YAVELBERG
MICHAL TINGLE
GREGORY PEARSON
Attorneys
Civil Division
United States Department of Justice
175 N. Street, NW
Room 9012.13
Washington, DC  20001
Telephone:  202-307-6699

*Attorneys for the United States*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES ex rel. BRIAN MARKUS, individually,<br><br>Relator,<br><br>v.<br><br>AEROJET ROCKETDYNE HOLDINGS, INC., a corporation, and<br>AEROJET ROCKETDYNE, INC., a corporation,<br><br>Defendants. | CASE NO.  2:15-CV-02245 WBS AC<br><br>**UNITED STATES' STATEMENT OF INTEREST IN CONNECTION WITH DEFENDANTS' SUMMARY JUDGMENT MOTION**<br><br>Judge:        Hon. William B. Shubb<br>Hearing Date: November 1, 2021<br>Time:         1:30 p.m.<br>Courtroom:    5 |

# I. INTRODUCTION

The United States respectfully submits this Statement of Interest (SOI) pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, and 28 U.S.C. § 517, to address certain issues raised by the Motion for Summary Judgment of Aerojet Rocketdyne, Inc. and Aerojet Rocketdyne Holdings, Inc. (collectively, "AR") and AR's Opposition to the Relator's Motion for Summary Judgment.  (Dkt. Nos. 116 and 130).

The FCA is "the government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government." *Avco Corp. v. U.S. Dep't of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989).  The government, therefore, has a significant interest in how decisions by the courts, even in declined actions, may shape future enforcement of the statute.  Moreover, although the government has declined to intervene in this case, it remains the real party in interest.  *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934 (2009).  Accordingly, the United States files this SOI to ensure that the Court is apprised of applicable law on the issues of (1) promissory fraud, (2) materiality, and (3) damages.  *See* 28 U.S.C. § 517 (providing for Department of Justice participation in any federal court litigation to attend to the interests of the United States).

# II. ARGUMENT

## A. Promissory Fraud

It is well settled that when a contract is obtained through false statements or fraudulent conduct, FCA liability attaches to each claim submitted to the government under the contract.  *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943)).  This theory is known as "promissory fraud" or "fraud-in-the-inducement." *Hendow* at 1173. Case law recognizes "two major variations of the fraudulent inducement theory": (1) in one type, prior to contract, a party makes a promise it intends to break; and (2) in the other type, a party makes a false statement that induces contract award, or agreement to terms and conditions the government otherwise would not have accepted.  *United States v. DynCorp*, 253 F. Supp. 3d 89, 107 (D.D.C. 2017).  Each claim submitted to the government under a contract which was procured by such fraud is false even if false representations were not made on the claim itself.  *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 904 (9th Cir. 2017); *United States ex rel. Bettis*

1 | *v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (a contractor is liable "for
2 | each claim submitted to the Government under a contract which was procured by fraud, even in the
3 | absence of evidence that the claims were fraudulent in themselves.").

4 |     AR overstates the causation showing necessary to establish an FCA promissory fraud claim.
5 | AR's contention that the showing is a "heavy burden" suggests it requires more than it does.  To satisfy
6 | this requirement, plaintiff need only show but-for causation, which is not a "heavy burden."  *See United*
7 | *States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F. 4th 412, 421-22 (D.C. Cir. 2021).  Under this
8 | standard, causation is established by showing that the government would not have entered into the
9 | contract (or on the agreed terms) had it known defendant's representations were false.  *Id*.

