1   Mark Holscher (SBN 139582)
    mark.holscher@kirkland.com
2   Tammy A. Tsoumas (SBN 250487)
    tammy.tsoumas@kirkland.com
3   KIRKLAND & ELLIS LLP
    2049 Century Park East
4   Los Angeles, CA 90067
    Telephone:    (310) 552-4200
5   Facsimile:    (310) 552-5900

6   Ashley Neglia (SBN 298924)
    ashley.neglia@kirkland.com
7   KIRKLAND & ELLIS LLP
    555 S. Flower Street, Suite 3700
8   Los Angeles, CA 90071
    Telephone:    (213) 680-8400
9   Facsimile:    (213) 680-8500

10  Sable Hodson (SBN 313252)
    sable.hodson@kirkland.com
11  KIRKLAND & ELLIS LLP
    1601 Elm Street
12  Dallas, TX 75201
    Telephone:    (214) 972-1770
13  Facsimile:    (214) 972-1771

14  *Attorneys for Defendants Aerojet Rocketdyne*
    *Holdings, Inc. and Aerojet Rocketdyne, Inc.*

15

16              **UNITED STATES DISTRICT COURT**

17          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

18  UNITED STATES OF AMERICA *ex rel.* BRIAN       )   Case No. 2:15-cv-02245-WBS-AC
    MARKUS, individually,                          )
19                                                 )   **THIRD DECLARATION OF TAMMY**
                    Relator,                       )   **TSOUMAS IN SUPPORT OF**
20                                                 )   **DEFENDANTS' REPLY IN SUPPORT**
         vs.                                       )   **OF DEFENDANTS' MOTION FOR**
21                                                 )   **SUMMARY JUDGMENT, OR,**
    AEROJET ROCKETDYNE HOLDINGS, INC., a           )   **ALTERNATIVELY, MOTION FOR**
22  corporation and AEROJET ROCKETDYNE, INC.,      )   **SUMMARY ADJUDICATION**
    a corporation,                                 )
23                                                 )
                    Defendants.                    )   Judge:         Hon. William B. Shubb
24                                                 )   Hearing Date:  November 1, 2021
                                                   )   Time:          1:30 p.m.
25                                                 )   Courtroom:     5
                                                   )
26  _____   )

27

28

                                    1
          **THIRD DECL. OF TAMMY TSOUMAS IN SUPPORT OF DEFS.' REPLY IN SUPPORT**
          **OF MOT. FOR SUMM. J., OR, ALTERNATIVELY, MOT. FOR SUMM. ADJUDICATION**

I, Tammy Tsoumas, declare as follows:

1.      I am a partner at Kirkland & Ellis LLP, counsel for Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc. (together, "Aerojet") in this action. I have personal knowledge of the facts stated in this declaration, and could and would testify competently to them if called upon as a witness. I submit this declaration in support of Aerojet's Reply in Support of Defendants' Motion for Summary Judgment, or Alternatively, Motion for Summary Adjudication filed concurrently herewith.

2.      Attached as **Exhibit 261** is a true and correct copy of excerpts from the transcript of the Deposition of Craig Halterman taken in this matter on January 20, 2021.

3.      Attached as **Exhibit 262** is a true and correct copy of excerpts from the transcript of the Deposition of Gary ("Gus") Guissanie taken in this matter on September 1, 2021.

4.      Attached as **Exhibit 263** is a true and correct copy of Aerojet Rocketdyne, Inc.'s First Amended Answer to First Amended Complaint and Counterclaims Against CGI Federal Inc. filed in *CGI Federal Inc. v. Aerojet Rocketdyne, Inc.*, 2:20-cv-01781-JAM-KJN (E.D. Cal.).


Executed on October 25, 2021, in Los Angeles, California.


*/s/ Tammy A. Tsoumas*
Tammy A. Tsoumas

**THIRD DECL. OF TAMMY TSOUMAS IN SUPPORT OF DEFS.' REPLY IN SUPPORT OF MOT. FOR SUMM. J., OR, ALTERNATIVELY, MOT. FOR SUMM. ADJUDICATION**

# EXHIBIT 261

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA:

EX REL.

BRIAN MARKUS,



      Plaintiffs,

VS.                   No. 2:15-cv-2245 WBS-AC

AEROJET ROCKETDYNE HOLDINGS

INC., a corporation and AEROJET

ROCKETDYNE, INC., a corporation,

      Defendants.

_____/


CONFIDENTIAL TRANSCRIPT

VIDEO-CONFERENCED DEPOSITION OF

CRAIG HALTERMAN

Wednesday, January 20, 2021

Reported by:  LEIAN R. ELLIS, CSR #7431

CONFIDENTIAL

Deposition of CRAIG HALTERMAN        UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 5 of 101

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4

 5              THYBERG LAW OFFICES

 6              BY:  GREGORY A. THYBERG, Esq.

 7              3104 O Street, Suite 190

 8              Sacramento, CA  95816

 9              (916) 204-9173

10              greg@thyberglaw.com

11

12    FOR THE DEFENDANTS:

13

14              KIRKLAND & ELLIS, LLP

15              BY:  JONATHAN FARIA, Esq.

16              BY:  ASHLEY NEGLIA, Esq.

17              2049 Century Park East

18              Los Angeles, CA  90067

19              (213) 680-8400

20              ttsoumas@kirkland.com

21

22

23    VIDEOGRAPHER:  Kurt Mangels

24

25
```

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 6 of 101

1    contract negotiations or discussions.  I did not read

2    contracts.  I provided normal cyber independent of

3    anything that was -- was provided by a contract group.

4              BY MR. THYBERG:  Q.  Were you aware or made

10:38:43   5    aware of any defense department or NASA cybersecurity

6    regulations that Aerojet was required to adhere to in

7    performing these contracts?

8              MR. FARIA:  Object to form, assumes facts.

9              THE WITNESS:  In 2009, there was no indication

10:39:07  10    or no overall arching, you know, regulations that were

11    passed to me or that I tried to adhere to.  There

12    can -- later in years, there were the DFARS that were

13    initiated.

14              BY MR. THYBERG:  Q.  So you mentioned Jose

10:39:29  15    Ruiz coming in to Aerojet.  Was -- were you his

16    supervisor or did he supervise you?  Were you guys in

17    the same level?  What was -- what was --

18    A.       No.  He technically was my supervisor at that

19    point.  We transitioned -- I transitioned the CIO

10:39:46  20    responsibilities to Jose at that point.  And we

21    worked -- you know, I -- I -- I had knowledge of the

22    company up to that point.  So I transitioned that

23    knowledge to him, and then he moved -- he was the one

24    who hired Brian Markus as an example.

10:40:05  25    Q.       Sorry.  He was -- what was that?

CONFIDENTIAL

Deposition of CRAIG HALTERMAN    UNITED STATES OF AMERICA vs. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 7 of 101

1    A.        He -- he was the one who hired Brian Markus

2    and -- and other directors that were -- you know, at

3    that point.  So --

4    Q.        All right.  So when you were -- when it was

10:40:29  5    just Aerojet before the merger with Rocketdyne, was the

6    company performing contracts, NASA contracts?

7    A.        Yes, they were.

8    Q.        And are you aware that, in 2011, there were

9    some NASA FARS cybersecurity regulations that came into

10:40:48  10    effect that Aerojet was supposed to be complying

11    with?

12          MR. FARIA:  Object to the form, assumes facts,

13    calls for speculation and lacks foundation.

14          THE WITNESS:  In 2011, there was no

10:41:06  15    communication or no message about NASA FARS that were

16    overarching.  I believe that, if there was any kind of

17    message or communication in that time, that I did not

18    receive it, or I -- I -- I don't remember having any

19    knowledge of the NASA FARS in 2011.

10:41:29  20          BY MR. THYBERG:  Q.  Were you familiar with

21    the NIST 800-53 moderate controls?

22    A.        Not at 2- -- not at that time.

23          Later, in 2013, when it became something that

24    was distributed or brought forward by whatever

10:41:51  25    government agency.

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 8 of 101

1    Q.       So fair to say, then, before 2013, Aerojet was

2    not making any effort to monitor whether it was

3    complying with NASA FARS cybersecurity regulations?

4                MR. FARIA:  Object to the form, misstates his

10:42:13   5    testimony, calls for speculation.

6                THE WITNESS:  I -- I -- at 2009, up to that

7    point, I don't remember what was being discussed about

8    NIST controls or not.  It was a long time ago for me.

9                BY MR. THYBERG:  Q.  Right.  But I'm -- I'm

10:42:34  10    saying is, if you as the person who's supervising the

11    whole IT cybersecurity -- you're not aware of the

12    specific NASA FAR cybersecurity regulations, isn't it

13    fair to say that, then, no one was actually monitoring

14    that?

10:42:53  15                MR. FARIA:  Object to the form, misstates his

16    testimony, calls for speculation, assumes facts,

17    argumentative.

18                THE WITNESS:  Me, as the CIO, I was not

19    directly involved at a monitoring level.  People inside

10:43:10  20    of my organization in the cybersecurity group would

21    have been monitoring and managing any kind of rules or

22    regulations that were -- were known and available at

23    that time.

24                BY MR. THYBERG:  Q.  So before the merger with

10:43:32  25    Rocketdyne then, who was the person that was directly

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 9 of 101

```
 1    provides services.  As your internal audit or your

 2    external auditing company, you cannot actually

 3    participate in definition or support of control

 4    management.

 5          So I believe PwC would have been excluded.

 6    EY's security group was contacted and used for

 7    penetration tests, which is a standard activity.  Most

 8    companies do some type of penetration test, and most

 9    companies -- well, I've never seen a penetration test

10    done by any company that did not find areas to improve.

11    Q.       Okay.  Well --

12    A.       That's why you conduct them, is to try to find

13    your vulnerabilities or risk.

14    Q.       All right.  So you're familiar with Emagined

15    Security?

16    A.       Yes, I am.

17    Q.       Okay.  What was their -- what was their --

18    were you involved in hiring them as a consultant for

19    Aerojet?

20    A.       Yes, I was.

21    Q.       And why were they hired?

22    A.       To augment and provide additional resources to

23    the team, as well as -- cybersecurity is -- is somewhat

24    specialized at times, and you have the ability to bring

25    independence and -- and find somebody that actually
```

Time stamps: 10:55:17 (line 5), 10:55:34 (line 10), 10:55:50 (line 15), 10:56:00 (line 20), 10:56:19 (line 25)

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2.15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 10 of 101

```
 1    supports the -- whether it's something to do with DFARS

 2    or whether it's something to do with a specific tool.

 3    Q.        Okay.  So when was Emagined hired?

 4    A.        I do not remember the exact date, time or

 5    year, but it was somewhere around 2013.

 6    Q.        And isn't it true that Emagined Security was

 7    brought in because Aerojet Rocketdyne had -- was -- had

 8    experienced several breaches of their computer

 9    network?

10    A.        No.

11              MR. FARIA:  Objection, misstates the record,

12    assumes facts.

13              THE WITNESS:  No, that's -- that's not true.

14    The -- any -- the breaches that probably are being

15    listed are UTC breaches.  They were com- -- they were

16    on the United Technologies network, and they were --

17    you know, Aerojet Rocketdyne at the -- it was

18    technically on -- completely on United Technologies'

19    event because the breach in November of -- or in 2013,

20    right before we closed the Rocketdyne acquisition, that

21    breach was completely done through United Technologies,

22    and it was still a part of -- Rocketdyne was still a

23    part of United Technologies, Pratt/Whitney United

24    Technologies.

25              So you're -- you're not aware that -- by going
```

Timestamps (left margin):
10:56:47 — line 5
10:57:10 — line 10
10:57:21 — line 15
10:57:44 — line 20
10:58:01 — line 25

CONFIDENTIAL

Deposition of CRAIG HALTERMAN                    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 11 of 101

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | into the United Technologies network, that these             |
|          | 2  | hackers were able to get into Aerojet's network?             |
|          | 3  | A.      They did not get -- they did not get into the        |
|          | 4  | Aerojet network.  They got in the Rocketdyne network.        |
| 10:58:18 | 5  | The networks were still separated with a firewall in         |
|          | 6  | between.  So the Aerojet data was not accessed, and the     |
|          | 7  | Rocketdyne information and all of the responsibility         |
|          | 8  | for that breach was on United Technologies.                 |
|          | 9  | Q.      Do you know who Jens Laundrup is?                    |
| 10:58:39 | 10 | A.      Yes, I do.  He's an Emagined employee that was      |
|          | 11 | a part of their team.                                        |
|          | 12 | Q.      Isn't it true that Aerojet joined their            |
|          | 13 | networks to the Rocketdyne network against his              |
|          | 14 | advice?                                                       |
| 10:58:56 | 15 | MR. FARIA:  Objection, misstates the record,                |
|          | 16 | assumes facts, lacks foundation.                            |
|          | 17 | THE WITNESS:  I -- I don't remember that.  The              |
|          | 18 | networks were not technically open.  There was               |
|          | 19 | basically a door, and that's one reason why Aerojet          |
| 10:59:12 | 20 | information was not accessed during that time.              |
|          | 21 | This was the United Technologies breach, and                |
|          | 22 | I'm not sure that information was available that             |
|          | 23 | disclosed whether United Technologies had other             |
|          | 24 | entities' information extracted.                             |
| 10:59:36 | 25 | BY MR. THYBERG:  Q.  Oh.  So you're not --                   |

CONFIDENTIAL

Deposition of CRAIG HALTERMAN UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2.15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 12 of 101

```
 1    you're not aware that -- in 2013, that there was a

 2    hacking incident where foreign nation states were

 3    actually able to acc- -- access the Aerojet network?

 4            MR. FARIA:  Objection, assumes facts,
10:59:51  5    misstates the record.

 6            THE WITNESS:  There's -- there's no evidence

 7    of who breached United Technologies' network.  There's

 8    only an incident of somebody breaching.  There was

 9    never a definition of the bad actor, and I -- I can't
11:00:12 10    make any kind of judgment one way or another.  That

11    information was held very tightly at United

12    Technologies, not at Aerojet Rocketdyne.

13            BY MR. THYBERG:  Q.  Let's -- if you go into

14    that binder, if you go to page -- let me see here.  You
11:00:42 15    should go to page 114 and the corner that's

16    Aerojet 223149, and the next page is 115,

17    Aerojet 223150.

18    A.        Those pages are in front of me.  Should I read

19    them?

11:01:25 20    Q.        Well, I'm asking first, do you recognize

21    that?

22    A.        Well, it's a draft copy of something that, if

23    I remember correctly, was from Emagined as a starting

24    point draft letter for me to communicate to Scott and
11:01:49 25    Warren, which I did not send in this format or I
```

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 13 of 101

```
 1    wouldn't have sent in this format.

 2    Q.        So when you say you didn't send the format --

 3    so did -- so have you seen this 114-115?

 4    A.        Yes.

11:02:07  5    Q.        Okay.  So --

 6    A.        I did not create it.

 7    Q.        I'm sorry?

 8    A.        It's not my memo.

 9    Q.        I'm sorry?

11:02:18  10   A.        It's not my memo.  It's -- it was created by

11    Emagined.

12    Q.        Right.  Well, my understanding from Emagined,

13    that this is a memo that they created for you to

14    communicate to the board some of their findings when

11:02:35  15   they investigated these incidents.

16            Do you recall them giving you this to

17    communicate to the board?

18            MR. FARIA:  Objection, assumes facts, lacks --

19    completely lacks foundation.

11:02:47  20            THE WITNESS:  I remember them giving me the

21    draft copy of this as a starting point for a

22    communication, but it would not have gone to the board.

