1  Mark Holscher (SBN 139582)
   mark.holscher@kirkland.com
2  Tammy A. Tsoumas (SBN 250487)
   tammy.tsoumas@kirkland.com
3  KIRKLAND & ELLIS LLP
   2049 Century Park East
4  Los Angeles, CA 90067
   Telephone:    (310) 552-4200
5  Facsimile:    (310) 552-5900

6  Ashley Neglia (SBN 298924)
   ashley.neglia@kirkland.com
7  KIRKLAND & ELLIS LLP
   555 S. Flower Street, Suite 3700
8  Los Angeles, CA 90071
   Telephone:    (213) 680-8400
9  Facsimile:    (213) 680-8500

10 Sable Hodson (SBN 313252)
   sable.hodson@kirkland.com
11 KIRKLAND & ELLIS LLP
   1601 Elm Street
12 Dallas, TX 75201
   Telephone:    (214) 972-1770
13 Facsimile:    (214) 972-1771

14 *Attorneys for Defendants Aerojet Rocketdyne*
   *Holdings, Inc. and Aerojet Rocketdyne, Inc.*
15

16              **UNITED STATES DISTRICT COURT**

17           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

18 UNITED STATES OF AMERICA ex rel. BRIAN    ) Case No. 2:15-cv-02245-WBS-AC
   MARKUS, individually,                     )
19                                            )
                                              ) **DEFENDANTS' REPLY TO RELATOR'S**
20            Relator,                        ) **RESPONSE TO AEROJET'S**
                                              ) **STATEMENT OF UNDISPUTED FACTS**
21       vs.                                  )
                                              )
22 AEROJET ROCKETDYNE HOLDINGS, INC.,         ) Judge:        Hon. William B. Shubb
   a corporation and AEROJET ROCKETDYNE,      ) Hearing Date: November 1, 2021
23 INC., a corporation,                       ) Time:         1:30 p.m.
                                              ) Courtroom:    5
24            Defendants.                     )
                                              )
25                                            )
                                              )
26                                            )
                                              )
27 _____        )

28

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

Pursuant to Local Rule 260 and Federal Rule of Civil Procedure 56, Aerojet replies as follows to Relator's Response to Defendants' Statement of Undisputed Material Facts ("SUF") (ECF No. 133). Aerojet incorporates its responses to Relator's Statement of Material Facts (ECF No. 130-2). In addition, Aerojet notes that Relator does not dispute the following facts in Aerojet's Statement: 1–3, 5, 7–11, 14–16, 19–22, 25–27, 34, 36–39, 44–45, 47–48, 50, 52, 54, 59, 64–65, 67–72, 74–75, 77, 79, 83–84, 88, 92–93, 95, 98–99, 103, 105, 107, 109–11, 113–14, 118, 123–24, 128–29, 133, 135, 138, 140–41, 144–47, 149, 151–55, 157–59, 161–68, 170–77, 179–192, 194–227, 229, 232–233. Many of Relator's responses that are "nothing more than 'mere allegations or denials' . . . [and] are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was "nothing more than self-serving speculation that should be disregarded" was insufficient). Such responses should be disregarded as they do not create a genuine dispute. *Id*. With respect to the remaining statements of fact that Relator purports to dispute, Aerojet responds as set forth in **Attachment A.**

DATED: October 25, 2021                          Respectfully submitted,

                                                 KIRKLAND & ELLIS, LLP

                                                 */s/ Tammy A. Tsoumas*
                                                 Mark Holscher (SBN 139582)
                                                 mark.holscher@kirkland.com
                                                 Tammy A. Tsoumas (SBN 250487)
                                                 tammy.tsoumas@kirkland.com
                                                 KIRKLAND & ELLIS LLP
                                                 2049 Century Park East
                                                 Los Angeles, CA 90067
                                                 Telephone:    (310) 552-4200
                                                 Facsimile:    (310) 552-5900

                                                 Ashley Neglia (SBN 298924)
                                                 ashley.neglia@kirkland.com
                                                 KIRKLAND & ELLIS LLP
                                                 555 S. Flower Street, Suite 3700
                                                 Los Angeles, CA 90071
                                                 Telephone:    (213) 680-8400
                                                 Facsimile:    (213) 680-8500

                                                 Sable Hodson (SBN 313252)
                                                 sable.hodson@kirkland.com

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:      (214) 972-1770
Facsimile:      (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne*
*Holdings, Inc. and Aerojet Rocketdyne, Inc.*

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

# ATTACHMENT A

I.   **THE DOD RECOGNIZED THE FLAWS WITH THE CYBERSECURITY CLAUSE AT ISSUE (THE 2013 DFARS CLAUSE) AND AS A RESULT, ABANDONED IT.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 1 | **On November 18, 2013, section 252.204-7012 was published in Chapter 2 of Title 48 of the Code of Federal Regulations (the "2013 DFARS Clause").[1]**<br><br>• 48 C.F.R. § 252.204-7012 (Nov. 18, 2013) | Not Disputed | |
| 2 | **The 2013 DFARS Clause required contractor systems that transmitted or stored unclassified, controlled technical information ("UCTI") to either (a) implement fifty-one selected National Institute of Standards and Technology ("NIST") Special Publication 800-53 ("NIST SP 800-53") security controls or (b) submit a written explanation to the contracting officer stating why a control was not applicable or that an alternate control or protective measure was used by the contractor to achieve adequate protection.**<br><br>• 48 C.F.R. § 252.204-7012 (Nov. 18, 2013)<br><br>• Ex. 13 (NIST Special Publication (SP) 800-53 r.4) (NIST standards in effect at time of November 2013 Clause implementation) | Not Disputed | |

---

[1]   Where Aerojet references the "DFARS Clause" without referencing a specific version of the clause, Aerojet intends to refer to all versions of 48 C.F.R. § 252.204-7012.

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • ECF No. 42 ("SAC") ¶¶ 12, 18-19 (admitting that DFARS and NFS Clauses only apply if UCTI is involved)<br><br>• Ex. 70 (Office of the Chief Information Officer ("OCIO") concurring with Air Force assessment that DFARS Clause "does not apply" in the event contract did not include UCTI)<br><br>• Ex. 200 (OCIO memorandum to Navy indicating that DFARS Clause was not applicable to contractor because it was not required to store UCTI)<br><br>• Ex. 205 (1/6/2016 e-mail from OCIO stating that contracts could be awarded to non-compliant contractors)<br><br>• Ex. 92 (5/20/2015 e-mail from OCIO stating that contract could be awarded to non-compliant contractors) | | |
| 3 | **Representatives from the Department of Defense (the "DoD") acknowledged that the controls in NIST SP 800-53 were intended for use on federal government information systems, which differ from private contractor systems.**<br><br>• Ex. 21 at 8:20-24 (4/6/2017 DoD SBTW Presentation: "[I]f anybody is familiar with [NIST SP 800-53], that's actually a document | Not Disputed | |

2

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | that is focused on protecting government systems, it's very federalistic and it gives lots of how to."); *see also* "Ex. 20 (video recording of same)<br><br>• SAC ¶ 20 ("The NIST SP 800-53 standards were originally implemented to apply to contractors operating computer systems on behalf of the federal government.")<br><br>• Ex. 23 at 19:9-10 (6/23/2017 DoD Industry Day Presentation: "[800-53] was for federal agencies and federal information."); *see also* Ex. 22 (video recording of same)<br><br>• Ex. 9 (Guissanie Dep.) at 63:10-64:17 ("there are elements in [NIST 800-53] that are federally focused that do not apply to nonfederal entities.")<br><br>• Ex. 10 (Thomas Dep.) at 84:17-21 ("So prior to May 2016 my understanding is that [NIST 800-]171 was written specifically for industry. Where as [NIST 800-]53 was not, so it was written with the properties of a contractor system in mind.") | | |
| 4 | **The DoD admitted that applying the NIST 800-53 standard to private contractor systems was not practicable.**<br><br>• Ex. 25 at 25:4-6 (6/23/2017 DoD Industry Day Presentation: "To apply [NIST 800-53] to a contractor system to protect CDI for confidentiality really isn't very -- isn't | Disputed. The DOD stated the NIST 800-53 was focused on protecting government systems, it was very prescriptive does not always make sense for industry with existing information systems which hold way more than just weapon system | Relator's response does not create a genuine dispute of material fact because it does not cite any evidence controverting the assertion that applying the NIST 800-53 standard to private contractor systems was not practicable. Instead, Relator's citation to another DoD statement merely rephrases the same point. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | possible."); *see also* Ex. 24 (video recording of same)<br><br>• Ex. 23 at 19:17-23 (6/23/2017 DoD Industry Day Presentation: "Also, since 800-53 was focused on the federal government, there's a lot of things in there that are federal-centric. They're the ways federal government decided to do business for itself based on policy or other reasons that aren't necessarily the way it has to be done in order to achieve the security objective."); *see also* Ex. 22 (video recording of same)<br><br>• Ex. 25 at 26:12-20 (6/23/2017 DoD Industry Day Presentation: explaining that NIST 800-53 was "overly specific because the federal government wanted to do it in a particular way . . . and that was going to be problematic if we applied that to the contracting community, so we wanted to take that out of the situation"); *see also* Ex. 24 (video recording of same)<br><br>• Ex. 23 at 19:9-13 (6/23/2017 DoD Industry Day Presentation: "So that's 800-53. That was for federal agencies and federal information. In order to apply [NIST 800-53] to the contracting community, NIST 800-171 was developed."); *see also* Ex. 22 (video recording of same) | information. (Thyberg Dec. Opp. Ex. 1, 8:18-9:9 AR00232956-7). |  |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 18 at AFDODCIO000589 ("[NIST] 800-53 controls developed for Federal systems . . . [and is] overly granular and difficult to apply to an 'as-built' contractor's system[, contains m]any baseline controls [that are] unnecessary . . . [contains m]any controls/elements [that] should not apply outside the US Government (Federal-centric).") | | |
| 5 | **Contractors and contracting officers were confused by the requirements of the DFARS Clause and the NIST standards, leading the Government to clarify requirements in later versions of the DFARS Clause and NIST revisions.**<br><br>• Ex. 7 (Markus Dep.) at 163:16-164:4 ("[I]n areas where a control or something was intended . . . [the Government] intended one thing, and [contractors] implemented it a different way, and so [the Government] wanted to clarify, and they did end up clarifying that quite a bit or clarifying quite a few [requirements].")<br><br>• Ex. 9 (Guissanie Dep.) at 45:8-20 ("There were less questions from contractors about 171 than we had with [800-]53 because . . . the language is much plainer and . . . it was a holistic document, it packaged everything up | Not Disputed | |

5

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | and explained everything it was much easier for most contractors to understand then the table of selected 800-53 controls in a DFARS clause.")<br><br>• Ex. 10 (Thomas Dep.) at 117:23-118:2 ("I am aware that many questions came in to the DoD CIO with regards to the NIST standards and requirements[.]")<br><br>• Ex. 206 at AFDODCIO000215 & AFDODCIO000224 (12/15/2015 contractor disclosure reflecting disagreement between contractor and Air Force regarding NIST control requirements and wish to "remove some of the ambiguity" of the requirements)<br><br>• Ex. 35 at ii (2019 Inspector General Report: "DoD Component contracting offices and requiring activities did not always know which contracts required contractors to maintain CUI" and "DoD does not know the amount of DoD information managed by contractors and cannot determine whether contractors are protecting unclassified DoD information from unauthorized disclosure") | | |
| 6 | **On August 26, 2015, a new version of the DFARS Clause was published (the "August 2015 DFARS Clause") that adopted the security requirements set forth in NIST** | Contractors were not permitted to implement "alternative but equally security measures" in lieu of implementing the | Relator's response admits that contractors were permitted to implement alternative but equally effective security measures and adds the additional fact that the August 2015 |

6

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | Special Publication 800-171 ("NIST SP 800-171"). The August 2015 Clause permitted a contractor to implement "alternative but equally effective security measures" in lieu of implementing the technical requirements in NIST 800-171.<br><br>• 48 C.F.R. § 252.204-7012 (Aug. 26, 2015) | technical requirements in NIST 800-171. The August 26, 2015 clause provided that "alternative but equally security measures" had to be approved in writing by an authorized representative of the DOD CIO prior to contract award.<br>48 C.F.R. § 252.204-7012 (Aug. 26, 2015) | DFARS Clause included a new requirement to obtain approval from the DoD for such alternative security measures. Aerojet does not dispute Relator's addition, but it does not create a genuine dispute of material fact. |
| 7 | NIST SP 800-171 required contractors to comply with 109 cybersecurity controls, which built upon the table of controls set forth in NIST 800-53 and expanded them, adding additional requirements.<br><br>• Ex. 14 (NIST 800-171)<br><br>• Ex. 17 at 15 (reflecting defense industry group understanding that under NIST 800-171, even if a contractor was fully compliant with 800-53 they would have 70 "new" or "partially new" requirements) | Not Disputed | |
| 8 | NIST SP 800-171 expected contractors to have "plans of action designed to correct deficiencies and reduce or eliminate vulnerabilities."<br><br>• Ex. 14 (NIST SP 800-171) at Control 3.12.2 | Not Disputed | |
| 9 | Under the August 2015 DFARS Clause, contractors were expected to have | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | **implemented the NIST 800-171 controls immediately upon receiving covered information.**<br><br>• 48 C.F.R. § 252.204-7012 (Aug. 26, 2015) | | |
| 10 | **On October 8, 2015, the DoD issued a classwide deviation allowing contractors additional time to implement multifactor authentication.**<br><br>• Ex. 16 | Not Disputed | |
| 11 | **On December 30, 2015, the DFARS Clause was amended to give contractors until December 31, 2017 to comply with NIST SP 800-171 (the "December 2015 DFARS Clause").**<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 30, 2015)<br><br>• Ex. 21 at 9:20-25 (4/6/2017 DoD SBTW Presentation: "Other changes that we made as we moved forward with the rule, we gave them extra time to implement the standards. So right now industry has until December 31, 2017, to get these requirements in place on their information systems."); *see also* Ex. 20 (video recording of same)<br><br>• Ex. 10 (Thomas Dep.) at 102:10-15 (testifying the December 2015 DFARS Clause "gave contractors until December | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | 2017 to implement the 171 requirements"), 107:14-17 (same) |  |  |
| 12 | **Under the December 2015 DFARS Clause, contractors were compliant with the DFARS Clause even if they had implemented no controls until December 31, 2017.**<br><br>• Ex. 9 (Guissanie Dep.) at 46:24-47:1, 108:2-18 (testifying "the December 2015 interim rule basically said you had up to two years to implement the requirements of 800-171 . . . for that period, technically one didn't have to meet any requirement")<br><br>• SBTW17 Tr. at 21:7-12 ("Because as a department we basically had about a two year period from 2015 when we put out the interim rule until it was final, and then having extended the requirements to be compliant until December of 2017, you had almost two years for industry to work on it.") | Disputed. Although contractors were given until December 31, 2017 to comply with the NIST 800-171 technical controls, but compliance the DFARS Clause required more than compliance with the NIST 800-171 controls. If a contractor did not comply with a NIST 800-171 requirement that were required to submit to the contracting office for consideration of the DOD Chief Information Officer (CIO) a written explanation as to why a particular requirement was not applicable or how an alternative but equally effective, security measure is used to compensate for the inability to satisfy the particular requirement and achieve equivalent protection. The authorized DoD CIO representative was required to adjudicate the offerors request to vary form NIST SP 800-171 and respond in writing prior to the contract award with accepted variance being incorporated in the resulting contract. Apart from the | Relator's response does not create a genuine dispute of material fact. The response does not address the stated fact's contention that, before December 31, 2017, a contractor did not need to implement the controls of NIST 800-171 to be in compliance with the December 2015 DFARS Clause.<br><br>Further, the response misstates the requirements under the December 2015 DFARS Clause. Relator claims that, under the December 2015 DFARS Clause, an "authorized DoD CIO representative was required to adjudicate the offerors request to vary form [*sic*] NIST SP 800-171 and respond in writing prior to the contract award with accepted variance being incorporated in the resulting contract." However, the December 2015 DFARS Clause only requires DoD approval if a contractor wished to use an "alternative but equally effective security measure[]." For controls not implemented, the contractor only needed to "notify the DoD CIO" via e-mail within 30 days of contract award of the NIST 800-171 controls "not implemented at the time of contract award." As plainly signified by the |

9

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | required technical controls and equally effective alternative measures the contractors are always required to provide "adequate security" which means "protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information." DFARS Clause 252.204-7012 (December 2015 version) | "or" in section (ii) of the December 2015 DFARS Clause, the contractor could choose how to comply with the clause: notification of unimplemented controls or approval of alternative measures. Neither route required "incorporat[ion] in the resulting contract, and indeed, the notification option expressly contemplated that it would occur *after* contract award. 48 C.F.R. § 252.204-7012(b)(1)(ii)(A) (Dec. 30, 2015) ("The Contractor shall notify the DoD CIO, via email at osd.dibcsia@mail.mil, within 30 days of contract award, of any security requirements specified by NIST SP 800–171 not implemented at the time of contract award"). <br><br> Relator also overlooks that the December 2015 DFARS Clause set compliance with the NIST requirements by December 31, 2017 or approved alternative controls as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Dec. 30, 2015). Thus, if a contractor did not comply with (ii)(A) or (ii)(B), under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional |

10

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | steps to secure their information systems. |
| 13 | **The deadline for compliance with NIST 800-171 was extended because the DoD understood that immediate implementation of NIST 800-171 was not feasible for government contractors.**<br><br>• Ex. 19 at 2 (letter from industry group stating that industry and the DoD reached a "consensus" regarding the December 31, 2017 implementation deadline)<br><br>• Ex. 17 at 2 (industry group letter discussing "inability of industry to comply with at least one of the requirements" of the August 2015 DFARS Clause and explaining that contractors needed "time to implement the requirements of the [NIST 800-171]")<br><br>• Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics reflecting that | Disputed. Defense Undersecretary Ellen Lord's testimony, in defendants' Ex. 32, referred only to the difficulties small defense contractors were having in complying. Ex's 17, and 19 cited by defendants are hearsay documents published by industry groups lobbying the government and should be disregarded. | Relator's response does not create a genuine dispute of material fact. Instead, the response confirms that Defense Undersecretary Ellen Lord testified about non-compliance and needing to extend the deadline but mischaracterizes the context of the testimony. Undersecretary Lord, though asked about the challenges faced by small businesses, stated that the DoD "heard back over a year ago that there was great concern about the difficulty of implementing these requirements, so we went and modified them." Ex. 32 at 42:12-43:25.[2]<br><br>The statement is non-hearsay as it is a statement by a party opponent. *U.S. ex rel. Guadalupe v. Goodyear Tire & Rubber Co.*, 2005 WL 1324977, at *12 (N.D. Ohio June 3, 2005) (finding report commissioned by the government a party admission when government declined intervention in |

---

[2] Unless otherwise stated, references to Exhibits A–Q refer to the exhibits to the Declaration of Gregory Thyberg (ECF No. 125), references to Exhibits 1 through 213 refer to exhibits to the Declaration of Tammy Tsoumas submitted in support of Aerojet's Motion for Summary Judgment (ECF No. 117), references to Exhibits 214 through 260 refer to exhibits to the Second Declaration of Tammy Tsoumas submitted in support of Aerojet's Opposition to Relator's Motion for Summary Judgment (ECF No. 130-1), and references to Exhibits 261 through 263 refer to exhibits to the Third Declaration of Tammy Tsoumas submitted in connection with this reply.

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | December 31, 2017 deadline was adopted because of concern about compliance) |  | FCA case given "that Relator is suing on behalf of the United States"); *U.S. ex rel. Milam v. Regents of Univ. of Calif.*, 912 F.Supp. 868, 880 (D. Md. 1995) (holding that a statement by a government agency constitutes a statement of a party opponent in a non-intervened FCA case for purposes of Fed. R. Evid. 801(d)(2) because the government is the real party in interest).<br><br>Further, Undersecretary Lord testified that she met with industry associations to understand the industry's compliance status and concerns. |
| 14 | On October 21, 2016, the DFARS Clause was amended again (the "2016 DFARS Clause"). The amendment reiterated that compliance with NIST SP 800-171 was not required until December 31, 2017 and provided instructions to contractors on how to request variances from NIST SP 800-171's controls.<br><br>• 48 C.F.R. § 252.204-7012 (Oct. 21, 2016)<br><br>• 81 FR 72986 at 72990 (The phrase "as soon as practical" is added to encourage contractors to begin implementing the security requirements in NIST SP 800-171 prior to the December 31, 2017, deadline, but allows contractors to exercise their own | Not Disputed |  |

12

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | judgement when planning an optimal implementation strategy.) | | |
| 15 | **In December 2016, NIST published SP 800-171, Revision 1. Under the Revision, contractors could show compliance through adoption of a system security plan ("SSP") and implementation of plans of action and milestones ("POAMs") when they had not yet implemented a given control.**<br><br>• Ex. 15 (NIST 800-171 Revision 1) at Ch. 3 ("Nonfederal organizations should describe in a system security plan, how the specified security requirements are met or how organizations plan to meet the requirements.")<br><br>• Ex. 29 at 4:20-5:70 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered | Not Disputed | |

13

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."); *see also* Ex. 28 (video recording of same)<br><br>• Ex. 29 at 15:13-21 (6/23/2017 DoD Industry Day Presentation: "[Y]our SSP and any associated POAMs document your implementation of [NIST 800-]171. So there could be a case where the requiring activity does not even ask for it. And if not, by signing the contract, you have something that documents how you're implementing [NIST 800-]171, so you're in compliance with that requirement of the clause."); *see also* Ex. 28 (video recording of same) |  |  |
| 16 | **SSPs set forth how an organization's cybersecurity requirements are currently met or how the organization plans to meet those requirements. POAMs are specific to any unimplemented security controls, and describe how the organization plans to address them and how the planned mitigation will be implemented.**<br><br>• Ex. 15 (NIST 800-171 Revision 1) at Ch. 3 ("Nonfederal organizations should describe in a system security plan, how the specified security requirements are met or how organizations plan to meet the requirements.") | Not Disputed |  |

14

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 29 at 4:20-5:70 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation."); *see also* Ex. 28 (video recording of same) | | |
| 17 | **As of December 2016, a contractor would be considered to have implemented NIST 800-171 if they had an SSP reflecting POAMs in place.**<br><br>• Ex. 15 (NIST 800-171 Revision 1) at Ch. 3<br><br>• Ex. 29 at 4:20-5:7 (6/23/2017 DoD Industry Day Presentation: "So, again, [NIST 800-]171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."); *see also* Ex. 28 (video recording of same) | Disputed. Defendants' Undisputed Fact No. 17 is an inaccurate paraphrase of the exhibits defendants rely on. For example, Ex. 29 states: "… a POAM may be linked with the system security plan to even show planned implementation" of a NIST 800-171. Ex. 29 does not state that simply because you have a POAM you are considered to be implementing a NIST 800-171. To the contrary, Ex. 29 indicates that government has to indicate they are willing to accept the risk of your POAM before you are considered implementing 171. | Relator's response does not create a genuine dispute of material fact. The response fails to identify any inaccurate paraphrasing and mischaracterizes the stated fact. Aerojet stated that a contractor would be considered to have implemented NIST 800-171 if they had an SSP reflecting POAMs in place, not that simply having a POAM constituted compliance. Additionally, NIST 800-171 Revision 1 states that "Organizations can document the system security plan and plan of action as separate or combined documents and in any chosen format." Ex. 15 at Ch. 3, p. 9.<br><br>Relator also mischaracterizes the DoD's statements, as the DoD did not indicate that the government had to indicate that it was willing to accept the risk of a contractor's POAM before considering the contractor compliant with NIST 800-171. |

15

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • 48 C.F.R. § 252.204-7012 (Oct. 21, 2016)<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 30, 2015)<br><br>• Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics: "the only requirement for [2017] is to lay out what your plan [for compliance with NIST 800-171] is" and that it can "be a very simple plan")<br><br>• Ex. 34 at 53:7-11 (4/26/2018 DoD SBTW Presentation: "Compliance means again not having every single security requirement implemented but having a System Security Plan in place."); *see also* Ex. 33 (video recording of same)<br><br>• Ex. 34 at 19:24-20:24 (4/26/2018 DoD SBTW Presentation: "The NIST 800-171 is structured such that a contractor can demonstrate that he's implementing the 110 requirements in that pub[lication] by documenting what he's doing in a System Security Plan . . . in that he describes his information system and he also would describe how he is implementing the security requirements that he's implementing, and he would indicate which security requirements | | To the contrary, the DoD stated that when a contractor has a document SSP that reflects POAMs in place, it is in compliance with NIST 800-171 even if the government never reviewed such a plan. *See, e.g.*, Ex. 29 at 15:13-21 (6/23/2017 DoD Industry Day Presentation: "[Y]our SSP and any associated POAMs document your implementation of [NIST 800-]171. So there could be a case where the requiring activity does not even ask for it. And if not, by signing the contract, you have something that documents how you're implementing [NIST 800-]171 so you're in compliance with that requirement of the clause."); *see also* Ex. 28 (video recording of same). Relator's reference to Exhibit 29 ignores that the statement was made in the context of a situation where the government requiring activity proactively requests to see the contractor's SSP, which the government stated is not required. Ex. 29 at 4:20-5:14. Exhibit 29 reads: "So *if* a requiring activity **requested** for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the 171 and you are in compliance with the DFARS rule. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | he has not yet implemented"); *see also* Ex. 33 (video recording of same)<br><br>• Ex. 34 at 21:14-23 (4/26/2018 DoD SBTW Presentation: "But now because they can document in the System Security Plan how they plan to implement, they now can confidently sign the contract knowing that they are implementing NIST 800-]171 in the way that it says you need to implement it."); *see also* Ex. 33 (video recording of same)<br><br>• Ex. 29 at 15:13-21 (6/23/2017 DoD Industry Day Presentation: "[Y]our SSP and any associated POAMs document your implementation of [NIST 800-]171. So there could be a case where the requiring activity does not even ask for it. And if not, by signing the contract, you have something that documents how you're implementing [NIST 800-]171, so you're in compliance with that requirement of the clause."); *see also* Ex. 28 (video recording of same)<br><br>• Ex. 29 at 22:22-23:4 (6/23/2017 DoD Industry Day Presentation: "if you look at the language in the clause, it says shall implement as a minimum, 800-171. And if you look at revision 1, [NIST] 800-171 says you can meet my requirements by doing a SSP and planned requirements with a plan of action. So it doesn't say implement the -- the clause doesn't say implement the requirements of 171. It says implement | | Should the required activity make that apart [*sic*] of their evaluation process and decide not to accept that risk, then they don't need to consider that as complying with what they intend the risk of the system to be. So I would say that it's based on the required activity that you're dealing with." *Id*. (emphasis added). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | 171."); *see also* Ex. 28 (video recording of same) | | |
| 18 | **The DoD recognized that contractors would remain non-compliant with the technical controls in NIST 800-171 even after the December 31, 2017 compliance deadline, yet remain compliant with the DFARS Clause.**<br>• Ex. 21 at 20:18-23 (4/6/2017 DoD Small Business Training Week ("SBTW") Presentation: "And it might take longer than 2017 to get [to full technical compliance]. They would document that in their System Security Plan. What's interesting about the System Security Plan is that the NIST 800-171 says that the System Security Plan documents how the contractor is implementing 171."); *see also* Ex. 20 (video recording of same) | Disputed. Defendants misquote their source. The DOD presentation stated it "**might**" take longer than 2017 to get full technical compliance. The statement further reiterated that the DFARS required that contractors must implement 171 although they recognized the rule does not say contractors have to be 100% compliant 100% of the time. The defendants undisputed fact does not define "non-complaint." There is no indication in the cited source that the DOD expected contractors to be less than 25% compliant as Aerojet was according to its Nasa Gap Analysis "NGA". | Relator's response does not create a genuine dispute of material fact. Aerojet does not dispute that the DoD stated in Exhibit 21 that "it might take longer than 2017" to get to full technical compliance, as made clear by its parenthetical to Exhibit 21 in Aerojet's SUF. The DoD went on to state that a contractor "*would* document that in their System Security Plan," suggesting that the DoD expected at least some contractors to do that, thus supporting Aerojet's stated fact. This fact is further evidenced by the DoD's expectation that it would be virtually impossible for contractors to be compliant with the NIST 800-171 controls 100% of the time. Ex. 21 at 19:15-17.<br><br>Relator's reference to the NASA Gap Analysis from 2015 has no relevance to Aerojet's stated fact. |
| 19 | **The DoD instructed contracting officers to modify existing contracts that incorporated the 2013 DFARS Clause or the initial version of NIST SP 800-171 in favor of NIST SP 800-171, Revision 1, which offered more flexibility to contractors.** | Not Disputed | |

18

—

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 30 at 3 (9/21/2017 Memorandum from Office of the Under Secretary of Defense directing "contracting officer[s] to modify the contract[s] to authorize the use of NIST SP 800-171, Revision 1, dated December 2016," if the contract included an earlier version of the NIST requirements) | | |
| | • Ex. 31 (12/12/2017 Memorandum from the Office of the Under Secretary of Defense "requesting contracting administration components to act on behalf of all affected components to issue mass modifications to bring DoD contracts in conformity with the latest version of NIST SP 800-171.") | | |
| 20 | **In 2020, the "NIST SP 800-171 DoD Assessment Methodology" and the "Cybersecurity Maturity Model Certification" took effect.**<br><br>• 85 FR 61505 (introducing assessment methodology)<br><br>• Ex. 21 at 16:22-17:11 (4/6/2017 DoD SBTW Presentation:  discussing in 2017 whether DoD would monitor contractors' system for implementation of NIST 800-171 and stating "that is not going to happen" and explaining DoD "publishing this DFARS rule, realized that there is no conceivable way for us to deal with the volume of contractors and subcontractors that we have to deal with to be | Not Disputed | |

19

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | able to go out and do a hands-on inspection of their systems. So that is not the intent."); *see also* Ex. 20 (video recording of same).<br><br>• Ex. 21 at 17:11-17:13 (stating in 2017 that "[t]he department's position is that they will not recognize third party assessor certifications"); *see also* Ex. 20 (video recording of same). | | |
| 21 | **The NIST SP 800-171 DoD Assessment Methodology was the first time the DoD required a compliance assessment with any NIST standards from contractors.**<br><br>• 85 FR 61505 (introducing assessment methodology)<br><br>• 48 C.F.R. § 252.204-7012 (Nov. 18, 2013)<br><br>• 48 C.F.R. § 252.204-7012 (Aug. 26, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Sept. 21, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 30, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Oct. 21, 2016)<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 31, 2019)<br><br>• Ex. 21 at 16:22-25 (4/6/2017 DoD SBTW Presentation: telling industry that it "is not going to happen" that someone would "come and monitor [industry] systems to see if we're actually implementing [NIST 800-]171") *see also* Ex. 20 (video recording of same) | Not Disputed | |

