1  THYBERGLAW
2  GREGORY A. THYBERG SBN102132
   3104 O STREET. #190
3  SACRAMENTO, CALIFORNIA 95816
   TEL: (916) 204-9173
4  greg@thyberglaw.com

5
   ATTORNEYS FOR PLAINTIFF, BRIAN MARKUS
6

7

8                    UNITED STATES DISTRICT COURT
9

10
                FOR THE EASTERN DISTRICT OF CALIFORNIA
11

12

13
   UNITED STATES OF AMERICA:        )   Civil Action No. 2:15-cv-2245 WBS-AC
14                                   )
   *ex rel.*                        )
15                                   )
   BRIAN MARKUS                     )   **RELATOR'S REPLY TO**
16                                   )   **DEFENDANTS' OPPOSITION TO**
                                     )   **RELATOR'S MOTION FOR**
17                                   )   **SUMMARY JUDGMENT/ SUMMARY**
                                     )   **ADJUDICATION**
18            Plaintiffs,            )
                                     )
19        vs.                        )   Date: November 1, 2020
                                     )   Time: 1:30 p.m.
20                                   )   Courtroom: 5
21  AEROJET ROCKETDYNE HOLDINGS,     )   Judge: Hon. William B. Shubb
                                     )
22  INC., a corporation and AEROJET  )
                                     )
23  ROCKETDYNE, INC. a corporation.
24

25            Defendants
26

27  _____

28

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ……………………………………………………….5

II. REPLY TO DEFENDANTS' CONTENTIONS…………………………..7

A. Relator's Case Is Not Limited To Eighteen Contracts……………………7

B. Defendants' False Claims Liability Is Not Simply Based On
   Their Failure To Comply With Technical Controls. ………………………..9

C. Defendants' Disclosures Related To Its Noncompliance With
   Technical Controls Were Accompanied By False Statements and
   Material Omissions. ……………………………………………………..10

III.   LEGAL ARGUMENT……………………………………………..11

A. Relators Claim Is Not Limited To Eight Contracts………………….......11

B. Relator Has Established Materiality And Causation As A
   Matter of Law…………………………………………………………..15

C. Relator Should Be Granted Summary Adjudication As To The Eight
   Contracts AR Concedes Had A Cybersecurity Clause………………………19

D. The Court Should Award Damages In the Amount of Three Times The
   Invoices Defendants' Have Been Paid……………………………………21

IV. CONCLUSION………………………………………………………23

1

**TABLE OF AUTHORITIES**

2

Page

3

**Cases**

4

5

*Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.,* 395 F.2d 388
(8th Cir. 1968)……………………………………………………………….13

6

7

*Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F2d 573 (9th Cir. 1992)……..…14

8

*Pickern v. Pier 1 Imports (U.S.), Inc.,* 457 F.3d 963 (9th Cir. 2006)……………...13

9

10

*United States v. Aerojet Rocketdyne Holdings, Inc.,* 381 F. Supp. 3d 1240
(E.D. Cal. 2019)…………………………………………………………...11

11

12

*United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 10
(1st Cir. 2016)……………………………………………………… ..……17

13

*U.S. ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166 (9th Cir. 2006)…….. 13, 23

14

15

*U.S. ex rel. McLean v. Cty. of Santa Clara,* No. C05-01962 HRL, 2011
WL5223076, (N.D. Cal. Oct. 31, 2011), aff'd, 542 F. App'x 579
(9th Cir. 2013)……………………………………………………………..12,13

16

17

*United States ex rel. Morsell v. NortonLifeLock, Inc.*, No. CV 12-800 (RC),
2021 WL 3363446, (D.D.C. Aug. 3, 2021)…………………………………………16

18

19

*United States v. Pub. Warehousing Co. K.S.C.,* No. 1:05-CV-2968-TWT, 2017
WL 1021745,(N.D. Ga. Mar. 16, 2017) …………………………………....17

