Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone:    (310) 552-4200
Facsimile:    (310) 552-5900

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:    (214) 972-1770
Facsimile:    (214) 972-1771

*Attorneys for Defendants Aerojet Rocketdyne
Holdings, Inc. and Aerojet Rocketdyne, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. BRIAN MARKUS, individually,<br><br>Relator,<br><br>vs.<br><br>Aerojet ROCKETDYNE HOLDINGS, INC., a corporation and Aerojet ROCKETDYNE, INC., a corporation,<br><br>Defendants. | Case No. 2:15-cv-02245-WBS-AC<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Judge:          Hon. William B. Shubb<br>Jury Trial:     April 26, 2022<br>Time:           9:00 a.m.<br>Courtroom:  5 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS.....................................................................................2
- A.   The DoD Revoked the Applicable 2013 Clause, Finding It Unworkable for Private Contractor Systems.........................................................................2
- B.   The NASA FARS Clause.........................................................................3
- C.   Aerojet Disclosed Its Noncompliance to the Government and the Government Understood Aerojet Was Not Compliant. ...................................................4
  - 1.   Aerojet Disclosed to the DoD That It Was Not Compliant with the DFARS Clause and the Government Acknowledged Those Disclosures, Belying Any Fraud.......................................................4
  - 2.   Aerojet Detailed Its Cybersecurity Status to NASA, and NASA Approved of Aerojet's Efforts. ...........................................................5
- D.   Despite Recognizing Aerojet's Non-Compliance, the Government Continued to Pay Aerojet and to Award Aerojet Contracts. ......................................6
- E.   The Government Knew the Defense Industry Was Not Compliant with Cybersecurity Clauses.............................................................................7

III. ALL ADMISSIONS AND STIPULATIONS NOT RECITED IN THE PRETRIAL ORDER ...................................................................................................................7

IV. SUMMARY OF POINTS OF LAW ....................................................................8
- A.   Relator Will Not Be Able to Prove Aerojet Made Knowingly False Statements. ..................................................................................................9
- B.   The Government's Actions, Among Other Things, Bely Causation and Materiality..................................................................................................11
  - 1.   Strict Regulatory Compliance Was Not the Purpose of the Contracts. .....12
  - 2.   Any Falsity Was Insubstantial. ................................................................12
  - 3.   Non-Compliance with the Cybersecurity Clauses Did Not Affect Government Contracting or Payment Decisions........................................13
    - a.   The Government Continued to Pay and Contract with Aerojet Despite Knowledge of Its Non-Compliance. ..............................13
    - b.   The Government Knew Industry Was Not Compliant with the Cybersecurity Clauses.................................................................16
  - 4.   The Government's Abandonment of the 2013 DFARS Clause Requirements Belie Materiality and Causation. .......................................17
  - 5.   Condition of Payment .............................................................................17
- C.   Relator's Damages Evidence Is Nonexistent........................................19
- D.   Statutory Penalties ...................................................................................20

V. MOTIONS IN LIMINE .......................................................................................20
- A.   Motion in Limine No. 1 to Exclude References to Endangering American Lives and Foreign Actors.........................................................................20
- B.   Motion in Limine No. 2 to Exclude Audits Performed by Ernst & Young and Grant Thornton........................................................................................22

C.     Motion in Limine No. 3 to Preclude Argument and/or References to "Billions" of Dollars in Damages ............................................................................23

D.     Motion in Limine No. 4 to Exclude References, Argument, and Evidence to 2013 Pratt & Whitney Rocketdyne Attacks ...........................................24

E.     Motion in Limine No. 5 to Admit Government Statements as Opposing Party Statements ...........................................................................................26

F.     Motion in Limine No. 6 to Exclude Testimony from Witnesses Not Identified by Name in Relator's Pretrial Statement ..............................................28

G.     Motion in Limine No. 7 to Exclude Improper Non-Retained Expert Testimony ..28

H.     Motion in Limine No. 8 to Exclude Allegations Made in Complaints in Other Litigation ............................................................................................29

I.     Motion in Limine No. 9 to Exclude Arguments, References, and Evidence Regarding Aerojet's Earnings and Executive Compensation. ..............................30

1
2

## TABLE OF AUTHORITIES

3

**Page(s)**

4

**Cases**

5

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
    2021 WL 1088433 (N.D. Fla. Mar. 22, 2021) ...................................................29, 30

6

*Ab-Tech Const., Inc. v. United States*,
    31 Fed. Cl. 429 (1994), aff'd sub nom., 57 F.3d 1084 (Fed. Cir. 1995), *abrogated*
    *on other grounds* .....................................................................................................20

7
8

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
    2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) .........................................................30

9
10

*Am. Fed'n of Musicians v. Paramount Pictures Corp.*,
    903 F.3d 968 (9th Cir. 2018) ..................................................................................27

11
12

*Arlio v. Lively*,
    474 F.3d 46 (2d Cir. 2007)......................................................................................30

13
14

*Benna v. Reeder Flying Serv., Inc.*,
    578 F.2d 269 (9th Cir. 1978) ..................................................................................25

15
16

*United States ex rel. Berg v. Honeywell Int'l, Inc.*,
    226 F. Supp. 3d 962 (D. Alaska 2016), *aff'd*, 740 F. App'x 535 (9th Cir. 2018)..............10, 15

17
18

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047, 1057 (9th Cir. 2011) ......................................................................18

19

*Clinton v. Universal Music Grp., Inc.*,
    2011 WL 13175080 (C.D. Cal. May 4, 2011) .................................................29, 30

20
21

*Coyne v. Amgen, Inc.*,
    717 F. App'x 26 (2d Cir. 2017) .............................................................................15

22
23

*Cummings v. Hale*,
    2017 WL 3669622 (N.D. Cal. May 17, 2017), *report and recommendation*
    *adopted sub nom. United States ex rel. Cummings v. Hale*, 2017 WL 3669553
    (N.D. Cal. Aug. 16, 2017)........................................................................................20

24

*D'Agostino v. ev3, Inc.*,
    845 F.3d 1 (1st Cir. 2016)..................................................................11, 13, 14, 16

25
26

*Doe v. Rose*,
    2016 WL 9150617 (C.D. Cal. July 27, 2016).........................................................32

27
28

*United States ex rel. Durcholz v. FKW Inc.*,
   189 F.3d 542 (7th Cir. 1999) ...................................................................10

*United States ex rel. Durkin v. Cty. of San Diego*,
   300 F. Supp. 3d 1107 (S.D. Cal. 2018)........................................................9

*In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*,
   No. 2:12-CV-4301, 2014 WL 505234 (S.D.W. Va. Feb. 5, 2014).........................30

*United States ex rel. Foreman v. AECOM*,
   454 F. Supp. 3d 254 (S.D.N.Y. 2020)........................................................15

*United States ex rel. Guadalupe v. Goodyear Tire & Rubber Co.*,
   2005 WL 1324977 (N.D. Ohio June 3, 2005)...............................................27

*Guardian Life Ins. Co. of Am. v. Andraos*,
   2009 WL 10674144 (C.D. Cal. Sept. 10, 2009) ...........................................32

*United States ex rel. Hagood v. Sonoma Cty. Water Agency*,
   929 F.2d 1416 (9th Cir. 1991) .........................................................8, 9, 10

*Hamling v. U.S.*,
   418 U.S. 87 (1974)..............................................................................23, 25

*United States ex rel. Harman v. Trinity Indus. Inc.*,
   872 F.3d 645 (5th Cir. 2017) .................................................................15

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) ..............................................................19, 24

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
   2019 WL 3291582 (C.D. Cal. June 14, 2019) ..............................................14

*United States ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ........................................................... *passim*

*In re Homestore.com, Inc.*,
   2011 WL 291176 (C.D. Cal. Jan. 25, 2011) ...............................................31

*United States ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996) ..........................................................8, 13, 18

*United States ex rel. Howard v. Caddell Constr. Co., Inc.*,
   2021 WL 1206584 (E.D.N.C. Mar. 30, 2021) ...........................................16, 19

*Jackson v. Officer Forman*,
   2020 WL 6526373 (C.D. Cal. Oct. 15, 2020)................................................29

*United States ex rel. Kelly v. Serco, Inc.*,
   846 F.3d 325 (9th Cir. 2017) ........................................................11, 12, 13, 17

iv

DEFENDANTS' TRIAL BRIEF

*Knudsen v. Sprint Commc'n. Co.*,
    2016 WL 4548924 (N.D. Cal. Sep. 1, 2016) .........................................................................18

*United States ex rel. Lamers v. City of Green Bay*,
    998 F. Supp. 971 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999) .........................9, 18

*United States ex rel. Lewis v. California Inst. of Tech.*,
    2021 WL 1600488 (C.D. Cal. Apr. 19, 2021) ............................................................13, 14, 15

*United States ex rel. Lewis v. Honolulu Cmty. Action Program, Inc.*,
    2019 WL 4739283 (D. Haw. Sept. 27, 2019) .......................................................................19

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1999)..............................................................................................................13

*Matsuura v. E.I. du Pont De Nemours & Co.*,
    2007 WL 433115 (D. Haw. Feb. 2, 2007) ............................................................................29

*United States ex rel. McBride v. Halliburton Co.*,
    848 F.3d 1027 (D.C. Cir. 2017)............................................................................................15

*United States ex rel. McGrath v. Microsemi Corp.*,
    140 F. Supp. 3d 885, 900-01, 907, 911 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551
    (9th Cir. 2017).................................................................................................................18, 19

*United States ex rel. Mei Ling v. City of L.A.*,
    2018 WL 3814498 (C.D. Cal. July 25, 2018)........................................................................11

*United States ex rel. Milam v. Regents of Univ. of Calif.*,
    912 F. Supp. 868 (D. Md. 1995)...........................................................................................27

*Mulligan v. Nichols*,
    2014 WL 12586245 (C.D. Cal. Jan. 2, 2014), *aff'd*, 835 F.3d 983 (9th Cir. 2016)................30

*United States ex rel. Oliver v. Parsons Co.*,
    195 F.3d 457 (9th Cir. 1999) ..................................................................................................9

*United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*,
    787 F. Supp. 2d 1329 (M.D. Ga. 2011) ..................................................................................9

*Pennington v. Clayton Indus.*,
    2002 WL 34357428 (C.D. Cal. Apr. 18, 2002) ................................................................31, 32

*United States ex rel. Petratos v. Genentech Inc.*,
    855 F.3d 481 (3d Cir. 2017)..................................................................................................15

*United States ex rel. Poehling v. Unitedhealth Grp.*,
    2018 WL 1363487 (C.D. Cal. Feb. 12, 2018)........................................................................18

DEFENDANTS' TRIAL BRIEF

*United States ex rel. Rose v. Stephens Inst.*,
909 F.3d 1012 (9th Cir. 2018) ..........................................................11, 16

*San Luis v. Badgley*,
136 F. Supp. 2d 1136 (E.D. Cal. 2000)...............................................30

*Skillsky v. Lucky Stores, Inc.*,
893 F.2d 1088 (9th Cir. 1990) ...........................................................23

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)............................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).....................10

*United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*,
820 F.3d 1162 (10th Cir. 2016) ....................................................12, 19

*Txo Prod. Corp. v. Alliance Res. Corp.*,
509 U.S. 443 (1993)............................................................................32

*United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021),
*cert. denied sub nom. Mortg. Invs. Corp. v. United States ex rel. Bibby*, 2021 WL
1951877 (May 17, 2021).....................................................................18

*United States v. Blackstone*,
56 F.3d 1143 (9th Cir. 1995) ..............................................................21

*United States v. Catholic Health Sys. of Long Island Inc.*,
2017 WL 1239589 (E.D.N.Y. Mar. 31, 2017).....................................15

*United States v. Comstor Corp.*,
308 F. Supp. 3d 56 (D.D.C. 2018) ......................................................17

*United States v. Corinthian Colleges*,
655 F.3d 984 (9th Cir. 2011) ..............................................................10

*United States v. J-M Mfg. Co., Inc.*,
2020 WL 4196880 (C.D. Cal. June 5, 2020) ...........................19, 20, 24

*United States v. Monaco Enters., Inc.*,
2016 WL 3647872 (E.D. Wash. July 1, 2016).......................................9

*United States v. Morales*,
720 F.3d 1194 (9th Cir. 2013) ............................................................23

*United States v. Woodbury*,
359 F.2d 370 (9th Cir. 1966) ..............................................................19

DEFENDANTS' TRIAL BRIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Universal Health Servs., Inc. v. United States*,
 579 U.S. 176, 136 S. Ct. 1989 (2016)................................................................................ *passim*

*Wall Data Inc. v. L.A. Cnty. Sheriffs Dep't.*,
 447 F.3d 769 (9th Cir. 2005) ................................................................................................31

*United States ex rel. Westrick v. Second Chance Body Armor Inc.*,
 128 F. Supp. 3d 1, 19 (D.D.C. 2015), *on reconsideration in part*, No. CV 04-0280
 (PLF), 2017 WL 8809510 (D.D.C. Mar. 31, 2017), *and on reconsideration in*
 *part*, 266 F. Supp. 3d 110 (D.D.C. 2017) ...............................................................................14

DEFENDANTS' TRIAL BRIEF

Pursuant to this Court's March 17, 2022 Amended Final Pretrial Order (ECF No. 180) and Local Rule 285, Defendants Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc. (together, "Aerojet"), submit this Trial Brief.