10 |     Nothing in *Hendow,* upon which AR relies, suggests the causation showing is a "heavy burden."
11 | To the contrary, *Hendow* merely requires a showing that the false statement induced the government to
12 | take action, which amounts to simple, but-for causation.  *See Hendow* at 1173.  Where a contractor
13 | obtains a contract through false statements or fraudulent conduct, the FCA is violated when the
14 | contractor submits claims under that contract.  *See Campie*, 862 F.3d at 904-07 (upholding promissory
15 | fraud action where government's purchase of drug was conditioned on Food and Drug Administration
16 | (FDA) approval and defendant misrepresented facts to FDA to obtain approval); *United States ex rel.*
17 | *Westrick v. Second Chance Body Armor, Inc.*, 266 F. Supp. 3d 110, 128–29 (D.D.C. 2017) (denying
18 | summary judgment on promissory fraud claim based on partial disclosures by defendant of the true state
19 | of affairs, where disclosures induced the government to award contract); *United States v. Honeywell*
20 | *Int'l Inc.*, 502 F. Supp. 3d 427, 456 (D.D.C. 2020), *motion to certify appeal granted*, No. CV 08-0961
21 | (PLF), 2021 WL 2493382 (D.D.C. June 18, 2021) (finding genuine issue of material fact as to truth or
22 | falsity of data that subcontractor gave to contractor precluded summary judgment on FCA claim
23 | stemming from subcontractor's fraudulent inducement of contractor).

24 |     AR also argues that its non-compliance with applicable cybersecurity requirements had no effect
25 | on the government's contracting decisions.  In support of this argument, AR claims that this *qui tam*
26 | action did not prompt Department of Defense (DOD) components and NASA to cancel their AR
27 | contracts or deter them from entering new contracts with AR.  This claim mistakenly presumes that
28 | these contracting agencies had full knowledge of AR's non-compliance merely because the Relator filed

a *qui tam* complaint and provided a written disclosure of Relator's material evidence to DOJ. A *qui tam* complaint and relator's disclosure statement are unproven allegations, not proven facts. The government cannot be expected or required to refuse to honor an existing contract or refuse to enter into a new contract in response to every one of the hundreds of private relators who accuse government contractors of misconduct every year. Finally, as this Court has found, "the contracts government agencies entered with AR after relator commenced this litigation are not at issue and possibly relate to a different set of factual circumstances." *United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1248 (E.D. Cal. 2019).[1]

AR's causation argument also relies on *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016). There, relator alleged that claims to government agencies for a medical device violated the FCA because the FDA's approval of the device, which was required for government reimbursement, was obtained using false statements. *Id*. As AR notes, the court upheld the dismissal of the relator's promissory fraud claim, in part, because:

> The FDA's failure actually to withdraw its approval of Onyx in the face of D'Agostino's allegations precludes D'Agostino from resting his claims on a contention that the FDA's approval was fraudulently obtained. To rule otherwise would be to turn the FCA into a tool with which a jury of six people could retroactively eliminate the value of FDA approval and effectively require that a product largely be withdrawn from the market even when the FDA itself sees no reason to do so. The FCA exists to protect the government from paying fraudulent claims, not to second-guess agencies' judgments about whether to rescind regulatory rulings.

*Id*. at 8.

However, the Ninth Circuit rejected this finding from *D'Agostino* in *Campie*, another case that involved relator allegations that a defendant induced FDA approval using false statements. In *Campie*, the Ninth Circuit found:

///

///

---

[1] AR's reliance on *United States ex rel. Berg v. Honeywell Int'l, Inc.*, 740 F. App'x 535, 538 (9th Cir. 2018), *United States ex rel. Howard v. Caddell Constr. Co., Inc.*, No. 7:11-CV-270-FL, 2021 WL 1206584, at *20 (E.D.N.C. Mar. 30, 2021), and *United States ex rel. Lewis v. California Inst. of Tech*, No. 218CV05964CASRAOX, 2021 WL 1600488, at *10 (C.D. Cal. Apr. 19, 2021) is misplaced. In those cases, the courts found materiality lacking because the government knew of the defendant's conduct from a number of sources, not just from the relators' allegations.

STATEMENT OF INTEREST                              3

> [J]ust as it is not the purpose of the False Claims Act to ensure regulatory compliance, it is not the FDA's purpose to prevent fraud on the government's fisc. Mere FDA approval cannot preclude False Claims Act liability, especially where, as here, the alleged false claims procured certain approvals in the first instance.

862 F.3d at 905-906. Here, as in *Campie*, that a federal agency does not rescind a contract after learning of relator's allegations does not preclude a finding of promissory fraud.