23    It would have only gone to Scott or Warren.  Warren

24    would have been my direct communication, and Scott

11:03:04  25   would have received it via Warren or -- if he was
```

CONFIDENTIAL

Deposition of CRAIG HALTERMAN                    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 14 of 101

1    specifically asking something.

2            BY MR. THYBERG:  Q.   Okay.  Well, did -- do

3    you know whether this memo went to the CEO, Scott

4    Seymour, or to Warren -- Warren Boley?

11:03:33  5    A.       I do not remember this memo going to anyone,

6    especially considering there's a grammar error in the

7    first section that, hopefully, I would have never

8    allowed to pass, as well as I don't know -- I don't

9    remember the memo I sent or communicated or whether we

11:03:55  10    did anything.

11            I think Emagined was hopeful that this would

12    generate more business for them and more work.  I think

13    that was probably my read.

14    Q.       So -- so do you -- did you not trust what they

11:04:18  15    put in this memo?

16    A.       I think it -- the memo is from the perspective

17    of an outside augmentation staff or consulting group,

18    and I believe that I would have evaluated it as that.

19    Q.       So you -- you think these things they put in

11:04:38  20    that memo were just things trying to get Aerojet to

21    spend more money on their services?

22            MR. FARIA:  Objection, misstates his

23    testimony.

24            THE WITNESS:  I think this positions their

11:04:52  25    best interest.  I do believe that the factual points of

CONFIDENTIAL

Deposition of CRAIG HALTERMAN                    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2.15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 15 of 101

1    the information in the document are probably what they

2    believe to be the truth.

3            BY MR. THYBERG:  Q.  Okay.  Well, the first --

4    first sentence here is "In the past four months,

11:05:16  5    multiple incidents have detect-" -- looks like

6    "detected resulting in huge quantities of data leaving

7    the Rocketdyne network."

8            Do you believe that statement was true?

9    A.        No.  I believe that that was something related

11:05:30  10   to the United Technologies breach and that, in this

11   context, they're trying to relay that about

12   Rocketdyne's network when it was a part of

13   Pratt/Whitney and a part of United Technologies.  If

14   it -- if it's implied that that's an Aerojet Rocketdyne

11:05:48  15   breach, I would disagree.

16   Q.        So you disagree with their conclusion that, by

17   breaching this other network, that they were able to

18   get access to the Rocketdyne network.

19   A.        Well, as I -- I stated that the information

11:06:06  20   there is implying -- or if it's read by the person

21   who's not in the company at that time or not

22   responsible, they would try to make that into being

23   something that was on Aerojet Rocketdyne's side.

24           Once the networks were separated, there was

11:06:24  25   not a large exfiltration of data.  So "In the past four

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 16 of 101

| | | |
|---|---|---|
| | 1 | by that? |
| | 2 | A.      They had enacted not only the, you know, |
| | 3 | general basic functionalities of cybersecurity, but |
| | 4 | they were also investing, as an example, Emagined as an |
| 11:18:08 | 5 | augmentation staff with specialized skills.  They |
| | 6 | had -- in, you know, 2014, which is after this memo, |
| | 7 | they had hired Brian and others to support |
| | 8 | cybersecurity directly.  There was already a |
| | 9 | cybersecurity team.  So -- |
| 11:18:34 | 10 | Cybersecurity has been in evolution for every |
| | 11 | company, not Aerojet Rocketdyne.  This is -- they're |
| | 12 | not in a vacuum.  Every company is getting stronger. |
| | 13 | Whether you're prime or whether you're not, the -- the |
| | 14 | risks of cybersecurity are, you know, growing and |
| 11:18:52 | 15 | changing daily. |
| | 16 | So I would hope that, you know, the activities |
| | 17 | of Aerojet Rocketdyne indicate that, you know, they |
| | 18 | were trying to get stronger and better and improve the |
| | 19 | overall protection of information. |
| 11:19:09 | 20 | Q.      If they were trying to get better, why would |
| | 21 | they just discount what Emagined was saying, thinking |
| | 22 | they were just trying to get more work? |
| | 23 | MR. FARIA:  Objection, misstates his testimony |
| | 24 | and the record. |
| 11:19:21 | 25 | THE WITNESS:  I don't think I said that. |

CONFIDENTIAL

Deposition of CRAIG HALTERMAN                    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 17 of 101

|             | 1  | I just said that Emagined is an outside |
|             | 2  | external company that benefited from more tools, more |
|             | 3  | hours, more labor.  They had the opportunity or they |
|             | 4  | were -- they saw an opportunity and communicated those |
| 11:19:42    | 5  | opportunities in their draft.  Does not mean that this |
|             | 6  | is a draft or a message that went to Warren Boley or to |
|             | 7  | Scott Seymour. |
|             | 8  | BY MR. THYBERG:  Q.  So you don't think |
|             | 9  | Emagined was being truthful in their assessment. |
| 11:19:56    | 10 | MR. FARIA:  Objection, misstates his |
|             | 11 | testimony. |
|             | 12 | THE WITNESS:  I did not say that. |
|             | 13 | BY MR. THYBERG:  Q.  Well, let's go -- let's |
|             | 14 | go to -- look at pages 96 to 113 there in that binder. |
| 11:20:07    | 15 | That's Aerojet 33764 to 33781. |
|             | 16 | A.        96.  96 to what page? |
|             | 17 | Q.        It is 96 to 113. |
|             | 18 | A.        It will take me a minute to read through this. |
|             | 19 | Q.        Okay. |
| 11:25:02    | 20 | (Pause.) |
|             | 21 | THE WITNESS:  I've scanned the document.  I |
|             | 22 | haven't read it line for line. |
|             | 23 | BY MR. THYBERG:  Q.  All right.  Well, I'll |
|             | 24 | ask you, you see this is addressed to you? |
| 11:25:11    | 25 | A.        Yes, I do. |

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 18 of 101

```
          1    Q.        Okay.  And this was an audit performed by

          2    Ernst & Young?

          3    A.        Yes, I do.  I remember.

          4    Q.        And did you -- at the time you received this

11:25:23  5    back in July 2013, did you go over these findings?  Did

          6    you read this report?

          7    A.        I remember going over this report and

          8    reviewing it, yes.

          9    Q.        Okay.  You -- you see on -- on page 98, they

11:25:43 10    indicate that, in their audit, they found eight

         11    high-risk and two moderate-risk findings?

         12    A.        Which line are you calling out?  On 98?

         13    Q.        Let me see.

         14    A.        It's the have program weaknesses were

11:26:10 15    identified, resulting in eight high-risk and two

         16    moderate-risk" --

         17    Q.        Under finding the summary.

         18    A.        Okay.  I -- I see that line, but there's no

         19    real context.  I mean --

11:26:21 20    Q.        Okay.  Well, did that concern you, that there

         21    were eight high-risk findings?

         22    A.        Well, cybersecurity is a continuous living

         23    process, and you're going to find risks at all

         24    different levels, always.  Even when you're very good

11:26:39 25    and very, very strong, you're still going to find --
```

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 19 of 101

11:26:53

1   that's what happens.

2          And they found eight, which I would expect

3   them to do.  During a normal review or audit of any

4   company, they would find risks, and they would have

5   documented them.

6          I'm not sure, if we count up these bullets --

7   logs and alerts are reviewed manually with undefined

8   frequency.  If that's considered a "high," I think

9   every company in the United States DoD arsenal would

11:27:15   10   probably have the same challenge.

11   Q.     So this Ernst & Young report we're looking at

12   here, is that for the Aerojet system or the Aerojet and

13   the Rocketdyne system?

14   A.     Well, it's listed as Aerojet.  So I can't

11:27:33   15   remember -- and since it was only done in Sacramento,

16   it would have been limited to information systems at

17   that point.  And I believe that this was done prior to

18   the closing.  So it would have only been Aerojet at

19   that point.

11:27:52   20   Q.     Well, would you consider a high-risk finding

21   to be serious?

22          MR. FARIA:  Object to the form.

23          THE WITNESS:  In the world of cybersecurity,

24   all risks are serious, and I think Aerojet Rocketdyne,

11:28:04   25   like a good company, would actually be responsible and

```
 1    security efforts to management.  Basically --

 2    Q.        This report's directed to you, and --

 3            MR. FARIA:  Greg, you have to let Craig finish

 4    his answer.

 5            (Reporter interruption.)

 6            MR. FARIA:  Greg, you didn't let him finish

 7    his answer to your question.

 8            MR. THYBERG:  Well, he's -- he is not

 9    responsive.  He tends to -- he thinks he can just

10    filibuster through this deposition, and we need to get

11    specific information.

12            BY MR. THYBERG:  Q.  So I appreciate if you'd

13    just respond to the question and not just go rambling

14    off in your defense of -- you sound very defensive to

15    me.  I'm just asking you questions, and all I get are

16    all this -- when I ask you a simple question, all I get

17    is your defense.  "Well, nobody can do this, and nobody

18    can do that," and there's all this.

19            I'm not asking you that.  I'm asking you

20    specific questions.  So I'd appreciate you giving me

21    specific answers rather than, every time, going into a

22    filibuster, trying to defend what was done or not done.

23            MR. FARIA:  I'll certainly object to that

24    instruction.  Mr. Halterman is entitled to answer your

25    question in his own words, in the way that he sees fit.
```

11:36:22  (line 5)
11:36:28  (line 10)
11:36:41  (line 15)
11:36:51  (line 20)
11:37:04  (line 25)

CONFIDENTIAL

Deposition of CRAIG HALTERMAN    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 21 of 101

| | | |
|---|---|---|
| | 1 | BY MR. THYBERG:  Q.  So it says "Metrics and |
| | 2 | Reporting."  Do you understand what that term means |
| | 3 | when they put it in this report? |
| | 4 | A.      I understand, at the highest level, what |
| 11:37:20 | 5 | they're -- what they were talking about at that point |
| | 6 | in time. |
| | 7 | Q.      They gave you a 1.37 out of 5. |
| | 8 | Did that concern you? |
| | 9 | A.      Not to ramble, but this -- all information in |
| 11:37:37 | 10 | this report was taken seriously. |
| | 11 | We did the audit.  We engaged EY to understand |
| | 12 | where we were.  This is a learning and improvement |
| | 13 | document.  If it came up as 1.37/5, I would have |
| | 14 | definitely looked for opportunities to improve that |
| 11:37:58 | 15 | score. |
| | 16 | Q.      Do you think Ernst & Young was giving you |
| | 17 | these numbers because they were looking to get more |
| | 18 | business from Aerojet? |
| | 19 | A.      I don't remember at that point in time, but |
| 11:38:11 | 20 | anybody that's doing outside work like this would have |
| | 21 | definitely wanted to bid on any kind of improvement or |
| | 22 | activity.  Just nature of the beast. |
| | 23 | Q.      They write in their conclusion, the last |
| | 24 | line -- this is page -- on page 99 -- "The Aerojet |
| 11:38:34 | 25 | information security program is determined not to be |

CONFIDENTIAL

Deposition of CRAIG HALTERMAN                    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 22 of 101

```
         1    aligned with Aerojet's business objectives."

         2           Do you see that statement?

         3    A.      Yes, I do.

         4    Q.      Do you understand that statement?

11:38:47 5    A.      I do not understand what their statement was

         6    at that time.  I might have known, but at this point in

         7    time, I don't know what business objectives they were

         8    referring to.

         9    Q.      Was one of Aerojet's business objectives to be

11:39:05 10   cybersecurity, protecting this information?

        11           MR. FARIA:  Object to the form.

        12           THE WITNESS:  I'm not sure that the business

        13   objectives that were listed at the highest level for

        14   Aerojet would have contained a direct cyber statement.

11:39:22 15   I think they would have been higher level, more

        16   specific about supporting the businesses that they

        17   serve and pro- -- you know, producing good quality in

        18   products.

        19           BY MR. THYBERG:  Q.  If you look at page 113,

11:39:52 20   they have a definition of a high-risk finding.

        21   A.      My copy is very poor.

        22   Q.      Yeah.  It's not the best copy.  I think, if

        23   you read it on the -- in the left part, it says "High

        24   risk requires" -- "requires high level and urgent

11:40:14 25   attention."
```

CONFIDENTIAL

Deposition of CRAIG HALTERMAN                    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 23 of 101

1    question.

2          Aerojet Rocketdyne continuously worked to

3    improve their cybersecurity program for NASA or DFARS

4    but for just the Aerojet Rocketdyne intent to, you

12:27:10    5    know, reduce risk.  So cybersecurity was being funded,

6    and it was being funded more each year.  And there were

7    more resources each year during my tenure there and

8    then, I would assume, since then.

9          So -- but cybersecurity has increased in the

12:27:30    10    world.  The risk and the challenges of cybersecurity as

11    well as the government's requirements for cybersecurity

12    having increased over that period of time.  So it is a

13    continuous process for the government as well as for

14    Aerojet Rocketdyne.  Everybody was trying to get

12:27:46    15    better.  Everybody was working hard and taking this

16    serious.

17          BY MR. THYBERG:  Q.  How much was Aerojet

18    Rocketdyne spending on cybersecurity in 2014.

19    A.        I -- I can't remember budgets, and I can't

12:28:04    20    remember the dollar amounts.  But you would indicate --

21    by reading some of the information that you had me look

22    at for Wayne Reynolds indicating all the tools that

23    were in place in case -- Rapid7, FireEye, all these

24    types of devices are indications that Aerojet was

12:28:26    25    spending and they were putting tools and technologies

CONFIDENTIAL

Deposition of CRAIG HALTERMAN    UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 24 of 101

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | in place, and the people that were running them were       |
|          | 2  | cyber-dedicated people.  So there were money and people    |
|          | 3  | and resources being deployed.  It's just a matter of       |
|          | 4  | can you always deploy more?  Yeah, absolutely.             |
| 12:28:45 | 5  | I -- I can't answer beyond that.                           |
|          | 6  | Q.       And you would agree, if you have                  |
|          | 7  | eight-high-risks finding, you should deploy more           |
|          | 8  | resources to correct that, right?                          |
|          | 9  | MR. FARIA:  Objection; misstates the record                |
| 12:28:54 | 10 | and his testimony.                                         |
|          | 11 | THE WITNESS:  I believe I said at that point               |
|          | 12 | that you have to have context.  You would intend, for      |
|          | 13 | any penetration test or any kind of audit or any kind      |
|          | 14 | of review from an external entity to help you improve      |
| 12:29:09 | 15 | your cybersecurity program, they would find risks.         |
|          | 16 | There's always risk.  If you've satisfied all eight of     |
|          | 17 | those risks and redid the assessment, there would be       |
|          | 18 | more.  So you're never going to have zero, and you're      |
|          | 19 | probably -- if you find zero on a report that comes        |
| 12:29:26 | 20 | from some external entity, they probably haven't done a    |
|          | 21 | very good job.                                             |
|          | 22 | BY MR. THYBERG:  Q.  Would you agree that, if              |
|          | 23 | a company knows that they have malware in their system     |
|          | 24 | that's causing them to leak data, that they should make    |
| 12:29:50 | 25 | every effort immediately to correct that situation?        |

CONFIDENTIAL

Deposition of CRAIG HALTERMAN          UNITED STATES OF AMERICA VS. AEROJET ROCKETDYNE HOLDINGS, INC.

Case 2:15-cv-02245-WBS-AC   Document 138-1   Filed 10/25/21   Page 25 of 101

```
            1              MR. FARIA:  Objection; improper hypothetical,

            2    assumes facts.

            3              THE WITNESS:  Malware in this day and age is a

            4    fact of life.  It's going to be present, chances are,

12:30:05    5    somewhere.  You deploy tools.  You have AV and malware

            6    tools that are all.  If you have a known incident of

            7    any kind, whether your -- it's malware or a virus or

            8    anything else, I think every company would make any

            9    attempt to remove it and get it out of the system.

12:30:23   10              And malware and information removal is not

           11    necessarily synonymous.  Malware could just be an

           12    annoyance.  Malware could be a variety of different

           13    things by its nature.  Same way with viruses.  You

           14    know, they destroy or cause damage, but does not mean

12:30:43   15    that they take data.

           16              BY MR. THYBERG:  Q.  Are you aware that

           17    Emagined told Aerojet Rocketdyne that they had malware

           18    in their system such that they were leaking data and

           19    they could -- and that Aerojet couldn't even detect

12:31:03   20    when they were leaking data?

           21              MR. FARIA:  Objection; assumes facts,

           22    misstates the record, completely lacks foundation.

           23              THE WITNESS:  I -- I don't know what

           24    information you're reading or referring to.  So I -- I

12:31:18   25    can't answer that.  It's outside of my -- if -- if
```

```
 1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTERS

 2

 3              I, LEIAN R. ELLIS, a Certified Shorthand

 4    Reporter, licensed by the State of California, being

 5    empowered to administer oaths and affirmations pursuant

 6    to Section 2093(b) of the Code of Civil Procedure, do

 7    hereby certify:

 8              That the witness named in the foregoing

 9    deposition was present at the time and place specified,

10    and was by me administered an oath to testify as to the

11    truth, the whole truth, and nothing but the truth; that

12    the said proceeding was taken before me, in shorthand

13    writing, and was thereafter transcribed, under my

14    direction, by computer-assisted transcription;

15              That the foregoing transcript constitutes a

16    full, true and correct report of the proceedings which

17    then and there took place; that I am a disinterested

18    person to the said action.

19              IN WITNESS WHEREOF, I have hereunto

20    subscribed my signature on this 29th day of January,

21    2021.

22    _____

23    LEIAN R. ELLIS, CSR
      Certified Shorthand Reporter
24    California License # 7431

25
```

# **EXHIBIT 262**

CONFIDENTIAL

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF CALIFORNIA
3
4    UNITED STATES OF AMERICA:
5    ex rel., BRIAN MARKUS,
6        Plaintiff,
7
8    VS.                        CASE NO.
9                          2:15-cv-2245 WBS-AC
10
11   AEROJET ROCKETDYN HOLDINGS, INC.,
12   a corporation and AEROJET ROCKETDYNE,
13   INC., a corporation,
14       Defendants.
15       *********************************
             ***CONFIDENTIAL***
16        ZOOM VIDEOTAPED DEPOSITION OF
                  GARY GUISSANIE
17             SEPTEMBER 1, 2021
                   9:00 PST
18       *********************************
19   TAKEN BY:
         ASHLEY NEGLIA, ESQ
20       ATTORNEY FOR DEFENDANTS
21   REPORTED BY:
         BELLE VIVIENNE, CRR
22       CERTIFIED STENOGRAPHIC
         REALTIME COURT REPORTER
23       VERITEXT LEGAL SOLUTIONS
         JOB NO. 4776944
24       866 299-5127
25
```