20

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 21 at 17:1-23:6 (4/6/2017 DoD SBTW Presentation: explaining that "when publishing this DFARS rule, [DoD] realized that there is no conceivable way for us to deal with the volume of contractors and subcontractors that we have to deal with to be able to go out and do a hands-on inspection of their systems. So that is not the intent" and it was the "department's position is that they will not recognize third party assessor certifications") <br><br> • Ex. 199 (reflecting that there is no accreditation of DFARS compliance and that contractors have "latitude" in complying with the DFARS Clause) <br><br> • Ex. 35 at 28 ("While DoD Component contracting offices oversee contractor performance, they expressed confusion on whether they could conduct oversight activities of contractor networks and systems specific to cybersecurity protections.") | | |
| 22 | **The NIST SP 800-171 DoD Assessment Methodology introduced, for the first time, a method to assess contractor implementation of NIST 800-171 controls required by the DFARS Clause. Specifically, the methodology scores contractors based on the "net effect of NIST SP 800-171 security requirements not yet implemented[.]"** | Not Disputed | |

21

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • 85 FR 61505 (introducing assessment methodology)<br><br>• Ex. 21 at 16:22-23:6 (4/6/2017 DoD SBTW Presentation: stating in 2017 that "[t]he department's position is that they will not recognize third party assessor certifications"); *see also* Ex. 20 (video recording of same)<br><br>• Ex. 199 (reflecting that there is no accreditation of DFARS compliance)<br><br>• Ex. 92 (OCIO recognizing that in 2015, the DFARS Clause did not have enforcement mechanism) | | |
| 23 | **No version of the DFARS Clause after November 2013 required contractors to comply with controls from NIST 800-53.**<br><br>• 48 C.F.R. § 252.204-7012 (Aug. 26, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Sept. 21, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 30, 2015)<br><br>• 48 C.F.R. § 252.204-7012 (Oct. 21, 2016)<br><br>• 48 C.F.R. § 252.204-7012 (Dec. 31, 2019) | It is not disputed that versions of the DFARS Clause after November 2013 referred to NIST 800-171 rather than NIST 800-53. | Relator's response does not purport to dispute Aerojet's fact, and thus it is not disputed. *See Buren v. Waddle*, 2017 WL 272198, at *2 (E.D. Cal. Jan. 19, 2017) (treating responses to statements of undisputed facts as undisputed where the opposition fails to "cite to or explain the evidentiary or factual basis for his denial or offer an alternative version of the disputed facts."). |
| 24 | **The government expected that contractor systems, even if fully compliant with NIST 800-53 or NIST 800-171 could be breached and information could be exfiltrated.** | Disputed. The quoted presentation makes no mention of exfiltrated information. The full context of the quotation indicates the purpose of the DFARS compliance is not that it | Relator's response does not create a genuine dispute of material fact. Relator does not dispute Aerojet's cited evidence showing that the government understood that a contractor compliant with the NIST controls could "still |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 34 at 45:15-17 (4/26/2018 DoD SBTW Presentation: "And they could implement everything about the clause perfectly and still have a cyber incident."); *see also* Ex. 33 (video recording of same) | prevents a breach but when a breach occurs the contractor knows it is happening so that can take action to mitigate the loss of data and report to the DOD. | have a cyber incident." Relator provides no evidence to contest that a "cyber incident" refers to a breach and/or loss of data. |

## II.    THE NFS CLAUSE AT ISSUE

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 25 | **On January 24, 2011, Section 1852.204-76 was published in Title 48 of the Code of Federal Regulations (the "NFS Clause").**<br><br>• 48 C.F.R. 1852.204-76 (Jan. 24, 2011) | Not Disputed | |
| 26 | **The NFS Clause requires contractors to "protect the confidentiality, integrity, and availability of NASA Electronic Information and IT resources and protect NASA Electronic Information from unauthorized disclosure."**<br><br>• 48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (a) | Not Disputed | |
| 27 | **By its terms, the NFS Clause is only "applicable to [] NASA contractors . . . that process, manage, access, or store unclassified electronic information, to include Sensitive But Unclassified (SBU) information."**<br><br>• 48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (b) | Not Disputed | |

23

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 28 | **The NFS Clause does not require the contractor's information technology system to meet any specific security standard on its face, and allows "Parts of the clause and referenced ADL may be waived by the contracting officer."**<br><br>• 48 C.F.R. 1852.204-76 (Jan. 24, 2011) | Disputed. Defendants have quoted 48 C.F.R 1852.204-76 out of context. "Parts of the clause and ADL may be waived by the contracting officer "if the contractor's ongoing IT security program meets or exceeds the requirements of NASA Procedural Requirements (NPR) 2810.1 in effect at the time of the award." | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that the NFS Clause does not require the contractor's information technology system to meet any specific security standard on its face, and as Relator agrees that "Parts of the clause and referenced ADL may be waived by the contracting officer." |
| 29 | **The NFS Clause instructs NASA contracting officers to outline the requisite cybersecurity standards in an "Applicable Documents List (ADL) provided as an attachment to the contract."**<br><br>• 48 C.F.R. 1852.204-76 (Jan. 24, 2011) at (b) | Disputed. The clause does not instruct the contracting officer to "outline" anything. The clause states: Applicable requirements, regulations, policies, and guidelines are identified in the Applicable Documents List (ADL) provided as an attachment to the contract. The documents listed in the ADL can be found at: ***http://www.nasa.gov/offi ces/ocio/itsecurity/index.ht ml.*** For policy information considered sensitive, the documents will be identified as such in the ADL and made available through the Contracting Officer. | Relator's response does not create a genuine dispute of material fact. Relator admits, and Aerojet agrees, that the NFS Clause requires the contract to include "as an attachment to the contract" any "[a]pplicable requirements, regulations, policies, and guidelines." |
| 30 | **One document that is optional for NASA contracting officers to include in a contract's ADL is NASA Procedural Requirement ("NPR") 2810.1, which sets forth NASA** | Disputed. NPR 2810.1 is not an optional applicable document. Ex. 212 referenced by defendants indicates that NPR | Relator's response does not create a genuine dispute of material fact. Relator cites no evidence for his contention that any documents |

24

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | **cybersecurity policies which contemplate a system compliant with NIST 800-53.**<br><br>• Ex. 36 (NPR 2810.1A)<br><br>• Ex. 212 (NASA webpage reflecting cybersecurity policies)<br><br>• RJN Fact No. 21 | 2810.1 is a document on the list of documents contractors interested in doing business with NASA should refer to for information security requirements. | referenced on NASA's website are "required" when the NFS Clause specifically states that any "requirements" will be referenced in an attachment to each contract, not on NASA's website. *See* 48 C.F.R. 1852.204-76(b) (Jan. 24, 2011). |

III.   **LESS THAN HALF OF THE CONTRACTS IN RELATOR'S COMPLAINT INCLUDE THE DFARS OR NFS CLAUSES.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 31 | **Relator alleges that Aerojet defrauded the government in connection with eighteen contracts enumerated in his Second Amended Complaint.**<br><br>• Ex. 7 (Markus Dep.) at 295:3–8.<br><br>• SAC ¶¶ 67-68, 84-119<br><br>• RJN Fact No. 71 | Disputed. Relator's Second Amended Compliant ("SAC") is not limited to eighteen contracts but alleges defendants engaged in a fraudulent course of conduct to obtain multiple contracts. SAC ¶ 29. The SAC alleges that defendants signed **at least** six DOD contracts. (Emphasis added) SAC ¶ 84. The SAC alleged two contracts where Aerojet was required to comply with the interim August 2015 DFARS Clause. SAC ¶ 91 The SAC alleges that defendants signed **at least** nine NASA contracts. (Emphasis added) | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that only eighteen contracts are identified in the SAC. Relator's response confirms that only nine NASA contracts and only six DOD contracts are enumerated in the SAC. Relator does not point to any other allegations in his complaint where he enumerated any other contract or subcontract number. With regards to the GBSD program, Relator neither provided a contract number for the GBSD program nor does Relator include any reference to the GBSD program in the section of his complaint that addresses DoD Contract. SAC ¶¶ |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | SAC ¶ 105 Count One of SAC refers to defendants engaging in a course of conduct where they entered multiple contracts. SAC ¶ 121. The SAC alleges that defendants violated the false claims act by entering subcontracts with prime contracts that were subject to the NASA FARS and DFARS clause including contracts with Boeing, Lockheed Martin and Raytheon. SAC ¶ 126 The SAC also refers to defendants violating the False Claims Act on the GBSD contract. SAC ¶ 76 The SAC refers to defendants violating the False Claims Act on Air Force contract FA8650-14-C-7424. | 76, 84–104. In any event, Aerojet notes that Aerojet implemented a compliance plan around June 26, 2015 for this specific GBSD program where it created an isolated network server. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10.<br><br>Aerojet also notes that despite Relator's argument to the contrary, its fact actually accounts for Air Force contract FA8650-14-C-7424 being enumerated in Relator's SAC. *See* SUF ¶ 37. |
| 32 | **On February 25, 2014, the Department of the Army (the "Army") awarded Aerojet contract # W31P4Q-14-C-0075, to manufacture HAWK rocket motors. The contract did not contain the DFARS Clause.**<br><br>• Ex. 71<br><br>• Ex. 37 at Row 2 | Disputed. The contract included a DD Form 254 which required that Aerojet comply with all laws and regulations governing access to "Unclassified Controlled Technical Information" which would include the DFARS Clause. The DD Form 254 stated: "The contractor is responsible for compliance with all applicable laws and regulations governing | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that Contract No. W31P4Q-14-C-0075 did not contain the DFARS Clause.<br><br>Instead, Relator claims that an attachment to the contract on DoD DD Form 254 required Aerojet to comply with the DFARS Clause by referring to "all laws and regulations governing access to 'Classified or Controlled |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | access to Classified or Controlled Unclassified Information. Ex. 71 to Defendant's motion. The contract actually required Aerojet to comply with more stringent requirements including ITAR, the NISPOM and DOD 5220.22 because it required that Aerojet handle classified information. Id. The SAC referred that not only violated the DFARS Clause but earlier contracts that did not have the DFARS Clause but had cybersecurity requirements in a DD- 254. SAC ¶ 12 | Unclassified Information.'" Relator misquotes the evidence, which states that Aerojet is "responsible for compliance with all ***applicable*** laws and regulations governing access to Classified Information or Controlled Unclassified Information." Ex. 71 at AR00227614 (emphasis added). Relator cites no support for his contention that a clause not contained in the contract is "applicable." |
| 33 | On March 11, 2014, the National Aeronautics and Space Administration ("NASA") awarded Aerojet Award ID # NNC13TA66T under parent contract # NNC10BA13B, to study the potential application of additive manufacturing for the RL10 rocket propulsion engine. The contract itself did not contain the NFS Clause but stated that "all of the applicable clauses under [the parent award] are still applicable" and referenced particular regulations "for their specific importance to this Task Order." The parent award included the NFS Clause. Ex. 122 | Not Disputed. | |

27

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 121 at row 10 | | |
| 34 | **On April 22, 2014, the Department of the Navy (the "Navy") awarded Aerojet contract # N00014-14-C-0035, to develop injector/manifold, and inlet designs for a continuous detonation engine. The contract contained the 2013 DFARS Clause.**<br><br>• Ex. 104<br><br>• Ex. 37 at Row 3 | Not Disputed | |
| 35 | **On September 29, 2014, the Department of the Air Force (the "Air Force") awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0002,[3] to fabricate powerhead hardware for a scramjet technology program. The contract did not contain the DFARS Clause.**<br><br>• Ex. 39<br><br>• Ex. 37 at Row 5 | Disputed. Defendants have only provided a task order not the complete contract. The document by it terms is does not list all clauses that apply to the contract. Section I of Ex 39 cited by defendants, states that the document is not to be construed as a complete listing of all of the contract clauses. | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that Contract # FA8650-13-D-2335, Award ID # 0002, does not contain the DFARS Clause. Further, Aerojet did "provide[] . . . the complete contract" as Relator alleged it in his SAC. SAC ¶ 87. Aerojet also provided the parent contract as Exhibit 38, reflecting that the DFARS Clause is not in it, either. Relator also misrepresents Section I of Exhibit 39, which states: "The following clauses *from the basic contract* are highlighted as applicable |

---

[3]   Aerojet was awarded parent contract FA8650-13-D-2335 on May 10, 2013, with subsequent awards #0002, 0003, and 0004, named in Relator's SAC. The original parent award did not contain the DFARS Clause. *See* Ex 38.

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | to this task order; however, this shall not be construed as a complete listing, but it serves to highlight those requirements that apply because task order performance involves Export Control related data, or item identification: DFARS. 252.204-7008 . . . DFARS 252.211-7003 . . . DFARS 252.204-700." (emphasis added). Thus, Section I only highlights those clauses from the parent contract that are applicable to the task order, and given the DFARS Clause is not in the parent contract or Section I of the task order, it is inapplicable to both. |
| 36 | On September 30, 2014, the Navy awarded Aerojet contract # N68936-14-C-0035, to perform system optimization studies for defense weapons systems. The contract contained the 2013 DFARS Clause.<br><br>• Ex. 105<br><br>• Ex. 37 at Row 8 | Not Disputed | |
| 37 | On September 30, 2014, the Air Force awarded Aerojet contract # FA8650-14-C-7424, to design the thrust chamber assembly for a bantam rocket engine. The contract was funded by the Defense Advanced Research | Not Disputed | |

29

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     | Projects Agency ("DARPA"). The contract contained the 2013 DFARS Clause.<br><br>• Ex. 42<br><br>• Ex. 37 at Row 7 | | |
| 38  | **On December 11, 2014, NASA awarded Aerojet contract # NNC10BA02B, Award ID # NNC15TA07T, to conduct testing to advance key enabling technology for hypersonic propulsion systems. The award did not contain the NFS Clause.**<br><br>• Ex. 124<br><br>• Ex. 121 at Row 14 | Disputed.<br><br>The only evidence offered by defendants is the task order, not the parent contract. | Relator's response does not create a genuine dispute of material fact. Aerojet's fact states that "the award" did not contain the NFS Clause. Relator has presented no conflicting evidence. Nor has he presented any evidence that the parent contract included the NFS Clause, which is his burden.<br><br>Further, the task order does not contain any language incorporating the provisions of the parent contract. Moreover, the NFS Clause on which Relator bases his claims promulgated in January 2011. *See* SUF ¶ 25 (Relator not disputing that "[o]n January 24, 2011, Section 1852.204-76 was published in Title 48 of the Code of Federal Regulations (the 'NFS Clause')); *see also* Ex. 261 (Halterman Dep.) at 20:8-11 (Relator's Counsel: "Q. And are you aware that, in 2011, there were some NASA FARS cybersecurity regulations that came into effect that Aerojet was supposed |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | to be complying with?"). Parent contract # NNC10BA02B was awarded in 2010. Thus, it could not contain the 2011 NFS Clause. |
| 39 | **On March 31, 2015, NASA awarded Aerojet contract # NNC15CA07C, to produce the NASA ion propulsion system for future space exploration and commercial use. The contract contained the NFS Clause.**<br><br>• Ex. 125 | Not Disputed | |
| 40 | **Prior to contracting with Aerojet, NASA determined that Contract No. NNC15CA07C would not require access to or storage of NASA Electronic Information or Information Technology ("IT") resources, meaning that Aerojet did not have access to information requiring protection under the NFS Clause.**<br><br>• Ex. 123 at NASA_TOUHY00001128 (6/23/14 NASA form indicating that contract would not require selected contractor to have access to NASA's systems or generate data with NASA or on behalf of NASA)<br><br>• Ex. 166 (interpreting Ex. 123 to mean that NFS Clause was not applicable) | Disputed. Defendants' Ex. 123 is a requisition request and makes no reference to contract NNC15CA07C. Defendants admit in Undisputed Fact No. 39 this contract contained the NFS Clause. Ex. 166 contains conflicting information about whether the NFS Clause applies and at best is a contracting officer's interpretation of the contract. A contracting officer does not have authority to change a mandatory contract term or by bind the government by interpreting that a term in the contract did not apply. | Relator's response does not create a genuine dispute of material fact. Exhibit 125 submitted with Aerojet's motion shows that Contract # NNC15CA07C is linked to requisition request reflected in Exhibit 123. Additionally, the requisition number on Exhibit 123 is the same requisition number as Exhibit 125. Relator presents no contrary evidence.<br><br>Relator's misinterpretation of Ex. 166 does not dispute Aerojet's fact that "***prior to contracting with Aerojet***" NASA determined that this contract would not require access to or storage of NASA Electronic Information or Information Technology ("IT") |

31

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | resources, rendering the NFS Clause inapplicable, as stated in Exhibit 166.<br><br>Relator does not cite any evidence in support of his perplexing argument that a "contracting officer does not have authority to change a mandatory contract term or by [*sic*] bind the government by interpreting that a term in the contract did not apply" when a contracting officer is the person who binds the government to a contract in the first place. *See* Ex. 125 (reflecting signature of contracting officer on contract). |
| 41 | **Contract # NNC15CA07C does not reference any applicable documents related to, or that contain cybersecurity standards, such as NPR 2810.1, which outlines certain NIST 800-53 compliant technical requirements.**<br><br>• Ex. 125<br><br>• Ex. 36 (NPR 2810.1A)<br><br>• Ex. 212 (NASA webpage reflecting cybersecurity policies)<br><br>• RJN Fact No. 21 | Disputed. Defendants admit in their Undisputed Fact No. 39 that NNC15CA07C included the NFS Clause which references NIST 800-53. | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that Contract # NNC15CA07C does not contain an attachment referencing any applicable documents related to cybersecurity as contemplated by the NFS Clause.<br><br>Further, 48 C.F.R. 1852.204-76 (Jan. 24, 2011) does not reference NIST 800-53 as Relator claims. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 42 | **The NFS Clause was not applicable to Contract No. NNC15CA07C and Aerojet was not required to implement a NIST 800-53 compliant system for that contract.**<br><br>• Ex. 123 at NASA_TOUHY00001128<br><br>• Ex. 125 | Disputed. Defendants admit in their Undisputed Fact No. 39 that NNC15CA07C included the NFS Clause which references NIST 800-53. | Relator's response does not create a genuine dispute of material fact. Relator does not point to any part of Exhibits 125 that required Aerojet to implement a NIST 800-53 compliant system. The NFS Clause does not reference NIST 800-53 as Relator claims. 48 C.F.R. 1852.204-76 (Jan. 24, 2011).<br><br>Further, Relator has not created a genuine dispute of the fact that prior to contract award, NASA determined that the NFS Clause did not apply to Contract # NNC15CA07C. *See* SUF ¶ 40. |
| 43 | **On April 8, 2015, the Air Force awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0003, to test engine operability and performance for scramjet technology. The contract did not contain the DFARS Clause.**<br><br>• Ex. 40<br><br>• Ex. 37 at Row 9 | Disputed. Defendants have provided no evidence as to the contract terms of the parent award. Defendant have provided a copy of an order for supplies not the contract itself. | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that Contract # FA8650-13-D-2335, Award ID # 0003, does not contain the DFARS Clause. Further, Aerojet did "provide[] []evidence as to the contract terms of the parent award," even though Relator only alleged fraud in connection with the sub-awards for Contract # FA8650-13-D-2335 in his SAC. SAC ¶ 87. Exhibit 38 reflects that the DFARS Clause is not in the parent award and Relator does not dispute that fact. *See* SUF ¶ 35 n. 2. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 44 | On July 27, 2015, NASA awarded Aerojet contract # NNC15VD08P, to perform an industry hypersonic propulsion capability assessment. The contract did not contain the NFS Clause.<br><br>• Ex. 126<br><br>• Ex. 121 at Row 17 | Not Disputed | |
| 45 | On September 15, 2015, the Defense Advanced Research Projects Agency ("DARPA") awarded Aerojet contract # HR001115C0132, to perform research and development for the High Altitude Velocity (HAVOC) program for the Air Force. The contract incorporated by reference the 2013 DFARS Clause.<br><br>• Ex. 41<br><br>• Ex. 37 at Row 15 | Not Disputed | |
| 46 | On October 8, 2015, the Air Force awarded Aerojet contract # FA8650-13-D-2335, Award ID # 0004, to conduct a performance analysis of flight four of X-51A. The contract did not contain DFARS Clause 252.204-7012.<br><br>• Ex.43 | Disputed. Defendants have provided no evidence as to the contract terms of the parent award. Defendant have provided a copy of an order for supplies not the contract itself. | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that Contract # FA8650-13-D-2335, Award ID # 0004, does not contain the DFARS Clause. Further, Aerojet did "provide[] []evidence as to the contract terms of the parent award," even though Relator only alleged fraud in connection with |

34

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 37 at Row 17 | | the sub-awards for Contract # FA8650-13-D-2335 in his SAC. SAC ¶ 87. Exhibit 38 reflects that the DFARS Clause is not in the parent award and Relator does not dispute that fact. *See* SUF ¶ 35 n. 2. |
| 47 | **On November 17, 2015, NASA issued Award No. NNM16AB22P to accommodate final payment to Aerojet on contract # NAS8-36801, though there is no writted record for this award. The government's records reflect that the contract was completed on July 11, 2017.**<br><br>• Ex. 121 at Row 20<br><br>• RJN Fact No. 60 | Not Disputed | |
| 48 | **On November 19, 2015, NASA awarded Aerojet contract # NNM16AA02C, to provide RS-25 rocket engines for the Space Launch System. The contract incorporated the NFS Clause by reference.**<br><br>• Ex. 127<br><br>• Ex. 128<br><br>• Ex. 121 at Row 21 | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 49 | On December 14, 2015, NASA awarded Aerojet contract # NNM16AB21P, to test a research engine for the purpose of demonstrating a RAMS injector. The contract did not contain the NFS Clause.<br><br>• Ex. 129<br><br>• Ex. 121 at Row 22 | Disputed. The contract did not include the NFS Clause but included NASA FARS Clause 1852.237-73 which required Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure. | Relator's response does not create a genuine dispute of material fact. Relator admits that Contract # NNM16AB21P did not contain the NFS Clause.<br><br>Further, NASA FARS Clause 1852.237-73 did not "require[] Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure" as Relator claims. A plain read of the cited regulation reflects that it was intended to protect *Aerojet's* sensitive company information from disclosure by *NASA* "service providers" and imposed no requirements whatsoever on Aerojet. *See* 48 C.F.R. § 1852.237-73. |
| 50 | On December 23, 2015, the Army awarded Aerojet undefinitized contract # W31P4Q-16-C-0026,[4] to manufacture Igniter rocket motors. The contract incorporated by reference the 2013 DFARS Clause. The definitized contract was signed on October 31, 2016. | Not Disputed | |

---

[4] Contract # W31P4Q-16-C-0026 is the correct, as-awarded contract number for contract W31P4Q-15-C-0016, which was named in Relator's complaint. SAC ¶¶ 66-68; *see also infra* Fact No. 58.

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 72 at AR00234332, AR00234336. <br><br> • Ex. 73 <br><br> • Ex. 37 at Row 19 | | |
| 51 | **On January 15, 2016, NASA awarded Aerojet contract # NNH16CP17C, to participate in the NEXTSTEP program to develop capabilities and technologies for advanced propulsion systems, with commercial applications. The contract did not contain the NFS Clause.** <br><br> • Ex. 130 <br><br> • Ex. 121 at Row 23 | Disputed. The contract did not include the NFS Clause but included NASA FARS Clause 1852.237-73 which required Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure. | Relator's response does not create a genuine dispute of material fact. Relator admits that Contract # NNH16CP17C did not contain the NFS Clause. <br><br> Further, NASA FARS Clause 1852.237-73 did not "require[] Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure" as Relator claims. A plain read of the cited regulation reflects that it was intended to protect ***Aerojet's*** sensitive company information from disclosure by ***NASA*** "service providers" and imposed no requirements whatsoever on Aerojet. *See* 48 C.F.R. § 1852.237-73. |
| 52 | **On April 1, 2016, NASA awarded Aerojet contract # NNM16AA12C, to manufacture RL10 rocket flight engines for SLS missions. The contract incorporated the NFS Clause by reference.** | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 131<br><br>• Ex. 121 at Row 25 | | |
| 53 | **Of the contracts identified in Relator's SAC, there are five DoD contracts that contain the DFARS Clause**<br><br>• SAC ¶¶ 67-69; 85-114<br><br>• Ex. 71 (Contract No. W31P4Q-14-C-0075 without the DFARS Clause)<br><br>• Ex. 104 (Contract No. N00014-14-C-0035 with 2013 DFARS Clause)<br><br>• Exs. 72 & 73 (Contract No. W31P4Q-16-C-0026 with 2013 and 2016 DFARS Clauses)<br><br>• Ex. 105 (Contract # N68936-14-C-0035 with 2013 DFARS Clause)<br><br>• Ex. 42 (Contract No. FA8650-14-C-7424 with 2013 DFARS Clause)<br><br>• Ex. 39 (Contract No. FA8650-13-D-2335, Award ID # 0002 without DFARS Clause) | Disputed. Relator's SAC compliant identified more than the contracts listed. The SAC alleges that defendants violated the false claims act by entering subcontracts with prime contracts that were subject to the NASA FARS and DFARS clause including contracts with Boeing, Lockheed Martin and Raytheon. SAC ¶ 126 The SAC also refers to defendants violating the False Claims Act on the GBSD contract. SAC ¶ 76 The SAC refers to defendants violating the False Claims Act on Air Force contract FA8650-14-C-7424. | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that the contracts identified in SUF ¶ 53 do not contain the DFARS Clause. Relator's argument concerning unspecified and vaguely referenced subcontracts does not dispute that only five contracts actually identified in the SAC contain the DFARS Clause. Relator does not point to any allegations in his complaint where he enumerated any other contract or subcontract number.<br><br>With regard to the GBSD program, Relator neither provided a contract number for the GBSD program nor does Relator include any reference to the GBSD program in the section of his complaint that addresses DoD Contract. SAC ¶¶ 76, 84–104. In any event, Aerojet notes that Aerojet implemented a compliance plan around June 26, 2015 for this specific GBSD program where it created an isolated network server. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan (Ex. A at 184), and awarded Aerojet |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 40 (Contract No. FA8650-13-D-2335, Award ID # 0003 without DFARS Clause)<br><br>• Ex. 43 (Contract No. FA8650-13-D-2335, Award ID # 0004 without DFARS Clause)<br><br>• Ex. 41 (Contract No. HR001115C0132 with the 2013 DFARS Clause) | | the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10.<br><br>Aerojet also notes that its fact accounts for Air Force contract FA8650-14-C-7424 being enumerated in Relator's SAC. *See* Ex. 42. |
| 54 | **Of the contracts identified in Relator's SAC, there are 4 NASA contracts that contain the NFS Clause.**<br><br>• Ex. 122 (Contract No. NNC10BA13B, Award ID # NNC13TA66T incorporating the NFS Clause)<br><br>• Ex. 130 (Contract No. NNH16CP17C without NFS Clause)<br><br>• Ex. 131 (Contract No. NNM16AA12C with NFS Clause)<br><br>• Ex. 129 (Contract No. NNM16AB21P without NFS Clause) | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 127 (Contract No. NNM16AA02C with NFS Clause)<br><br>• Ex. 125 (Contract No. NNC15CA07C with the NFS Clause)<br><br>• Ex. 124 (Contract No. NNC10BA02B, Award ID # NNC15TA07T without the NFS Clause)<br><br>• Ex. 126 (Contract No. NNC15VD08P without the NFS Clause) | | |
| 55 | **As of 2017, only approximately 80% of contracts included the DFARS Clause as a contract term.**<br><br>• Ex. 21 at 33:3-11 (4/6/2017 DoD SBTW Presentation: "We're up to I think like, 80 percent of the time [the DFARS Clause] gets in [contracts], but not always."); *see also* Ex. 20 (video recording of same) | Disputed. This undisputed fact is not supported by the quoted statement. The statement itself is hearsay and there is a lack of foundation for the statement. | Relator's response does not create a genuine dispute of material fact. Relator's response does not dispute that, as of 2017, only approximately 80% of contracts included the DFARS Clause as a contract term.<br><br>Ms. Mary Thomas was authorized by the DOD to make the statement quoted in Exhibit 21. *See* Ex. 10 (Thomas Dep. Tr.) at 21:12-23 ("[A]s a program analyst for DPAP, were -- did you have responsibility for certain public-facing presentations regarding the DFARS clause? A. Yes, I did. Q. Did you also have responsibility of giving guidance to contractors about how to implement the DFARS clause? A. I had responsibility to present briefings that |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  |  |  | were developed by a team of folks and that spoke to many stakeholders to include this industry."). Statements from the government are admissions of a party opponent, and thus not hearsay. *U.S. ex rel. Guadalupe v. Goodyear Tire & Rubber Co.*, 2005 WL 1324977, at *12 (N.D. Ohio June 3, 2005) (finding report commissioned by the government a party admission when government declined intervention in FCA case given "that Relator is suing on behalf of the United States"); *U.S. ex rel. Milam v. Regents of Univ. of Calif.*, 912 F.Supp. 868, 880 (D. Md. 1995) (holding that a statement by a government agency constitutes a statement of a party opponent in a non-intervened FCA case for purposes of Fed.R.Evid. 801(d)(2) because the government is the real party in interest). |

## IV.   AEROJET DELIVERED THE GOODS AND SERVICES IT CONTRACTED TO PROVIDE THE GOVERNMENT.

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 56 | Aerojet delivered the goods and services for which the government agencies paid on Contract Nos. W31P4Q-14-C-0075; N00014-14-C-0035; FA8650-13-D-2335, Award ID # 0002; N68936-14-C-0035; FA8650-14-C-7424; | Disputed. The good and services the government is paying for when a contractor is hired to produce a product related to advanced military or space technology is not simply the | Relator's response does not create a genuine dispute of material fact. Relator cites no evidence to demonstrate whether the government would have paid less for a product created in a not fully compliant |

41

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | **FA8650-13-D-2335, Award ID # 0003; NNM16AB22P; HR001115C0132; FA8650-13-D-2335, Award ID # 0004; W31P4Q-16-C-0026; NNC10BA13B, Award ID # NNC13TA66T; NNC10BA02B, Award ID # NNC15TA07T; NNC15CA07C; NNC15VD08P; NNM16AA02C; NNM16AB21P; NNH16CP17C; and NNM16AA12C.**<br>• Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data)<br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data) | product produced but the value of the technology and intellectual property invested in creating that physical product. The government has stated that when its advanced technology is stolen in a cyber incident the finished product is less valuable to the government as the DOD stated: "The adversary is looking to steal information in order to counter, kill or clone our capabilities and when information is compromised in the development of a program, then the program is less valuable to the DOD and the money invested is less valuable. (Thyberg Dec. Opp. Ex. 2,4:22-5:7, AR00233090) Part of services Aerojet was required to perform in connection with these contracts was to provide "adequate security" to protect the government's unclassified controlled technical information and sensitive but unclassified information which Aerojet did not do. NASA wanted to understand how AR would be working with their SBU information prior to awarding contracts. (Thyberg declaration in support of relator's MSJ | environment. Nor does he provide evidence to support his contention that "*when* . . . advance technology is stolen in a cyber incident, the finished product is less valuable to the government." Nor does he offer *any* evidence that even suggests that any of the technology associated with the contracts identified in this stated fact were stolen or compromised.<br><br>Relator also provides no evidence to show that the government did not receive all of the rocket and missile technology it contracted for. Further, the evidence cited in Relator's response fails to support the contention that providing cybersecurity countermeasures was the contracted-for goods and services for the contracts identified in this stated fact. This is especially lacking support when certain contracts listed in this fact did not even contain the DFARS or NFS Clauses. *See* SUF ¶¶ 53, 54. |

42

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | motion "Thyberg Dec. , Ex A 173-177, 290-291, Thyberg Dec. Ex. K Ruiz Dep. 99:17-101:13.) NASA contract statement of works orders included cybersecurity as AR NASA contract NNM06AB13C "Space Launch System Rocket Engine Development Project Statement of Work (SOW)" (Thyberg Dec. Ex. A, 416-495) which stated that :"The contractor shall provide support for the following NASA Technology Protection Program Processes (TPP) processes, Critical Program Information(CPI) identification, Threat & Vulnerability Analysis, Selection and implementation of security countermeasures. ( Thyberg Dec. Ex. A 421) The SOW stated AR: " … shall ensure that NASA'S Sensitive But Unclassified (SBU) information,… is encrypted in storage and transmission." (Thyberg Dec. Ex. A, 421-22) The DOD also advised AR part of the services performing a DoD contract that included the DFARS clause was providing cybersecurity indicated that when a contractor signs a | |

43

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | contract with the DFARS Clause they certifying are compliant with the clause. (Thyberg Dec. Ex A 212.) The MDA demanded that defense contractors adhere to the DFARS Clause requirement to safeguard covered defense information on DOD contracts and cybersecurity reporting will apply to all DOD contracts. (Thyberg Dec., Ex. A 310). The documents cited do not indicate what the good and services in were itemized in these contracts. | |

**V.    AEROJET DISCLOSED ITS NONCOMPLIANCE WITH THE CYBERSECURITY CLAUSES TO THE GOVERNMENT AND THE GOVERNMENT UNDERSTOOD THAT AEROJET WAS NOT COMPLIANT.**

   **A.    Aerojet disclosed to the DoD that it was not compliant with the DFARS Clause or NIST 800-53 and the DoD Understood that Aerojet Was Not Compliant.**

      **1.    Aerojet's Contracts with the Army**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Army and the Army understood that Aerojet was not compliant.