20

21

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008)………………….....16,17

22

23

*Universal Health Servs., Inc. v. United States (Escobar),*
136 S. Ct. 1989, (2016)……………………………………………….11,18,19

**Statutes**

24

25

31 U.S.C. §§ 3729 *et seq*……………………………………………………….7

26

31 U.S.C. §§ 3729(G)……………………………………………………..23

27

28

**Rules**

Fed. R. Civ. P. 8…………………………………………………………………..13

Fed. R. Civ. P. 36(a)(4)……………………………………………… .14

**Federal Regulations**

DFARS Clause 252.204-7012…………………………………………………..9

NASA FARS Clause 1852.237-73……………………………………….... 8.9

## I.  INTRODUCTION

Defendants' opposition to Relator's motion confirms that Aerojet ("AR") has no viable defense to this False Claims Action. AR's response, much like its disclosures to government, relies on misdirection and falsehoods, as defendants attempt to escape summary judgment by rewriting the record and misrepresenting the law. AR defends its actions by repeatedly stating: "Aerojet disclosed its non-compliance to the government" in the hope that the court will never evaluate the content of those disclosures. Each of AR's carefully crafted disclosures of its technical noncompliance were designed to buy more time and avoid telling the government what was really going on, that AR was unable to protect the government's sensitive information from disclosure to our adversaries.

AR claims the government was not misled, but fails to point to a single document that indicates that the government understood that its information was not secure. The government clearly did not understand that sensitive information it shared with AR would be placed on a computer network that could be easily penetrated by  North Korea, China, Iran and others. AR's contention that there is no evidence the government suffered any damage as result of its conduct is a remarkable claim, in light of the fact that since these cyber breaches began North Korea has developed an ICBM capable of hitting the United States and just a few days ago China tested a hypersonic missile with capabilities far beyond what our military intelligence would have expected.

Although AR does not see any harm caused by their conduct, the government definitely does as the DOJ has announced a Civil Cyber Fraud Initiative that will use the

False Claims Act ("FCA") to pursue contractors who take government funds while making false assurances about protecting the government's sensitive information. (DOJ October 13, 2021 Announcement attached as Exhibit "A" to the Declaration of Gregory A. Thyberg in support of this reply "Thyberg Dec.") AR's conduct falls squarely within three types of wrongful conduct the DOJ initiative is designed to address. The DOJ stated: "First the False Claims Act is a natural fit to pursue knowing failures to comply with cybersecurity standards. (Thyberg Dec. Ex. A, page 2) The DOJ went on to state:

> Second, False Claims Act liability may be based on the knowing misrepresentation of security controls and practices. In seeking a government contract, or performing under it, companies often make representations to the government about their products, services and cybersecurity practices. These representations may be about a system security plan detailing the security controls in place, the company's practices for monitoring systems for breaches, or password or access requirements. Misreporting about these practices may cause the government to choose a contractor who should not have received the contract in the first place. Or it could cause the government to structure a contract differently than otherwise would have. Knowing misrepresentations of this kind also deprive the government of what it paid for and violate the False Claims Act. *Id.*

Third the DOJ stated that government contractors, like AR, who conceal cyber intrusions violate the FCA. The DOJ stated:

> Finally, the knowing failure to timely report suspected breaches is another way a company may run afoul of the Act. Government contracts for cyber products, as well as other goods and services, often require the timely reporting of cyber incidents that could threaten the security of agency information and systems. Prompt reporting by contractors often is crucial for agencies to respond to the breach, remediate the vulnerability and limit the resulting harm. *Id.*

It is undisputed that Aerojet has violated the FCA in every manner proscribed by the

1   DOJ so summary judgment is appropriate.

2   **II. REPLY TO DEFENDANTS' CONTENTIONS**

3   **A. Relator's Case Is Not Limited To Eighteen Contracts**

4

5   Relator's case is not limited to eighteen contracts as relator has alleged that

6   defendants have engaged in a fraudulent course of conduct in violation of the Civil False