## I.   INTRODUCTION

At its core, this case concerns whether, in 2014 and 2015, Aerojet made actionable false statements regarding its compliance with a cybersecurity clause that was included in certain of its contracts — referred to as the DFARS clause (for defense agencies) or NASA FARS clause (for NASA) (together the "Cybersecurity Clauses").  It did not.  Far from making a false or misleading statement — as explained at length in Aerojet's Motion for Summary Judgment — Aerojet instead made many detailed disclosures to the relevant government agencies regarding the state of its compliance with these cybersecurity standards in 2014, 2015, and beyond.  With knowledge of those disclosures, the government continued to pay Aerojet for its deliverables under contracts in existence when this case was filed, it continued to send Aerojet more business after this case was filed, and continues to do business with Aerojet today.  Additionally, the Department of Justice and other potentially affected agencies conducted an extensive investigation into Aerojet's programs with Aerojet's customers, including NASA, the Air Force, the Army, the Missile Defense Agency, and prime contractors, which resulted in the government declining to intervene in this matter.  On this record, as explained in further detail below, Relator will not be able to establish a False Claims Act ("FCA") violation.

Even if he could somehow convince a jury to believe his impossible arguments on liability, his damages theory is sure to fail.  Aerojet delivered all of the aerospace goods and services at the heart of the seven at-issue contracts to the government.  The government has kept – and used – those goods and benefited from Aerojet's work.  Relator cannot present an ounce of evidence that the purpose of the contracts has in any way been diminished in value due to any alleged noncompliance with the Cybersecurity Clauses.  Because the FCA only permits recovery of actual damages that result "**_because of_**" a false statement and Relator's evidence reflects no such harm, Relator will not be able to prove any actual damages.

## II.     STATEMENT OF FACTS

The underlying facts in this dispute were detailed extensively in Aerojet's motion for summary judgment.  *See* ECF Nos. 116 & 120.  Aerojet incorporates by reference the facts outlined therein and provides a concise overview below.

### A.     The DoD Revoked the Applicable 2013 Clause, Finding It Unworkable for Private Contractor Systems.

In November 2013, the first version of DFARS Clause 252.204-7012 (the "2013 DFARS Clause") was published. The clause imposed requirements for contractors to provide "adequate security" when a contract included the clause and the contractor received unclassified controlled technical information ("UCTI") under the contract.  Under the clause, "adequate security" was defined as, at a minimum, compliance with certain controls from the National Institute of Standards and Technology ("NIST") Special Publication 800-53 ("NIST 800-53").  If a contractor could not implement the NIST 800-53 controls, the 2013 DFARS Clause permitted a contractor to comply with the clause by submitting a "written explanation" to the contracting officer explaining its "alternate controls" or why certain NIST 800-53 controls were not applicable.  No specific approval was required.  The 2013 DFARS clause did not specify a format for the written explanation, nor did it explain what qualified as an alternate control providing equivalent protection.  As repeatedly stated by the Department of Defense, compliance with the DFARS Clause was "black and white," that "partial compliance is considered non-compliance," and "enhancements are not relevant to the compliancy target."

After receiving feedback from government contractors and recognizing that the government-system-oriented NIST 800-53 framework was "not possible" to apply to contractor systems, the government reworked the DFARS Clause several times to better suit the capabilities and needs of private contractors, and to give them necessary time to comply.  Certain important changes to the regulatory scheme are reflected in the chart below.

| | November 18 2013 | August 26 2015 | 30 December 2015 | 21 October 2016 |
|---|---|---|---|---|
| **Scope – What Information** | Unclassified Controlled technical information (CTI) | Unclassified Covered Defense Information (CDI) | | |

|  | November 18 2013 | August 26 2015 | 30 December 2015 | 21 October 2016 |
|---|---|---|---|---|
| **Applicable NIST Standard** | NIST 800-53 (selected controls) | NIST 800-171 |  |  |
| **Deadline for Compliance** | Receipt of CTI | Receipt of CDI | The latter of December 31, 2017 or receipt of CTI |  |
| **Compliance Requirements** | Compliance with Selected NIST 800-53 Controls **OR** Written Explanation to Contracting Officer | Compliance with NIST 800-171 **OR** DOD CIO Approved Alternative Controls | Compliance with NIST 800-171 **OR** DOD CIO Approved Alternative Controls | Compliance with NIST 800-171 **OR** Approved Variance/Non-Implementation Request |

Importantly, in December 2016, although the DFARS Clause remained intact, NIST 800-171 was revised to allow contractors to achieve compliance through System Security Plans ("SSPs") and Plans of Actions and Milestones ("POAMs"). These features allowed contractors to be compliant with the NIST standard *by merely having a plan in place* to implement the technical security controls.

### B.      The NASA FARS Clause.

NASA has its own regulatory scheme for cybersecurity. Section 1852.204-76 of title 48 of the Code of Federal Regulations (the "NASA FARS Clause") requires NASA contractors to "protect the confidentiality, integrity, and availability of NASA Electronic Information and IT resources and protect NASA Electronic Information from unauthorized disclosure" if the clause is in its contracts that involve Sensitive But Unclassified ("SBU") information. The NASA FARS Clause does not require that a contractor's information technology system meet any specific security standard on its face, but instead, instructs NASA contracting officers to identify cybersecurity requirements in an "Applicable Documents List (ADL) provided as an attachment to the contract." One document that is optional to include in a contract's ADL is NASA Procedural Requirement ("NPR") 2810.1, which directs contractors to comply with technical requirements that are compliant with NIST 800-53.

Unlike the 2013 DFARS Clause which required compliance with only 60 of the NIST 800-53 controls, NPR 2810.1 contemplates a system in compliance with all 264 controls.

   **C.    Aerojet Disclosed Its Noncompliance to the Government and the Government Understood Aerojet Was Not Compliant.**

   Contrary to Relator's claims that Aerojet somehow defrauded the government, the facts reflect that Aerojet ***voluntarily and repeatedly made disclosures*** to the government detailing its lack of compliance with the applicable cybersecurity standards, and the only evidence in the record shows that the government understood that Aerojet was disclosing its noncompliance.

       **1.    Aerojet Disclosed to the DoD That It Was Not Compliant with the DFARS Clause and the Government Acknowledged Those Disclosures, Belying Any Fraud.**

   Once Aerojet began receiving solicitations containing the 2013 DFARS Clause, Aerojet assessed its compliance status and began informing customers that it was not compliant with the minimum NIST 800-53 controls in the 2013 DFARS Clause.  It sent the government letters plainly stating that Aerojet was not compliant with the DFARS Clause or the enumerated, minimum NIST controls.  These letters included a table breaking down the number of controls Aerojet had (and had not) implemented:

| Category | Quantity |
|---|---|
| Controls in Place and Compliant | 10 |
| Controls in Place<br>Enhancements  and Refinement  On-going | 43 |
| Mitigating Controls in Place<br>Enhancements and Refinement On-going | 1 |
| Partial Controls are In-place<br>Strengthening, Enhancements, and Refinement On-going /<br>Needed | 6 |
| **TOTAL** | 60 |

The letter continued to explain what each category meant and further provided a matrix identifying each control's implementation status and the priority ranking for Aerojet's planned implementation. In addition, Aerojet had numerous teleconferences, meetings, and e-mail exchanges with DoD agencies in which Aerojet disclosed its non-compliance with the DFARS Clause and NIST 800-53.

   In response to Aerojet's disclosures, the government indicated that it understood that Aerojet was disclosing that it was not compliant.  For example, the Department of Defense Office of the

Chief Information Officer reviewed the letter mentioned above and concluded that the table included therein was "notify[ing] [the Army] on the status of compliance, ***with the table indicating that he is not fully compliant with the requirements*** . . ." The Army also reviewed Aerojet's letter and concluded that Aerojet was informing it that it was only compliant with 10 of the minimum NIST 800-53 controls.  The evidence will show that the other DoD agencies also repeatedly acknowledged Aerojet's non-compliance, yet continued to do business with it.

        2.    **<u>Aerojet Detailed Its Cybersecurity Status to NASA, and NASA Approved of Aerojet's Efforts.</u>**

Aerojet also had extensive, open, and continuous dialogue with NASA about its non-compliance with the NIST standards from 2012 forward.  Aerojet had regular meetings and calls with NASA to update the agency on its progress towards achieving compliance with NIST 800-53 including a February 2016 presentation where it told NASA the complete results of the gap analysis it commissioned.  This included disclosing in no uncertain terms that Aerojet was only compliant with 63 of the 264 NIST 800-53 controls, resulting in only 24% compliance.

**NASA FARS Gap Analysis and Current Status Summary**

| Requirements Source | Total | Gap Analysis Report | | | February 2016 | | |
|---|---|---|---|---|---|---|---|
| | | Compliant | Non-Compliant | Percent Compliant | Compliant | Non-Compliant | Percent Compliant |
| NASA (NIST SP 800-53 Moderate Controls) | 264 | 63 | 201 | 24% | 97 | 167 | 37% |

Following the February 2016 presentation, Aerojet continued to update NASA on its progress toward compliance, with unambiguous statistics on its gaps:

**NASA FARS Gap Analysis and Current Status Summary**

| Requirements Source | Total | Gap Analysis Report | | | 3/7/16 Status | | | 6/30/16 Status | | | 9/30/16 Status | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Compliant | Non-Compliant | Percent Compliant | Compliant | Non-Compliant | Percent Compliant | Compliant | Non-Compliant | Percent Compliant | Compliant | Non-Compliant | Percent Compliant |
| NASA (NIST SP 800-53 Moderate Controls) | 264 | 63 | 201 | 24% | 103 | 161 | 39% | 134 | 130 | 51% | 157 | 107 | 59% |

Aerojet further maintained an ongoing dialogue with NASA technology representatives apprising them of its compliance gap burn-down, and move toward a managed service provider to reach full compliance.

Like the DoD, NASA similarly indicated that it knew that Aerojet was not fully compliant with NIST 800-53, and was supportive of Aerojet's plan to become compliant by December 31, 2017 (the deadline set by the December 2015 DFARS Clause).  NASA's Chief Information Security

Officer, for example, recognized that Aerojet was making "good progress per [its] remediation plan" and "great progress" in its "burn down plan efforts" regarding "the remaining 50% technical NIST control gaps" in compliance with NIST 800-53.  NASA also indicated that "the progress made as well as the open, transparent communications demonstrate[d] a path to success."[1]

### D.      Despite Recognizing Aerojet's Non-Compliance, the Government Continued to Pay Aerojet and to Award Aerojet Contracts.