### B.   Materiality

False claims must be "material" to the government's decision to pay in order to provide a basis for liability under the FCA. The Supreme Court recognized in *Escobar* that the test for materiality under the FCA requires plaintiffs to show that the alleged falsity has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar,* 136 S. Ct. 2002 (citing 31 U.S.C. § 3729(b)(4)). *Escobar* explained that "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." 136 S. Ct. at 2002 (quotation marks and alterations omitted). Thus, a matter is material if (1) a reasonable person would attach importance to it in determining the government's choice of action, or (2) the defendant knew or had reason to know that the government attaches importance to the specific matter in determining its choice of action, regardless of whether a reasonable person would do so. *Id*. at 2002-03 (citing Restatement (Second) of Torts § 538 (Am. Law Inst. 1977); Restatement (Second) of Contracts § 162(2) & cmt. c (Am. Law Inst. 1981)).

*Escobar* identified four factors relevant to assessing materiality: (1) whether the requirement allegedly violated has expressly been designated a condition of payment, (2) whether the requirement goes to the "essence of the bargain," (3) whether the violation at issue is significant, and (4) whether the government has taken action when it had actual knowledge of the defendant's conduct or of similar violations in similar cases. 136 S. Ct. at 2003 & n.5, 2004. Under this analysis, no one factor is necessarily dispositive, nor is the list exhaustive. *Id*. at 2003. Ultimately, because materiality depends on a holistic assessment, in many cases it is likely to be a determination for a jury. *Cf.* Restatement (Second) of Torts § 538 cmt. e (recognizing that the materiality of a misrepresentation will often depend on a jury determination of what is reasonable).

///

///

1. **Materiality Is Not Lacking Merely Because the Government Pays a Claim with Some Knowledge of Non-Compliance**

AR argues that materiality is lacking here because the government continued to pay and contract with AR despite knowledge of its non-compliance with applicable cybersecurity requirements. Although *Escobar* recognizes that the Government's payment of a claim in full may be relevant in assessing materiality, it is only relevant where it can be shown the Government did so despite its actual knowledge that certain requirements were violated. *Escobar*, 136 S. Ct. at 2003. As this Court found when ruling on AR's Motion to Dismiss in this action, partial disclosure by a defendant of noncompliance with a regulation does not relieve the defendant of liability where the defendant fails to fully "disclose noncompliance with material statutory, regulatory, or contractual requirements." *Aerojet*, 381 F. Supp. 3d at 1246-47 (quoting *Escobar*, 136 S. Ct. at 2001). Without full knowledge of the actual non-compliance at issue in a case, the government's response to the claims submitted by the defendants simply "has no bearing on the materiality analysis." *See United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 834 (6th Cir. 2018). Similarly, "[m]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) ("*Escobar II*") (holding that actual knowledge was not established where regulators had notice of complaints of noncompliance but "did not conclusively discover the extent of the violations until . . . well after the commencement of the litigation").

The Ninth Circuit has recognized the importance of these principles. In *Campie*, as noted above, a drug manufacturer received FDA approval for a drug which was eventually sold to private parties that received reimbursement from the government. 862 F.3d at 895. For a time, the manufacturer sold a misbranded and adulterated version of the drug, but ultimately returned to selling the FDA-approved version. *Id*. at 896. The government never ceased making payments and reimbursements for the drug, possibly even after it knew of the FDA violation. *Id*. at 905. On the materiality question, the Ninth Circuit concluded that dismissal was inappropriate because the parties disputed "exactly what the government knew and when" calling into question its "actual knowledge" of the purported violations. *Id*. at 906-07. The Ninth Circuit also found that it "would be a mistake" to give the government's

STATEMENT OF INTEREST                               5

1   continued approval of a drug, or its continued payment of claims for the drug, too much weight in the
2   materiality analysis because doing so would allow a wrongdoer "to use the allegedly fraudulently-
3   obtained FDA approval as a shield against liability for fraud." *Id*. at 906.