Page 1

```
 1                A P P E A R A N C E S
 2
     FOR THE RELATOR:
 3
         GREGORY A. THYBERG, ESQ.
 4       THYBERGLAW
         3104 O Street, #190
 5       Sacramento, California 95816
         916.204.9173
 6       greg@thyberglaw.com:
 7   FOR THE DEFENDANTS:
 8       ASHLEY NEGLIA, ESQ.
         TAMMY TSOUMAS, ESQ.
 9       NICK BENYO, technician
         KIRKLAND & ELLIS LLP
10       2049 Century Park East
         Los Angeles, California 90067
11       213.680.8400
         ttsoumas@kirkland.com
12       jonathan.faria@kirkland.com
         ashley.neglia@kirkland.com
13
     FOR THE UNITED STATES DEPARTMENT OF
14   DEFENSE:
15       UNITED STATES AIR FORCE
         DAMUND WILLIAMS, ESQ.
16       ROGELIO FERNÁNDEZ, ESQ.
         ROBERT TALBERT, ESQ.
17       1740 Air Force Pentagon
         Room 4E836
18       Washington DC 20330-1740
         571.256.6673
19       rogelio.fernandez.2@us.af.mil
         robert.talbert.2@us.af.mil
20       damund.williams.2@us.af.mil
21   FOR THE UNITED STATES:
22       UNITED STATES ATTORNEY'S OFFICE
         RACHEL MUOIO, ESQ.
23       COLLEEN KENNEDY, ESQ.
         501 I Street, Suite 10-100
24       Sacramento, California 95814
         916.554.2826
25       colleen.m.kennedy@usdoj.gov
         rachel.muoio@usdoj.gov


                                      Page 2
```

```
 1    APPEARANCES:   (Continued.)

 2

         UNITED STATES DEPARTMENT OF JUSTICE
 3       GREG PEARSON, ESQ.
         175 N Street, NW
 4       Washington DC   20001
         202.307.6699
 5       greg.pearson@usdoj.gov

 6

      VIDEOGRAPHER:
 7       Emily Walter
 8    Also Present:
         Amanda Rutenberg, In-House Counsel
 9       for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | an IDA employee because there was an | 09:32:36 |
| 2 | exclusion because I was a senior executive | 09:32:40 |
| 3 | upon retirement and you -- and there are | 09:32:41 |
| 4 | some rules about that, but they could | 09:32:44 |
| 5 | me -- could use me in the special | 09:32:47 |
| 6 | government employee role. | 09:32:50 |
| 7 | Q.   And when you say you worked on | 09:32:52 |
| 8 | the DFARS rules, can you explain what your | 09:32:55 |
| 9 | role was specifically with respect to | 09:32:58 |
| 10 | that? | 09:33:00 |
| 11 | A.   Generally, I think that would | 09:33:05 |
| 12 | fall under the privilege issue. | 09:33:06 |
| 13 | Q.   I'm not asking for any | 09:33:11 |
| 14 | decision-making or any internal | 09:33:13 |
| 15 | communications.  I'm just asking what | 09:33:15 |
| 16 | you -- what your job responsibilities | 09:33:18 |
| 17 | were. | 09:33:21 |
| 18 | A.   Well, mainly in that time frame, | 09:33:22 |
| 19 | it was working with other government | 09:33:27 |
| 20 | agencies, federal government agencies | 09:33:30 |
| 21 | because the rule was going to be | 09:33:32 |
| 22 | interagency coordination, and they needed | 09:33:37 |
| 23 | some help in explaining why we were | 09:33:39 |
| 24 | doing -- the department was doing certain | 09:33:41 |
| 25 | things with OMB, the National Archives and | 09:33:43 |

Page 26

CONFIDENTIAL

```
 1    also NIST.                                09:33:49

 2         Q.    Okay.  And just for the record  09:33:51

 3    to be clear, when we're talking about the  09:33:55

 4    DFARS rule, are we speaking -- on the same 09:33:58

 5    page that we're speaking about the clause  09:34:01

 6    252.204-7012 related to cybersecurity?     09:34:05

 7         A.    Yes.  It was -- it was not yet   09:34:13

 8    published at that time.                    09:34:15

 9         Q.    Excellent.  And during this 2011 09:34:16

10    to 2016 time frame, what role, if any, did 09:34:19

11    you have in communicating with government  09:34:24

12    contractors related -- regarding           09:34:28

13    cybersecurity?                             09:34:31

14         A.    So there were kind of two roles, 09:34:35

15    depending on what role I -- what job I was  09:34:39

16    operating in.  So -- so if the department  09:34:43

17    needed assistance in dealing with the      09:34:47

18    public in sessions like -- and I'm sure    09:34:52

19    you're aware of it -- industry day, or if  09:34:56

20    there were sessions they'd set up with     09:34:59

21    industrial associations like the Aerospace 09:35:03

22    Industries Association or CODSIA, which I  09:35:07

23    think is the Council of Defense Space      09:35:09

24    and -- and something-or-other Association, 09:35:12

25    I would -- I would go to those -- to those 09:35:17
```

Page 27

| | | |
|---|---|---|
| 1 | meetings with the other folks in the | 09:35:21 |
| 2 | government, actually full-time government | 09:35:24 |
| 3 | people, to assist them in answering any | 09:35:26 |
| 4 | questions that might come up. | 09:35:28 |
| 5 | In the role of -- as part of the | 09:35:32 |
| 6 | clause, if folks came into the DoD CIO and | 09:35:36 |
| 7 | asked under the clause for the permission | 09:35:44 |
| 8 | to vary from that, from -- usually from | 09:35:46 |
| 9 | NIST 800-171, then I would typically | 09:35:49 |
| 10 | analyze their request and provide my | 09:35:53 |
| 11 | analysis to the other people in the | 09:35:58 |
| 12 | DoD CIO for them to communicate back to | 09:36:01 |
| 13 | the contracting community. | 09:36:02 |
| 14 | Those requests should come in | 09:36:05 |
| 15 | from the contracting officer, but they | 09:36:06 |
| 16 | often came in directly from the | 09:36:10 |
| 17 | contractor. | 09:36:12 |
| 18 | Q.    And when you say "often," how | 09:36:17 |
| 19 | often did you receive these requests | 09:36:19 |
| 20 | directly from contractors in the 2013 to | 09:36:21 |
| 21 | 2016 time frame, let's say? | 09:36:24 |
| 22 | MS. MUOIO:  I'm going to object | 09:36:26 |
| 23 | as to scope and to clarify that the | 09:36:28 |
| 24 | time frame that is relevant and | 09:36:29 |
| 25 | authorized here ends May 31, 2016. | 09:36:31 |

Page 28

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | The witness may answer up to that time | 09:36:35 |
| 2 | frame. | 09:36:37 |
| 3 | A.    So I can give you average of the | 09:36:41 |
| 4 | number of requests per year.  It would be | 09:36:44 |
| 5 | difficult for me to -- I'd have to guess | 09:36:47 |
| 6 | so I won't do that, because they would | 09:36:50 |
| 7 | come in randomly from the contracting | 09:36:54 |
| 8 | officer or the contractor, and it's in -- | 09:36:56 |
| 9 | I'd have to go back and do a study to | 09:37:02 |
| 10 | see -- and I don't have the data to do | 09:37:05 |
| 11 | that anymore. | 09:37:07 |
| 12 | BY MS. NEGLIA: | 09:37:07 |
| 13 | Q.    Okay. | 09:37:08 |
| 14 | A.    On average per year, I'd say | 09:37:09 |
| 15 | probably about two or three per week. | 09:37:15 |
| 16 | There might be some weeks where nothing | 09:37:20 |
| 17 | would come in, other weeks a little more, | 09:37:22 |
| 18 | but it would average about 100 to 150 a | 09:37:24 |
| 19 | year.  But many of those were just "what | 09:37:29 |
| 20 | do I do" kind of thing from the | 09:37:35 |
| 21 | contracting officer.  They were all over | 09:37:37 |
| 22 | the map.  So they weren't necessarily | 09:37:40 |
| 23 | focused on exactly the question that | 09:37:42 |
| 24 | should have been directed to that e-mail | 09:37:44 |
| 25 | address in the clause. | 09:37:46 |

Page 29

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | If there was any question about | 09:37:47 |
| 2 | anything that came up in the clause, | 09:37:49 |
| 3 | frequently contracting officers would come | 09:37:52 |
| 4 | to that e-mail address because it was | 09:37:54 |
| 5 | easier for them. | 09:37:56 |
| 6 | Q.    Understood.  And when you say | 09:37:57 |
| 7 | 100 to 150 requests per year, are we | 09:38:02 |
| 8 | talking about from contracting officers | 09:38:05 |
| 9 | and from contractors or just from | 09:38:08 |
| 10 | contractors? | 09:38:10 |
| 11 | A.    No, from everybody. | 09:38:11 |
| 12 | Q.    From everybody.  And -- | 09:38:13 |
| 13 | A.    I couldn't tell you if it's | 09:38:17 |
| 14 | 50/50 or 70/30 because often, and | 09:38:19 |
| 15 | depending on who sent it to me, I might | 09:38:22 |
| 16 | not even know whether it came from a | 09:38:25 |
| 17 | contracting officer because they all came | 09:38:27 |
| 18 | generally through the government, and they | 09:38:28 |
| 19 | would send them to me, and sometimes I -- | 09:38:30 |
| 20 | I wouldn't have the details of the from/to | 09:38:33 |
| 21 | so I wouldn't know who it came from. | 09:38:37 |
| 22 | Q.    Okay.  Understood.  We'll look | 09:38:39 |
| 23 | at a few of those communications in just a | 09:38:40 |
| 24 | bit, but I'd like to just focus back now | 09:38:44 |
| 25 | on the DFARS clause for a moment. | 09:38:48 |

Page 30

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | So as we had just discussed a | 09:38:53 |
| 2 | moment ago, you are familiar with the | 09:38:56 |
| 3 | DFARS clause provision 252.204-7012, | 09:39:00 |
| 4 | correct? | 09:39:05 |
| 5 | A.   Yes. | 09:39:06 |
| 6 | Q.   Okay.  And for the duration of | 09:39:06 |
| 7 | the deposition, instead of saying all | 09:39:10 |
| 8 | those numbers, if I just say the "DFARS | 09:39:12 |
| 9 | clause," can we understand -- can we agree | 09:39:14 |
| 10 | that that's the clause I'm referring to? | 09:39:16 |
| 11 | A.   Yes. | 09:39:20 |
| 12 | Q.   Okay, excellent. | 09:39:20 |
| 13 | And I think I understand that | 09:39:23 |
| 14 | you first became familiar with this | 09:39:26 |
| 15 | provision by being involved in its actual | 09:39:29 |
| 16 | drafting; is that accurate? | 09:39:33 |
| 17 | MS. MUOIO:  Objection as to | 09:39:35 |
| 18 | scope and privilege.  The witness may | 09:39:36 |
| 19 | answer to the extent it does not | 09:39:37 |
| 20 | reveal deliberative process protected | 09:39:40 |
| 21 | information and is within the scope of | 09:39:43 |
| 22 | the relevant time frame. | 09:39:45 |
| 23 | Go ahead. | 09:39:49 |
| 24 | A.   So before I retired, being in | 09:39:50 |
| 25 | charge of cybersecurity for the | 09:39:57 |

Page 31

1   the time frame that you're allowed to          09:54:26

2   discuss, did you become aware of any            09:54:27

3   contractors having concerns about              09:54:31

4   compliance with the immediate effect of        09:54:32

5   the August 2015 rule?                          09:54:34

6        A.    So, in general, from some           09:54:40

7   contractors, mostly the large ones, there      09:54:44

8   was a concern about one of the                 09:54:49

9   requirements in 171, which was the             09:54:52

10  multifactor authentication requirement.        09:54:55

11  That was an issue they were having in          09:54:59

12  being able to comply, if only because it       09:55:02

13  essentially required them to deal with         09:55:08

14  something on every desktop.  And if you're     09:55:11

15  dealing with 70,000 desktops, that -- that     09:55:14

16  sometimes can be a challenge.  It's --         09:55:19

17  it's less of a challenge if you're dealing     09:55:25

18  with 100 desktops.                             09:55:27

19       Q.    Understood.                         09:55:30

20             Were there any other concerns       09:55:32

21  that you learned of with contractors'          09:55:33

22  concerns about ability to comply with the      09:55:37

23  August 2015 rule?                              09:55:40

24             MS. MUOIO:  Objection as to         09:55:41

25        privilege.  The witness may answer to    09:55:42

Page 44

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | the extent it just does not disclose | 09:55:44 |
| 2 | deliberative process protected or | 09:55:46 |
| 3 | other information protected from | 09:55:49 |
| 4 | public disclosure. | 09:55:50 |
| 5 | A.    Aside from the odd question | 09:55:53 |
| 6 | about what a particular phrase in 171 -- a | 09:55:55 |
| 7 | particular requirement might mean, but | 09:56:03 |
| 8 | most of them were pretty clear.  There | 09:56:05 |
| 9 | were less questions from contractors about | 09:56:07 |
| 10 | 171 than we had with 53, because they -- | 09:56:11 |
| 11 | the language, which -- was much plainer | 09:56:17 |
| 12 | and it kind of built -- it wasn't the -- | 09:56:20 |
| 13 | it -- there was a logic that you could -- | 09:56:24 |
| 14 | you could go through in that document that | 09:56:27 |
| 15 | was not -- because it was a holistic | 09:56:29 |
| 16 | document, it packaged everything up and | 09:56:31 |
| 17 | explained everything, it -- it was much | 09:56:37 |
| 18 | easier for most contractors to understand | 09:56:38 |
| 19 | than the table of selected 800-53 controls | 09:56:41 |
| 20 | in a DFARS clause. | 09:56:44 |
| 21 | BY MS. NEGLIA: | 09:56:44 |
| 22 | Q.    So Mr. Guissanie, are you aware | 09:56:50 |
| 23 | that in December of 2015, the government | 09:56:53 |
| 24 | published a new interim rule related to | 09:56:56 |
| 25 | the DFARS clause? | 09:57:01 |

Page 45

| | | |
|---|---|---|
| 1 | MS. MUOIO:  Objection, | 09:57:02 |
| 2 | privilege -- deliberative process | 09:57:03 |
| 3 | privilege.  To the extent that the | 09:57:07 |
| 4 | witness can answer without revealing | 09:57:08 |
| 5 | such information, he may answer. | 09:57:11 |
| 6 | A.    Did you say December 2015? | 09:57:14 |
| 7 | BY MS. NEGLIA: | 09:57:14 |
| 8 | Q.    Correct, sir. | 09:57:16 |
| 9 | A.    Yes. | 09:57:17 |
| 10 | Q.    Okay.  And are you aware that | 09:57:18 |
| 11 | the December 2015 rule gave contractors a | 09:57:23 |
| 12 | two-year extension to become compliant | 09:57:28 |
| 13 | with the NIST 800-171 controls? | 09:57:30 |
| 14 | MS. MUOIO:  Objection as to | 09:57:35 |
| 15 | privilege.  The witness may answer to | 09:57:36 |
| 16 | the extent it does not reveal | 09:57:38 |
| 17 | deliberative process protected | 09:57:40 |
| 18 | information. | 09:57:42 |
| 19 | MR. THYBERG:  Also objection, | 09:57:42 |
| 20 | calls for legal conclusion, vague and | 09:57:44 |
| 21 | ambiguous as to "compliant." | 09:57:46 |
| 22 | BY MS. NEGLIA: | 09:57:46 |
| 23 | Q.    You can answer, sir. | 09:57:51 |
| 24 | A.    The plain reading of the clause | 09:57:53 |
| 25 | says you have essentially two years to | 09:57:54 |

Page 46

CONFIDENTIAL

```
 1   comply.                                   09:57:57
 2       Q.   So you were aware of the         09:57:59
 3   extension?                                09:58:01
 4       A.    If -- anyone reading the clause 09:58:01
 5   would be aware that it gave you those --  09:58:03
 6           (Reporter clarification.)         09:58:03
 7       A.    -- would be aware that there was 09:58:14
 8   a two-year -- essentially a two-year      09:58:15
 9   extension.                                09:58:17
10   BY MS. NEGLIA:                            09:58:17
11       Q.   Are you aware of any             09:58:18
12   communications to industry after the     09:58:20
13   extension was implemented as to why the  09:58:24
14   extension was granted in the December 2015 09:58:28
15   version of the DFARS clause?             09:58:32
16           MS. MUOIO:  Objection as to       09:58:34
17       scope.  The witness can respond to the 09:58:35
18       extent it doesn't call for speculation 09:58:39
19       or opinion.  Also lodge a vague and   09:58:42
20       ambiguous objection.                  09:58:44
21           MR. TALBERT:  And actually --     09:58:49
22       this is an instruction from           09:58:49
23       Mr. Talbert.                          09:58:51
24           Mr. Guissanie, do not answer      09:58:51
25       that if it would reveal any internal  09:58:53
```

Page 47

1          discussions related to the rule-making      09:58:55

2          process related to the new clause that      09:58:57

3          would be out there, as well as any          09:58:59

4          internal discussions with the               09:59:01

5          government from your special                 09:59:04

6          government employee role where you           09:59:05

7          were consulting with the DoD before         09:59:07

8          this interim rule was issued.                09:59:08

9     BY MS. NEGLIA:                                    09:59:08

10         Q.    And, again, Mr. Guissanie, I'm        09:59:14

11    just asking if you're aware of                    09:59:16

12    communications to industry regarding the          09:59:19

13    reason that the extension had been                 09:59:22

14    granted.  I'm not asking for any internal          09:59:24

15    deliberations before the fact.                     09:59:27

16         MS. MUOIO:  And then, just to              09:59:29

17         clarify, the scope objection also           09:59:30

18         applies through May 31, 2016.               09:59:32

19         A.    Well, I would -- so I cannot          09:59:35

20    remember explicitly any -- any particular         09:59:41

21    explanation.  I would -- I would                  09:59:45

22    presume -- because I did not go back and          09:59:48

23    review it, I would presume that the               09:59:50

24    Federal Register notice that implemented          09:59:53

25    that -- that change in the rule explained         09:59:56

Page  48

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | BY MS. NEGLIA: | 10:14:21 |
| 2 | Q.    Okay, Mr. Guissanie, I want to | 10:14:22 |
| 3 | just ask you a couple of additional | 10:14:25 |
| 4 | questions regarding the DFARS clause.  And | 10:14:27 |
| 5 | this is with respect to -- | 10:14:33 |
| 6 | MS. NEGLIA:  Actually, Nick, why | 10:14:37 |
| 7 | don't we pull up the topics so we're | 10:14:38 |
| 8 | all on the same page.  Can you please | 10:14:41 |
| 9 | pull up Exhibit 1, page 3 and pull up | 10:14:44 |
| 10 | topic 9? | 10:14:48 |
| 11 | BY MS. NEGLIA: | 10:14:48 |
| 12 | Q.    Can you see that topic, sir? | 10:14:56 |
| 13 | A.    Yes.  Part of it's broken up by | 10:14:58 |
| 14 | the -- I can -- I can get as far as 7012 | 10:15:02 |
| 15 | and then it says "and the" something | 10:15:07 |
| 16 | "thereof over time."  Okay "the effects | 10:15:09 |
| 17 | thereof."  All right. | 10:15:12 |
| 18 | Q.    Okay.  Perfect. | 10:15:12 |
| 19 | All right.  So just a few | 10:15:14 |
| 20 | additional questions on this topic.  Sir, | 10:15:17 |
| 21 | are you aware of any provision in the 2013 | 10:15:20 |
| 22 | or 2015 versions of the DFARS clause that | 10:15:27 |
| 23 | required contractors to share the results | 10:15:31 |
| 24 | of internal penetration testing with the | 10:15:34 |
| 25 | government? | 10:15:38 |

Page 51

| | | |
|---|---|---|
| 1 | A.    No. | 10:15:40 |
| 2 | Q.    Okay.  Are you aware of any | 10:15:41 |
| 3 | provision in either the 2013 or 2015 | 10:15:44 |
| 4 | versions of the DFARS clause that required | 10:15:49 |
| 5 | contractors to share the results of any | 10:15:52 |
| 6 | internal cybersecurity audits with the | 10:15:54 |
| 7 | government? | 10:15:57 |
| 8 | A.    No. | 10:15:58 |
| 9 | Q.    Okay.  Are you aware of any | 10:15:58 |
| 10 | provision in the 2013 or 2015 versions of | 10:16:04 |
| 11 | the DFARS clause that required contractors | 10:16:08 |
| 12 | to share system security plans with the | 10:16:11 |
| 13 | government? | 10:16:15 |
| 14 | A.    No. | 10:16:18 |
| 15 | MS. MUOIO:  Objection as to | 10:16:19 |
| 16 | scope.  I'm going to keep that | 10:16:21 |
| 17 | objection as to scope on the record to | 10:16:23 |
| 18 | the extent it extends beyond the | 10:16:25 |
| 19 | authorized time frame. | 10:16:27 |
| 20 | Sorry, Mr. Guissanie.  You may | 10:16:28 |
| 21 | answer. | 10:16:31 |
| 22 | A.    No. | 10:16:34 |
| 23 | BY MS. NEGLIA: | 10:16:34 |
| 24 | Q.    Okay.  Are you aware of any | 10:16:35 |
| 25 | guide -- oh, I'm sorry, before I ask that | 10:16:39 |

Page 52

CONFIDENTIAL