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 57 | Aerojet disclosed that it was not compliant with the DFARS Clause to the Army. | Disputed. Aerojet claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. Aerojet has presented no evidence it ever disclosed to the | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet told the Army it was not compliant with the DFARS Clause. Additionally, the response confirms that Aerojet made |

44

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 76 (8/28/14 e-mail and attached letter taking exception to the DFARS Clause in Igniter contract) <br><br> • Ex. 77 (9/10/2014 e-mail from B. Joe to J. Nabity, noting AR "cannot confirm that we are compliant with this clause at this time.") <br><br> • Ex. 78 (9/29/2014 email noting 9/22/14 telecom and attached disclosure statement from B. Joe to J. Nabity) <br><br> • Ex. 79 (9/30/2014 email reflecting Army's understanding that Aerojet was "not compliant" with the DFARS Clause) <br><br> • Ex. 80 (10/2/2014 e-mail invite for teleconference to discuss AR position on DFARS) <br><br> • Ex. 82 (10/2/2014 Hewitt internal memo detailing teleconference discussion where AR disclosed non-compliance with DFARS) <br><br> • Ex. 83 at AR00035399-5405 (10/27/14 email and attached disclosure letter to Army providing compliance update) <br><br> • Ex. 84 (10/27/14 disclosure letter to Army providing compliance update) <br><br> • Ex. 85 (2/10/2015 email noting that "Aerojet provided a process to | government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statements accompanied Aerojet's disclosures that it was not technically compliant with the DFAR controls. In a letter to the ARMY in September 2014, Aerojet disclosed its compliance status with controls but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Thyberg Dec. Ex. A, 103) This letter advised Aerojet was compliant with the "majority" of the requirements when the NGA concluded Aerojet was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that Aerojet was making every effort to prevent a data breach when Aerojet knew if was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58- | "disclosures that it was not technically compliant with the DFAR controls." Further, Relator does not dispute SUF ¶¶ 59, 64, 65, 67–72, 74–75, 77, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the Army. <br><br> Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed the Army on numerous occasions that it was ***not complying*** with the DFARS Clause. *See, e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS). <br><br> Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was |

45

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | become compliant," and that "Contract Specialist is currently working … [to] obtain a waiver for the DFARS Clause.")<br><br>• Ex. 91 (4/16/2015 e-mail from B. Joe to C. McElyea responding that AR does "not have an ECD [estimated completion date] at this time[,]" for when it will be fully compliant with DFARS.)<br><br>• Ex. 93 (6/15/2015 e-mail to M. Teasley providing additional information for "areas in which AR is not completely compliant[.]")<br><br>• Ex. 95 (6/30/2015 e-mail from B. Joe to M. Teasley, L. Hewitt, and V. Michetti, attaching list of 7 items "in which AR says we are not compliant.")<br><br>• Ex. 96 (6/30/2015 e-mail telecom invite to discuss DFARS with OSD and Army)<br><br>• Ex. 98 (7/31/2015 e-mail with telecom invite to discuss DFAR compliance)<br><br>• Ex. 101 (12/23/15 e-mail from J. Greene to M. Teasley updating Army that AR was still not compliant with NIST 800-171 or NIST 800-53 controls but would | 59, 61, 68- 83 , Thyberg Dec. Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) Aerojet advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were leaking data and EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's representations to the government that they had "alternate controls" this was code for "alternate controls and no controls." (Thyberg Dec. Ex. A 213-217, 220-276, 302) | making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89.<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that "Aerojet knew if [*sic*] was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | address "[i]dentified gaps in compliance" with POAMS)<br><br>• Ex. 8 (Hewitt Dep.) at 25:14-26:4 (discussing a September 29, 2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause")<br><br>• Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's noncompliance")<br><br>• Ex. 8 (Hewitt Dep.) at 71:24-72:4 ("[i]t is my understanding that [Aerojet] [was] still not in compliance, based on the information attached to this e-mail") | | 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place.") |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 58 | **On August 28, 2014, Aerojet sent the Army a letter stating that it took exception to the DFARS Clause in connection with Contract No. W31P4Q-14-C-0157, which was eventually awarded to Aerojet as Contract No. W31P4Q-16-C-0026.**[5]<br><br>• Ex. 76 (Aerojet's conditional acceptance taking exception to the DFARS Clause)<br><br>• Ex. 8 (Hewitt Dep.) at 54:11-13 (testifying Aerojet never accepted W31P4Q-14-C-0157)<br><br>• Ex. 82 (noting the change from W31P4Q-14-C-0157 to W31P4Q-15-C-0016)<br><br>• Ex. 8 (Hewitt Dep.) at 66:20–22 ("Aerojet did not sign . . . W31P4Q-15-C-0016 . . . .")<br><br>• Ex. 8 (Hewitt Dep.) at 73:10-19 (testifying that the solicitation was reissued as W31P4Q-14-R-0109, Amendment 2 on August 10, 2015) | Disputed. Ex. 73 is a definitized contract which means the parties never came to an agreement on the contract terms. | Relator's response does not create a genuine dispute of material fact. Relator does not contest that Aerojet informed the Army that it took exception with the inclusion of the DFARS Clause on August 28, 2014 nor does he contest that Contract No. W31P4Q-14-C-0157 was eventually awarded to Aerojet as Contract No. W31P4Q-16-C-0026. This contract was awarded after Relator filed his complaint, on December 23, 2015, and is not at issue in this case. SUF ¶ 50, ECF No. 57 at 11.<br><br>Moreover, Relator's irrelevant statement that a "definitized contract [] means the parties never came to an agreement on contract terms" is not true. An undefinitized contract is a "contract action for which the contract terms, specifications, or price are not agreed upon before performance is begun under the action." 48 C.F.R. § 217.7401. A definitized contract, on the other hand, is a contract where the parties have reached "agreement on, or determination of, contract terms, specifications, and price," thus "convert[ing] the undefinitized contract action to a definitive contract." *See id.*<br><br>As this fact reflects, on December 23, 2015 Aerojet and the Army entered into an **undefinitized** contract. Ex. 101. This |

---

[5]   For ease of reference, Aerojet hereinafter refers to this contract as the awarded contract number.

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 73 at AR00234357 (signed definitized Contract No. W31P4Q-16-C-0026)<br>• Ex. 37 at cells 19B & 19L (reflecting that contract W31P4Q-16-C-0026 resulted from solicitation W31P4Q-14-R-0109) | | contract was **definitized** on October 31, 2016. Ex. 73 at AR00234356 ("Letter Contract W31P4Q-16-C-0026 is definitized as a Firm Fixed Price (FFP) Contract"). This contract was awarded after Relator filed his complaint, on December 23, 2015, and is not at issue in this case. SUF ¶ 50, ECF No. 57 at 11. |
| 59 | On September 10, 2014, in connection with Contract No. W31P4Q-16-C-0026, Aerojet indicated that it could "not confirm that [Aerojet] [is] compliant with [the DFARS] clause at this time."<br>• Ex. 77 | Not Disputed | |
| 60 | On September 22, 2014, Aerojet disclosed its non-compliance with the DFARS Clause to the Army during a teleconference in connection with Contract No. W31P4Q-16-C-0026.<br>• Ex. 78 | Disputed. There not indication in defendants' Ex. 78 as to what was said in the teleconference. Attached as part of Ex.78 is a September 29, 2014 letter. The letter does not disclose that Aerojet's system cannot detect of stop cyber intrusions, prevent the exfiltration of data and is leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13). This letter advised that Aerojet was compliant with the "majority" of the requirements when the NGA concluded Aerojet was only compliant with 27.5% of | Relator's non-responsive narrative response does not create a genuine dispute of material fact.<br><br>Exhibit 78 attaches data "per the telecom between [Aerojet] and the Army personnel on 22 September 2014." The attached data reflects that Aerojet was not compliant with the DFARS Clause as of that date. Thus, Exhibit 78 supports that Aerojet disclosed its non-compliance on the teleconference discussing the data.<br><br>Further, though not in response to Aerojet's stated fact. Relator does not dispute that Aerojet's September 29, 2014 letter |

49

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A) 292 The letter claimed that Aerojet was making every effort to prevent a data breach when Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68- 83, Thyberg Dec. Ex. C ¶¶ 7-13.) Aerojet claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) | disclosed Aerojet's non-compliance. In fact, the contracting officer who received it understood it to mean that Aerojet was non-compliant with the DFARS Clause. Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("With this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance").<br><br>The non-responsive narrative neither contests nor presents any evidence to contradict that Aerojet told the Army it was not compliant with the DFARS Clause. Additionally, the response confirms that Aerojet made "disclosures that it was not technically compliant with the DFAR controls." Further, Relator does not dispute facts 59, 64, 65, 67–72, 74–75, 77, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the Army.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's |

50

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See, e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS). Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89.<br><br>The "facts" that Relator claims Aerojet did not disclose to the government are not |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | supported by the evidence he cites. Relator cites no evidence to support his contention that "Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). <br><br> Finally, this contract was awarded after Relator filed his complaint, on December 23, 2015, and is not at issue in this case. SUF ¶ 50, ECF No. 57 at 11. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 61 | **On September 29, 2014, Aerojet sent the Army a letter in connection with Contract No. W31P4Q-16-C-0026 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."**<br><br>• Ex. 78<br><br>• Ex. 81<br><br>• Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("With this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's noncompliance]") | Disputed. The letter does not disclose that Aerojet's system cannot detect of stop cyber intrusions, prevent the exfiltration of data and is leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13). This letter advised that Aerojet was compliant with the "majority" of the requirements when the NGA concluded Aerojet was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that Aerojet was making every effort to prevent a data breach when Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58-59, 61, 68- 83, Thyberg Dec. Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet stated in its September 29, 2014 disclosure letter to the Army that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." Furthermore, Relator does not dispute facts 59, 64, 65, 67–72, 74–75, and 77, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the Army.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See, e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS). Relator's narrative is further belied by the evidence showing that the government itself |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89.<br><br>The "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that "Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). <br><br> Finally, this contract was awarded after Relator filed his complaint, on December 23, 2015, and is not at issue in this case. SUF ¶ 50, ECF No. 57 at 11. |
| 62 | The Army read Aerojet's September 29, 2014 letter and understood that it "documented their non-compliance with DFARS Clause 252.204-7012." <br><br> • Ex. 78 <br> • Ex. 81 <br> • Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in | Disputed. The documents indicate that the ARMY was aware that Aerojet was not fully compliant with the DFARS technical controls but there is no indication in these supporting exhibits that ARMY was made aware that Aerojet was not providing "Adequate Security" to protect the DOD's UCTI information, that Aerojet could not detect or stop cyber intrusions, prevent the exfiltration of data or that Aerojet was leaking sensitive data every day. | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the Army read Aerojet's September 29, 2014 letter and understood that it "documented their non-compliance with DFARS Clause 252.204-7012." Additionally, this response confirms that "the ARMY was aware that Aerojet was not fully compliant with the DFARS technical controls." <br><br> Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not |

55

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's noncompliance") | | comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the Army that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See*, *e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS). Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant |

56

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89.<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by evidence, as made clear by Aerojet's reply to SUF ¶ 61. |
| 63 | On September 29, 2014, Aerojet and the Army had a teleconference in which Aerojet disclosed that it was not compliant with the DFARS Clause.<br><br>• Ex. 81<br><br>• Ex. 8 (Hewitt Dep.) at 25:14-26:4 ("one of the topics concerned as to how much Aerojet did not comply with the DFARS clause") | Disputed. Although Aerojet had a teleconference to discuss its technical compliance with the DFARS controls these documents to do not indicate that Aerojet actually disclosed the extent of its non-compliance and that the government information on the Aerojet's system was not secure as Aerojet could not detect or stop cyber intrusions, prevent the exfiltration of data or that Aerojet was leaking sensitive data every day. | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet disclosed that it was not compliant with the DFARS Clause on the September 29, 2014 teleconference. This response confirms that "Aerojet had a teleconference to discuss its technical compliance with the DFARS controls."<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b).<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See*, *e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS). Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See*, *e.g.*, Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you |

58

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89. Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by evidence, as made clear by Aerojet's reply to SUF ¶ 61. |
| 64 | On September 29, 2014, Aerojet e-mailed Army contracting officers and explained that Aerojet "is working diligently in bringing all of our [NIST] controls to full compliance with the DFARS Clause."<br><br>• Ex. 79<br><br>• Ex. 81 | Not Disputed | |
| 65 | On September 30, 2014, a contracting officer for the Army recognized that Aerojet's communications reflected "the areas that Aerojet Rocketdyne are not compliant." | Not Disputed | |

59

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 79<br>• Ex. 81<br>• Ex. 82 | | |
| 66 | **On October 1, 2014, Aerojet requested a teleconference with the Army "to further discuss" the DFARS Clause, which was held on October 2, 2014. Relator, along with Aerojet's cybersecurity experts, participated in the teleconference. The Army summarized the call as Aerojet "mainly re-stat[ing] Aerojet's non-compliance issues with [the DFARS Clause] and how they worked it out with the Air Force and Navy."**<br>• Ex. 82<br>• Ex. 80 | Disputed. Although Aerojet had a teleconference to discuss its technical compliance with the DFARS controls these documents to do not indicate that Aerojet actually disclosed the extent of its non-compliance and that the government information on the Aerojet's system was not secure as Aerojet could not detect or stop cyber intrusions, prevent the exfiltration of data or that Aerojet was leaking sensitive data every day. | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict this stated fact. This response also confirms that "Aerojet had a teleconference to discuss its technical compliance with the DFARS controls."<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See, e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS). Relator's narrative is further belied by the evidence showing that the government itself |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89. Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by evidence, as made clear by Aerojet's reply to SUF ¶ 61. |
| 67 | On October 27, 2014, Aerojet sent a letter to the Army stating that the attachment which described Aerojet's status with respect to NIST 800-53 control implementation showed "the specific 7 areas in which [Aerojet] is in substantial compliance to the requirements of [the DFARS Clause]." <br><br>• Ex. 83 at AR00035400. | Not Disputed | |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 68 | On February 10, 2015, a contracting officer from the Army indicated that she understood that "Aerojet provided a process to become compliant" with the DFARS Clause and that the Army wanted to obtain a waiver.<br><br>• Ex. 85 | Not Disputed | |
| 69 | In March 2015, the Army sent Aerojet's October 27, 2014 letter to the DoD Office of the Chief Information Officer (the "DoD OCIO") along with a memorandum stating that the Army concluded that Aerojet's letter stated "compliance issues they may have with the requirements [in the DFARS Clause]."<br><br>• Ex. 86 | Not Disputed | |
| 70 | On April 2, 2015, the DoD OCIO sent a memorandum to the Army concluding that Aerojet was "not in compliance with the requirements of the subject DFARS Clause."<br><br>• Ex. 89 | Not Disputed | |
| 71 | On April 14, 2015, the Army requested an estimate date that | Not Disputed | |

62

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | Aerojet would be compliant with the DFARS Clause. Aerojet stated that it did not currently have an estimated completion date for compliance.<br><br>• Ex. 91 | | |
| 72 | On May 14, 2015, the Army requested a waiver of the DFARS Clause from the DoD OCIO for Contract No. W31P4Q-16-C-0026.<br><br>• Ex. 92 | Not Disputed | |
| 73 | On May 21, 2015, the DoD OCIO informed the Army that it concluded that Aerojet was "not compliant with the DFARS Clause" but that there was "nothing to preclude [the Army] from awarding the contract" to Aerojet.<br><br>• Ex. 94 at AR00218330. | Disputed. This undisputed fact is misleading. The DOD CIO Stated: "In discussing this with OUSD (AT&L) they noted the DFAR does not require compliance with the controls prior to award-but the controls must be in place by the time the contractor has Controlled Technical Information (CTI) on his information system. Defendants' Ex. 94 Michetti from the DOD CIO office indicated that the DFARS Clause controls had to be in place before AR was awarded a contract and that was relayed to AR. (Thyberg Dec. Opp., Ex. 5, Hewitt Dep. 49:5-18) | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that "the DoD OCIO informed the Army that it concluded that Aerojet was not compliant with the DFARS Clause" as stated in this fact.<br><br>Aerojet does not dispute that in Exhibit 94, Vicki Michetti wrote that "In discussing this with OUSD (AT&L) they noted the DFAR does not require compliance with the controls prior to award-but the controls must be in place by the time the contractor has Controlled Technical Information (CTI) on his information system," while Laurie Hewitt testified that "Ms. Michetti reiterated that the controls had to be in place for contract award to Aerojet." Thyberg Decl. Opp., ECF No. |

63

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | 134, Ex. 5, Hewitt Dep. 49:5-18. The reference however is immaterial as Ms. Hewitt's testimony, approximately seven years later, does not undermine what the DoD OCIO wrote on May 21, 2015 before the contract was awarded. |
| 74 | On June 15, 2015 and June 30, 2015, Aerojet disclosed to the Army a "list of the 7 areas in which [Aerojet] is not completely compliant" with the DFARS Clause.<br><br>• Ex. 93<br><br>• Ex. 95 | Not Disputed | |
| 75 | Aerojet made its cybersecurity experts available to the Army on June 30, 2015, via teleconference, to discuss Aerojet's non-compliance with the DFARS Clause.<br><br>• Ex. 97<br><br>• Ex. 96 | Not Disputed | |
| 76 | Aerojet conducted another teleconference with the Army on August 3, 2015 in which Aerojet discussed its non-compliance with the DFARS Clause. | Disputed. The supporting document does not mention non-compliance nor does it prove the teleconference ever happened or provide information as to what was actually discussed. | Relator's response does not create a genuine dispute of material fact. This response does not contest or offer any evidence to contradict the stated fact. Exhibit 98 reflects that Aerojet held a teleconference with the Army in which Aerojet "provide[d] a status |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 98 | | of where [it] w[as] on this DFAR[S] requirement." |
| 77 | **On August 13, 2015, Aerojet sent the Army an updated matrix regarding its DFARS Clause compliance status.**<br><br>• Ex. 89 | Not Disputed | |
| 78 | **On December 23, 2015, Aerojet sent a signed version of undefinitized Contract No. W31P4Q-16-C-0026 with a cover e-mail disclosing that it was not compliant with the 2013 DFARS Clause as it was only "fully compliant in meeting 24 [of the 60] security controls and identified 36 alternative controls . . . ."**<br><br>• Ex. 101 | Disputed. The cover email indicated that it was complying with the DFARS by providing 36 alternate controls or protective measures to achieve equivalent protection. Defendant's Ex. 101 | Relator's response does not create a genuine dispute of material fact. Relator states in his Additional Fact 21 that the DFARS Clause did not apply to this contract. Regardless, Exhibit 101 reflects that Aerojet disclosed to the Army that it was not compliant with the DFARS Clause as Aerojet stated that it "prepared a strategy and plan to address the gaps going forward." Ex. 101. The e-mail goes on to state: "Identified gaps in compliance with the specific security controls levied under the clause via [NIST SP 800-171] . . . and defined in [NIST SP 800-53] . . . have been documented in Plans of Action and Milestones (POAMs) and closure will be addressed under detailed plans documented in each POAM. Compliance gaps driven by necessary updates to documentation will be closed in Q2 2016 while technical gaps will be addressed incrementally through 2017 as AR transitions to a managed services model for information technology applications' infrastructure and cyber security management." *Id*. Moreover, this contract |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | was awarded after Relator filed his complaint, on December 23, 2015, and is not at issue in this case. SUF ¶ 50, ECF No. 57 at 11. |
| 79 | On March 31, 2016, the project manager for Contract No. W31P4Q-16-C-0026 concluded that the DFARS Clause was not applicable to the contract because the contract did not involve UCTI.<br><br>• Ex. 102 | Not Disputed | |
| 80 | The Army understood that Aerojet was not compliant with the 2013 DFARS Clause.<br><br>• Ex. 86 at AFDODCIO000109.<br>• Ex. 91<br>• Ex. 94 (5/27/2015 e-mail from M. Teasley to B. Joe relaying OSD interpretation of compliance)<br>• Ex. 79<br>• Ex. 81 (10/1/2014 timeline re Igniters contract)<br>• Ex. 82 (10/2/2014 Hewitt internal memo detailing teleconference | Disputed. AR has presented no evidence that the ARMY was ever given the complete story about its DFARS Clause compliance status. Although the ARMY knew AR was not compliant with the technical controls required by the DFARS clause, AR communicated to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's Undisputed Material Fact ("UMF") in support of relator's motion for MSJ No. 166) There is no evidence that the AR ever disclosed or the ARMY understood that AR was not compliant with the DFARS requirement that AR provide | Relator's non-responsive narrative does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the "Army understood that Aerojet was not compliant with the 2013 DFARS Clause." In fact, this response confirms that "the ARMY knew AR was not compliant with the technical controls required by the DFARS clause."<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, the evidence relator cites to fails to support Relator's contention that Aerojet claimed "it was complying with the [DFARS] Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed the Army on numerous occasions that it was **not** |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | discussion where AR disclosed non-compliance with DFARS)<br><br>• Ex. 85 (2/10/2015 email noting that "Aerojet provided a process to become compliant," and "Contract Specialist is currently working … [to] obtain a waiver for the DFARS Clause.")<br><br>• Ex. 8 (Hewitt Dep.) at 25:14-26:4 (discussing a 9/29/2014 teleconference between the Army and Aerojet and testifying "one of the topics concerned as to how much Aerojet did not comply with the DFARS clause")<br><br>• Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [] letter that Aerojet had provided the [A]rmy to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that | "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the ARMY that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in support of Relator's MSJ) AR's disclosures of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 2014 letter to the ARMY, AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF 1, 151 in Support of Relator's MSJ). The September 2014 letter stated AR was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF 54, 151 in Support of | *complying* with the DFARS Clause. *See*, *e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS).<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the Army that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was |

67

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | September 29 letter "identified [Aerojet's noncompliance") <br><br> • Ex. 8 (Hewitt Dep.) at 67:21-23 ("It was my understanding that on February 10, 2015, Aerojet was still not in compliance with the DFARS Clause.") <br><br> • Ex. 8 (Hewitt Dep.) at 71:24-72:4 ("[i]t is my understanding that [Aerojet] are still not in compliance, based on the information attached to this e-mail") | Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective measures, AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) | sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See, e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this time" for when it will be fully compliant with DFARS). Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.*, Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89. <br><br> Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | Relator cites no evidence to support his contention that Aerojet had been advised "it was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). Finally, Relator's cited evidence and purported facts do not support his contention that EY gained access to "rocket designs," that Aerojet was "leaking data every day," or that "AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget." |

69

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

   2.   **Aerojet's Contracts with the Navy**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Navy and the Navy understood that Aerojet was not compliant.

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 81 | **Aerojet disclosed that it was not compliant with the DFARS Clause to the Navy.**<br><br>• Ex. 110<br><br>• Ex. 111<br><br>• Ex. 112, ¶ 3 | Disputed. AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statement accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the NAVY dated September 30, 2014, AR disclosed its compliance status with controls but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet disclosed to the Navy that it was not compliant with the DFARS Clause. Additionally, the response confirms that Aerojet made "disclosures that it was not technically compliant with the DFAR controls." Furthermore, Relator does not dispute SUF ¶ 83, which reflects a disclosure of Aerojet's non-compliance with the DFARS Clause to the Navy.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed the Navy it was *not complying* with the DFARS Clause. *See*, *e.g.*, Ex. 110 (identifying |

70

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | (Relator's UMF Nos. 151,153 in Support of Relator's MSJ) This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58- 59, 61, 68-83, Thyberg Dec. Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25- 79:17) AR advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were leaking data and EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's representations to the government that they had "alternate controls" this was code | 10 "Controls in Place and Compliant").<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b).<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative |

71

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     |                                                   | for "alternate controls and no controls." (Thyberg Dec. Ex. A 213-217, 220-276, 302) | is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 111; Ex. 112 ¶ 3 & Ex. 1 (reflecting acceptance of Aerojet's disclosure statement).

Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that "Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place.") |
| 82 | Aerojet sent the Navy a letter in connection with N68936-14-C-0035 on September 30, 2014 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." <br><br> • Ex. 110 <br><br> • Ex. 111 | Disputed. In defendants' Exs. 110 and 111 AR claimed it was compliant with the majority of the DFARS Clause requirements. | Relator's non-responsive narrative response does not create a genuine dispute of material fact. Relator does not dispute that on September 30, 2014 Aerojet disclosed to the Navy that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." |
| 83 | On September 30, 2014, the contracting officer for Contract No. N68936-14-C-0035 acknowledged receipt of Aerojet's September 30, 2014 letter and "accepted" Aerojet's conditional acceptance of the contract. <br><br> • Ex. 111 <br><br> • Ex. 112, ¶ 3 | Not Disputed | |
| 84 | The contracting officer for Contract No. N00014-14-C-0035 found no documents related to the DFARS Clause in a search of his files. | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 113, ¶ 5 | | |
| 85 | **The Navy understood that Aerojet was not compliant with the 2013 DFARS Clause.**<br><br>• Ex. 111<br><br>• Ex. 112, ¶ 3, Ex. 1 (reflecting acceptance of Aerojet's disclosure statement). | Disputed. Defendants supporting exhibits indicated that the NAVY understood that AR was not fully compliant with the technical controls required by the DFARS Clause. There is no indication in these documents that the NAVY understood the extent of AR's non-compliance and that AR was operating a computer network that could be penetrated in a few hours undetected allowing full administrator access, that AR's system was leaking sensitive data every day, could not detect or stop cyber intrusions or prevent the exfiltration of sensitive data. Moreover, AR while telling the NAVY it was non-compliant was claimed to have alternate controls to achiev equivalent protection when that was code for "alternate controls and no controls." (Thyberg Dec. Ex. A 213-217, 220-276, 302) There is no indication the NAVY understood that AR was not providing "adequate security" to protect is information such that AR's VP and CIO Jose Ruiz did not feel comfortable having his personal information on AR's | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the Navy understood that Aerojet was not compliant with the 2013 DFARS Clause. This response confirms that "the NAVY understood that AR was not fully compliant with the technical controls required by the DFARS Clause."<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed the Navy it was ***not complying*** with the DFARS Clause. *See, e.g.*, Ex. 110 (identifying 10 "Controls in Place and Compliant").<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a |

74

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
| | | computer network or believe the government would be comfortable. (Thyberg Dec. Ex. K Ruiz Dep. 37:21-38:10) | "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the Navy that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative |

75

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     |                                                   |                                            | is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 111, Ex. 112 ¶ 3 & Ex. 1 (reflecting acceptance of Aerojet's disclosure statement).<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government either lack any evidentiary citation or are not supported by the evidence he cites. For example, Relator does not support his contention Ruiz believed the government would not be comfortable having its information on Aerojet's computer network, and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 250 (Ruiz Dep. Tr.) at 37:21–38:10 ("Q BY MR. THYBERG: Do you think the United States government should feel comfortable having rocket designs and weapon system designs on Aerojet's system when they could be penetrated in four hours and go undetected? [ ] THE WITNESS: I'm sure that they don't feel as comfortable either. I'm not sure what the design documents were, so I can't say to what extent."). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

3.     **Aerojet's Contracts with the Air Force**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Air Force and the Air Force understood that Aerojet was not compliant.