7   Claims Act, 31 U.S.C. §§ 3729 *et seq.* to induce the government to enter contracts while

8   failing to comply with NASA and DOD Federal Acquisition Regulations. (Relator's

9   Second Amended Complaint "SAC" ¶¶ 1,9-10) The SAC refers to AR entering **at least**

10  eight prime DOD contracts and nine NASA contracts. (SAC ¶¶ 84,91,105)   The SAC

11  also alleges that AR violated the FCA by entering subcontracts with prime contractors

12  including Boeing, Lockheed Martin and Raytheon. (SAC ¶¶ 77-80,126)

13

14

15  AR's attempt to limit its liability based on the fact that the NASA FARS and

16  DFARS clause did not make it into certain contracts is without merit. AR's obligation to

17  protect sensitive information did not begin the day the NASA FARS or DFARS clause

18  became effective. These clauses were enacted as tools used to make sure contractor's

19  honored existing obligations to protect the government's sensitive information.  The SAC

20  complaint does not simply refer to the DFARS and NASA FARS Clause but alleged

21  generally that AR's contracts included federal regulations related to cybersecurity. (SAC

22  ¶ 12)

23

24

25  In the case of DOD contracts, the SAC alleges not only that DOD contracts

26  included the DFARS Clause but also that contracts included a DD-254 tForm that

27  incorporated cybersecurity requirements into the contract. *Id.* These DOD contracts that

28

did not yet incorporate the DFARS Clause would include a DD Form 254 which required that AR comply with all laws and regulations governing access to "Unclassified Controlled Technical Information" which would include the DFARS Clause. The standard DD Form 254 states: "The contractor is responsible for compliance with all applicable laws and regulations governing access to Classified or Controlled Unclassified Information". (Defendants' Ex. 71) So the day the DFARS Clause became effective, AR was contractually required to comply with it regardless of whether the clause itself was listed in the contract.  Even before the DFARS Clause was effective the MDA advised AR that safeguarding unclassified information against network intrusions and data exfiltration was a requirement for MDA contracts related to ballistic missile defense. (UMF No. 124)

    For NASA contracts that did not specifically include the NASA FARS Clause, the contract would have included NASA FARS Clause 1852.237-73 which required Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure.

    Regardless of whether these specific clauses got into a particular contract, AR cannot seriously argue that they did not know that leaking the government's sensitive military information to our adversaries was not illegal or material to these contracts. If AR wants summary adjudication that these clauses do not apply to certain contracts, the burden is on them to produce for the court copies of these contracts, so they can demonstrate the clauses are not there. As for the AR subcontracts, compliance with the DFARS and NASA FARS Clause were mandatory flow down requirements. Lockheed

sent AR numerous letters wherein they advised AR that compliance with DFARS Clause 252.204-7012 was a mandatory requirement. (UMF Nos.125,132,134)

**B. Defendants' False Claims Liability Is Not Simply Based On Their Failure To Comply With Technical Controls.**

Defendants' opposition fails to address the core of the relator's false claims case. This case is not simply about AR's compliance with technical controls but its obligation to provide "adequate security" to protect sensitive government information. NASA FARS Clause 1852.237-73 required Aerojet to safeguard sensitive information coming into its possession from unauthorized use or disclosure. DFARS Clause 252.204-7012 required that adequate security on all covered contractor information systems. The DFARS Clause states: "Adequate security' means protective measures that are commensurate with the consequences and probability of loss, misuse, or unauthorized access to, or modification of information."

Relator's undisputed material facts establish that AR placed the government's sensitive data on a computer network where the loss of sensitive data was certain as AR could not detect or stop cyber intrusions or prevent the loss of data (UMF Nos. 11,13,17, 20-23,26,28,34,36,40-50,53,54) The consequences of this loss are potentially catastrophic, as AR was storing engineering documents that could assist our adversaries in building an intercontinental ballistic missile capable of hitting the United States. (UMF No. 15) Indeed, in the years since cyber intrusions documented in this case began, North Korea has developed such a missile.