In the face of Aerojet's disclosed non-compliance with the Cybersecurity Clauses, the government continued to award contracts to Aerojet, pay for the goods and services Aerojet delivered, and keep the goods and services at the heart of the contracts.  For example, after Aerojet's initial disclosure to the DoD in 2014, the DoD awarded Aerojet at least 60 contracts.  Similarly, after Aerojet disclosed its non-compliance to NASA, NASA awarded Aerojet over $2 billion in contracts.  Nor did the government reject any invoice Aerojet submitted on the seven at-issue contracts or take any steps to reject or return the goods Aerojet supplied.  None of the contracts were terminated and all have since successfully been completed.

Aerojet will present declarations of government contracting officials admitting that non-compliance with the Cybersecurity Clauses *did not impact their contracting decisions*.  Each NASA contracting officer stated under oath that they did "not terminate[] or refuse[] to award a contract for non-compliance with [the NASA FARS Clause]" and similarly have no recollection of other contracting officers terminating or refusing to award a contract to a similarly situated contractor.  Similarly, two Navy contracting officers from separate Navy offices have provided sworn declarations explaining that they do not know of any instance where an invoice was not paid, a contract was terminated, or a contract was refused to be awarded for non-compliance with the DFARS Clause.

Indeed, even after Relator filed this action and the government thoroughly investigated his claims and declined to intervene, the government continued to award Aerojet contracts (over forty) and continued to pay Aerojet on the contracts at-issue here and more.  And for each of the seven

---

[1] NASA recognized Aerojet's commitment to cybersecurity, awarding it a NASA Silver Achievement Medal for its continued cybersecurity efforts in 2019.

contracts, Aerojet delivered the goods and services that are at the heart of the contracts at issue and the contracts have all been completed since this case has been pending.

| Date Completed | Contract No. |
|---|---|
| 10/29/2015 | Relator's Complaint Filed |
| 12/31/2015 | N68936-14-C-0035 |
| 1/31/2016 | W31P4Q-14-C-0075 |
| 3/31/2016 | FA8650-14-C-7424 |
| 9/24/2016 | NNC10BA13B, NNC13TA66T |
| 9/30/2016 | HR001115C0132 |
| 6/8/2017 | N00014-14-C-0035 |
| 10/9/2020 | NNC15CA07C |

**E.** **The Government Knew the Defense Industry Was Not Compliant with Cybersecurity Clauses.**

Aerojet was not the only company struggling with implementing the burdensome NIST controls. Aerojet will present evidence produced by the DoD OCIO reflecting that dozens of contractors had not fully implemented the NIST requirements despite the DFARS Clause being in effect. Representatives from the DoD also participated in working groups, which Relator attended while employed by Aerojet, where defense contractors "openly discuss[ed]" non-compliance with the DFARS Clause. DoD officials even stated that they expected that many contractors would remain non-compliant with certain NIST controls well after the December 31, 2017 grace period lapsed. In fact, the DoD recognized that in 2019, only 1% of Defense Industrial Base companies had implemented all 110 controls from NIST 800-171.

Mary Thomas, from the Defense Procurement and Acquisition Policy remarked in public presentations about the DFARS Clause that it was not "realistic" for government contractors to comply with the NIST 800-53 controls in the 2013 DFARS Clause and that full compliance at all times with the later 800-171 controls was "virtually impossible."

**III.** **ALL ADMISSIONS AND STIPULATIONS NOT RECITED IN THE PRETRIAL ORDER**

As reflected in Exhibit A, the parties have stipulated to the authenticity of documents produced by various government agencies pursuant to Touhy requests in this action. The Parties have also stipulated to exchanging demonstrative exhibits by 5:30 p.m. the calendar day before such

exhibits shall be used.  If there are any objections, the parties have agreed to meet and confer about them by 8:00 p.m. (unless otherwise agreed by the Parties) to attempt to resolve any disputes.  The Parties will raise any remaining objections with the Court prior to the jury being seated the next Court day.  *See* Ex. B.

The Parties have discussed the possibility of additional stipulations of fact and authenticity and admissibility of documents, including exchanging proposed initial stipulated facts, and anticipate that certain stipulations will be reached.  However, despite requests by Aerojet for an early exchange of the Parties' full exhibit set, Relator has not yet agreed to an early disclosure of copies of his exhibits for Aerojet's evaluation.[2]

## IV.    SUMMARY OF POINTS OF LAW

Relator has only one theory of False Claims Act liability remaining: fraudulent inducement[3] (Count 1).  To succeed on that theory, Relator must prove by a preponderance of the evidence: (1) that Aerojet made a false or fraudulent statement, (2) with scienter, (3) that was material, and (4) that caused the government to award Aerojet the at-issue contracts.  *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006); *see also* 31 U.S.C. § 3729(a). Under the facts that will be presented at trial, Relator cannot succeed in meeting his burden.

Fraudulent inducement is only "actionable in rare circumstances."  *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996).  For falsity and scienter, Relator must show that any allegedly false statements Aerojet made were "false when made," and were not "innocent mistakes, mere negligent misrepresentations," or merely taking advantage of ambiguities.  *See id.*; *United States ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("Innocent mistake is a defense to the . . . civil complaint.  So is mere negligence . . . . To take advantage of a disputed legal question . . . is to be neither deliberately ignorant nor recklessly

---

[2]      The lack of an agreement on early disclosure of exhibits also hampers Aerojet's ability to bring a motion in liminie for any documents on Relator's exhibit list that were not properly sought or disclosed during discovery.  To the extent Relator seeks to introduce such documents, Aerojet reserves its right to bring a motion to the Court at a later date.

[3]      Relator's Count One is termed as a claim based on promissory fraud, which is also referred to in the case law and herein as fraudulent inducement.

disregardful."); *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999) ("A contractor relying on a good faith interpretation of a regulation is not subject to liability, not because his or her interpretation was correct or 'reasonable' but because the good faith nature of his or her action forecloses the possibility that the scienter requirement is met.").  Further, "the statutory phrase 'known to be false' does not mean 'scientifically untrue'; it means 'a lie.'" *Hagood*, 929 F.2d at 1478.

Even more challenging, Relator must prove that each of the contracts were awarded **because of** the claimed false statements by Aerojet.  *See Hendow*, 461 F.3d at 1173.  In other words, Relator's remaining claim requires a showing that the government would not have awarded Aerojet the contracts at all had Aerojet not made the statements it did before the contract was awarded.  *Id.*[4] He must also prove the "demanding" materiality requirement, which looks to the likely or actual behavior of the government to determine whether the false statement was something that could have influenced their contracting decisions.  *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 136 S. Ct. 1989, 2003 (2016).  He will be unable to prove any of these elements, even though the failure to prove one would be fatal.

Even if a jury saw merit in Relator's evidence, he will not be able to show that the government suffered any actual damages because of statements Aerojet made about its compliance with the cybersecurity regulations at issue here.

A.    **Relator Will Not Be Able to Prove Aerojet Made Knowingly False Statements.**

To prove scienter, Relator must show that Aerojet made "a palpably false statement, known to be a lie when it is made." *Hendow*, 461 F.3d at 1172.  "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as an opposing inference or nonfraudulent intent." *United States ex rel. Durkin v. Cty. of San Diego*, 300 F. Supp.

---

[4]    *See also United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1340 (M.D. Ga. 2011) (explaining fraudulent inducement "is a difficult theory under which to proceed" and granting summary judgment for defendant); *United States v. Monaco Enters., Inc.*, 2016 WL 3647872, at *7 (E.D. Wash. July 1, 2016) (explaining fraudulent inducement is a "difficult [theory] to sustain"); *United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 987 (E.D. Wis. 1998), *aff'd*, 168 F.3d 1013 (7th Cir. 1999) (same and granting summary judgment for defendant).

DEFENDANTS' TRIAL BRIEF

3d 1107, 1128 (S.D. Cal. 2018) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).  "Under the False Claim Act's scienter requirement, 'innocent mistakes, mere negligent misrepresentations and differences in interpretations' will not suffice to create liability."  *United States v. Corinthian Colleges,* 655 F.3d 984, 996 (9th Cir. 2011) (quoting *Hendow,* 461 F.3d at 1174 (internal citations, quotation marks, and alterations omitted)).

The FCA aims to punish only for ***fraudulent*** acts, which the facts here belie.  Instead, the evidence will show that Aerojet went to great lengths to inform the government that it was not compliant with the relevant cybersecurity clauses after determining it did not meet the requirements.  Such actions do not align with fraudulent intent.  For several of the at-issue contracts, Aerojet told the government leading up to the contract award that it was not compliant with the cybersecurity clauses.  In those instances, there can be no false statement because Aerojet told the government the truth about its non-compliance.  *See United States ex rel. Berg v. Honeywell Int'l, Inc.*, 226 F. Supp. 3d 962, 972 (D. Alaska 2016), *aff'd,* 740 F. App'x 535 (9th Cir. 2018) ("Government knowledge may show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'"); *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) ("If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.  In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA.").  Further, even if a jury were to believe that Aerojet's disclosures somehow misstated their compliance status regarding the cybersecurity clauses,[5] Aerojet's attempt to tell the government the truth fatally undercuts Relator's assertion that Aerojet's statements were palpable lies.  Rather, they show that Aerojet was attempting to tell the government where they had gaps and that they were working toward closing them.  *See Corinthian Colleges,* 655 F.3d at 996 (mere negligence does not suffice for FCA liability); *Hagood,* 929 F.2d at 1421 ("innocent mistake" and "mere negligence" do not amount to scienter for FCA liability).

---

[5]     To be sure, the evidence at trial will show that the government read Aerojet's disclosures and understood that they were far from compliant.

In other instances, the applicable cybersecurity clauses were not even expressly included in the contract at all.  Certain of the at-issue contracts were signed before the defense industry even had a moment to digest the requirements of the newly implemented DFARS regulation, let alone to evaluate their compliance status.  The evidence will show that, for these contracts, Aerojet did not have the intent necessary to prove fraud.

**B.      The Government's Actions, Among Other Things, Bely Causation and Materiality.**

Materiality and causation both look to the effect or likely effect of Aerojet's statements on the government contracting officials responsible for awarding Aerojet these seven contracts.  This case presents a unique set of circumstances uncommon to FCA trials where the jury will see actual evidence of what the government did after Aerojet repeatedly disclosed its non-compliance: nothing other than continue to work with Aerojet.  Further, actions by the government unrelated to its specific business dealings with Aerojet will show that the government did not expect complete compliance with the cybersecurity clauses, nor did it affect contracting or payment decisions.

To date, Relator has relied on the claim that the applicable regulations mandate compliance to meet his burden of proof with respect to materiality and causation.  That is not enough.  *See Escobar,* 136 S. Ct. at 2003.  *Escobar* directs courts to look at various factors, including: (1) whether the violated requirement was expressly identified as a condition of payment, which, though "relevant, [is] not automatically dispositive" in Relator's favor; (2) whether the violation went to the essence of the bargain; (3) whether the violation was minor or insubstantial; and (4) the actions the government took in response to the violation at issue or similar violations.  *See id.*; *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1020–22 (9th Cir. 2018).  *Escobar*'s factors, however, are non-exhaustive and other factors, such as regulatory changes, are relevant to the Court's analysis as well.  *See United States ex rel. Kelly v. Serco, Inc.,* 846 F.3d 325, 334 (9th Cir. 2017) (considering removal of requirement in materiality analysis in addition to *Escobar*'s enumerated factors); *see also United States ex rel. Mei Ling v. City of L.A.*, 2018 WL 3814498, at *33 (C.D. Cal. July 25, 2018) ("*Escobar*'s non-exhaustive factors for assessing materiality are instructive to the materiality analysis").  These same factors are relevant to the causation analysis.  *See D'Agostino v. ev3, Inc.*,

845 F.3d 1, 8 (1st Cir. 2016) (considering government actions after learning of alleged fraud in causation analysis).

Relator will not be able to present evidence that Aerojet's representations about the Cybersecurity Clauses caused government agencies to contract with Aerojet or that the government placed contracting weight on the representations. Instead, the evidence will show that Aerojet's compliance status had no effect on the government's ultimate contracting decisions.