4         Here, the government's alleged knowledge of AR's non-compliance with some cybersecurity
5   requirements does not establish that it knew that AR was not compliant with the particular requirements
6   at issue in this case, in the same way, to the same degree, and for the same duration of time.  For
7   example, in support of its argument, AR cites to letters it sent to government agencies about its
8   compliance with 48 C.F.R. § 252.204-7012 (the "DFARS Clause"), the cybersecurity regulation used in
9   DOD contracts.  At least some of those letters do not appear to fully disclose the extent of AR's non-
10  compliance.  For example, in 2014, AR sent a letter to the Air Force, in connection with an Air Force
11  contract award, addressing the 60 controls required by the DFARS Clause, and stating that "it is
12  important to note that AR is compliant with the majority of the clause's requirements."  Defs.' Summary
13  Judgment Motion (SJM), Ex. 60, p. 2.  However, an audit of AR's computer system in 2014 by
14  Emagined Security Inc. found that AR was only fully compliant with five of the controls, not the
15  majority of the controls, as stated in AR's letter to the Air Force.  Plaintiff's SJM, Ex. L, Answers to
16  Requests for Admission 160-162.  The letter also indicated that AR was at least partially compliant with
17  all of the controls, Defs.' SJM, Ex. 60, pages 1-2, while the Emagined audit found that AR was
18  compliant with 5 controls, partially compliant with 35 controls, and not compliant with 19 controls.
19  Plaintiff's SJM, Ex. L, Answers to Requests for Admission 160-162.

20        **2.    Materiality Is Not Lacking Merely Because the Government Is Aware of Compliance Problems in an Industry**
21

22        AR's claim that materiality is lacking in this case because the government knew that the
23  "defense industry" was not compliant with cybersecurity requirements, but continued doing business
24  with the industry, is legally and factually baseless.  Generalized claims of industry non-compliance are
25  irrelevant to the materiality analysis.  In *Escobar*, the Court stated that "if the Government regularly
26  pays a particular type of claim in full despite actual knowledge that certain requirements were violated,
27  and has signaled no change in position, that is strong evidence that the requirements are not material."
28  *Escobar*, 136 S. Ct. 1989, 2003-04.  Broad assertions of widespread non-compliance in an industry are

STATEMENT OF INTEREST             6

not evidence of the government regularly paying a *particular* type of claim with actual knowledge that *certain* requirements were violated.

In line with *Escobar*, this Court rejected AR's "defense industry non-compliance" argument when ruling on AR's Motion to Dismiss. *Aerojet*, 381 F. Supp. 3d at 1248-49. The court recognized that government knowledge of general industry non-compliance is not the same as knowledge of the particular non-compliance alleged against a defendant, stating that AR had "not put forth any judicially noticeable evidence that the government paid a company it knew was noncompliant to the same extent as AR was." *Id*. Also, in response to AR's contention that DOD components never expected full technical compliance, the court found that "even if the government never expected full technical compliance . . . the extent to which a company was technically complaint still mattered to the government's decision to enter into a contract." *Id*. at 1249.

In its Summary Judgment Motion, AR presents no evidence to support a finding that DOD or NASA regularly paid a particular type of claim in full despite actual knowledge that certain requirements were violated to the extent alleged in this action. For example, AR asserts that "dozens of contractors disclosed to DOD that they were not compliant" with cybersecurity regulations. In support of this assertion, AR provides disclosures by contractors to DOD or NASA, but these disclosures provide little information about the extent of the violations, the duration of the violations, or other substantive information about the violations that would allow a useful comparison to the violations at issue in this case. Also, AR provides no information about the particular claims submitted by the other contracts and whether they were the same as, or comparable to, the claims submitted by AR. For instance, AR does not say whether the claims were for rockets and rocket parts, or for a good or service that may have been treated differently by the agencies. Finally, the record provides no information about whether the government paid the other contractors in full, in part, or with some qualification. The evidence relied upon by AR does not support its conclusion that DOD or NASA regularly paid a particular type of claim in full despite actual knowledge that certain requirements were violated, as required by *Escobar*.