```
 1   question --                              10:16:41

 2           MS. NEGLIA:  Nick, will you       10:16:41

 3      please pull up topic number 4?         10:16:43

 4   BY MS. NEGLIA:                            10:16:43

 5      Q.   And we've looked at this topic    10:16:53

 6   as well previously, sir, but just so you  10:16:55

 7   have your parameters here in front of you. 10:16:59

 8           Are you aware of any guidance      10:17:01

 9   that the OCIO provided to contractors     10:17:03

10   between 2013 and 2016 advising contractors 10:17:11

11   to share the results of internal          10:17:14

12   penetration testing with the government?   10:17:16

13           MS. MUOIO:  Objection as to        10:17:19

14      scope.  The witness may answer through  10:17:20

15      May 31, 2016.                           10:17:22

16      A.   I don't remember any.             10:17:25

17   BY MS. NEGLIA:                            10:17:25

18      Q.   Okay.  And are you aware of any   10:17:27

19   guidance that the OCIO provided to        10:17:30

20   contractors between 2013 and 2016         10:17:33

21   regarding sharing the results of internal 10:17:36

22   cybersecurity audits pursuant to the DFARS 10:17:40

23   clause?                                    10:17:43

24           MS. MUOIO:  Objection as to        10:17:43

25      scope.  The witness may answer through  10:17:44
```

Page 53

CONFIDENTIAL

```
 1    number 8 in this presentation.              10:25:54
 2            MS. NEGLIA:  Nick, if you could     10:25:58
 3        flip to the slide number 8, that would  10:25:59
 4        be great.                               10:26:01
 5    BY MS. NEGLIA:                              10:26:01
 6        Q.    Okay.  Sir, this slide discusses  10:26:06
 7    "Replacing NIST SP 800-53 based controls    10:26:10
 8    with NIST SP 800-171"; do you see that?     10:26:15
 9        A.    Right.                            10:26:19
10        Q.    Okay.  And do you recall          10:26:19
11    discussing this slide during this           10:26:27
12    presentation?                               10:26:28
13        A.    Very probably.  This slide        10:26:34
14    typically often was presented by Mary, but  10:26:36
15    it could have been either one of us.        10:26:41
16        Q.    Okay, but you're familiar with    10:26:43
17    the contents of this slide?                 10:26:45
18        A.    Yes.                              10:26:47
19        Q.    Okay, great.  So on the           10:26:47
20    left-hand column, the highlighted portion   10:26:49
21    of this slide states that 800-53 was        10:26:51
22    "federal focused."                          10:26:56
23            Do you see that?                    10:26:59
24        A.    Yes.                              10:27:03
25        Q.    Is that an accurate statement in  10:27:03
```

Page 62

CONFIDENTIAL

```
 1    your view?                             10:27:05
 2           MS. MUOIO:  Objection as to     10:27:09
 3       scope.  The witness can answer based 10:27:10
 4       on his personal knowledge, but he may 10:27:12
 5       not answer to the extent it calls for 10:27:15
 6       his opinion or expert testimony,     10:27:16
 7       expert opinion.                      10:27:19
 8           Mr. Guissanie, you may answer to 10:27:20
 9       the extent you can.                  10:27:28
10    A.    Yes, so -- so NIST has evolved.   10:27:30
11    So if you look at the title at the top, it 10:27:33
12    says "Security and Privacy Controls For 10:27:35
13    Federal Information Systems and          10:27:37
14    Organizations," right?  So that logically 10:27:42
15    says it's federally focused.             10:27:44
16           NIST, a number of years before   10:27:45
17    that, began to -- to expand and, frankly, 10:27:47
18    their -- their control catalogue was used 10:27:49
19    widely --                                10:27:59
20           (Reporter clarification.)         10:27:59
21    A.     -- their control catalogue is     10:27:59
22    used -- is widely used by -- by state and 10:27:59
23    local governments, by private            10:28:02
24    corporations, by international bodies.    10:28:04
25    And, actually, the name has changed and  10:28:06
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1    the word "federal" has now gone away, and     10:28:09
 2    it's -- I think it's now "Security and        10:28:12
 3    Privacy Controls For Systems and              10:28:14
 4    Organizations."  They don't even restrict     10:28:17
 5    it to information system.                      10:28:18
 6           But, yes, there are elements in        10:28:21
 7    there that are federally focused that do      10:28:24
 8    not apply to nonfederal entities.             10:28:29
 9    BY MS. NEGLIA:                                 10:28:29
10      Q.    Slide 8 on the right-hand -- oh,      10:28:36
11    I'm sorry.  Were you --                        10:28:39
12      A.    You have to -- I was just saying      10:28:40
13    you have to -- that doesn't mean               10:28:42
14    everything is a problem.  It just means        10:28:44
15    there are certain controls that make no        10:28:46
16    sense if you try to apply them outside the    10:28:48
17    federal government.                            10:28:50
18      Q.    On slide 8, on the right-hand         10:28:51
19    column, also states that 800-171, the         10:28:54
20    "Intent is not to require the development     10:29:00
21    or acquisition of new systems to process,    10:29:03
22    store or transmit CUI."                        10:29:07
23           Can you explain that bullet for       10:29:09
24    me?                                            10:29:10
25           MS. MUOIO:  Objection.                10:29:17
```

Page 64

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Objection as to scope.  The witness | 10:29:17 |
| 2 | may answer to the extent it does not | 10:29:19 |
| 3 | call for his opinion or expert | 10:29:20 |
| 4 | opinion, expert testimony. | 10:29:22 |
| 5 | A.    It -- it kind of relies a lot -- | 10:29:35 |
| 6 | (Reporter clarification.) | 10:29:35 |
| 7 | A.    It relies essentially on my | 10:29:44 |
| 8 | expert testimony to make that -- or draw | 10:29:47 |
| 9 | that conclusion. | 10:29:50 |
| 10 | BY MS. NEGLIA: | 10:29:50 |
| 11 | Q.    Why don't we -- why don't I | 10:29:52 |
| 12 | re-ask this question.  Maybe this will | 10:29:54 |
| 13 | simplify things. | 10:29:56 |
| 14 | What was your understanding of | 10:29:57 |
| 15 | what you were conveying with that bullet | 10:29:58 |
| 16 | point at this December 2015 presentation? | 10:30:00 |
| 17 | MS. MUOIO:  Same objection as to | 10:30:03 |
| 18 | scope, but the witness may answer to | 10:30:05 |
| 19 | the extent he can. | 10:30:06 |
| 20 | A.    So the point of the way some of | 10:30:11 |
| 21 | those requirements are listed in 171 is -- | 10:30:17 |
| 22 | are easily understandable from the point | 10:30:23 |
| 23 | of view of a contractor who has an | 10:30:25 |
| 24 | existing system, which is like | 10:30:27 |
| 25 | 99.9 percent of anybody who's got to | 10:30:29 |

Page 65

CONFIDENTIAL

```
 1    someone actually asking for an              10:47:23
 2    alternative -- substituting an alternative  10:47:26
 3    requirement instead of the one that was --  10:47:30
 4    was specified; or someone saying that they  10:47:32
 5    shouldn't -- there's a reason why a         10:47:36
 6    particular requirement was not applicable.  10:47:40
 7            So in -- and so in that -- in       10:47:43
 8    that case, frequently, the -- most often,   10:47:45
 9    the answer back was, your request for an    10:47:50
10    alternative, you don't need approval        10:47:53
11    because what you are doing actually meets   10:47:55
12    the requirement and we will explain why.    10:47:57
13            And typically, when it was a        10:48:00
14    not-applicable request, it was something    10:48:04
15    that was -- and which we address in the     10:48:07
16    FAQs, but people don't read the FAQs --     10:48:10
17    that you need not request of approval or    10:48:14
18    example.  I don't meet the control and      10:48:17
19    monitor -- the controlling remote          10:48:22
20    access --                                   10:48:33
21            (Reporter clarification.)           10:48:33
22    A.    The controlling remote access.        10:48:33
23            I don't meet that control           10:48:37
24    because I don't have to meet that.  It      10:48:39
25    doesn't apply to me because I don't allow   10:48:42
```

Page 80

CONFIDENTIAL

```
 1    it.                                         10:48:43

 2            And -- and so when it's -- when     10:48:44

 3    it is a requirement that you explicitly     10:48:46

 4    prohibit, you don't need to say it doesn't  10:48:49

 5    apply.  So that's one set.                  10:48:52

 6            The other set would be a simple     10:48:55

 7    statement sometimes from the contractor --  10:48:58

 8    mostly from the contracting officer, which  10:49:01

 9    they would send to the CIO saying, this     10:49:04

10    contractor is reporting his compliance      10:49:07

11    with the -- with some of the requirements   10:49:11

12    in the clause, typically the control set,   10:49:15

13    and they would say they are only partially  10:49:19

14    compliant or -- or -- or not compliant.     10:49:22

15    They would send that to the CIO.            10:49:26

16            The CIO has no role in dealing      10:49:29

17    with that, but we would typically look at   10:49:31

18    what we were sent by the contracting        10:49:34

19    officer and -- and send back some advice    10:49:36

20    if it was warranted.  So, yes, I'm aware,   10:49:40

21    but the only reason I'd be aware of         10:49:43

22    someone being noncompliant, which was not   10:49:45

23    a requirement that they identify to the     10:49:47

24    CIO, is because the contracting officer     10:49:50

25    sent it to us, and we would go back and     10:49:53
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | say, well, we don't have a role in this. | 10:49:55 |
| 2 | But actually when we read what they're | 10:49:57 |
| 3 | saying, they are compliant with this. | 10:49:59 |
| 4 | They aren't with this one, but it should | 10:50:02 |
| 5 | be easy to deal with, and here's some | 10:50:05 |
| 6 | advice that you can give back to the | 10:50:07 |
| 7 | contracting officer. | 10:50:09 |
| 8 | BY MS. NEGLIA: | 10:50:09 |
| 9 | Q.   Did you ever receive, through | 10:50:13 |
| 10 | contractors themselves or through | 10:50:17 |
| 11 | contracting officers, requests for waivers | 10:50:19 |
| 12 | from certain provisions of the DFARS | 10:50:23 |
| 13 | clause between the 2013 and 2016 time | 10:50:25 |
| 14 | frame? | 10:50:31 |
| 15 | MS. MUOIO:  Objection as to | 10:50:31 |
| 16 | scope.  The witness can answer through | 10:50:32 |
| 17 | May 31, 2016 based on his own personal | 10:50:33 |
| 18 | knowledge. | 10:50:36 |
| 19 | A.   Yes.  And the answer going back | 10:50:40 |
| 20 | is always there are no waivers, what there | 10:50:41 |
| 21 | are, per the clause, is an allowance for a | 10:50:45 |
| 22 | variance as long as -- essentially that | 10:50:49 |
| 23 | have -- or in the terms of the clause, if | 10:50:51 |
| 24 | you're proposing an alternative and | 10:50:55 |
| 25 | equally effective security measure or why | 10:50:58 |

Page 82

| | | |
|---|---|---|
| 1 | a particular requirement is not | 10:51:00 |
| 2 | applicable, you know, you could submit | 10:51:03 |
| 3 | that to the contracting officer, and the | 10:51:04 |
| 4 | DoD CIO will adjudicate that to ensure | 10:51:06 |
| 5 | that we agree. | 10:51:09 |
| 6 | So, yes, frequently is there | 10:51:09 |
| 7 | were requests for waivers.  Sometimes the | 10:51:11 |
| 8 | waivers were just another word for | 10:51:14 |
| 9 | variance.  Sometimes the request for a | 10:51:16 |
| 10 | waiver was, we don't think we ought to be | 10:51:18 |
| 11 | able to have to do -- have to do these | 10:51:20 |
| 12 | things and -- and when it was, you know -- | 10:51:23 |
| 13 | we don't have to meet these requirements | 10:51:27 |
| 14 | at all because, for whatever reason.  And | 10:51:29 |
| 15 | the answer would go back, was -- would be, | 10:51:32 |
| 16 | if it came from a contractor, it would -- | 10:51:34 |
| 17 | one, we don't grant waivers.  We -- the | 10:51:38 |
| 18 | clause says we're allowed to do this.  You | 10:51:40 |
| 19 | have to submit that to the contracting | 10:51:42 |
| 20 | officer, so go and do that. | 10:51:44 |
| 21 | Or if it came from the | 10:51:46 |
| 22 | contracting officer, the answer would be | 10:51:48 |
| 23 | generally the same.  We don't do waivers. | 10:51:49 |
| 24 | We do just this.  If that's the case, | 10:51:52 |
| 25 | we'll give a -- if they provided us | 10:51:56 |

Page 83

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | adequate -- sufficient information to be | 10:51:59 |
| 2 | able to answer, if it was a request for an | 10:52:00 |
| 3 | alternative, we would provide that answer, | 10:52:03 |
| 4 | otherwise, tell them what -- what the CIO | 10:52:06 |
| 5 | could or couldn't do. | 10:52:09 |
| 6 | BY MS. NEGLIA: | 10:52:09 |
| 7 | Q.    And you said you would | 10:52:12 |
| 8 | frequently see requests for waivers.  Can | 10:52:14 |
| 9 | you -- can you be a little more specific? | 10:52:17 |
| 10 | How frequently in this authorized time | 10:52:20 |
| 11 | frame up to May 31, 2016, would you see | 10:52:23 |
| 12 | requests for waivers? | 10:52:27 |
| 13 | A.    Sometimes -- | 10:52:29 |
| 14 | MS. MUOIO:  Objection as -- | 10:52:29 |
| 15 | objection as to scope.  To the extent | 10:52:30 |
| 16 | it calls for speculation, the witness | 10:52:32 |
| 17 | is not allowed to speculate.  So he | 10:52:35 |
| 18 | can answer to the extent it's based on | 10:52:38 |
| 19 | his personal knowledge within the | 10:52:40 |
| 20 | relevant time frame or without | 10:52:42 |
| 21 | speculating. | 10:52:43 |
| 22 | MS. NEGLIA:  Counsel -- | 10:52:46 |
| 23 | A.    It's probably -- | 10:52:46 |
| 24 | (Reporter clarification.) | 10:52:58 |
| 25 | BY MS. NEGLIA: | 10:52:58 |

Page 84

1       Q.    Go ahead, Mr. Guissanie.              10:52:58

2       A.    "Frequently" was probably a bad        10:53:00

3   choice of words.  The same figure I gave        10:53:04

4   you before of about maybe 100 to 150 a          10:53:06

5   year.  Two to three at most per week on         10:53:10

6   average is what I saw.                          10:53:14

7       Q.    Thank you.                            10:53:18

8             And I apologize.  I'm going to        10:53:21

9   try not to talk over you to give the court      10:53:23

10  reporter some -- some breathing room here.      10:53:26

11  So I apologize for that interruption.           10:53:29

12            I'd like to look at one of these      10:53:46

13  waiver requests.                                10:53:48

14            MS. NEGLIA:  Nick, can you            10:53:51

15       please pull up tab 15, and we'll mark      10:53:52

16       this as Exhibit 3, I believe.             10:53:57

17            (Exhibit 3, E-mail chain dated        10:54:04

18       November 13, 2015, marked for             10:54:04

19       identification.)                          10:54:05

20  BY MS. NEGLIA:                                  10:54:05

21       Q.    And, Mr. Guissanie, please take     10:54:14

22  a moment to read through the e-mail chain.      10:54:16

23  It's fairly short, if you'd like to take a      10:54:18

24  look before we get going.                       10:54:23

25       A.    Is it possible to blow that up a    10:54:43

                                        Page 85

| | | |
|---|---|---|
| 1 | little bit? | 10:54:45 |
| 2 | Q.   Absolutely, sir.  And if it's | 10:54:45 |
| 3 | easier for you to review in Exhibit Share, | 10:54:47 |
| 4 | that's fine as well. | 10:54:49 |
| 5 | A.   No, that's fine. | 10:54:50 |
| 6 | Q.   Okay.  Great. | 10:54:52 |
| 7 | So you want to probably start -- | 10:54:54 |
| 8 | MS. NEGLIA:  Nick, can you | 10:54:56 |
| 9 | scroll to the bottom of the e-mail | 10:54:57 |
| 10 | chain, so that Mr. Guissanie can see | 10:54:59 |
| 11 | the full text of that first message? | 10:55:02 |
| 12 | BY MS. NEGLIA: | 10:55:09 |
| 13 | Q.   So this is a November 13, 2015 | 10:55:09 |
| 14 | e-mail from a redacted individual at the | 10:55:13 |
| 15 | U.S. Air Force, it looks like, to the OSD | 10:55:17 |
| 16 | NCR DOD CIO Mailbox. | 10:55:21 |
| 17 | A.   Right. | 10:55:25 |
| 18 | Q.   Is this the e-mail box that you | 10:55:25 |
| 19 | referenced -- | 10:55:28 |
| 20 | A.   Yes. | 10:55:28 |
| 21 | Q.   -- that's noted in the DFARS | 10:55:28 |
| 22 | clause? | 10:55:30 |
| 23 | A.   Yes. | 10:55:31 |
| 24 | Q.   Okay.  And this e-mail chain | 10:55:31 |
| 25 | begins "Sir/Ma'am," redacted name of | 10:55:38 |