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 86 | **Aerojet disclosed that it was not compliant with the DFARS Clause to the Air Force.**<br><br>• Ex. 56 (8/7/2014 internal AF e-mail summarizing telecom with AR, noting that Aerojet is "not fully compliant yet" with the DFARS Clause)<br><br>• Ex. 55 at AIRFORCE_TOUHY00000006-007 (9/6/14 - 9/8/14 e-mail chain between AR and the AF, discussing 9/8/14 telecom with DCMA ACO re DFARS non-compliance noting that "Aerojet discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance.")<br><br>• Exs. 59-61 (disclosure letter sent to Air Force and DARPA representatives)<br><br>• Ex. 61 at AIRFORCE_TOUHY00000002-03 (9/18/2014 email to Air Force and DARPA noting 9/16/2014 teleconference which discussed DFARS Clause, and attaching updated compliance matrix from version presented in meeting)<br><br>• Ex. 65 (6/17/2015 e-mail to Air Force, attaching compliance matrix noting that "AR | Disputed. AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statement accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the Air Force in September 18, 2014 AR disclosed its compliance status with controls, but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Defendants Ex 60,61.) This letter advised AR was compliant | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet told the Air Force it was not compliant with the DFARS Clause. Further, Relator does not dispute SUF ¶¶ 88, 92, 93, 98, and 99, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the Air Force.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed the Air Force on numerous occasions that it was not complying with the DFARS Clause. *See*, *e.g.*, Ex. 55 (e-mail where Aerojet "discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance"); Ex. 66 (noting that AR is "not fully compliant with |

77

---

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | is compliant with the majority of the clause's requirements.")<br><br>• Ex. 66 (6/17/2015 e-mail exchange between J. Nishikawa and Cpt. Shannon, noting that AR is "not fully compliant with the subject DFARS clause.")<br><br>• Ex. 67 (6/22/2015 e-mail invite to telecom with AF and DCMA to discuss AR compliance with DFARS)<br><br>• Ex. 68 (6/23/2015 e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark) | with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec. Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58- 59, 61, 68-83, (Thyberg Dec. Ex. C, Laundrup Dec. ¶¶ 7-13). On June 23, 2015, AR promised the Air Force they would be 100% DFARS compliant for the GBSD Study contract and that they were complying with the DFARS clause with a stand-alone computer network when they were not. (Thyberg Dec. Ex. A 197,301,498, Thyberg Dec. Ex. C Laundrup Dec. ¶¶ 32-34 | the subject DFARS clause."; Ex. 68 (e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark).<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b).<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed |

78

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See*, *e.g.*, Ex. 56 (8/7/2014 internal AF e-mail summarizing telecom with AR, noting that Aerojet is "not fully compliant yet" with the DFARS Clause).<br><br>The "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites, as made clear by Aerojet's reply to SUF ¶ 61. |
| 87 | After discussing the DFARS Clause with Aerojet, a representative from DARPA who was assisting with (and funding) the procurement, indicated that a contracting officer from the Air Force for Contract No. FA8650-14-C-7424 was "willing to work with [Aerojet] to find a way to move forward [with the contract] while making sure [Aerojet] makes good-faith progress toward compliance."<br><br>• Ex. 54 at AR00196693 | Disputed. The cited exhibits do not support defendants undisputed fact. The exhibits, which have been heavily redacted by AR, contain only selfserving hearsay statements from AR employees and no direct evidence of any statement from a government representative from DARPA. | Relator's response does not create a genuine dispute of material fact. Contrary to Relator's argument, Exhibit 54 contains an email from Vijay Ram, a Project Manager in DARPA's Tactical Technology Office. Mr. Ram, not AR employees, states that the Air Force contracting office is "willing to work with [Aerojet] to find a way to move forward [with the contract] while making sure [Aerojet] makes good-faith progress toward full compliance." This statement from the government is not hearsay. *U.S. ex rel. Guadalupe v. Goodyear Tire &* |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 37 at row 6 (reflecting that DARPA was the funding agency for the Air Force award) | | *Rubber Co.*, 2005 WL 1324977, at *12 (N.D. Ohio June 3, 2005) (finding report commissioned by the government a party admission when government declined intervention in FCA case given "that Relator is suing on behalf of the United States"); *U.S. ex rel. Milam v. Regents of Univ. of Calif.*, 912 F.Supp. 868, 880 (D. Md. 1995) (holding that a statement by a government agency constitutes a statement of a party opponent in a non-intervened FCA case for purposes of Fed.R.Evid. 801(d)(2) because the government is the real party in interest).<br><br>Moreover, Relator's response "is nothing more than 'mere allegations or denials' which are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was "nothing more than self-serving speculation that should be disregarded" was insufficient). |
| 88 | **On July 24, 2014, Aerojet disclosed that it was not compliant with the DFARS Clause to contracting officials from the Air Force on Contract No. FA8650-14-C-7424.** | Not Disputed | |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 56 | | |
| 89 | **Contracting officials from the Air Force on Contract No. FA8650-14-C-7427 understood from the teleconference with Aerojet on July 24, 2014 that Aerojet was not compliant with the DFARS Clause.**<br><br>• Ex. 56 | Disputed. There is no indication that the Air Force understood the extent of AR's non-compliance and that AR was failing to provide "adequate security" to protect DOD UCTI and that AR could not detect or stop cyber intrusions, could not prevent the exfiltration of data and knew it was leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68-83, Thybeg Dec. Ex. C, Laundrup Dec. ¶¶ 7-13). Defendants' Ex. 56 indicates that AR told the Air Force that AR was putting a "high" priority on becoming compliant with the DFARS Clause when AR had no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the Air Force understood Aerojet was not compliant with the DFARS Clause. Furthermore, Relator does not dispute SUF ¶¶ 88, 92, 93, 98, and 99, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the Air Force.<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the Air Force that Aerojet was not compliant with the NIST controls |

81

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See, e.g.*, Ex. 55 (e-mail where Aerojet "discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance"); Ex. 66 (noting that AR is "not fully compliant with the subject DFARS clause."; Ex. 68 (e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark). Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.*, Ex. 56 (8/7/2014 internal AF e-mail summarizing telecom with AR, noting that Aerojet is "not fully |

82

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | compliant yet" with the DFARS Clause).<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that "Aerojet knew it was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- |

83

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | that the plans were approved through - - and funded plans are in place."). |
| 90 | On August 7, 2014, Aerojet disclosed again that it was not compliant with the DFARS Clause to contracting officials from the Air Force on Contract No. FA8650-14-C-7424.<br><br>• Ex. 56 | Disputed. AR disclosed that they were not "fully" compliant yet and claimed that AR was putting a "high" priority on becoming compliant with the DFARS Clause. (Defendants' Ex. 56) | Relator's response does not create a genuine dispute of material fact. Relator admits that Aerojet disclosed it was not compliant with the DFARS clause. *See* Relator's Resp. to SUF ¶¶ 88, 92, 93, 98, and 99. That Aerojet also disclosed that DFARS compliance was a high priority is irrelevant to this fact but also demonstrates that Aerojet was taking the requirements seriously. |
| 91 | Contracting officials from the Air Force on Contract No. FA8650-14-C-7427 understood from the teleconference with Aerojet on August 7, 2014 that Aerojet was not compliant with the DFARS Clause.<br><br>• Ex. 56 | Disputed. AR disclosed that they were not "fully" compliant yet and claimed that AR was putting a "high" priority on becoming compliant with the DFARS Clause. (Defendants' Ex. 56) | Relator's response does not create a genuine dispute of material fact. Relator admits that Aerojet disclosed it was not compliant with the DFARS clause. *See* Relator's Resp. to SUF ¶¶ 88, 92, 93, 98, and 99. That Aerojet also disclosed that DFARS compliance was a high priority is irrelevant to this fact but also demonstrates that Aerojet was taking the requirements seriously. |
| 92 | On August 28, 2014, Aerojet told an Air Force representative in connection with Contract No. FA8650-14-C-7424 that it was "continu[ing] to work the issues / actions associated with [the DFARS Clause]." | Not Disputed | |

84

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 57 | | |
| 93 | **On September 8, 2014, Aerojet, including individuals from its IT department participated in a teleconference with DCMA, regarding Contract No. FA8650-14-C-7424, in which Aerojet disclosed that it had a "company plan to reach compliance" with the DFARS Clause.**<br><br>• Ex. 55 at AIRFORCE_TOUHY00000006-007 (9/6/14 - 9/8/14 e-mail chain between AR and the AF, discussing 9/8/14 telecom with DCMA ACO re DFARS non-compliance noting that "Aerojet discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance.") | Not Disputed | |
| 94 | **On September 18, 2014, Aerojet sent a disclosure letter to the Air Force in connection with Contract No. FA8650-14-C-7424 stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."**<br><br>• Exs. 59-61 | Disputed. The letter does not disclose that AR's system cannot detect or stop cyber intrusions, prevent the exfiltration of data and is leaking data every day. (Thyberg Dec. Ex. A 58-59, 61, 68- 83, Thyberg Dec. Ex. C Laundrup Dec. ¶¶ 7-13). This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet told the Air Force it was not compliant with the DFARS Clause. Furthermore, Relator does not dispute SUF ¶¶ 88, 92, 93, 98, and 99, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the Air Force. |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | controls. (Thyberg Dec. Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec. Ex. A 58- 59, 61, 68-83, Thyberg Dec. Ex. C, Laundrup Dec. ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec. Ex. H Van Kleeck Dep. 78:25-79:17) | Relator's non-responsive narrative is also unsupported by the evidence. The evidence shows that Aerojet informed the Air Force on numerous occasions that it was not complying with the DFARS Clause. *See*, *e.g.*, Ex. 55 (e-mail where Aerojet "discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance"); Ex. 66 (noting that AR is "not fully compliant with the subject DFARS clause."; Ex. 68 (e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark).<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See*, *e.g.*, Ex. 56 (8/7/2014 internal AF |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---|---|---|
| | | | e-mail summarizing telecom with AR, noting that Aerojet is "not fully compliant yet" with the DFARS Clause).<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that Aerojet "knew it was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that |

87

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | this statements that there were no -- that the plans were approved through -- and funded plans are in place."). |
| 95 | On September 19, 2014, an Air Force contracting officer for Contract No. FA8650-14-C-7424 concluded that Aerojet "submitted sufficient information required by the clause to determine that an 'alternative controls' is in place" and suggested sending a letter reflecting that conclusion.<br><br>• Ex. 63 | Not Disputed | |
| 96 | On September 26, 2014, the Air Force provided a letter to Aerojet regarding Contract No. FA8650-14-C-7424 stating that Aerojet had "provided a detailed analysis of its compliance status" for the applicable NIST 800-53 controls and that it understood that Aerojet "ha[d] developed a phased approach which will assist in efforts to become fully compliant [with the NIST 800-53] controls in the future."<br><br>• Ex. 64 | Disputed. Defendants have taken the statement in their Ex 64 out of context. The letter only references AR's phased approach to become fully compliant as an additional comment to the main point of the letter confirming that the Air Force has approved AR's alternate controls or protective measures that AR has represented to the government will achieve equivalent protection to the security controls in DFARS Clause 252.204-7012. Letter indicates AR has a phased strategy to become fully compliant when there was no approved or funded plan to drive DFARS Compliance. (Thyberg | Relator's response does not create a genuine dispute of material fact. Exhibit 64 reflects that the Air Force understood that "Aerojet ha[d] developed a phased approach . . . to become fully compliant [with the NIST 800-53] controls in the future." In connection with the same contract 6 days earlier, the government indicated that the DFARS Clause "was not well thought thru" and that "AR has a reasonable *plan to comply* [with the DFARS Clause]," indicating it knew that Aerojet was not compliant with the DFARS Clause. Ex. 62 (emphasis added). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | Dec., Ex. H Van Kleeck Dep. 78:25-79:17) | Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is in fact directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place.") |
| 97 | **On June 17, 2015, Aerojet sent a disclosure letter to the Air Force stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." The Air Force responded that its "only take away after reading it several time[s] was [Aerojet] is not compliant with [the DFARS Clause." Aerojet confirmed that it was "not fully compliant with the subject DFARS Clause[.]"**<br><br>• Ex. 65<br><br>• Ex. 66 | Disputed. Defendants misrepresent Exhibits 65 and 66. The Air Force's stated AR's letter was confusing. The Air Force concluded AR was not compliant with the DFARS Clause but was representing it was compliant with the majority of the requirements. | Relator's response does not create a genuine dispute of material fact. Relator admits the Air Force "concluded AR was not compliant with the DFARS Clause." |
| 98 | **On June 23, 2015, Aerojet discussed its compliance with the DFARS Clause during a teleconference with the Air Force.**<br><br>• Ex. 67 | Not Disputed | |

89

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 68 | | |
| 99 | **On June 23, 2015, Aerojet sent the Air Force a letter "providing an updated response that is specific to [its] commitment and compliance plan for the GBSD Trade Study A (Post Boost Propulsion program)" and indicating that Aerojet would put special controls in place for the GBSD program.**<br><br>• Ex. 68 | Not Disputed | |
| 100 | **The Air Force understood that Aerojet was not compliant with the 2013 DFARS Clause.**<br><br>• Ex. 64<br><br>• Ex. 62 (noting DARPA's acceptance of AR's "reasonable plan to comply")<br><br>• Ex. 54 at AR00196693 (7/21/2014 email from DARPA program manager, noting conversations with Air Force, indicating that they were willing to work with AR "to find a way to move forward while making sure AR makes good-faith progress toward full compliance.")<br><br>• Ex. 58 at AR00228740 (9/10/2014 email from DARPA program manager to AR, discussing efforts to come to resolution on DFAR-compliant contract, and noting AF openness to "solutions that do not require AR | Disputed. Defendants supporting exhibits indicate that the Air Force understood that AR was claiming to comply with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls which is an alternate way to comply with the DFARS Clause. The exhibits indicate the Air Force understood AR was not fully compliant with the technical controls required by the DFARS Clause but there is no indication in these documents that the Air Force understood the extent of AR's noncompliance and that AR was operating a computer network that could be penetrated in a few hours undetected allowing full | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the Air Force understood Aerojet was not compliant with the DFARS Clause. Furthermore, Relator does not dispute SUF ¶¶ 88, 92, 93, 98, and 99, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the Air Force.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." |

90

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | to sign a contract with which it cannot comply.")<br><br>• Ex.63 (9/19/2014 email and subsequent chain from Air Force to Aerojet, noting acceptance of alternate controls and proposed letter to this effect)<br><br>• Ex. 64 (Letter from M. Voiles (Air Force) to J. Capizzi (Aerojet Contracting) noting that the Air Force accepted AR's alternate control approach and understands "that AR has developed a phased approach which will assist in its efforts to become fully compliant in the future.") | administrator access. There is no indication that the Air Force understood that AR's system was leaking sensitive data every day, could not detect or stop cyber intrusions or prevent the exfiltration of sensitive data. Moreover, AR while telling the Air Force it was non-compliant claimed to have alternate controls to provide equivalent protection when that was code for "alternate controls and no controls." (Thyberg Dec., Ex. A 213-217, 220-276, 302) There is no indication the Air Force understood that AR was not providing "adequate security" to protect is information such that AR's VP and CIO Jose Ruiz did not feel comfortable having his personal information on AR's computer network or believe the government would be comfortable. (Thyberg Dec., Ex. K Ruiz Dep. 37:21-38:10) | To the contrary, the evidence shows that Aerojet informed the Air Force on numerous occasions that it was not complying with the DFARS Clause. *See, e.g.*, Ex. 55 (e-mail where Aerojet "discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance"); Ex. 66 (noting that AR is "not fully compliant with the subject DFARS clause."), Ex. 68 (e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark). Indeed, Relator admits in his response that "the Air Force understood AR was not fully compliant with the technical controls required by the DFARS Clause."<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     |                                                   |                                            | information systems. *Id.* § 252.204-7012(b). Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.*, Ex. 56 (8/7/2014 internal AF e-mail summarizing telecom with AR, noting that Aerojet is "not fully compliant yet" with the DFARS Clause). The "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites, as made clear by Aerojet's reply to SUF ¶ 61. Relator cites no evidence to support his contention that "AR's system was leaking sensitive data every day, could not detect or stop cyber |

92

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | intrusions or prevent the exfiltration of sensitive data." Relator cites no evidence that "AR was operating a computer network that could be penetrated in a few hours undetected allowing full administrator access." |

    **4.**    **Aerojet's Contracts with DARPA**: Aerojet disclosed that it was not compliant with the DFARS Clause to the Defense Advanced Research Projects Agency, which understood that Aerojet was not compliant.

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 101 | **Aerojet disclosed that it was not compliant with the DFARS Clause to the Defense Advanced Research Projects Agency ("DARPA").**<br><br>• Ex. 54 at 196693 (7/21/2014 e-mail reflecting DARPA's acknowledgement that Aerojet was working toward compliance with the DFARS Clause)<br><br>• Ex. 58<br><br>• Ex. 59-61 (9/18/2014 email to Air Force and DARPA noting 9/16/2014 teleconference regarding DFARS Clause, and attaching updated compliance matrix from version presented in meeting) | Disputed. AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statements accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the Air Force and DARPA dated September 18, 2014 | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict the stated fact. Additionally, the response confirms that Aerojet made "disclosures that it was not technically compliant with the DFARS controls."<br><br>The response is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | (Defendants' Ex. 60), AR disclosed its compliance status with controls but the letter stated: "It is important to note that AR is compliant with the majority of the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Defendants' Ex. 60) This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec., Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew it was leaking data every day and could not stop or detect cyber intrusions. (Thyberg Dec., Ex. A 58- 59, 61, 68-83, Thyberg Dec., Ex. C ¶¶ 7-13). They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec., Ex. H Van Kleeck Dep. 78:25- 79:17) AR | DARPA that it was ***not complying*** with the DFARS Clause. *See*, *e.g.*, Ex. 54, 60 (identifying 10 "Controls in Place and Compliant").<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 54; Ex. 62 (noting DARPA's acceptance of AR's "reasonable plan to comply"); Ex. 86; Ex. 89.<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that "Aerojet knew it was leaking data every day and could not stop or detect |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were leaking data and EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's representations to the government that they had "alternate controls" this was code for "alternate controls and no controls." (Thyberg Dec., Ex. A 213-217, 220-276, 302) | cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). |
| 102 | **Aerojet disclosed that it was not compliant with the DFARS Clause to DARPA at least by July 21, 2014.**<br><br>• Ex. 54 at 196693 | Disputed. The cited exhibits do not support this UMF. The exhibits which have been heavily redacted by AR contain only self-serving hearsay statements from AR employees and no direct | Relator's response "is nothing more than 'mere allegations or denials' which are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     |                                                   | evidence that AR disclosed anything to the government. | "nothing more than self-serving speculation that should be disregarded" was insufficient).<br><br>Moreover, Exhibit 54 is not self-serving hearsay, but rather the statement of a government employee, and thus an admission of a party opponent. *See* Ex. 54 at AR00196693 ("We on the DARPA team . . ."); *U.S. ex rel. Guadalupe v. Goodyear Tire & Rubber Co.*, 2005 WL 1324977, at *12 (N.D. Ohio June 3, 2005) (finding report commissioned by the government a party admission when government declined intervention in FCA case given "that Relator is suing on behalf of the United States"); *U.S. ex rel. Milam v. Regents of Univ. of Calif.*, 912 F.Supp. 868, 880 (D. Md. 1995) (holding that a statement by a government agency constitutes a statement of a party opponent in a non-intervened FCA case for purposes of Fed.R.Evid. 801(d)(2) because the government is the real party in interest). Moreover, the statement is non-hearsay as it is introduced for the non-hearsay purpose of notice that Aerojet was not compliant with the DFARS Clause. Relator does not dispute that DARPA stated, "Based on the conversation with Melinda, it is clear that AFRL contracting is willing |

96

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | to work with the Contractor, Aerojet Rocketdyne (AR), to find a way to move forward while making sure AR makes good-faith progress toward full compliance." *Id.* |
| 103 | **On September 10, 2014, DARPA e-mailed Aerojet indicating that it understood that Aerojet could not comply with the DFARS Clause if it was included in a contract.**<br><br>• Ex. 58 at AR00228741 | Not Disputed | |
| 104 | **After a September 16, 2014 teleconference discussing its compliance status, on September 18, 2014, Aerojet sent a disclosure letter to DARPA stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."**<br><br>• Exs. 59-61 | Disputed. Exhibit 60 does not explicitly state AR is not compliant with the DFARS Clause rather exhibit 60 indicates AR sent a letter where it proposed complying with the DFARS Clause by using alternate controls or protective measures that provided equivalent protection to the DFARS controls. | Relator's response does not create a genuine dispute of material fact. Relator does not dispute that on September 18, 2014, Aerojet sent a disclosure letter to DARPA stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant." The response's contention that Exhibit 60 "proposed complying with the DFARS Clause by using alternate controls or protective measures that provided equivalent protection to the DFARS controls," is inaccurate as the document states that "Aerojet Rocketdyne (AR) appreciated the opportunity to discuss our proposed alternative controls or protective measures[.]" Ex. 60 at AR00001199. |

97

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 105 | Discussing Aerojet's September 18, 2014 letter, a DARPA program manager indicated that she did not believe the "new Gov't [DFARS] clause was [] well thought through" and that Aerojet "had a reasonable plan to comply" with the DFARS Clause.<br><br>• Ex. 62 | Not Disputed | |
| 106 | DARPA understood that Aerojet was not compliant with the 2013 DFARS Clause.<br><br>• Ex. 54 at 196693<br><br>• Ex. 62 (noting DARPA's acceptance of AR's "reasonable plan to comply") | Disputed. AR claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Material omissions and misleading statement accompanied AR's disclosures that it was not technically compliant with the DFAR controls. In a letter to the Air Force and DARPA dated September 18, 2014 (Defendants' Ex. 60), AR disclosed its compliance status with controls but the letter stated: "It is important to note that AR is compliant with the majority of | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that DARPA understood that Aerojet was not compliant with the 2013 DFARS Clause. Additionally, the response confirms that Aerojet made "disclosures that it was not technically compliant with the DFAR controls."<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed DARPA that it |

98

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---|---|---|
| | | the clauses requirements. Please be assured that AR will make every effort to prevent a data breach while we work aggressively to strengthen the controls and implement additional protection measures." (Defendants' Ex. 60) This letter advised AR was compliant with the "majority" of the requirements when the NGA concluded AR was only compliant with 27.5% of the pre-August 2015 required DFARS controls. (Thyberg Dec., Ex. A 292) The letter claimed that AR was making every effort to prevent a data breach when AR knew if was leaking data every day and could not stop or detect cyber intrusions. Thyberg Dec., Ex. A 58- 59, 61, 68-83, Thyberg Dec., Ex. C Laundrup Dec. ¶¶ 7-13. They claimed to be making every effort to comply when there was no approved or funded plan to drive DFARS Compliance. (Thyberg Dec., Ex. H Van Kleeck Dep. 78:25-79:17) AR advised the government that they had "alternate controls" to provide equivalent protection to the DFARS clause when they knew they were leaking data and | was *not complying* with the DFARS Clause. *See, e.g.*, Ex. 54, 60.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.*, Ex. 58 at AR00228741.<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that "Aerojet knew if [*sic*] was leaking data every day and could not stop or detect cyber intrusions." Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the |

99

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | EY was able to penetrate AR system in four hours undetected gaining administrator access. Moreover, AR's representations to the government that they had "alternate controls" this was code for "alternate controls and no controls." (Thyberg Dec., Ex. A 213-217, 220-276, 302) | exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). |

5.   Aerojet disclosed that it was not compliant with the DFARS Clause to the DoD OCIO, which understood that Aerojet was not compliant.

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 107 | The "DoD CIO is responsible for all matters relating to the DoD information enterprise, such as cybersecurity, communications, information systems, and more." | Not Disputed | |

100

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • RJN Fact No. 23 | | |
| 108 | **The DoD OCIO was made aware that Aerojet was not compliant with the DFARS Clause.**<br><br>• Ex. 86 (3/12/2015 letter from Army to DoD OCIO noting that AR "informed the Government they were not in full compliance with DFARS" and attaching compliance matrix.)<br><br>• Ex. 89 (3/17/2015 e-mail from DoD OCIO to Army noting they were reviewing AR's compliance matrix)<br><br>• Ex. 89 at AFDODCIO000003 (4/2/2015 letter from OCIO Army concluding that Aerojet "is clearly not in compliance[,]" with certain DFARS controls.)<br><br>• Ex. 94 (5/27/2015 e-mail chain between L. Hewitt and V. Michetti discussing how AR can become compliant with DFARS)<br><br>• Ex. 95 (6/30/2015 e-mail from B. Joe to M. Teasley, L. Hewitt, and V. Michetti, attaching list of 7 items "in which AR says we are not compliant.") | Disputed. Although defendants present evidence that the DOD CIO was aware AR was not compliant with the technical requirements of the DFARS Clause the exhibits provided by defendants do not indicate that AR ever disclosed the extent of their non-compliance with the DFARS Clause. AR has presented no evidence it ever disclosed to the government that it could not detect or stop cyber intrusions, could not detect or prevent the exfiltration of data and that it was leaking data every day. Defendants have presented no evidence that they advised the DOD CIO that they could not provide adequate security to protect the government's sensitive information. | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the DoD OCIO was made aware that Aerojet was not compliant with the DFARS Clause. Additionally, the response confirms "AR present[s] evidence that the DOD CIO was aware AR was not compliant with the technical requirements of the DFARS Clause." Furthermore, Relator does not dispute SUF ¶¶ 69, 70, 72, and 73, which reflect communications with the DoD OCIO concerning Aerojet's non-compliance.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed |

101

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     |                                                   |                                            | details about its compliance on multiple occasions. Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Furthermore, Relator's contention is belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89. Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by evidence, as made clear by Aerojet's reply to SUF ¶ 61. |
| 109 | In March 2015, the DoD OCIO received Aerojet's October 27, 2014 letter that was sent to the Army to along with a memorandum stating that the Army concluded that Aerojet's letter stated "compliance issues they may have with the requirements [in the DFARS Clause]."<br><br>• Ex. 86 | Not Disputed | |
| 110 | The DoD concluded after reviewing Aerojet's October 27, 2014 letter that Aerojet was "not compliant [with the DFARS Clause]."<br><br>• Ex. 86<br><br>• Ex. 89 | Not Disputed | |

DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 111 | On May 20, 2015, the DoD OCIO suggested a teleconference with Aerojet to discuss its non-compliance with the DFARS Clause.<br><br>• Ex. 92 | Not Disputed | |
| 112 | The DoD OCIO stated that "the DFAR[S] does not require compliance with the controls prior to award" and stated that there was "nothing to preclude [the Army] from awarding the contract [to Aerojet]."<br><br>• Ex. 92 | Disputed. This Undisputed Fact is misleading. The DOD CIO Stated: "In discussing this with OUSD (AT&L) they noted the DFAR does not require compliance with the controls prior to award-but the controls must be in place by the time the contractor has Controlled Technical Information (CTI) on his information system. (Defendants' Ex. 92) Michetti from the DOD CIO office indicated that the DFARS Clause controls had to be in place before AR was awarded a contract and that was related to AR. (Thyberg Dec. Opp. Ex.5, Hewitt Dep. 49:5-18) | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the DoD OCIO stated that "the DFAR[S] does not require compliance with the controls prior to award" and stated that there was "nothing to preclude [the Army] from awarding the contract [to Aerojet]." Ex. 92.<br><br>Aerojet does not dispute that in Exhibit 94, Vicki Michetti wrote that "In discussing this with OUSD (AT&L) they noted the DFAR does not require compliance with the controls prior to award-but the controls must be in place by the time the contractor has Controlled Technical Information (CTI) on his information system," while Laurie Hewitt testified that "Ms. Michetti reiterated that the controls had to be in place for contract award to Aerojet." Thyberg Decl. Opp., ECF No. 134, Ex. 5, Hewitt Dep. 49:5-18. The reference however is immaterial as |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | Ms. Hewitt's testimony, approximately seven years later, does not undermine what the DoD OCIO wrote on May 21, 2015, and Aerojet had not been awarded the relevant contract from the Army at this point in time. |
| 113 | On June 30, 2015, Aerojet disclosed to the OCIO a "list of the 7 items in which [Aerojet] [was] not compliant" with the DFARS Clause.<br><br>• Ex. 93<br><br>• Ex. 95 | Not Disputed | |
| 114 | Aerojet made its cybersecurity experts available to the DoD OCIO on June 30, 2015, via teleconference, to discuss Aerojet's non-compliance with the DFARS Clause.<br><br>• Ex. 97 (7/1/2015 E-mail from Doug Smith summarizing call with members of the DoD OCIO)<br><br>• Ex. 96 (meeting invite including DoD CIO members for 6/30/2015 meeting) | Not Disputed | |
| 115 | The DoD understood that Aerojet was not compliant with the 2013 DFARS Clause.<br><br>• Ex. 88 at 287-288 (3/23/2015 internal OCIO e-mail from V. Michetti acknowledging "we | Disputed. This Undisputed Fact is misleading. The exhibits cited by defendants indicate that the DOD understood at a point in time that AR was not compliant with the DFARS Clause controls | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that the DoD understood that Aerojet was not |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | know that [AR] are not compliant from what was submitted.")<br><br>• Ex. 89 (4/2/2015 letter from V. Michetti (OCIO) to C. McElyea (Army), stating AR "is clearly not in compliance[,]" with certain DFARS controls.)<br><br>• Ex. 97 (7/1/2015 AR e-mail recounting comments from teleconference with OCIO)<br><br>• Ex. 82 (10/2/14 memo re teleconference with Aerojet)<br><br>• Ex. 94 at AR00218330 (5/21/2015 E-Mail from OCIO to Army stating the OCIO determined that AR is not compliant but "it may be a relatively simple matter" to become compliant and "seems to have done most of what is required")<br><br>• Ex. 8 (Hewitt Dep.) at 68:2-69:1 (DoD concluded that Aerojet's disclosure indicated that it was not in compliance with the DFARS Clause), 69:20-70:2 ("it was my understanding that [DoD's OCIO's] Ms. Michetti believed [Aerojet] was still noncompliant") | but nothing in these documents indicates that the DOD was aware of AR performing contracts or handling the government's unclassified technical information while not complying with the DFARS Clause. To the contrary these exhibits state that compliance with the DFARS controls was a black and white issue and that AR could not put the government's information on its computer network unless it was compliant with the DFARS controls or had implemented approved alternate controls or protective measure that achieved security that was equivalent to the DFARS controls. The records indicate the AR advised multiple DOD agencies that they were complying with the clause by providing alternate controls or protective measures to achieve equivalent protection. (Thyberg Dec., Ex. A 343-344) The exhibits indicate the DOD understood AR was not fully compliant with the technical controls required by the DFARS Clause but there is no indication in these documents that the DOD understood the extent of AR's | compliant with the 2013 DFARS Clause. Additionally, Relator confirms that "the exhibits cited by defendants indicate that the DOD understood at a point in time that AR was not compliant with the DFARS Clause controls." Furthermore, Relator does not dispute SUF ¶¶ 59, 60, 64–65, 67–75, 77, 83, 88, 92–93, and 98–99, which reflect disclosures of Aerojet's non-compliance with the DFARS Clause to the DoD.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. The very day Aerojet informed the Navy that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant," the contracting officer for the Navy acknowledged receipt of Aerojet's letter and "accepted" Aerojet's conditional acceptance of the contract. Ex. 110, Ex. 111, Ex. 112, ¶ 3.<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the |

106

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | noncompliance and that AR was operating a computer network that could be penetrated in a few hours undetected allowing full administrator access. There is no indication that the DOD understood that AR's system was leaking sensitive data every day, could not detect or stop cyber intrusions or prevent the exfiltration of sensitive data. Moreover, AR while telling the DOD it was non-compliant it claimed to have alternate controls to provide equivalent protection when that was code for "alternate controls and no controls." (Thyberg Dec.,Ex. A 213-217, 220-276, 302) There is no indication the DOD understood that AR was not providing "adequate security" to protect is information such that AR's VP and CIO Jose Ruiz did not feel comfortable having his personal information on AR's computer network or believe the government would be comfortable. (Thyberg Dec., Ex. K Ruiz Dep. 37:21-38:10) | NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the DoD OCIO that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at |

107

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 (" [w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89. Additionally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by evidence, as made clear by Aerojet reply to SUF ¶ 61. And, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is in fact directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

6.   **Aerojet disclosed that it was not compliant with the DFARS Clause to Other DoD Agencies, which understood that Aerojet was not compliant.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 116 | **Aerojet disclosed that it was not compliant with the DFARS Clause to the Missile Defense Agency ("MDA") at least by to June 29, 2015. On June 30, 2015, Aerojet provided additional detail regarding its non-compliance and its plan toward compliance with NIST 800-53.**<br><br>• Ex. 116 (response to MDA questions with compliance matrix and updated explanatory controls statement) | Disputed. In December 2015, AR was communicating with the MDA that it was complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection. On December 16, 2015, AR'S Director of Contracts, Douglas Greer sent AR Director of Contracts, Missile Defense, an email with a statement that AR contracts personnel were to use to responding to customers regarding DFARS Clause 252.204- 7012 which represented AR was fully compliant with meeting 24 security controls and identified 36 alternate controls or protective measures in place to achieve equivalent protection. The statement stated: AR completed a gap analysis of our enterprise infrastructure to assess our posture from a documentation and technical perspective. **AR does not intend to deviate from any of the security requirements under DoD FARS clause (Dec** | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet disclosed to the MDA that it was not compliant with the DFARS Clause. Relator's non-responsive narrative is also unsupported by the evidence. The document Relator cites is an internal Aerojet e-mail, does not reference the MDA, nor does it demonstrate that this letter was sent to the MDA. Further, the letter refers to the December 2015 DFARS Clause, which allowed until December 2017 to become technically compliant with the NIST 800-171 controls. SUF ¶ 11. Nonetheless, this statement informs of a plan to "address gaps going forward" and "identifie[s] compliance gaps." Ex. A, 343-344.<br><br>Relator's contention that the MDA did not understand that Aerojet was not compliant with the DFARS Clause is belied by the evidence showing that the MDA itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 226 at AR00032683 ("For items that are not fully compliant, MDA requests that |