AR's focus its disclosure of technical noncompliance to the exclusion of everything else, ignores the purpose for having cybersecurity controls and AR's most important obligation to provide "adequate security" to protect the government's information. AR is not facing liability because it was not 100% compliant with a list of technical controls. Indeed, AR was comfortable disclosing its noncompliance with technical controls because they knew technical noncompliance would not disqualify them from participating in a contract as long as they assured the government they were protecting the government's sensitive information through alternate controls or protective measure that provided equivalent protection. Disclosing a percentage compliance with a list of its controls in itself was meaningless as controls vary in how critical they are and many controls simply relate to documentation requirements rather than a specific piece of hardware or software. The only question that really mattered was in spite of AR's noncompliance with required technical controls, did they have alternate controls in place to provide equivalent protection. The government's wanted to know if we share our sensitive information with AR, will it be protected? What is our risk?  (UMF Nos. 74,75) AR's response was always protective controls are in place to safeguard unclassified information or that AR had alternate controls or protective measures in place to provide equivalent protection. (UMF Nos. 79, 84,85)

**C. Defendants' Disclosures Related To Its Noncompliance With Technical Controls Were Accompanied By False Statements and Material Omissions.**

AR's disclosures regarding its noncompliance with the NASA FARS and DFARS technical controls is no defense to false claims liability when those disclosures were

accompanied by false statements, half-truths and material omissions. As the Supreme Court held in *Universal Health Servs., Inc. v. United States (Escobar)* 136 S. Ct. 1989 (2016) half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations for the purposes of false claims liability. *Id.* at 2000. To escape liability AR must demonstrate not only that they made disclosures but that those disclosures were free of falsehood or omissions such that AR's disclosure told the whole truth. The undisputed record is that AR never told the whole truth resulting in critical omissions the information the government would want to know in assessing whether its information was safe. AR points to numerous documents and meetings where it disclosed to the government it was noncompliant but fails to cite a single document where it told the whole truth.

Moreover, AR repeated citations to government witnesses who understood AR was not compliant are of no avail on the issue of its false claims liability. Establishing that government witnesses understood its half-truths does not cure the fact that AR never told the government the whole truth. A partial disclosure will not relieve a defendant of false claims liability where the defendant failed to "disclose noncompliance with material statutory, regulatory, or contractual requirements." *United States v. Aerojet Rocketdyne Holdings, Inc.,* 381 F. Supp. 3d 1240, 1246 (E.D. Cal. 2019)

## III.   LEGAL ARGUMENT

### A. Relators Claim Is Not Limited To Eight Contracts.

AR contention that relator's case is limited to certain contracts specifically enumerated in the SAC is without merit. The SAC alleges a fraudulent course of conduct

wherein AR made false statements to obtain contacts. The SAC refers to AR entering **at least** eight prime DOD contracts and nine NASA contracts. (SAC ¶¶ 84,91,105) The SAC also alleges AR entered subcontracts with prime contractors.  Relator has not expanded the scope of the SAC complaint by seeking judgment as to the specific contracts referenced in the SAC as well as other contracts that are listed on usapending.gov. To allege otherwise would allow AR to escape liability for entering fraudulent contracts just because the relator does not have knowledge of the specifics of those contracts at the time he files his complaint. Following AR reasoning a relator could not bring a false claims action for fraudulent medical billing unless he was able to allege in the complaint every fraudulent billing transaction.  Clearly, the purpose of the False Claims Act is to recover the damages sustained by the government due to a contractor's fraudulent course of conduct and is not limited to each specific transaction alleged in the complaint as long as the transactions that are proved are linked to the course of conduct alleged.