### 1.   Strict Regulatory Compliance Was Not the Purpose of the Contracts.

As Relator admits, the purpose of the at-issue contracts was for Aerojet to provide aerospace equipment or research to the government. None of the contracts at issue focused on a cybersecurity product or service. Because compliance with the cybersecurity clauses did not go to the "essence" of the bargain between Aerojet and the government, this factor weighs against materiality and causation. *See Escobar*, 136 S.Ct. at 2003 & n.5 (noting that whether the misrepresentation went to the "essence of the bargain" is relevant to materiality); *Kelly*, 846 F.3d at 333 ("By enforcing [the materiality] requirement rigorously, courts will ensure that government contractors will not face 'onerous and unforeseen FCA liability' as the result of noncompliance with any of 'potentially hundreds of legal requirements' established by contract."); *United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1169-72 (10th Cir. 2016) (violation of requirements for worker requirements did not undermine purpose of contract to deliver electricity, where electricity was delivered).

### 2.   Any Falsity Was Insubstantial.

As discussed above, Aerojet repeatedly disclosed that it was not compliant with the cybersecurity clauses to the relevant agencies. Relator takes issue with the content of Aerojet's disclosures, claiming that they did not disclose the full picture of Aerojet's cybersecurity. However, as representatives from the department of defense repeatedly stated, compliance with the DFARS Clause was "black and white," and that "enhancements are not relevant to the compliancy target" because "partial compliance is considered non-compliance." The only evidence that will be presented at trial is that the government understood that Aerojet was only compliant with part of the controls and thus their partial compliance was non-compliance. Even assuming for the sake of

argument only that Aerojet's disclosures misstated the extent of its compliance with the

cybersecurity requirements, any misstatement in them did not change their overall disclosure of non-

compliance, which was plainly understood by the government.  Under these facts, any "falsity" was

insubstantial because of the overall message conveyed by Aerojet.  Materiality, in addition, cannot

be found where noncompliance is minor or insubstantial.  *Escobar*, 136 S.Ct. at 2003; *Hopper*, 91

F.3d at 1265 (not all minor regulatory violations give rise to an FCA claim); *see also Masson v. New

Yorker Mag., Inc.*, 501 U.S. 496, 517 (1999) ("statement [for libel purposes] is not considered false

unless it 'would have a different effect on the mind of the reader' from that which the pleaded truth

would have produced.").

### 3. <u>Non-Compliance with the Cybersecurity Clauses Did Not Affect Government Contracting or Payment Decisions.</u>

The government's actions after learning about non-compliance with a statute, regulation,

rule, or contract provision bear heavily on materiality and causation.  *See Escobar*, 136 S.Ct. at

2003–04 ("[I]f the Government pays a particular claim in full despite its actual knowledge that

certain requirements were violated, that is very strong evidence that those requirements are not

material"); *Kelly*, 846 F.3d at 329 (same); *United States ex rel. Lewis v. California Inst. of Tech.*,

2021 WL 1600488, at *10 (C.D. Cal. Apr. 19, 2021) (same).  As highlighted by the Supreme Court,

(1) continued payment of the defendant's claims for payment after learning of its non-compliance

and (2) regular payment of claims despite knowing that requirements were violated by other

contractors are highly indicative of a lack of materiality.  *See Escobar*, 136 S.Ct. at 2003–04.  These

facts are also relevant to causation.  *See D'Agostino,* 845 F.3d at 8 ("If the [government] would have

approved [the device] notwithstanding the alleged fraudulent representations, then the [causal]

connection between those representations . . . and a payment by [the government] . . . disappears.").

As discussed below, here both points weigh in favor of Aerojet.

### a. The Government Continued to Pay and Contract with Aerojet Despite Knowledge of Its Non-Compliance.

The government's actions after repeatedly learning that Aerojet was not compliant with the

cybersecurity clauses will foreclose any finding of materiality or causation.  Under these facts, where

"the Government pays a particular claim in full despite its actual knowledge that certain

---

13

requirements were violated, that is *very strong evidence* that those requirements are not material."

*Escobar*, 136 S.Ct. at 2003–04 (emphasis added); *see also D'Agostino*, 845 F.3d at 8 (finding no causation where government actions after learning of supposed fraud foreclosed such a finding).

The evidence will show that Aerojet repeatedly disclosed its non-compliance to the government, kept the government apprised of its progress toward compliance, and made its cybersecurity specialists available to answer any of the government's questions openly and honestly. The evidence will also show that the government understood that Aerojet was not compliant.  For example, the Department of Defense Office of the Chief Information Officer reviewed Aerojet's disclosures in June 2015 in connection with an Army award and unequivocally determined that Aerojet's disclosures "indicat[ed] that [it] is not fully compliant with the [DFARS] requirements . . . ."  As for NASA, the evidence will show that Aerojet told NASA plainly that it was only 24% compliant with the NIST 800-53 requirements.  Thereafter, the government not only entered into many of the at-issue contracts with Aerojet (and more) knowing of Aerojet's non-compliance, but also paid Aerojet for its work, accepted the goods and services central to the contracts, and allowed Aerojet to complete each of the at-issue contracts while this case has been pending.[6]

On these facts reflecting what the government *actually* did, the jury will be unable to reasonably conclude that Aerojet's compliance with the cybersecurity clauses was material to or the reason why the government awarded Aerojet the contracts at issue.  *See, e.g.*, *Lewis*, 2021 WL 1600488, at *10 (continued payment, no request for repayment, declination of intervention, and new awards to defendant indicated lack of materiality); *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 2019 WL 3291582, at *13–16 (C.D. Cal. June 14, 2019) (granting summary judgment where "government knew of the noncomplian[ce] . . . and paid in full anyway"); *United States ex rel. Westrick v. Second Chance Body Armor Inc.,* 128 F. Supp. 3d 1, 19 (D.D.C. 2015), *on*

---

[6] The evidence will show that, in some cases, the contracting officer was not even aware that the cybersecurity clause was in the contract, wanted to remove the clause, or tried to work around the clause's requirements.  These facts cannot be squared with Relator's argument that the government would not have awarded Aerojet the at-issue contracts were it not for Aerojet's statements about its compliance status.

*reconsideration in part*, No. CV 04-0280 (PLF), 2017 WL 8809510 (D.D.C. Mar. 31, 2017), *and on reconsideration in part*, 266 F. Supp. 3d 110 (D.D.C. 2017) (granting partial summary judgment on causation grounds where "[t]he government [did] not present[] any evidence that suggest[ed] that the government relied on the allegedly manipulated data").[7]

Moreover, in 2015, upon filing this action in accordance with the FCA, Relator disclosed "substantially all material evidence and information" he possessed regarding Aerojet's alleged fraud. *See* 31 U.S.C. § 3730(b)(2).  In the years following, the government thoroughly investigated Relator's claims, including reviewing nearly all of the documents Relator now possesses and interviewing Aerojet's employees.  Undoubtedly, at the close of that investigation in 2017, the government was aware that Aerojet was not compliant with the cybersecurity clauses.  Yet, the government cancelled no contracts, returned no goods, and made no requests for reimbursement or refunds.  Instead, the contracts were completed with the government accepting Aerojet's goods and services under the contract.  These facts strongly point to a lack of materiality and causation for purposes of FCA liability.  *See*, *e.g.*, *Berg*, 740 F. App'x at 538 (affirming grant of summary judgment for defendant where the government continued to pay its claims despite its awareness of the relator's fraud claims for six years); *McBride*, 848 F.3d at 1034 (affirming summary judgment in favor of defendant where the government continued to pay claims and "did not disallow any charged costs" after learning of and investigating the relator's allegations); *Lewis*, 2021 WL 1600488 at *10

---

[7] *Accord United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) (affirming summary judgment in part because the government continued payment after learning of non-compliance); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (FDA's decision to not only maintain approval of drug, but to increase the number of approved indications, after learning of concerns, precluded a finding that the concerns were material); *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 30 (2d Cir. 2017) (government's continued reimbursement showed that "any concealment of the [study's] data from [government agency] was immaterial to its payment decisions"); *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 668 (5th Cir. 2017) (finding defendant entitled to judgment where government knew of non-compliance and still approved payment); *United States v. Catholic Health Sys. of Long Island Inc.*, 2017 WL 1239589, at *23 (E.D.N.Y. Mar. 31, 2017) (granting motion to dismiss where government's continued payment despite knowing through an investigation and an audit of the defendant constituted "strong evidence" that compliance with the regulations was not material); *United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 265 (S.D.N.Y. 2020) (no materiality when the government was aware of violations and continued to pay and extended the contract).

(no materiality where the government learned of relator's claims, investigated, declined to intervene, continued to pay the defendant, and praised the defendant's work); *United States ex rel. Howard v. Caddell Constr. Co., Inc.*, 2021 WL 1206584, at *20 (E.D.N.C. Mar. 30, 2021) (government's full payment and awards of additional contracts after learning of allegations precluded materiality).

> b.   The Government Knew Industry Was Not Compliant with the Cybersecurity Clauses.

In addition to the government's response to Aerojet's non-compliance (which on its own is a reason to find that there is no materiality or causation), the government's reaction to ***other*** contractors' non-compliance is also probative.  *See Escobar*, 136 S.Ct. at 2003. In such instances, continuing to contract with or pay non-compliant contractors weighs heavily in favor of a lack of materiality and suggests there was no causal connection between Aerojet's statements and the government's contract awards.  *Id.*; *see also Rose*, 909 F.3d at 1020 (when evaluating materiality, courts should "consider how the [government] has treated similar violations"); *D'Agostino*, 845 F.3d at 8 (evidence that "the [government] would have approved [the device] notwithstanding the alleged fraudulent representations" weighs against finding a causal "connection between those representations . . . and a payment by [the government]").

Here, in the mine run of cases, the government did not take adverse action against contractors upon learning of their non-compliance with the Cybersecurity Clauses.  The government was well aware during the relevant timeframe that the vast majority of contractors were not compliant with the Cybersecurity Clauses.  Despite this knowledge, the government did not stop paying contractors or awarding contracts.  In fact, to the contrary, four NASA contracting officials admit that non-compliance with the NFS Clause did not affect their contracting decisions, each stating that they did "not terminate[] or refuse[] to award a contract for non-compliance with [the NASA FARS Clause]" and similarly have no recollection of other contracting officers terminating or refusing to award a contract.  Two Navy contracting officers from separate Navy offices likewise stated that they do not know of any instance where an invoice was not paid, a contract was terminated, or a contract was refused to be awarded for non-compliance with the DFARS Clause.  Instead, the government took

DEFENDANTS' TRIAL BRIEF

actions to allow for leniency with respect to contractors who had not yet fully implemented the clause requirements.

The dearth of evidence reflecting consistent adverse action against contractors for non-compliance points toward compliance with the cybersecurity clauses being immaterial to the government's payment and award decisions.