///

///

STATEMENT OF INTEREST

### 3. The Government's Payment of Claims with Actual Knowledge of Non-Compliance Is Not Itself Dispositive of Materiality

AR suggests that the government's failure to withhold payment upon learning of regulatory violations demonstrates their immateriality. However, as the Court made clear in *Escobar*, materiality cannot rest on a single factor as always determinative, including government knowledge. *Id*. at 2001. Rather, the materiality test is holistic, under which many factors should be considered. *Escobar II,* 842 F.3d at 109. This principle recognizes that even where the government has actual knowledge of the defendant's wrongful conduct and continues to pay claims, such action does not necessarily undermine a materiality finding because there are many good reasons why the government might continue to pay claims in such circumstances. *See United States ex rel. Mei Ling v. City of Los Angeles*, No. CV 11-974 PSG (JCX), 2018 WL 3814498, at *19 (C.D. Cal. July 25, 2018) (agreeing that "other factors might well influence the Government to continue to provide funding despite knowledge of false claims, such as when the service provided is essential, and that *Escobar* does not completely foreclose a viable FCA claim in such cases."); *United States v. Pub. Warehousing Co. K.S.C.*, No. 1:05-CV-2968-TWT, 2017 WL 1021745, at *6 (N.D. Ga. Mar. 16, 2017) ("The more essential the continued execution of a contract is to an important government interest, the less the government's continued payment weighs in favor of the government knowledge defense. . . . The contracts at issue in this case were for the procurement of necessary supplies for American troops in an active theater of war. A contract could hardly be more essential to an important government interest than that."); *United States v. Rite Aid Corp.*, No. 2:11-CV-11940, 2019 WL 1426333, at *8 (E.D. Mich. Mar. 30, 2019) ("Even if the Government decided to pay Rite Aid's prescription charges despite knowledge of violations, the payment decision would not necessarily reflect a lack of materiality. For example, the Government may have continued to pay to avoid adversely affect[ing] the millions of Medicaid beneficiaries who rely on Rite Aid to meet their prescription needs"); *see also United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1350 (11th Cir. 2021) (addressing materiality and finding that "the significance of continued payment [by the government] may vary depending on the circumstances"). In such cases, the government may be forced to accept goods or services with material deficiencies because rejecting the goods or services is not an option.

### 4. Subsequent Regulatory Changes Do Not Disprove Materiality

AR's counter-factual assertion that DOD "abandoned" the 2013 DFARS Clause provides no support for their argument that AR's non-compliance was immaterial to the government as a matter of law. The government's amendment of a regulation cannot mean that compliance with the older version of the regulation was never material to its payment decisions. Compliance with a regulation is material when it is capable of influencing a government payment decision, regardless of whether the regulation is later amended or rescinded. *See Escobar*, 136 S. Ct. at 2002. Adopting AR's argument would mean that a company could submit materially false claims in violation of a regulation, and then escape liability if the government later amends the regulation for any reason.

In any event, there is no truth to AR's assertion that DOD "abandoned" the 2013 DFARS Clause when amending it in 2015. To the contrary, the amended version built on many of the cybersecurity controls from the 2013 version. *See* Defense Federal Acquisition Regulation Supplement: Network Penetration Reporting and Contracting for Cloud Services (DFARS Case 2013-D018), 81 Fed. Reg. 72986-01, at 72989. The changes to the DFARS Clause are at least as likely to suggest the importance to the government of compliance with the clause. Moreover, each version of the regulation defines adequate security in the same way: "protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information." *Compare* 48 C.F.R. § 252.204–7012(a) (2013) and 48 C.F.R. § 252.204–7012(a) (2016).

Further, the 2013 version of the DFARS Clause remained the operative version of the clause in contracts entered prior to the 2015 amendment, unless the contract was amended by the parties. *See* 81 Fed. Reg. 72986-01, at 72989. So, for thousands of pre-amendment contracts, the 2013 DFARS Clause remained DOD's primary tool for protecting unclassified military technical data stored on the computer networks of defense contractors. *See* 48 C.F.R. 252.204-7012 (2013).