Page 86

CONFIDENTIAL

| 1 | the organization, they were helping the | 10:57:41 |
| 2 | Defense Industrial Base, meaning defense | 10:57:44 |
| 3 | contractors deal with cybersecurity | 10:57:47 |
| 4 | issues. | 10:57:49 |
| 5 | And -- and so she effectively | 10:57:51 |
| 6 | was where all the DFAR work that CIO was | 10:57:53 |
| 7 | concerned with was centered. | 10:57:59 |
| 8 | Q.   And Ms. Michetti writes to you | 10:58:02 |
| 9 | "Gus, please review.  Seems to me this is | 10:58:05 |
| 10 | another 'I am not compliant letter,' but | 10:58:08 |
| 11 | it is difficult to tell what they are | 10:58:11 |
| 12 | actually doing." | 10:58:14 |
| 13 | Do you see that, sir? | 10:58:14 |
| 14 | A.   Yes. | 10:58:15 |
| 15 | Q.   So based on this e-mail, was it | 10:58:16 |
| 16 | your understanding that this was not the | 10:58:20 |
| 17 | first communication you had received from | 10:58:25 |
| 18 | a contractor stating that they were | 10:58:27 |
| 19 | noncompliant? | 10:58:32 |
| 20 | A.   Well -- | 10:58:33 |
| 21 | MS. MUOIO:  Objection as to | 10:58:33 |
| 22 | scope.  The witness can answer based | 10:58:34 |
| 23 | on his personal knowledge without | 10:58:40 |
| 24 | speculating within the authorized time | 10:58:41 |
| 25 | frame. | 10:58:43 |

Page 89

CONFIDENTIAL

1        A.    Yes.   Periodically, we would          10:58:43

2    get -- this appears to be under the new          10:58:44

3    clause, which applied 171, even under the        10:58:47

4    previous clause, under 53, sometimes we          10:58:56

5    would end up with a communication that the       10:58:58

6    contracting officer sent the CIO based on        10:59:01

7    what the contractor sent to the                  10:59:04

8    contracting officer saying, I'm not really       10:59:07

9    compliant with the clause at the current         10:59:11

10   time.                                            10:59:13

11          And that is something for the             10:59:15

12   contracting officer to deal with the             10:59:17

13   contractor, not something that they ought        10:59:19

14   to send to the CIO, but they often did.          10:59:21

15   And then we would try and figure it out,         10:59:25

16   okay, what are we supposed to do with            10:59:27

17   this?  Because our role was, as I've noted       10:59:30

18   before, was very limited.                        10:59:33

19          It's only adjudicating requests           10:59:35

20   from the contracting officer for                 10:59:37

21   alternatives for nonapplicable variances,       10:59:38

22   not dealing with, I'm not doing anything,        10:59:42

23   or I'm not meeting this requirement, which       10:59:45

24   is apparently what this one said.  Without       10:59:47

25   seeing the actual what they forwarded, I         10:59:50

Page 90

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | couldn't really tell you. | 10:59:52 |
| 2 | BY MS. NEGLIA: | 10:59:52 |
| 3 | Q.    Fair enough. | 10:59:56 |
| 4 | Your response to Ms. Michetti | 11:00:01 |
| 5 | says that you agree and -- and what were | 11:00:04 |
| 6 | you agreeing with there, sir? | 11:00:09 |
| 7 | A.    Well, I was agreeing that this | 11:00:12 |
| 8 | probably was just a -- like she said, an | 11:00:14 |
| 9 | "I am not compliant" -- the company | 11:00:21 |
| 10 | telling the contracting officer, I don't | 11:00:23 |
| 11 | actually meet the requirements of this | 11:00:26 |
| 12 | clause, which is something that the CIO | 11:00:27 |
| 13 | shouldn't really get involved in. | 11:00:31 |
| 14 | And then my comment back, this | 11:00:35 |
| 15 | is why I presume it's under the new | 11:00:38 |
| 16 | clause, is because they are meeting | 11:00:40 |
| 17 | apparently the multifactor authentication | 11:00:49 |
| 18 | requirement, but looking under some of the | 11:00:51 |
| 19 | things they say they are not meeting. | 11:00:55 |
| 20 | They were actually requirements that | 11:00:57 |
| 21 | existed under the old clause.  And so I | 11:01:03 |
| 22 | had a question about, you know, why | 11:01:08 |
| 23 | that -- why that is.  That's kind of what | 11:01:12 |
| 24 | I meant by "most of these can be made | 11:01:14 |
| 25 | 'compliant' if they'd just start doing -- | 11:01:17 |

Page 91

CONFIDENTIAL

```
 1    little bit.  All right.  Stop.              11:02:45

 2    BY MS. NEGLIA:                              11:02:45

 3        Q.    Let me know when you're ready,    11:02:59

 4    sir.                                        11:03:03

 5        A.    Okay.                             11:03:04

 6        Q.    Okay.  So just a few questions    11:03:23

 7    on this document.  Again, this is from      11:03:26

 8    April of 2016 to May of 2016, this -- this  11:03:29

 9    chain.  On the second e-mail communication  11:03:35

10    on your screen there, it looks like this    11:03:43

11    is an e-mail from you to Ms. Michetti and   11:03:47

12    the OSD NCR Mailbox, regarding redacted's   11:03:52

13    "Notice in Response to DFARS               11:04:01

14    252.204-7012-April 2016."                   11:04:02

15        Do you see that?                        11:04:08

16        A.    Yes.                              11:04:09

17        Q.    Okay.  And you write to the       11:04:09

18    recipients "Attached is revised," redacted  11:04:13

19    "gap sheet.  Given the vast improvement, I  11:04:17

20    am surprised most of the basic             11:04:20

21    requirements are still not in compliance -  11:04:22

22    perhaps we could discuss with them as they  11:04:24

23    may be overthinking some of this."          11:04:26

24        Can you explain what you were           11:04:30

25    communicating to Ms. Michetti in that       11:04:31
```

Page 93

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | e-mail? | 11:04:32 |
| 2 | MS. MUOIO:  Objection to the | 11:04:35 |
| 3 | extent it calls for information | 11:04:35 |
| 4 | protected from public disclosure.  The | 11:04:37 |
| 5 | witness may answer to the extent he | 11:04:38 |
| 6 | can. | 11:04:40 |
| 7 | A.    So this is obviously something | 11:04:46 |
| 8 | we got based on the December change to the | 11:04:47 |
| 9 | interim rule and -- and the December | 11:04:51 |
| 10 | change that it gave people two years to | 11:04:55 |
| 11 | meet the requirements of 171, included | 11:04:57 |
| 12 | another part saying that for any -- | 11:05:02 |
| 13 | anybody awarded a contract after that date | 11:05:05 |
| 14 | and prior to, I believe it was October 31, | 11:05:07 |
| 15 | 2017, had to report any requirements not | 11:05:11 |
| 16 | met at the time of contract award to the | 11:05:17 |
| 17 | DoD CIO. | 11:05:20 |
| 18 | And the reason for that was to | 11:05:21 |
| 19 | ensure that people actually began | 11:05:24 |
| 20 | addressing requirements they didn't meet | 11:05:28 |
| 21 | over time, so every two years we didn't | 11:05:30 |
| 22 | end up with the same problem we had | 11:05:34 |
| 23 | earlier, right? | 11:05:36 |
| 24 | So part of -- so what they did, | 11:05:37 |
| 25 | and there was no format, they would | 11:05:39 |

Page 94

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | send -- when a contract -- they signed a | 11:05:42 |
| 2 | new contract, they would send a report to | 11:05:45 |
| 3 | DoD CIO saying, under this -- this -- this | 11:05:49 |
| 4 | company, or part of a company, under this | 11:05:52 |
| 5 | contract, we -- you know, awarded on this | 11:05:57 |
| 6 | date, we are not meeting the following | 11:06:00 |
| 7 | requirements. | 11:06:02 |
| 8 | So I would put -- essentially | 11:06:04 |
| 9 | take that and put it in a little | 11:06:07 |
| 10 | spreadsheet that showed a picture of the | 11:06:10 |
| 11 | requirements, and highlight the ones they | 11:06:12 |
| 12 | weren't doing in red, so you get sort of a | 11:06:14 |
| 13 | spotted chart, and it's easy to see | 11:06:17 |
| 14 | visually, you know, what the problem -- | 11:06:20 |
| 15 | where the problems are and how -- how bad | 11:06:22 |
| 16 | it was for that particular firm. | 11:06:25 |
| 17 | And that was sent then to the | 11:06:30 |
| 18 | CIO, who could do a trend analysis to see | 11:06:32 |
| 19 | that people were actually kind of | 11:06:34 |
| 20 | generally improving, right?  And they | 11:06:36 |
| 21 | could also provide data back to the | 11:06:38 |
| 22 | acquisition people about how things were | 11:06:41 |
| 23 | going. | 11:06:47 |
| 24 | (Reporter clarification.) | 11:06:50 |
| 25 | A.    How things were going -- are | 11:06:50 |

Page 95

CONFIDENTIAL

```
 1    things progressing.                        11:06:51

 2           And so in this case -- these        11:06:53

 3    happen every time there's a new contract   11:06:58

 4    award, so we might get these from a        11:06:59

 5    company twice a month, three times a       11:07:02

 6    month, five times a month.  It just        11:07:04

 7    depended on how often they were awarded    11:07:06

 8    contracts.                                 11:07:09

 9           And -- and in this case, it was     11:07:10

10    obvious they were making -- they'd made a  11:07:13

11    lot of improvements.  And what I mean by   11:07:15

12    the "basic requirements" is there are      11:07:17

13    some fund -- the way 171 is written, there 11:07:21

14    are some fundamental basic requirements    11:07:24

15    that -- that begin each -- each category   11:07:28

16    of set of requirements, like access        11:07:31

17    control or configuration management or     11:07:35

18    identity -- identification authentication. 11:07:39

19    There's a couple of fundamental things at  11:07:41

20    the beginning, and then there are more     11:07:44

21    detailed, specific requirements below.     11:07:46

22           And they were filling in            11:07:47

23    apparently the detailed requirements, but  11:07:48

24    they still had some of the basic ones not  11:07:50

25    done.  And my only question was maybe we   11:07:54
```

CONFIDENTIAL

```
1    ought to talk to them and -- and see if        11:07:59
2    they understand because why -- it would        11:08:02
3    seem -- it seemed to me that they should       11:08:06
4    have the basic requirements completed if       11:08:07
5    they were doing all these other things in      11:08:10
6    more detail.                                   11:08:13
7          And Vicki's comment was -- the          11:08:15
8    way I'm reading that is, companies had         11:08:18
9    different approaches to this.  Some            11:08:22
10   companies would simply report based on the     11:08:24
11   clause requirement what they knew they         11:08:29
12   weren't doing.  Other companies would --       11:08:31
13   and so they would report, I met all these      11:08:35
14   except for these five, for example.            11:08:38
15         Other companies -- and some of          11:08:41
16   them the larger companies -- would not         11:08:43
17   give a report on they've met all the           11:08:47
18   requirements -- a requirement until they       11:08:50
19   validate it through the entire company         11:08:53
20   that they met that requirement.  So you        11:08:55
21   might find a larger company that you would     11:08:57
22   think would be very -- generally, would        11:08:59
23   meet all the requirements for this -- in       11:09:03
24   this -- under this part of the clause,         11:09:05
25   would actually report that they weren't        11:09:07
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | meeting many requirements they -- they | 11:09:11 |
| 2 | thought they were, but they hadn't | 11:09:13 |
| 3 | confirmed it everywhere yet. | 11:09:15 |
| 4 | So you would see this massive | 11:09:17 |
| 5 | red, based on what they reported, which | 11:09:20 |
| 6 | actually was not representative of their | 11:09:22 |
| 7 | actual condition.  And then once they | 11:09:25 |
| 8 | validated that everything in the | 11:09:27 |
| 9 | company -- every system in the company -- | 11:09:28 |
| 10 | and some of them had, you know, 20 to 30 | 11:09:31 |
| 11 | different information systems.  Once they | 11:09:35 |
| 12 | confirmed that every one was in | 11:09:36 |
| 13 | compliance, they would turn -- they would | 11:09:38 |
| 14 | stop reporting that one as not met, right? | 11:09:40 |
| 15 | And -- and -- and what she was | 11:09:43 |
| 16 | saying there was that's why they | 11:09:45 |
| 17 | haven't -- why they're still reporting | 11:09:48 |
| 18 | some of the basic requirements as not met, | 11:09:50 |
| 19 | which they haven't confirmed it everywhere | 11:09:53 |
| 20 | in the company. | 11:09:56 |
| 21 | BY MS. NEGLIA: | 11:09:56 |
| 22 | Q.    Understood.  Thank you. | 11:09:56 |
| 23 | I do have a follow-up question. | 11:09:58 |
| 24 | You -- you stated, I believe, that the | 11:10:00 |
| 25 | reason for this new reporting requirement | 11:10:04 |

Page 98

CONFIDENTIAL

```
 1    little more specific.  And counsel stated      11:13:19
 2    it very well.                                   11:13:22
 3            Was the multifactor                     11:13:23
 4    authentication control the only control         11:13:24
 5    that folks were reporting on in this time       11:13:28
 6    frame?                                          11:13:28
 7        A.    No.                                   11:13:31
 8            MS. MUOIO:  Objection as to --          11:13:31
 9        objection as to privilege.  The             11:13:33
10        witness may answer.                         11:13:34
11        A.    Yeah.  No, they -- they were          11:13:35
12    reporting -- they did exactly what the          11:13:39
13    clause said, any requirement.  Multifactor      11:13:42
14    is one of them, but that was just one of        11:13:46
15    them.                                           11:13:48
16            MS. NEGLIA:  All right.  If it's        11:13:53
17        all right with everyone, maybe we can       11:13:54
18        take another five minutes off the           11:13:57
19        record, and I will go over my notes.        11:13:58
20        I may be close to done.  I don't want       11:14:01
21        to promise anything, but I may be.          11:14:03
22        Can we go off the record?                   11:14:07
23            THE VIDEOGRAPHER:  We're going          11:14:10
24        off the record.  The time is                11:14:13
25        11:13 a.m.                                  11:14:14
```

Page 102

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | (Whereupon, a brief recess is | 11:14:17 |
| 2 | taken.) | 11:24:31 |
| 3 | THE VIDEOGRAPHER:  The time is | 11:24:31 |
| 4 | 11:24 a.m., and we are back on the | 11:25:03 |
| 5 | record. | 11:25:06 |
| 6 | BY MS. NEGLIA: | 11:25:06 |
| 7 | Q.   Mr. Guissanie, I just have one | 11:25:08 |
| 8 | follow-up question based on our last | 11:25:11 |
| 9 | discussion regarding Exhibit 4.  You -- | 11:25:14 |
| 10 | you mentioned, I believe, that you put | 11:25:17 |
| 11 | together these gap sheets that are | 11:25:21 |
| 12 | referenced in Exhibit 4 in order -- and | 11:25:24 |
| 13 | provided them for trend analyses. | 11:25:28 |
| 14 | Can you tell me what these trend | 11:25:30 |
| 15 | analyses were that you were referencing in | 11:25:32 |
| 16 | your prior testimony? | 11:25:34 |
| 17 | MS. MUOIO:  Objection, | 11:25:35 |
| 18 | privileged.  The witness can answer to | 11:25:36 |
| 19 | the extent it doesn't reveal protected | 11:25:37 |
| 20 | information and objection as to scope | 11:25:40 |
| 21 | based on the authorized time frame. | 11:25:43 |
| 22 | You may only answer through May 31, | 11:25:44 |
| 23 | 2016, to the extent it doesn't require | 11:25:47 |
| 24 | him to speculate or provide an expert | 11:25:49 |
| 25 | opinion.  You may otherwise answer. | 11:25:52 |

Page 103

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A.    Yeah, I was not involved in | 11:25:57 |
| 2 | doing whatever analysis they were doing. | 11:25:58 |
| 3 | So that was done by the -- Vicki | 11:26:01 |
| 4 | Michetti's folks.  So -- so I couldn't | 11:26:05 |
| 5 | really tell you what -- what kind of | 11:26:09 |
| 6 | trends they were looking at.  There can be | 11:26:11 |
| 7 | a variety.  I was just taking the raw | 11:26:13 |
| 8 | data, putting it in a format that they | 11:26:18 |
| 9 | could use and sending it over. | 11:26:20 |
| 10 | BY MS. NEGLIA: | 11:26:20 |
| 11 | Q.    Okay.  And -- and just to be | 11:26:21 |
| 12 | clear for the record, the raw data that | 11:26:24 |
| 13 | you were providing were the gaps reported | 11:26:27 |
| 14 | by contractors as required under the DFARS | 11:26:30 |
| 15 | clause; is that correct? | 11:26:35 |
| 16 | A.    Yes, the requirements -- the -- | 11:26:37 |
| 17 | the re- -- based on the clause | 11:26:41 |
| 18 | requirements they would report.  I am not | 11:26:42 |
| 19 | meeting -- for example, I am not meeting | 11:26:45 |
| 20 | the following requirements, 3.1.1, 3.1.2, | 11:26:47 |
| 21 | 3.1.3. | 11:26:55 |
| 22 | (Reporter clarification.) | 11:26:55 |
| 23 | A.    They would just provide a -- | 11:26:56 |
| 24 | typically a list of requirement numbers | 11:26:56 |
| 25 | that were not being met.  I just | 11:26:58 |

Page 104

CONFIDENTIAL

| 1 | translated them into a standard | 11:27:01 |
| 2 | spreadsheet and sent the spreadsheet on. | 11:27:03 |
| 3 | BY MS. NEGLIA: | 11:27:03 |
| 4 | Q.   Okay.  Thank you. | 11:27:09 |
| 5 | MS. NEGLIA:  All right.  Well, | 11:27:10 |
| 6 | reserving our right to re-cross, if | 11:27:13 |
| 7 | Mr. Thyberg has any questions, that is | 11:27:15 |
| 8 | all the questions I have for you | 11:27:18 |
| 9 | today, sir.  Thank you so much for | 11:27:20 |
| 10 | your time.  I am glad we didn't lose | 11:27:22 |
| 11 | your power, and I hope you stay safe. | 11:27:24 |
| 12 | MR. THYBERG:  Yes, I have some | 11:27:28 |
| 13 | questions. | 11:27:29 |
| 14 | Ready for me to proceed?  Hello? | 11:27:34 |
| 15 | Can people hear me? | 11:27:40 |
| 16 | MS. MUOIO:  Yes, I can hear you. | 11:27:42 |
| 17 | MR. THYBERG:  Oh, okay. | 11:27:42 |
| 18 | EXAMINATION | 11:27:42 |
| 19 | BY MR. THYBERG: | 11:27:42 |
| 20 | Q.   Okay.  Good afternoon, | 11:27:45 |
| 21 | Mr. Guissanie.  We appreciate you being | 11:27:46 |
| 22 | here today.  I have some questions. | 11:27:48 |
| 23 | In the DFARS clause, you know, | 11:27:53 |
| 24 | we've talked about compliance with the | 11:27:57 |
| 25 | 800-53 controls and the 800-171 controls, | 11:28:00 |

Page 105