109

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | **2015) , or propose alternative security measures** but had planned a strategy and plan to address gaps going forward… **While the analysis has identified compliance gaps and areas of improvement, security controls to safeguard unclassified IT resources are in place** as described in the "Explanatory Control Statement." (Emphasis added) (Thyberg Dec., Ex. A, 343-344) | these be tracked by Aerojet via a POA&M with periodic updates provided to the PM."). |
| 117 | **On July 1, 2015, MDA determined that "Aerojet ha[d] met the requirements stated in the DFARS clause" and recognized that Aerojet had "items that [were] not fully compliant" and requested that Aerojet track them "via POA&M with periodic updates" to MDA.**<br><br>• Ex. 117 | Disputed. Defendants Undisputed Fact is misleading as it quotes a statement out of context that mixes compliance with the DFARS Clause and compliance with the technical controls required DFARS clause to give the impression that MDA excused AR's failure to be fully compliant with the clause itself rather than the technical controls. Nothing in this statement indicates that the MDA's request that AR track its progress in technical compliance via POA&M excused AR from providing adequate security by providing "alternate controls or protective measures to achieve equivalent protection which the DFARS | Relator's non-responsive narrative response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that MDA recognized that Aerojet had "items that [were] not fully compliant" and requested that Aerojet track them "via POA&M with periodic updates" to MDA. Relator's speculation about what Aerojet gave to the MDA without offering any evidentiary support does not provide evidence to dispute this fact.<br><br>Relator also overlooks that the DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | Clause required for any technical control that was not met. Indeed defendants' Ex. 117 indicates security had reviewed AR's input and concluded AR had met the DFARS cybersecurity requirements, which was apparently based on information AR gave to the MDA about alternate controls that AR claimed achieved equivalent protection. Just a day before on July 1, 2015, the DOD OSD advised AR that a POAM or plan for compliance did not excuse compliance with the clause telling AR compliance was a "black and white" issue there is no middle ground and that when a contractor signs a contract they are asserting they are compliant not a plan to be compliant. (Thyberg Dec., Ex. A 212) Moreover, AR was at a meeting with the MDA on October 29, 2015, where it was stated that the MDA was demanding that defense contractors adhere to DFARS 252.204-7012. (Thyberg Dec., Ex A 310) | Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b).<br><br>Further, Relator's contention that Aerojet needed to provide alternate controls while simultaneously tracking its unimplemented technical controls via a POA&M is not supported by the record as implementing alternate controls would alleviate the need for a POA&M. Relator's reference to an internal Aerojet e-mail summarizing a call between Aerojet, the Army, and the DoD OCIO and does not mention POA&Ms, does not dispute this stated fact. To the contrary, as Relator notes, compliance was a "black and white" issue and the MDAs understood that Aerojet was not compliant.<br><br>Finally, the response's contention that MDA demanded that defense contractors adhere to the DFARS Clause is does not dispute this fact, even if it were true. Relator seeks to establish what MDA stated based on a |

111

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | recitation of a conversation contained in an internal Aerojet e-mail, which is inadmissible hearsay evidence. Ex. A at 310. Aerojet further disputes this purported fact insofar as Relator seeks to establish that the DFARS Clause would apply to all DoD contracts; rather, the DFARS Clause only applied in instances when UCTI was involved in the contract and the contract contained the DFARS Clause. SUF ¶ 2. |
| 118 | On July 2, 2015, MDA awarded Aerojet Contract No. HQ0147-15-C-0010.  Relator congratulated the Aerojet team: "Our efforts yesterday paid off. We got the 12.5MM award from the MDA!"<br><br>• Ex. 117 | Not Disputed | |
| 119 | On December 16, 2015, Aerojet met with representatives from the MDA and provided a detailed presentation on its compliance gap analysis. After the presentation, the MDA said Aerojet had the "best plan, only detailed plan they [had] seen" to reach compliance.<br><br>• Ex. 118 (internal AR e-mail recounting presentation to MDA attaching slide deck presented to MDA detailing DFARS compliance strategy) | Disputed. Defendants' Ex. 118 is nothing more than defendants own self-serving hearsay statement that does not prove anything. | Relator's response does not create a genuine dispute of material fact. The response neither contests nor presents any evidence to contradict that Aerojet provided a detailed presentation on its compliance gap analysis to the MDA on December 16, 2015. Additionally, the MDA's statement is non-hearsay as it shows that MDA had notice that Aerojet was not compliant at the time of the December 16, 2015 presentation. |

112

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | Moreover, Relator's response "is nothing more than 'mere allegations or denials' which are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was "nothing more than self-serving speculation that should be disregarded" was insufficient). |
| 120 | **In response to Aerojet's presentation to the MDA in December 2015, MDA stated that they "underst[oo]d the path forward" and removed the DFARS Clause from a contract modification.**<br><br>• Ex. 119 | Disputed. Defendants misrepresent Ex. 119. The clause was not removed from the contract, only a two-month cost extension. The extension was only given to prevent a lapse in performance because of the holidays. Ex. 119 indicates that there was going to have to be a resolution of clause 7012 if they were going to continue the contract. | Relator's response does not create a genuine dispute of material fact. Aerojet's stated fact does not state that the DFARS Clause was removed from the contract but from the contract modification, as Exhibit 119 states "I have removed the 252.204-7012 clause from the mod[ification] you had previously" and attaches the contract modification. |
| 121 | **On June 22, 2015, Aerojet sent a disclosure letter to the Defense Contract Management Agency (the "DCMA") stating that it was not compliant with the DFARS Clause and that it only had 10 NIST 800-53 "controls in place and compliant."**<br><br>• Ex. 67 | Disputed. Defendants' Ex. 67 does not contain any letter addressed to the DCMA or in any way confirm such a letter was sent. The letter included in Ex. 67 is addressed to the Air Force and for that contract, AR represented to the Air Force that all of the DFARS controls would be in place and compliant | Relator's response does not create a genuine dispute of material fact. The response incorrectly states that this letter was not sent to DCMA, but, as Exhibit 67 demonstrates, Aerojet attached this letter in an e-mail and sent this letter to Mike Bakh of the DCMA in addition to sending to Robert Shannon of the Air Force. Additionally, Relator does not dispute SUF ¶ 123, which reflects the |

113

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | for the duration of the contract. (Thyberg Dec., Ex. A 206- 207) | DCMA's response to this very letter. *See* Ex. 115 (responding to the same June 17, 2015 letter identified as 1497:15:JMN:101165). Aerojet does not dispute that after Aerojet sent the letter reflected in Exhibit 67, Aerojet implemented a compliance plan around June 26, 2015 for this specific program where it created an isolated network server. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. |
| 122 | **On June 23, 2015, Aerojet discussed its non-compliance with the DFARS Clause during a teleconference with the DCMA.**<br><br>• Ex. 67 | Disputed. Nothing in defendants' Ex. 67 indicates AR was discussing its noncompliance. The exhibit indicates that it was discussing its compliance in accordance with the DFARS Clause. These discussions on this GBSD contract concluded with AR stating they would be 100% | Relator's response does not create a genuine dispute of material fact. This response confirms that Aerojet sent a meeting invitation to "discuss its compliance" with the DFARS Clause while simultaneously attaching a disclosure letter that documented that it was only compliant with 10 controls. Ex. 67. |

114

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | compliant with the DFARS controls for the duration of the contract. (Thyberg Dec., Ex. A 206-207) | Aerojet does not dispute that after Aerojet sent the letter reflected in Exhibit 67, Aerojet implemented a compliance plan around June 26, 2015 for this specific program where it created an isolated network server. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. The Air Force accepted Aerojet's compliance plan (Ex. A at 184), and awarded Aerojet the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶ 4. Aerojet maintained the isolated network during the entirety of the GBSD Study A contract. Ex. 223 (Gilmartin Decl.) ¶¶ 4-6, 8-10. |
| 123 | The DCMA concluded on June 22, 2015, after reviewing Aerojet's June 17, 2015 letter to the Air Force, that Aerojet was "not fully in compliance with the solicitations DFAR requirements to safeguard unclassified controlled technical information as per [the DFARS Clause]."<br><br>• Ex. 115 | Not Disputed | |
| 124 | There is no evidence that Aerojet represented to any DoD component that its enterprise system was fully technically compliant with NIST 800-53.<br><br>• Ex. 7 (Markus Dep.) at 331:3-11; 112:22-113:23 (asked whether Aerojet's disclosure | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | statement states Aerojet is fully compliant with the DFARS Clause and testifying "No, I don't see words that say we are DFARS compliant")<br><br>• Ex. 8 (Hewitt Dep.) at 64:17-18 ("At no time did Aerojet say that they were compliant with the DFARS Clause.") |  |  |
| 125 | **The Defense Contract Management Agency determined after an audit that Aerojet was fully technically compliant with the NIST SP 800-171 controls in February 2021.**<br><br>• Ex. 120 | Disputed. Defendants' Ex. 120 indicates the DCMA audited AR's Rancho Cordova Facility. There is no statement about AR's compliance at any of its other facilities. It is unclear what the DCMA was auditing in Rancho Cordova as AR announced in April 2017, it was consolidating its defense related engineering and support positions and moving them to Huntsville Alabama which would reduce its workforce in Sacramento from 1400 to 300 by the end of 2018. (Thyberg Opp. Dec., Ex. 10) | Relator's response does not create a genuine dispute of material fact. The response mischaracterizes the scope of the DCMA audit. The audit states "[t]he scope of this assessment was the Aerojet Rocketdyne Inc's *enterprise-level* implementation of all requirements set forth in DFARS 252.204-7012, to include the NIST SP 800-171 requirements." Ex. 120 at AR0023908 (emphasis added). It was not limited to the Rancho Cordova Facility. *Id*. at AR00232906. The audit made determinations about Aerojet Rocketdyne, Inc. as a whole. For example, the audit "determined that Aerojet Rocketdyne, Inc. has a robust capability to manage all of their Contract and Mission-specific System Security Plans." *Id*. at AR00232909. |
| 126 | **After Aerojet disclosed to the MDA that it was not compliant with NIST 800-53 or the 2013** | Disputed. AR did not disclose the full extent of its non-compliance to the MDA. AR claimed to be complying with | Relator's response does not create a genuine dispute of material fact. The response does not contest or offer evidence to contradict that the MDA |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | **DFARS Clause, MDA continued to award Aerojet contracts.**<br><br>• RJN Fact No. 41.<br><br>• Ex. 37 (reflecting 5 contracts awarded since 7/2/2015) | the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection. (Thyberg Dec., Ex. A 343) AR minimized the significance of its failure to comply with the NIST 800-53 controls telling the MDA although it had identified compliance gaps and areas of improvement security controls to safeguard unclassified IT resources were in place. (Thyberg Dec., Ex. A 344). There is no indication that the MDA understood that AR was not providing "adequate" security to protect the MDA's sensitive information at the time the MDA awarded these contracts. | awarded Aerojet 5 contracts since July 2, 2015.<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the MDA that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent |

117

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---|---|---|
| | | | protection to the DFARS controls." The document Relator cites is an internal Aerojet e-mail, does not reference the MDA, and does not demonstrate that this letter was sent to the MDA. Relator's contention that the MDA did not understand that Aerojet was not compliant with the DFARS Clause is belied by the evidence showing that the MDA itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 226 at AR00032683 ("Security has reviewed the additional input you submitted yesterday and concurs that Aerojet has met the requirements as stated in the DFARS clause for cybersecurity. For items that are not fully compliant, MDA requests that these be tracked by Aerojet via a POA&M with periodic updates provided to the PM."). |

**B.    Aerojet Disclosed to NASA That Its System Was Not Compliant with NIST 800-53 and Provided Details Regarding Its Cybersecurity Posture and NASA Indicated That Compliance Was Not Material.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|-----|---|---|---|
| 127 | **Aerojet, prior to merging with Pratt Whitney Rocketdyne, disclosed to NASA that it had** | Disputed. Defendants' Exhibit 149 provides no evidence as to what AR discussed with NASA. It indicates there was a gap | Relator's response does not create a genuine dispute of material fact. Exhibit 149 evidences that on October 17, 2012 Aerojet met with |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | "gaps" in its compliance with NIST 800-53 and discussed those gaps with NASA.<br><br>• Ex. 149 | analysis but gives no indication if gaps were found or what was disclosed to NASA. | representatives from NASA to discuss Aerojet's NIST 800-53 gap analysis. That such an analysis exists evidences that gaps were found in Aerojet's compliance with 800-53. |
| 128 | When Aerojet submitted its proposal in connection with Contract No. NNM16AA02C in or around June 18, 2015, Aerojet stated that it was "not fully compliant per the Security Requirements for Unclassified Information Technology Resources at this time."<br><br>• Ex. 153 | Not Disputed | |
| 129 | Aerojet periodically submitted Contractor Information Technology Security Management Plans ("IT SMPs") to NASA discussing how Aerojet protected NASA's information, in some instances, explaining how Aerojet's policies and procedures fit within the NIST 800-53 framework.<br><br>• Ex. 150 (12/16/2013)<br><br>• Ex. 158 (12/10/2015)<br><br>• Ex. 159 (evidence of submission)<br><br>• Ex. 179 (1/23/2017)<br><br>• Ex. 176 (5/4/2017) | Not Disputed | |

119

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | • Ex. 157 at AR00052685 (10/1/15) <br><br> • Ex. 152 | | |
| 130 | **NASA accepted Aerojet's IT SMPs.** <br><br> • Ex. 152 at AR00232667 <br><br> • Ex. 155 | Disputed. Although NASA accepted AR's IT SMP's, the plans NASA approved were filled with false and misleading statements. (See, Relator's Statement of UMF is support of MSJ Nos, 88- 105). | Relator's response does not create a genuine dispute of material fact. Indeed, Relator admits that NASA accepted AR's IT SMPs. |
| 131 | **Aerojet agreed to provide access to its facilities, installations, operations, documentation, databases, and personnel at NASA's request to "carry out IT security inspection, investigation, and/or audits" to safeguard NASA information.** <br><br> • Ex. 151 | Disputed. This Undisputed Fact is misleading. AR was required to allow NASA access as that was a NASA requirement as set forth in the boilerplate language of defendants' Ex. 151. | Relator's response does not create a genuine dispute of material fact. Aerojet's IT SMP, as reflected in Exhibit 151 at 87789, provides NASA access to Aerojet's facilities, operations, documentation, databases, and personnel at NASA's request to "carry out IT security inspection, investigation, and/or audits" to safeguard NASA information. |
| 132 | **In July 2015, NASA responded to Aerojet's submission of an IT SMP and requested for Aerojet to include "a program plan to address all aspects required by NPR 2810.1A" including security controls compliant with NIST 800-53, reflecting that NASA did not expect full compliance with the requirements.** <br><br> • Ex. 154 at AR00067326. | Disputed. Defendants' Ex. 154 indicates that NASA expected AR to present a plan that showed they were addressing NIST 800-53 requirements with no indication that AR was excused from compliance or expected to be noncompliant. | Relator's response does not create a genuine dispute of material fact. NASA requested that Aerojet "[d]evelop a program plan to address all aspects required by NPR 2810.1A." NASA did not request that Aerojet demonstrate full compliance with NPR 2810.1A. |
| 133 | **On August 31, 2015, NASA informed Aerojet of certain "security controls that may be** | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | needed to be implemented," but that NASA did not know which controls would need to be implemented at that time. NASA told Aerojet not to "get wigged out" because NASA was there "to support and contribute to [Aerojet's success in . . . making sure the systems are protected with minimum security baselines in place." <br><br> • Ex. 156 | | |
| 134 | On February 16, 2016, Aerojet made a presentation to NASA briefing representatives on the status of Aerojet's cybersecurity and efforts to comply with NIST SP 800-53. During its presentation, Aerojet informed NASA that it was not compliant with 167 of the NIST SP 800-53 controls. <br><br> • Ex. 162 (2/16/16 Presentation and Compliance Gap Analysis) <br><br> • Ex. 160 (2/16/16 e-mail discussing NASA presentation, and noting further planned technical information exchange with NASA) <br><br> • Ex. 161 (2/16/16 e-mail discussing NASA presentation, noting that AR gave NASA "an entire 45 minutes of discussion" and presented them with the data.) | Disputed. AR's disclosure of its 167 noncompliant controls was accompanied by falsehoods that discounted the significance of this finding. Defendants' Ex. 162 at page 16 indicates protective controls to safeguard unclassified IT resources are in place. Ex. 162 indicates that AR's disclosure of its 167 noncompliant controls was accompanied by AR's explanatory control statement which discounted AR's compliance gaps as areas for improvement while asserting AR had alternative controls or protective measures in place to achieve equivalent protection. (See, Relator's UMF Nos. 82-85 is Support of Relator's Motion for MSJ). There is no mention | Relator's response does not create a genuine dispute of material fact. The response does not dispute that AR informed NASA it was not compliant with 167 of the 800-5 controls. Relator's arguments mischaracterizing Exhibits 162 and 167 unsupported by documents and do not create a material dispute of this fact. <br><br> The "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites, as made clear by Aerojet's reply to SUF ¶ 61. Relator cites no evidence to support his contention that "AR could not detect or stop cyber intrusions and was leaking sensitive data every day." |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | | in the presentation to NASA that AR could not detect or stop cyber intrusions and was leaking sensitive data every day. | |
| 135 | Based on Aerojet's February 2016 presentation, NASA understood that Aerojet had a "burn down plan" for its non-compliant controls.<br><br>• Ex. 168 at AR00022461. | Not Disputed | |
| 136 | On February 17, 2016, a NASA contracting officer indicated that for Contract No. NNC15CA07C, nobody "paid much attention to [the NFS Clause][,]" and further noted that the signed GRC-1707 form for the contract indicated that Aerojet "would NOT be subject to the requirements that the clause describes." The contracting officer noted that the Clause may have been "include[d]" just in case" and that he could "easily delete [it] . . . and explain . . . why [he] accidentally added this clause in the first place."<br><br>• Ex. 163 | Disputed. This is nothing more than a selfserving hearsay statement by a contracting officer who has no power to bind NASA trying to cover for the fact that Office of the Inspector General had requested information about his AR contracts that had the NASA FARS Clause. | Relator's response does not create a genuine dispute of material fact. Exhibit 163 is not "selfserving hearsay," but rather the statement of a government employee, and thus an admission of a party opponent. *U.S. ex rel. Guadalupe v. Goodyear Tire & Rubber Co.*, 2005 WL 1324977, at *12 (N.D. Ohio June 3, 2005) (finding report commissioned by the government a party admission when government declined intervention in FCA case given "that Relator is suing on behalf of the United States"); *U.S. ex rel. Milam v. Regents of Univ. of Calif.*, 912 F.Supp. 868, 880 (D. Md. 1995) (holding that a statement by a government agency constitutes a statement of a party opponent in a non-intervened FCA case for purposes of Fed.R.Evid. 801(d)(2) because the |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | | | government is the real party in interest).<br><br>Relator does not cite any evidence in support of his argument that a NASA contracting officer does not have authority to change contract terms or bind the government by interpreting that a term in the contract does not apply. Moreover, Relator's response does not address that Section 11 Part II of Contract No. NNC15CA07C stated Aerojet would not be subject to the requirements of the NFS Clause, which does bind the government.<br><br>Relator's baseless argument that the contracting officer was "trying to cover" is irrelevant. "This is nothing more than 'mere allegations or denials' which are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was "nothing more than self-serving speculation that should be disregarded" was insufficient). |
| 137 | On February 18, 2016, a NASA contracting officer suggested that the information Aerojet provided under the NFS clause would likely not "be worthwhile to us or even AR[,]" for | Disputed. This is nothing more than a selfserving hearsay statement by a contracting officer who has no power to bind NASA trying to cover for | Relator's response does not create a genuine dispute of material fact. Exhibit 164 is not self-serving hearsay, but rather the statement of a government employee, and thus an |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | **Contract No. NNC15CA07C, and stated that he "could always still delete the clause[.]"**<br><br>• Ex. 164 | the fact that Office of the Inspector General is requested information about his AR contracts that had the NASA FARS Clause. The officer's statement he could delete the clause after the fact to avoid providing documents to the Inspectors General Office is not evidence the clause was not actually required in the contract. | admission of a party opponent. *U.S. ex rel. Guadalupe v. Goodyear Tire & Rubber Co.*, 2005 WL 1324977, at *12 (N.D. Ohio June 3, 2005) (finding report commissioned by the government a party admission when government declined intervention in FCA case given "that Relator is suing on behalf of the United States"); *U.S. ex rel. Milam v. Regents of Univ. of Calif.*, 912 F.Supp. 868, 880 (D. Md. 1995) (holding that a statement by a government agency constitutes a statement of a party opponent in a non-intervened FCA case for purposes of Fed.R.Evid. 801(d)(2) because the government is the real party in interest).<br><br>Relator does not cite any evidence in support of his argument that a NASA contracting officer does not have authority to change contract terms or bind the government by interpreting that a term in the contract does not apply. Moreover, Relator's response does not address that Section 11 Part II of the requisition request for Contract No. NNC15CA07C stated Aerojet would not be subject to the requirements of the NFS Clause, which does bind the government. SUF ¶ 42. |

124

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | | | Relator's baseless argument that the contracting officer was "trying to cover" is irrelevant. "This is nothing more than 'mere allegations or denials' which are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was "nothing more than self-serving speculation that should be disregarded" was insufficient). |
| 138 | On February 17, 2016, in response to Aerojet's submission of an IT SMP for Contract No. NNM16AA02C, NASA approved Aerojet's submittal with comments and requested a dialogue with Aerojet regarding its cybersecurity policies and procedures.<br><br>• Ex. 165 at AR00023815. | Not Disputed. | |
| 139 | On March 4, 2016, in response to NASA's request for a discussion, Aerojet's cybersecurity experts had a meeting with NASA regarding Aerojet's cybersecurity posture and provided NASA with contact information for everyone on Aerojet's cybersecurity team. After the meeting, Aerojet's cybersecurity expert, David Chamberlain, was provided access to NASA's system "to complete future questions as they | Disputed. Defendants' Exs 167 and 173 provide no evidence that David Chamberlin was given access to the NASA system than other defendants' own inadmissible self-serving hearsay statements. | Relator's response does not create a genuine dispute of material fact. David Chamberlain, not Aerojet, stated that he "continue[d to] be in contact [with NASA] at this time" and that he "now ha[s] a NASA RSA Token so I can log onto the NASA systems to complete future questions as they are required." Ex. 173. David Chamberlain's statement is admissible under Federal Rule of Evidence 803(1) as he describes his conversation, which was |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | [were] required" with respect to Aerojet's cybersecurity.<br><br>• Ex. 167<br><br>• Ex. 173 | | an event with NASA "at this time." Relator does not dispute the remaining facts in SUF ¶ 139. |
| 140 | **On March 17, 2016, Aerojet provided an updated IT SMP for Contract No. NNM16AA02C in accordance with NASA's comments and March 4, 2016 meeting, which was approved on June 6, 2016.**<br><br>• Ex. 152 | Not Disputed. | |
| 141 | **On June 22, 2016, Aerojet updated NASA on the status of its non-compliance with NIST 800-53, stating that it had "improved our overall compliance to the applicable NIST 800-53 security controls from 24% to 50%. NASA responded that "this is a very good effort on [Aerojet]'s part" and that it "greatly appreciated [Aerojet] sharing th[e] information with" NASA.**<br><br>• Ex. 168 at AR00022459-60. | Not Disputed. | |
| 142 | **On July 3, 2016, the NASA contracting officer on Contract No. NNC15CA07C indicated the NFS clause was "in his blind spot" when entering into the contract.**<br><br>• Ex. 174 | Disputed. Defendants' Ex. 174 does not state the NFS Clause was in his blind spot when entering the contract. The officer states that AR's obligation to submit NASA | Relator's response does not create a genuine dispute of material fact. The NASA contracting officer states: "[w]hen I checked our contract, I realized that our NEXT-C contract contains these clauses as well, and that I never requested and Aerojet never |

126

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | | FARS required plans was in "our blind spots". | submitted either [NFS Clause] plans. Was likely in both our blind spots." This evidences that both the plan and the NFS clause itself were in the blind spot of the NASA contracting officer, as he did not realize it was in the NEXT-C contract until he checked after contract award. |
| 143 | **NASA reviewed Aerojet's explanatory control statement which described Aerojet's cybersecurity posture and indicated on July 20, 2016 that the document was "well written" and was "a very good document."**<br><br>• Ex. 175 at AR00020134-35. | Disputed. The statements defendants misrepresent statements taken out of context from their Ex. 175. Ex. 175 says the document is a very good pre-cursor to AR's SMP. | Relator's response does not create a genuine dispute of material fact. NASA states in Exhibit 175 that Aerojet's explanatory control statement is "well written" and looks "to be a very good document as a pre-cursor to their SMP." That the explanatory control statement is a pre-cursor to Aerojet's SMP does not refute that NASA described it as well written and a very good document. |
| 144 | **On August 11, 2016, Aerojet provided an update to NASA regarding its closure of compliance gaps with respect to NIST 800-53, stating that it had completed closing documentation gaps.**<br><br>• Ex. 172 at AR00017843-44. | Not Disputed | |
| 145 | **On August 16, 2016, Aerojet met with NASA, including representatives on Contract Nos. NNM16AA02C and NNM16AA12C to discuss Aerojet's NFS Clause compliance. During that** | Not Disputed | |

127

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     | meeting, Aerojet "reviewed [its] compliance metrics and plan/stats for transition . . . to an IT outsource provider." NASA acknowledged that Aerojet "had made great progress toward full compliance with [its] documentation compliance gap closure efforts and indicated that they felt [Aerojet] had a solid plan going forward to nail down our technical compliance through the outsourcing initiative."<br><br>• Ex. 169<br><br>• Ex. 170 (reflecting Aerojet's desire to "continue to be transparent and forthcoming with [NASA].") |  |  |
| 146 | On October 14, 2016, Aerojet provided another compliance matrix to NASA detailing its continued progress toward compliance with NIST SP 800-53, including informing NASA that it was not compliant with 130 of the NIST SP 800-53 Controls.<br><br>• Ex. 171 | Not Disputed |  |
| 147 | On October 19, 2016, Aerojet had a teleconference with NASA in which Aerojet gave NASA "an update on [Aerojet's] plan to become completely compliant with NFS."<br><br>• Ex. 172 | Not Disputed |  |

128

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| 148 | **Aerojet submitted IT SMPs to NASA on Contract No. NNM16AA12C beginning in November 2016, which NASA approved. Aerojet indicated that Aerojet "does not develop or document policies and procedures addressing minimum security requirements following the guidelines of the [NIST] Certification and Accreditation (C&A) for all systems containing" NASA data. However, Aerojet stated that it would "adhere to [Aerojet] Cybersecurity Policies, Procedures and Standards to meet the [NASA] requirements" and went on to detail the policies and procedures Aerojet had in place.**<br><br>• Ex. 179<br><br>• Ex. 177 | Disputed. Defendants Ex. 179 indicates in multiple locations that AR developed policies and procedures to meet the minimum NASA FARS security requirements. According to Ex.179 AR stated they had gaps and areas for improvement but claimed to have security controls in place to protect NASA's information. | Relator's response does not create a genuine dispute of material fact. Relator's response does not address or dispute the quoted language in SUF ¶ 148 or the fact that Aerojet submitted IT SMPs to NASA on Contract # NNM16AA12C and that NASA approved them. Relator simply paraphrases other information contained in Aerojet's IT SMPs. |
| 149 | **On January 20, 2017, Aerojet met with NASA and presented on its strategy to bring its systems into compliance with NIST 800-53.[6] Aerojet informed NASA that it was not compliant with 107 of the NIST SP 800-53 Controls.** | Not Disputed | |

[6] Aerojet's January 2017 meeting with NASA was conducted, in part, to address NASA's rejection of one invoice based on NASA's disapproval of Aerojet's System Security Plan for Contract No. NNC16CA21C. After discussions with Aerojet, NASA approved Aerojet's IT System Security Plan and paid the invoice. *See* Ex. 148.