AR's citation of *U.S. ex rel. McLean v. Cty. of Santa Clara,* No. C05-01962 HRL, 2011 WL 5223076, at *14 (N.D. Cal. Oct. 31, 2011), <u>aff'd,</u> 542 F. App'x 579 (9th Cir. 2013) does not support AR's position as that case involved a situation where the relator was raising a new legal theory not alleged in the complaint. The court wrote:

> But nowhere in the original complaint or the subsequent amendment is there an allegation that defendants perpetrated a fraud on the government by falsely inflating the Discount Rate. At the summary judgment stage, liberal pleading standards are inapplicable, and new claims cannot properly be raised for the first time on summary judgment… **Indeed, the first (vague) hint that relator might be pursuing this particular theory came well after the close of discovery and at a time when the parties were**

**preparing to brief the instant summary judgment motions.** (Emphasis added and citations omitted) *Id.*

*Pickern v. Pier 1 Imports (U.S.), Inc.,* 457 F.3d 963 (9th Cir. 2006) cited by AR also has no application to the present case as the plaintiff in Pickern was raising new factual allegations that did not fall within the original complaint thus failing to give the defendant fair notice of plaintiff's claim. *Id.* at 968. Relators SAC alleged placed defendants on notice that their liability rested on a course of conduct wherein they made false statements and material omissions about their cybersecurity status to secure contracts and subcontracts. The terms of the complaint which referred to "at least" a certain number of prime contracts and alleged subcontracts with prime contractors including Boeing, Lockheed Martin and Raytheon cannot be fairly read to limit relator's compliant to the enumerated contracts listed by way of example. Fed. R. Civ. P. 8 requires  that a complaint set forth  a short and plain statement of the claim showing that the pleader is entitled to relief. This could hardly be accomplished if relator were required to plead not simply a course of conduct giving rise to liability but was also required to allege the factual details contained in hundreds of contracts. As the court stated in *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.,* 395 F.2d 388, 389–90 (8th Cir. 1968): "… the spirit of Fed.R.Civ.P. 8. Rule 8(a) prescribes a simplified pleading: '(2) A short and plain statement of the claim showing that the pleader is entitled to relief.' **The clear purpose of the rule is to give notice to the other party and not to formulate issues or fully summarize the facts involved.** (Emphasis added) at 389-90.

Defendants' contention that relator is required to produce copies of hundreds contracts to prove his case is without merit. These clauses were required to be in the contracts during the relevant time period as matter of law. AR in its motion admits the clause was in at least eight contracts. Moreover, Relator has presented evidence that AR was advised that compliance with the contracts was a mandatory flow down requirement (UMF Nos. 125,132,134) AR was working on missile contracts and they were advised by the DOD even before the enactment of the DFARS Clause, that for contracts related to Ballistic Missile Defense ("BMD") they were required to safeguard their network against intrusions and data exfiltration. Even contracts that did not include the DFARS Clause had a DD-254  Form that required AR comply with all regulations related to cyber security.

Defendants' claim that relator has presented no evidence that any contract included UCTI or SBU information is contradicted by defendants' responses to request for admissions as set forth in UMF Nos. 170,175,180,186,191,197,208.  AR admitted "in the course" of performing certain contracts it stored SBU or UCTI on its computer system. Defendants' attempt to escape the binding effect of these admissions through a semantic "slight of hand" wherein they contend these admission responses  do not establish the information they admitted was on their system was related to the cited contact should be rejected. When good faith requires that a party responding to a request for admission to qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." Fed. R. Civ P 36(a)(4); see *Holmgren v. State Farm Mut. Auto. Ins. Co.* (9th Cir. 1992) 976 F2d 573, 579-580. If

these were not unequivocal admissions, defendant should qualified their admissions by admitting the specified information was on their system but not related to the cited contract.