### 4.    The Government's Abandonment of the 2013 DFARS Clause Requirements Belie Materiality and Causation.

The abandonment of the 2013 DFARS Clause and adoption of more lenient standards also reflects that non-compliance with the 2013 DFARS Clause was not material and that there is no causal linkage between Aerojet's non-compliance and the government's contract awards.  After adopting the 2013 DFARS Clause, the DoD reacted in the wake of feedback from its contractors and subcontractors about the difficulty in implementing and complying with the rigid cybersecurity regulations by amending the clause to make compliance easier.  In addition, the DoD has since admitted that the standard set forth in the 2013 version of the DFARS Clause was not "possible" or "realistic" for the defense industry to implement.  Importantly, in 2017, the DoD set out its formal policy that any contracts including the 2013 DFARS Clause should be modified to incorporate the later, more lenient standards.

The government's substantial changes to the requirements of the DFARS Clause weigh against finding that compliance with the 2013 DFARS Clause could have or did influence the government's contracting actions here.  *See Kelly*, 846 F.3d at 334 (materiality lacking, in part, because the government "eliminated the [] requirement because it provided minimal benefit and was not cost-justified"); *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 87 (D.D.C. 2018) ("expressed willingness to 'work with' vendors in order to address compliance issues instead of outright rejecting claims" suggests immateriality).

### 5.    Condition of Payment

The evidence will show that compliance with the cybersecurity clauses was not a condition of payment or award.  To determine whether a contract provision or regulation is a condition of receipt of government monies, the specific language must be analyzed.  *See Hendow*, 461 F.3d at

1175; *see also Knudsen v. Sprint Commc'n. Co.*, 2016 WL 4548924, at *13 (N.D. Cal. Sep. 1, 2016) ("only point[ing] to the regulations . . . is not sufficient to meet the rigorous standard for [] materiality"); *United States ex rel. Poehling v. Unitedhealth Grp.*, 2018 WL 1363487, at *9–10 (C.D. Cal. Feb. 12, 2018) (allegations "that Defendants were obligated by various regulations and contracts to comply with the Attestation requirements" under Medicare were insufficient to establish materiality); *Hopper*, 91 F.3d at 1267 ("Mere regulatory violations do not give rise to a viable FCA action."); *Lamers*, 168 F.3d at 1020 ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations."); *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011) (breach of contract does not suffice for FCA claim).

In *McGrath*, the court found that the regulatory provision was not a condition of payment where there was no link between compliance and payment, despite those regulations being required in every contract. *United States ex rel. McGrath v. Microsemi Corp.*, 140 F. Supp. 3d 885, 900-01, 907, 911 (D. Ariz. 2015), *aff'd*, 690 F. App'x 551 (9th Cir. 2017). Conversely, where courts have found compliance to be a condition of payment, the language is strong and obvious in connecting the requirement to a condition for payment. *See, e.g.*, *Hendow*, 461 F.3d at 1175–77 (compliance with executive compensation ban was a condition of payment where statute stated that agreements "shall condition [eligibility] upon compliance," regulation required institution to enter into an agreement that "conditioned" its eligibility on compliance, and contract between the parties stated that compliance with the ban was a "prerequisite" to receiving funding); *United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021), *cert. denied sub nom. Mortg. Invs. Corp. v. United States ex rel. Bibby*, 2021 WL 1951877 (May 17, 2021) (finding regulation a condition of payment where it stated that "no loan shall be guaranteed or insured" absent certification of compliance).

Here, neither of the cybersecurity clauses or the government's contracts with Aerojet tie compliance to payment or eligibility. Unlike in *Hendow* and similar to *McGrath*, the cybersecurity clauses here merely state what a contractor "shall" do, without reference to any payment repercussions for not doing so. Further, none of the contract language involved here ties compliance with the cybersecurity clauses to payment. To the contrary, the contracts that expressly contain the

1    cybersecurity clauses merely copy and paste them into the contracts or incorporate them by reference

2    as one-line citation in a list of other regulations.[8]

3            And, tellingly, even in the face of directives to include the Cybersecurity Clauses in every

4    contract, like the relator tried to point to in *McGrath*, the government here even omitted the

5    cybersecurity clauses from many contracts.  Such widespread exclusion of the Cybersecurity Clauses

6    suggests that they were not a requirement for contract award or payment.  *See also Howard*, 2021

7    WL 1206584, at *18-19 (no materiality, in part because "the government did not expressly identify

8    compliance with the Subcontracting Plan and FAR 52.219-8 as a condition of payment"); *United*

9    *States ex rel. Lewis v. Honolulu Cmty. Action Program, Inc.*, 2019 WL 4739283, at *7 (D. Haw.

10   Sept. 27, 2019) (granting defendant's motion for summary judgment where regulations outlining

11   payment were not linked to subject of purportedly false statements).

12           Because Relator cannot point to any statute, rule, regulation, or contract provision that links

13   payment with compliance with the cybersecurity clauses, he will not be able to prove materiality or

14   causation.

15           **C.**    **Relator's Damages Evidence Is Nonexistent.**

16           Relator claims that he is entitled to three times the amount of all of the contracts at issue,

17   regardless of the fact that the government received the goods and services at the heart of the

18   contracts.  It is Relator's burden to prove actual "damages which the Government sustain*s because*

19   *of*" the alleged fraud.  *See* 31 U.S.C. § 3729(a)(1) (emphasis added); *United States v. J-M Mfg. Co.,*

20   *Inc.*, 2020 WL 4196880, at *12 (C.D. Cal. June 5, 2020) ("Plaintiff[] bear[s] [the] burden of proving

21   actual damages in an FCA case."); *United States ex rel. Harrison v. Westinghouse Savannah River*

22   *Co.*, 352 F.3d 908, 923 (4th Cir. 2003) (A "qui tam relator[ ] stands in the place of the

23   government . . . [and] must assume the government's burden of proof as to damages in an FCA

24   case.").  The evidence will show that Relator cannot prove that the government suffered actual

25   damages because the government received the goods central to the purpose of each of the at-issue

26   contracts.  *See United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966) (affirming finding of

27

28   [8] *See also Thomas*, 820 F.3d at 1169-72 (finding that mere incorporation by reference of regulation
     into contract weighed against materiality).

no actual damages where project completed and government received what it contracted for); *J-M Mfg.*, 2020 WL 4196880 at *41 (finding no actual damages where the products properly performed). Further, Relator will not be able to present any evidence that any of the government's information on the at issue contracts was compromised in any way, and thus will be unable to prove that the government suffered any damages as a result of any statements by Aerojet about its compliance status with the cybersecurity clauses.  *See, e.g.*, *Ab-Tech Const., Inc. v. United States*, 31 Fed. Cl. 429, 434 (1994), aff'd sub nom., 57 F.3d 1084 (Fed. Cir. 1995), *abrogated on other grounds* (explaining actual "[d]amages represent compensation for a loss or injury sustained" and reversing actual damage award where "no proof has been offered to show that the Government suffered any detriment to its contract interest because of [defendant's] falsehoods").

### D.   Statutory Penalties

Aerojet contends that Relator is not entitled to statutory penalties because he cannot prove the affirmative elements of either of his theories of liability.  Statutory penalties are set by the Court after the case has been tried.  *See Cummings v. Hale*, 2017 WL 3669622, at *8 (N.D. Cal. May 17, 2017), *report and recommendation adopted sub nom. United States ex rel. Cummings v. Hale*, 2017 WL 3669553 (N.D. Cal. Aug. 16, 2017).  In the event a jury credits Relator's case, Aerojet contends that the minimum amount of civil penalties should be assessed to be commensurate with the proportionality of any misconduct and Aerojet's evidence of its efforts to inform the government of its non-compliance.  Aerojet respectfully requests additional briefing regarding the amount of penalties to be assessed if that becomes necessary.

## V.   MOTIONS IN LIMINE

Pursuant to this Court's March 17, 2022 Amended Final Pretrial Order (ECF No. 180) and Local Rule 285, Aerojet submits the following motions in limine as part of its trial brief instead of filing separate motions.

### A.   Motion *in Limine* No. 1 to Exclude References to Endangering American Lives and Foreign Actors

Throughout his motions and filings, Relator has made baseless and inflammatory assertions that Aerojet "has endangered American lives," put "all Americans at risk," and has "hand[ed] our

most advanced missile technology to our adversaries." ECF No. 132 at 5:8–12; 5:24–27; 22:27–23:1. Relator, without any evidentiary support whatsoever, has even attempted to connect Aerojet's conduct in this case with recent missile tests by North Korea and China. *See* ECF No. 139 at 5:20–25. But as Relator admits in these same filings, neither he nor any witness in this case have evidence to support these incendiary claims. *See*, *e.g.*, *id*. at 21:23–24 ("Was North Korea assisted by technology stolen from AR? ***We may never know***") (emphasis added); *id*. at 22:7–8 ("Was China assisted by hypersonic missile designs stolen from AR? ***Once again, we may never know***") (emphasis added). If Relator presents these assertions to the jury, as Aerojet expects he will, it will serve only to inflame the jury's emotions to the severe prejudice of Aerojet. The Court should preclude Relator from making statements or eliciting testimony about endangering American lives and foreign state actors because it is unduly prejudicial, wholly speculative, and lacking in foundation. *See* Fed. R. Evid. 403, 602.

Evidence is unduly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly … an emotional one." Fed. R. Evid. 403, Notes of Advisory Committee. "Evidence is prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instincts to punish, or triggers other mainsprings of human action." *United States v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) (quotations omitted). Evidence is "particularly prejudicial when … the proffered evidence connects a party with a highly charged public issue." *Id*. (quotations omitted). Telling a jury that Aerojet's conduct in this case has put Americans' lives at risk or provided our adversaries with lethal and devastating weapons is not only intended, but certain, to "arouse [the jury's] sense of horror" on a "highly charged public issue"—war. It is the epitome of a bell that cannot be unrung, and must be enjoined.

The Court should preclude these assertions for another reason: there is no evidence to support that Aerojet has endangered American lives or leaked sensitive weapons technology to foreign state actors. Relator does not have a shred of evidence that Aerojet has endangered American lives. Indeed, the only evidence is to the contrary, as Aerojet's weapons systems have been used by the American military in every major war going back decades. The only support Relator has that foreign nation states obtained Aerojet's weapons data is one witness who admitted in a sworn

declaration that he "do[es] not recall how it was determined to be a foreign nation state actor" that breached Pratt & Whitney's systems in 2013, prior to the merger of Aerojet and Rocketdyne or any integration between the companies' systems. *See* ECF No. 125, Ex. C ¶ 13. That same witness states his only knowledge that "data concerning rocket fuels" was taken during the breach came from hearsay statements of the FBI made at some unspecified time and place. *Id*. ¶ 15. Lacking personal knowledge of what data was taken, such testimony is inadmissible and must be excluded. *See* Fed. R. Evid. 602, Notes of Advisory Committee (stating Rule 602 would "prevent [the witness] from testifying to the subject matter of the hearsay statement, as he has no personal knowledge of it").

Statements about endangering American lives and giving advanced weapons systems to foreign nation states are precisely the type of baseless, prejudicial assertions Rules 403 and 602 were enacted to exclude.  The Court should exercise its gatekeeping role and prevent any argument, statement, or testimony about endangering American lives or foreign state actors from getting to the jury.

      **B.**      <u>**Motion *in Limine* No. 2 to Exclude Audits Performed by Ernst & Young and Grant Thornton**</u>

The Court should exclude all reference, argument, and evidence (documentary or testimonial) regarding audits of Aerojet's network performed by Ernst & Young ("E&Y") and Grant Thornton ("GT").  These third-party audits are inadmissible hearsay not subject to an exception. *See* Fed. R. Evid. 801, 802.