AR also claims that implementing the 2013 DFARS Clause was "not possible" or "not realistic." Defs.' SJM 39. These claims are not supported by the evidence AR cites. For example, AR cites to a presentation DOD employees gave to industry, and claims that at that presentation former DOD employee Gary Guissanie said that it was "not possible" to implement the 2013 DFARS Clause. *Id*. What he actually said was that applying all of the 263 controls that appear in NIST SP 800-53 to a

1  contractor system "isn't possible," and that is why DOD only selected 61 of the 263 controls to include
2  in the 2013 DFARS Clause.  Defs.' SJM, Ex. 25 at 25-26.

3  Citing to a different presentation to industry given by DOD employees, AR asserts that former
4  government employee Mary Thomas stated that implementing the 2013 DFARS clause was "not
5  realistic." Defs.' SJM 39.  What Mary Thomas actually said was that NIST SP 800-171, which appears
6  in the later versions of the DFARS Clause, is more flexible and more realistic for industry to implement,
7  and not that implementing the 2013 DFARS Clause was "not realistic," merely because it used selected
8  controls from NIST SP 800-53.  Defs.' SJM, Ex. 21 at 9.[2]

9  Contrary to AR's claim, *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir.
10 2017), did not find that the "government's elimination and revisions to at-issue requirements weighs
11 against materiality under *Escobar*." Defs.' SJM 39.  In *Kelly*, a defendant provided equipment and
12 project management services to the Department of Homeland Security (DHS) for a wireless
13 communication system.  *Kelly* at 328.  The contract required the defendant to have an Earned Value
14 Management (EVM) system and to provide EVM reports.  *Id*.  Relator alleged that the EVM reports
15 were submitted to DHS in the wrong format.  *Id*.  The court determined that the EVM reports were not
16 material to DHS payments because DHS found the reports to be unhelpful and did not use them on the
17 contract.  *Id*. at 334.  While the court noted the EKM system requirement was removed from the contract
18 because it provided minimal benefit and was not cost-justified, it did not find that the removal of the
19 requirement was itself indicative of materiality.  *Id*.

20 AR also contends that the government's willingness to work with contractors to ensure their
21 compliance with cybersecurity regulations precludes a finding of materiality.  In support of this
22 argument, AR cites changes to the DFARS Clause in 2015 that it claims show DOD was willing to work
23 with contractors.  These 2015 changes applied prospectively, however, and did not apply to the 2013
24 version of the DFARS Clause that AR claims is immaterial to the government.  In support of its
25 contention, AR relies on *United States v. Comstor Corp*., 308 F. Supp. 3d 56, 87 (D.D.C. 2018).  In
26 pleading materiality, the relator in *Comstor* relied primarily on *Escobar*'s first materiality factor – an

---

[2] Both of the documents cited by AR purport to be transcripts from presentations.  However, neither appears to have been authenticated and both appear to amount to inadmissible hearsay.

**STATEMENT OF INTEREST**                                       10

express condition of payment in a statutory, regulatory or contractual requirement. Absent other indicia of reliability, the court found relator's materiality allegations implausible. Here, AR relies on language in *Comstor* noting the agency's "willingness to 'work with,' vendors" on compliance issues rather than declining payment outright, shows the government may continue to make payments despite known violations. *Id.* Even if the regulation was not an express condition of payment as the court concluded, the ruling does not preclude materiality (which the FCA defines as a natural tendency to influence or be capable of influencing payment or government action). To the contrary, far from suggesting a lack of materiality, the government's willingness to forebear financial remedies while working with a contractor to secure its compliance may speak to the significance of the requirement and the importance of securing the contractor's compliance.

C. **Damages**

AR's contention that there can be no damages where AR delivered a functional product to the government overlooks the full scope of its obligations to the government. It ignores that the government did not just contract for rocket engines, but also contracted with AR to store the government's technical data on a computer system that met certain cybersecurity requirements. False claims for payment for cybersecurity services AR failed to provide as required can be a source of damages even if the rocketry it delivered was free of defect and functioned as required.

"Damages awarded under the False Claims Act typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 549 (1943) (citation omitted); *United States ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 304 (6th Cir. 1998). FCA damages are measured on a case-by-case basis. *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir.1988); *United States ex rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 893 (S.D. Ohio 1999). As the Eleventh Circuit has explained:

> No single rule can be, or should be, stated for the determination of damages under the Act . . . . Fraudulent interference with the government's activities damages the government in numerous ways that vary from case to case. Accordingly, the [Congressional Committee] believes that the courts should remain free to fashion the measure of damages on a case by case basis.