```
 1    and it seems like we kind of -- we sort of      11:28:07
 2    have interchangeably mixed compliance with      11:28:12
 3    those controls, compliance with the            11:28:14
 4    clause.                                         11:28:17
 5            Isn't it true that, in the DFARS        11:28:17
 6    clause, that each of these versions in          11:28:19
 7    2013 and 2015, that if the contractor did       11:28:22
 8    not meet the NIST controls, that they were      11:28:25
 9    required to have alternative controls in        11:28:28
10    place to provide equivalent protection?         11:28:31
11            MS. NEGLIA:  Objection, vague.          11:28:34
12    BY MR. THYBERG:                                 11:28:34
13        Q.    You can answer.                       11:28:39
14        A.    So I wouldn't state it that way.      11:28:44
15    So a better way -- there's a compliance         11:28:49
16    with the clause and there's implementing        11:28:51
17    the part of the clause that dealt with          11:28:56
18    either the NIST 800-53 controls or the          11:28:58
19    800-171 requirements.                           11:29:03
20            And in both cases, the clause           11:29:06
21    requires -- implemented those.  And if you      11:29:12
22    wanted to do something -- so there wasn't       11:29:19
23    an opportunity to do -- to not do that.         11:29:21
24    The only opportunity the clause afforded        11:29:24
25    was if you had an alternative but equally       11:29:26
```

Page 106

CONFIDENTIAL

```
 1    effective measure you wanted to use          11:29:30
 2    instead of what was specified, you could     11:29:31
 3    propose that for approval, or if you         11:29:34
 4    had -- if you could make the case that a     11:29:38
 5    particular requirement didn't apply, you     11:29:40
 6    could make that case.                        11:29:43
 7           But it wasn't -- it isn't             11:29:46
 8    phrased in the way that you did, which is,   11:29:48
 9    well, if I'm not doing this, I can propose   11:29:50
10    an alternative.  It -- that's a -- that's    11:29:52
11    a control by control or requirement by       11:29:57
12    requirement.  You know, is there -- if       11:30:00
13    that makes any sense to you.                 11:30:03
14       Q.   Well, so what I'm just trying to     11:30:06
15    clarify when we talk about excusing the      11:30:10
16    contractor or extending the time for the     11:30:13
17    contractor to comply with the DFARS          11:30:16
18    clause, that is not stating that they are    11:30:19
19    excused from their requirement to get        11:30:23
20    alternative control that provides            11:30:25
21    equivalent protection approved; isn't that   11:30:28
22    correct?                                     11:30:30
23           MS. MUOIO:  Objection as to           11:30:30
24       scope to the extent it requires the       11:30:32
25       witness to speculate.  He may             11:30:33
```

Page 107

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | otherwise answer. | 11:30:35 |
| 2 | A.    So up until the rule that said | 11:30:41 |
| 3 | the December 20- -- 2015 interim rule | 11:30:45 |
| 4 | basically said you have up to two years to | 11:30:53 |
| 5 | implement the requirements of 800-171.  So | 11:30:55 |
| 6 | based on the plain reading of that rule, | 11:31:01 |
| 7 | and that's all I'm doing is, people didn't | 11:31:05 |
| 8 | have to meet any of the requirements for | 11:31:07 |
| 9 | that time period, which was kind of an | 11:31:10 |
| 10 | unintended -- in a way, unintended | 11:31:16 |
| 11 | consequence because they couldn't | 11:31:19 |
| 12 | figure -- you know, it's difficult to | 11:31:20 |
| 13 | figure out how to -- how to do that.  So | 11:31:22 |
| 14 | that -- that's one reason for the | 11:31:25 |
| 15 | reporting of what you're not meeting. | 11:31:27 |
| 16 | But for that period, technically | 11:31:30 |
| 17 | one didn't have to meet any requirement. | 11:31:32 |
| 18 | Outside of that period, there -- you had | 11:31:35 |
| 19 | to meet the requirements, or if you wanted | 11:31:37 |
| 20 | to -- to -- to vary from any particular | 11:31:42 |
| 21 | one of those requirements, you needed | 11:31:45 |
| 22 | approval for that. | 11:31:46 |
| 23 | BY MR. THYBERG: | 11:31:46 |
| 24 | Q.    Okay.  Wasn't there, in each of | 11:31:48 |
| 25 | these versions, 2013, the 2015 versions of | 11:31:51 |

Page 108

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | the DFARS clause, there was an overriding | 11:31:55 |
| 2 | requirement to provide adequate security; | 11:31:59 |
| 3 | isn't that correct? | 11:32:01 |
| 4 | MS. MUOIO:  Objection as to | 11:32:03 |
| 5 | scope to the extent it requires the | 11:32:07 |
| 6 | witness to provide an expert opinion. | 11:32:08 |
| 7 | He may otherwise answer. | 11:32:10 |
| 8 | A.   Yes.  And as a minimum, that | 11:32:12 |
| 9 | was -- the clause says "provide adequate | 11:32:15 |
| 10 | security" and then it says -- generally, | 11:32:19 |
| 11 | the language said something of, as a | 11:32:22 |
| 12 | minimum, this is the table of controls | 11:32:24 |
| 13 | below or 800-171. | 11:32:26 |
| 14 | The -- the -- the "adequate | 11:32:30 |
| 15 | security" language is meant to -- to | 11:32:34 |
| 16 | describe the situations that the | 11:32:38 |
| 17 | contractor is aware of where -- where | 11:32:40 |
| 18 | there might be other issues that has to be | 11:32:43 |
| 19 | addressed that the government might not be | 11:32:46 |
| 20 | aware of. | 11:32:49 |
| 21 | For example, if part of the | 11:32:50 |
| 22 | covered defense information you're dealing | 11:32:53 |
| 23 | with deals with ITAR information, | 11:32:56 |
| 24 | International Trade and Arms Regulation | 11:32:59 |
| 25 | information, that is restricted to U.S. | 11:33:02 |

Page 109

CONFIDENTIAL

1          MS. NEGLIA:  And I'll object,          11:45:02

2      asked and answered.                        11:45:03

3          MR. TALBERT:  Mr. Guissanie, do        11:45:04

4      not answer that hypothetical question,     11:45:07

5      please.                                    11:45:08

6          THE WITNESS:  Okay.                    11:45:09

7  BY MR. THYBERG:                                11:45:09

8      Q.    If a contractor has -- knows         11:45:13

9  that they have malware hidden in their         11:45:18

10 system such that they are leaking data and     11:45:20

11 cannot control the leakage of data, is         11:45:23

12 that something that the contractor should      11:45:26

13 advise -- should be advising the              11:45:27

14 government about when --                       11:45:29

15          (Reporter clarification.)             11:45:29

16 BY MR. THYBERG:                                11:45:29

17     Q.    Should they be advising the DoD      11:46:07

18 if that is occurring?                          11:46:09

19          MS. NEGLIA:  Objection, asks for      11:46:11

20     a hypothetical response -- a response      11:46:12

21     to a hypothetical.                         11:46:15

22          MS. MUOIO:  Objection as to           11:46:16

23     scope.  I defer to DoD as to whether       11:46:17

24     the witness can answer.                    11:46:19

25          MR. TALBERT:  Mr. Guissanie,          11:46:21

Page 121

| | | |
|---|---|---|
| 1 | please do not answer that | 11:46:23 |
| 2 | hypothetical. | 11:46:24 |
| 3 | BY MR. THYBERG: | 11:46:24 |
| 4 | Q.   Now, you were asked about a | 11:46:39 |
| 5 | statement in a presentation.  There was a | 11:46:44 |
| 6 | word that you used about it being | 11:46:49 |
| 7 | impossible to -- something impossible to | 11:46:51 |
| 8 | comply in reference to the 800-53 | 11:46:55 |
| 9 | controls.  And I just want to clarify. | 11:46:58 |
| 10 | As I understand your testimony | 11:47:01 |
| 11 | today, you're not saying that compliance | 11:47:03 |
| 12 | was impossible, just that certain controls | 11:47:06 |
| 13 | could not be complied with because they | 11:47:08 |
| 14 | were directed toward government systems | 11:47:10 |
| 15 | and do not apply to private sector; is | 11:47:11 |
| 16 | that correct? | 11:47:16 |
| 17 | MS. NEGLIA:  Object to form. | 11:47:16 |
| 18 | MS. MUOIO:  Objection to the | 11:47:17 |
| 19 | extent it requires the witness to | 11:47:18 |
| 20 | provide an expert opinion.  He may | 11:47:21 |
| 21 | answer otherwise. | 11:47:22 |
| 22 | A.   Essentially, yes, there are -- | 11:47:25 |
| 23 | there -- there were certain controls in | 11:47:27 |
| 24 | the baseline that would typically be | 11:47:29 |
| 25 | required of the federal government that | 11:47:32 |

Page 122

| | | |
|---|---|---|
| 1 | cannot be applied to nonfederal entities. | 11:47:34 |
| 2 | BY MR. THYBERG: | 11:47:34 |
| 3 | Q.   And -- and it's your testimony | 11:47:41 |
| 4 | that it's not impossible for contractors | 11:47:44 |
| 5 | to comply with the 800-171 controls; is | 11:47:47 |
| 6 | that correct? | 11:47:51 |
| 7 | MS. NEGLIA:  Object to form. | 11:47:56 |
| 8 | MS. MUOIO:  Apologies.  Could | 11:47:58 |
| 9 | the court reporter repeat the | 11:48:00 |
| 10 | question, please? | 11:48:01 |
| 11 | THE COURT REPORTER:  Sure. | 11:48:03 |
| 12 | (Whereupon, the question is read | 11:48:14 |
| 13 | back by the reporter.) | 11:48:17 |
| 14 | MS. NEGLIA:  I'll repeat my | 11:48:17 |
| 15 | objection to form, foundation, calls | 11:48:19 |
| 16 | for expert opinion. | 11:48:21 |
| 17 | MS. MUOIO:  Objection to the | 11:48:22 |
| 18 | extent -- as to scope to the extent it | 11:48:24 |
| 19 | requires the witness to provide an | 11:48:26 |
| 20 | expert opinion, but he may otherwise | 11:48:27 |
| 21 | answer the question. | 11:48:30 |
| 22 | A.   So practically speaking, I mean, | 11:48:34 |
| 23 | just -- 171 was designed to be implemented | 11:48:39 |
| 24 | by nonfederal organizations to include | 11:48:42 |
| 25 | contractors.  So it's clearly possible | 11:48:46 |

Page 123

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | that the requirements in 171 can be | 11:48:48 |
| 2 | implemented by contractors. | 11:48:52 |
| 3 | MR. THYBERG:  I have no further | 11:49:00 |
| 4 | questions.  Thank you. | 11:49:00 |
| 5 | MS. NEGLIA:  No further | 11:49:03 |
| 6 | questions from defendants. | 11:49:04 |
| 7 | Mr. Guissanie, thank you very much for | 11:49:10 |
| 8 | your time today.  We appreciate you | 11:49:13 |
| 9 | taking your time out. | 11:49:15 |
| 10 | THE VIDEOGRAPHER:  Are we ready | 11:49:18 |
| 11 | to go off the record, Counsel? | 11:49:19 |
| 12 | MS. NEGLIA:  We're ready. | 11:49:20 |
| 13 | THE VIDEOGRAPHER:  Okay.  We are | 11:49:23 |
| 14 | going off the record.  The time is | 11:49:24 |
| 15 | 11:48 a.m.  This concludes today's | 11:49:26 |
| 16 | testimony given by Gary Guissanie. | 11:49:30 |
| 17 | The total number of media units is two | 11:49:33 |
| 18 | and will be retained by Veritext Legal | 11:49:36 |
| 19 | Solutions. | 11:49:40 |
| 20 | THE COURT REPORTER:  Can you | 11:49:46 |
| 21 | state your transcript orders? | 11:49:47 |
| 22 | MS. NEGLIA:  Can we get a rough? | 11:49:49 |
| 23 | And then we'd like video and -- and | 11:49:59 |
| 24 | the official transcript. | 11:50:01 |
| 25 | (Whereupon, a brief discussion | 11:50:01 |

Page 124

CONFIDENTIAL

```
 1        is held off the record.)              11:50:18
 2            MR. THYBERG:  Relator would like  11:50:18
 3        a copy.                               11:50:19
 4            MS. MUOIO:  United States would   11:50:21
 5        like a copy.  We don't need a video.  11:50:22
 6            THE COURT REPORTER:  Does         11:50:25
 7        anybody else want a rough draft?      11:50:26
 8            [TIME NOTED:  11:50 a.m.]
 9    _____
             GARY GUISSANIE
10
11

         _____
12    Subscribed and sworn to
      before me this _____
13    day of _____ 2021.
14    _____
             Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

Page 125

CONFIDENTIAL

```
1              CERTIFICATION

2

3       I, BELLE VIVIENNE, a Nationally

4   Certified Realtime Reporter, do hereby

5   certify:

6       That the witness whose testimony as

7   herein set forth, was duly sworn by me;

8   and that the within transcript is a true

9   record of the testimony given by said

10  witness.

11      I further certify that I am not

12  related to any of the parties to this

13  action by blood or marriage, and that I am

14  in no way interested in the outcome of

15  this matter.

16      IN WITNESS WHEREOF, I have hereunto

17  set my hand this 16th day of September

18  2021.

19

20

21

22     BELLE VIVIENNE, CRR, CCR, RPR

23

24           *      *      *

25
```

Page 126

# EXHIBIT 263

Ann Marie Mortimer (State Bar No. 169077)
amortimer@HuntonAK.com
Kirk A. Hornbeck (State Bar No. 241708)
khornbeck@HuntonAK.com
Brandon Marvisi (State Bar No. 329798)
bmarvisi@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627
Telephone: 213 • 532 • 2000
Facsimile: 213 • 532 • 2020

Attorneys for Defendant/Counterclaimant
AEROJET ROCKETDYNE, INC.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CGI FEDERAL INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> AEROJET ROCKETDYNE, INC., an Ohio Corporation, <br><br> Defendant | Case No.: 2:20-CV-01781-JAM-KJN <br><br> **DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.** <br><br> **JURY TRIAL DEMANDED** |
| AEROJET ROCKETDYNE, INC., an Ohio Corporation, <br><br> Counterclaimant, <br><br> v. <br><br> CGI FEDERAL INC., a Delaware Corporation <br><br> Counterclaim-Defendant. | Complaint Filed: September 3, 2020 <br> FAC Filed: November 18, 2020 |

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.
2:20-CV-01781-JAM-KJN

*Hunton Andrews Kurth LLP*
*550 South Hope Street, Suite 2000*
*Los Angeles, California 90071-2627*

# I.

## AR'S FIRST AMENDED ANSWER TO CGI'S FIRST AMENDED COMPLAINT

Defendant-Counterclaimant Aerojet Rocketdyne, Inc. ("AR"), by and through its undersigned counsel, hereby answers the allegations of the First Amended Complaint ("FAC") filed by Plaintiff-Counterclaim Defendant CGI Federal Inc. ("CGI") as follows:

**A.** **Jurisdiction and Venue**

1.      AR admits that this Court has jurisdiction over this suit.  Except as expressly admitted, AR denies the allegations in Paragraph 1.

2.      AR admits that venue in this district is proper and that AR is subject to personal jurisdiction in this Court.  Except as expressly admitted, AR denies the allegations in Paragraph 2.

**B.** **The Parties**

3.      AR admits that CGI is a Delaware corporation with a principal place of business as alleged.  AR lacks knowledge or information sufficient to form a belief about the truth of CGI's allegation that it is registered to do business in California, and on that basis denies it.  Except as expressly admitted, AR denies the allegations in Paragraph 3.

4.      AR admits the allegations in Paragraph 4.

**C.** **Factual Allegations**

**a.** **The Parties' Contractual Relationship**

5.      AR admits that it released a Request for Proposal for Information Technology Services Outsourcing (the "RFP") to which CGI responded, but AR denies that the allegations in Paragraph 5 accurately or completely describes the RFP and the RFP process, and denies CGI's characterization of the RFP.  Except as expressly admitted, AR denies the allegations in Paragraph 5.