129

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | • Ex. 178 | | |
| 150 | On January 23, 2017, Aerojet submitted an IT SMP to NASA in connection with Contract No. NNM16AA12C stating "[a]s a part of our ongoing efforts to enhance IT security controls, AR completed a gap analysis of our enterprise infrastructure to assess our IT security posture . . . [i]dentified gaps in compliance with the specific security controls . . . as defined in the National Institute of Standards and Technology (NIST) Special Publication (SP) 800-53 . . . have been documented in Plans of Action and Milestones (POA&Ms) and closure will be addressed . . . technical gaps will be addressed incrementally through 2017[.]"<br><br>• Ex. 179 at AR00232652 | Disputed. AR's disclosure about the gap its analysis was false, misleading and had material omissions. Defendants' Ex.179 indicates that in disclosing the gap analysis results, AR stated: "While the analysis has identified compliance gaps and areas of improvement, security controls to safeguard unclassified IT resources are in place as described in AR's IT SMP and the Explanatory Controls Statement." What AR neglected to tell NASA is that the its internal cyber security audit completed a month earlier indicated AR had five high risk and one medium risk finding. (Relator's UMF No. 18 in Support of Relator's MSJ) "High Risk" was defined in the audit as involving a significant deviation from regulatory requirements and fraud or management misconduct. (Thyberg Dec., Ex. A 395) Ex.179 also indicates that NASA was referred to AR's Explanatory Control Statement where AR claimed to be providing alternate controls or | Relator's non-responsive narrative response does not create a genuine dispute of material fact. Relator's citation to a draft audit report does not create a dispute concerning the language contained in Aerojet's IT SMP submitted to NASA. Relator does not dispute that Aerojet's IT SMP stated "[a]s a part of our ongoing efforts to enhance IT security controls, AR completed a gap analysis of our enterprise infrastructure to assess our IT security posture . . . [i]dentified gaps in compliance with the specific security controls . . . as defined in the National Institute of Standards and Technology (NIST) Special Publication (SP) 800-53 . . . have been documented in Plans of Action and Milestones (POA&Ms) and closure will be addressed . . . technical gaps will be addressed incrementally through 2017[.]"<br><br>Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. *See, e.g.,* SUF 128–29; 132; 134; 138–41; 144–49. Relator's narrative is further |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| | | protective measures to achieve equivalent protection to the NIST 800-53 controls. | belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* SUF ¶ 141, Ex. 168; ¶ 145, Ex. 169; ¶ 152, Ex. 180. |
| 151 | **In September 2017, in connection with Contract No. NNC15CA07C Aerojet updated NASA on its plan to outsource its cybersecurity and detailed remediation efforts Aerojet and its provider were taking with respect to certain NIST 800-53 controls. Aerojet provided additional status updates regarding its progress and indicated that, though it was not yet compliant with NIST 800-53, it intended to be compliant by December 31, 2017.**<br><br>• Ex. 180 | Not Disputed | |
| 152 | **NASA responded to Aerojet's disclosure of its non-compliance acknowledging that Aerojet had made "good progress per [its] remediation plan" and thanked Aerojet for its "diligent efforts" and "open, transparent communications" which "demonstrate[d] a path to success."**<br><br>• Ex. 180 at AR00229090 & AR00229095 | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response if Disputed |
|---|---|---|---|
| 153 | **NASA understood that Aerojet did not have a system in place that was compliant with either NPR 2810.1 or NIST 800-53.**<br><br>• Ex. 162<br>• Ex. 160<br>• Ex. 161<br>• Ex. 168 at AR00022461<br>• Ex. 167<br>• Ex. 168 at AR00022459-60.<br>• Ex. 175 at AR00020134-35.<br>• Ex. 169<br>• Ex. 171<br>• Ex. 172<br>• Ex. 178<br>• Ex. 180 at AR00229090 & AR00229095 | Not Disputed | |
| 154 | **In 2019, Aerojet received a NASA Silver Achievement Medal for its cybersecurity efforts.**<br><br>• Ex. 181 | Not Disputed | |

132

## VI.   THE GOVERNMENT PAID AEROJET AND CONTINUED TO CONTRACT WITH AEROJET DESPITE KNOWING OF AEROJET'S NON-COMPLIANCE.

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
| 155 | **None of the contracts alleged in the SAC were terminated based on Aerojet's non-compliance with the DFARS or NFS Clauses.**<br><br>• SAC ¶¶ 67-68, 84-119<br><br>• Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br><br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts)<br><br>• Ex. 113, ¶¶ 3-4<br><br>• Ex. 185, ¶¶ 4-5<br><br>• Ex. 184, ¶¶ 4-5<br><br>• Ex. 183, ¶¶ 4-5<br><br>• Ex. 182, ¶¶ 4-5<br><br>• Ex. 112, ¶ 5<br><br>• Ex. 114, ¶ 4 | Not Disputed | |
| 156 | **Aerojet has provided the contracted-for goods and services for the at-issue contracts.** | Disputed. Providing cybersecurity counter measures to protect critical program information and NASA's sensitive but unclassified | Relator's response does not create a genuine dispute of material fact. Relator cites no evidence to demonstrate whether the government would have paid less for a product |

133

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts) | information was part of the statement of work order on NASA contracts. (See, Relator's UMF Nos. 67-69 in Support of Relator's MSJ) | created in a not fully compliant environment. Relator's response to SUF ¶ 56 states that "*when* . . . advance technology is stolen in a cyber incident, the finished product is less valuable to the government," but he does not offer *any* evidence that even suggests that any of the technology associated with the contracts identified in this stated fact were stolen or compromised.<br><br>Relator also provides no evidence to show that the government did not receive all of the rocket and missile technology it contracted for. Further, the evidence cited in Relator's response fails to support the contention that providing cybersecurity countermeasures was the contracted-for goods and services for the contracts identified in this stated fact. This is especially lacking support when certain contracts referenced in this fact did not even contain the DFARS or NFS Clauses. *See* SUF ¶¶ 53, 54. |
| 157 | **The government has not rejected any of the contracted-for goods or services for the contracts listed in Relator's SAC based on Aerojet's non-compliance with the DFARS or NFS Clauses.** | Not Disputed | |

134

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br><br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts)Ex. 113, ¶¶ 2, 4<br><br>• Ex. 185, ¶ 3<br><br>• Ex. 112, ¶¶ 4-5<br><br>• Ex. 184, ¶ 3<br><br>• Ex. 183, ¶ 3<br><br>• Ex. 182, ¶ 3 | | |
| 158 | **The government has not rescinded any payments or sought reimbursement for any of the goods or services Aerojet delivered for the at-issue contracts based on Aerojet's non-compliance with the DFARS or NFS Clauses.**<br><br>• Ex. 37 at cells 2E, 3E, 5E-7E, 9E, 15E, 17E, 19E (DoD contract data reflecting completion of contract date for SAC contracts)<br><br>• Ex. 121 at cells 10F, 14F, 15F, 17F, 20F, 21F, 22F, 23F, 25F (NASA contract data reflecting completed and ongoing contracts)Ex. 113, ¶¶ 2, 4 | Not Disputed | |

135

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 185, ¶ 3<br><br>• Ex. 112, ¶¶ 4-5<br><br>• Ex. 184, ¶ 3<br><br>• Ex. 183, ¶ 3<br><br>• Ex. 182, ¶ 3 | | |
| 159 | **The United States Department of Justice conducted an investigation into Relator's claims and declined to intervene.**<br><br>• Ex. 1 (1/26/2017 Civil Investigative Demand to Aerojet)<br><br>• Ex. 2 (8/5/2016 Civil Investigative Demand to Emagined Security)<br><br>• Ex. 3 (8/5/2016 Civil Investigative Demand to Ernst & Young LLP)<br><br>• Exs. 3 & 4 (reflecting correspondence regarding interviews of Aerojet employees pursuant to Civil Investigative Demand to Aerojet)<br><br>• RJN No. 70<br><br>• ECF No. 25 | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

A.    **The Army continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 160 | After Aerojet disclosed to the Army that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Army continued to award Aerojet contracts.<br>• RJN Fact No. 35<br>• Ex. 37 (reflecting 30 contracts awarded since 9/26/2014) | Disputed. AR has presented no evidence that the ARMY was ever given the complete story about its non-compliance with NIST 800-53 or the DFARS Clause compliance. Although the ARMY knew AR was not compliant with the technical controls required by the DFARS clause, AR was communicating to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. 166 in Support of Relator's MSJ) There is no evidence that the AR ever disclosed or the ARMY understood that AR was not compliant with the DFARS requirement that AR provide "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. | Relator's response does not create a genuine dispute of material fact. The response admits that "the ARMY knew AR was not compliant with the technical controls required by the DFARS clause[.]" Additionally, the response does not contest or offer evidence to contradict that the Army awarded Aerojet 30 contracts since September 26, 2014.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed the Army on numerous occasions that it was ***not complying*** with the DFARS Clause. *See, e.g.*, Ex. 77 (noting AR "cannot confirm that we are compliant with this clause at this time."), Ex. 78 (email noting 9/22/14 telecom and attached disclosure statement), Ex. 91 (AR stating it does "not have an ECD [estimated completion date] at this |

137

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     |                                                   | (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the ARMY that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 2014 letter to the ARMY AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF Nos. 1, 151 in Support of Relator's MSJ). The September 2014 letter stated AR was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54, 151 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective | time" for when it will be fully compliant with DFARS).<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the Army that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making |

138

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied Their VP and CIO's request to increase his budget to improve security he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) | extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 8 (Hewitt Dep.) at 33:14-23 ("Q. So did you understand this [September 29, 2014] letter that Aerojet had provided the army to be representing that Aerojet was compliant with 53 of these 60 controls? A. In my opinion, based on the letter that was provided to me, Aerojet only had ten controls in place and compliant."), 60:6-61:5 ("[w]ith this letter it was my understanding that Aerojet was not in compliance with the DFARS clause"), 92:3-6 (testifying that the September 29 letter "identified [Aerojet's] noncompliance"); Ex. 86; Ex. 89.<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that Aerojet had been advised that it was leaking data every day and could not stop or detect cyber intrusions. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions" or "could not detect or prevent the exfiltration of data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). <br><br> Finally, Relator's cited evidence and purported facts do not support that his contention that EY gained access to "rocket designs," that Aerojet was "leaking data every day," or that "AR not only denied their VP and CIO's request to increase his budget to |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | improve security but he was told he had to reduce his budget." |
| 161 | **Aerojet submitted invoices to the Army on Contract No. W31P4Q-14-C-0075, none of which contained any representation about Aerojet's compliance with the DFARS Clause.**<br><br>• Ex. 74<br><br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 162 | **The Army paid all invoices on Contract No. W31P4Q-14-C-0075.**<br><br>• Ex. 75<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 163 | **Contract No. W31P4Q-14-C-0075 was successfully completed on January 31, 2016.**<br><br>• RJN Fact No. 53<br><br>• Ex. 37 at cell 2F | Not Disputed | |
| 164 | **Aerojet submitted invoices to the Army on Contract No. W31P4Q-16-C-0026, none of which contained any representation about Aerojet's compliance with the DFARS Clause.** | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | | |
| 165 | **The Army paid all invoices on Contract No. W31P4Q-16-C-0026.**<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 166 | **Contract No. W31P4Q-16-C-0026 was successfully completed on August 1, 2017.**<br><br>• RJN Fact No. 54<br><br>• Ex. 37 at cell 19F | Not Disputed | |
| 167 | **The Army continued to award Aerojet contracts after this lawsuit was filed.**<br><br>• RJN Fact Nos. 36, 68<br><br>• Ex. 37 (reflecting 28 contracts awarded since this case was filed)<br><br>• ECF No. 1 | Not Disputed | |
| 168 | **The Army participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene.**<br><br>• RJN Fact Nos. 37, 70 | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | • Ex. 37 (reflecting 16 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br><br>• Exs. 3 & 4 (reflecting participation in investigation)<br><br>• ECF No. 25 |  |  |

**B.      The Navy continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 169 | **After Aerojet disclosed to the Navy that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, the Navy continued to award Aerojet contracts.**<br><br>• RJN Fact No. 32<br><br>• Ex. 37 (reflecting 8 contracts awarded since 9/29/2015) | Disputed. AR has presented no evidence that the NAVY was ever given the complete story about its DFARS Clause compliance status. Although the NAVY knew AR was not compliant with the technical controls required by the DFARS clause AR was communicating to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. 166 in Support of Relator's MSJ) There is no evidence that the AR ever disclosed or the NAVY | Relator's response does not create a genuine dispute of material fact. The response admits that "the NAVY knew AR was not compliant with the technical controls required by the DFARS clause[.]" The response does not contest or contradict that the Navy awarded 8 contracts to Aerojet since September 29, 2015.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet "claimed to be complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | understood that AR was not compliant with the DFARS requirement that AR provide "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the NAVY that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 30, 2014 letter to the NAVY AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF Nos. 1, 151,153 | the contrary, the evidence shows that Aerojet informed the Navy that it was **not complying** with the DFARS Clause. *See*, *e.g.*, Ex. 110 (identifying 10 "Controls in Place and Compliant").<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the Navy that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non- |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | in Support of Relator's MSJ). The September 30, 2014 letter stated AR was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54,151,153 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151,153 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) | compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 111; Ex. 112 ¶ 3 & Ex. 1 (reflecting acceptance of Aerojet's disclosure statement). Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator's contention that Aerojet was, and had been advised, that it was leaking data every day is not supported by the evidence he cites. Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions or prevent the unauthorized flow [*sic*] data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt |

145

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). Finally, Relator's cited evidence and purported facts do not support his contention that EY gained access to "rocket designs," that Aerojet was "leaking data every day," or that "AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget." |
| 170 | **Aerojet submitted invoices to the Navy on Contract No. N00014-14-C-0035, none of which contained any representation about Aerojet's compliance with the DFARS Clause.**<br><br>• Ex. 106<br><br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---|---|---|
| 171 | **The Navy paid all invoices on Contract No. N00014-14-C-0035.**<br><br>• Ex. 107<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 172 | **Contract No. N00014-14-C-0035 was successfully completed on June 8, 2017.**<br><br>• RJN Fact No. 51<br><br>• Ex. 37 at cell 3F | Not Disputed | |
| 173 | **Aerojet submitted invoices to the Navy on Contract No. N68936-14-C-0035, none of which contained any representation about Aerojet's compliance with the DFARS Clause.**<br><br>• Ex. 108<br><br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 174 | **The Navy paid all invoices on Contract No. N68936-14-C-0035.**<br><br>• Ex. 109<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 175 | **Contract No. N68936-14-C-0035 was successfully completed on December 31, 2015.** | Not Disputed | |

147

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | • RJN Fact No. 52<br><br>• Ex. 37 at cell 7F |  |  |
| 176 | **The Navy continued to award Aerojet contracts after this lawsuit was filed.**<br><br>• RJN Fact Nos. 33, 68<br><br>• Ex. 37 (reflecting 7 contracts awarded since this case was filed)<br><br>• ECF No. 1 | Not Disputed |  |
| 177 | **The Navy continued to award Aerojet contracts after the United States declined to intervene.**<br><br>• RJN Fact Nos. 34, 70<br><br>• Ex. 37 (reflecting 2 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br><br>• ECF No. 25 | Not Disputed |  |

C.    **The Air Force continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 178 | **After Aerojet disclosed to the Air Force that it was not compliant with NIST 800-53 or the** | Disputed. AR has presented no evidence that the AIR FORCE was ever given the complete story about its DFARS Clause | Relator's response does not create a genuine dispute of material fact. The response admits that "the AIR FORCE knew AR was not compliant with the |

148

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|---------------------------------------------|---------------------------------------------------|
|  | **2013 DFARS Clause, the Air Force continued to award Aerojet contracts.**<br><br>• RJN Fact Nos. 29<br><br>• Ex. 37 (reflecting 31 contracts awarded since 9/29/2014) | compliance status. Although the AIR FORCE knew AR was not compliant with the technical controls required by the DFARS clause, AR was communicating to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. 166 in Support of Relator's MSJ) There is no evidence that the AR ever disclosed or the AIR FORCE understood that AR was not compliant with the DFARS requirement that AR provide "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the AIR FORCE that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF | technical controls required by the DFARS clause[.]" The response does not contest or contradict that the Air Force awarded 31 contracts to Aerojet since September 29, 2014.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet claimed to be "complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed the Air Force on numerous occasions that it was not complying with the DFARS Clause. *See*, *e.g.*, Ex. 55 (e-mail where Aerojet "discussed the approached [*sic*] employed to assess the DFAR[S] gap analysis and company plan to reach compliance"); Ex. 66 (noting that AR is "not fully compliant with the subject DFARS clause."; Ex. 68 (e-mail and attached updated compliance matrix from J. Nishikawa to M. Stark).<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. |

149

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. In a September 18, 2014 letter to the AIR FORCE, AR claimed to be compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF Nos.1, 151,152 in Support of Relator's MSJ). The September 18, 2014 letter stated AR was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54,151,152 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen control and implement additional protective measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151,152 in Support of Relator's MSJ) When EY advised AR their system could | 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by the Air Force that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non-compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not |

150

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | be penetrated undetected in four hours giving them access to trophy data, AR not only denied Their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) | compliant with the DFARS Clause. *See, e.g.*, Ex. 56 (8/7/2014 internal AF e-mail summarizing telecom with AR, noting that Aerojet is "not fully compliant yet" with the DFARS Clause).<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator's contention that Aerojet was, and had been advised, that it was leaking data every day is not supported by the evidence he cites. Additionally, Relator's evidence in support of his contention that Aerojet "could not detect or stop cyber intrusions or prevent the unauthorized flow [*sic*] data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 |

151

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). Finally, Relator's cited evidence and purported facts do not support his contention that EY gained access to "rocket designs," that Aerojet was "leaking data every day," or that "AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget." |
| 179 | Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0002, none of which contained any representation about Aerojet's compliance with the DFARS Clause. <br><br> • Ex. 44 <br><br> • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 180 | The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0002. <br><br> • Ex. 45 | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | | |
| 181 | **Contract No. FA8650-13-D-2335, Award Id. 0002 was successfully completed on June 15, 2019.**<br><br>• RJN Fact No. 48<br><br>• Ex. 37 at cell 5F | Not Disputed | |
| 182 | **Aerojet submitted invoices to the Air Force on Contract No. FA8650-14-C-7424, none of which contained any representation about Aerojet's compliance with the DFARS Clause.**<br><br>• Ex. 46<br><br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 183 | **All invoices were paid by the government on Contract No. FA8650-14-C-7424.**<br><br>• Ex. 47<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 184 | **Contract No. FA8650-14-C-7424 was successfully completed on March 31, 2016.**<br><br>• RJN Fact No. 47<br><br>• Ex. 37 at cell 6F | Not Disputed | |

153

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 185 | Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0003, none of which contained any representation about Aerojet's compliance with the DFARS Clause.<br><br>• Ex. 48<br><br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 186 | The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0003.<br><br>• Ex. 49<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 187 | Contract No. FA8650-13-D-2335, Award Id. 0003 was successfully completed on August 30, 2016.<br><br>• RJN Fact No. 49<br><br>• Ex. 37 at cell 9F | Not Disputed | |
| 188 | Aerojet submitted invoices to the Air Force on Contract No. FA8650-13-D-2335, Award Id. 0004, none of which contained any representation about Aerojet's compliance with the DFARS Clause.<br><br>• Ex. 50 | Not Disputed | |

154

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | | |
| 189 | **The Air Force paid all invoices on Contract No. FA8650-13-D-2335, Award Id. 0004.**<br><br>• Ex. 51<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 190 | **Contract No. FA8650-13-D-2335, Award Id. 0004 was successfully completed on September 28, 2018.**<br><br>• RJN Fact No. 50<br><br>• Ex. 37 at cell 17F | Not Disputed | |
| 191 | **The Air Force continued to award Aerojet contracts after this lawsuit was filed.**<br><br>• RJN Fact Nos. 30, 68<br><br>• Ex. 37 (reflecting 24 contracts awarded since this case was filed)<br><br>• ECF No. 1 | Not Disputed | |
| 192 | **The Air Force participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene.**<br><br>• RJN Fact Nos. 31, 70 | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 37 (reflecting 12 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br><br>• Exs. 3 & 4 (reflecting participation in investigation)<br><br>• ECF No. 25 | | |

**D.     DARPA continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 193 | **After Aerojet disclosed to DARPA that it was not compliant with NIST 800-53 or the 2013 DFARS Clause, DARPA continued to award Aerojet contracts.**<br><br>• RJN Fact No. 38<br><br>• Ex. 37 (reflecting 4 contracts awarded since 9/30/2014) | Disputed. AR has presented no evidence that the DARPA was ever given the complete story about its DFARS Clause compliance status. Although the DARPA may have known AR was not compliant with the technical controls required by the DFARS clause, AR was communicating to DOD agencies that it was complying with the clause by providing alternate controls or protective measures that achieved equivalent protection to the DFARS controls. (Relator's UMF No. 166 in Support of Relator's MSJ) There is no evidence that the AR ever | Relator's response does not create a genuine dispute of material fact. The response admits that "the DARPA may have known AR was not compliant with the technical controls required by the DFARS clause[.]" Additionally, the response does not contest or offer evidence to contradict that DARPA awarded Aerojet 4 contracts since September 30, 2014.<br><br>Relator's non-responsive narrative is also unsupported by the evidence. First, Relator cites no evidence supporting Relator's contention that Aerojet claimed to be "complying with the DFARS Clause by providing alternate controls or protective measures to achieve equivalent |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | disclosed or the DARPA understood that AR was not compliant with the DFARS requirement that AR provide "adequate security." AR did not disclose that their system was leaking sensitive data every day (Relator's UMF No. 54 in Support of Relator's MSJ) AR did not disclose that they could not detect or stop cyber intrusions or prevent the unauthorized flow data. (Relator's UMF No. 23 in Support of Relator's MSJ) AR did not tell the DARPA that EY was able to penetrate their computer network undetected in four hours gaining access to rocket designs. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) AR's disclosure of non-compliance with the technical controls were accompanied with false and misleading statements about everything else. AR told DOD agencies that it was compliant with the majority of the DFARS controls when the NGA concluded AR was only 27.5% compliant with the pre-August 2015 DFARS controls. (Relator's UMF Nos. 1, 151- | protection to the DFARS controls." To the contrary, the evidence shows that Aerojet informed DARPA that it was ***not complying*** with the DFARS Clause. *See, e.g.*, Exs. 54, 60.<br><br>Relator also overlooks that the 2013 DFARS Clause set compliance with the NIST requirements as a "minimum" for supplying adequate security, not as a separate requirement. 48 C.F.R. § 252.204-7012(b)(1) (Nov. 18, 2013). Thus, if a contractor did not comply with the NIST controls or provide an alternative control or protective measure, under the plain language of the DFARS Clause, they could not be supplying "adequate security" regardless of whether or not they took additional steps to secure their information systems. *Id.* § 252.204-7012(b). Thus any understanding by DARPA that Aerojet was not compliant with the NIST controls necessarily meant that it understood that Aerojet was not providing "adequate security" as defined by the DFARS Clause.<br><br>Relator himself admits in UMF ¶ 139 and in his response to SUF ¶ 115 that compliance with the DFARS Clause is "a black and white issue," meaning that Aerojet's disclosure of any non- |

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     |                                                   | 153 in Support of Relator's MSJ). AR advised DOD agencies it was making every effort to prevent a data breach when AR had been advised they were leaking sensitive data every day. (Relator's UMF Nos. 54,151-153 in Support of Relator's MSJ) AR claimed they were working aggressively to strengthen controls and implement additional protective measures when AR had no approved or funded plan to become DFARS compliant. (Relator's UMF Nos. 55,151-153 in Support of Relator's MSJ) When EY advised AR their system could be penetrated undetected in four hours giving them access to trophy data, AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget. (Relator's UMF Nos. 34-39 in Support of Relator's MSJ) | compliance was sufficient to disclose non-compliance. Regardless, as explained above, Aerojet was making extensive efforts to disclose its compliance status beyond mere non-compliance and in fact disclosed details about its compliance on multiple occasions. Relator's narrative is further belied by the evidence showing that the government itself understood that Aerojet was not compliant with the DFARS Clause. *See, e.g.,* Ex. 58<br><br>Finally, the "facts" that Relator claims Aerojet did not disclose to the government are not supported by the evidence he cites. Relator cites no evidence to support his contention that Aerojet was leaking sensitive data every day and could not stop or detect cyber intrusions. Additionally, Relator's evidence in support of his contention that it "could not detect or stop cyber intrusions or prevent the unauthorized flow [*sic*] data" is not so broad. Instead, it is a draft document from 2013—before the DFARS Clause was even enacted and before any contracts at issue in this case were awarded. Further, it concerned one cyber incident from 2013 that began on Pratt & Whitney Rocketdyne's systems, not Aerojet's. The evidence says nothing |

158

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | about Aerojet's cybersecurity in 2014. Similarly, Relator does not support his contention that there was no "approved or funded plan to drive DFARS Compliance," and is, in fact, directly undermined by the deponent's testimony Relator cites. *See* Ex. 245 (Van Kleeck Dep. Tr.) at 80:20-81:5 ("I don't have knowledge that -- that this statements that there were no -- that the plans were approved through -- and funded plans are in place."). Finally, Relator's cited evidence and purported facts do not support his contention that EY gained access to "rocket designs," that Aerojet was "leaking data every day," or that "AR not only denied their VP and CIO's request to increase his budget to improve security but he was told he had to reduce his budget." |
| 194 | **Aerojet submitted invoices to DARPA on Contract No. HR001115C0132, none of which contained any representation about Aerojet's compliance with the DFARS Clause.**<br><br>• Ex. 52<br><br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 195 | **DARPA paid all invoices on Contract No. HR001115C0132.**<br><br>• Ex. 53<br><br>• Ex. 6 at Resp. No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 196 | **Contract No. HR001115C0132 was successfully completed on September 30, 2016.**<br><br>• RJN Fact No. 55<br><br>• Ex. 37 at cell 15F | Not Disputed | |
| 197 | **DARPA continued to award Aerojet contracts after this lawsuit was filed.**<br><br>• RJN Fact Nos. 39, 68<br><br>• Ex. 37 (reflecting 2 contracts awarded since this case was filed)<br><br>• ECF No. 1 | Not Disputed | |
| 198 | **DARPA continued to award Aerojet contracts after the United States' declined to intervene.**<br><br>• RJN Fact Nos. 40, 70<br><br>• Ex. 37 (reflecting 1 contract awarded since June 25, 2018, when the government declined to intervene in this action) | Not Disputed | |

160

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
|     | • ECF No. 25                                      |                                            |                                                   |

E.   **NASA continued to pay and award Aerojet contracts despite knowing of Aerojet's non-compliance.**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|-----|---------------------------------------------------|--------------------------------------------|---------------------------------------------------|
| 199 | **After Aerojet disclosed to NASA that it was not compliant with NASA's Security Requirements for Unclassified Information Technology Resources in June 2015, NASA continued to award Aerojet contracts.**<br><br>• RJN Fact No. 44<br><br>• Ex. 121 (reflecting 22 contracts awarded since 7/27/2015) | Not Disputed |  |
| 200 | **Aerojet submitted invoices to NASA on Contract No. NNC10BA13B, Award ID # NNC13TA66T, none of which contained any representation about Aerojet's compliance with the NFS Clause.**<br><br>• Ex. 132<br><br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed |  |
| 201 | **NASA paid all invoices on Contract No. NNC10BA13B, Award ID # NNC13TA66T.**<br><br>• Ex. 133 | Not Disputed |  |

161

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 202 | **Contract No. NNC10BA13B, Award ID # NNC13TA66T was successfully completed on September 24, 2016.**<br><br>• Ex. 121 at cell 10F<br><br>• RJN Fact No. 56 | Not Disputed | |
| 203 | **Aerojet submitted invoices to NASA on Contract No. NNC10BA02B, Award ID # NNC15TA07T, none of which contained any representation about Aerojet's compliance with the NFS Clause.**<br><br>• Ex. 134<br><br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 204 | **NASA paid all invoices on Contract No. NNC10BA02B, Award ID # NNC15TA07T.**<br><br>• Ex. 135 | Not Disputed | |
| 205 | **Contract No. NNC10BA02B, Award ID # NNC15TA07T was successfully completed on May 11, 2015.**<br><br>• Ex. 121 at cell 14F<br><br>• RJN Fact No. 57 | Not Disputed | |
| 206 | **Aerojet submitted invoices to NASA on Contract No. NNC15CA07C, none of which** | Not Disputed | |

162

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | **contained any representation about Aerojet's compliance with the NFS Clause.**<br><br>• Ex. 136<br><br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | | |
| 207 | **NASA paid all invoices on Contract No. NNC15CA07C.**<br><br>• Ex. 137 | Not Disputed | |
| 208 | **Contract No. NNC15CA07C was successfully completed on October 9, 2020.**<br><br>• Ex. 121 at cell 15F<br><br>• RJN Fact No. 58 | Not Disputed | |
| 209 | **Aerojet submitted an invoice to NASA on Contract No. NNC15VD08P, which did not contain any representation about Aerojet's compliance with the NFS Clause.**<br><br>• Ex. 138<br><br>• Ex. 6 at Resp. No. 11 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 210 | **NASA paid all invoices on Contract No. NNC15VD08P.**<br><br>• Ex. 139 | Not Disputed | |

163

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 211 | **Contract No. NNC15VD08P was successfully completed on March 31, 2016.**<br><br>• Ex. 121 at cell 17F<br><br>• RJN Fact No. 59 | Not Disputed | |
| 212 | **Aerojet submitted invoices to NASA on Contract No. NNM16AA02C, none of which contained any representation about Aerojet's compliance with the NFS Clause.**<br><br>• Ex. 140<br><br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 213 | **NASA paid all invoices on Contract No. NNM16AA02C.**<br><br>• Ex. 141 | Not Disputed | |
| 214 | **Contract No. NNM16AA02C is still ongoing.**<br><br>• Ex. 121 at cell 21F (showing NNM16AA02C is still in progress and has not been terminated)<br><br>• RJN Fact No. 61 | Not Disputed | |
| 215 | **Aerojet submitted an invoice to NASA on Contract No. NNM16AB21P, which did not contain any representation about Aerojet's compliance with the NFS Clause.** | Not Disputed | |

164

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 142<br><br>• Ex. 6 at Resp. No. 13  (7/29/20 Relator's Am. Resp. to RFAs) | | |
| 216 | **NASA paid all invoices on Contract No. NNM16AB21P.**<br><br>• Ex. 143 | Not Disputed | |
| 217 | **Contract No. NNM16AB21P was successfully completed on March 31, 2016.**<br><br>• Ex. 121 at cell 22F<br><br>• RJN Fact No. 62 | Not Disputed | |
| 218 | **Aerojet submitted invoices to NASA on Contract No. NNH16CP17C, none of which contained any representation about Aerojet's compliance with the NFS Clause.**<br><br>• Ex. 144<br><br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 219 | **NASA paid all invoices on Contract No. NNH16CP17C.**<br><br>• Ex. 145 | Not Disputed | |
| 220 | **Contract No. NNH16CP17C was successfully completed on June 30, 2019.**<br><br>• Ex. 121 at cell 23F | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • RJN Fact No. 63 | | |
| 221 | **Aerojet submitted invoices to NASA on Contract No. NNM16AA12C, none of which contained any representation about Aerojet's compliance with the NFS Clause.**<br><br>• Ex. 146<br><br>• Ex. 6 at Resp. No. 13 (7/29/20 Relator's Am. Resp. to RFAs) | Not Disputed | |
| 222 | **NASA paid all invoices on Contract No. NNM16AA12C.**<br><br>• Ex. 147 | Not Disputed | |
| 223 | **Contract No. NNM16AA12C is still ongoing.**<br><br>• Ex. 121 at cell 25F (showing NNM16AA12C is still in progress and has not been terminated)<br><br>• RJN Fact No. 64 | Not Disputed | |
| 224 | **NASA contracting officials have not terminated or refused to reward a contract for non-compliance with the NFS Clause, and have no recollection of other contracting officers terminating or refusing to award a contract for non-compliance.**<br><br>• Ex. 182 ¶ 5<br><br>• Ex. 183 ¶ 5 | Not Disputed | |

166

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 184 ¶ 5<br><br>• Ex. 185 ¶ 5 | | |
| 225 | **NASA continued to award Aerojet contracts after this lawsuit was filed.**<br><br>• RJN Fact Nos. 45, 68<br><br>• Ex. 121 (reflecting 19 contracts awarded since this case was filed)<br><br>• ECF No. 1 | Not Disputed | |
| 226 | **NASA participated in the United States' investigation of Relator's allegations and continued to award Aerojet contracts after the United States declined to intervene.**<br><br>• RJN Fact Nos.  46, 70<br><br>• Ex. 121 (reflecting 8 contracts awarded since June 25, 2018, when the government declined to intervene in this action)<br><br>• Exs. 3 & 4 (reflecting participation in investigation)<br><br>• ECF No. 25 | Not Disputed | |
| 227 | **In 2019, NASA awarded Aerojet the Silver Achievement Medal for its cybersecurity efforts.**<br><br>• Ex. 181 | Not Disputed | |

167

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  |  |  |  |

**VII.    THE GOVERNMENT KNEW THE DEFENSE INDUSTRY WAS NOT COMPLIANT WITH CYBERSECURITY CLAUSES, BUT CONTINUED TO CONTRACT WITH AND PAY SUPPLIERS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 228 | **Defense Industrial Base companies, including Aerojet, participated in policy working groups with the Government, where companies "openly discuss[ed]" noncompliance with the DFARS Clause.**<br><br>• Ex. 7 (Markus Dep.) at 92:16-93:3 ("There were DFARS compliance meetings and presentations at the DIB and we had conversations about them. There were -- excuse me -- quite a few conversations about how the other defense contractors were becoming DFARS compliant and how some of them were already DFARS compliant and what they did to become DFARS compliant at those meetings.")<br><br>• Ex. 7 (Markus Dep.) at 159:13-161:7 (reflecting meeting with OCIO before introduction of NIST 800-171 in which Aerojet was trying to "help guide the government as to what makes sense for organizations to comply with and do and | Disputed. Defendants misrepresent these exhibits. Defendants Ex. 7 indicates that among the defense contractors many were compliant and some were non-compliant and in discussing best practices but these companies were in much better shape than Aerojet. (Defendants' Ex.7 163:2-164:16) Raytheon was discussing the final pieces it put in place to become fully complaint. (Defendants' Ex. 7 164:17-165:6) | Relator's response fails to create a genuine dispute of material fact. Relator does not dispute that Defense Industrial Base companies, including Aerojet, participated in policy working groups with the Government, where companies "openly discuss[ed]" noncompliance with the DFARS Clause. Instead, Relator's response confirms that "some" defense contractors "were non-compliant." |