AR's claim that relator has not proved his case because the DFARS Clause was rescinded, replaced or changed is simply false. Every version of the DFARS Clause required that defendants provide "adequate security" to protect the government's sensitive information. Every version of the clause required that AR detect and stop cyber intrusions, report intrusions as soon as they occur and prevent the unauthorized exfiltration of data. AR was doing none of these things and has provided no evidence that any version of the DFARS Clause excused them from these obligations. Moreover, most of the contracts at issue incorporated the NASA FARS Clause that has never been revised. If these clauses were not in AR's contracts, then why were they engaged all of the correspondence and meetings with the government about their compliance status

**B. Relator Has Established Materiality And Causation As A Matter of Law**

AR has provided no evidence that providing "adequate security" to protect the government's information from unauthorized disclosure was not material to its contracts with NASA or the DOD when it would be storing the government's sensitive information on its computer network. Since defendants' have no evidence from which a trier could find their false statements and omissions were not "material" they have resorted to mispresenting the law. Defendant's cite *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006) for the proposition that to prove a fraud in the inducement claim, "relator must meet a heavy burden" but nowhere in the case does the court refer to

a "heavy burden." Rather than present evidence to refute relator's material facts,

defendants seek to mislead the court to set the bar higher than is legally required.

In a similar manner, defendants seek to mislead the court by asserting a "but for"

causation standard wherein they claim the relator cannot prevail unless he presents

testimony from government contracting officers that they would have denied AR

contracts if they had known the truth about AR's falsehoods. The court in *United States*

*ex rel. Morsell v. NortonLifeLock, Inc.*, No. CV 12-800 (RC), 2021 WL 3363446,

(D.D.C. Aug. 3, 2021) rejected the argument that establish false claim liability the

government had to provide evidence of actual contract or payment decisions. The court

wrote:

> **First, Norton argues that the Government must identify evidence of
> its *actual* contracting or payment decisions to prevent summary
> judgment on materiality.** *See, e.g.*, Mem. at 9 ("the government presented
> no evidence regarding the government's actual contracting or payment
> decisions"); Mem. at 10 ("Rather, the government must prove materiality
> with evidence that the government would not have paid the allegedly false
> claim if it had known of its alleged falsity"); Reply at 6 ("Under any theory
> of liability, the FCA requires the plaintiff to adduce evidence that the
> alleged falsity in the subject claims *actually affected the government's
> decision making.*"); Reply at 8 ("This is entirely consistent with the central
> teaching of *Escobar* that materiality requires a showing of actual effect on
> government decision making."). **But *Escobar* does not require such a
> showing.** *Id.* at 4

The court in *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) also rejected the

argument that testimony from an actual decision maker was required in false claim case.

The court wrote:

> **Rogan agrees that this is so but argues, nonetheless, that a federal
> employee in a position to take a decision had to testify that the
> government was sure to enforce the statute. That's not a component of**

> **materiality.** A statement or omission is "capable of influencing" a decision even if those who make the decision are negligent and fail to appreciate the statement's significance. (Emphasis added) *Id.* at 452

Defendants cannot create a disputed issue that its falsehoods were not material to the government's contracting decisions by asserting that the government kept contracting with AR and paying AR after this lawsuit was filed. The government's mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance. See, *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) The filing of a FCA Complaint does not necessarily put the government on notice of the allegations of the complaint. See, *United States v. Pub. Warehousing Co. K.S.C.,* No. 1:05-CV-2968-TWT, 2017 WL 1021745, at *6 (N.D. Ga. Mar. 16, 2017) It is AR that has failed to produce any evidence that the government continued to contract with them with full knowledge that AR's computer network could not detect or stop cyber intrusions and was actively leaking information to our adversaries. If AR really believes the information they were withholding was not material to the government, then why didn't they solicit testimony from government witnesses that if they had known AR was leaking leaking missile technology to our adversaries that would not change their contracting decision? AR cannot create a disputed fact by merely speculating that contracting officers knew something because this case exists.

The pages defendants devote in their response to relator's motion about their disclosures of their noncompliance is unavailing. AR claims their non-compliance did not affect government's contracting decisions but they  present zero evidence that the government was ever given full knowledge of AR's compliance status along with the

most critical information the government needed to know,  that AR could not and was not protecting its computer network against cyber intrusions and the unauthorized exfiltration of data.