Relator intends to admit into evidence audit reports generated by E&Y and GT, and communications relaying the contents thereof, identifying vulnerabilities within Aerojet's systems in 2013, 2014, and 2015. There is no reason to submit evidence of these audits other than as proof of the matters asserted—that is, proof that vulnerabilities existed in Aerojet's systems during these timeframes.  But these reports, and communications relaying the contents of these reports, are inadmissible hearsay.  E&Y and GT are not parties to this lawsuit and will not be testifying at trial. Relator did not seek to depose a records custodian or any other employee of either E&Y or GT during discovery.  Relator has not, and cannot, establish that these audit reports are business records or satisfy any other exception under Rules 803 or 804.  The reports are out of court statements being

22
DEFENDANTS' TRIAL BRIEF

offered for their truth, and are thus inadmissible hearsay.  Further, any communications or documents relaying the contents of these reports, even if subject to a hearsay exception themselves, are inadmissible under Rule 805.  *See United States v. Morales*, 720 F.3d 1194, 1201 (9th Cir. 2013) ("Each type of statement must satisfy an exception to the rule against hearsay in order to be admitted for its truth") (citing Fed. R. Evid. 805); *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990) ("Hearsay included within hearsay, or 'multiple hearsay,' is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rules").

Aerojet therefore respectfully requests that the Court exclude as inadmissible hearsay the E&Y and GT audit reports and any documents or communications relaying the contents thereof.

C.    **Motion *in Limine* No. 3 to Preclude Argument and/or References to "Billions" of Dollars in Damages**

The Court should exclude all reference, argument, and evidence (documentary or testimonial) regarding Relator being entitled to recover billions of dollars in damages.  In his motions and public statements, Relator has claimed that he is entitled to billions of dollars in damages.  *See, e.g.*, J. Edward Moreno, *Aerojet Rocketdyne Gets Claims Trimmed In FCA Suit*, LAW360 (Feb. 2, 2022, 8:51 PM), https://www.law360.com/articles/1460975/aerojet-rocketdyne-gets-claims-trimmed-in-fca-suit (stating Mr. Thyberg told LAW360 that "even just the remaining contracts could themselves be worth billions of dollars"); ECF No. 122 at 20 ("The total false claims damages [Aerojet] is liable for is $6,348,013,039 . . . . [Aerojet]'s total liability is $19,044,039,117.").  But neither Relator nor any witness has put forth any evidence to substantiate these astronomical figures.  Indeed, neither can do so because the Government did not suffer any actual damages.  And even if Relator could prove that the entire value of the 7 contracts constituted actual damages, that value is $71,976,541.98, which after trebling, amounts to $215,929,625.94— not billions.

Evidence that is unduly prejudicial, including evidence that is likely to confuse the issues or mislead the jury, is routinely excluded.  *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … confusing the issues [and] misleading the jury"); *Hamling v. U.S.*, 418 U.S. 87, 124–27 (1974) (holding that trial court

did not abuse its discretion by excluding evidence on the basis that it was largely irrelevant, and to the extent that it was relevant, it was confusing to the jury).  If Relator presents these figures to the jury, as Aerojet expects he will, it will serve only to confuse the issues in this case and mislead the jury.  The only reason Relator would present them would be to engender such confusion.  Indeed, referencing billions of dollars in damages has no probative value because Relator has failed to prove that the government sustained any actual damage because of the alleged fraud.  *See* 31 U.S.C. § 3729(a)(1) (emphasis added); *J-M Mfg*, 2020 WL 4196880, at *12 ("Plaintiff bears the burden of proving actual damages in an FCA case."); *Harrison*, 352 F.3d at 923 (A "qui tam relator[ ] stands in the place of the government . . . [and] must assume the government's burden of proof as to damages in an FCA case").  Where the Government receives the benefit of its bargain—as it did here—it suffers no actual damages.  *J-M Mfg.*, 2020 WL 4196880 at *4 (granting defendants' judgment as a matter of law on the issue of actual damages).  After a three-year government investigation and Relator's own subsequent discovery, no evidence exists that the Government got anything less than what it bargained for.  "Actual damages under the FCA must be ***established by actual evidence***, not merely by an argument."  *J-M Mfg.*, 2020 WL 4196880 at *12 (emphasis added).  And even if the jury were to find actual damages, the maximum damages available here is the value of the seven contracts, or $71,976,541.98, which after trebling, amounts to $215,929,625.94—not billions.

Given the lack of any probative value and the danger of confusing the issues and misleading the jury, the Court should exclude all reference, argument, and evidence regarding Relator being entitled to recover billions of dollars in damages.

**D.**    **Motion *in Limine* No. 4 to Exclude References, Argument, and Evidence to 2013 Pratt & Whitney Rocketdyne Attacks**

The Court should exclude all reference, argument, and evidence (documentary or testimonial) regarding the 2013 attacks on Pratt & Whitney Rocketdyne's ("Rocketdyne") network.  Those attacks occurred on Rocketdyne's systems (or those of its parent company, United Technologies) prior to its merger with Aerojet General Corp. and while the companies maintained separate networks.  These attacks are thus irrelevant to the state of cybersecurity on Aerojet's

systems.[9] ECF No. 130-2 ¶¶ 11–13, Ex. A at 071 ("Emagined Security's Investigative team has performed an investigative analysis and forensics review of malware identified in the *Rocketdyne legacy network*.") (emphasis added); *id*. at 063 ("The current tool set is . . . not under Aerojet Rocketdyne control"); *id*. at 064 ("[United Technologies Corporation] and [Pratt & Whitney] still control the border systems and data from their systems is not readily available").  Jens Laundrup, the Emagined employee contracted to investigate the 2013 attacks, confirmed in a sworn declaration that the attacks occurred on Rocketdyne's network, not Aerojet's.  *See* ECF No. 125, Ex. C ¶ 7 (stating the data breaches occurred on the "Rocketdyne Network," as distinguished from "Aerojet Rocketdyne (AR)").

Evidence that is unduly prejudicial, including evidence that is likely to confuse the issues or mislead the jury, is routinely excluded.  *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … confusing the issues [and] misleading the jury"); *Hamling,* 418 U.S. at 124–27 (trial court did not abuse its discretion by excluding evidence on the basis that it was largely irrelevant, and to the extent that it was relevant, it was confusing to the jury).  Evidence of attacks that occurred on another company's network will confuse the issues in this case and mislead the jury.  Confusion is especially likely here given the overlapping company names between the old system that was attacked (Pratt & Whitney Rocketdyne) and the system at issue in this case (Aerojet Rocketdyne).

Further, the state of cybersecurity on Rocketdyne's network prior to the company's merger with Aerojet and prior to the awarding of any in-scope contract (the first of which was awarded in 2014) is, at best, collateral to the issue in this case—whether Aerojet defrauded the government about its compliance with certain cybersecurity regulations.  *See Benna v. Reeder Flying Serv., Inc.*, 578 F.2d 269, 274 (9th Cir. 1978) (evidence on a collateral issue may unduly distract or mislead the jury).  The attacks on Rocketdyne's systems occurred in the summer of 2013, well before the government awarded any contract at issue in this case.  Relator has no evidence that these attacks on

---

[9] Relator may argue the Rocketdyne and Aerojet systems were merged against the advice of Aerojet's cybersecurity consultants and the attacks are therefore relevant.  Even if true, the evidence shows the two systems were separately maintained for a period even after the merger, and any vulnerabilities on Rocketdyne's network attacked in 2013 were remedied by the fall of 2013.

non-Aerojet systems swayed any government contracting officer's decision regarding whether to enter into contracts with Aerojet.  Indeed, Relator acknowledges that the government was involved in investigating the breaches, negating any suggestion that Aerojet was hiding the attacks from the government.  ECF No. 125, Ex. C ¶ 13 (stating the FBI was involved in investigating the alleged breaches).  Simply put, evidence concerning the 2013 attacks are irrelevant and collateral to the issues presented here and should be excluded.

Given the lack of any probative value and the danger of confusing the issues and misleading the jury, the Court should exclude all reference, argument, and evidence regarding the 2013 attacks of Pratt & Whitney Rocketdyne's network.

**E.**     **Motion in Limine No. 5 to Admit Government Statements as Opposing Party Statements**

The Court should admit evidence of, and argument related to, out-of-court statements made by government employees within the scope of their employment or statements they were authorized to make by the government, including sworn declarations from seven government contracting officers.  The sworn declarations from the seven government contracting officers establish that Aerojet disclosed to the government its gaps in cybersecurity compliance, that Aerojet transparently updated the government regarding its progress toward closing those gaps, that the government continued to pay Aerojet on its contracts, and that the government never terminated a contract with Aerojet or any other contractor for non-compliance with the Cybersecurity Clauses.  *See* ECF No. 117 at Exs. 112–14, 182–84.  Relator brings this case on behalf of the government—a real party in interest—therefore the statements of government employees, including employees of government agencies, are admissible under either Federal Rule of Evidence 801(d)(2)(C) or 801(d)(2)(D).

Statements made by employees of an opposing party are admissible and do not constitute hearsay, and accordingly, are admissible for the truth of the matter asserted.  *See* Fed. R. Evid. 801(d)(2)(C) ("A statement that meets the following conditions is not hearsay . . . The statement is offered against an opposing party and . . . was made by a person whom the party authorized to make a statement on the subject."); Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay . . . The statement is offered against an opposing party and . . . was made

by the party's agent or employee on a matter within the scope of that relationship and while it existed."); *Am. Fed'n of Musicians v. Paramount Pictures Corp.*, 903 F.3d 968, 976 (9th Cir. 2018) (holding that the district court abused its discretion when it excluded statements made by an employee of a party opponent made in her capacity as an employee).  In False Claims Act cases where the government has declined to intervene, courts have held that statements made by employees of a government agency constitute admissions of a party opponent because the United States is still a real party in interest in the litigation.  *See United States ex rel. Milam v. Regents of Univ. of Calif.,* 912 F. Supp. 868, 880 (D. Md. 1995) (holding that a statement by a government agency constitutes a statement of a party opponent in a non-intervened False Claims Act case for purposes of Fed. R. Evid. 801(d)(2) because the government is the real party in interest); *see also United States ex rel. Guadalupe v. Goodyear Tire & Rubber Co.*, 2005 WL 1324977, at *12 (N.D. Ohio June 3, 2005) (finding in a False Claims Act case where the U.S. declined to intervene that the conclusions of a report commissioned by the government were party admissions given "that Relator is suing on behalf of the United States").  Accordingly, the statements made by government employees in their capacity as an employee or statements made by government employees authorized by the government offered by Aerojet constitute non-hearsay party opponent admissions. *See* Fed. R. Evid. 801(d)(2)(C)–(D).  Specifically, the seven sworn declarations made were all made by employees of either Navy or NASA, and the contents of these declarations relate to the scope of their employment:

- Declaration from Matthew Schoewe, Contracting Officer at NASA, regarding his work as a contracting officer for at-issue contract no.  NNC15CA07C.  *See* ECF No. 117 (Decl. of Tammy Tsoumas In Supp. of Aerojet's Mot. for Summ. J.) at Ex. 183.
- Declaration from Jeffrey Hoyt, Contracting Officer at NASA, regarding his work as a contracting officer for at-issue contract no.  NNC15CA07C.  *See id.* at Ex. 182.
- Declaration from Vanessa Turner, Contracting Officer at NASA, regarding her work as a contracting officer for contract no.  NNM16AA12C.  *See id.* at Ex. 184.
- Declaration from Corinna Kinman, current Common Geopositioning Services Foreign Military Sales Lead at the Navy regarding her work as a procuring contracting officer for at-

1

issue contract no.  N68936-14-C-0035.  *See id.* at Ex. 112.

2

- Declaration from Steve Schultz, current Project Manager at the Navy regarding his work as a

3

procuring contracting officer for at-issue contract no.  N68936-14-C-0035.  *See id.* at Ex.

4

114.

5

- Declaration from Joseph McCollister, Contracting Officer at NASA, regarding his work as a

6

contracting officer for contract no.  NNM16AA02C.  *See id.* at Ex. 185.

7

- Declaration from Knox Millsaps, Director of Aerospace Sciences Research at the Navy,

8

regarding his work as a contracting officer representative for at-issue contract no.  N00014-

9

14-C-0035.  *See id.* at Ex. 113.