1  *Killough* at 1532 (quoting S. Rep. No. 615, 96th Cong.2d Sess. at 4 (1986)).  FCA damages are at least
2  the difference in value between what the government bargained for and what the government received.
3  *See United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 90 (2d Cir. 2012*); United States v. Science*
4  *Applications International Corp.*, 626 F.3d 1257, 1278-79 (D.C. Cir. 2010).

5        Numerous courts have recognized the potential for FCA damages where a defendant has
6  provided a functioning product or required service but failed to satisfy a material requirement.  *United*
7  *States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (upholding damages award where the defendant
8  billed the government for physical therapy services using a false provider identification number, even
9  though medical services were performed); *United States ex rel. Humane Soc. of U.S. v. Hallmark Meat*
10 *Packing Co.*, No. EDCV 08-00221-VAP, 2013 WL 5753784, at *9 (C.D. Cal. Apr. 30, 2013) (denying
11 defendants' motion for summary judgment on damages where defendant violated "humane treatment" of
12 cattle clause in contract to supply beef to the United States, even though the defendant otherwise
13 supplied the required beef); *United States ex rel. Wall v. Circle C Constr., LLC*, 813 F.3d 616, 617 (6th
14 Cir. 2016) (finding damages where contractor built warehouses under contract with the Army, but failed
15 to ensure Davis-Bacon wages were paid on the project, as required by the contract); *United States ex rel.*
16 *Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 204 (D.D.C. 2017) (denying defendants' motion
17 for summary judgment on damages where defendant provided services under sponsorship agreement
18 with the U.S. Postal Service, but violated anti-doping clause of agreement); *see also Compton v.*
19 *Midwest Specialties, Inc.*, 142 F.3d at 304 (upholding FCA damages award against defendant that failed
20 to test brake shoes supplied to Army "because *none* of them came with the quality assurance of a
21 product that had been subjected to periodic production testing").

22       If AR violated the FCA by failing to provide the cybersecurity required by the contracts, then
23 the government was damaged because it did not get the full value for which it paid.  That is true
24 regardless of whether the government suffered a known loss of data or other cybersecurity breach, even
25 though such a breach could certainly diminish, or conceivably even eliminate, the value of the rocket
26 engines the United States received.

27       AR's reliance on *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966), is misplaced.
28 That case concerned violations of a loan agreement between a government agency and a company,

where a housing project served as security. *Id.* Contrary to AR's suggestion, the court did not find a lack of damages because the housing project was completed. Rather, the court found the loan violations could have damaged the government, but the government failed to prove any damages. *Id.* In the other case cited by AR, *United States v. J-M Mfg. Co., Inc.*, No. EDCV 06-55-GW-PJWX, 2020 WL 4196880 (C.D. Cal. June 5, 2020), the court found that the proper application of the "benefit-of-the-bargain measure depends on the particular circumstances of the case." *Id.* at *4 (citation omitted). There, a jury found that the PVC pipe supplied by defendants failed to comply with certain industry standards, as alleged by the plaintiffs. *Id.* at *5. However, the court determined that the evidence presented by the plaintiffs failed to establish damages. *Id.* at *4. The court did not find, as suggested by AR, that a finding of damages was foreclosed because the defendant otherwise provided functional PVC pipe.

### III.  CONCLUSION

The United States retains an interest in this suit and in the proper interpretation and application of legal principles developed under the FCA, and, accordingly, respectfully submits the foregoing for the Court's consideration.

Dated: October 20, 2021

PHILLIP A. TALBERT
Acting United States Attorney

By: /s/ *Rachel J. Muoio*
COLLEEN M. KENNEDY
RACHEL J. MUOIO
Assistant United States Attorneys

By: /s/ *Gregory Pearson*
JAMIE A. YAVELBERG
MICHAL TINGLE
GREGORY PEARSON
Attorneys
Civil Division
United States Department of Justice

STATEMENT OF INTEREST                                   13