6.      AR admits that the parties entered into a Master Service Agreement, which includes attached Terms and Conditions of Master Service Agreement (the "MSA"), for the provision of various information technology ("IT") services.  Except as expressly admitted, AR denies the allegations in Paragraph 6.

7.      AR admits the allegations in Paragraph 7.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

8.     AR admits the allegations in Paragraph 8.

9.     AR admits the allegations in Paragraph 9.

10.     AR admits that the parties entered into Change Orders from time to time that have modified Statement of Work ("SOW") #001.  AR specifically denies that the allegations in Paragraph 10 accurately and completely describe the full scope and extent of the parties' contract (the "Contract").  Except as expressly admitted, AR denies the allegations in Paragraph 10.

11.     AR admits SOW #001, Section 3.A, describes various "Services" to be provided by CGI to AR, but states that SOW #001, Section 3.A, speaks for itself.  AR denies that Paragraph 11 describes the full scope and extent of SOW #001, Section 3.A.  Except as expressly admitted, AR denies the allegations in Paragraph 11.

12.     AR admits that SOW #001, Attachment G, sets out a governance structure and issue resolution process, but states that SOW #001, Attachment G, speaks for itself.  AR denies that Paragraph 12 describes the full scope and extent of SOW #001, Attachment G.  Except as expressly admitted, AR denies the allegations in Paragraph 12.

13.     AR admits that the parties previously have attempted to resolve their disputes without success.  Except as expressly admitted, AR denies the allegations in Paragraph 13.

**b.     <u>Transformation Delay</u>**

14.     AR admits that SOW #001, including its attachments, sets forth Milestones For Transformation, but states that SOW #001 and its attachments speak for themselves.  AR also admits that Table O-2 sets forth responsibilities regarding certain Transformation Requirements, but states that Table O-2 speaks for itself.  AR denies that Paragraph 14 accurately and completely describes the full scope and extent of SOW #001 and its attachments.  Except as expressly admitted, AR denies the allegations in Paragraph 14.

15.     AR denies the allegations in Paragraph 15.

16.     AR admits that it disclosed information to CGI regarding its information technology ("IT") enterprise.  Except as expressly admitted, AR denies the allegations in Paragraph 16.

17.     AR denies the allegations in Paragraph 17.

**Hunton Andrews Kurth LLP**
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

2

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

18.     AR denies the allegations in Paragraph 18.

19.     AR denies the allegations in Paragraph 19.

20.     AR denies the allegations in Paragraph 20.

**c.      Payment For Additional Virtual Cloud Servers Based On Demand Units**

21.     AR admits that SOW #001, Attachment C, sets forth certain Financial Provisions, but states that SOW #001, Attachment C, speaks for itself.  AR denies that Paragraph 21 accurately and completely describes the full scope and extent of SOW #001, Attachment C.  Except as expressly admitted, AR denies the allegations in Paragraph 21.

22.     AR admits that Demand Units ("DUs") include two categories called "Mandatory" and "Additional."  AR denies that Paragraph 22 completely and accurately describes the nature and extent of the Contracts' DUs.  Except as expressly admitted, AR denies the allegations in Paragraph 22.

23.     AR denies that Paragraph 23 accurately and completely describes SOW #001 and its attachments.  AR also denies any implication in Paragraph 23 that CGI ever completed the requisite wall-to-wall inventory and physical confirmation or the related asset true-up.  Except as expressly admitted, AR denies the allegations in Paragraph 23.

24.     AR denies the allegations in Paragraph 24.

**d.      AT&T Pass-Through Costs**

25.     AR admits that SOW #001, Attachment C at Section 2.2.9, governs the administration of pass-through costs associated with telecommunications services provided by AT&T.  Except as expressly admitted, AR denies the allegations in Paragraph 25.

26.     AR admits that SOW #001, Attachment C at Section 2.2.9, governs AT&T Pass-Through Costs.  AR also states that Section 2.2.9 speaks for itself, and denies that the allegations in Paragraph 26 accurately and completely describe Section 2.2.9.  Except as expressly admitted, AR denies the allegations in Paragraph 26.

27.     AR denies the allegations in Paragraph 27.

28.     AR denies the allegations in Paragraph 28.

29.     AR admits that it was forced to assume responsibility for administering certain AT&T

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.
2:20-CV-01781-JAM-KJN

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

1  Pass-Through Costs, including by paying AT&T directly.  AR also admits that it did not pay CGI for

2  amounts that AR was forced to pay to AT&T directly, as provided for in the Contract.  Except as

3  expressly admitted, AR denies the allegations in Paragraph 29.

4      30.     AR admits that MSA Section 8.1, provides, "[CGI] shall not be in default for any

5  liability because of a failure to perform the Agreement under its terms, or because of a failure to make

6  progress so as to endanger performance, if the failure arises from causes beyond the control of and

7  without the fault of [CGI]; provided [CGI] gives to AR prompt notice in writing as soon as it appears

8  that such cause will delay performance of the Agreement."  AR further states that MSA Section 8.1

9  speaks for itself.  Except as expressly admitted, AR denies the allegations in Paragraph 30.

10     31.     AR denies the allegations in Paragraph 31.

11     32.     AR denies the allegations in Paragraph 32.

12     **e.    Asset Transfer At End of Contract**

13     33.     AR admits that SOW #001, Attachment C at Section 5.8, provides, among other things,

14  that "[i]n the event of contract expiration or termination by default, AR will have the right but not the

15  obligation, to purchase CGI's assets acquired for performance of the Services for AR in CGI's

16  provision of the Services."  AR further states that SOW #001, Attachment C at Section 5.8, speaks for

17  itself.  Except as expressly admitted, AR denies the allegations in Paragraph 33.

18     34.     AR admits that SOW #001, Attachment C at Section 5.3, provides, among other things,

19  that "the appropriate termination fee will be calculated and paid based on the Effective Date of the

20  termination as set forth in the Termination Liability Schedule."  AR further states that SOW #001,

21  Attachment C at Sections 5.1 and 5.3, speak for themselves.  Except as expressly admitted, AR denies

22  the allegations in Paragraph 34.

23     35.     AR admits that SOW #001, Attachment C at Section 5.1, governs the termination

24  schedule, among other things, but states that Sections 5.1, 5.2, and 5.3, speak for themselves.  Except

25  as expressly admitted, AR denies the allegations in Paragraph 35.

26     36.     AR denies the allegations in Paragraph 36.

27     37.     AR admits that it requested that CGI enter into negotiations to resolve the parties'

28

4

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

disputes with respect to the ownership and financial responsibility of assets under the Contract. Except as expressly admitted, AR denies the allegations in Paragraph 37.

38.    AR admits that CGI has provided various Change Requests, but denies Paragraph 38's implications about the meaning and effect of such Change Requests. Except as expressly admitted, AR denies the allegations in Paragraph 38.

39.    AR admits that CGI continues to send Change Requests to AR, but denies Paragraph 39's implications about the meaning and effect of such Change Requests. Except as expressly admitted, AR denies the allegations in Paragraph 39.

40.    AR admits that it has rejected CGI's Change Requests because they do not comply with the Contract. Except as expressly admitted, AR denies the allegations in Paragraph 40.

41.    AR lacks knowledge or information sufficient to form a belief about the truth of CGI's allegations about the bases for its purported interpretation of the Contract, and on that basis denies them. Except as expressly admitted, AR denies the allegations in Paragraph 41.

42.    AR admits that CGI makes the stated assertions and contentions set forth in Paragraph 42, but denies the validity and merit of such assertions and contentions. Except as expressly admitted, AR denies the allegations in Paragraph 42.

43.    Paragraph 43 consists of legal conclusions to which no response is necessary.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

44.    Paragraph 44 constitutes an allegation to which no response is necessary.

45.    AR admits that the parties' Contract is valid and enforceable, but denies that CGI's FAC has accurately and completely described the full scope and extent of the Contract.

46.    Paragraph 46 constitutes a legal conclusion to which no response is necessary. To the extent a response is necessary, AR denies the allegations in Paragraph 46.

47.    AR denies the allegations in Paragraph 47.

48.    AR denies the allegations in Paragraph 48.

49.    AR denies the allegations in Paragraph 49.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

50. AR denies the allegations in Paragraph 50.

51. AR denies the allegations in Paragraph 51.

52. AR denies the allegations in Paragraph 52.

## SECOND CLAIM FOR RELIEF

### (Concealment)

53. Paragraph 53 constitutes an allegation to which no response is necessary.

54. AR denies the allegations in Paragraph 54.

55. AR denies the allegations in Paragraph 55.

56. AR denies the allegations in Paragraph 56.

57. AR denies the allegations in Paragraph 57.

58. AR denies the allegations in Paragraph 58.

59. AR denies the allegations in Paragraph 59.

60. AR denies the allegations in Paragraph 60.

## II.

## PRAYER

AR denies that CGI is entitled to any of the relief requested in the unnumbered "PRAYER" paragraph and further denies that CGI is entitled to any relief whatsoever.

## III.

## AFFIRMATIVE DEFENSES

Without waiving or excusing CGI's burden of proof, or assuming that AR has any burden of proof, AR states the following separate affirmative defenses to CGI's FAC:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1. CGI fails to state facts sufficient to constitute a claim upon which relief can be granted.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

6

1

**SECOND AFFIRMATIVE DEFENSE**

2

(Prior Material Breach / Excused Performance)

3     2.     CGI's claims are barred in whole, or in part, because CGI committed one or more prior

4     material breaches of the Contract, and those failures excuse AR's performance.

5

**THIRD AFFIRMATIVE DEFENSE**

6

(Modification of Contract)

7     3.     CGI's claims are barred in whole, or in part, because the contract attached to the FAC

8     as Exhibit A has been the subject of written modifications agreed to by CGI and AR, and AR has

9     performed fully under the operative, modified version of the Contract attached to AR's counterclaims

10    as Exhibits A, B, and C, to the extent not prevented by CGI. Accordingly, the contract attached to the

11    FAC as Exhibit A cannot support any finding of liability against AR to the extent CGI relies on

12    provisions that are inconsistent with the operative, modified version of the Contract attached to AR's

13    counterclaims as Exhibits A, B, and C.

14    4.     In addition, CGI complains in its FAC that CGI was not compensated for the additional

15    expenses incurred due to the discovery of critical vulnerabilities in AR systems (the "Vulnerabilities").

16    However, CGI and AR negotiated and agreed to Statements of Work ("SOWs") #002 and #003,

17    attached to AR's counterclaims as Exhibits B and C, respectively, which provide for over $3.65 million

18    in compensation to CGI for the additional work to address the Vulnerabilities alleged in CGI's FAC.

19    5.     Other examples may be identified as investigation and discovery proceed.

20

**FOURTH AFFIRMATIVE DEFENSE**

21

(Conditions Precedent)

22    6.     CGI's claims are barred in whole, or in part, by CGI's failure to satisfy the conditions

23    precedent to maintain this lawsuit against AR. Specifically, the Contract provides that AR's payments

24    to CGI are predicated on CGI's completion of various milestones. To date, various transformation

25    milestones outlined in SOW #001 Exhibit C.4.2 remain incomplete and past due including but not

26    limited to: (a) Milestone #2 "Application Rationalization Assessment," due on December 31, 2017;

27    and (b) Milestone #3 "Infrastructure Migration," due on March 31, 2019. Accordingly, AR's payment

28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

7

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

obligations are not yet due, in whole or in part, for the various milestones that remain incomplete.

7.      Further, AR's payments to CGI with respect to certain Demand Units are based on consumption of resources in excess of "Monthly Demand Baselines."  Those baselines were to have been established 60 days after the Effective Date of the Contract based on the results of a "Demand Baseline True-Up" to be conducted by CGI and only upon AR's "acknowledgment that the True-Up data is complete, verified, and accepted by AR" (SOW #001 Attachment C, Section 2.2.8.1).  The Contract further provides that "prior to the completion of the Demand Baseline True-Up … AR will be charged for the Services based on the Demand Baselines listed in Exhibit C.5.  Post True-Up, however, AR will be charged based on actual consumption using the monthly DU Usage as reported by CGI and accepted by AR" (SOW #001 Attachment C, Section 2.2.8.3).

8.      Section 26.3.1 of the MSA also conditions AR's payment obligations upon receipt of a "proper invoice."  CGI failed to conduct the Demand Baseline True-Up, AR never acknowledged or accepted that it had occurred, AR has consistently rejected alternative DU Usage reports provided by CGI that are not in accordance with the Contract, and AR has never received a proper invoice under the Contract for the claimed amounts.

9.      Accordingly, the conditions precedent for charging AR for consumption of virtual cloud server Demand Units other than per the Demand Baselines listed in Exhibit C.5 have never been satisfied and none of the invoices based on CGI's invented alternative calculus is a "proper invoice."

10.     In addition, CGI has attempted to invoice AR for AT&T Pass-Through Costs despite the fact that Section 2.2.9.1 of Attachment C provides that "Pass-Through Costs are part of the Services and included in the Demand Unit Charges" and none of the limited exceptions to that rule applies.  As a result, CGI's invoices are not "proper invoices" and the conditions precedent to AR's payment obligations under Section 26.3.1 of the MSA are not satisfied.

11.     Other examples may be identified as investigation and discovery proceed.

### FIFTH AFFIRMATIVE DEFENSE

(Consent)

12.     CGI's claims are barred in whole, or in part, because CGI consented to and approved

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.
2:20-CV-01781-JAM-KJN

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

the acts about which CGI now complains. Specifically, CGI complains in their FAC that CGI was not compensated for the additional expenses incurred due to the discovery of the Vulnerabilities. However, CGI and AR negotiated and agreed to SOWs #002 and #003, attached to AR's counterclaims as Exhibits B and C, respectively, which provided for over $3.65 million in compensation to CGI for the additional work to address the Vulnerabilities alleged in CGI's FAC.

13.     Other examples may be identified as investigation and discovery proceed.

## SIXTH AFFIRMATIVE DEFENSE

### (Good Faith)

14.     CGI's claims are barred in whole, or in part, because AR acted reasonably, in good faith, and without malice, based upon all relevant facts and circumstances known at the time, and did not at any time willfully or otherwise fail to comply with the Contract or applicable laws and regulations.

## SEVENTH AFFIRMATIVE DEFENSE

### (Offset)

15.     CGI's claims are barred in whole, or in part, on the ground that CGI failed to apply all lawful offsets on the alleged amounts that CGI claims are due and owing. Specifically, and without limitation, CGI and AR negotiated and agreed to SOWs #002 and #003, which provided for over $3.65 million to compensate CGI for the additional work to address the Vulnerabilities alleged in CGI's FAC.

16.     Other examples may be identified as investigation and discovery proceed.

## EIGHTH AFFIRMATIVE DEFENSE

### (Laches)

17.     CGI's claims are barred in whole, or in part, by the doctrines of laches. CGI claims in its FAC that CGI was not compensated for the additional expenses incurred due to the Vulnerabilities in AR's IT infrastructure, but AR has provided CGI with unfettered access to and control of its IT infrastructure since March of 2017, including for many months before the Contract was executed and for many more months before SOWs #002 and #003 were executed. Accordingly, CGI has

9

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

unreasonably delayed bringing suit to AR's prejudice. Among other things, CGI's unreasonable delay in bringing suit has prejudiced AR because certain evidence, including witnesses' memories, may have become unnecessarily stale.

18. With respect to CGI's claims for payment for additional virtual cloud server Demand Units, CGI failed to conduct the required inventory and True-Up within 60 days after the Effective Date – despite AR's repeated demands – likely rendering impossible the re-creation of the actual inventory now, years after the fact. CGI cannot now avoid enforcement of the terms of the Contract that contemplate this exact failure and require billing based on the initial Demand Baselines set forth in SOW #001 Exhibit C.5.

## NINTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

19. CGI's claims are barred in whole, or in part, by the doctrines of unclean hands. With respect to CGI's claims for payment for additional virtual cloud server Demand Units, CGI failed to conduct the required inventory and True-Up within 60 days after the Effective Date – despite AR's repeated demands – likely rendering impossible the re-creation of the actual inventory now, years after the fact. CGI cannot now avoid enforcement of the terms of the Contract that contemplate this exact failure and require payment based on the initial Demand Baselines specified in SOW #001 Exhibit C.5.

20. Moreover, CGI is demanding payment for server resources that are required to be consumed only because of its breach of its Transformation obligations. For example, CGI failed to complete Milestone #3 "Infrastructure Migration," as provided for in SOW #001 Exhibit C.4.2 and Attachment O, which would have resulted in the migration of AR servers from AR's premises to a CGI data center or CGI's third party hosting provider. As a result of CGI's breach, CGI must maintain servers both on AR's premises and on CGI's premises or those of its hosting provider. CGI has invoiced AR for all of these servers, regardless of the fact that many of them are required only as a result of CGI's breach. Further, CGI's invoices for servers located at AR premises themselves represent a breach of the Contact, since they are based on invented rates that do not appear in the

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.
2:20-CV-01781-JAM-KJN

Contract (since this class of servers was never contemplated by the parties) and have never been approved by AR.

## TENTH AFFIRMATIVE DEFENSE

### (Waiver)

21.     CGI's claims are barred in whole, or in part, because CGI has waived its claims. Specifically, and without limitation, CGI waived its rights to recover for additional work necessary to address the Vulnerabilities because CGI and AR negotiated and agreed to SOWs #002 and #003, which provided for over $3.65 million to compensate CGI for the additional work to address the Vulnerabilities alleged in CGI's FAC.

22.     Other examples may be identified as investigation and discovery proceed.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Estoppel)

23.     CGI's claims are barred in whole, or in part, because CGI is estopped from asserting its claims.  CGI claims in their FAC that CGI was not compensated for the additional expenses incurred due to the Vulnerabilities in AR's IT infrastructure, but CGI and AR negotiated and agreed to SOWs #002 and #003 for the express purpose of compensating CGI to address the Vulnerabilities.  CGI is estopped from claiming to the contrary.