168

___

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | what doesn't, what would cost them too much and put us, for example, a small business out of business if they had to comply with every single control") | | |
| | • Ex. 7 (Markus Dep.) at 162:11-20 (explaining that working group meetings with the OCIO would include a discussion of "how to individuals get compliant [with the NIST standards] properly") | | |
| | • Ex. 7 (Markus Dep.) at 163:2-163:9 (contractors "were openly discussing" that they "were noncompliant" in meeting with the OCIO). | | |
| | • Ex. 10 (Thomas Dep.) at 145:1-147:18 (explaining that there were working groups with the defense industry and the government between 2013 and 2016 regarding the DFARS Clause) | | |
| | • Ex. 19 at 1 (reflecting "continued engagement" between OCIO, DPAP, and industry" regarding the DFARS Clause) | | |
| | • Ex. 206 at AFDODCIO000224 (12/15/2015 contractor disclosure reflecting participation in "DoD-led Defense Industrial Base Cybersecurity Working Group") | | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 103 (reflecting Aerojet's participation in working group meetings)<br><br>• Ex. 32 at 42:12-43:25 (12/7/2017 congressional testimony from Ellen Lord, Defense Undersecretary for Acquisition, Technology, and Logistics reflecting that she participated in working groups with industry associations and DoD components regarding cybersecurity compliance)<br><br>• 80 FR 81472 (noting that changes to DFARS Clause to allow for additional time was made after discussing "implementation issues" and the "need for additional time to implement the security requirements" with the defense industry) | | |
| 229 | **Dozens of contractors disclosed to the DoD that they were not compliant with the technical controls in NIST 800-53 and NIST 800-171 and the DoD recognized that many contractors were not compliant with NIST 800-53 or NIST 800-171.**<br><br>• Ex. 186 (8/20/2015 contractor disclosure to DoD OCIO demonstrating 44% compliance with 50 NIST controls)<br><br>• Ex. 188 (8/26/2015 OCIO acknowledgment of non-compliance) | Not Disputed | |

170

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
|  | • Ex. 187 at AFDODCIO000486 & 488 (11/9/2015 disclosure noting compliance gaps with NIST 800-171 and NIST 800-53 and estimated completion date of gap analysis as December 31, 2015)<br><br>• Ex. 190 (11/14/2015 contracting officer requesting waiver of DFARS Clause and DoD describing contractor's disclosure as "another 'I am not compliant letter'")<br><br>• Ex. 191 (11/18/2015 disclosure from contractor reflecting non-compliance with NIST 800-171 controls)<br><br>• Ex. 194 (11/25/2015 contractor notifying DoD OCIO that it would not be able to implement the 800-171 controls immediately and that its subcontractors would not be able to either.)<br><br>• Ex. 195 (12/14/2015 DoD interpreting contractor disclosure to be "stating that they aren't compliant." with the NIST 800-171 controls)<br><br>• Ex. 206 (12/15/2015 contractor disclosure reflecting non-compliance with NIST 800-171); *see also* Ex. 10 (Thomas Dep.) at 138:24-140:16 (reviewing December 14, 2015 disclosure and agreeing that letter reflects that contractor was "not |  |  |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | implementing all of the [NIST 800-]171 requirements" and acknowledging non-compliance before DFARS Clause permitted additional time to implement controls)<br><br>• Ex. 196 (12/16/2015 e-mail reflecting that a contractor did "not currently meet all of the NIST 800-171 security measures" and DoD OCIO recognizing that "this is a case of non-compliance" and that "compliance appears to be deficient")<br><br>• Ex. 197 (12/22/2015 DoD tracking spreadsheet reflecting contractor non-compliance with the NIST standards)<br><br>• Ex. 205 (1/6/2016 e-mail from OCIO stating that "so many contractors are not [compliant], this [December 2015 DFARS Clause] gives them time to take appropriate actions" and recognizing that contractors would decrease non-compliant controls approaching December 2017)<br><br>• Ex. 198 (2/24/2016 contractor disclosing non-compliance with "105 requirements of NIST SP 800-171")<br><br>• Ex. 201 (4/27/2016 contractor disclosing non-compliance with "44 requirements of NIST SP 800-171") | | |

172

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 202 (5/2/2016 OCIO recognizing that a contractor was "working to implement" NIST controls, but that they still had gaps in compliance) | | |
| | • Ex. 189 (acknowledging that contractor is not at 100% compliance) | | |
| | • Ex. 9 (Guissanie Dep.) at 84:7-85:6; 27:14-30:21 (testifying that between 2013 and 2016, OCIO received approximately two to three a week requests for waivers from the requirements of the DFARS Clause and about "100 to 150" requests for variances from the clause a year) | | |
| | • Ex. 9 (Guissanie Dep.) at 90:1-18 (testifying "[p]eriodically, we would get . . . a communication that the contracting officer sent the CIO based on what the contractor sent to the contracting officer saying, 'I'm not really compliant with the clause at the current time'" under NIST 800-53 and NIST 800-171 and explaining contracting officers "often" sent OCIO such communications) | | |
| | • Ex. 9 (Guissanie Dep.) at 81:6-82:7 (testifying he would see contractors' statements identifying where contractors were and were not compliant) | | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | • Ex. 9 (Guissanie Dep.) at 96:2-97:14 ("Some companies would simply report based on the clause requirement what they knew they weren't doing. Other companies would -- and so they would report I met all those except for these five, for example.") | | |
| | • Ex. 9 (Guissanie Dep.) at 94:7-96:1 (reflecting that contractors would disclose non-compliance with NIST requirements after signing a contract and that the OCIO tracked such non-compliance) | | |
| | • Ex. 9 (Guissanie Dep.) at 103:7-105:2 (testifying OCIO conducted "trend analyses" of unimplemented NIST controls) | | |
| | • Ex. 21 at 22:4-9 (4/6/2017 DoD SBTW Presentation: "What I've seen is some small businesses are doing extremely well and are almost all fully compliant because it was easier for them to implement some of the solutions than some of the very large companies."); *see also* Ex. 20 (video recording of same) | | |
| | • Ex. 10 (Thomas Dep.) at 120:9-25 (testifying that between 2013 and 2016, Ms. Thomas knew that contractors "weren't fully compliant [with the NIST requirements] | | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | based on their questions" at presentations to the defense industry) <br><br> • Ex. 10 (Thomas Dep.) at 108:15-109:4 (testifying after August 2015 that some contractors were not in full compliance but working towards compliance under the December 31, 2017 deadline) | | |
| 230 | **Surveys of industry and public articles from 2016 to 2020 reflect that the defense industry has not successfully implemented all of the technical requirements NIST 800-171 or NIST 800-53.** <br><br> • Exs. 207 & 208 (AIA survey results) <br><br> • Ex. 203 & 204 (NDIA survey and white paper) <br><br> • Ex. 213 at Ex. A (5/2019, Reality Check: Defense industry's implementation of NIST SP 800-171) at 2, 3. <br><br> • Ex. 209 (9/4/2018 "Small Contractors Struggle with Cyber Rules") <br><br> • Ex. 210 (2/19/2020 "New Cybersecurity Standards Pose Challenges for Industry") <br><br> • Ex. 211 (6/17/2019 "Why DoD's decision to make cybersecurity an 'allowable cost' matters") | Disputed. All of the exhibits cited by defendant are self-serving hearsay documents from trade organizations and "news" publications whose purpose is to serve as an advocate for the defense industry so none of the statements in these publications can be accepted as proof for the matters stated. The defense industry lobbied congress to make the DFARS Clause go away. (Thyberg Opp. Dec., Ex 1, 3:12-24, AR00233088) | Relator does not contest or offer evidence to contradict this stated fact. Relator's contention that these surveys and articles are "self-serving" is undermined by the fact that the Government itself cited Exhibits 204 and 207 in the Federal Register. 85 FR 61505 nn. 1-2 (acknowledging surveys reflecting industry non-compliance with NIST controls). <br><br> "Surveys are admissible, if relevant, either as nonhearsay or through a hearsay exception. Surveys conducted according to accepted principles are routinely admitted." *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982) (citation omitted); *Sanchez v. Cnty. of San Bernardino*, 2014 WL 12734756, at *8 n.31 (C.D. Cal. Mar. 10, 2014) (citing Fed. R. Evid. 807) ("Courts frequently find that survey evidence is admissible under the 'catch-all' exception to the hearsay |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | rule."). The government's incorporation of surveys conducted by the AIA and NDIA indicates the credibility of AIA's and NDIA's methodology, Exhist 213 is also admissible as a business record. In any event, these statements also are non-hearsay as it shows that the government was on notice that the defense industry had not successfully implemented all of the technical requirements of NIST 800-171 or NIST 800-53.<br><br>Moreover, Relator's response "is nothing more than 'mere allegations or denials' which are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was "nothing more than self-serving speculation that should be disregarded" was insufficient). |
| 231 | **The DoD was aware of industry surveys indicating that contractors were not compliant with the NIST 800-53 or NIST 800-171.**<br>• Ex. 10 (Thomas Dep.) at 159:12-161:2 (testifying that she learned of industry surveys regarding DFARS compliance | Disputed. Contrary to what defendants have represented, Mary Thomas of the DOD CIO had no recollection of any surveys. (Defendants' Ex. 10 159:12- 23) | Relator's response fails to create a genuine dispute of material fact. Relator is incorrect that Mary Thomas "had no recollection of any surveys," as Thomas testified she "recall[ed] hearing about surveys that may have been conducted by industry groups or some parties outside of the department." Ex. 10 (Thomas Dep.) at |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | between 2013 and 2016 through discussions with individuals at the OCIO)<br><br>• Ex. 213 at ¶¶ 4, 7, Exs. B, D<br><br>• 85 FR 61505 (acknowledging surveys reflecting industry non-compliance with NIST controls) | | 159:20-22. Relator does not contest or contradict that Sera-Brynn sent Special Assistant to Assistant Secretary of Defense in the Office of the Under Secretary of Acquisition & Sustainment for the DoD its report nor does Relator contest that the DoD cited some of these surveys in the Federal Register. |
| 232 | **On January 26, 2017, the Aerospace Industries Association ("AIA") sent a letter to the DoD Chief Information Officer, Terry Halvorsen, regarding "DFARS Network Penetration and Contracting for Cloud Services Request" that stated that the industry struggled to implement the DFARS Clause and urged DoD to revise the applicable regulations.**<br><br>• Ex. 19 | Not Disputed | |
| 233 | **In 2019, the DoD Inspector General issued an audit report on DoD contractors' compliance with the technical controls in NIST 800-171. Out of ten contractors assessed, none were 100% compliant.**<br><br>• Ex. 35 | Not Disputed | |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

na

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| 234 | **The DoD knew that contractors were unable to implement NIST 800-53 based on its specificity to contractor systems.**<br><br>• Ex. 25 at 25:1-9 (6/23/2017 DoD Industry Day Presentation: "800-53 [] was the baseline as security and established them low, moderate, and high baselines for federal government. To apply that to a contractor system to protect CDI for confidentiality really isn't very -- isn't possible. The moderate baseline is 263 requirements. Many of them are overly specific based on federal organizations and what they require."); *see also* Ex. 24 (video recording of same)<br><br>• Ex. 21 at 9:18-20 (4/6/2017 DoD SBTW Presentation: "So [NIST 800-171 is] much more flexible, and much more realistic for us to ask industry to implement."); *see also* Ex. 20 (video recording of same) | Disputed. Gary Guissanie from the DOD CIO testified it was not impossible for contractors to comply with the NIST 800-53 controls the issue was that some of the controls only applied to federal systems and not private contractors. (Thyberg Dec. Opp. Ex. 13, Guissanie Dep. 122:4-123:2) | Relator's response fails to create a genuine dispute of material fact. Aerojet agrees that the takeaway from Mr. Guissanie's statements was that "In the testimony Relator cites, Gus Guissanie testified "some of the [NIST 800-53] controls only applied to federal systems and not private contractors." However, Mr. Guissanie also stated that NIST 800-53 was not "possible" "[t]o apply [] to a contractor system to protect CDI" because "[m]any of them are overly specific based on federal organizations." Ex. 25 at 24:24-25:9. |
| 235 | **The DoD acknowledged that it is "virtually impossible" to be in full compliance with even the more flexible NIST 800-171 standard.**<br><br>• Ex. 21 at 19:14-22 (4/6/2017 DoD SBTW Presentation: "[I]t's also important to know that at any given moment, it's virtually impossible for a contractor to be in 100 percent compliance with 171 because it is a | Disputed. Gary Guissanie from the DOD CIO testified it was not impossible for contractors to comply with the NIST 800-171 controls. ((Thyberg Dec. Opp. Ex. 13, Guissanie Dep. 123:3-124:12) It is not impossible to comply with the NIST-800-171, it is only impossible to in 100% compliance at all of the time | Relator's response fails to create a genuine dispute of material fact. Relator does not dispute or contest that the DoD stated that it was "virtually impossible for a contractor to be in 100 percent compliance with 171 because it is a very liquid type of system" on April 6, 2017. Moreover, Relator's response confirms the stated fact. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | very liquid type of system. Things change, they might have temporary deficiencies, things that they're working toward, things that they haven't gotten in place yet . . . ."); *see also* Ex. 20 (video recording of same)<br><br>• Ex. 21 at 20:24-21:2 (4/6/2017 DoD SBTW Presentation: contractor "must implement [NIST 800-]171. It doesn't say that they need to be in 100% compliance 100% of the time."); *see also* Ex. 20 (video recording of same) | because the liquid nature of the system might cause temporary deficiencies. (Defendants' Ex. 21 at 19:14-22;Thyberg Dec. Opp. Ex. 1, 19: 14-21 AR00232967) | |
| 236 | **The DoD indicated that non-compliance with the DFARS Clause at the time of contracting would not disqualify a contractor, but would instead be a "risk-based decision for the program managers and the requiring activity" to make.**<br><br>• Ex. 21 at 34:12-35:9 (4/6/2017 DoD SBTW Presentation: "[T]he onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the program managers and the requiring activity. . . . So it's really on the program management offices to understand when they need to make sure a certain level of | Disputed. Defendants' quote the speaker, Mary Thomas out of context and misprepsent what she said. There no indication non-compliance with the DFARS Clause would not disqualify a contractor. Ms. Thomas indicated that not every defense contract involves critical information that is required to be protected by the DFARS Clause. Ms. Thomas offhand comment taken out of context does not bind the DOD or change the requirements of the DFARS Clause that was enacted into law by executive order. The DOD advised AR that compliance with the DFARS Clause was mandatory and | Relator's response fails to create a genuine dispute of material fact. First, Relator's contention that Ms. Thomas' statement that was authorized by the DoD cannot bind the DoD is completely unsupported. *See* Ex. 10 (Thomas Dep. Tr.) at 21:12-23 ("[A]s a program analyst for DPAP, were -- did you have responsibility for certain public-facing presentations regarding the DFARS clause? A. Yes, I did. Q. Did you also have responsibility of giving guidance to contractors about how to implement the DFARS clause? A. I had responsibility to present briefings that were developed by a team of folks and that spoke to many stakeholders to include this industry."). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | protections are in place."); *see also* Ex. 20 (video recording of same)<br><br>• 48 C.F.R. § 9.103<br><br>• Ex. 189 (indicating that a "contracting officer [] and the requiring activity need to determine appropriate action" when "the contractor is not compliant with the DFARS clause") | nonwaivable. (Relator's UMF Nos. 126, 128, 131 in Support of Relator's MSJ) The DOD's position was that if a contractor was not compliant, they could not have DOD CTI on their system until they were. (Relator's UMF No.131 in Support of Relator's MSJ) | Second, Relator is incorrect that Mary Thomas's statement was made in the context in which the DFARS Clause was not included in the contract. When Mary Thomas introduced the System Security Plan, she explained that the SSP is how contractors document their noncompliance with specific NIST 800-171 controls and that the SSPs need not be provided to the government unless the government requests it. Ex. 21 at 18:22-19:4. Thomas then explained that the SSPs, which document noncompliance with NIST 800-171 controls, are "a very good way for program offices and requiring activities who have a high level of risk and really need to know ahead of time the state of a contractor's information system, they can request the System Security Plan, either in the solicitation, it could be part of the source selection process." *Id*. at 19:5-11. Mary Thomas repeated this point again when she said "the onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the program managers and the requiring activity. . . . So it's really on the program management offices to understand when they need to make |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | | | sure a certain level of protections are in place." *Id.* at 34:12-35:9. |
| 237 | In 2019, the government acknowledged that only "1% of [Defense Industrial Base] companies have implemented all 110 controls from [NIST]."<br><br>• Ex. 211 (reflecting comments from Katie Arrington, Special Assistant to Assistant Secretary of Defense in the Office of the Under Secretary of Acquisition & Sustainment") | Disputed. Defendants' proof is nothing more than an inadmissible hearsay statements of a news reporter. The reporter's statement is not under oath so there is no admissible evidence that any statement was made. Even if the reporter's statement were admissible an off-hand comment by Katie Arrington's, a government employee, cannot bind the entire federal government and is not an admission of the federal government. | Relator's response fails to create a genuine dispute of material fact. Relator's response "is nothing more than 'mere allegations or denials' which are insufficient to overcome [Aerojet's] showing." *Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994) (finding opposition party's response that material fact was "nothing more than self-serving speculation that should be disregarded" was insufficient). Special Assistant to Assistant Secretary of Defense in the Office of the Under Secretary of Acquisition & Sustainment Katie Arrington's statement that "1% of [Defense Industrial Base] companies have implemented all 110 controls from [NIST]" is non-hearsay as it shows that the government was on notice that the defense industrial base has not implemented all 100 controls from NIST. Relator's contention that Ms. Arrington's statement as a representative of the DoD acting in her DoD position cannot bind the DoD is completely unsupported. |
| 238 | Navy contracting officials have no recollection of ever terminating a contract, refusing to | Disputed. Defendants' Undisputed Fact gives the false impression that "Navy | Relator's response does not create a genuine dispute of material fact. Relator presents no evidence that any |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Aerojet's Undisputed Fact and Supporting Evidence | Relator's Response and Supporting Evidence | Aerojet's Reply to Relator's Response If Disputed |
|---|---|---|---|
| | **award a contract, or refusing to pay an invoice for non-compliance with the DFARS Clause.** <br><br> • Ex. 113, ¶ 4 <br><br> • Ex. 114, ¶¶ 3-4 <br><br> • Ex. 112, ¶¶ 4-5 <br><br> • Ex. 6 at Resp No. 17 (7/29/20 Relator's Am. Resp. to RFAs) | Contracting Officials" as whole have no recollection of terminating a contract, refusing to award a contract or pay an invoice for non-compliance with the DFARS Clause. Defendants' evidence is based on the limited knowledge of three Navy contacting officials who can only speak to the limited number of contracts in their purview. Absent from these declarations is any indication that these contracting officers were aware of contractor non-compliance, paid or entered a contract knowing a contractor was non-compliant, or paid or entered a contract knowing the contractor was as non-compliant as Aerojet and failing to provide "adequate security" to protect the DOD sensitive unclassified information. | Navy contracting official has any recollection of terminating a contract, refusing to pay an invoice, of refusing to award a contract based on non-compliance with the DFARS Clause. Instead, the only Navy contracting officials to provide testimony in this case confirmed in signed declarations that they are not aware of ever terminating a contract, refusing to award a contract, or refusing to pay an invoice because of non-compliance with the DFARS clause. |

182

**AEROJET'S RESPONSE TO RELATOR'S ADDITIONAL FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 1 | On October 6, 2021 the DOJ announced the launch of the Civil Cyber Fraud Initiative and its intention to utilize the False Claims Act to pursue government contractors and grant recipients who have engaged in cybersecurity fraud.<br><br>• Thyberg Dec. Opp. Ex. 12 | Undisputed. Aerojet notes that this announcement and initiate comes nearly eight years after the DoD first enacted the DFARS Clause and nearly ten years after the NFS Clause was effective. |
| 2 | In announcing the Civil Cyber Fraud Initiative, Deputy Attorney General, Lisa Monaco stated: "For too long, companies have chosen, silence under the mistaken belief that it less risky to hide breach than to bring it forward and report it…Well that changes today. We are announcing today that we will use our civil enforcement tools to pursue companies, those who are government contractors who receive federal funds, when they fail to follow required cybersecurity standards-because we know it puts all of us at risk."<br><br>• Thyberg Dec. Opp. Ex. 12 | Undisputed. Aerojet notes that this announcement and initiate comes nearly eight years after the DoD first enacted the DFARS Clause and nearly ten years after the NFS Clause was effective. |
| 3 | It is very important to the DOD that its proprietary or developmental information is protected when it is in the hands if its defense industry partners.<br><br>• Thyberg Dec. Opp. Ex. 1, 3:21-4:4, AR00232952 | Undisputed that the DoD stated in its opening remarks at the April 6, 2017 SBTW presentation "it's very important to us to ensure that the information, that proprietary or developmental information is protected when it's in the hands of our industry partners." Thyberg Decl. Opp., ECF No. 134 Ex. 1 at 4:1-4 (4/6/2017 DoD SBTW Presentation). Disputed to the extent this fact suggests that compliance with the technical controls in the DFARS Clause was required to protect such information. Disputed to the extent this fact suggests that compliance |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | with the DFARS Clause was "important" for every contract or to every contracting officer or DoD agency. The DoD acknowledged that, based on the specific contract, the requiring activities would be more or less willing to award contracts to contractors who had not implemented specific technical controls. Ex. 21 at 34:12-35:9 (4/6/2017 DoD SBTW Presentation: "[T]he onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the program managers and the requiring activity. . . . So it's really on the program management offices to understand when they need to make sure a certain level of protections are in place."); Ex. 29 at 4:20-5:7 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."). |
| 4 | Cyber security is important to the DOD, because the DOD knows that theft of its sensitive data can allow our adversaries to clone technology, get leap ahead technologies that allows them to counter us in battle putting our warfighter's lives at risk.<br><br>• Thyberg Dec. Opp. Ex. 1, 4:5-12 AR00232952 | Disputed insofar as Relator mischaracterizes the DoD's statement. When discussing cybercrimes in its opening remarks of the April 6, 2017 SBTW presentation, the DoD stated:  "In the end, what we know is the adversary finds this to be very lucrative, that they can come in, steal a significant amount of data, and then use it to either clone our capabilities, get ahead of us in leap-ahead technologies, or counter us, and we don't want to find out about that when we're out on the battle space and our war fighters' lives are at risk." Thyberg Decl. Opp., ECF |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | No. 134 Ex. 1 at 3:16-4:12 (4/6/2017 DoD SBTW Presentation). The DoD did not state that the theft of information allows adversaries to counter us in battle, putting our warfighters' lives as risk; rather the DoD stated that such theft could allow the development of leap-ahead technology and it does not want to find out about that on the battlefield and our war fighters' lives are at risk. *Id*. Disputed to the extent this fact suggests that compliance with the DFARS Clause was "important" for every contract or to every contracting officer or DoD agency. The DoD acknowledged that, based on the specific contract, the requiring activities would be more or less willing to award contracts to contractors who had not implemented specific technical controls. Ex. 21 at 34:12-35:9 (4/6/2017 DoD SBTW Presentation: "[T]he onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the program managers and the requiring activity. . . . So it's really on the program management offices to understand when they need to make sure a certain level of protections are in place."); Ex. 29 at 4:20-5:7 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 5 | It's virtually impossible for a contractor to be in 100 % compliance with 171 because it's a very liquid type system, Things change they might have temporary deficiencies they are working towards.<br><br>• Thyberg Dec. Opp. Ex. 1, 19: 14-21 AR00232967 | Undisputed. Aerojet notes that the last sentence of this quote states in full: "Things change, they might have temporary deficiencies, things that they're working towards, things that just haven't gotten in place yet." Thyberg Decl. Opp., ECF No. 134 Ex. 1 at 19:14-22 (4/6/2017 DoD SBTW Presentation). |
| 6 | The DFARS Clause requires defense contractors report to incidents on their network where there is covered defense information so the DOD so they can understand the impact the cyber incident on the DOD military operations as the DOD is depending this information in a war fighting situation. (24:21-25:13 AR00232972-73)<br><br>• Thyberg Dec. Opp. Ex. 1, 24:21- 25:13, AR00232972-73 | Undisputed that the DoD stated at the April 6, 2017 Small Business Training Week presentation that the DFARS Clause in effect at that time, the October 21, 2016 DFARS Clause, required the reporting of cyber incidents to the DoD. Disputed to the extent Relator seeks to establish that this statement applied to other versions of the DFARS Clause. |
| 7 | The DOD needs information from contractors regarding cyber incidents involving covered defense information so they can do a damage assessment so they know what information regarding the capability of our weapons system was exfiltrated by an adversary.<br><br>• Thyberg Dec. Opp. Ex. 1, 25:14-20, AR0023273 | Disputed insofar as Relator mischaracterizes the DoD's statement. The DoD stated: "If it effects the covered defense information, we find out that all of the very sensitive information that had to do with the development of a capability of our weapons system was now exfiltrated by an adversary, we also need to know that. And we need to go back and assess what we call the damage." Thyberg Decl. Opp., ECF No. 134 Ex. 1 at 25:14-20 (4/6/2017 DoD SBTW Presentation). |
| 8 | The DOD wants contractors to provide malware from cyberattacks so they can do a forensic analysis they want to look at the media, what happened and understand impact on the mission. | Disputed insofar as Relator mischaracterizes the DoD's statement. The DoD stated "we had language in the National Defense Authorization |

186

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | • Thyberg Dec. Opp. Ex. 1, 26:11-22, AR00232974 | Act that helped us with this, and we wanted to get malware from the companies. If they're able to isolate it and submit it to us, we want to take a look at it so we can take it apart, do some forensic analysis, and do some really good stuff to figure out who's coming after us, what are the signatures, and what can we share back with our communities so we can be better protected moving forward." Thyberg Decl. Opp., ECF No. 134 Ex. 1 at 26:11-21 (4/6/2017 DoD SBTW Presentation). <br><br> The DoD also stated "And this is on the damage assessment piece of it. Our point here is that we want to look at the media, we want to look at what happened, and understand the impact to the mission. At that point, that's not so much a contractual decision, it's a decision in part the department." *Id*. at 26:23-27:4. |
| 9 | DOD advised prime contractors that if you are dealing with a sub-contractor who you don't believe is able to protect data, then your sensitive data should not be going to them. <br><br> • Thyberg Dec. Opp. Ex. 1, 31:15-21, AR00232979 | Disputed to the extent Relator seeks to establish that the DoD advised prime contractors but undisputed that the DoD made this statement at the April 6, 2017 Small Business Training Week presentation. |
| 10 | If the information is critical to the DOD Program office they will make sure they satisfied with the state of the contractor system before they will make an award. <br><br> • Thyberg Dec. Opp. Ex. 1, 34:21-35:3, AR00232982-83 | Undisputed. Aerojet notes that the DoD was discussing the contract-by-contract risk-based decision made by each program officer. The DoD stated: "the onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the [DoD] program managers and the requiring activity. So if it's of that critical importance to a program office that their data is protected, and we've worked with some where that is the case, they will ahead of time in the solicitation process say |