AR contends relator's motion fails to address the government's actual response to their disclosed non-compliance, but there is nothing about the government's response that is relevant to "materiality" in the case. AR disclosed technical non-compliance coupled with false statements that assured the information was still protected. Of course the government did not respond negatively to AR's disclosures because they were never told the truth. AR's misleading disclosures had their intended affect as they allowed AR to continue to secure new contracts and get their invoices paid. Arguably, AR's partial disclosures of non-compliance gave the government a false sense of security that AR was being candid and could be trusted when they could not.

Relator's undisputed facts have established materiality and causation as a matter of law. The Supreme Court held in *Universal Health Servs., Inc. v. United States (Escobar),* 136 S. Ct. 1989 observed that Section 3729(b)(4) defines materiality using language that has been employed to define materiality in other federal fraud statutes: "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 2002
The Court went on to state that materiality looks at the effect the misrepresentation would have on the "likely or actual behavior of the recipient of the alleged misrepresentation". *Id.*

Whether defined by the statute or the common law the Court indicated the ultimate question is whether a reasonable person would attach importance to the misrepresentation in making a decision or choosing a course of action. The Court wrote:

> Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation'…In tort law, for instance, a 'matter is material' in only two circumstances: (1) **'[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction'**; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter "in determining his choice of action,' even though a reasonable person would not…Materiality in contract law is substantially similar… '[A] misrepresentation is material' only if it would 'likely ... **induce a reasonable person to manifest his assent,' or the defendant 'knows that for some special reason [the representation] is likely to induce the particular recipient to manifest his assent' to the transaction**. (Emphasis added and citations omitted) *Id.* at 2002-03.

The question is would a reasonable person acting on behalf or government attach importance to the fact that if they award a contract to AR, the sensitive information they share with AR in the course of performing that contract will be placed on a computer network that can be accessed by North Korea, China, Russia, Iran and others. As far as causation, no jury could find a reasonable person, much less a sane person, would enter such a contract, unless they wanted to harm the United States.

## C. Relator Should Be Granted Summary Adjudication As To The Eight Contracts AR Concedes Had A Cybersecurity Clause.

AR's opposition concedes that during the relevant time frame AR entered eight contracts that contained either the NASA FARS or DFARS Clause so regardless of AR's contention that some contracts did not contain the clause, summary adjudication should be granted as to these contracts.

On December 11, 2014 AR was awarded NASA contract # NNC10BA02B, Award ID # NNC15TA07T the parent award contained the NASA FARS Clause. (Aerojet Statement Of Additional Fact "ASOF" No.38) The government has paid AR at least **$12,226,270** on this contract. (UMF No. 171) On March 31, 2015, AR was awarded NASA contract # NNC15ACA07C which contained the NASA FARS Clause. (ASOF No.39) The government has paid AR at least $17,682,764 on this contract. (UMF No. 176) Since the filing of this motion, usaspending.gov has increased the amount the government has paid or is obligated to pay on this contract to **$44,984,296**. (Thyberg Dec. Ex. B )  On November 19, 2015, AR was awarded NASA contract # NNM16AA02C which incorporated by reference the NASA FARS Clause. (ASOF No.48) The government has paid or is obligated to pay AR at least $1,717,862,988 on this contract. (UMF No. 182) Since the filing of this motion usaspending.gov has increased the amount the government has paid or  is obligated to pay on this contract to **$1,759,598,913**. (Thyberg Dec. Ex. C )    On November April 1, 2016, AR was awarded NASA contract # NNM16AA12C which incorporated by reference the NASA FARS Clause. (ASOF No.52) The government has paid or is obligated to pay AR at least $175,165,695 on this contract. (UMF No. 192) Since the filing of this motion usaspending.gov has increased the amount the government has paid or is obligated to pay on this contract to $**179,999,357.** (Thyberg Dec. Ex. D )

On April 22, 2014 AR was awarded Navy contract N00014-14-C-0035 that contained the 2013 DFARS Clause. (ASOF No. 34) The government has paid AR at least **$710,149** on this contract. (UMF No. 199)  On September 30, 2014 AR was awarded Navy contract