10

Therefore, the Court should allow these statement and argument about the statements into

11

evidence for the truth of the matter asserted.

12

**F.**     **Motion *in Limine* No. 6 to Exclude Testimony from Witnesses Not Identified by Name in Relator's Pretrial Statement**

13

The Court should prohibit any testimony from witnesses not identified by name in Relator's

14

pretrial statement.  Relator identifies *11* unnamed "PMK" and "Records Custodian" witnesses in his

15

pre-trial statement.  *See* ECF No. 161 at 6.  There is no way for Aerojet to identify who any of the

16

"PMK or "Records Custodian" witnesses are, and thus, it would be highly prejudicial to allow

17

Relator to call individuals at trial who they purport to be "PMK" or "Records Custodian" witnesses.

18

Indeed, allowing Relator to do so would be in direct conflict with the purpose of Federal Rule of

19

Civil Procedure 26, which is to prevent gamesmanship and surprise in litigation.  *See* Fed. R. Civ. P.

20

26 advisory committee's note to 1993 Amendments.  Therefore, the Court should exclude any

21

witnesses not identified by name—the "PMK" and "Records Custodian" witnesses—on Relator's

22

exhibit list.

23

**G.**     **Motion *in Limine* No. 7 to Exclude Improper Non-Retained Expert Testimony**

24

The Court should exclude testimony beyond the personal knowledge of disclosed non-

25

retained witnesses, Relator, Jose Ruiz, Jens Laundrup, David Chamberlain, and David Sockol.

26

Relator's disclosure of himself, Mr. Ruiz, Mr. Laundrup, Mr. Chamberlain, and Mr. Sockol indicates

27

that these non-retained expert witnesses will be based on both "personal observations ***and all of the***

28

1   ***documents produced by AR in this case or pursuant to subpoenas in this action including the***

2   ***records subpoenaed from Emagined Security, Inc, Grant Thornton, CGI, and Ernst & Young***."

3   Ex. C at 2 (emphasis added).  This is clearly improper.  Under Rule 26, non-retained experts cannot

4   provide opinions that rely on information beyond that witness's personal knowledge.  *See Matsuura*

5   *v. E.I. du Pont De Nemours & Co.*, 2007 WL 433115, at *3 (D. Haw. Feb. 2, 2007) (non-retained

6   experts "cannot, however, give opinion testimony based on information obtained outside of their

7   personal knowledge, for instance, from reading the deposition testimony of other witnesses").  If a

8   percipient witness provides information beyond their personal knowledge, then that witness

9   constitutes a retained expert, and is required to provide the information enumerated in Rule

10   26(a)(2)(B), "namely, the written expert report, list of qualifications, and other information."  *See*

11   *id.*; *Jackson v. Officer Forman*, 2020 WL 6526373, at *2–3 (C.D. Cal. Oct. 15, 2020) (granting

12   motion *in limine* to exclude expert where no report was served and the testimony was not based on

13   personal observations and instead involved the witness "receiving and analyzing evidence in

14   preparation for litigation").

15   Relator, Mr. Ruiz, Mr. Laundrup, Mr. Chamberlain, and Mr. Sockol do not have personal

16   knowledge of all the documents produced by Aerojet, as there are many documents that these

17   witnesses would not have reviewed or been aware of during the time they worked at Aerojet.

18   Indeed, Aerojet's work with Grant Thorton occurred *after* any of these witnesses worked at Aerojet.

19   Therefore, these witnesses must be prohibited from testifying to opinions based on documents and

20   information outside of their personal knowledge.

21   **H.      Motion _in Limine_ No. 8 to Exclude Allegations Made in Complaints in Other**
        **Litigation**

22
23   Aerojet moves to exclude reference, argument, or evidence related to allegations made in

24   complaints in other litigation related to Aerojet.  "Allegations in a complaint are not evidence." *See*

25   *Clinton v. Universal Music Grp., Inc.*, 2011 WL 13175080, at *8 (C.D. Cal. May 4, 2011).  **First**, the

26   Court should bar Relator from referencing any such allegations because "[a]llegations contained in

27   other plaintiffs' complaints . . . are hearsay not within a recognized exception."  *In re 3M Combat*

28   *Arms Earplug Prod. Liab. Litig.*, 2021 WL 1088433, at *4 (N.D. Fla. Mar. 22, 2021) (excluding

such evidence as hearsay); *see also Clinton*, 2011 WL 13175080, at *8 (explaining statements in pleadings are inadmissible hearsay).[10]  **Second**, references or "evidence of other lawsuits and the factual allegations therein is inadmissible under Rule 403."

*In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2:12-CV-4301, 2014 WL 505234, at *5–6 (S.D.W. Va. Feb. 5, 2014) (excluding evidence of other lawsuits concerning the product at issue under Rule 403, hearsay, and improper evidence of other acts); *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 2013 WL 1155420, at *7 & n.69 (S.D.N.Y. Mar. 20, 2013) (citations omitted).  "Unproven allegations from other lawsuits" often lack probative value and, whatever value may exist may be "substantially outweighed by a danger of unfair prejudice and jury confusion."  *See In re 3M*, 2021 WL 1088433, at *4 (citation omitted) (excluding such evidence under Rule 403).  Courts also exclude allegations in other lawsuits because they are "reluctant to cloud the issues in the case at trial by admitting evidence relating to previous litigation involving one or both of the same parties."  *See Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) (noting "[a]dmitting evidence about previous cases inevitably results in trying those cases before the jury, and the merits of the other cases would become inextricably intertwined with the case at bar") (citations omitted).

I.    **Motion *in Limine* No. 9 to Exclude Arguments, References, and Evidence Regarding Aerojet's Earnings and Executive Compensation.**

Aerojet seeks to exclude all argument, references, and evidence, including testimony or exhibits, regarding Aerojet's earnings and the compensation of Aerojet's executives pursuant to Rules 401, 402, and 403 of the Federal Rules of Evidence, including items 90 through 98 on Relator's exhibit list.

Aerojet anticipates that Relator will seek to refer to and introduce evidence of Aerojet's earnings and its executives' compensation in an effort to paint Aerojet in a negative light.  Neither Aerojet's earnings nor its executives' compensation is relevant to the issue in this case: whether

---

[10] Court have also declined to take judicial notice of the complaints because such facts would constitute inadmissible hearsay.  *E.g.*, *Mulligan v. Nichols*, 2014 WL 12586245, at *2 (C.D. Cal. Jan. 2, 2014), *aff'd*, 835 F.3d 983 (9th Cir. 2016) (declining to take judicial notice of a complaint because "[t]he facts alleged . . . [therein] would likely be inadmissible hearsay"); *San Luis v. Badgley*, 136 F. Supp. 2d 1136, 1146 (E.D. Cal. 2000) (explaining courts may not take judicial notice to documents filed in another case for the truth of the matter asserted in the other litigation).

Aerojet knowingly made materially false statements about its cybersecurity posture that caused the government to award Aerojet contracts and somehow damaged the government.  Aerojet's and its executives' earnings are irrelevant to these inquiries and merely serve to inflame the jury and should be excluded under Rules 401, 402, and 403 of the Federal Rules of Evidence.

"[E]vidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  "Irrelevant evidence is not admissible" and must be excluded where it is not relevant to the matters at issue.  Fed. R. Evid. 402.  Moreover, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury," or "wasting time."  Fed. R. Evid. 403.

Aerojet's earnings and its compensation of its executives is not relevant to this matter because argument, reference, or evidence of earnings or compensation do not have the tendency to make *a "**fact of consequence**"* in this action more or less probable.  *See* Fed. R. Evid. 401 (emphasis added); *Wall Data Inc. v. L.A. Cnty. Sheriffs Dep't.*, 447 F.3d 769, 782 (9th Cir. 2005) (affirming exclusion of excerpts of plaintiff's SEC Form 10-K in copyright infringement case as "irrelevant because it did not deal specifically with the action at hand"); *In re Homestore.com, Inc.*, 2011 WL 291176, at *1 (C.D. Cal. Jan. 25, 2011) (excluding evidence and stating that "a party's financial condition is generally not relevant and can be unduly prejudicial, as it can distract the jury from the real issues in the case."); *Pennington v. Clayton Indus.*, 2002 WL 34357428, at *2 (C.D. Cal. Apr. 18, 2002) ("Evidence of the compensation paid to defendant's high-level executives is irrelevant."). How much Aerojet earned and how much it paid its executives has nothing to do with whether Aerojet knowingly made false or fraudulent statements about its cybersecurity posture, whether such statements caused the government to award Aerojet contracts, and whether those statements were material to the government decision-making.  The Court should thus not permit irrelevant argument, references, or evidence of Aerojet's earnings or executive compensation.

Even if there were minimal probative value in Aerojet's earnings and its executives' compensation (there is not), that limited probative value is substantially outweighed by the risks of prejudice Aerojet would face.  *See Pennington*, 2002 WL 34357428, at *2 (excluding evidence of

executive compensation and stating that "the prejudice defendant would suffer in the eyes of the jurors, who would be deflected from the legitimate issues in the case" outweighed any relevance); *Doe v. Rose*, 2016 WL 9150617, at *1 (C.D. Cal. July 27, 2016) ("Defendants' income, assets, and net-[worth] could improperly influence the jury's determination of liability and compensatory damages.").  Evidence of Aerojet's earnings and its compensation of its executives would be unduly prejudicial, as it would present the risk of a jury improperly taking into account a corporation's finances and distracting from the legitimate issues in this case.  *See Guardian Life Ins. Co. of Am. v. Andraos*, 2009 WL 10674144, at *3 (C.D. Cal. Sept. 10, 2009) (finding "that any slight probative value that evidence of [company's] wealth and size may have to this action is outweighed by the danger that such evidence might unfairly prejudice the jury" into finding for the opposing side "based in part on [company's] status as a large, wealthy corporation.").  Indeed, the Supreme Court has twice observed that introduction of a company's wealth "provides an open-ended basis for inflating awards when the defendant is wealthy."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427–28 (2003); *Txo Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 464 (1993) (noting that "the emphasis on the wealth of the [defendant company] increased the risk that the award may have been influenced by prejudice against large corporations").

For the foregoing reasons, the Court should preclude Relator from arguing, referencing, or introducing evidence of Aerojet's earnings or its compensation of its executives, including excluding items 90 through 98 on Relator's exhibit list.