24.     Further, AR has provided CGI with unfettered access to and control of its IT infrastructure since March of 2017, including for many months before the Contract was executed and for many more months before SOWs #002 and #003 were executed.  Because CGI had such access and control, CGI negotiated for additional compensation for the express purpose of addressing the Vulnerabilities, and CGI assumed the risks of performance by executing the Contract and SOWs #002 and #003 in light of all of the foregoing, AR was entitled to conclude that CGI's claims relating to the Vulnerabilities were resolved and that CGI would perform its obligations in full.  Accordingly, CGI is estopped from claiming additional compensation and excuse of its breaches.

25.     CGI also has unreasonably delayed bringing this suit, years after it claimed to have discovered the vulnerabilities and the parties executed SOWs #002 and #003 to address them, resulting

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

1    in material prejudice to AR. Among other things, CGI's unreasonable delay in bringing suit has

2    prejudiced AR because certain evidence, including witnesses' memories, may have become

3    unnecessarily stale. Having slept on its claims, CGI now is estopped from bringing them.

4        26.    With respect to CGI's claims for payment for additional virtual cloud server Demand

5    Units, CGI failed to conduct the required inventory and True-Up within 60 days after the Effective

6    Date – despite AR's repeated demands – likely rendering impossible re-creation of the actual inventory

7    now, years after the fact. CGI cannot now avoid enforcement of the terms of the Contract that it

8    negotiated, which contemplate this exact failure and require billing based on the initial Demand

9    Baselines set forth in Exhibit C.5.

10       27.    Other examples may be identified as investigation and discovery proceed.

11                    **TWELFTH AFFIRMATIVE DEFENSE**

12                          (Accord and Satisfaction)

13       28.    CGI's claims are barred in whole, on in part, to the extent any payments owed to CGI

14   have been paid in full and any obligations AR may have owed CGI have been paid or otherwise

15   satisfied. For example, CGI complains in its FAC that CGI was not compensated for the additional

16   expenses incurred due to the discovery of the Vulnerabilities. However, CGI and AR negotiated and

17   agreed to SOWs #002 and #003, described in AR's counterclaims as Exhibits B and C, respectively,

18   which provided for over $3.65 million in compensation to CGI for the additional work to address the

19   Vulnerabilities alleged in CGI's FAC.

20       29.    Other examples may be identified as investigation and discovery proceed.

21                   **THIRTEENTH AFFIRMATIVE DEFENSE**

22                        (Failure to Mitigate Damages)

23       30.    CGI's claims are barred in whole, or in part, to the extent that CGI has failed to take

24   reasonable steps to mitigate and/or avoid its damages.

25   / / /

26   / / /

27   / / /

28

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

12

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

# IV.

## AR'S COUNTERCLAIMS AGAINST CGI

AR brings these counterclaims against CGI, and alleges as follows:

**A.    The Parties**

1.    Plaintiff and Counterclaim-defendant CGI is a Delaware corporation with its principal place of business at 12601 Fair Lakes Circle, Fairfax, Virginia 22033.  CGI is an information technology ("IT") consulting and systems integration company that provides data security services.  CGI boasts of being a global leader in its field that is recognized internationally for its technical depth, experience, and effectiveness in the IT space.  CGI claims to offer robust and comprehensive IT services and to have invested heavily in establishing its cyber security credentials.  Its claimed areas of expertise include: (a) assessing IT portfolios (both applications and supporting infrastructure); (b) working with commercial and government organizations to manage their cyber security needs, including with respect to IT architecture; and (c) working with its clients to develop a cloud-native strategy optimized for their business goals.

2.    Defendant and Counterclaimant AR is an Ohio corporation with its principal place of business in the State of California.  AR is an American rocket and missile propulsion manufacturer as well as a government contractor.  In 2015, AR began seeking a vendor with expertise in the IT space.

**B.    Jurisdiction and Venue**

3.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of different states.  This Court also has ancillary and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because AR's counterclaims derive from a common nucleus of operative facts and arise out of the same transaction or occurrence or series of transactions or occurrences as CGI's claims.

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is not disputed by the parties.

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

## C. **Factual Background**

5.     In 2017, after evaluating which IT vendors would provide a technically acceptable solution and deliver the "best value" to AR, AR contracted with CGI to provide a wide range of IT services.  The parties' contract consists of a Master Service Agreement ("MSA"), as amended, more than forty Statements of Work ("SOWs"), and a number of change orders associated with those SOWs, all of which together constitute the parties' "Contract."  A true and correct copy of the parties' MSA and SOW #001, as amended, are attached as **Exhibit A** and are incorporated herein by reference.  A true and correct copy of SOW #002 and SOW #003, as amended, are attached hereto as **Exhibits B** and **C**, respectively, and are incorporated herein by reference.

6.     The parties' Contract is a valid and enforceable contract for good and valuable consideration.

7.     In exchange for monetary consideration provided by AR, the Contract requires, among other things, CGI to: (a) substantially update, or "transform," AR's IT infrastructure; (b) provide site security and safety; (c) provide qualified personnel to perform IT services; (d) update, or "refresh," AR's computer hardware and software; and (e) deliver such IT services "in an accurate and timely manner."

8.     AR has fully performed all material covenants, conditions, and obligations as required on its part under the terms of the Contract, except those conditions and obligations excused by CGI's various breaches.

9.     CGI, as alleged herein, has failed to discharge its contractual obligations.  CGI's conduct also amounts to gross negligence and, on information and belief, willful misconduct.

10.    The parties have unsuccessfully attempted to resolve the issues and disputes raised by AR's counterclaims by engaging in the escalation process provided for in SOW #001.

### **FIRST CAUSE OF ACTION**

### **(Breach of Contract)**

11.    AR re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 10 of its Counterclaim as though fully set forth herein.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

14

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

**A.     CGI's Failures To Fully Transform AR's IT Infrastructure**

12.     Among other things, the Contract obligates CGI to provide a detailed transformation plan and to manage transformation.

     **a.     CGI's Breaches Arising From, Or Relating To, Its Failure To Provide The Transformational Planning And Management**

13.     Table O-2 of Attachment O of SOW #001 requires CGI to: (a) provide a detailed transformation plan; and (b) manage transformation risk and communications.  Table O-2 also imposes additional obligations on CGI, such as requiring CGI to establish a transformational management and leadership structure and secure approval of transformation milestones and deliverables.

14.     CGI breached its obligation set forth in Table O-2 by: (a) failing to provide the requisite transformation plan; (b) failing to manage transformation risk and communications; and (c) failing to deliver required notices and propose contractually required change orders to adjust deadlines required by the Contract to the extent justified by unforeseen circumstances such as the claimed discovery of the vulnerabilities alleged in CGI's operative complaint.

15.     As a direct and proximate result of CGI's breaches of its obligations under Table O-2 of Attachment O of SOW #001, AR has been damaged, and continues to suffer damages, in an amount to be proven at trial.

     **b.     CGI's Breaches Arising From, Or Relating To, Its Failure To Execute The Requisite Transformation Itself**

16.     Under Section 2 of Attachment O of SOW #001, CGI is required to: (a) transform AR's "as-is" enterprise; (b) transform AR operations to CGI Service Operations Framework (ITIL) and migrate to CGI ITSM (Information Technology Service Management); (c) provide an Application Rationalization Assessment that includes an evaluation, an analysis, and an application portfolio rationalization roadmap; (d) transform AR's on-premises infrastructure management to CGI's data center and cloud services; and (e) complete transformational work, such as LANDesk replacement, Active Directory consolidation, and the closure of the Sacramento Data Center.  The transformation requirement is consistent with other contractual obligations of SOW #001 such as the obligation to

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

---

15

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

provide disaster recovery services as required by Attachment A.7 of SOW #001.

17.    CGI breached its obligations under Section 2 of Attachment O of SOW #001 by, among other things, failing to timely: (a) transform AR's "as-is" enterprise; (b) transform AR operations to CGI Service Operations ITIL Framework and migrate to CGI ITSM; (c) provide an Application Rationalization Assessment; (d) transform AR's on-premises infrastructure management to CGI's data center and cloud services; and (e) complete transformational work, such as LANDesk replacement, Active Directory consolidation, and the closure of the Sacramento Data Center.  As a result of its failure to transform AR's "as-is" enterprise, CGI breached other contractual obligations in SOW #001, including, *inter alia*, timely providing disaster recovery services.

18.    As a direct and proximate result of CGI's breaches of its obligations under Section 2 of Attachment O of SOW #001, and CGI's breaches of other contractual obligations in SOW #001, AR has been damaged, and continues to suffer damages, in an amount to be proven at trial.

**B.    CGI's Breach Of Contractually Specified Security Protocols**

19.    Among other things, the Contract requires CGI to provide AR with contractually specified site security and safety services, as well as to protect AR's proprietary information. Specifically, Section 4 of the Terms and Conditions requires CGI to provide site security and safety including by requiring CGI to take various precautions and comply with various policies.  Section 12 of the Terms and Conditions also requires CGI to protect AR's proprietary information.  Indeed, a breach of Section 12 is deemed to be a material breach under Section 12.1.2 of the Terms and Conditions.

20.    On multiple occasions, CGI breached its obligation to provide site security and safety as well as to protect AR's proprietary information and require its personnel to comply with the Contract to the same extent as CGI is so required.  Specifically, CGI employees and CGI's outsourced contractors have used their personal email accounts to engage in unauthorized transmissions of AR's proprietary information.  Most recently, CGI breached its obligation to provide site security and safety as well as to protect AR's proprietary information and require compliance with the Contract by permitting a CGI employee to abscond with AR proprietary information following the employee's

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

16

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

termination from employment with CGI. CGI has failed to address this recurring breach of material terms of the Contract after repeated demands by AR.

21.     As a direct and proximate result of CGI's breaches of its obligations under the Contract, to provide site security and safety services as well as to protect AR's proprietary information and require its personnel to comply with the Contract, AR has been damaged, and continues to suffer damages, in an amount to be proven at trial.

## C.     CGI's Failure To Provide Qualified Personnel

22.     Among other things, Section 16.1 of the Terms and Conditions requires CGI to provide AR with qualified personnel. Specifically, Section 16.1 provides, "[CGI] shall assign Personnel who are capable, skilled, qualified, and competent to perform the tasks and activities assigned to them, according to the specific requirements of the applicable Statement of Work."

23.     CGI breached its contractual obligation to provide AR with qualified personnel. CGI's personnel have exhibited an unresolved pattern of incompetence. As a consequence of the conduct by CGI's personnel and their incompetence, AR has suffered numerous service interruptions and outages.

24.     Indeed, AR continues to experience a high number of system outages, which significantly harm AR's business operations. Between May 2019 and August 2020, AR's IT infrastructure has experienced more than 150 significant service interruptions and outages, an average of approximately 10 per month. The incompetence of CGI's personnel has been a root cause of those system outages, and CGI has failed to address this recurring breach of material terms of the Contract after repeated demands by AR.

25.     CGI also has breached its obligations to provide qualified personnel by failing to fill open positions, leaving critical roles vacant for long periods of time, and temporarily filling roles with CGI personnel that are already employed full-time in other critical roles. As an example, CGI has not provided qualified personnel to support application enhancement projects and initiatives, providing, for example, only 52% of the 1,855 support hours that it was obligated to provide over a three-month period as a result of leaving a significant number of roles vacant.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

26.     As a direct and proximate result of CGI's breaches of its obligations under the Contract to provide AR with qualified personnel, AR has been damaged, and continues to suffer damages, in an amount to be proven at trial.

**D.     CGI's Failure To Refresh AR's Hardware**

27.     Among other things, the Contract requires CGI to update or "refresh" AR's hardware. Specifically, Section 3 of Attachment A-2 of SOW #001 requires CGI to: (a) deliver an equipment update plan to AR for approval within 30 days after execution of SOW #001 and on an annual basis thereafter; and (b) procure and replace the specified hardware as well as update the specified server, network, and storage hardware during the SOW's term.

28.     CGI breached its contractual obligations to "refresh" AR's hardware by: (a) failing to provide the requisite plans for AR approval; and (b) failing to fully discharge its obligation to procure and replace the specified hardware as well as update the specified server, network, and storage hardware during the SOW's term, particularly with respect to high dollar and high impact hardware, such as servers and network devices.

29.     As a direct and proximate result of CGI's breaches of its obligation under the Contract to update and supplement AR's hardware and software, AR has been damaged, and continues to suffer damages, in an amount to be proven at trial.

**E.     CGI's Failure To Determine The Baseline Inventory**

30.     Among other things, the Contract required CGI to determine AR's actual baseline level of IT inventory that existed at the time the parties entered into the Contract.  Specifically, Section 2.2.8.2 of Attachment C of SOW #001, along with other contractual provisions, required CGI to conduct within 60 days of the Effective Date "an initial wall-to-wall inventory that will be a physical confirmation by both Parties of the actual existence of a managed asset, a profile of it attributes, and the confirmation by both Parties that it is designated as in-scope hardware or software managed asset as part of the Services."  The agreed results of that inventory were to be used in an "Asset Inventory True-Up," which would form the foundation for future charges by CGI.  Section 2.2.8.3 of Attachment C of SOW #001 provides that, prior to completion of the Asset Inventory True-Up, "AR will be

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

18

1   charged for the Services based on the Demand Baselines in Exhibit C.5." CGI has subsequently

2   invoiced AR for charges that do not comply with this requirement, which AR has disputed.

3        31.     CGI has breached that requirement by failing to conduct the wall-to-wall inventory,

4   failing to obtain AR's confirmation of such an inventory, failing to conduct the Asset Inventory True-

5   Up, and repeatedly invoicing AR for charges in a manner not provided for in the Contract and not

6   based on the Demand Baselines set forth in Exhibit C-5.

7        32.     As a direct and proximate result of CGI's breaches of its obligations under the Contract

8   relating to AR's actual baseline level of IT inventory that existed at the time the parties entered into

9   the Contract, AR has been damaged, and continues to suffer damages, in an amount to be proven at

10  trial.

### SECOND CAUSE OF ACTION

### (Declaratory Relief)

13       33.     AR re-alleges and incorporates by reference the allegations contained in Paragraphs 1

14  through 33 of its Counterclaim as though fully set forth herein.

15       34.     Pursuant to Section 19.2 of the Terms and Conditions of the MSA, AR has a right to

16  terminate the Agreement, in whole or in part if: (a) CGI fails to comply with any of the material terms

17  of the Contract; (b) CGI endangers performance of the contractually required services by failing to

18  make progress; or (c) upon reasonable request by AR, CGI fails to provide adequate assurances of

19  future performance.

20       35.     AR contends that it has a right to terminate the Contract:

21       (a)     As alleged above, CGI has breached material terms of the Contract;

22       (b)     CGI has endangered performance of the contractually required services by

23  failing to discharge its obligations under: (i) Section 2 of the Terms and Conditions, which requires

24  CGI to "provide the Services described in the applicable Statement(s) of Work," and Section 3.A of

25  SOW #001 which provides for CGI to provide all of the Services specified in that SOW and its

26  Attachments; (ii) Section 2.1 of the Terms and Conditions, which requires CGI to deliver its IT

27  services "in an accurate and timely manner, and in accordance with any applicable time schedules set

28

---

19

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.

2:20-CV-01781-JAM-KJN

1  forth in the Agreement;" and (iii) Section 2.1 of the Terms and Conditions and Section 6.1 of SOW

2  #001, which require CGI to perform the Services in a manner that meets or exceeds the contractually

3  defined "Service Levels."

4         (c)    CGI has failed to provide adequate assurances of future performance in

5  response to AR's April 23, 2019 Notice of Breach and Demand for Adequate Assurances and October

6  16, 2020 Second Notice of Breach and Demand for Adequate Assurances.

7      36.    In its written response to AR's October 16, 2020 Second Notice of Breach and Demand

8  for Adequate Assurances, CGI denies that AR has a right to terminate the Contract pursuant to Section

9  19.2 of the Terms and Conditions of the MSA and exercise any other rights it may have under the

10  Contract as a result of such termination pursuant to Section 19.2 of the Terms and Conditions of the

11  MSA.

12      37.    An actual controversy has arisen and now exists between AR and CGI regarding AR's

13  right to terminate the Contract pursuant to Section 19.2 of the Terms and Conditions of the MSA.

14      38.    Pursuant of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, AR seeks a

15  judicial declaration that AR has a right to terminate the Contract pursuant to Section 19.2 of the Terms

16  and Conditions of the MSA.

18  **V.**

19  **PRAYER**

20  WHEREFORE, AR prays for judgment against CGI as follows:

21  1.    For compensatory and consequential damages according to proof;

22  2.    For declaratory relief as described above;

23  3.    For pre- and post-judgment interest at the maximum rate allowed by law;

24  4.    For costs of suit herein, including reasonable attorneys' fees and experts' fees; and

25  5.    For such other and further relief as the Court may deem just and proper.

Hunton Andrews Kurth LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.
2:20-CV-01781-JAM-KJN

# VI.

## **REQUEST FOR JURY TRIAL**

AR hereby requests a jury trial on all liability and damage issues.  AR accordingly requests that all disputed fact issues be heard before properly empaneled jury in this case.

Dated:  January 11, 2021

**HUNTON ANDREWS KURTH LLP**
Ann Marie Mortimer
Kirk A. Hornbeck
Brandon Marvisi

By:  _____*/s/ Ann Marie Mortimer*_____
Ann Marie Mortimer
Attorneys for Defendant/Counterclaimant
AEROJET ROCKETDYNE, INC.

**Hunton Andrews Kurth LLP**
**550 South Hope Street, Suite 2000**
**Los Angeles, California 90071-2627**

DEFENDANT AEROJET ROCKETDYNE, INC.'S FIRST AMENDED ANSWER TO FIRST
AMENDED COMPLAINT AND COUNTERCLAIMS AGAINST CGI FEDERAL INC.
2:20-CV-01781-JAM-KJN