187

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | that this is something that they're going to look at. And they make sure that they're satisfied with the state of the system before they award." Thyberg Decl. Opp., ECF No. 134 Ex. 1 at 34:15-35:3 (4/6/2017 DoD SBTW Presentation). |
| 11 | When the DOD was asked if a contractor could have their contract terminated if their system were breached due a security fault or failure, the DOD make a distinction between contractors who are implementing the DFARS requirements and those who are not but said they were, and in the second case the contractor would be subject to all contract remedies and penalties.<br><br>• Thyberg Dec. Opp. Ex. 1, 37:24-38:20, AR00232985-86 | Disputed. The DoD stated:  "if there is a cyber incident, that does not mean there is any fault by the contractor. Somebody implementing 171 100 percent all the time will still have cyber incidents occur . . . [t]he goal of our clause is really to understand what is happening out there and what information is being lost rather than for it to be something that is going to go against a contractor contractually. Now if there were cases where they said they were implementing it and it was found that they were not, again, the same penalties and remedies that are in place for other contract clauses is the spectrum of things that could be applied in that case. So there's nothing unique about this rule that says that there are any different penalties or remedies." Thyberg Decl. Opp., ECF No. 134 Ex. 1 at 38:3-20 (4/6/2017 DoD SBTW Presentation).<br><br>The DoD made clear that the DFARS Clause did not require compliance with every NIST 800-171 control. Ex. 29 at 22:22-23:4 (6/23/2017 DoD Industry Day Presentation: "if you look at the language in the clause, it says shall implement as a minimum, 800-171. And if you look at revision 1, [NIST] 800-171 says you can meet my requirements by doing a SSP and planned requirements with a plan of action. So it doesn't say implement the -- the clause doesn't say implement the requirements of 171. It says implement 171."); *see also* Ex. 28 (video recording of same). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 12 | The DOD has stated the DFARS Clause is very important for our national security.<br><br>• Thyberg Dec. Opp. Ex. 2, 2:24-3:1, AR00233087-88 | Disputed insofar as Relator seeks to establish that the DoD statement made during the opening remarks of the April 26, 2018 Small Business Training Week presentation was made in reference to every version of the DFARS Clause. Rather, the DoD, when describing the October 21, 2016 DFARS Clause, stated "This new cyber DFARS clause is very important for our national security and our defense industrial base security." Thyberg Decl. Opp., ECF No. 134 Ex. 2, at 2:24-3:1 (4/26/2018 DoD SBTW Presentation). Further disputed to the extent this fact suggests that 100% compliance with the DFARS Clause was "very important" for every contract or to every contracting officer or DoD agency. The DoD acknowledged that, based on the specific contract, the requiring activities would be more or less willing to award contracts to contractors who had not implemented specific technical controls. Ex. 21 at 34:12-35:9 (4/6/2017 DoD SBTW Presentation: "[T]he onus of determining if that -- the state of someone's information system is -- if it meets the level of risk -- I mean it's really a risk-based decision for the program managers and the requiring activity. . . . So it's really on the program management offices to understand when they need to make sure a certain level of protections are in place."); Ex. 29 at 4:20-5:7 (6/23/2017 DoD Industry Day Presentation: "So, again, 171 states that the system security plan is a mechanism to document implementation of how a contractor's implementing the [NIST 800-]171 requirements and that a POAM may be linked with the system security plan to even show planned implementation. So if a requiring activity requested for your system security plan and saw that you had a plan of action and milestones in place for say five or six of your controls, and they were willing to accept that risk, then that is |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | considered implementing the [NIST 800-]171 and you are in compliance with the DFARS rule."). |
| 13 | The defense industry lobbied congress to make the DFARS Clause go away but the DFARS Clause is not going away it got presidential and congressional support because everyone realizes it is important to secure our defense industrial base for national security.<br><br>• Thyberg Dec. Opp. Ex. 2, 3:12-24, AR00233088 | Undisputed that Ted Bujewski made this statement during his opening remark at the April 26, 2018 Small Business Training Week presentation. Aerojet notes that Ted Bujewski, who was not one of the panelists who presented during the event, said at the end of that statement "and it's not going away so we need to be able to implement the clause *__as best as possible__* within industry." Thyberg Decl. Opp., ECF No. 134 Ex. 2, at 3:12-4:1 (4/26/2018 DoD SBTW Presentation) (emphasis added). |
| 14 | The adversary is looking to steal information in order to counter, kill or clone our capabilities and when information is compromised in the development of a program, then the program is less valuable to the DOD and the money invested is less valuable.<br><br>• Thyberg Dec. Opp. Ex. 2, 4:22-5:7, AR00233090 | Undisputed that the DoD made this statement during the opening remarks of the April 26, 2018 Small Business Training Week presentation. |
| 15 | When a DOD contractor has cyber incident on their system they are required to report it to the DOD and if they find malware on their system they need to submit it to the DOD as well.<br><br>• Thyberg Dec. Opp. Ex. 2, 9:17-10:10, AR00233094-95 | Undisputed that the DoD stated in connection with the 2016 DFARS Clause: "if there were to be a cyber incident on that system, they're required to report to the DoD directly that that incident has occurred . . . When they report a cyber incident, if they were to find malware on their system at that time, they would need to submit that to the department as well. And then depending on the incident, the government might want to do a further assessment of the incident in which they might ask them for media or ask them to facilitate that damage assessment. But that doesn't always happen, it's just based on |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|-----|---------------------------------------------------------------|--------------------------------------------|
|  |  | the type of incident that occurs." Disputed to the extent Relator seeks to establish that this statement applies to other versions of the DFARS Clause that were not in effect at the time of this statement, on April 26, 2018. |
| 16 | When a DOD contracor has covered defense information they are required to protect it no matter where it is. If they give it to anyone in their supply chain they are still responsible for protecting it.<br><br>• Thyberg Dec. Opp. Ex. 2, 10:17- 11:3, AR00233095-96 | Undisputed that the DoD made this statement at the April 26, 2018 Small Business Training Week presentation. Disputed to the extent Relator seeks to establish that this statement applies to contracts that do not contain the DFARS Clause. Aerojet further disputes this purported fact to the extent Relator seeks to establish that this statement applies to versions of the DFARS Clause other than the 2016 DFARS Clause, which is what was being discussed in Relator's Exhibit 2. |
| 17 | When there is a cyber incident the contractor is required to report to the DOD within 72 hours so the DOD can take appropriate action.<br><br>• Thyberg Dec. Opp. Ex. 2, 26:23- 27:6, AR00233111-12 | Aerojet disputes that the DoD said that reporting was required within 72 hours of a cyber incident. Rather, the DoD stated:  "the requirement is that the contractor must report to the DoD within 72 hours *of the discovery of a* cyber incident." Thyberg Decl. Opp., ECF No. 134 Ex. 2, at 27:4–11 (4/26/2018 DoD SBTW Presentation) (emphasis added). Aerojet further disputes this purported fact to the extent Relator seeks to establish that this statement applies to contracts that do not contain the DFARS Clause or that contain versions of the DFARS Clause other than the 2016 DFARS Clause, which is what was being discussed in Relator's Exhibit 2. |
| 18 | When information is compromised the DOD wants to do a damage assessment, they want to understand what part of a weapon system had been potentially compromised and how that may change how they use the weapon in an actual military operation. | Disputed. The DoD stated that it "want[s] to do a damage assessment *if [it] ha[s]* a need to understand in greater detail the impact of the information that may have been compromised." Thyberg Decl. Opp., ECF No. 134 Ex. 2, at 28:20-24 (4/26/2018 DoD SBTW Presentation) (emphasis added). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | • Thyberg Dec. Opp. Ex. 2, 28:20-29:18, AR00233113-14 | |
| 19 | When a contractor signs a contract they are stating they have met all of the contract and one of those is NIST 800-171 and when they sign the contract the contractor is saying they have documented system security plan on how they are implementing the their requirements and they have a plan of action for any requirement not yet implemented.<br><br>• Thyberg Dec. Opp. Ex. 2, 41:11-23, AR00233126 | Undisputed that the DoD made this statement at the April 26, 2018 Small Business Training Week presentation. Disputed to the extent Relator seeks to establish that this statement applies to contracts that do not contain the DFARS Clause or that contain versions of the DFARS Clause other than the 2016 DFARS Clause, which is what was being discussed in Relator's Exhibit 2. Further disputed that this statement applies in situations where, like here, Aerojet disclosed that it was non-compliant with the DFARS Clause. *See* SUF ¶¶ 57, 81, 86, 101, 108, 116, 119, 121-22. |
| 20 | The DOD understands that most companies are really trying to do the right thing but thing happen but where companied are not doing the right thing the DOD definitely wants to see those companies held accountable.<br><br>• Thyberg Dec. Opp. Ex. 2, 44:3-24, AR00233129 | Disputed insofar as Relator mischaracterizes the statement and attributes Vicki Michetti's statement clearly espousing her personal opinion to the DoD. Vicki Michetti stated: "I think most of the time they're really trying to do the right thing, but things happen. And if they're not, then I definitely want to see that those companies are being held accountable." Thyberg Decl. Opp., ECF No. 134 Ex. 2, at 44:20-24 (4/26/2018 DoD SBTW Presentation). |
| 21 | The Army determined that the DFARS Clause did not apply to contract W31P4Q- 16-C-0026 because the it did not require information that was required to be protected by the DFARS Clause.<br><br>• Thyberg Dec. Opp. Ex. 9, ARMY_TOUHY00000012 | Undisputed. Aerojet notes that this contract was awarded after Relator filed his complaint, on December 23, 2015, and is not at issue in this case. SUF ¶ 50, ECF No. 57 at 11. |
| 22 | On March 17, 2017, NASA rejected payment on an invoice and all future invoices due to AR's | Disputed that NASA rejected all future invoices. Exhibit 8 is an e-mail from Leahmarie Khoury, the contracting officer on NNC16CA21C, |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | performance deficiencies in submitting an acceptable Information Technology System Security Plan.<br><br>• Thyberg Dec. Opp. Ex. 8, NASA TOUHY 00000113-15 | which relates to the one invoice that NASA rejected for Contract No. NNC16CA21C, which is not identified in Relator's SAC. Ex. 148. Nothing in Exhibit 8 supports Relator's contention that NASA would reject "all" future invoices. Indeed, the undisputed facts show that between NASA's rejection of Aerojet's invoice in March 2017, NASA paid Aerojet dozens of invoices on other contracts. *See, e.g.,* SUF ¶ 201, Ex. 133 at AR00225294, AR00225256; SUF ¶ 207, Ex. 137 at AR00232632, AR00225321; SUF ¶ 213, Ex. 141 at AR00227948–49, AR00227961–63, AR00227934–35; SUF ¶ 219, Ex. 145 at AR00226519–22; SUF ¶ 222, Ex. 147 at AR00227729, AR00227722–23, AR00227716–18, AR00227703–07. Aerojet further notes that Contract No. NNC16CA21C was awarded after Relator filed his complaint and is not at issue in this case. Ex. 121 at row 26; ECF No. 57 at 11. |
| 23 | Due to security concerns, on December 22, 2016, NASA Deputy CISO, David Murnan, recommended that NASA not share any sensitive data on contract NNC15CA21C, until AR had an authorized Information Technology System Security Plan.<br><br>• Thyberg Dec. Opp. Ex. 8, NASA TOUHY 00000202-03 | Relator's fact and evidence reference Contract No. NNC15CA21C, which was not awarded to Aerojet.[7] However, Aerojet believes this reference to be a typographical error, and relates to Contract No. NNC1**6**CA21C. Regardless, neither contract is identified in Relator's Second Amended Complaint and Contract No. NNC16CA21C was awarded to Aerojet after Relator filed his complaint and is not at issue in this case. Ex. 121 at row 26; ECF No. 57 at 11.<br><br>Undisputed that Mr. Murnan made the recommendation contained in Realtor's fact. Disputed that Mr. Murnan's recommendation was due to "security concerns" as the evidence cited does not support this |

[7]   Contract No. NNC15CA21C is a contract between NASA and TDA Research, Inc. *See* https://www.usaspending.gov/award/CONT_AWD_NNC15CA21C_8000_-NONE-_-NONE- (last visited Oct. 25, 2021).

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|-----|-----|-----|
| | | reasoning. Further disputed that there were any actual "security concerns" about NASA's data housed with Aerojet, but rather that Aerojet's documentation did not adequately describe the security in place. *See* Thyberg Decl. Opp., ECF No. 134 Ex. 8.<br><br>Further, Aerojet met with NASA on January 20, 2017 and presented on its strategy to bring its systems into compliance with NIST 800-53. SUF ¶ 149, *see* Ex. 178. After discussions with Aerojet, NASA approved Aerojet's IT System Security Plan and paid the invoice; SUF ¶ 149, *see* Ex. 148; which Relator does not dispute, ECF No. 133 ¶ 149. Moreover, NASA later acknowledged that Aerojet had made "good progress per [its] remediation plan" and thanked Aerojet for its "diligent efforts" and "open, transparent communications" which "demonstrate[d] a path to success." SUF ¶ 152, Ex. 180 at AR00229090 & AR00229095. Relator also does not dispute this fact. ECF No. 133 ¶ 152. Aerojet has consistently disclosed its compliance status to NASA. *E.g.*, SUF ¶¶ 128–29; 132; 134; 138–41; 144–49. NASA Contracting Officer Joseph McCollister also stated that during his time as a contracting officer for NASA, he "ha[d] not terminated or refused to award a contract for non-compliance with NASA FARS Supplement 1852.204-76." Ex. 185 ¶ 5.<br><br>Aerojet further notes that Contract No. NNC16CA21C is ongoing and is expected to be completed on July 31, 2024. Ex. 121 at row 26. Finally, Aerojet notes that NASA continued to award Aerojet contracts after December 22, 2016. Ex. 121 (identifying 8 contracts awarded after 12/22/2016). |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 24 | On January 5, 2017, Leahmarie Khoury, lead contracting officer at NASA emailed Ann Bovee, Mark McBride, David Chamberlin at AR stating:<br><br>"**The subject DRD has been rejected by the Government due to material omissions of required information and the quality of information provided**… The AEPS Project is currently operating at risk until the corrections to the plan are made, which includes the assessment described below. Without assurance there are adequate protections in place, the late delivery of the DRD along with the **low fidelity if the documentation provided puts the NASA data in AR possession at risk. As such the Government will require a complete risk mitigation plan and schedule to be provided no later than January 23, 2017 as to avoid actions leading to a stop work order.**" (Emphasis added) AR00025727<br><br>• Thyberg Dec. Opp. Ex. 7, AR00025727 | Disputed that Ms. Khoury emailed Ann Bovee, Mark McBride, and David Chamberlain on January 5, 2017. Undisputed that Ms. Khoury stated that in an email to Keith Keehan, Jerry Jackson, Todd Tofil, Daimel Herman, and Daniel Saccomando. Further, Relator cites no evidence that Leahmarie Khoury was a "lead contracting officer" at NASA or defines what a "lead contracting officer" is.<br><br>Relator's fact and evidence reference Contract No. NNC16CA21C, which is not identified in Relator's Second Amended Complaint and was awarded to Aerojet after Relator filed his complaint and is not at issue in this case. Ex. 121 at row 26; ECF No. 57 at 11.<br><br>Aerojet met with NASA on January 20, 2017 and presented on its strategy to bring its systems into compliance with NIST 800-53. SUF ¶ 149, *see* Ex. 178. After discussions with Aerojet, NASA approved Aerojet's IT System Security Plan and paid the invoice; SUF ¶ 149, *see* Ex. 148; which Relator does not dispute, ECF No. 133 ¶ 149. Moreover, NASA later acknowledged that Aerojet had made "good progress per [its] remediation plan" and thanked Aerojet for its "diligent efforts" and "open, transparent communications" which "demonstrate[d] a path to success." SUF ¶ 152, Ex. 180 at AR00229090 & AR00229095. Relator also does not dispute this fact. ECF No. 133 ¶ 152. Aerojet has consistently disclosed its compliance status to NASA. *E.g.*, SUF ¶¶ 128–29; 132; 134; 138–41; 144–49. Further, NASA Contracting Officer Joseph McCollister stated that during his time as a contracting officer for NASA, he "ha[d] not terminated or refused to award a contract for non-compliance with NASA FARS Supplement 1852.204-76." Ex. 185 ¶ 5. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | Aerojet further notes that the AEPS contract, Contract No. NNC16CA21C is ongoing and is expected to be completed on July 31, 2024. Ex. 121 at row 26. Finally, Aerojet notes that NASA continued to award Aerojet contracts after January 5, 2017. Ex. 121 (identifying 8 contracts awarded after 1/5/2017). |
| 25 | On or about January 17, 2017, AR was warned by their NASA Glenn contracts manager that AR's failure to satisfy NASA IT concerns will result in stop work order. AR00025719-20 <br><br> • Thyberg Dec. Opp. Ex. 7, AR00025719-20 | Disputed. The document reflects Aerojet's employee's statement that the "Government will require a complete risk mitigation plan and schedule be provided … as to avoid actions leading to a stop work order." Relator references an Aerojet employee's recitation of what NASA Glenn contract managers told Aerojet, which constitutes inadmissible hearsay evidence. Additionally, Exhibit 7 refers to Contract No. NNC16CA21C, which is not identified in Relator's Second Amended Complaint and was awarded to Aerojet after Relator filed his complaint and is not at issue in this case. Ex. 121 at row 26; ECF No. 57 at 11. <br><br> Three days after NASA's e-mail, Aerojet met with NASA to discuss NASA's concerns and provide details on its non-compliance with NIST 800-53. SUF ¶ 149, *see* Ex. 148. After discussions with Aerojet, and Aerojet's resubmittal of its IT System Security Plan, NASA approved Aerojet's IT System Security Plan and paid the invoice; SUF ¶ 149, *see* Ex. 148; which Relator does not dispute, ECF No. 133 ¶ 149. Moreover, in connection with the same contract, NASA later acknowledged that Aerojet had made "good progress per [its] remediation plan" and thanked Aerojet for its "diligent efforts" and "open, transparent communications" which "demonstrate[d] a path to success." SUF ¶ 152, Ex. 180 at AR00229090 & AR00229095. Relator also does not dispute this fact. ECF No. 133 ¶ 152. Aerojet has consistently disclosed its compliance status to NASA. *E.g.*, SUF ¶¶ |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | 128–29; 132; 134; 138–41; 144–49. Further, NASA Contracting Officer Joseph McCollister stated that during his time as a contracting officer for NASA, he "ha[d] not terminated or refused to award a contract for non-compliance with NASA FARS Supplement 1852.204-76." Ex. 185 ¶ 5. Aerojet notes that the AEPS contract, Contract No. NNC16CA21C, is ongoing and is expected to be completed on July 31, 2024. Ex. 121 at row 26. Finally, Aerojet notes that NASA continued to award Aerojet contracts after January 5, 2017. Ex. 121 (identifying 8 contracts awarded after 1/17/2017). |
| 26 | On June 13, 2013 EY disclosed to AR (known as Gencorp at that time) that the cyberattack on the Rocketdyne network on May 25, 2013 had resulted in the exfiltration of 100.5 gigabytes of data in 61,640 files located in 5,643 directories accessing approximately nine years of data and a broad range of content including information regarding hypersonic weapons systems, DARPA white papers and NASA Briefings.<br><br>• Thyberg Dec. Opp. Ex. 6, EY-AEROJET - 00030350 | Disputed. Exhibit 6 is not an EY document, as it is marked "UTC Proprietary Information." The May 25, 2013 cyber incident occurred on Pratt & Whitey Rocketdyne's systems, not Aerojet's, as reported by UTC in Exhibit 6. |
| 27 | Grant Thornton Data Loss Prevention Audit dated November 26, 2018 rated AR's did not Data Loss Prevention Process ("DLP") as "high risk" as it was not able to prevented data loss and relied on procedures that notified AR after a potential disclosure of data has occurred rather than employing preventive measure to address DPL before exfiltration or unauthorized disclosure. | Disputed. The Grant Thornton Data Loss Prevention Audit is hearsay not subject to an exception. Further, the report notes that "as of the date of this report, Information Technology management has selected, and is in the process of piloting a DLP vendor," that "will provide the necessary technical capabilities, training, support and vendor-provided turnkey installation and configuration to reduce manual processing and |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | • Thyberg Dec. Opp. Ex.11, GT00044-45 | introduce a more proactive detection/protection posture." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT00047.<br><br>The report is from 2018, which is years after this case was filed and the applicable 2013 DFARS Clause was amended. Further, the report was not to evaluate Aerojet's *compliance* with the DFARS Clause or NFS Clause but rather only evaluated POA&Ms. *Id*. at GT00039. Aerojet notes that this report states that for the DFARS POA&M and mitigation, the audit found no deficiencies in Aerojet's POA&Ms. *Id*.<br><br>The findings in the report are also "not to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. |
| 28 | Grant Thorton 2018 Cyber Security Report dated December 21, 2018, advised AR they needed to make improvements in cybersecurity due to the severity of the audit findings and associated risks.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00027 | Disputed. The Grant Thornton Cyber Security Report is hearsay not subject to an exception. Further, the report characterized the improvements as "moderate," and noted that Aerojet "has continued to evolve its cybersecurity capabilities through the implementation of additional protective technology, such as multi-factor authentication; as well as implementation of a POA&M management program, and the hiring of a permanent CISO." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT 00027. The report also noted that Aerojet "leadership via the third-party service provider, CGI, is in the process of planning and implementing initiatives to address these weaknesses and strengthen the Company's information security program." *Id*.<br><br>The findings in the report are also "not to meant to be defined as non-compliance with applicable U.S. Government or other governmental |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00030. |
| 29 | The 2018 Grant Thornton Audit advised AR they had well known vulnerabilities due to outdated operating systems and missing patches.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00027 | Disputed. The Grant Thornton Cyber Security Report is hearsay not subject to an exception. Further, the report noted that Aerojet "has continued to evolve its cybersecurity capabilities through the implementation of additional protective technology, such as multi-factor authentication; as well as implementation of a POA&M management program, and the hiring of a permanent CISO." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT 00027. The report also noted that Aerojet "leadership via the third-party service provider, CGI, is in the process of planning and implementing initiatives to address these weaknesses and strengthen the Company's information security program." *Id*.<br><br>The findings in the report are also "not to meant to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00030. |
| 30 | Grant Thornton found AR's system was not protected against well-known vulnerabilities such as "WannaCry" and warned AR that their unsupported and unpatched servers could lead to critical vulnerabilities that could be exploited and increased the risk of exposure of sensitive, proprietary, and restricted information.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00030 | Disputed. The Grant Thornton Cyber Security Report is hearsay not subject to an exception. Further, the report states that Aerojet "has a vulnerability management program in place." The report noted that Aerojet "has continued to evolve its cybersecurity capabilities through the implementation of additional protective technology, such as multi-factor authentication; as well as implementation of a POA&M management program, and the hiring of a permanent CISO." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT 00027. The report also noted that Aerojet "leadership via the third-party service provider, CGI, is in the process of planning and implementing initiatives to address these |

199

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | weaknesses and strengthen the Company's information security program." *Id*.<br><br>The findings in the report are also "not to meant to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00030. |
| 31 | Grant Thornton indicated that during their penetration test AR's managed service provider CGI failed to identify or respond to the suspicious activity indicating that a malicious scan could go undetected and result in the exfiltration of data.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00033 | Disputed. The Grant Thornton Cyber Security Report is hearsay not subject to an exception. Further, the report states the "CGI Security Operations Center did not identify, take action and/*or* notify AR Information Security leadership during the penetration testing simulating malicious scanning activities," meaning CGI may have identified the malicious scanning activities but did not notify AR Information Security. Thyberg Dec. Opp. Ex.11 at GT 00033. |
| 32 | Grant Thornton's 2019 Cyber Security Loss Prevention Audit dated February 21, 2020, indicated risk losing proprietary information, significant enhancements of certain key processes in the cybersecurity program were required and that AR had failed to address a number if findings in their previous year's audit.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00003 | Disputed. The Grant Thornton Cyber Security Loss Prevention Audit is hearsay not subject to an exception. Further, Realtor misconstrues the report. The report also states that "under the guidance of the Director, Information Security Management, the cybersecurity program at AR continues to mature with significant changes occurring in key areas," and that "[t]hroughout the audit, we observed an improvement in the cybersecurity program since the 2018 internal audits." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT 00003.<br><br>The findings in the report were also not "meant to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00007. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 33 | Grant Thornton's 2019 AR audit findings were worse than the 2018 findings as now AR had two "high risk" findings, and three "moderate risk" findings.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00004 | Disputed. The Grant Thornton Cyber Security Loss Prevention Audit is hearsay not subject to an exception.<br><br>The report states that "under the guidance of the Director, Information Security Management, the cybersecurity program at AR continues to mature with significant changes occurring in key areas," and that "[t]hroughout the audit, we observed an improvement in the cybersecurity program since the 2018 internal audits." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT 00003.<br><br>The findings in the report were also not "meant to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00007. |
| 34 | Although Grant Thornton had advised AR their servers were not adequately patched to protect against well-known critical vulnerabilities, a year later Grant Thornton found this issue had not been adequately addressed.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00007 | Disputed. The Grant Thornton Cyber Security Loss Prevention Audit is hearsay not subject to an exception. The report also concluded that "[t]hroughout the audit, we observed an improvement in the cybersecurity program since the 2018 internal audits. [Aerojet] continues to evolve its cybersecurity capabilities through large-scale transformative projects, such as the data center migration, and the implementation of additional protective technologies, such as Wildfire for the Palo Alto Firewall." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT 00003.<br><br>The findings in the report were also not "meant to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00007. |

201

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 35 | Grant Thornton found that in 2019 AR was still using Windows 2003 servers that were no longer supported by Microsoft when Grant Thornton had warned AR these outdated and unsupported systems were at risk for being compromised by malicious vulnerabilities.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00009 | Disputed. The Grant Thornton Cyber Security Loss Prevention Audit is hearsay not subject to an exception. The report also concluded that "[t]hroughout the audit, we observed an improvement in the cybersecurity program since the 2018 internal audits. [Aerojet] continues to evolve its cybersecurity capabilities through large-scale transformative projects, such as the data center migration, and the implementation of additional protective technologies, such as Wildfire for the Palo Alto Firewall." Thyberg Decl. Opp., ECF No. 134 Ex.11 at GT 00003.<br><br>The findings in the report were also not "meant to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00007. |
| 36 | In their 2019 penetration test Grant Thornton found that AR's managed service provider CGI still failed to correctly identify their malicious scanning activities indicating that a malicious scan could go unprotected.<br><br>• Thyberg Dec. Opp. Ex.11, GT 00009 | Disputed. The Grant Thornton Cyber Security Loss Prevention Audit is hearsay not subject to an exception.<br><br>Grant Thornton did not find that CGI still failed to correctly identify their malicious scanning activities indicating that a malicious scan could go unprotected. Nor did Aerojet's Internal Audit team. Rather, the report merely repeats the findings from the 2018 report and notes "that the prior year audit actions over data breach and incident response handling capabilities were addressed."<br><br>The findings in the report were also not "meant to be defined as non-compliance with applicable U.S. Government or other governmental organizations' rules and regulations or written company policies and procedures unless specifically stated otherwise." *Id*. at GT00007. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 37 | Shortly, March 2017, CGI found what later proved to be millions of critical vulnerabilities in AR's servers, work stations and network devices.<br><br>• Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶¶ 16,54 | Disputed. Relator's only evidence for this fact are allegations from a complaint filed in another action against Aerojet—allegations that Aerojet denied in its answer to the complaint. *See* Ex. 263 ¶¶ 16, 54. An allegation in a complaint is not admissible evidence, nor is it sufficient to support an undisputed material fact on summary judgment. *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (holding allegations in a complaint "are insufficient to defeat a summary judgment motion"). |
| 38 | AR made representations to CGI leading CGI to believe AR was compliant with guidelines and best practices applicable to federal government contractors and was not plagued with critical vulnerabilities<br><br>• Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶¶ 16,54 | Disputed. Relator's only evidence for this fact are allegations from a complaint filed in another action against Aerojet—allegations that Aerojet denied in its answer to the complaint. Ex. 263 ¶¶ 16, 54. An allegation in a complaint is not admissible evidence, nor is it sufficient to support an undisputed material fact on summary judgment. *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (holding allegations in a complaint "are insufficient to defeat a summary judgment motion"). |
| 39 | AR representatives, Kurt Figler and Mark McBride gave CGI copies of security policies and practices touted as AR standard practices but CGI learned these security policies and procedures were never fully or widely implemented. CGI Amended Comp<br><br>• Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶16 | Disputed. Relator's only evidence for this fact are allegations from a complaint filed in another action against Aerojet—allegations that Aerojet denied in its answer to the complaint. Ex. 263 ¶ 16. An allegation in a complaint is not admissible evidence, nor is it sufficient to support an undisputed material fact on summary judgment. *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (holding allegations in a complaint "are insufficient to defeat a summary judgment motion"). |
| 40 | AR represented to CGI they had security systems in place that were not in place. | Disputed. Relator's only evidence for this fact are allegations from a complaint filed in another action against Aerojet—allegations that Aerojet denied in its answer to the complaint. Ex. 263 ¶ 16. An |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | • Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶16 | allegation in a complaint is not admissible evidence, nor is it sufficient to support an undisputed material fact on summary judgment. *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (holding allegations in a complaint "are insufficient to defeat a summary judgment motion"). |
| 41 | AR concealed its critical vulnerabilities by configuring it computer network with security tools and sensors that masked all or a substantial number of its critical security alerts.<br><br>• Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶¶16,55 | Disputed. Relator's only evidence for this fact are allegations from a complaint filed in another action against Aerojet—allegations that Aerojet denied in its answer to the complaint. Ex. 263 ¶¶ 16, 55. An allegation in a complaint is not admissible evidence, nor is it sufficient to support an undisputed material fact on summary judgment. *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (holding allegations in a complaint "are insufficient to defeat a summary judgment motion"). |
| 42 | Due to critical flaws in its security environment AR experienced a major security incident on May 2, 2017.<br><br>• Thyberg Dec. Opp. Ex. 3, CGI Amended Complaint ¶18 | Disputed. Relator's only evidence for this fact are allegations from a complaint filed in another action against Aerojet—allegations that Aerojet denied in its answer to the complaint. Ex. 263 ¶ 18. An allegation in a complaint is not admissible evidence, nor is it sufficient to support an undisputed material fact on summary judgment. *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (holding allegations in a complaint "are insufficient to defeat a summary judgment motion"). |
| 43 | Army contracting officer Laurie Hewitt would not award AR a contract unless AR was compliant with the DFARS Clause.  (Hewitt Dep. 46:4-18)<br><br>• Thyberg Dec. Opp. Ex. 5, Hewitt Dep. 46:4-18 | Undisputed. Aerojet notes, however, that Contract No. W31P4Q16C0026 was awarded to Aerojet despite Aerojet's disclosure that it was not compliant with the DFARS Clause. SUF ¶¶ 50, 57-80. Finally, Aerojet notes that this contract was awarded after Relator filed |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | | his complaint, on December 23, 2015, and is not at issue in this case. SUF ¶ 50, ECF No. 57 at 11. |
| 44 | Compliance with the DFARS Clause was not a Department of Defense wide problem. (Hewitt Dep. 48:6-10)<br><br>• Thyberg Dec. Opp. Ex. 5, Hewitt Dep. 48:6-10 | Disputed. The evidence reflects that compliance with the DFARS Clause was a DoD-wide problem. Ex. 9 (Guissanie Dep.) at 84:7-85:6; 27:14-30:21 (testifying that between 2013 and 2016, OCIO received approximately two to three a week requests for waivers from the requirements of the DFARS Clause and about "100 to 150" requests for variances from the clause a year), 81:6-82:7 (testifying he would see contractors' statements identifying where contractors were and were not compliant), 90:1-18 (testifying "[p]eriodically, we would get . . . a communication that the contracting officer sent the CIO based on what the contractor sent to the contracting officer saying, 'I'm not really compliant with the clause at the current time'" under NIST 800-53 and NIST 800-171 and explaining contracting officers "often" sent OCIO such communications), 94:7-96:1 (reflecting that contractors would disclose non-compliance with NIST requirements after signing a contract and that the OCIO tracked such non-compliance), 96:2-97:14 ("Some companies would simply report based on the clause requirement what they knew they weren't doing. Other companies would -- and so they would report I met all these except for these five, for example."), 103:7-105:2 (testifying OCIO conducted "trend analyses" of unimplemented NIST controls). Finally, Relator seeks to establish the truth of the matter asserted by citing testimony that discusses the statements made in an e-mail by Vicki Michetti, which constitutes inadmissible hearsay evidence. Thyberg Decl. Opp., ECF No. 134 Ex. 5, Hewitt Dep. 48:6-10. |

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| 45 | Michetti from the DOD CIO office indicated that the DFARS Clause controls had to be in place before AR was awarded a contract and that was related to AR.<br><br>• Thyberg Dec. Opp. Ex. 5, Hewitt Dep. 49:5-18 | Disputed. During the Laurie Hewitt's deposition, Relator's counsel presented Ms. Hewitt with Exhibit A at 412-15 (AR00026626-28),[8] which is an e-mail chain between Laurie Hewitt and Vicki Michetti. Thyberg Decl. Opp., ECF No. 134 Ex. 5, Hewitt Dep. 48:21-49:18 ("Look at page Aerojet 26626 to 26628. There's an e-mail that starts on that first page, original message from Ms. Michetti to yourself on May 21, 2015"). In the document, Vicki Michetti wrote that "In discussing this with OUSD (AT&L) they noted that the DFAR does not require compliance with the controls prior to award –but the controls must be in place by the time the contractor has Controlled Technical Information (CTI) on his information system." Ex. A at 412. Relator's Counsel asked Laurie Hewitt about this statement, and Hewitt testified that "Ms. Michetti reiterated that the controls had to be in place for contract award to Aerojet." Thyberg Decl. Opp., ECF No. 134, Ex. 5, Hewitt Dep. 49:5-18. Hewitt's testimony, approximately seven years later, is undermined by the e-mail itself. This fact also relies on inadmissible hearsay to the extent Relator seeks to establish the truth of the matter asserted from testimony by Laurie Hewitt describing a statement by Vicki Michetti. |
| 46 | AR VP and CIO Mark Angelo did not think it was fiscally responsible for AR to try to achieve the highest cyber security standard stating … **I am not convinced that it is fiscally responsible for leadership to attempt to achieve a maturity level of 5**. (Emphasis added) AR00180711 | Undisputed that Mark Angelo said he is "not convinced that it is fiscally responsible for leadership to attempt to achieve a maturity level of 5" on January 5, 2017, in response to a draft report performed by Aerojet Internal Audit. Disputed as to Relator's characterization of a maturity level of 5 being "the highest cyber security standard" or that |

---

[8]   Exhibit A at 412-15 (AR00026626-28) is the same document as Aerojet's Exhibit 94.

**DEFS.' REPLY TO RELATOR'S RESP. TO DEFS.' STMT. OF UNDISPUTED FACTS**

| No. | Relator's Additional Undisputed Facts and Supporting Evidence | Aerojet's Response and Supporting Evidence |
|---|---|---|
| | • Thyberg Dec. Opp. Ex. 4, AR00180711 | any such maturity level was necessary or required to protect DoD or NASA information. |

207