N68936-14-C-0035 that contained the 2013 DFARS Clause. (ASOF" No. 36) The government has paid AR at least **$843,421** on this contract. (UMF No. 204) On September 15,2015 AR was awarded DARPA contract #HR001115C0132 that incorporated by reference the  2013 DFARS Clause. (ASOF" No. 45) The government had paid or obligated  obligated to pay AR **$178,419** on this contract. (Thyberg Dec. E ) On December 23, 2015 AR was awarded Army contract #W31P4Q-16-C-0026 that incorporated by reference the 2013 DFARS Clause. (ASOF" No. 50) The government has paid or is obligated to pay AR **$1,046,804** on this contract. (Thyberg Dec. F)

The total amount paid or obligated to be paid to AR on these contracts is **$1,999,587,629.**

### D.  The Court Should Award Damages In the Amount of Three Times The Invoices Defendants' Have Been Paid.

AR's outrageous and reckless course of conduct has placed our most advanced missile technology in the hands of our adversaries causing damage that is almost impossible to calculate. The full measure of damages may not be known for years to come when America's warfighters face an adversary in battle and find that they no longer have a strategic advantage as our enemy has the ability to neutralize our weapons. Since the breaches alleged in the lawsuit began, North Korea has developed an ICBM capable of hitting of the United States. Was North Korea assisted by technology stolen from AR? We may never know because AR's attitude toward cyber security was so cavalier that they operated a computer network for years knowing they could not detect cyber intrusions or prevent the exfiltration of data. How can we be place a value on the

devastation that would be caused if an ICBM hit San Francisco or Los Angeles ?

AR was entrusted with missile designs that can change the World balance of power for generations to come. The United States has learned in recent days that China has made huge advances developing a hypersonic missile. Hypersonic missiles can travel at five times the speed of sound and change direction inflight making them almost impossible to defend against. Was China assisted by hypersonic missile designs stolen from AR? Once again, we may never know because AR ignored the warnings of Emagined, Ernest Young, Grant Thorton and others that they were operating a computer network that could not detect or stop cyber intrusions.

AR's claim that the government suffered no damage because they delivered the products and services contracted for is preposterous. The government did not hire AR to simply provide hardware. The government enlisted AR to build the most advanced missiles with technology our adversaries do not have. As the DOD has stated: "The adversary is looking to steal information in order to counter, kill or clone our capabilities and when information is compromised in the development of a program, then the program is less valuable to the DOD and the money invested is less valuable." (Relators AUF No. 14 in opposition to defendants' MSJ). AR did not just have intellectual property they developed on their system but they were using information from prime contractors which the government spent billions of dollars to develop. There is no doubt  that AR exposed  billions of dollars worth of  intellectual property to our adversaries. The damage to the government sustained  as a result of AR's conduct easily exceeds the value the contracts awarded by many times.

AR has caused so much damage that almost any measure of damages is inadequate to make the government whole. The court in, *U.S. ex rel. Hendow v. Univ. of Phoenix,*, *supra,* held where a defendant is found liable for violating the FCA on a "promissory fraud or fraud in the inducement theory, the measure of damages is the amount paid on every invoice submitted to the government on the fraudulent contract. *Id.* at 1173.

The measure of damages for AR's conduct should be the value of every invoice paid on these fraudulently induced contracts multiplied times three pursuant to 31 U.S.C. § 3729 (G).

**IV. CONCLUSION**

For the foregoing reasons relator's motion for summary judgment should be granted in its entirety or in the alternative the court should grant summary adjudication as to those contracts entered in the relevant period that AR has admitted included these cyber security clauses.


Dated:  October 25, 2021                                  Respectfully submitted,

                                                                                THYBERGLAW


                                                                                 _ */s/ Gregory A. Thyberg__*
                                                                                GREGORY A. THYBERG
                                                                                Attorneys for Relator
                                                                                BRIAN MARKUS