DATED: April 12, 2022                                          Respectfully submitted,

                                                              KIRKLAND & ELLIS, LLP

                                                              */s/ Tammy A. Tsoumas*
                                                              Mark Holscher (SBN 139582)
                                                              mark.holscher@kirkland.com
                                                              Tammy A. Tsoumas (SBN 250487)
                                                              tammy.tsoumas@kirkland.com
                                                              KIRKLAND & ELLIS LLP
                                                              2049 Century Park East
                                                              Los Angeles, CA 90067
                                                              Telephone:    (310) 552-4200
                                                              Facsimile:    (310) 552-5900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone:      (213) 680-8400
Facsimile:      (213) 680-8500

Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone:      (214) 972-1770
Facsimile:      (214) 972-1771

*Attorneys for Defendants*

33

# EXHIBIT A

1  Mark Holscher (SBN 139582)
   mark.holscher@kirkland.com
2  Tammy A. Tsoumas (SBN 250487)
   tammy.tsoumas@kirkland.com
3  KIRKLAND & ELLIS LLP
   2049 Century Park East
4  Los Angeles, CA 90067
   Telephone:    (310) 552-4200
5  Facsimile:    (310) 552-5900

6  *Attorneys for Defendants Aerojet Rocketdyne*
   *Holdings, Inc. and Aerojet Rocketdyne, Inc.*
7  (Additional counsel on Signature Page)

8  Gregory A. Thyberg (SBN 102132)
   greg@thyberglaw.com
9  THYBERGLAW
   3104 O Street #190
10 Sacramento, CA 95816
   Tel: (916) 204-9173
11

12 *Attorney for Relator Brian Markus*

13

14                **UNITED STATES DISTRICT COURT**

15                **EASTERN DISTRICT OF CALIFORNIA**

16 UNITED STATES OF AMERICA *ex rel.* BRIAN     ) Case No. 2:15-cv-02245-WBS-AC
   MARKUS, individually,                        )
17                                              ) **STIPULATION RE: AUTHENTICITY OF**
                                                ) **DOCUMENTS PRODUCED BY THE**
18              Relator,                         ) **GOVERNMENT PURSUANT TO *TOUHY***
                                                ) **REQUESTS**
19         vs.                                   )
                                                )
20 AEROJET ROCKETDYNE HOLDINGS, INC., a         )
   corporation and AEROJET ROCKETDYNE, INC., a  )
21 corporation,                                  )
                                                )
22              Defendants.                      )
                                                )
23 _____ )

24

25

26

27

28

                                    1
―――――――――――――――――――――――――――――――――――――――――――――
**STIPULATION RE: AUTHENTICITY OF DOCUMENTS PRODUCED BY THE**
**GOVERNMENT PURSUANT TO *TOUHY* REQUESTS**

Defendants Aerojet Rocketdyne Holdings, Inc. and Aerojet Rocketdyne, Inc. (together, "Defendants") and Relator Brian Markus ("Relator") (collectively, the "Parties"), hereby jointly stipulate and agree to that they will not object to the authenticity of the documents listed below, which were produced by various government agencies pursuant to *Touhy* requests in this action.  The Parties reserve all rights to object to the ultimate admissibility of the documents below at trial.

**WHEREAS**, during the course of discovery, the Parties served *Touhy* requests on various government agencies.

**WHEREAS**, the Air Force, Army, Defense Advanced Research Projects Agency, Office of the Chief Information Officer under the Department of Defense, National Aeronautics and Space Administration, and Navy produced documents in response.

**IT IS HEREBY STIPULATED AND AGREED BY AND BETWEEN THE PARTIES:**

The parties agree that the documents listed below meet the criteria of Federal Rule of Evidence 901 for authenticity and agree not to object to their admissibility on those grounds:

1. AIRFORCE_TOUHY00000001–AIRFORCE_TOUHY00000063

2. ARMY_TOUHY00000001–ARMY_TOUHY00002661

3. DARPA00000001–DARPA00000103

4. AFDODCIO000001–AFDODCIO000987

5. NASA_TOUHY00000001– NASA_TOUHY00001213

6. NAVY_TOUHY00000001– NAVY_TOUHY00000365

**STIPULATION RE: AUTHENTICITY OF DOCUMENTS PRODUCED BY THE GOVERNMENT PURSUANT TO *TOUHY* REQUESTS**

1

DATED:  November 19, 2021

2

/s/ Tammy A. Tsoumas
3
Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
4
Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
5
KIRKLAND & ELLIS LLP
2049 Century Park East
6
Los Angeles, CA 90067
Telephone:     (310) 552-4200
7
Facsimile:     (310) 552-5900

8
Ashley Neglia (SBN 298924)
ashley.neglia@kirkland.com
9
KIRKLAND & ELLIS LLP
555 S. Flower Street, Suite 3700
10
Los Angeles, CA 90071
Telephone:     (213) 680-8400
11
Facsimile:     (213) 680-8500

12
Sable Hodson (SBN 313252)
sable.hodson@kirkland.com
13
KIRKLAND & ELLIS LLP
1601 Elm Street
14
Dallas, TX 75201
Telephone:     (214) 972-1770
15
Facsimile:     (214) 972-1771

16
*Attorneys for Defendants Aerojet Rocketdyne
Holdings, Inc. and Aerojet Rocketdyne, Inc.*

/s/   Gregory A. Thyberg as authorized on
November 19, 2021.
Gregory A. Thyberg (SBN 102132)
greg@thyberglaw.com
Thyberglaw
3104 O Street #190
Sacramento, CA 95816
Tel: (916) 204-9173

*Attorney for Relator*

17

18

19

20

21

22

23

24

25

26

27

28

**STIPULATION RE: AUTHENTICITY OF DOCUMENTS PRODUCED BY THE
GOVERNMENT PURSUANT TO *TOUHY* REQUESTS**

# EXHIBIT B

| | |
|---|---|
| **From:** | Gregory Thyberg |
| **To:** | Hodson, Sable |
| **Subject:** | Re: Markus - Demonstratives |
| **Date:** | Tuesday, March 8, 2022 2:23:44 PM |



Thanks then I am fine with the stipulation.


Best Regards,

Gregory A.  Thyberg
THYBERGLAW
3104 "O" Street #190
Sacramento, CA 95816
(916) 204-9173
greg@thyberglaw.com




On Mar 8, 2022, at 2:17 PM, Hodson, Sable <sable.hodson@kirkland.com>
wrote:

Thanks, Greg. By demonstrative exhibits, we intend any attorney-made PowerPoint
slides, attorney-made animations, attorney-made poster boards, or physical objects
(e.g., models) used in opening, closing, or with a witness. It would not include just blow
ups or excerpts from exhibits on the Parties' exhibit lists.

**Sable Hodson**
‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒
**KIRKLAND & ELLIS LLP**
1601 Elm Street, Dallas, TX 75201
**T** +1 214 972 1757
**F** +1 214 972 1771
‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒
sable.hodson@kirkland.com


**From:** Gregory Thyberg <greg@thyberglaw.com>
**Sent:** Tuesday, March 8, 2022 15:20
**To:** Hodson, Sable <sable.hodson@kirkland.com>
**Subject:** Re: Markus - Demonstratives

I know we had this discussion but could you please define what you consider to
be demonstrative exhibits, so we are on the same page.


Best Regards,

Gregory A.  Thyberg

THYBERGLAW
3104 "O" Street #190
Sacramento, CA 95816
(916) 204-9173
greg@thyberglaw.com

<image001.jpg>

On Mar 8, 2022, at 12:59 PM, Hodson, Sable
<sable.hodson@kirkland.com> wrote:

Hi Greg -- Please confirm our agreement when you have a moment so
both sides have for their records.

Thanks,
Sable

**Sable Hodson**
--------------------------------------------------------
**KIRKLAND & ELLIS LLP**
1601 Elm Street, Dallas, TX 75201
T +1 214 972 1757
F +1 214 972 1771
--------------------------------------------------------
sable.hodson@kirkland.com

---

**From:** Hodson, Sable
**Sent:** Thursday, March 3, 2022 9:09
**To:** greg (greg@thyberglaw.com) <greg@thyberglaw.com>
**Cc:** Tsoumas, Tammy A. <ttsoumas@kirkland.com>; Neglia, Ashley
<ashley.neglia@kirkland.com>
**Subject:** Markus - Demonstratives

Hi Greg,

As you saw, we filed the stipulation yesterday. We write to confirm our
agreement that the parties will disclose any demonstrative exhibits it
intends to display to the jury by 5:30 p.m. the calendar day before such
exhibits shall be used. If there are any objections, the parties must meet
and confer about them by 8:00 p.m. (unless otherwise agreed by the
Parties) to attempt to resolve any disputes. Any remaining objections shall
be raised with the Court prior to the jury being seated the next Court day.

Please confirm your agreement.

Best,

Sable

**Sable Hodson**

--------------------------------------------------------

**KIRKLAND & ELLIS LLP**
1601 Elm Street, Dallas, TX 75201
T +1 214 972 1757
**F** +1 214 972 1771

--------------------------------------------------------

sable.hodson@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# EXHIBIT C

1
2
3
4
THYBERGLAW
GREGORY A. THYBERG SBN102132
3104 O STREET. #190
SACRAMENTO, CALIFORNIA 95816
TEL: (916) 204-9173
greg@thyberglaw.com

5
6
ATTORNEYS FOR PLAINTIFF, BRIAN MARKUS

7

8
UNITED STATES DISTRICT COURT

9
FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  UNITED STATES OF AMERICA: | )  Civil Action No. 2:15-cv-2245 WBS-AC |
| 12  *ex rel.* | ) |
| BRIAN MARKUS | ) |
| 13 | )  RELATOR BRIAN MARKUS' EXPERT |
| | )  WITNESS DISCLOSURE PURSUANT |
| 14          Plaintiffs, | )  TO FEDERAL RULE OF CIVIL |
| 15       vs. | )  PROCEDURE 26 (a)(2)(A) |
| | ) |
| 16  AEROJET ROCKETDYNE HOLDINGS, | ) |
| INC., a corporation and AEROJET | ) |
| 17  ROCKETDYNE, INC. a corporation. | ) |
| | ) |
| 18          Defendants | ) |
| 19 | ) |
| | ) |
| 20 | ) |

21

22   Pursuant to Federal Rule of Civil Procedure 26 (a)(2)(A) please be advised that relator

23  intends to call the following non-retained expert witnesses to present evidence at trial

24  pursuant to Federal Rules of Evidence 702, 703 or 705.

25

26   1.  Brian Markus

27   2.  Jose Ruiz

28

3.  Jens Laundrup

4.  David Chamberlain

5.  David Sockol

6.  Julie Van Kleeck

Witnesses Brian Markus, Jose Ruiz, Jens Laundrup, David Chamberlain and David Sockol will testify regarding Aerojet Rocketdyne's ("AR") compliance with the NIST SP 800-53 and NIST SP 800-171 cybersecurity controls required by NASA FARS Clause 1852.204-76 and DFARS Clause 252.204-7012. These witnesses are expected to offer opinions that AR during the time they worked with AR was not compliant with these cybersecurity controls and was not providing adequate security to protect sensitive information belonging to the federal government stored on AR's computer from unauthorized disclosure. These witnesses are also expected to testify that AR's computer network was unable to detect cyber intrusions or prevent the exfiltration of sensitive data. These witnesses' opinions will be based on their personal observations and all of the documents produced by AR in this case or pursuant to subpoenas in this action including the records subpoenaed from Emagined Security, Inc, Grant Thornton, CGI, and Ernst & Young.

Julie Van Kleeck was employed by AR as engineer who worked in the development of rockets and missiles. Ms. Van Kleeck will be called as a witness to confirm her deposition testimony based on her personal knowledge that AR stored designs for rockets and intercontinental ballistic missiles on its computer network and her opinion that the engineering documents stored on AR's computer network could

assist a foreign country in developing an intercontinental ballistic missile that could carry a nuclear warhead.


DATED:  September 14, 2021                THYBERGLAW


                                          */s/ Gregory A. Thyberg*
                                          GREGORY A. THYBERG
                                          Attorneys for Relator
                                          BRIAN MARKUS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF SERVICE
BY MAIL and EMAIL

       I, Gregory A. Thyberg declare:  I am a citizen of the United States and a resident of Sacramento County, State of California; I am over the age of eighteen years and not a party to the within action; my business address is 3104 "O" Street #190, Sacramento, CA 95816.  On September 14, 2021, I served the following:

RELATOR BRIAN MARKUS' EXPERT WITNESS DISCLOSURE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26 (a)(2)(A)

on the interested parties by placing a true copy of same enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Sacramento, California addressed in the manner set forth below. I emailed the same to the email addresses listed below.

Mark Holscher
Tammy Tsoumas
Ashley Neglia
Sable Hodson
Kirkland & Ellis LLP
2049 Century Park East
Los Angeles, CA 90067

mholscher@kirkland.com
ttsoumas@kirkland.com
ashley.neglia@kirkland.com
sable.hodson@kirkland.com

       I declare under penalty of perjury that the foregoing is true and correct, dated at Sacramento, California on September 14, 2021.

                             */s/ Gregory A. Thyberg*
                             Gregory A. Thyberg

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28